# EXHIBIT B: Combined Complaint and Proposed Answer

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| VOTEAMERICA; VOTER PARTICIPATION CENTER; and CENTER FOR VOTER INFORMATION, <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia; REBECCA SULLIVAN, in her official capacity as Vice Chair of the STATE ELECTION BOARD; DAVID WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as members of the STATE ELECTION BOARD, <br><br> Defendants. | Civil Action No. <br> _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs VoteAmerica, Voter Participation Center, and Center for Voter Information ("Plaintiffs") file this Complaint for Declaratory and Injunctive Relief against Defendants Brad Raffensperger, in his official capacity as the Georgia Secretary of State; Rebecca Sullivan, in her official capacity as Vice Chair of the

State Election Board; and David Worley, Matthew Mashburn, and Anh Le, in their official capacities as members of the State Election Board (collectively "Defendants"), and allege the following:

## INTRODUCTION

1.    In the most recent election cycle, Georgia voters turned out in record numbers, casting more than 5 million votes in the 2020 general election and nearly 4.5 million in the 2021 runoff elections, both representing record-breaking levels of voter turnout.

**Proposed Answer: Turnout data speak for themselves.**

2.    Georgians' extraordinary levels of voter engagement in the 2020 and 2021 elections are remarkable because those elections occurred during the height of the COVID-19 pandemic, which disrupted daily operations and exacerbated burdens in all aspects of life, including civic participation in elections.

**PA: Intervenors admit that Georgia held elections during the COVID-19 pandemic. Intervenors otherwise lack sufficient information to admit or deny these allegations.**

3.    Due in part to the dangers posed by COVID-19, more Georgians voted absentee in 2020 and 2021 than ever before. In the 2020 general election, Georgia voters cast 1,320,154 absentee ballots, and in the 2021 runoff elections, Georgia

voters cast 1,070,596 absentee ballots. Both numbers broke all-time absentee voting records for general and runoff elections.

**PA: Voting data speak for themselves.**

4.      Georgia's 2020 and 2021 elections were also conducted safely and securely. Georgia Secretary of State Brad Raffensperger affirmed that the election was "secure, reliable and efficient," and after a statewide audit, concluded that there was no evidence that raised doubts about the outcome of the 2020 General Election. Governor Brian Kemp, Lieutenant Governor Geoff Duncan, and Georgia Voting Systems Manager Gabriel Sterling all repeatedly assured Georgian voters that the validity of the 2020 and 2021 elections were not in question and that their votes were accurately counted.

**PA: The referenced quotes speak for themselves.**

5.      After the 2020 General Election took place, several candidates for office, political parties, and other individuals filed numerous lawsuits seeking to challenge the validity of Georgia's election results. None of those lawsuits prevailed, and not a single court found evidence that the election results in Georgia were tainted by fraud or misconduct.

**PA: Lawsuits and court rulings speak for themselves.**

3

6.     Rather than celebrating Georgians' record-breaking turnout and success in conducting two secure elections in a span of two months, the Georgia General Assembly instead enacted Senate Bill 202 ("SB 202") through a secretive and extremely accelerated legislative process, with little to no opportunity for public input or review.

**PA: Intervenors admit that Georgia enacted SB 202. The legislative process speaks for itself.**

7.     SB 202 is an omnibus elections law that radically transforms Georgia's election systems in several ways that increase burdens on voters and others engaged in the political process.

**PA: SB 202 speaks for itself.**

8.     Among the many flawed provisions of SB 202 are several restrictions and prohibitions on the distribution of absentee ballot applications by third-party organizations. Those restrictions include: (1) a prohibition on prefilling absentee ballot applications, even where voters provide that information themselves, (2) a misleading disclaimer that is required to be attached to any absentee ballot application distributed by a non-governmental entity, and (3) an affirmative requirement to monitor an ever-changing list from the Secretary of State to avoid sending duplicate application forms to voters who have already requested, received,

or cast an absentee ballot (together, "Ballot Application Restrictions"). SB 202 also imposes a $100 penalty *per duplicate application* sent to a voter who has already requested, received, or cast an absentee ballot.

**PA: SB 202 speaks for itself.**

9.    These new requirements are not only costly and burdensome on nonprofit organizations who work to encourage political participation and facilitate access to absentee voting for Georgians—in some cases they are impossible to comply with or would present such prohibitively expensive financial burdens that some groups, like Plaintiffs VoteAmerica, Voter Participation Center, and Center for Voter Information, may have no choice but to cease their operations in Georgia altogether.

**PA: Denied.**

10.    Nonprofit organizations like Plaintiffs VoteAmerica, Voter Participation Center, and Center for Voter Information have a First Amendment right to engage in political speech and expression by encouraging eligible Georgians to vote absentee and providing them with the information and resources to do so. SB 202 unnecessarily and severely burdens that right by stifling Plaintiffs' protected political speech, compelling them to engage in misleading and confusing speech mandated by the Government, and limiting their right to freely associate with others.

**PA: These legal arguments require no response.**

11.    Moreover, the Ballot Application Restrictions are unconstitutionally vague and overbroad, such that they violate Plaintiffs' First Amendment and Due Process Rights.

**PA: This legal argument requires no response.**

12.    Voting is paramount in our Constitutional system because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). And voter engagement speech is "core political speech," for which the protections of the First Amendment are at their highest. *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Nonprofit organizations like Plaintiffs, whose missions focus on expanding electoral participation and voter turnout through, *inter alia*, the distribution of absentee ballot applications, are an essential piece of our civic society. SB 202 unduly restricts Plaintiffs' ability to engage with Georgia voters with no countervailing justification for the restrictions.

**PA: These legal arguments require no response.**

13.    The challenged provisions of SB 202 violate the Constitution of the United States. They must be declared unconstitutional and their enforcement must be enjoined.

**PA: Denied.**

## JURISDICTION AND VENUE

14.     This action is brought under the United States Constitution. The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

**PA: These legal arguments require no response.**

15.     This Court has personal jurisdiction over each Defendant in their official capacity because each is a citizen of Georgia and their principal places of business are in the Atlanta Division of the United States District Court for the Northern District of Georgia.

**PA: These legal arguments require no response.**

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendants in their official capacities reside in this District and all Defendants reside in Georgia, and because a substantial portion of the events giving rise to these claims occurred in the Northern District of Georgia.

**PA: These legal arguments require no response.**

## PARTIES

### *Plaintiffs*

17.    Plaintiff VoteAmerica is a 501(c)(3) nonprofit organization founded by a small team of elections and technology experts (including the founders of Vote.org and Vote.gov). VoteAmerica's core mission is to persuade and assist all eligible American voters to engage in the electoral process. It does so by providing access to trusted election information, open platform technology, and education programs to support and empower the most vulnerable voters to navigate the path to exercising their vote.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

18.    A key component of Plaintiff VoteAmerica's civic engagement activity and speech is providing voters with information and resources to facilitate their applications for absentee ballots. The VoteAmerica website provides extensive guides and tools for voter registration, absentee or mail voting, and voting in person in each state. VoteAmerica's resource for absentee or mail voting in Georgia consists of a guide to absentee voting rules, including deadlines, identification requirements, and other instructions, as well as links to relevant election offices and other election resources.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

19.    VoteAmerica's first and primary resource for absentee voting in Georgia is an interactive Absentee and Mail Ballot tool that allows electors to provide their name, address, date of birth, email, and phone number to prepare an official absentee ballot application form with their provided information while also signing up for further voter engagement communications from VoteAmerica. After users complete their absentee ballot application using VoteAmerica's web tool, the partially prefilled (with information provided by the voter) absentee ballot application is sent to the voter to submit to their local election official, and the voter receives follow-up communications from VoteAmerica to provide them with information regarding that election and future elections. This Absentee and Mail Ballot tool is available to potential voters not only on VoteAmerica but also on partner websites that utilize VoteAmerica's tool, which it makes freely available. VoteAmerica staffs this tool with at least three researchers at all times to keep the information provided on the tool up-to-date.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

20.     VoteAmerica seeks to reach the largest number of potential voters with its voter engagement message by pairing the tools and resources on its website with many other modes of speech, including peer-to-peer texting, campus engagement, billboards, digital ad campaigns, and other modes of communication to assist voters in all elements of the voting process. These communications guide voters to VoteAmerica's available online tools and resources. VoteAmerica also shares graphics, messaging, and other communications products with partners to amplify its message further.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

21.     VoteAmerica provides resources and communications to millions of voters in all fifty states, including Georgia. More than forty-eight thousand Georgia voters engaged with VoteAmerica's Absentee and Mail Voting tool during Georgia's most recent elections, including 46,732 voters during the November 2020 general election and 1,913 Georgia voters during the January 2021 Runoff Election. Additionally, more than 143,198 Georgia voters presently receive VoteAmerica's educational emails and reminder text messages. Further, VoteAmerica anticipates future growth in the number of Georgia voters who use its resources and plans to

continue to send educational messages, assistance, and reminders about voting, including in upcoming local and state elections in 2021.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

22.   In light of SB 202's restrictions on absentee ballot application distribution, VoteAmerica's model for communicating, associating, and engaging with Georgia voters will be upended. First, VoteAmerica will be required to append a confusing, misleading, and dissuading disclaimer to all Georgia applications it distributes. This will require VoteAmerica to expend and divert resources towards designing an application and ensuring that the application complies with SB 202's various requirements. Additionally, VoteAmerica will be required to divert resources from other programs and initiatives to implement a costly mechanism to comply with SB 202's restrictions on who can receive an application from VoteAmerica and when. VoteAmerica will be reliant on what data becomes "available" from the Secretary of State and when. With respect to all of these elements, VoteAmerica will be forced to navigate vague and overbroad restrictions, some of which may prove wholly impossible to comply with in practice.

