# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

VOTEAMERICA, *et al.,*

     *Plaintiffs,*

         v.

BRAD RAFFENSPERGER, in his
official capacity as the Secretary of
State for the State of Georgia, *et al.,*

     *Defendants.*

CIVIL ACTION

FILE NO. 1:21-CV-1390-JPB

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

Plaintiffs' Complaint should be dismissed in its entirety, both because Plaintiffs lack Article III standing and because, even if they had standing, they have failed to state a claim upon which relief may be granted.

Georgia's election laws have been fiercely criticized following each of the last three elections. Both Democrats and Republicans have criticized the way that Georgia ran its elections. Unsurprisingly, the General Assembly updated the State's election code—first in April 2019 and again in March 2021—in response to these concerns.

The most recent revision, SB 202, permanently adopted several innovations (in modified form) that had been adopted on an emergency basis for the COVID-19 pandemic. The law expands access to early voting, mandates at least one drop box in every county, and authorizes Sunday voting. Following the enactment of SB 202, the non-partisan Center for Election Innovation and Research rated Georgia as having some of the *least* restrictive voting laws in the country.  *See* Center for Election Innovation and Research, *How Easy Is It to Vote Early in Your State?*, https://electioninnovation.org/research/early-voting-availability-2022/ (April 17, 2021).

Despite these facts, Plaintiffs—VoteAmerica, the Voter Participation Center ("VPC"), and the Center for Voter Information ("CVI")—have sued to

enjoin enforcement of three SB 202 provisions relating to absentee ballot applications. These provisions: (1) require anyone who sends an absentee ballot application directly to an elector to include a disclaimer that, among other things, the application was "NOT provided to you by any government entity;" (2) prohibit third-party organizations from pre-filling absentee ballot applications; and (3) impose fines on "persons or entities" that mail absentee ballot applications to voters who have "already requested, received, or voted an absentee ballot in the primary, election, or runoff." We will refer to these provisions as the Disclaimer Provision, the Prefilling Prohibition, and the Anti-Duplication Provision (what Plaintiffs call the "Mailing List Restriction"), respectively. O.C.G.A. § 21-2-381.

As explained below, Plaintiffs lack standing to challenge any of these provisions. And in any event, they have failed to articulate any plausible legal challenge to any of them.

## ARGUMENT AND CITATION OF AUTHORITY

As the Supreme Court has said, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992). And "[s]tates—not federal courts—are in charge of setting those rules." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) (*NGP*).

Plaintiffs disagree with Georgia over the ideal election system, but that does not confer standing on them or give them cognizable legal claims.

## I.     Plaintiffs lack standing.

As the Eleventh Circuit recently explained, "[f]ederal courts are not constituted as free-wheeling enforcers of the Constitution and laws." *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) (cleaned up). Instead, Article III of the Constitution limits the subject-matter jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. CONST. Art. III § 2. "No principle is more fundamental to the judiciary's proper role in our system of government." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "To have a case or controversy, a litigant must establish that he has standing." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

1.     To demonstrate standing at the pleading stage, Plaintiffs must allege "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Id*. A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

Here, Plaintiffs have failed to demonstrate an injury-in-fact for any of their claims. That alone is dispositive. "To establish an injury in fact, a plaintiff

must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual and imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). When seeking injunctive relief specifically, a plaintiff must allege "a real and immediate as opposed to a merely conjectural or hypothetical-threat of future harm." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013) (cleaned up). Plaintiffs have not done so.

2.      Instead, Plaintiffs' alleged injuries fall into three buckets: (1) the need to divert resources internally in order to comply with the three absentee ballot application distribution changes in SB 202, Doc. 1 ¶¶ 22–23, 40; (2) the risk of incurring fines by inadvertently sending an absentee-ballot application to someone who has already requested or submitted one, *id.* at ¶¶ 24-25, 42; and (3) a decrease in the efficacy of two of the Plaintiffs' direct mailing program by being unable to send prefilled application, *id.* at ¶ 41. None of these alleged harms rises to the level of an injury in fact.