**PA: Intervenors lack sufficient information to admit or deny these allegations, but deny that SB 202 will require VoteAmerica to divert resources *away* from its mission.**

23.    To comply with SB 202, VoteAmerica would have to divert a significant portion of its limited programmatic and financial resources and spend hundreds of hours of staff time to develop a new matching algorithm to cross-reference each voter who engages with the Absentee and Mail Voting tool against the list provided by the Secretary of State. Developing this new tool would be necessary to attempt to mitigate the harmful impact of SB 202. To avoid the threat of civil sanctions or other penalties for potential mistakes, the algorithm would have to flag every voter who attempted to engage with the tool before the voter could submit an absentee ballot application request to VoteAmerica's system. Assuming VoteAmerica is able to develop such a system, VoteAmerica would then have to rely on the accuracy of the Secretary of State's list. VoteAmerica would then be forced to constantly update the data set upon which its algorithm would rely to ensure that it is using the most up-to-date information from the Secretary of State to verify that no voters who have already applied for an absentee ballot use their service to complete and submit an additional absentee ballot application. No technology can guarantee the accuracy of the Secretary of State's list, especially if the list is not

updated with any specific frequency. Furthermore, no technology would allow VoteAmerica to check if a voter has already submitted an absentee ballot application after that voter has already been sent an absentee ballot application via its Absentee and Mail Voting tool. When the Secretary of State's list is inaccurate or stale, voters will inadvertently submit a duplicate absentee ballot application using VoteAmerica's tool. Even if VoteAmerica expends significant resources to try and avoid this problem, through no fault of its own it will likely incur financial sanctions and risk more significant penalties due to inadvertent duplicate applications.

**PA: Intervenors lack sufficient information to admit or deny these allegations, but deny that SB 202 will require VoteAmerica to divert resources *away* from its mission.**

24.    The risk of a voter slipping through the cracks is prohibitively expensive. VoteAmerica predicts that the cost of assuming fines for each duplicate application could bankrupt the organization. VoteAmerica spends approximately thirty-three cents per voter through its Absentee and Mail Voting tool. That cost would increase by $100 per penalty for each duplicate absentee ballot application, a potential increase of more than 30,000 percent per application.

**PA: Intervenors lack sufficient information to admit or deny these allegations, but deny that SB 202 will require VoteAmerica to divert resources *away* from its mission.**

25.     Based on its assessment of the costs associated with complying with SB 202's requirements and the necessary risks of incurring penalties for inadvertent distribution of duplicate applications, VoteAmerica estimates that complying with SB 202 would effectively preclude VoteAmerica from fulfilling its mission and encouraging and supporting Georgia voters.

**PA: Intervenors lack sufficient information to admit or deny these allegations, but deny that SB 202 will require VoteAmerica to divert resources *away* from its mission.**

26.     Plaintiff Voter Participation Center ("VPC") is a 501(c)(3) nonprofit, nonpartisan organization founded in 2003. VPC's mission is to provide voter registration, early voting, vote by mail, and get out the vote ("GOTV") resources and information to traditionally underserved groups, including young voters, voters of color, and unmarried women.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

27.     Plaintiff Center for Voter Information ("CVI") is a 501(c)(4) nonprofit, nonpartisan organization and a partner organization to VPC. CVI's mission is to provide education and resources to eligible voters and encourage them to participate in democracy through means such as registering to vote, submitting absentee ballot applications, and voting.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

28.     VPC and CVI focus their efforts on communicating with and encouraging their potential voters to increase their engagement with the political process and assist them in doing so. VPC and CVI have designed and implemented direct mail programs to send mass mailers to their target demographics with resources for eligible voters to submit voter registration applications and absentee ballot applications. In 2020 alone, through their direct mail programs and other voter engagement activities, VPC and CVI sent approximately 83,005,908 vote-by-mail applications across the country, including 9,605,979 in Georgia. In 2018, VPC and CVI distributed 12,868,108 absentee ballot applications nationally, including 654,824 in Georgia.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

29.    One of VPC's primary activities is to associate with traditionally underserved voters and communicate to them the information and resources necessary to submit absentee ballot applications.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

30.    Likewise, CVI's primary activity is to associate with its targeted voters and communicate resources and assistance for them to submit absentee ballot applications.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

31.    Both VPC and CVI include a cover letter with every absentee ballot application that explains the organization's mission, contains the instructions for submitting an absentee ballot application to the voter's local election official, and communicates a persuasive message and encouragement for the voter to request and cast an absentee ballot. VPC and CVI's mailers already disclose information identifying themselves as the sender and reminding recipients that they need not submit a new application if they have already requested or received an absentee ballot.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

32.     In Georgia, VPC and CVI undertake these activities by first obtaining access to statewide voter registration files for the State of Georgia. VPC and CVI then send voters targeted mailers that include a cover letter, postage-paid envelope addressed to the voter's county election office, and an absentee ballot application obtained directly from the Georgia Secretary of State, which VPC and CVI typically prefill with some of the voter's information from their registration records. VPC and CVI sent 654,824 and 9,605,979 applications to Georgia voters during the 2018 and 2020 elections, respectively. These voter engagement efforts are remarkably successful. An estimated 30,119 Georgia voters submitted an absentee ballot application provided by VPC or CVI to their state or local election official in the 2018 election, and an estimated 576,487 voters did so for the 2020 general election. An additional 88,563 Georgia voters submitted an absentee ballot application provided by VPC or CVI for the 2021 runoff elections.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

33. VPC and CVI regularly work with state election officials in Georgia to ensure the accuracy of their direct mail programs before they distribute registration forms or absentee ballot applications to Georgia voters.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

34. Specifically, VPC and CVI coordinate with state election officials to review their direct mail materials and ensure that their absentee ballot applications and other information are current.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

35. VPC and CVI also periodically request updated voter records from state election officials to proactively remove voters from their mailing lists who have already requested or submitted an absentee ballot application.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

36. VPC and CVI regularly communicate with state elections officials in Georgia to ensure that their activities are consistent with Georgia law. To this end, neither VPC nor CVI have ever received a formal complaint about their activities in Georgia.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

37.    To execute their direct mail programs, VPC and CVI pay for a professional printer to produce and send several mailers to their targeted eligible voters over the course of an election cycle. Because VPC and CVI's operations are nationwide in scope, they submit millions of printing requests at a time for mailers intended to be sent to potential voters in multiple states, including in Georgia. This ordering, printing, and sending process for mailers takes at least four weeks per mailing cycle, with up to one million individual mailers printed per day.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

38.    VPC and CVI estimate that each individual mailer—which includes the cover letter, pre-stamped and pre-addressed envelope, and prefilled absentee ballot application—costs thirty-nine cents per mailer to produce.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

39.    SB 202's absentee ballot application distribution restrictions would effectively shut down VPC and CVI's current absentee ballot application direct mail programs in the state of Georgia.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

40.    Given the timelines for printing and mailing ballots and the scale at which VPC and CVI operate, it is impossible for VPC and CVI to comply with the absentee ballot application distribution restrictions in SB 202 without completely derailing their voter communication and engagement activities concerning absentee voting.