*First,* VoteAmerica (alone) claims it will need to divert internal resources to address the challenged provisions. But for such a diversion to qualify as an injury in fact, a plaintiff must show not only what the organization is diverting resources *to*, but also "what activities [the organization] would divert resources away *from* in order to spend additional

4

resources on combatting" the law's impact. *Jacobson*, 974 F.3d at 1250. VoteAmerica has not attempted to do so for any claim. *See* Doc. 1 ¶¶ 22–23.

*Second*, all three Plaintiffs predict they are likely to inadvertently send absentee-ballot applications to at least some voters who have "already requested, received, or voted an absentee ballot in the primary, election, or runoff," and will thus inevitably incur fines. Doc. 1 ¶¶ 24-25, 42. But it is entirely speculative whether Plaintiffs will make the mistakes they posit and whether the State Election Board will impose fines for such inadvertent violations. Moreover, SB 202 does not even go into effect until July 1, 2021. Thus, this alleged injury is entirely "conjectural," *Spokeo*, 136 S. Ct. at 1548, and unripe.

VoteAmerica nevertheless speculates that the risk of fines comes from the possibility that the Secretary of State's list of voters who have already "requested, received, or voted an absentee ballot" *might* be "inaccurate or stale," or that the Secretary *might* fail to "update[]" the list "with any specific frequency," and that Plaintiffs *might* rely on it to their detriment. Doc. 1 ¶ 23. Fortunately for Plaintiffs, SB 202 contains a safe-harbor provision for those who "relied upon information made available by the Secretary of State within five business days prior to the date such applications are mailed." O.C.G.A. § 21-2-381(3)(A) (effective July 1, 2021). Thus, Plaintiffs' speculative fear of

incurring penalties is not only premature but groundless, especially given how closely they claim to work with the State's officials.[1] *See* Doc. 1 ¶¶ 34, 36.

*Third*, VPC and CVI claim that the Prefilling Prohibition—prohibiting prefilling absentee ballot applications—will "reduce the efficacy of their direct mail program." Doc. 1 ¶ 41. But they point to no authority showing that such an alleged marginal decrease in efficiency is an injury in fact. In any event, Plaintiffs cannot prove that such an injury could be fairly attributable to Defendants. Indeed, Plaintiffs *concede* that "voters are more likely to submit an application that is already partially prefilled with their information," Doc. 1 ¶ 41, thus demonstrating that any decrease in the efficacy of Plaintiffs' direct mail program will result from individual voters' choices. A voter might be more likely to send in an absentee ballot application if someone paid him to do so, but that does not mean third-party organizations striving to get out the vote have standing to challenge prohibitions against bribery.

*Finally*, VPC and CVI have failed to even allege an injury stemming from the Disclaimer Provision.

---

[1] Given that Plaintiffs are already conducting a robust absentee ballot program (further proving that continuing to do so is not a diversion of resources), they assuredly already utilize the daily updates to the absentee file posted by the Secretary's office in the runup to elections. *See* Elections Division, *Voter Absentee Files*, https://elections.sos.ga.gov/Elections/voterabsenteefile.do.

In sum, Plaintiffs have failed to establish Article III standing as to any of their claims. Accordingly, all of them should be dismissed under Rule 12(b)(1), for lack of subject-matter jurisdiction.

## II. Plaintiffs fail to state a claim on which relief can be granted.

Nor have Plaintiffs properly pleaded any claim on which relief can be granted. Plaintiffs have not disputed Georgia's compelling interests in enacting SB 202's absentee-ballot application provisions.[2] These include: "(1) deterring and detecting voter fraud;" "(2) improv[ing] . . . election procedures;" "(3) addressing the state's own mismanagement of voter rolls;" "(4) safeguarding voter confidence;" and (5) running an efficient and orderly election. *Greater Birmingham Min. v. Sec'y of State for Ala.*, 992 F.3d 1299, 1319 (11th Cir. 2021) (*GBM*); *NGP*, 976 F.3d at 1282; *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling opinion). The General Assembly also explained that its goal was to improve "elector confidence" and reduce voter confusion when it enacted reasonable regulations

---

[2] Even after SB 202, Georgia allows far more latitude for third-party groups to send applications than many other states. Tennessee and South Carolina prohibit *all* third-party groups from distributing applications. Tenn. Code Ann. § 2-6-202; S.C. Code § 7-15-330. Alaska allows groups to distribute applications only to their affiliated members. Alaska Stat. §15.20.081.

on absentee-ballot applications from third-party groups. SB 202 at 5:102-106. These compelling interests must underlie any analysis of SB 202's lawfulness.