**PA: Intervenors lack sufficient information to admit or deny these allegations, but deny that SB 202 will require Plaintiffs to divert resources *away* from their missions.**

41.    SB 202's prohibition on engaging with potential voters by prefilling any of the absentee ballot application will also substantially alter both the method by which VPC and CVI communicate with Georgia voters and the content of that communication. Based on their past experience and internal research, VPC and CVI have concluded that voters are more likely to submit an application that is already partially prefilled with their information. If VPC and CVI are required to send blank applications, that would drastically reduce the efficacy of their direct mail program and their ability to further their pro-voting engagement message.

**PA: Intervenors lack sufficient information to admit or deny these allegations, but deny that SB 202 will require Plaintiffs to divert resources *away* from their missions.**

42.     VPC and CVI's objectives and intentions are to continue to engage and communicate with Georgia voters through their direct mail programs, but the costs of committing an inadvertent but essentially inevitable mistake while distributing absentee ballot applications could make the undertaking prohibitively expensive. Because VPC and CVI mail millions of mailers to voters every election cycle, SB 202's $100 penalty per duplicate application would significantly increase the cost of their respective direct mail programs. Compared to the present thirty-nine cent cost to produce each mailer and communicate with potential voters, the potential $100 penalty associated with sending a duplicate mailer would represent a 25,000 percent cost increase per mailer.

**PA: Intervenors lack sufficient information to admit or deny these allegations, but deny that SB 202 will require Plaintiffs to divert resources *away* from their missions.**

43.     If SB 202 is not enjoined, VPC and CVI will likely have to stop their absentee ballot application direct mail program for the State of Georgia entirely.

**PA: Intervenors lack sufficient information to admit or deny these allegations, but deny that SB 202 will require Plaintiffs to divert resources *away* from their missions.**

### *Defendants*

44.    Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia and is sued in his official capacity. As the chief elections official of the State, he is responsible for overseeing and administering Georgia's election laws and regulations. *See* O.C.G.A. §§ 21-2-210, 21-2-50, 45-13-20; *see also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005). Defendant Raffensperger also issues guidance to Georgia's county election officials on a range of elections procedures and requirements. SB 202 assigns Defendant Raffensperger authority as Secretary of State to implement aspects of Georgia's absentee ballot application system. *See* SB 202, Section 25 (to be codified as O.C.G.A. § 21-2-381).

**PA: The first sentence is admitted. The other allegations are legal arguments that require no response.**

45.    Defendant REBECCA N. SULLIVAN is Vice Chair of the State Election Board of Georgia. Defendants DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE are members of the State Election Board of Georgia. Defendants Sullivan, Worley, Mashburn, and Le are sued in their official capacities.

As Vice Chair and as members of the State Election Board, Defendants Sullivan, Worley, Mashburn, and Le are responsible for, *inter alia*, "promulgat[ing] rules and regulations so as to obtain . . . the legality and purity in all primaries and elections" and "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections[.]" O.C.G.A. § 21-2-31(1), (2). They are further responsible for "investigat[ing], or authoriz[ing] the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution." *Id.* at § 21-2-31(5). They are authorized to "employ such assistants as may be necessary" to conduct their responsibilities and to "take such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* at §§ 21-2-31(8), (10).

**PA: The first three sentences are admitted. The other allegations are legal arguments that require no response.**

46.    SB 202 specifically authorizes Defendants Sullivan, Worley, Mashburn, and Le, as members of the State Elections Board, to impose financial

sanctions on Plaintiffs for violations of the challenged provision of SB 202 which restricts the sending of absentee ballot applications to those Georgians who may have already requested, received, or voted an absentee ballot. Section 25 (to be codified at O.C.G.A. § 21-2-381(a)(3)(B)). Likewise, SB 202 specifically authorizes Defendants Sullivan, Worley, Mashburn, and Le, as members of the State Elections Board, to "promulgate reasonable rules and regulations for the implementation of" the remaining challenged provisions. *Id.* (to be codified at O.C.G.A. § 21-2-381(e)).

**PA: SB 202 speaks for itself.**

## FACTS

### *Legal Background*

47.    Any eligible voter in Georgia may vote by absentee ballot. O.C.G.A. § 21-2-380(b). To vote by absentee ballot, an eligible voter must submit an absentee ballot application to the board of registrars or absentee ballot clerk in their county no earlier than seventy-eight days prior to an election and no later than eleven days before an election. SB 202, Section 25 (to be codified at O.C.G.A. § 21-2-381(a)(1)(A)). This is a shorter timeframe for absentee ballot applications than under prior Georgia law, which previously allowed applications anytime in the 180 days before an election. *Id.*

**PA: Georgia law speaks for itself.**

48.     Officials at the state and local level participate in administering absentee voting. The Secretary of State coordinates absentee voting statewide by promulgating rules to establish uniform procedures and prescribe standard forms for printed materials including applications, ballots, ballot envelopes, return envelopes, and instructions to voters. *See* O.C.G.A §§ 21-2-383, 21-2-384(b); *see also* SB 202, Section 25 (to be codified at O.C.G.A 21-2-381(a)(1)(C)(ii)). Superintendents, registrars, and absentee ballot clerks administer absentee voting locally by, *inter alia*, printing the necessary materials, accepting and processing absentee ballot applications, providing ballots to eligible voters, receiving voted ballots, and ultimately accepting or rejecting voted ballots. *See* O.C.G.A §§ 21-2-381, 21-2-383, 21-2-384.

**PA: Georgia law speaks for itself.**

49.     The official absentee ballot application form promulgated by the Secretary of State of Georgia—the distribution of which is at the crux of this lawsuit—is publicly available online on the Secretary of State's website, on county election offices' websites, and on third-party websites.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

***The 2020 and 2021 Elections***

50.    Georgia held two statewide election days in 2020. Primary elections for offices including U.S. Senate, U.S. House of Representatives, Georgia Senate, and Georgia House of Representatives, among others, were held on June 9, with early voting from May 18 to June 5. The general Presidential election was held on November 3, with early voting from October 12 to October 30. Georgia also held statewide runoff elections for U.S. Senate and Georgia Public Service Commission in 2021 on January 5.

**PA: Election dates speak for themselves.**

51.    The 2020 and 2021 elections saw record turnout among Georgians of all political persuasions and, given the pandemic circumstances under which they were held, also experienced a steep increase in the use of absentee voting.

**PA: Voting data speak for themselves.**

52.    More than 5 million Georgians voted in the November 2020 election (compared to 4.1 million votes in November 2016) and nearly 4.5 million Georgians voted in the January 2021 runoff elections thereafter.

**PA: Voting data speak for themselves.**

53.    In November 2020, 1,320,154 Georgians voted absentee compared to 181,135 Georgians in November 2016. In the January 2021 runoff election, 1,070,596 absentee ballots were cast, accepted, and counted.

**PA: Voting data speak for themselves.**

54.     In the aftermath of the November 2020 Presidential Election, there were untold numbers of baseless accusations of election malfeasance in an attempt to undermine the results of the election in Georgia.

**PA: Because Plaintiffs cite nothing and offer no explanation, Intervenors lack sufficient information to admit or deny this allegation.**

55.     However, the integrity of the results of Georgia's 2020 and 2021 elections cannot be doubted. The results of the November 2020 election underwent numerous risk-limiting audits and ballot-by-ballot hand counts, all of which confirmed the results and integrity of the election and disproved baseless accusations of irregularities. Despite a searching inquiry and substantial litigation, no evidence of voter fraud was uncovered. Indeed, a signature match audit in Cobb County found "no fraudulent absentee ballots" whatsoever, with a 99% confidence threshold.

**PA: Audit results speak for themselves. Because Plaintiffs cite nothing and offer no explanation, Intervenors lack sufficient information to admit or deny these allegations.**

### *Legislative History*

56.     The success and historic turnout of the 2020 and 2021 Georgia elections are due in large part to a concerted effort by a broad coalition of Georgians,

community organizations, churches, civic participation groups, and others to encourage eligible voters to overcome existing barriers to political participation, educate voters on how to vote safely by mail, and assist voters in navigating the electoral process. Plaintiffs were part of this concerted and successful campaign to communicate with Georgia voters and provide them with the resources they needed to participate in the election.

**PA: Intervenors lack sufficient information to admit or deny these allegations.**

57. It is against this backdrop of enhanced voter engagement across the State, increased voter turnout, and increased utilization of absentee ballots that Georgia enacted SB 202.

**PA: Intervenors admit that SB 202 was enacted. Intervenors lack sufficient information to admit or deny the other allegations.**

58. The increased participation and widespread agreement that Georgia's election ran safely and efficiently did not spark the pride in the democratic process that one might expect of our elected leaders. Rather, politicians and legislators repeatedly indicated or openly announced that the motivation behind their renewed efforts to change Georgia's voting laws in the aftermath of the 2020 and 2021

elections was not to improve electoral administration but to suppress turnout and bolster the political advantage of the party in power.