Since the Constitution largely defers to Georgia to legislate in this space, surely "there must be a [constitutional] means" for the State to do so. *Glossip v. Gross*, 576 U.S. 863, 869 (2015) (cleaned up). Plaintiffs nevertheless raise 13 facial and as-applied challenges to these three SB 202 provisions. Facial challenges to election practices face a particularly high bar because they "must fail where [a] statute has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). In all events, none of Plaintiffs' claims should be allowed to proceed.

### A.   Free Speech Claims

That is certainly true of Plaintiffs' free speech claims. For one thing, Plaintiffs are wrong to suggest (at Doc. 1 ¶ 117) that any of the challenged provisions is subject to strict scrutiny. As the Supreme Court has held, only "[r]egulations imposing severe burdens on [the] rights [of election statute challengers] must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (cleaned up). "Lesser burdens, however, trigger less exacting review, and a state's important regulatory interests will usually be enough to justify reasonable nondiscriminatory restrictions." *Id*. Workaday burdens that "aris[e]

from life's vagaries" thus fall into the latter category. *Crawford*, 553 U.S. at 191, 197-98 (controlling opinion). Only laws imposing burdens that are so "severe" as to be "virtually impossible" to comply with are subject to strict scrutiny. *See Storer v. Brown*, 415 U.S. 724, 728-29 (1974). As explained below, Plaintiffs have not asserted any plausible reason to believe the challenged provisions impose such severe burdens.

Furthermore, "[a] State indisputably has a compelling interest in preserving the integrity of its election process," and wide latitude to decide how. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*) (cleaned up).  In addition, "[l]egislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).

### 1.   *Disclaimer Provision*

More specifically, nothing in the Disclaimer Provision impinges on protected speech. It has no impact on the content of Plaintiffs' message, not least because "[b]allots [as well as absentee ballot applications] serve primarily to elect candidates, not as forums for political expression." *Timmons*, 520 U.S. at 363; *see also Burdick*, 504 U.S. at 438. The Disclaimer Provision merely

stops the communications sent by private entities from being mistaken for official governmental communications.[3]

But even if this provision impinged on core political speech, it would still be valid because it is at most a "lesser," workaday burden. *Timmons*, 520 U.S. at 358; *see also Crawford*, 553 U.S. at 197-98 (controlling opinion). First, no one would infer from the disclaimer "that Plaintiffs' communications are in some way illegitimate or not in accord with government-prescribed processes." Doc. 1, ¶ 111. Second, Georgia has a compelling interest in "safeguarding voter confidence;" stopping voters from being misled; "improv[ing] . . . election procedures;" reducing voter confusion; and efficiently running elections. *GBM*, 992 F.3d at 1319; *NGP*, 976 F.3d at 1282; SB 202 at 5:102-106. Third, if prohibitions on fusion ballots (as in *Timmons*), photo ID requirements (as in *Crawford* and *GBM*), strict deadlines for the receipt of absentee ballots (as in

---

[3] Contrary to Plaintiffs' suggestion (at Doc. 1, ¶¶ 12, 74, 86, 111), *Meyer v. Grant*, 486 U.S. 414 (1988), is inapposite. *Meyer*, which concerned a law prohibiting the use of paid circulators to collect signatures for initiative petitions, was a heavily fact-specific decision. 486 U.S. at 421-24. Furthermore, the law in *Meyer* was deemed to choke off "core political speech," *id*. at 420, 421-22, whereas SB 202's challenged provisions do not implicate protected speech in the first place. Additionally, the deference to which a State is entitled in conducting its own elections, *see Purcell*, 549 U.S. at 4, including in ensuring the integrity of the absentee-ballot application process, is significantly lower in the petition context because the latter is removed both chronologically and logically from elections.