**PA: The referenced indications, feelings, and announcement speak for themselves.**

59.     For example, the Chair of the Gwinnett County Elections Board stated: "They don't have to change all [the voting laws], but they've got to change the major parts of them so that we [Republicans] at least have a shot at winning." Georgia House Speaker David Ralston opposed providing every voter with an absentee ballot because it would "certainly drive up turnout." And Representative Barry Fleming, Chair of the House Special Committee on Election Integrity, penned an inflammatory op-ed that baselessly attacked absentee voting and likened it to being in the "shady part of town" where the "chance of being shanghaied is significant." Defendant Raffensperger's office recognized legislators' misguided efforts in February, stating: "At the end of the day many of these bills are reactionary to a three-month disinformation campaign that could have been prevented."

**PA: Quotes speak for themselves.**

60.     The process by which SB 202 was enacted further demonstrates the Legislature's failure to engage in a good faith process designed to improve election administration. SB 202's final text was passed in a harried fashion marred by a lack

of transparency and no time for testimony and deliberation. The secretive and rushed passage of the bill gave no consideration to the damaging consequences of the constantly changing legislative text of SB 202 and its various companion bills that were ultimately consolidated into SB 202. Various versions of bills nearing one-hundred pages—many of whose provisions were included in SB 202—were released within hours of the legislative hearing, leaving the community and affected parties with little to no time to analyze the text. Indeed, even Defendant Raffensperger's Bipartisan Task Force issued a statement on March 8, 2021 warning that it was "concerned that the legislative process [was] proceeding at a pace that [did] not allow for full examination of all factors that must be considered."

**PA: The legislative process speaks for itself. Otherwise denied.**

61.    The final passage of SB 202 was no different than the process that preceded it. The substitute text of SB 202 was released on March 25, 2021. It was passed by the House and Senate and signed by the Governor in a closed door ceremony all on the same day. The result, as borne out by the challenged provisions discussed herein as well as many others, is not only voter suppression but also a dysfunctional, purely partisan legislative process.

**PA: The legislative process speaks for itself. Otherwise denied.**

### *Challenged Provisions*

62.     SB 202 is a sprawling 98-page omnibus law altering numerous Georgia election procedures—from access to water while waiting in line to vote, to hours for early voting, to the authority of local election officials to run their own elections. Many provisions of SB 202 have already been challenged for their disparate impact on minority communities, substantial and unnecessary burdens on the right of all Georgians to vote, and intentional discriminatory motivation.

**PA: These legal arguments require no response. Intervenors admit that this is the fifth federal case challenging SB 202.**

63.     Plaintiffs challenge the Ballot Application Restrictions: three discrete provisions of SB 202, all of which target Plaintiffs' core political speech and freedom of association by restricting their ability to encourage and assist Georgia voters to participate in elections by mail. Each of these provisions limit Plaintiffs' ability to speak and associate by distributing and assisting Georgia voters with absentee ballot applications.

**PA: Intervenors admit that Plaintiffs challenge three provisions of SB 202. The other allegations are legal arguments that require no response.**

64.     ***The Disclaimer Provision***. SB 202 requires Plaintiffs, and all similar persons or organizations that wish to "send" absentee ballot applications to "any elector" to not only utilize the Secretary of State's absentee ballot application form

but also include a confusing and misleading disclaimer on that form. Thus, Plaintiffs must modify the Secretary of State's official form to "clearly and prominently disclose on the face of the form" the following language:

> This is NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot. It is being distributed by [insert name and address of person, organization, or other entity distributing such document or material].

Section 25 (to be codified at O.C.G.A. § 21-2-381(a)(1)(C)(ii)).

**PA: SB 202 speaks for itself.**

65.    SB 202 further requires the disclaimer be "(I) Of sufficient font size to be clearly readable by the recipient of the communication; (II) Be contained in a printed box set apart from the other contents of the communication; and (III) Be printed with a reasonable degree of color contrast between the background and the printed disclaimer." *Id.* (to be codified at O.C.G.A. § 21-2-381(a)(1)(C)(iii)). SB 202 fails to sufficiently explain these ambiguous requirements, providing no definition for "sufficient font size" or "reasonable degree of color contrast." *Id.* The requirements regarding the appearance of the disclaimer are vague and leave Plaintiffs to guess whether their disclaimer is compliant or violates the law, subjecting them to the risk of sanctions or other penalties.

**PA: SB 202 speaks for itself. The other allegations are legal arguments that require no response.**

66.     This disclaimer is inherently misleading and will be confusing to voters. SB 202 in one breath requires Plaintiffs to use an official government form to assist voters in applying to vote absentee—a requirement Plaintiffs do not challenge—and in another requires Plaintiffs to tell voters that this official form is, in fact, not official. Indeed, the current application for an absentee ballot—which Plaintiffs must use for this purpose—includes the official seal of the Secretary of State and is titled "Application for *Official* Absentee Ballot." *See* Exhibit 1 (emphasis added).



And yet, Plaintiffs would be required to add a "clear[] and prominent" disclaimer contradicting this message on the very same page, stating that the document is, despite all appearances, "NOT an official government publication." Likewise, it requires Plaintiffs to indicate that the form is "NOT provided by any governmental entity," despite it being a government-prescribed form that is created, maintained, and published by the Secretary of State.

**PA: SB 202 and the current application speak for themselves. The other allegations are legal arguments that require no response.**

67.     Thus, SB 202 not only compels Plaintiffs to communicate a government-mandated message, but it requires them to do so in a misleading and incoherent manner. This disclaimer appears to have been designed to, and will have the effect of, dissuading voters from using absentee ballot application forms distributed by Plaintiffs. This contradictory and misleading disclaimer will lead voters to believe the form is illegitimate, undermine Plaintiffs' speech, and only serve to confuse voters rather than assist them. The compelled inaccurate speech disclaimer will impair the truthful message Plaintiffs seek to send to potential voters—*i.e.* you can vote absentee and can do so by using *this* appropriate official form we are providing you—and reduce the effectiveness of their speech, alter the content of their voter engagement messages, and impede their ability to associate with voters.

**PA: These legal arguments require no response.**

68.     The disclaimer will also likely create confusion for local election officials processing absentee ballot applications. Plaintiffs' variable alterations of the Secretary of State's form to comply with this provision will create disuniformity and will likely lead to improper rejections of absentee ballot applications.

**PA: These legal arguments require no response.**

69.     The Disclaimer Provision also lacks any reasonable limits on its application. The disclaimer must appear on "*[a]ny* application for an absentee ballot sent to *any* elector by *any* person or entity." By its text, the Disclaimer Provision would apply even to the Secretary of State and other local election officials who are charged with creating and distributing this official form. But putting aside that absurdity, it applies regardless of whether the application is solicited or unsolicited by the elector and whether the person or entity is sending one application to one elector or one thousand applications to one thousand electors. It would apply to one neighbor sending an application to another upon their request.

**PA: SB 202 speaks for itself. The other allegations are legal arguments that require no response.**

70.     And because SB 202 fails to define "send," it leaves Plaintiffs to guess whether the Disclaimer Provision applies not only to postal mail but also email, fax, social media, any other electronic communications, or even in-person distribution. It is unclear whether it applies to the posting of the absentee ballot application on Plaintiffs' websites or social media accounts. Such vagueness only compounds the First Amendment harms imposed by this confusing and intentionally dissuading government-mandated speech.

**PA: These legal arguments require no response.**

71.    The State has no compelling interest, or even rational basis, for requiring such a confusing, misleading, and voter-dissuading disclaimer on its official absentee ballot application form.

**PA: These legal arguments require no response.**

72.    There is no evidence that this disclaimer is addressing any real or meaningful problem of voter confusion arising from the distribution of absentee ballot applications.

**PA: These legal arguments require no response.**

73.    In any event, the SB 202 disclaimer is not meaningfully, and certainly not narrowly, tailored to address any such confusion. "If [Georgia] is concerned that the public is insufficiently informed or misinformed, then 'more benign and narrowly tailored options are available' than compelled speech. For example, the state could 'communicate the desired information to the public' itself through a public awareness campaign. If the [Georgia Secretary] of State is concerned that the public is confused about its role in [facilitating absentee voting], it is free to communicate with the public of its own accord." *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 730 (M.D. Tenn. 2019) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 800 (1988)).