*NGP*), and even bans on write-in voting (such as in *Burdick*) count as lesser, non-severe burdens, then so does the Disclaimer Provision, which imposes at most a minimal burden. Fourth, the Disclaimer Provision does not force Plaintiffs to misrepresent the "official" character of the solicitation. *See* Doc. 1, ¶ 66. In the statute, "publication" obviously means conveying *private* views, communications, and outreach to voters. O.C.G.A. § 21-2-381(a)(1)(C)(ii). Through its use of that term, the statute thus simply distinguishes the unofficial and private character of the private *solicitation* from the governmental character of the absentee ballot *application*. Accordingly, the Court should dismiss this claim.

### 2.   *Prefilling Prohibition*

The Prefilling Prohibition likewise does not impinge on anyone's free speech rights. It does not stop anyone from communicating with, advising, or liaising with voters about candidates, ideas, or the like. Nor does it curtail a "forum[] for political expression"—because a ballot or ballot application is not such a forum in the first place. *Timmons*, 520 U.S. at 363.

Moreover, even if this provision invaded core political speech, it would still be constitutional because it is at most a "lesser" burden. *Id.* at 358. The Prefilling Prohibition stops fraud, abuse, manipulation, and exploitation of voters, as well as damaging disclosure of voters' private information by private

entities. The minimal burden imposed on Plaintiffs is amply justified by Georgia's interest in keeping the voter-requester relationship straight, clear, and mutually accountable to safeguard election integrity, protect voter confidence, reduce voter confusion, and manage voter rolls. *See GBM*, 992 F.3d at 1319; *NGP*, 976 F.3d at 1282. And, by exempting relatives authorized to request an absentee ballot for a voter and persons assisting illiterate or disabled voters, the Prefilling Prohibition eases the burden. Consequently, this claim should be dismissed.

### 3.   *Anti-Duplication Provision*

For similar reasons, the Anti-Duplication Provision also does not infringe anyone's free speech rights. But even if it implicated protected speech, it would be a non-severe burden that the governmental interests more than justify. *See Timmons*, 520 U.S. at 358. This restriction serves Georgia's powerful interests in safeguarding election integrity, reducing voter confusion, and increasing voter confidence: By stopping private entities like Plaintiffs from mailing absentee ballot applications to voters who *already* "have . . . requested, received, or voted an absentee ballot in the primary, election, or runoff," Georgia is legitimately trying to avoid elector confusion and decrease the burden on election officials who process absentee ballot applications. It also reduces the potential for double voting.

Otherwise, election integrity would be harmed, election officials would be burdened, and voter confidence would be undermined—stopping which are compelling governmental interests. *See GBM*, 992 F.3d at 1319; *NGP*, 976 F.3d at 1282. The Anti-Duplication Provision is a reasonable way for Georgia to advance those interests. *See Purcell*, 549 U.S. at 4. Therefore, this claim too should be dismissed.

### B.   Freedom of Association Claims

The same is true of Plaintiffs' freedom of association claims. Although the "freedom to associate . . . for the common advancement of . . . beliefs and ideas" is central to the First Amendment, *Kusper v. Pontikes*, 414 U.S. 51, 56 (1973), the freedom of association does not shield *non-associational* activities from the law's reach. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984). Hence the freedom of association may be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Boy Scouts*, 530 U.S. at 648 (cleaned up).

Given these standards, freedom of association is not implicated by SB 202's challenged provisions. None of them impedes Plaintiffs from associating with voters to "express[] commonly held views." *Id*. All they do is place

13

reasonable regulations around solicitation activity—to reduce voter confusion, make the absentee ballot process more manageable, and protect the integrity of the election.

For instance, the Disclaimer Provision has no impact on Plaintiffs' freedom to associate with voters. This provision merely instructs Plaintiffs that *when* they send absentee ballot applications to voters, they must clearly and conspicuously tell those voters that the solicitation came from a particular private entity. Far from creating a "false impression of illegitimacy" for Plaintiffs' outreach, *but see* Doc. 1, ¶ 126, the Disclaimer Provision *strengthens* the association between Plaintiffs and voters because it enables the voters to identify Plaintiffs with their outreach.

Similarly, the Prefilling Prohibition does not stop Plaintiffs from associating with voters to provide information and views about candidates, issues, or the like—even in a manner of Plaintiffs' choosing. By preventing people (absent a few reliable and trustworthy exceptions) from sending voters absentee ballot applications that are prefilled with those voters' required information, Georgia reduces voter confusion, prevents allegations of fraud that occur when pre-filled applications are sent to addresses where that voter does not live, and increases the security of the absentee ballot process by ensuring that it is the voter herself who fills out the required information.