**PA: These legal arguments require no response.**

74.     ***The Prefilling Prohibition.*** In addition to requiring Plaintiffs to place a misleading and dissuading disclaimer on all their voter engagement communications that include an absentee ballot application, SB 202 prohibits Plaintiffs from sending any absentee ballot applications that are "prefilled" with the elector's required information. Section 25 (to be codified at O.C.G.A. § 21-2-381(a)(1)(C)(ii)).

**PA: SB 202 speaks for itself. The other allegations are legal arguments that require no response.**

75.     This prohibition directly restricts the content of the communications Plaintiffs can send to electors; interferes with Plaintiffs' models for associating with, engaging with, and assisting voters; and reduces the effectiveness of Plaintiffs' speech and expressive conduct.

**PA: These legal arguments require no response.**

76.     This prohibition applies broadly, including where the application is solicited by the voter and where the voter provides the sender with the required information. It applies regardless of whether the sender is sending individualized applications in response to direct requests or mass applications on an unsolicited basis.

**PA: These legal arguments require no response.**

77.     The only exception to this rule is extraordinarily narrow: relatives authorized to request an absentee ballot for an elector and persons "signing as assisting an illiterate or physically disabled elector." This exception would do nothing to alleviate the burden, for example, on a disabled voter seeking to use the services of Plaintiff VoteAmerica to receive an absentee ballot application—containing information that the voter themselves provided—that they could then simply sign and return to their local election office.

**PA: These legal arguments require no response.**

78.     Like the Disclaimer Provision, the Prefilling Prohibition fails to define "send," leaving Plaintiffs to guess whether the Prefilling Prohibition applies not only to postal mail but also email, fax, social media, any other electronic communications, or even in-person distribution.

**PA: These legal arguments require no response.**

79.     Furthermore, the Prefilling Prohibition bars the sending of any application "prefilled with *the elector's* required information" as set forth in SB 202. This vague language leaves Plaintiffs to guess whether prefilling is only prohibited if it includes *all* the required information or *any* of the required information.

**PA: SB 202 speaks for itself. The other allegations are legal arguments that require no response.**

80.     These uncertainties about the content and coverage of the Prefilling Prohibition put Plaintiffs in an especially difficult position given the threat of penalties and sanctions for failing to strictly adhere to the provision.

**PA: These legal arguments require no response.**

81.     The Prefilling Prohibition imposes serious harms on Plaintiffs' freedom of speech and freedom of association rights. Take, for example, the model for voter engagement and association employed by Plaintiff VoteAmerica. On VoteAmerica.com, any Georgia elector can visit the site, click "Request Your Mail-In Ballot" or "Request Your Absentee Ballot," provide their personalized information, and receive a copy (either by email or mail or both) of the Georgia Secretary of State's Application for an Official Absentee Ballot pre-filled with the information they provided. In doing so, the elector also voluntarily agrees to receive further communications from VoteAmerica so that VoteAmerica builds a broad associational base with whom it can communicate further about political engagement and civic participation. If VoteAmerica can no longer provide this service to voters, one of its critical tools for association and political speech will be entirely undermined.

**PA: The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

82.    Likewise, the Prefilling Prohibition would severely hinder Plaintiffs VPC and CVI, whose mass mailing programs rely on sending voters partially prefilled absentee ballot applications containing information provided by voters in their registration records. If VPC and CVI can no longer provide voters with prefilled applications, the effectiveness of their programs will be severely curtailed.

**PA:  The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

83.    The State has no compelling interest, or even rational basis, for so severely restricting the content and conveyance of Plaintiffs' political speech. The prohibition is both overbroad—for example, by prohibiting prefilling even where the voter provides the information and requests the application and thus the risk of error or voter confusion is low—and underinclusive, by allowing prefilling of information that is not required but optional on the form but that might not correctly represent the voter's situation.

**PA: These legal arguments require no response.**

84.    Any attempt to submit fraudulent absentee ballot applications is already prohibited by Georgia law and criminally punishable. O.C.G.A. § 21-2-573. Likewise, local election officials are required to match the information on absentee

ballot applications to the voter registration system to identify errors or anomalies. O.C.G.A. § 21-2-381(b)(1).

**PA: These legal arguments require no response.**

85.     There is no substantial evidence that this Prefilling Prohibition addresses any widespread problem of election administration arising from the distribution of absentee ballot applications. In any event, the SB 202 Prefilling Prohibition is not rationally, and certainly not narrowly, tailored to address any purported election administration problems.

**PA: These legal arguments require no response.**

86.     ***The Mailing List Restriction.*** In addition to requiring a government-mandated misleading disclaimer on its absentee ballot application communications, and restricting the remaining content of those communications, SB 202 also restricts *to whom* Plaintiffs can send absentee ballot applications. And it does so in a manner so restrictive that it will either impose enormous costs on Plaintiffs, force Plaintiffs to drastically reduce their voter engagement communications, or both.

**PA: SB 202 speaks for itself. The other allegations are legal arguments that require no response. Intervenors lack sufficient information to admit or deny the allegations regarding Plaintiffs' costs, but deny that SB 202 will require VoteAmerica to divert resources *away* from its mission.**

87.    Specifically, SB 202 dictates that "All persons or entities, other than [election officials] that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff." Section 25 (to be codified at O.C.G.A. § 21-2-381(a)(3)(A)). Failure to comply with this restriction can result in a fine of up to $100 "per duplicate application that is processed by the county due to such violation." *Id.* (to be codified at O.C.G.A. § 21-2-381(a)(3)(B)). This is in addition to "all other possible sanctions" for violation of the election code. *Id.*

**PA: SB 202 speaks for itself.**

88.    This prohibition, once again, applies to any person or entity sending any elector an application for absentee ballot regardless of whether such application is solicited or unsolicited or the volume of applications the person or entity is sending. It introduces the term "mail" in addition to "send" without further definition, once again leaving Plaintiffs to guess whether that includes email or other similar electronic communications.

**PA: These legal arguments require no response.**

89.    The provision contains no exceptions to its prohibition on sending applications to individuals who may have "already requested, received, or voted an

absentee ballot in the primary, election, or runoff." Thus, Plaintiffs cannot send *solicited* applications to electors that made an error on their prior request, had their prior request rejected, or need a new application for any other reason.[1] Plaintiffs similarly cannot send *solicited* applications to individuals who may have already requested or received a ballot but are seeking additional applications for their family members.

**PA: These legal arguments require no response.**

90.     Presumably to facilitate compliance with this restriction, Section 25 of SB 202 further dictates that "[a]ny such person or entity shall compare its mail distribution list with the most recent information available about which electors have requested, been issued, or voted an absentee ballot in the primary, election, or runoff and shall remove the names of such electors from its mail distribution list." *Id.* It then provides a safe harbor for organizations that rely on "information made available by the Secretary of State within five business days prior to the date such applications are mailed." *Id.*

**PA: SB 202 speaks for itself.**

---

[1] During the March 3, 2021 Senate Ethics Committee hearing on SB 202, Senator Bo Hatchett proposed an amendment to SB 202 that would have limited the application of this restriction to only "unsolicited" applications. This change was not included in SB 202's final text.

91.     But these provisions are riddled with vagaries and uncertainties that make compliance nearly or practically impossible. The "most recent information available" is undefined. It is unclear what makes information "available." For example, it's unclear whether information is "available" if Plaintiffs would have to request that information from each individual county and if Plaintiffs are relying on such data, how recent it must be to be the "most recent."

**PA: These legal arguments require no response.**

92.     These vagaries might be mitigated by the five-day safe harbor provision but nothing in SB 202 actually requires the Secretary of State to make all the necessary information available or do so on any regular timeframe. The election code contemplates lists of rejected absentee ballots, lists of absentee ballots sent to voters, and lists of received and certified absentee ballots. *See* O.C.G.A. §§ 21-2-384(d), 21-2-386(a)(1)(B), 21-2-386(a)(1)(E). But it does not specifically require a comprehensive list that includes all voters who have applied but not yet been sent an absentee ballot. And the election code requires maintenance of these lists at the individual county level rather than statewide level. While they must be available for public inspection, SB 202 does not require publication of that data in any particular manner, or publication at any regular interval. During testimony on SB 202, a representative from the ACLU of Georgia explained that at that time, requesting a

voter list roll from the Secretary of State would cost $250 and take 1-2 weeks to arrive. As such, he urged legislators: "So when it comes to the accuracy of us or these organizations putting on a burden, we have to take into account what the Secretary of State is actually able to do and update at the proper time." This plea was rejected.