14

Nor does the Anti-Duplication Provision implicate associational rights. As with the Prefilling Prohibition, this restriction does not prevent Plaintiffs from associating with voters to discuss candidates and issues. It just stops Plaintiffs from sending duplicative absentee ballot applications, which both confuse voters and burden election officials processing those applications.

But even if the three challenged provisions implicated associational rights, they impose non-severe burdens that are supported by Georgia's previously mentioned regulatory interests. *See* Part II(A) – Free Speech Claims, *supra*. Clearly, these interests are "unrelated to the suppression of ideas." *Boy Scouts*, 530 U.S. at 648 (cleaned up). And Georgia's law is narrowly tailored to protect voters from abuse and exploitation and the election system from corruption. *See id.*; *Roberts*, 468 U.S. at 623. Accordingly, these claims should be dismissed.

## C.    Compelled Speech Claim

So too for Plaintiffs' compelled speech claim. Contrary to Plaintiffs' suggestion (at Doc. 1, ¶¶ 136, 139), freedom from compelled speech is implicated *only* when the government "alters the content of the speech," *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988). Moreover, such compelled alteration can still survive a First Amendment challenge if it "serve[s] a compelling state interest that cannot be achieved through means significantly

less restrictive of associational freedoms." *Janus v. AFSCME*, 138 S. Ct. 2448, 2465 (2018) (cleaned up).

Here, the Disclaimer Provision does not "alte[r] the content of [Plaintiffs'] speech" at all. *Riley*, 487 U.S. at 795. It does not stop Plaintiffs from conveying to voters exactly what they want to convey or change their message in any way. All the provision requires is that the solicitation make clear that it comes from the private entity, not the government. This is entirely sensible: Understandably, the voter might give the communication an exaggerated level of importance if (s)he thought it had been sent by Georgia election officials. And receiving multiple absentee ballot applications from entities they assume are government sources is likely to confuse voters because they may believe either that their first application was not processed correctly, or that they are required to complete more than one form—a problem the Georgia legislature said it was trying to avoid. SB 202 at 5:102-106.

Precedents, accordingly, have acknowledged the crucial difference between government alteration of speech's content versus reasonable government efforts to ensure the public is aware of important caveats concerning the message it is receiving. *See*, *e.g.*, *Janus,* 138 S. Ct. at 2464 ("the compelled subsidization of private speech seriously impinges on First Amendment rights" because it makes the challenger a state-favored third

party's mouthpiece); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (invalidating requirement on licensed clinics to tell women about how to obtain an abortion); *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985) (upholding requirement that challenger must disclose "purely factual and uncontroversial information about the terms under which . . . services will be available."). This is a significantly easier case than *Zauderer* because, unlike in *Zauderer*, where the government coerced attorneys to disclose information about their own fee arrangements, here Georgia is merely trying to ensure that voters understand that the private entities sending them absentee ballot applications are distinct from the government.

The Disclaimer Provision, therefore, is a content-neutral requirement that does not implicate compelled speech. It permissibly regulates speech "without reference to [its] content" and is "narrowly tailored to serve" compelling governmental interests—Georgia, as noted earlier, has compelling interests that justify this provision against all First Amendment challenges. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The measure also "leave[s] open ample alternative channels" to communicate. *Id*.

However, *even* if the Disclaimer Provision implicated the compelled-speech doctrine, it is amply justified by compelling interests (including the

need to avoid confusion with a government entity) and is narrowly tailored to invade associational and expressive freedoms as little as possible. *See Janus*, 138 S. Ct. at 2465. As a non-severe burden on these freedoms (assuming it burdens them at all), this provision is more than justified by Georgia's regulatory interests. *See Timmons*, 520 U.S. at 358; *see also Crawford*, 553 U.S. at 197-98 (controlling opinion). Thus, this claim should be dismissed.