**PA: Quotes speak for themselves. The other allegations are legal arguments that require no response.**

93.     Thus, Plaintiffs can only rely on this safe harbor if the Secretary of State happens to make this information available and does so in the five-day window prior to a mailing of absentee ballot applications. As a result, Plaintiffs' ability to communicate with *any* Georgia electors about absentee voter applications is wholly contingent on the Secretary of State's unfettered discretion and how often Defendant Raffensperger provides information about who has requested, received, or voted an absentee ballot in an election. And without any standards for when and how the Secretary of State will make this list "available," there remains the real possibility that some preferred speakers might receive more timely responses than less preferred speakers.

**PA: These legal arguments require no response.**

94.    Even if the Secretary of State made a new list of individuals who had requested, received, or voted an absentee ballot in a given election available every day—an unlikely occurrence—the Mailing List Restriction would impose severe burdens on Plaintiffs' free speech and associational rights.

**PA: These legal arguments require no response.**

95.    *First*, the safe harbor provision only applies if Plaintiffs rely on data provided by the Secretary of State in the last five days. But preparing a large volume mailing—the means by which Plaintiffs VPC and CVI communicate—takes longer than five days. Thus, if Plaintiffs rely on the most recent information available from the Secretary of State in creating a mailing distribution list, it will be stale and beyond the five-day safe harbor by the time the mailing is printed and ready to be sent for delivery. Indeed, a typical VPC or CVI mailing takes at least 20 days from when a list is provided to the vendor until the mailing is sent. This unreasonable five-day limitation would impose enormous costs on Plaintiffs' speech and substantially reduce the amount of speech they are able to deliver on a timely basis.

**PA: The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

96.    To continue associating and communicating with potential voters in Georgia, Plaintiffs VPC and CVI would have to significantly alter the content of

their absentee ballot application mailers, drastically reduce the scope of their absentee ballot application direct mail program, or incur prohibitively expensive costs to seek compliance and reduce the high risk of sanctions.

**PA: The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

97.    For example, it is logistically impossible for VPC and CVI to both comply with SB 202's five-day safe-harbor provision—effectively requiring organizations to check against a moving-target list of voters who the Secretary of State reports have already requested their absentee ballot applications—and submit their orders to the printer on time to send the direct mailers.

**PA: The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

98.    To comply with SB 202 and continue having even a circumscribed level of engagement with Georgia voters, VPC and CVI would have to check their mailers against the State's list after the mailers are already printed. In effect, VPC and CVI would have to first submit their order to the printer by reference to the Secretary of State's then-current list of Georgia absentee voter statuses. After VPC and CVI's mailer print order is completed multiple weeks later, VPC and CVI would then have to expend significant resources to manually check the millions of printed and already

paid-for direct mailers against the State's current absentee ballot list, which will unpredictably contain countless voters with updated absentee ballot statuses. To avoid sanctions or other steep penalties under O.C.G.A. § 21-2-573, VPC and CVI would have to guarantee absolute precision while manually removing any potential duplicate recipients from the printing order, and be forced to do so in five days' time or else start the process all over again. The diversion and drain of resources necessary to comply with the five-day safe harbor would overwhelm VPC and CVI, and dramatically impede their ability to communicate with Georgia voters.

**PA: The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

99.    The Legislature was aware of the problems inherent in requiring civic engagement organizations to rely on the "most recent available information." Indeed, this was the topic of significant discussion during a March 3, 2021 hearing on SB 202. The "fix" of the five-day safe harbor provision was proposed by Senator Strickland, who seemed surprised that his off-the-cuff suggestion was so quickly adopted as legislative text. He noted: "I was thinking I was making stuff up as I went. Isn't that how laws are made," which led to laughter in the chamber, a "sausage" comment from the presiding officer, and then unanimous adoption of the amendment. But the failure of the Legislature to think through an appropriate or

reasonable timeline and safe harbor is no laughing matter. It has left Plaintiffs unable to exercise their First Amendment rights.

**PA: The legislative history speaks for itself. Intervenors (and Plaintiffs) lack sufficient information to admit or deny what the Legislature was "aware of." The other allegations are legal arguments that require no response.**

100.   *Second,* because the Mailing List Restriction applies even where the elector solicits an absentee ballot application, it would require Plaintiffs like VoteAmerica, which utilize technology to respond individually to requests for applications, to create a new technological solution that would reject requests for absentee ballot applications based on the "most recent available information"—whatever that may be—about who has requested, received, or voted an absentee ballot. Such a state-specific system, requiring frequent updates to the data relied upon, would be costly and onerous to implement. Once again, this unreasonable restriction imposes unnecessary costs on Plaintiffs' speech that will reduce the total quantum of speech they can deliver.

**PA: The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

101.  The State has no compelling interest, or even rational basis, for so severely restricting the content of Plaintiffs' political speech. There is no substantial evidence that this Mailing List Restriction addresses any widespread problem of election administration or voter fraud arising from the distribution of absentee ballot applications. The election apparatus is already designed to identify duplicate applications to ensure that voters do not receive multiple absentee ballots.

**PA: These legal arguments require no response.**

102.  In any event, the Mailing List Restriction is not meaningfully, and certainly not narrowly, tailored to address any purported election administration problems or minimize the burden on Plaintiffs' speech. Instead, it imposes overbroad restrictions on who Plaintiffs can contact, fails to provide a reasonable mechanism for delivering the necessary information for compliance, and imposes an unrealistic timeline that would create enormous costs for Plaintiffs.

**PA: These legal arguments require no response.**

103.  Together and individually, these restrictions impose severe burdens on Plaintiffs' associational and free speech rights. Plaintiffs regularly engage in core political speech—encouraging civic engagement and participation, including through absentee voting—with Georgia electors. Indeed, this type of speech and voter engagement activity is core to all of their organizational missions. Yet, these

restrictions require Plaintiffs to convey misleading speech that dilutes their message, limit the content of Plaintiffs' communications and handicap their ability to associate with and assist electors, and impose vague and unreasonable restrictions on *who* Plaintiffs can communicate with and when.

**PA: The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

## CLAIMS FOR RELIEF

### First Claim for Relief: Free Speech
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

104.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-103 as if fully set forth herein.

**PA: Intervenors incorporate and restate all prior paragraphs of this answer.**

105.  The First Amendment to the United States Constitution prohibits the government's abridgment of the freedom of speech.

**PA: The First Amendment speaks for itself.**

106.  The First Amendment is applied to the states through the Fourteenth Amendment.

**PA: This legal argument requires no response.**

107.  SB 202 directly and severely burdens Plaintiffs' core political speech, which includes communications and expressive activities aimed at encouraging voters to participate in the political process through absentee voting.

**PA: Denied.**

108.  SB 202 restricts Plaintiffs' expressive conduct in sharing their belief in the capacity of the popular will to shape the composition and direction of the

government. Advocating for that belief through Plaintiffs' endeavors to persuade Georgians to participate in the political process and assisting eligible voters to successfully request an absentee ballot is in itself a political and philosophical statement.

**PA: Denied.**

109.  Like the circulation of an initiative petition for signatures, engaging and assisting voters with the absentee ballot application process is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). Whether a citizen should participate in an election and exercise their right to vote by absentee ballot is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking" sanctions or other penalties. *See id.* at 421; *see also Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186–87 (1999) (quoting *Meyer*, 486 U.S. at 422).

**PA: These legal arguments require no response.**

110. SB 202's provisions in Section 25 impose onerous restrictions on distributing absentee ballot applications that are coupled with the threat of substantial penalties to heavily burden Plaintiffs' political expression. These requirements diminish Plaintiffs' ability to convey their message and further that

message by engaging more individuals in the political process through absentee balloting.

**PA: Denied.**

111. The Disclaimer Provision is a severe burden on Plaintiffs' First Amendment rights. The provision will obscure Plaintiffs' intended message and dissuade voters from using the absentee ballot application form that Plaintiffs distribute. It undermines Plaintiffs' core political expression by altering and dictating the content of their voter engagement communications. And it impairs Plaintiffs' speech by giving potential voters the incorrect impression that Plaintiffs' communications are in some way illegitimate or not in accord with government-prescribed processes.

**PA: Denied.**

112. The Prefilled Prohibition is a severe burden on Plaintiffs' First Amendment rights. The Prefilled Prohibition directly restricts the content of the communications Plaintiffs can send to electors. It entirely proscribes certain types of speech that Plaintiffs currently communicate and would plan to continue communicating to engage and assist voters. It also diminishes the effectiveness of Plaintiffs' speech and expressive conduct by eliminating a primary option that Plaintiffs use to advocate their message with voters who seek assistance obtaining

and completing their absentee ballot application. *See Meyer*, 486 U.S. at 424 ("The First Amendment protects [the] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").