### D.   Overbreadth Claims

Nor is there any merit to Plaintiffs' overbreadth claims. The substantial overbreadth doctrine "prohibits the [g]overnment from banning unprotected speech if a *substantial* amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) (emphasis added); *see also United States v. Williams*, 553 U.S. 285, 292 (2008). And the Supreme Court has said that "a statute's overbreadth [need] be substantial" both "absolute[ly]" and "relative to the statute's plainly legitimate sweep," before the statute may be invalidated. *Id.* Moreover, the challenger bears the burden of proving substantial overbreadth. *See Virginia v. Hicks*, 539 U.S. 113, 122 (2003). And, since "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers," the first step is to interpret a statutory provision. *Williams*, 553 U.S. at 293. Plaintiffs have failed to adequately plead overbreadth as to any of the disputed provisions.

18

### 1. Disclaimer Provision

Plaintiffs are concerned that "[t]he required disclaimer must appear on '[a]ny application for an absentee ballot sent to any elector by any person or entity.'" Doc. 1, ¶ 147. But this does not show overbreadth, much less substantial overbreadth. For one, Plaintiffs have not identified how the Disclaimer Provision impinges on protected speech or activities. After all, the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303 (cleaned up). And the Disclaimer Provision has a legitimate sweep, for it merely requires private entities sending applications to voters to note that they, not the government, are the senders. *See Wash. State Grange*, 552 U.S. at 449; *Williams*, 553 U.S. at 292.

Moreover, the Disclaimer Provision does not stop "individual Georgians [from] helping each other [to] participate in the political process," Doc. 1, at ¶ 148. The law continues to allow authorized family members to request an absentee ballot for their relative. Not only is the latter interpretation clear on its face, but even if it were not, courts are obligated to give it this saving construction. *See Skilling v. United States*, 561 U.S. 358, 405-06 (2010). Furthermore, the fact that the Disclaimer Provision does not make an exception is a reasonable choice Georgia has made to curtail abuses. In short,

the Disclaimer Provision is not substantially overbroad, and Plaintiffs have not pleaded a plausible overbreadth claim as to that provision.

2.     *Prefilling Prohibition*

Similarly, the Prefilling Prohibition is not substantially overbroad either. The Prefilling Prohibition does not sweep so broadly as to impinge on free speech, free association, or any other constitutional rights. Indeed, the provision makes clear that an authorized relative and someone assisting an illiterate or disabled voter *is* permitted to request absentee ballots.

Plaintiffs nevertheless posit one situation in which, they say, the provision would infringe First Amendment rights: "a situation where the absentee ballot application is solicited by the voter and the voter [herself] provides Plaintiffs with the required prefilled information." Doc. 1, ¶ 149. But whether voters would in fact do so in significant numbers is highly speculative. In any event, such a narrow sliver of potentially problematic exceptions would not constitute *substantial* overbreadth. *See Williams*, 553 U.S. at 303. Here again, Plaintiffs have failed to plausibly plead an overbreadth violation.

3.     *Anti-Duplication Provision*

For similar reasons, the Anti-Duplication Provision is not substantially overbroad. It prohibits sending applications to individuals who may have "already requested, received, or voted an absentee ballot in the primary,

election, or runoff." Georgia has devised an easily administrable rule that makes no exceptions and enables the appropriate election officials to mail absentee ballot applications to the relevant voters—namely those whose earlier attempts to obtain absentee ballots had failed. The law also requires both the Secretary of State's office and each county registrar to make the absentee ballot application form available on their websites that any voter can access at any time. Plaintiffs point out that this provision prevents them "from sending solicited applications to electors that made an error on their prior request, had their prior request rejected, or need a new application for any other reason." Doc. 1, ¶ 150. But these are not protected activities, and Plaintiffs have not plausibly alleged that any over-inclusiveness here is substantial. *See Williams*, 553 U.S. at 303.

*   *   *

The subtext underlying Plaintiffs' grievance is that Georgia did not make exceptions in *their* favor. But if Georgia had made exceptions for some groups and not others, Plaintiffs or others may well have leveled equal-protection challenges against those classifications. Nor should Plaintiffs have any trouble understanding or complying with these challenged provisions if they try. For these reasons, Plaintiffs' substantial-overbreadth claims should be dismissed.

### E.   Vagueness Claims

The same is true of Plaintiffs' vagueness claims. A law is void for vagueness only if it "fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Plaintiffs have not adequately pleaded a vagueness claim as to any of the challenged provisions.