**PA: Denied.**

113. The Mailing List Restriction is a severe burden on Plaintiffs' First Amendment rights, restricting to whom Plaintiffs can communicate. The Mailing List Restriction's list comparison requirement and its impossible and arbitrary timeline to conduct that comparison will also impede Plaintiffs' ability to speak at all concerning Georgia's absentee ballot applications, much less at the scale of its current outreach and voter assistance programs. It will necessarily reduce the quantum of speech Plaintiffs are able to deliver because it dramatically increases the logistical and monetary costs of every instance of Plaintiffs' expressive conduct made through mailer campaigns and direct outreach.

**PA: Denied.**

114. The Mailing List Restriction's onerous requirements and enormous costs, coupled with the substantial penalties, circumscribe Plaintiffs' core political expression and risk derailing their ability to communicate their message in Georgia. Given the large scale of Plaintiffs' absentee ballot application communications, imposing the steep financial penalties established in SB 202 would consume a large

percentage of Plaintiffs' budgets and decimate their ability to conduct any of their civic work. Plaintiffs' fear of prosecution and desire to avoid inadvertent violations that would generate financial sanctions or other potential penalties will chill Plaintiffs' protected speech and force Plaintiffs to self-censor.

**PA: Denied.**

115.  Together and individually, SB 202's burdensome provisions "reduce[] the voices available to convey political messages," *see Buckley*, 525 U.S. at 210 (Thomas, J., concurring), because they impair Plaintiffs' core organizational missions to speak with potential voters and encourage political participation through the use of absentee balloting.

**PA: Denied.**

116. SB 202's provisions in Section 25 also constitute content-based restrictions on speech because speakers who discuss absentee ballot applications such as Plaintiffs are subject to restrictions and penalties that other speakers are not.

**PA: This legal argument requires no response.**

117.  Thus, the challenged provisions in SB 202 are subject to strict scrutiny review because they proscribe speech based on the identity of the speaker, operate as a content-based restriction on speech, and impede Plaintiffs' core political expression.

**PA: This legal argument requires no response.**

118.  These challenged requirements are not narrowly tailored to serve any compelling state interest. Indeed, Section 25 of SB 202 does not actually advance any legitimate regulatory interest, and serves little purpose other than to dissuade civic organizations and individuals from engaging in activity and speech concerning absentee ballot application distribution.

**PA: This legal argument requires no response.**

119.  The State's purported goals of increasing confidence in elections or encouraging uniformity are at best pretextual, and these restrictions are more likely to undermine than restore confidence in Georgia's elections.

**PA: Denied.**

120.  These requirements heavily burden Plaintiffs' freedom of speech and are not rationally related to any legitimate government interests.

**PA: Denied.**

121.  Under the exacting scrutiny standard applied in *Meyer* and *Buckley*, or any other level of judicial scrutiny, the challenged provisions in Section 25 of SB 202 violate Plaintiffs' First Amendment free speech rights.

**PA: Denied.**

## Second Claim for Relief: Freedom of Association

**(Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)**

122.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-121 as if fully set forth herein.

**PA: Intervenors incorporate and restate all prior paragraphs of this answer.**

123.   The First Amendment to the United States Constitution prohibits government abridgment of the freedom of association. *Nat'l Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 430 (1963).

**PA: This legal argument requires no response.**

124.   SB 202 directly and severely burdens Plaintiffs' associational rights by preventing Plaintiffs from banding together with others to engage potential voters and assist community members to further participate in the civic community through absentee voting.

**PA: Denied.**

125.   SB 202's requirements in Section 25 will reduce the options and opportunities for Plaintiffs to associate with potential voters and jointly participate in meaningful civic activities.

**PA: Denied.**

126.   The Disclaimer Provision, for example, gives Plaintiffs' absentee ballot outreach the false impression of illegitimacy, which hinders Plaintiffs ability to associate with potential voters and develop a network for collective civic action.

**PA: Denied.**

127.   The Prefilling Prohibition likewise interferes with Plaintiffs' model for associating with voters through their effective absentee ballot application services. The provision eliminates the method by which Plaintiffs connect with Georgians at the absentee ballot application phase to gain a foothold with those voters for further association and group engagement for political expression.

**PA: Denied.**

128.   For example, Plaintiff VoteAmerica assists voters by prefilling the absentee ballot application with the information they provided online and, in doing so, the voters also voluntarily agree to receive further communications from VoteAmerica. This streamlined process enables VoteAmerica to build a broad associational base of Georgians with whom it can communicate further about civic participation. By eliminating this service to voters, the Prefilling Prohibition also eliminates one of Plaintiffs' critical tools for developing and enhancing its political association in the State.

**PA: Intervenors lack sufficient information to admit or deny the factual allegations. Otherwise denied.**

129.  The Mailing List Restriction imposes a severe burden because it entirely prohibits Plaintiffs from associating with certain categories of voters concerning its absentee ballot application programs. In practice, the burdensome punitive sanctions attached to the Mailing List Restriction inhibit Plaintiffs from recruiting and associating with even potential voters who have not already requested, received, or voted an absentee ballot because of the fear of incurring penalties for any instance of inadvertent noncompliance with the statute.

**PA: Denied.**

130.  Together and individually, SB 202's restrictive provisions in Section 25 impose a severe burden on Plaintiffs' freedom of association and are subject to strict scrutiny.

**PA: Denied.**

131.  These requirements are not narrowly tailored to serve any compelling state interest. Indeed, these requirements do not advance *any* legitimate regulatory interest, and serve little purpose other than to hinder civic organizations from associating with voters concerning absentee ballot applications and other engagement in the political process.

**PA: Denied.**

132.   These requirements which impinge on Plaintiffs' associational rights are also not rationally related to any legitimate government interests.

**PA: Denied.**

133.   Under the exacting scrutiny standard applied in *Meyer* and *Buckley*, or any other level of judicial scrutiny, the requirements in SB 202 Section 25 violate the First Amendment's guarantee of freedom of association.

**PA: Denied.**

### Third Claim for Relief: Compelled Speech
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

134.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-133 as if fully set forth herein.

**PA: Intervenors incorporate and restate all prior paragraphs of this answer.**

135.   The First Amendment to the United States Constitution prohibits government abridgment of Plaintiffs' freedom of speech through government-compelled speech.

**PA: This legal argument requires no response.**

136.   SB 202's Disclaimer Provision undermines Plaintiffs' core political speech. It unconstitutionally forces Plaintiffs and other individuals or organizations that conduct absentee ballot application programs to speak for the government by making a disclaimer that Plaintiffs would not otherwise recite. The disclaimer constitutes speech (specifically, confusing, misleading, and dissuading speech), Plaintiffs object to the government imposing such speech upon them, and the speech will be readily associated with Plaintiffs and tied to their name when it is used on the absentee ballot application forms that Plaintiffs distribute.

**PA: This legal argument requires no response.**

137.   The SB 202 required disclaimer pejoratively emphasizes that the Plaintiffs' speech is "NOT an official government publication and was NOT provided to you by any governmental entity[.]" Such a disclaimer—prominently displayed—suggests that filling out an absentee ballot application is an activity that should be done only in conjunction with the Secretary of State and undermines a voter's confidence that using Plaintiffs' services will be official and effective. This disclaimer will undermine the credibility of Plaintiffs, which are legitimate civic organizations that provide important services to eligible Georgia voters.

**PA: These legal arguments require no response.**

138.   This disclaimer, moreover, will not be accurate because SB 202 makes Plaintiffs use the State-prescribed form titled "Application for *Official* Absentee Ballot.".

**PA: This legal argument requires no response.**

139.   SB 202's Disclaimer Provision "is a content-based regulation of speech" because it is "compelling individuals to speak a particular message" that functions to "alter the content of their speech." *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (citations and internal alterations omitted). As such, it is subject to strict scrutiny. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d at 729–30.

**PA: This legal argument requires no response.**

140.   The Disclaimer Provision is not narrowly tailored to serve any compelling state interest; rather, this disclaimer serves no legitimate governmental function because there is no evidence that Georgians have been confused about the nature of community-based absentee ballot application activity. There is no indication that Plaintiffs or other similar voter engagement and assistance groups have suggested to application recipients that their community-based activity is done in coordination with the Secretary of State or have misled anyone regarding the

nature of their efforts. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d at 730.

**PA: These legal arguments require no response. Intervenors deny that SB 202 violates the First Amendment.**

141.   To the extent the government thinks that the disclaimer message required by SB 202 is needed, the government must speak for itself. The State must not co-opt Plaintiffs and other civic organizations to speak in furtherance of Georgia's own governmental message.

**PA: This legal argument requires no response.**

142.   The Disclaimer Provision is not rationally related to any legitimate government interest.

**PA: Denied.**

### Fourth Claim for Relief: Substantial Overbreadth
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

143.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-142 as if fully set forth herein.

**PA: Intervenors incorporate and restate all prior paragraphs of this answer.**

144.   The First Amendment to the United States Constitution prohibits government abridgment of the freedom of speech through the enactment of substantially overbroad laws. *See FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1304 (11th Cir. 2017) (citing *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987)).

**PA: This legal argument requires no response.**

145.   SB 202's Disclaimer Provision, Prefiling Prohibition, and Mail List Restriction are all unconstitutionally overbroad laws because they regulate a sweeping amount of noncommercial political speech and constitutionally protected expressive conduct.

**PA: Denied.**

146.   The threat of penalties for violations of SB 202's ambiguous and overbroad provisions will impermissibly chill or present the substantial risk of chilling Plaintiffs' protected speech, such as Plaintiffs' speech informing voters about their right to request an absentee ballot and the process for doing so.

**PA: Denied.**

147.   The Disclaimer Provision is overbroad because it lacks any reasonable bounds on its application. The required disclaimer must appear on "*[a]ny* application

for an absentee ballot sent to *any* elector by *any* person or entity." This expansive and open-ended language, is unconstitutionally overbroad.

**PA: Denied.**

148.   As the broadest absentee ballot application disclaimer requirement in the country—both in writing and application—the Disclaimer Provision would impede all of Plaintiffs' absentee ballot application activities in Georgia, regardless of whether the absentee ballot application is solicited or unsolicited by the elector. It would also expansively cover the most benign and commonplace scenarios of individual Georgians helping each other participate in the political process, such as one neighbor sending an application to another upon their request. Indeed, the Disclaimer Provision is so deficiently and substantially overbroad that it could even paradoxically apply to the Secretary of State and other local election officials who are charged with creating and distributing the official absentee ballot application form.

**PA: The legal arguments require no response. Intervenors lack sufficient information to admit or deny the factual allegations.**

149.   The Prefilled Prohibition is also unconstitutionally overbroad. The overbreadth of the provision would sweep in substantial protected First Amendment activity by applying regardless of whether the absentee ballot application distributor

is sending individualized applications in response to isolated requests from voters or mass applications on an unsolicited basis. Such unconstitutional applications of the overbroad Prefilled Prohibition would also include a situation where the absentee ballot application is solicited by the voter and the voter themselves provides Plaintiffs with the required prefilled information.

**PA: The first sentence is denied. These legal arguments require no response.**

150.   The Mailing List Restriction is likewise unconstitutionally overbroad, in part because it offers no exceptions or limiting principle to its prohibition on sending applications to individuals who may have "already requested, received, or voted an absentee ballot in the primary, election, or runoff." Accordingly, the ambiguous extensiveness of the restriction would over-inclusively prohibit Plaintiffs from sending solicited applications to electors that made an error on their prior request, had their prior request rejected, or need a new application for any other reason.

**PA: These legal arguments require no response. Intervenors deny that SB 202 violates the First Amendment.**

151.   These overbroad provisions in SB 202 are full of uncertainties and risk a degree of capricious enforcement that will make Plaintiffs' compliance potentially

impossible, and are therefore unconstitutional infringements on Plaintiffs' protected speech that do not survive First Amendment scrutiny.

**PA: Denied.**

## Fifth Claim for Relief: Vagueness
## (Violation of Plaintiffs' First and Fourteenth Amendment Rights Pursuant to 42 U.S.C. §1983)

152.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-151 as if fully set forth herein.

**PA: Intervenors incorporate and restate all prior paragraphs of this answer.**

153.    The First Amendment to the United States Constitution prohibits the government's abridgment of freedom of speech due to the enactment of unconstitutionally vague restrictions. *See Jews for Jesus, Inc.*, 482 U.S. at 576.

**PA: This legal argument requires no response.**

154.    Additionally, the Due Process Clause of the Fourteenth Amendment prohibits punitive sanctions for activity that are "so vague that [they] fail[] to give ordinary people fair notice of the conduct [they] punish, or so standardless that [they] invite arbitrary enforcement." *See Johnson v. United States*, 576 U.S. 591, 595 (2015). When penalties affect political expression, the "standards of permissible statutory vagueness are strict." *Button*, 371 U.S. at 432.

**PA: This legal argument requires no response.**

155.   The challenged provisions of SB 202 are substantially vague and violate Plaintiffs' rights under the First and Fourteenth Amendments.

**PA: Denied.**

156.   The Disclaimer Provision is ambiguous, in part because it fails to define the key word "send," a vague verb with potentially broad meaning that compels Plaintiffs to guess whether the disclaimer requirement applies beyond postal mail to include email, fax, social media, website posting, any other electronic communications, or even in-person distribution. Moreover, the physical specifications of the disclaimer are substantially vague because SB 202 fails to explain what constitutes "sufficient font size" or "reasonable degree of color contrast." Such vagueness issues only compound the First Amendment harms imposed by this confusing and intentionally dissuading government-mandated speech, and further expose Plaintiffs to the unpredictable and arbitrary risk of punishment despite their good faith efforts to comply.

**PA: Denied.**

157.   The Prefiling Prohibition is also substantially vague, in part because it similarly fails to define "send" and leaves Plaintiffs in the dark about whether the Prefiling Prohibition applies not only to postal mail but also to email, fax, social

media, any other electronic communications, or even in-person distribution. The Prefilling Prohibition additionally bars Plaintiffs and other civic organizations from sending any absentee application "prefilled with *the elector*'s required information," which offers no guidance as to whether prefilling is only prohibited if it includes *all* the required information or *any* of the required information.

**PA: SB 202 speaks for itself. Otherwise denied.**

158.   The Mailing List Restriction is also substantially vague, and its constitutional deficiencies are acutely problematic given the heavy punitive sanctions attached to even inadvertent violations of that provision. For example, the restriction introduces the term "mail" in addition to "send" without further definition, once again setting Plaintiffs up to merely guess whether that includes email or other similar electronic communications. And its ambiguous terms appear to apply to any person or entity sending any elector an application for absentee ballot regardless of whether such application is solicited or unsolicited or the volume of applications the person or entity is sending. The "most recent information available" is undefined. It is unclear what makes information "available." In addition, Plaintiffs' good faith efforts to comply with the requirements may still not be enough because the provision makes reliance on the "most recent information available,"

with no clear provision in law for how, when, or where the Secretary of State must publish such information.

**PA: SB 202 speaks for itself. Otherwise denied.**

159.   Due to these vague provisions, SB 202 fails to give reasonable notice of what constitutes prohibited conduct to civic organizations and persons that participate in First Amendment protected activities concerning absentee ballot applications, including Plaintiffs.

**PA: Denied.**

160.   The State has no compelling interest or even rational basis for requiring such confusing, misleading, and voter-dissuading disclaimers and restrictions for its absentee ballot application process that inhibit Plaintiffs' ability to speak.

**PA: Denied.**

161.   These provisions of SB 202 are therefore unconstitutionally vague under the Due Process Clause and the First Amendment.

**PA: Denied.**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A. Declare that the challenged provisions in Section 25 of SB 202 violate the

First and Fourteenth Amendments, both facially and as-applied to Plaintiffs;

B. Preliminarily and permanently enjoin Defendants from enforcing the

challenged provisions in Section 25 of SB 202, both facially and as-applied

to Plaintiffs, and including the punitive sanctions contained therein;

C. Retain jurisdiction to render any and all further orders that this Court may

deem necessary;

D. Award Plaintiffs their attorneys' fees and costs pursuant to statute; and

E. Grant such other and further relief that the Court deems just and proper.

Respectfully submitted this 7th day of April, 2021.

/s/ Robert B. Remar
Robert B. Remar (Ga. Bar No. 600575)
Katherine L. D'Ambrosio (Ga. Bar No. 780128)
ROGERS & HARDIN LLP
229 Peachtree Street NE
2700 International Tower
Atlanta, GA 30303
Tel: (404) 522-4700
Fax: (404) 525-2224
rremar@rh-law.com
kdambrosio@rh-law.com

Danielle Lang*
Jonathan Diaz*
Caleb Jackson*
Hayden Johnson*
Valencia Richardson^*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, D.C. 20005

Tel: (202) 736-2200
Fax: (202) 736-2222
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
cjackson@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org

*Counsel for Plaintiffs*

*\* Pro Hac Vice applications forthcoming*

*^ Licensed to practice in Louisiana only;
Supervised by Danielle Lang, a member of the
D.C. Bar*