#### 1.   *Disclaimer Provision*

Plaintiffs' challenge to the Disclaimer Provision alleges ambiguity in the word "sent." But the meaning of that word is clear, especially in context. *See United Sav. Ass'n. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). The ordinary, contemporary, and natural meaning of "sent" (or its present tense, "send") in this context is "to cause something to go from one place to another," Cambridge Dictionary (online ed.), and "to convey or cause to be conveyed," Merriam-Webster Dictionary (online ed.). Furthermore, the Disclaimer Provision's instruction that the absentee ballot application "shall utilize" the Secretary of State's form and "shall clearly and prominently disclose [the disclaimer] on the face of th[is] form" obviously refers to the paper format. Viewed in context, then, "sent" naturally refers to conveyance of the absentee ballot application by hard copy. There is no genuine ambiguity.

Nor is there anything unclear about the requirements that the disclaimer be written in "sufficient font size" so as "to be clearly readable by the recipient of the communication" or that it "[b]e printed with a reasonable degree of color contrast between the background and the printed disclaimer." Reasonable people would know what each of these requirements means.[4] *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). And in applying the vagueness doctrine, courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (cleaned up). Moreover, if all less-than-fully-definite legislative terminology were deemed unconstitutionally vague, the statute books would be nearly empty. Therefore, the Disclaimer Provision is not void for vagueness.

### 2.   *Prefilling Prohibition*

For the same reasons, Plaintiffs' challenge to the Prefilling Prohibition's use of the word "send" also fails as a matter of law. Moreover, there is nothing remotely vague about this provision's proscription on "prefill[ing]" an absentee ballot application "with the elector's required information." Doc. 1, ¶ 157. Clearly, this provision does not require that *all* of a voter's required information be prefilled in order to trigger its scope; *some* prefilling suffices.

---

[4] In fact, they are identical to the requirements for disclaimers on candidate communications to voters. 52 U.S.C. § 30120(c).

No one would reasonably interpret it otherwise—and the legislature explained that the purpose was to address the voter confusion that emerged in 2020 with groups sending applications "with incorrectly filled-in voter information." SB 202 at 5:102-106. Accordingly, this provision is not void for vagueness.

### 3.   *Anti-Duplication Provision*

For similar reasons, Plaintiffs' challenge to the Anti-Duplication Provision's use of the word "send" also fails. Their challenge to its use of "mail" is also implausible because the ordinary, contemporary, natural meaning of that word in this context refers to conveyance by postal mail. *See* Merriam-Webster Dictionary (online ed.) (mail (*v*) – "to send by mail"); American Heritage Dictionary (online ed.) (mail (*v.tr.*) – "[t]o send by a postal system").

Additionally, as already discussed, the Anti-Duplication Provision unambiguously allows only appropriate election officials, and no one else, to "mail [absentee ballot] applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff." The law also requires the application to be made available online, so a voter can easily access the application if they need to submit one. Moreover, this provision refers to "the most recent information available *about which electors have requested, been issued, or voted an absentee ballot in the primary,*

24

*election, or runoff*"—information that is posed online daily by the Secretary of State. There is nothing ambiguous or unclear here.

Finally, contrary to Plaintiffs' oblique suggestion, the Constitution does not require state officials to publish this information with any given frequency. Georgia law only requires Plaintiffs to comply with "the most recent information [made] available" by state officials. For all these reasons, the Anti-Duplication Provision is not void for vagueness.

## CONCLUSION

Plaintiffs lack Article III standing to challenge the absentee ballot provisions in SB 202. Moreover, as "neutral, nondiscriminatory regulation[s] of voting procedure," each of the challenged provisions is constitutionally valid both facially and as applied to Plaintiffs. *GBM*, 992 F.3d at 1328. Plaintiffs' Complaint should be dismissed, in its entirety, with prejudice.

Respectfully submitted this 17th day of May, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan

Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Gene C. Schaerr*
gschaerr@schaerr-jaffe.com
Erik Jaffe*
ejaffe@schaerr-jaffe.com
H. Christopher Bartolomucci*
cbartolomucci@schaerr-jaffe.com
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Fax: (202) 776-0136
**Pro hac vice* motions pending

*Counsel for Defendants*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief in Support of Defendants' Motion to Dismiss has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson