THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT.

OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL

COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90

DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE

DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER

THE COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT; HOWEVER, YOU

ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY

DOCUMENT FILED WITH THE COURT.

1

2

3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

4   VOTEAMERICA, ET AL,                    )
                                          )
5        PLAINTIFFS,                       )
                                          )   DOCKET NO. 1:21-CV-01390-JPB
6        -VS-                              )   VOLUME 1
                                          )
7   BRAD RAFFENSPERGER, ET AL,             )
                                          )
8        DEFENDANTS.                       )

9

10

11          **TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
                **BEFORE THE HONORABLE J.P. BOULEE**
12                **UNITED STATES DISTRICT JUDGE**
                      **JUNE 9, 2022**

13

14

15

16

17

18

19

20  STENOGRAPHICALLY RECORDED BY:

21

                        PENNY PRITTY COUDRIET, RMR, CRR
22                          OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
23                            ATLANTA, GEORGIA

24

25

```
1                    A P P E A R A N C E S

2

  ON BEHALF OF THE PLAINTIFF - VOTEAMERICA, VOTER PARTICIPATION
3 CENTER AND CENTER FOR VOTER INFORMATION

4         KATHERINE LEIGH D'AMBROSIO
          SMITH GAMBRELL & RUSSELL, LLP
5
          JONATHAN DIAZ, ESQ.
6         DANIELLE M. LANG, ESQ.
          VALENCIA RICHARDSON, ESQ.
7         HAYDEN JOHNSON, ESQ.
          ALICE CLARE CAMPBELL HULING, ESQ.
8         CAMPAIGN LEGAL CENTER

9

  ON BEHALF OF THE DEFENDANTS - BRAD RAFFENSPERGER, SARA GHAZAL,
10 JANICE JOHNSTON, EDWARD LINDSEY, MATTHEW MASHBURN

11        GENE C. SCHAERR, ESQ.
          H. CHRISTOPHER BARTOLOMUCCI, ESQ.
12        BRIAN FIELD, ESQ.
          SCHAERR JAFFE, LLP.
13
          BRYAN P. TYSON, ESQ.
14        TAYLOR ENGLISH DUMA, LLP.

15

  ON BEHALF OF THE INTERVENOR DEFENDANTS - REPUBLICAN NATIONAL
16 COMMITTEE, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, NATIONAL
  REPUBLICAN CONGRESSIONAL COMMITTEE, GEORGIA REPUBLICAN PARTY,
17 INC.,

18        CAMERON T. NORRIS, ESQ.
          CONSOVOY MCCARTHY, PLLC.
19

20

21

22

23

24

25
```

3

1                          I N D E X

2

3    WITNESS:                                        PAGE:

4    1.  THOMAS LOPACH

5             DIRECT EXAMINATION.............................32
          CROSS-EXAMINATION..............................72
6             REDIRECT EXAMINATION..........................125
          RECROSS-EXAMINATION...........................130
7
    2.  DANIEL MCCARTHY
8
              DIRECT EXAMINATION............................132
9             CROSS-EXAMINATION.............................162

10

11   3.  DONALD GREEN

12            DIRECT EXAMINATION............................199
          CROSS-EXAMINATION.............................242

13                          - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (PROCEEDINGS HELD IN OPEN COURT AT 9:54 A.M., ATLANTA)
 2            COURTROOM DEPUTY CLERK:  The Court has set aside time
 3   today for a motion hearing in case VoteAmerica, et al, v.
 4   Raffensperger, et al, case 1:21-CV-1390.
 5            Counsel, will y'all make your appearances for the
 6   record.
 7            MS. D'AMBROSIO:  Good morning, your Honor.  Katie
 8   D'Ambrosio from Smith, Gambrell & Russell for plaintiffs, local
 9   counsel.  And here with me today is lead counsel from Campaign
10   Legal Center Jonathan Diaz, Danielle Lang, Alice Huling, Valencia
11   Richardson and Katie Johnson.
12            THE COURT:  All right.  Thank you.  And good morning to
13   all of you.  And I'm going to take my mask off when I'm speaking.
14   If you have any witnesses, they can take their mask off if they
15   would like but don't have to.
16            Good morning.
17            MR. TYSON:  Good morning, your Honor.  Bryan Tyson from
18   Taylor English for the defendants.
19            We're joined today, I'll just introduce those who will
20   be speaking, Gene Schaerr from Schaerr Jaffe in Washington.  Chris
21   Bartolomucci, also from Schaerr Jaffe.  Brian Field from Schaerr
22   Jaffe.  And then the Secretary's General Counsel is joining us at
23   counsel table, Ryan Germany.
24            THE COURT:  Good to see you all this morning.
25            MR. NORRIS:  Good morning, your Honor.  I just want to
```

 1  introduce myself as well.  Cam Norris for the Republican

 2  intervenors.

 3          THE COURT:  Good to see you.  I intended this to be a

 4  one-day hearing, generally splitting time equally between the

 5  plaintiffs and the two defendant groups.  We started a little bit

 6  late, but I think we still should be able to get things in in one

 7  day, I hope.  So if you can kind of guide the extent of any

 8  argument or direct, cross-examinations to using up perhaps

 9  three-and-a-half hours time per side, it would be appreciated.  I

10  don't have a stopwatch up here, so if you go a little over, I

11  don't really care, but let's just use that as our guide and we'll

12  see where we are towards the end of the day.

13          All right.  Having said that, you have the floor.  Happy

14  to hear anything anybody would like to say in opening.

15          MR. DIAZ:  Thank you, your Honor.  Before we start I did

16  want to deal with one housekeeping item, which is that plaintiffs

17  wanted to move their Exhibits 1 through 46 into the record.  Those

18  are all of the exhibits that were attached to all of the PI

19  briefing.  The defendants and the intervenors have stipulated to

20  the admissibility of those exhibits.

21          THE COURT:  All right.  Thank you.  They are admitted.

22          MR. DIAZ:  Great.

23          Thank you, your Honor.  And may it please the Court.

24  I'm Jonathan Diaz from Campaign Legal Center for the plaintiffs

25  VoteAmerica, Voter Participation Center, or VPC, and Center For

1   Voter Information, or CVI.

2          This is a straightforward case, your Honor.  As this

3   Court is well aware, in 2021 Georgia enacted Senate Bill 202 which

4   made a variety of changes to Georgia's election laws.  This case

5   and this hearing concern only three provisions of that bill, which

6   we'll refer to collectively as the ballot application

7   restrictions.  All of which, in plaintiffs' view, impose severe

8   and content-based restraints on plaintiffs' freedom of political

9   expression and association in violation of the First Amendment,

10  and in the case of the disclaimer provision in particular, compel

11  plaintiffs to disseminate a false and misleading

12  government-scripted message.

13         Plaintiffs are nonprofit organizations focused on

14  encouraging and facilitating participation in the political

15  process by eligible voters across the nation, including here in

16  Georgia, with a particular focus on communities and populations

17  who have historically participated in elections at lower rates.

18  They achieve that mission in part through concerted communications

19  campaigns that urge eligible voters to participate in upcoming

20  elections and provide them with absentee ballot applications

21  personalized with the voter's information to make their

22  communications direct, personal and to make it as easy as possible

23  for their audience to request and vote an absentee ballot.

24         Plaintiffs' distribution of absentee ballot applications

25  is a key component of their persuasive messaging to mobilize

1    voters to engage in the political process.  And as detailed in our

2    briefing, courts around the country have routinely held that civic

3    engagement activities, like those our clients engage in, are

4    paradigmatic examples of the core political expression protected

5    by the First Amendment.  And as the Supreme Court has held

6    repeatedly, restrictions that infringe on that kind of expression,

7    like the ballot application restrictions at issue here, are

8    subject to strict scrutiny under *Myer v. Grant* and *Buckley v.*

9    *American Constitutional Law Foundation*.

10           There are three provisions of SB 202 that comprise the

11   ballot application restrictions:

12           First, the disclaimer provision, which requires the use

13   of a misleading disclaimer on every application that plaintiffs

14   distribute undermining the legitimacy of their message and

15   dissuading voters from utilizing the forms that plaintiffs

16   provide.

17           Second, the pre-filling prohibition, which prevents

18   plaintiffs from pre-populating the applications with the voter's

19   personal information derived from the state's voter registration

20   file drastically reducing the personal nature and effectiveness of

21   their communications with voters.

22           Third and finally, the mailing list restriction imposes

23   severe penalties on plaintiffs for every application sent to an

24   individual who has already requested, received or cast an absentee

25   ballot, which obligates them to monitor a dynamic, ever-changing

```
 1   list of those voters provided by the state to ensure that
 2   successive applications are not distributed.
 3          Each of these provisions is undeniably content-based.
 4   They only apply to communications that contain absentee ballot
 5   applications.  And individually and collectively these provisions
 6   drastically limit the quantity and effectiveness of the
 7   plaintiffs' speech.
 8          Your Honor, you'll hear today from Tom Lopach of VPC
 9   and CVI, and Daniel McCarthy of VoteAmerica about how those
10   restrictions are devastating to their organizations' efforts to
11   communicate with Georgia voters and how compliance with these
12   provisions will necessarily limit their ability to speak with and
13   associate with Georgia voters in advance of the 2022 general
14   election.
15          You'll also hear from Dr. Donald Green, a professor of
16   political science at Columbia University, and an expert on voting
17   behavior, who will draw on his more than 30 years of scholarship
18   and research into political motivation and persuasion to describe
19   how these restrictions reduce the effectiveness of plaintiffs'
20   communications, dissuade and confuse potential voters from
21   engaging with plaintiffs' message, and limit their overall
22   expression.
23          The state and intervenors will try to convince you that
24   lesser scrutiny should apply to these provisions, but they cannot
25   overcome the weight of binding precedent that makes clear that
```

1   these restrictions are subject to strict scrutiny.  And while they

2   claim that the evidentiary record supports the need for these

3   restrictions, in reality they have little more than a handful of

4   conspiratorial, post-election complaints that purport to provide

5   justification for these severe restrictions on plaintiffs' speech.

6   Hardly the kind of compelling government interest that can satisfy

7   strict scrutiny in this case.

8           The need for preliminary relief at this junction is

9   plain.  Plaintiffs filed this motion now because the threat of

10  harm became imminent.  Absent intervention from this Court, SB

11  202's restrictions will prevent plaintiffs from effectively

12  communicating with Georgia voters in advance of the November 2022

13  general election.

14          Plaintiffs did not, as the state suggests, unduly delay

15  in filing this motion.  Any sooner and the state would have argued

16  that plaintiffs' harms were speculative and their claims unripe,

17  and this Court shouldn't fall pray to the state's Goldie Lock's

18  trap where it is always too early or too late for relief.

19          The public interest also clearly supports an injunction

20  here.  The government has no legitimate interest in enforcing an

21  unconstitutional restriction on plaintiffs' First Amendment rights

22  to communicate and associate with Georgia voters through protected

23  political expression.

24          And despite the state and intervenors' protestations,

25  *Purcell* does not preclude relief for plaintiffs here.  As this

1  Court has previously stated most recently in the *Coalition for*

2  *Good Governance* case, *Purcell* does not function as a bright-line

3  rule in the way that they suggest.  It's a balancing test that

4  instructs the Court to weigh the potential impact of an injunction

5  on election administration against the unconstitutional harms

6  caused by the enjoined law.  And here defendants' warnings of

7  electoral chaos resulting from plaintiffs' requested injunction

8  are just hyperbole.

9           THE COURT:  Let me break in on that.  Let's say on the

10  merits hypothetically I agree with everything you argue, would you

11  have me ignore *League of Women Voters of Florida v. The Florida*

12  *Secretary of State*, Eleventh Circuit, what, about a month ago?

13  You're familiar with that case I'm sure.

14           MR. DIAZ:  Yes.

15           THE COURT:  I understand it's not binding on me, but I

16  would be foolish to just ignore it, wouldn't I?

17           MR. DIAZ:  Well, your Honor, I don't think that that

18  case stands for the proposition that there is --

19           THE COURT:  Well, agree with me that it would be foolish

20  for me to ignore that case?

21           MR. DIAZ:  I mean, of course, your Honor, you know,

22  should consider the Eleventh Circuit's decisions and that should

23  weigh on your evaluation of this motion, but I don't think that

24  the *League of Women Voters* case represents the proposition that

25  there is an absolute bar on relief in election cases in the months

 1   preceding an election.

 2           In this instance, you know, plaintiffs' motion, we have

 3   more than two months before the time at which any individual can

 4   even request an absentee ballot -- or can submit an absentee

 5   ballot application, and more than five months for the election.

 6   And the only thing that the defendants have to do to implement the

 7   injunction that we've asked for is not enforce the three

 8   provisions of this bill -- or of this statute, excuse me.

 9           So the disruption to electoral administration is really

10   minimal.  It's not going to impact voters.  These are restrictions

11   on speech and association that occur outside of the ballot box and

12   outside of election administration offices.  So, you know, the

13   reasoning of *Purcell* and the analysis in that *League of Women*

14   *Voters* case, you know, we don't think really, you know, carries

15   the day here.

16           THE COURT:  Thank you.

17           MR. DIAZ:  And so I'll just, you know, wrap up, your

18   Honor, and say the First Amendment's protections, as the Court is

19   aware, are at their strongest when Americans engage in expression

20   and association related to the political process.  The ballot

21   application restrictions in SB 202 plainly run afoul of those

22   protections.  And plaintiffs would respectfully request that the

23   Court grant their motion for preliminary injunction.

24           THE COURT:  All right.  Thank you, counsel.

25           MR. DIAZ:  Thank you.

1          MR. TYSON:  Good morning, your Honor.  Bryan Tyson for

2     the defendants.  I'm just going to briefly introduce Mr. Schaerr

3     who is going to be handling the merits argument for us today.

4     Mr. Schaerr is one of our co-counsel in DC, handled appellate

5     practice chair for most of the Austin and Winston Strachan over

6     time before starting his own firm.  He was integral in the defense

7     the 2020 election results for the state.  So he will be arguing

8     the merits.

9          I wanted to set a couple pieces of the table of some

10    Georgia specific issues.  As your Honor knows, me and my

11    colleagues have stood in these podiums defending Georgia election

12    results in 2018 and 2020 and 2022, and how Georgia runs elections.

13    And I think often people think of elections as a single event when

14    in reality they're a process.  And the best example I could come

15    up with here was the May 24th primaries, which seem at this point

16    kind of distant, but even this week that's when the Secretary of

17    State certified those election results.

18         So as you'll hear testimony from Mr. Germany and others,

19    we're now moving towards the runoff elections and all the tasks

20    there and then the certification and other things that will be

21    completed as we move towards the general election.  So an election

22    year for election officials is really an all-encompassing effort.

23         And your Honor highlighted the *League of Women Voters*

24    case and, obviously, you've ruled already that *Purcell* is not a

25    bright-line.  But I think that looking at the development

1  particularly around *Purcell* in the last six months is important.

2         When we had the redistricting hearing in front of Judge

3  Jones in February, we had similar arguments.  The November

4  election is nine months away.  And one of the things that Judge

5  Jones did in the *Alpha Phi Alpha* decision on the third and fourth

6  prongs is really walk through in detail all the different pieces

7  of the election calendar that had to be addressed.

8         And when the Supreme Court issued its opinion in

9  *Merrill v. Milligan* in the middle of that redistricting PI

10 hearing, Judge Jones recognized that although that wasn't

11 precedential, it was very important to him, and one of the reasons

12 was the -- what we called at the time the whiplash effect.  If an

13 injunction is entered but then later stayed by an appellate court,

14 there's an impact on election officials that comes from that.

15        So the Eleventh Circuit decision in *League of Women*

16 *Voters* looked at some of those factors and the requirements that

17 Justice Kavanaugh announced *in Merrill*.  And for those

18 specifically, I think what you'll find is the evidence before you

19 today is not going to show that plaintiffs can meet any of those

20 requirements.  The evidence is going to show these claims are not

21 entirely clear-cut in favor of the plaintiffs.

22        There are issues around what the legislature was doing

23 responding to the issues raised by voters, making a careful

24 decision that ultimately, as the evidence will show you, had a

25 minimal impact on what the plaintiffs are doing in their reaching

1  out to voters about absentee ballot issues.

2          The irreparable harm piece is relevant to the delay.

3  The evidence will show the plaintiffs have some ideas and

4  speculation about potential harms, but they can't show for certain

5  they will be harmed by these provisions.

6          The third factor of undue delay also, the evidence will

7  show you here today that there's nothing the plaintiffs needed in

8  discovery to bring this preliminary injunction motion.  They knew

9  about these issues a year ago when this case was filed.  And as

10 the Court's aware, plaintiffs have not been hesitant to file

11 preliminary injunction motions against the state, even when there

12 are jurisdictional questions.

13         And the last factor of the feasibility without

14 significant cost, confusion or hardship, the evidence is going

15 to show to this Court that the plaintiffs can't show this is

16 feasible.  But even if they could, the cost on election officials,

17 the confusion to voters that would come, the exact thing the

18 legislature was trying to mitigate by adding these provisions of

19 Senate Bill 202 would impose a cost beyond what should be

20 permitted at this point.

21         So, with that, your Honor, I'll turn it over to

22 Mr. Schaerr for the merits but just wanted to make clear that

23 we're at a point where interfering with the election laws, having

24 the Court intervene in the minutiae of election administration, we

25 believe it's too late to reach those kinds of questions.

1          THE COURT:  Let me ask you, and it may be you want to

2    have Mr. Schaerr answer, I'm not sure, but it does seem to be more

3    of a local question.  Looking at 21-2-381, as I understand it, it

4    says, and I'm at (c)(1) -- or (c)(2):  Any application for

5    absentee ballot sent to any elector by any person or entity shall

6    use the form of the application made available by the Secretary of

7    State.  And I think plaintiffs attach that as -- I think last time

8    I looked at it it was Exhibit 1F to a brief or reply brief or

9    something.

10         But then in the very next sentence is the verbiage of

11   what you have to put on that.  And the first part of it is what I

12   wanted to ask you about.  And, again, I'm not sure if I should ask

13   you or Mr. Schaerr, but it says -- so right after you're told to

14   use the form made available by the Secretary of State, it says you

15   have to say "this is not an official government publication."

16         Now, I understand your argument about who provided it,

17   not a ballot, et cetera, but it's that first phrase that I'm

18   having trouble with because it seems like it's saying you have to

19   use this form, but then it's saying it's not a government

20   publication.  And maybe there's different definitions of the word

21   "publication," I don't know, but I'm confused about that.

22         MR. TYSON:  Certainly, your Honor.  I'll take the

23   initial piece and let -- Mr. Germany's testimony I think will

24   really help elucidate some of this in more detail.

25         The application itself is for the ballot, that's what

1  we're trying to get to.  So the official absentee ballot in the

2  title of that I think is the key point.

3        What we'll see, Mr. Germany will testify that over time

4  there's been movement in terms of what type of information has to

5  be provided with an absentee ballot application.  So there was a

6  different rule in 2016.  2018 there were some changes.  2020 we

7  saw what happened with that.  The key point is voter confusion.

8  And I believe that it will probably be best brought out in terms

9  of Mr. Germany's testimony and evidence on that point.  We

10 definitely understand that will be a concern of the Court and are

11 planning to discuss that in detail with Mr. Germany.

12        THE COURT:  All right.  Thank you.  It's something that

13 I'm very interested in.

14        MR. TYSON:  Certainly, your Honor.  And I'll hand that

15 over to Mr. Schaerr now.  Thank you.

16        THE COURT:  Very well.  Good morning.

17        MR. SCHAERR:  Good morning, your Honor, and thank you

18 for the opportunity to address these issues before the Court

19 today.

20        I think everybody in this courtroom agrees that ensuring

21 smooth and efficient and secure elections is critically important

22 to our democracy.  And we all agree that they should be conducted

23 in a way that allows robust voter participation.  And in that

24 regard we were pleased to see that just last month in the primary

25 there was record turnout, including many more absentee ballots, as

1  we'll discuss later in our presentation, there were many more

2  absentee ballots in the just-concluded primary election than there

3  had been in 2018, which was the nearest comparable election.  And

4  only minimal reports of any kind of issues or long lines, and

5  perhaps that's why we no longer hear claims that this entire law,

6  SB 202, was somehow akin to Jim Crow 2.0, which, of course, is

7  what we heard initially when it was passed.  So we're delighted

8  that the temperature, the political temperature around all of

9  this, around the statutes has been reduced in light of the recent

10 primary election.

11         Nevertheless, as the Court is aware, the plaintiffs are

12 still challenging three provisions of SB 202, but as we'll show

13 today, especially through the testimony of Mr. Germany, these

14 provisions increase the efficiency of elections, reduce voter

15 confusion and reduce the risk of fraud.  And as -- we'll also

16 explain in great detail, they do all of that while ensuring that

17 the plaintiffs in similar organizations may fully exercise their

18 First Amendment speech and association rights.  And that's a

19 second independent reason besides the *Purcell* and *League of Women*

20 *Voters* problem that Mr. Tyson just discussed, why the Court should

21 deny plaintiffs' requested preliminary injunction.

22         And in that regard let me emphasize just how high a

23 burden the plaintiffs must clear.  Not only are they subject to

24 the heightened legal standards under the *Purcell* doctrine and

25 *League of Women Voters* as elucidated most recently by Justice

1    Kavanaugh, but it's also significant that the state's election

2    system and its procedures under SB 202 have already been

3    established for all of this year's elections, including the

4    November election.  And because of that, the PI that plaintiffs

5    have requested would necessarily be a mandatory injunction because

6    it wouldn't just preserve the current status quo, it would seek to

7    restore the status quo to the time before SB 202 was passed and

8    was implemented by the Secretary of State and by the elections

9    board.

10          And so the fact that the plaintiffs are effectively

11    asking for a mandatory injunction means that all of the

12    preliminary injunction factors are subject to an even heightened

13    standard.  They have to clear -- they have to be clearly

14    established and not just more likely than not, and there's no way

15    that plaintiffs can clearly establish that they will win on the

16    merits.  So let me just give you a brief overview of our case on

17    the merits.

18          As the Court is aware, the plaintiffs have to establish

19    a -- have to clearly establish a likelihood of success on the

20    merits, and a good starting point there, which we'll discuss at

21    greater length, is the evidence demonstrating the important

22    interests that the challenged provisions serve.

23          Now, the plaintiffs argue, as they have this morning,

24    that the challenged provisions are unsupported by evidence, but

25    the record is already full of examples of Georgians pre-SB 202 who

1    expressed confusion and concerns about fraud after receiving

2    absentee ballot applications in the mail from groups like the

3    plaintiffs.  Many were concerned about applications that were

4    pre-filled with incorrect information.  And, similarly, many

5    Georgians expressed confusion and concern about fraud when they

6    received applications that were addressed to people who no longer

7    live or even who never lived at all at the particular address to

8    which they were sent.

9           Other Georgians were concerned about the possibility of

10   voter fraud when they received multiple applications, which many

11   people thought were themselves ballots, not just applications for

12   an absentee ballot.  And other voters were confused by

13   applications that were sent by third-party-like plaintiffs as to

14   whether they were actually sent by the state, and whether those

15   applications actually had to be submitted to the state to allow

16   the individual to vote at all, even if they didn't want to vote

17   absentee.  So there was a lot of confusion and concerns about

18   fraud and all kinds of other things with respect to this

19   particular practice of sending out absentee ballot applications to

20   voters.

21          And across all of these categories of concerns, there

22   were many complaints lodged about absentee ballot applications

23   from the plaintiffs themselves.  And so as Mr. Germany will

24   testify, these applications did more than just confuse voters and

25   spark concerns about fraud, they were a serious drag on the

```
 1  election system's limited resources, because many of these

 2  applications, if they were duplicate or if they had the wrong

 3  information, they had to be dealt with by elections personnel

 4  throughout the state.

 5          So, for example, Mr. Germany will explain how incorrect

 6  or confusing absentee applications led to a significant increase

 7  in canceled absentee ballots, each of which is a burden on

 8  election officials.  He'll also explain how canceling absentee

 9  ballots creates confusing in the polling location.  And he'll

10  explain how each canceled ballot slows down the voting process

11  thereby contributing to lines on Election Day.

12          So with SB 202 in place for the recent primary election,

13  however, as Mr. Germany will explain, the number of complaints

14  about inaccurate absentee ballot applications went way down.  He

15  will also explain that the number of canceled absentee ballot

16  applications dropped significantly.  And because of that and other

17  aspects of SB 202 there were very few lines at polling locations

18  during the past primary election.

19          And so the challenged provisions directly address the

20  important concerns that were raised by plaintiffs own prior

21  absentee ballot applications.  And the Supreme Court, as the Court

22  is aware, and the Eleventh Circuit have already confirmed that

23  preventing voter confusion and fraud as well as conducting an

24  efficient election are legitimate and compelling state interests.

25          We also don't think that plaintiffs can deny that the
```

1  challenged provisions here are tailored to serve those interests.

2  Each provision relates directly to complaints and inefficiencies

3  that arose in prior elections.  And in responding to those issues

4  the state took a very narrow approach.  For example, the state did

5  not prohibit outside organizations from sending absentee ballot

6  applications outright.  It still allows plaintiffs to send those

7  applications.

8          The state also didn't entirely prohibit sending

9  duplicate absentee ballot applications.  Plaintiffs are only

10 prevented from sending applications to voters who have already

11 requested and received an application.

12         And, moreover, SB 202 left plenty of room for plaintiffs

13 to express their pro-absentee voting message to all Georgia voters

14 as frequently as they wish.  They can send as many mailings as

15 they want to Georgia voters encouraging them to vote absentee,

16 touting the benefits of absentee voting.  And they can also help

17 voters who have requested an absentee ballot and received it to

18 fill it out.

19         So there's a whole range of things that groups like the

20 plaintiffs can still do to exercise their First Amendment rights

21 to tout the benefits of absentee voting and to help voters with

22 that.

23         So we think that regardless of the level of scrutiny

24 that the Court determines is appropriate here, the plaintiffs

25 cannot show a substantial likelihood of success.  But I think it's

1  worth pausing briefly to discuss what is the correct level of

2  scrutiny.

3          Now, two of the three challenged provisions here, the

4  pre-filing -- or the pre-filling provision and the

5  anti-duplication provision, those provisions regulate only conduct

6  and they're, therefore, subject only to rational basis review,

7  where the plaintiffs to prevail must show that the provisions are

8  not even a rational means to serve a legitimate end.

9          Indeed, as plaintiffs VPC and CVI conceded in

10  Mr. Lopach's declaration, as we'll discuss later, they communicate

11  their message about absentee voting in cover letters that are sent

12  along side their absentee ballot applications.  Those cover

13  letters, as I mentioned, are unaffected by SB 202, and so rather

14  these two provisions, the pre-filling and anti-duplication

15  provisions, only address the materials that these groups may send

16  alongside the materials that contain their core speech.

17          Now, Plaintiff VoteAmerica by contrast promotes its

18  absentee voting message on its website separate and apart from any

19  conduct in assisting a voter to obtain and complete an absentee

20  ballot.  So, in other words, the plaintiffs engage in speech on

21  the one hand in cover letters and general messages about absentee

22  voting, and in conduct on the other, which is what they're doing

23  when they simply provide absentee ballot applications.

24          Now, I think it's also important to remember the Supreme

25  Court's decision in *Rumsfeld v. FAIR*, in which the Court made

 1  clear that conduct is not transformed into speech simply by

 2  talking about it.  But that's exactly what the plaintiffs are

 3  arguing here based largely on a misreading of the Supreme Court's

 4  decision in *Myer v. Grant*.

 5          Now, unlike this Court, this case, of course, *Myer*

 6  involved not just a restriction on the conduct of circulating

 7  petitions, but also on the speech that accompanied that

 8  circulation.  In fact, the Court held that communicating with

 9  potential signers of petitions was an inherent part of the

10  activity of distributing those petitions.  And that's obviously

11  not true here, but it was then in that case in the pre-Internet

12  age.

13          So it's no wonder that circuits addressing similar

14  claims reject the notion that simply sending or receiving forms is

15  itself expression.  Again, we don't doubt that the message in the

16  cover letters is expressive, but the evidence today will show that

17  plaintiffs' absentee applications and sending those applications

18  is distinct from the plaintiffs' speech.

19          But even if the Court concludes that some heightened

20  level of scrutiny applies to those two provisions, as it does for

21  the disclaimer provision or the disclosure provision, the

22  plaintiffs' motion still fails.

23          Now, the possible standards applicable to the disclosure

24  provision, which the Court highlighted earlier, are either the

25  *Anderson-Burdick* framework, where the plaintiffs must show that

1    the provision is not a reasonable voting restriction, or at most

2    the -- what is sometimes called the exacting scrutiny test that

3    the Supreme Court applied in cases like *Citizens United*.

4            Now, as noted, both the Supreme Court and the Eleventh

5    Circuit have confirmed that preventing voter fraud and confusion

6    are strong and entirely legitimate and compelling interests and

7    all three of those provisions narrowly target the issues that

8    arose in prior elections.  And they do that, as I mentioned

9    earlier, while allowing plaintiffs to send absentee applications

10   to every Georgian, allowing them to send multiple applications to

11   Georgians who haven't yet requested an absentee ballot, allowing

12   them to send their pro-absentee voting message to Georgians as

13   often as they wish, and allowing plaintiffs to help individual

14   Georgians fill out the applications that they've already

15   requested.

16           THE COURT:  Let me ask you about *Citizens United*.

17           MR. SCHAERR:  Sure.

18           THE COURT:  Cases like that I think essentially assume

19   that if you have a disclaimer, it can burden the ability to speak.

20   And I'm wondering whether that controls here.

21           I know defendants, state defendants, and I think

22   intervenor defendants, kind of concede that this is -- as to the

23   disclaimer at least, speech is affected.  And I'm wondering if

24   it's because of cases like *Citizens United* or if it's for some

25   other reason.  Is it that it's a disclaimer and that gets you in

1  the category of speech automatically?

2          I was a bit surprised to see you concede that point so

3  easily.

4          MR. SCHAERR:  Well, we're certainly not conceding that

5  *Citizens United* applies.  We think -- part of the problems in

6  Citizens United is that the disclaimer or disclosure provision

7  there required people to, you know, lift the veil of anonymity on

8  their speech.  And, of course, that's been a big issue in First

9  Amendment cases for a long time, is the Court has held, properly

10 we think, that anonymous speech is protected.  And so the core

11 issue I think in the Citizens United case was that the disclaimer

12 or disclosure provision required groups that might otherwise

13 prefer to speak anonymously to identify themselves.  In fact, that

14 was the focus of Justice Thomas' dissent in that case, was that it

15 was requiring people to give up their right to speak anonymously.

16         And we think that's the reason that the Court applied

17 what they called exacting scrutiny there, rather than the less

18 demanding *Anderson-Burdick* standard, which we think is the -- we

19 think *Anderson-Burdick* is the correct standard but *Citizens United*

20 is the ceiling.

21         THE COURT:  That's helpful but, you know, if you're

22 conceding that the disclaimer provision does amount to speech --

23 are you conceding that point?  I guess if you are, under what

24 logic?

25         MR. SCHAERR:  Well, it implicates speech because it's --

1   because it's a requirement that the plaintiffs have to comply with

2   in order to -- in order to send out an absentee ballot to people.

3   So we can't really dispute that it implicates speech, but we

4   think, again, it's a -- we think it's an entirely reasonable

5   regulation of an election process that's governed by

6   *Anderson-Burdick* and is -- it's impossible we think for the

7   plaintiff to show that it violates the *Anderson-Burdick* standard.

8            THE COURT:  Where in the *Anderson-Burdick* standard would

9   you put it?

10           MR. SCHAERR:  Well, *Anderson-Burdick* says that you

11  analyze first the strength of the state interests that are

12  implicated.  And we'll be discussing those at length, especially

13  in Mr. Germany's testimony.  And then you have to weigh that

14  against any burden on the plaintiffs' speech rights.  And we

15  think -- you know, we think this is akin to the situation like

16  with currency.  There's a law that requires if somebody wants to,

17  you know, create and sell play money, they have to have a

18  disclaimer on the play money that says this is not legal tender

19  of the United States or some such.  They have to make clear to

20  anybody who buys that play money that this is not real, you know,

21  legal tender.

22           So it -- yes, it implicates speech rights, but it's a

23  fairly minimal implication and it's something that the government

24  requires just to make sure that people are not committing fraud

25  or, you know, using fake money to buy goods and services.

1          And here, too, the ballot application, when it's

2    submitted, it has legal consequences that are of concern to the

3    state, right?  It's not just any old piece of advocacy, it's a

4    document that once it's filled out and completed has legal

5    consequences.  And so the state has a strong interest in ensuring

6    that those who receive absentee ballots understand that this

7    particular document that you're looking at did not come from the

8    state so that they're not confused about that.  So that's, you

9    know -- in a nutshell, that's how we analyze that issue.

10          And so for all those reasons, we don't think the

11   plaintiffs can establish a sufficient likelihood of success on the

12   merits.  But in addition to that, there are a host of other

13   reasons why we think plaintiffs' motion should be denied.

14          And as to irreparable injury, we think the evidence will

15   show that there really is no significant burden on the plaintiffs'

16   activities at all and, therefore, they can't be -- there can't be

17   irreparable injury from allowing SB 202 to remain in effect during

18   the ongoing and upcoming election this year.

19          And with respect -- and let me just outline a little bit

20   more of the evidence that we'll present on some of these points.

21   With respect to plaintiffs' challenge to the disclaimer provision

22   or the disclosure provision that your Honor referenced earlier,

23   we'll present testimony from Brandon Waters, who is a printer and

24   engaged in printing political documents.  And he will explain how

25   easy it would be for the plaintiffs to comply with the disclosure

1  provision and the anti-duplication provision, especially given the

2  five-day grace period that SB 202 allows.

3          We'll also present expert testimony from Dr. Justin

4  Grimmer, who is a Stanford professor, who will respond to the

5  plaintiffs' allegation of harm in greater detail.

6          Now, I think it's also worth emphasizing the point that

7  Mr. Tyson made about undue delay.  And I know your Honor is

8  familiar with Justice Kavanaugh's recent concurrence in the

9  *Merrill* case, and he said that in this kind of a context when an

10  election is close, that a plaintiff seeking a preliminary

11  injunction close to an election must show that they have not

12  caused undue delay.  So the burden is on the plaintiffs to

13  affirmatively establish that they did not cause undue delay.  And

14  we think that the facts here preclude such a showing.  They waited

15  for more than a year after their complaint before they even filed

16  their preliminary injunction.  And if they had filed that -- if

17  they had filed a request for a preliminary injunction immediately,

18  all of these issues could have been resolved well before the state

19  actually implemented these challenged provisions of SB 202 with

20  respect to the election that is effectively ongoing, even though

21  the general election won't conclude until November.

22          I'm sorry.  We think there is a distinction between the

23  primary election and the general election, but it's -- as

24  Mr. Tyson mentioned, it's kind of a continuous process for the

25  election officials.

1           And I think it's also worth focusing for a moment on the

2    balance of the equities and the public interest.  And we think

3    that those remaining factors weigh heavily against the plaintiff.

4    Under binding Eleventh Circuit precedent, the state itself would

5    suffer irreparable injury if the Court enjoins the state from

6    effectuating statutes that are enacted by representatives of its

7    people.  That's a quote from the Eleventh Circuit's decision in

8    *Hand v. Scott*.  So merely enjoining a duly enacted statute

9    constitutes irreparable injury to the state.

10          But the harm extends beyond the state, as we'll show.

11   The absentee ballot application system used by organizations like

12   the plaintiffs before SB 202 significantly harmed the voting

13   public, it caused confusion, it left room for voter fraud and

14   perceptions of voter fraud, and it caused elections to run less

15   efficiently.  And so enjoining these three provisions the Court

16   would force Georgians back to that confusing and harmful system.

17          And in contrast, the plaintiffs' harms, if there is any

18   real harm, pale in comparison to those that an injunction would

19   inflict on the state and on its voters.  And as we've already

20   discussed, SB 202 leaves plenty of room for plaintiffs to get

21   their messages out to voters and any minimal intrusion into that

22   effort that these three provisions create is really minimal and

23   far less significant than the harm to the state from enjoining

24   them.

25          So for all those reasons, we urge the Court to deny the

1    request for preliminary injunction.

2              I'll turn it over now to Mr. Norris.

3              MR. NORRIS:  Briefly, your Honor.  Good morning.

4              THE COURT:  Good morning.

5              MR. NORRIS:  Cam Norris for the intervenors.  Just want

6    to make a few short points.  One is really a housekeeping matter.

7    We have largely joined the state's brief on the merits in this

8    case, so my plan today is to join the state's presentation of the

9    evidence.  I don't plan to be heard from, unless your Honor would

10   like to hear from me, except for now and briefly in closing.

11             THE COURT:  All right.  Thank you.

12             MR. NORRIS:  The other couple points, this is a

13   preliminary injunction hearing.  Preliminary injunctions are

14   supposed to be extraordinary.  They're supposed to be exceptional.

15   But this one is hardly in the election context preliminary.  The

16   plaintiffs want to permanently change the rules for every election

17   that occurs until this case reaches final judgment, that's what a

18   preliminary injunction would do here.

19             And a preliminary injunction for that very reason

20   requires them to win both on the likely merits of their claims,

21   but also on the equitable balance.  And my firm and myself

22   litigated the *League of Women Voters* case that your Honor

23   mentioned in Florida.  And what that Court really made clear is

24   that the equities alone are a reason to deny a preliminary

25   injunction in this context because of the *Purcell* principle.

1         And the *Purcell* principle is important in all cases.  It
2  is a legal doctrine.  It's also based on factual on-the-ground
3  concerns about voter confusion, election administrator confusion,
4  Federalism, separation of powers.  As the per curiam decision in
5  *League of Women Voters* explains, those consequences can be
6  unpredictable sometimes and unforeseen, which is why the principle
7  exists and has been enforced so strongly in the last few years by
8  the Circuit Courts and the Supreme Court and the District Courts.

9         And I invite your Honor to look at the briefs that were
10 filed in that case in the Eleventh Circuit.  It's some of the same
11 lawyers in these consolidated cases.  My friends and I, we
12 litigate against each other quite often, and some of the same
13 exact arguments were made there.  Two of the provisions at issue
14 were a regulation of voter registration groups and what they had
15 to do with voter registration applications, which is even further
16 removed from the electoral process than this case.

17        There was also a disclaimer at issue in that case that
18 the plaintiffs all claimed made them say false information to
19 voters, and yet the Eleventh Circuit granted a stay of the
20 District Court's decision in full and heard arguments from the
21 plaintiffs that *Purcell* ought not apply to First Amendment cases,
22 it ought not apply to regulations of third-party groups instead of
23 voters, it ought not apply to the registration process, which is
24 far removed from the electoral machinery of running an election.

25        (Interruption by the court reporter)

 1          MR. NORRIS:  It heard arguments that voter registration

 2   is far removed from the machinery of running an election, and yet

 3   it granted a stay in full and articulated just how high the burden

 4   is to get a preliminary injunction.

 5          And my last point is *Purcell* is extremely important, but

 6   it also lowers the stakes in these cases.  *Purcell* is not a

 7   defense on the merits, it's not a reason that plaintiffs' case

 8   should be dismissed or they should have summary judgment entered

 9   against them, it's a reason why they get to continue litigating

10   their case but they have to operate under the status quo as

11   enacted by the Georgia Legislature.

12          THE COURT:  Thank you.

13          Mr. Diaz, do you want to call your first witness.

14          MR. DIAZ:  Thank you, your Honor.

15          The plaintiffs' first witness is Tom Lopach.  And my

16   colleague Alice Huling will be examining him.

17          COURTROOM DEPUTY CLERK:  Raise your right hand.

18          _____

19                      THOMAS LOPACH

20          a witness herein, being first duly sworn,

21           was examined and testified as follows:

22          _____

23          MS. HULING:  Good morning, your Honor.

24          THE COURT:  Good morning.

25                      DIRECT EXAMINATION

1  BY MS. HULING:

2  **Q.**  And good morning.  May you please state your name for the

3  Court.

4  **A.**  I will.  And I will also pronounce my last name for the Court.

5  Thomas Keith Lopach, and I go by Tom.

6  **Q.**  Thank you, Mr. Lopach.

7      What do you do for a living?

8  **A.**  I'm the president and CEO of the Voter Participation Center

9  and the Center for Voter Information.

10  **Q.**  When did you start in that role?

11  **A.**  March 16th of 2020.

12  **Q.**  What are Voter Participation Center and Center for Voter

13  Information?

14  **A.**  The Voter Participation Center is a 501(c)(3) nonprofit

15  organization --

16          MR. TYSON.  I apologize, your Honor.  I just wanted to

17  check.  I don't believe we've sworn Mr. Lopach yet.

18          COURTROOM DEPUTY CLERK:  He was sworn.

19          MR. TYSON:  I sorry, I missed that.  My apologies.  I'm

20  sorry.

21          THE WITNESS:  The Voter Participation Center is a

22  nonprofit organization, a 501(c)(3) under the tax code.  Our

23  mission is to help register and turn out people who traditionally

24  have engaged in our democracy at levels lower than the general

25  public.  And that's people of color, unmarried women and young

1  people.

2          The Center for Voter Information is a 501(c)(4)

3  organization under the tax code, also a nonprofit, that does the

4  work to register and turn out voters who are not members of -- who

5  are not people of color, unmarried women or young people, but who

6  share the value of wanting to see full participation in our

7  democracy.

8  BY MS. HULING:

9  **Q.**   Where are these organizations based?

10 **A.**   These organizations are based in Washington, DC, at

11 1707 L Street.

12 **Q.**   To be clear, they're two separate organizations?

13 **A.**   They are two separate organizations with two separate boards

14 of directors.  There is one overlapping board of director.  They

15 do share a staff and do similar work to different populations.

16 **Q.**   Do they ever work together?

17 **A.**   They have worked together in the past.

18 **Q.**   How so?

19 **A.**   In 2020 the volume of direct mail and digital outreach we

20 were doing increased significantly because of the pandemic,

21 recognizing that in-person voter contact in many cases was

22 sidelined for health and safety concerns, we increased our direct

23 mail and digital outreach.

24     When printing direct mail mailings at the volume that we were

25 printing, there are a different number of creatives that come into

1  play.  And if we had to come up with two creative codes for every

2  single printing, one for Voter Participation Center, one for

3  Center for Voter Information, it overly complicated the data and

4  printing process.

5      Recognizing that, relatively uniquely in 2020 we made the

6  business decision to have Voter Participation Center targets

7  mailed by Center for Voter Information, and then have VPC, if I

8  may, reimburse CVI for the mailings sent under a CVI letterhead.

9  **Q.**  Are VPC and CVI, as you say, planning to continue with that

10 cooperative working in the future?

11 **A.**  Not at this point.  That was a unique situation in a pandemic

12 election when many looked to us to do increased work because

13 in-person voter contact was reduced.

14 **Q.**  What are the goals of VPC and CVI?

15 **A.**  The goals of VPC and CVI are to increase participation in our

16 democracy.  We know that people of color, unmarried women and

17 young people participate in our democracy at numbers significantly

18 reduced compared to the general public.  So doing increased

19 outreach to these communities to increase their representation in

20 our democracy is what we do.  I very much view our work as an

21 extension of the Civil Rights Movement and voter registration and

22 turnout of the '50s and '60s.

23 **Q.**  Can you briefly describe how VPC and CVI, what their processes

24 are for achieving those stated goals?

25 **A.**  We use high-volume direct mail and digital outreach.  We will

1  send to voters direct mail letters with voter registration forms

2  and return envelopes.  We will send vote-by-mail applications and

3  explanatory cover letters as part of our message.  We'll send

4  Get Out The Vote reminders.

5      We also do similar work digitally, though it is harder to

6  target as directly as you can with direct mail.

7  **Q.**  How much of VPC and CVI's work focuses on those direct mail

8  campaigns?

9  **A.**  I would say that 80 to 85 percent of the program budget is

10  spent on direct mail versus digital.

11  **Q.**  Why?

12  **A.**  Direct mail is an exceptional way to reach voters directly.

13  You're reaching them in their mailbox, at their home.  You're able

14  to give them clear, concise information.  You can provide a

15  response application and a reply envelope with postage.

16      It's important to remember, not every voter has a printer in

17  their home.  Not every voter is going to have a stamp and a clean

18  envelope.  Not every voter would remember to send a return

19  envelope to the correct elections office.  Further, not every

20  voter has great Internet access or a computer.

21      I grew up in Montana.  I've done professional work over the

22  years in Montana.  As you might imagine, rural broadband is an

23  issue.  In Indian country there's not access to Internet.  By

24  using direct mail, we can reach voters directly and give them all

25  the tools they need to engage in our democracy.

1  **Q.**  How does that communicate your message?

2  **A.**  We are able to share through direct mail speech, a message, a

3  comprehensive message that includes explanatory letter about what

4  they're receiving, why they're receiving it and how to engage it.

5  We're able to provide in many cases voter registration

6  applications or vote-by-mail applications that are the approved

7  and official applications, which are pre-filled with the voters'

8  information as much as we know it, as much as publicly available.

9  And we are able to provide a stamped return envelope to the

10  correct elections office.  All of that works together as our

11  speech saying to a target, hey, we think your participation in our

12  democracy is important, let us help you participate.

13      Caveat there:  We always say we don't care who you vote for,

14  we care that you vote.

15  **Q.**  And to be clear, VPC and Center for Voter Information, do they

16  run direct mail programming specifically related to absentee

17  ballot application?

18  **A.**  Yes, we do.

19  **Q.**  And have they done so in Georgia?

20  **A.**  We have done so in Georgia for a handful of years going back

21  at least to the 2018 election.

22  **Q.**  And how has the size of your programming in the absentee

23  ballot application realm changed over the years?

24  **A.**  As I mentioned earlier, 2020 was a high watermark for our

25  vote-by-mail program, in large part because of the pandemic.

1    In 2018, I'm doing this from memory, so I apologize if my
2  numbers are wrong, I believe we sent about 650,000 vote-by-mail
3  applications into Georgia.
4    In 2020, to include the 2021 runoff elections, we sent north
5  of 11 Million vote-by-mail applications.
6    We sent up to five waves of vote-by-mail applications in the
7  2020 election.  Again, that was a high watermark due to the
8  pandemic, due to concerns about whether or not voters would get
9  out and vote in an election when there is fear of communicable
10 disease.
11 **Q.**  In recent years approximately how big were VPC and CVI's mail
12 voting programs in the State of Georgia?
13 **A.**  Again, in Georgia in 2018, doing this from memory, I think we
14 were 650,000 vote-by-mail applications sent out.  The response
15 rate was about four-and-a-half percent.  Again, I beg forgiveness
16 if my numbers are a smidgen off.
17    2020 and 2021 runoff election together were north of 11
18 Million vote-by-mail applications sent out.  I believe north of
19 five hundred -- 660,000 response rates -- responses.  And when you
20 think about it, 660,000 Georgians used our vote-by-mail
21 applications to submit and apply to vote by mail, that's a pretty
22 big deal and, frankly, it's something we're proud of.  That means
23 we helped 660,000 Georgians participate in democracy.  I see no
24 shame in that.
25 **Q.**  How do you know that 660,000 number?

**A.**   When we send a direct mail program, we include a unique

barcode for each target on the envelope that goes out and on the

return envelope.   That barcode is scanned by the US Postal Service

when they pick up the mail, when it hits a postal sorting

facility, when it arrives in the target's home.

   Should the target choose to return a vote-by-mail application

or a voter registration application, they would finish it, put it

in the return envelope, put it in the mail.   And the postal

service, again, scans it at pickup, be that in a blue box, be that

at a house, scans it at the postal sorting facility, scans it when

it is returned to the local election office, and we get those

scans and we know which envelopes are returned.   That gives us an

initial sense.

   When voter file -- and it's important to be clear here, the

state voter file, this is not our voter file -- is updated to

indicate who was accepted as a vote-by-mail voter, we can check

our targets and those that we have scans for against the voter

file to ensure that they are now accepted as a vote-by-mail voter.

And after an election we can check our targets against a voter

file to see who voted.   Again, not how they voted, who voted.

That's how we're able to track.

**Q.**   I would like to direct you to the two white binders that you

see there.   And I'm going to ask you to turn to tab 13, which is

in what's labeled Plaintiffs' Exhibit Binder, Part I.

**A.**   Yes.

1   **Q.**   I guess I should open it myself as well.

2        Do you recognize this document?

3   **A.**   I do.

4   **Q.**   What is it?

5   **A.**   This is a Voter Participation Center target sent a

6   vote-by-mail application package from 2020, again, under the

7   Center for Voter Information letterhead, as I explained earlier.

8   **Q.**   How does this compare to the absentee ballot application

9   mailers that Center for Voter Information sends for itself?

10  **A.**   They are nearly identical, the difference is largely the

11  targeting.

12  **Q.**   Can you please turn to the second page of the document that's

13  in there.

14  **A.**   Yes, ma'am.

15  **Q.**   What is this?

16  **A.**   On the left side is a sample -- I would just point out that

17  these two in this example are printed on one 18-and-a-half 11

18  (sic) sheet of paper.  In real life they are printed on two

19  separate sheets of paper.  On the left side is a cover letter from

20  the Center for Voter Information explaining to the recipient what

21  they are receiving.

22  **Q.**   Can you briefly describe what's included in this cover letter.

23  **A.**   In this cover letter are a number of paragraphs, the first

24  highlighting that the Georgia Secretary of State's Office and

25  county election officials have been encouraging folks to use

1  vote-by-mail in an upcoming election.

2      Then we talk about how voting by mail is easy.  We talk about

3  how it keeps you healthy and safe.  Again, 2020 was an important

4  election from that perspective.  It talks about how your privacy

5  is protected when you vote by mail, and that voting by mail from

6  your home is a great way to participate.  After that, you can sit

7  back and watch election returns come in.

8      There's also a graph on this letter that indicates the voter's

9  participation rate compared to the participation rate average of

10 all voters.  In this case, in Georgia.

11 **Q.**  Do you see a box in the upper right-hand corner of this?

12 **A.**  I do.

13 **Q.**  Can you read that, please.

14 **A.**  The box in the upper right-hand corner, the cover letter

15 reads:  If you've already submitted a request for a ballot by mail

16 for the 2020 general election, there is no need to submit another

17 request.

18 **Q.**  Why do VPC and CVI include that call-out box?

19 **A.**  A number of reasons.  Over the years we have engaged with

20 election administrators to get feedback on the programs that we

21 run.  And if my memory is right, this feedback came from an

22 elections office somewhere in the country suggesting we include

23 it.  Great idea.  We included.

24     We include it to make election administrators' lives easier.

25 We include it to tell the recipient or the voter, hey, if you have

1  already submitted, no need to do it again, you're covered.

2  **Q.**   And can you please look at the last sentence before the

3  sign-off with Mr. Dripps, can you read that for us.

4  **A.**   You can check your ballot status at:  mvp.sos.ga.gov

5  **Q.**   What is that?

6  **A.**   Again, I suspect this came from feedback from election

7  administrators.  But over years, nearly 20, of doing this work

8  we've learned that if we can provide information and tools for

9  voters who have questions in the mailer, we can help them answer

10 their own questions.  This particular sentence refers a voter to

11 the Secretary of State's website where they can look and see, not

12 specific to a vote-by-mail program, am I registered; or they can

13 look and see, am I signed up as a mail ballot voter in Georgia.

14 **Q.**   Why do VPC and CVI include this cover letter in their mailer?

15 **A.**   We view this entire package as speech in of itself, it all

16 works together.  The cover letter explains the absentee ballot

17 application.  The absentee ballot application without a cover

18 letter would create confusion.  Sending a cover letter without an

19 application leaves the recipient wondering, okay, great, nice

20 information, now what do I do, and puts the burden on the voter to

21 figure out what to do.

22     The return envelope and postage paid status of the return

23 envelope is part of our speech.  Again, our goal, our mission is

24 to increase participation in democracy.  By educating and

25 providing the paperwork and a return envelope and postage,

1  together that's our way of speaking to a voter and helping them

2  participate in our democracy.

3  **Q.**  On the right side of this page, again, it's a separate page

4  but the way it's printed here on the right side, what is this

5  document?

6  **A.**  This is a sample of the application for official absentee

7  ballot from the Georgia Secretary of State's Office, and it is a

8  sample of what we included in our mailings.

9  **Q.**  And how does -- how do VPC and CVI obtain these application

10 forms?

11 **A.**  Generally we go to the Secretary of State or election

12 administrators' website, and then we also check in with election

13 administrators in states where we run program to affirm that we

14 are using the correct form.

15 **Q.**  Why do you include it?

16 **A.**  We include it, again, to reduce barriers to entry, to increase

17 participation in our democracy.  This entire package works

18 together to engage voters.  Were we not to include it, we would

19 leave it up to the voter.  We would see decreased engagement.  It

20 would not be as effective.  And Georgia would see lower voting.

21 **Q.**  This sample has some fields filled in.  Is that just in the

22 sample or would a voter receiving a mailing from VPC and CVI see

23 something similar?

24 **A.**  The way we ran our programs in 2020 generally was to pre-fill

25 with information from the voter file.  Again, from the state voter

1  file.  This is not information that we go out and get, this is

2  official information.  So we pre-fill the name and address.  There

3  are other fields necessary to fill out that we don't pre-fill.

4  **Q.**  It looks like there may be highlighting on this form.  What is

5  that?

6  **A.**  Those are the other fields I just referenced.  The

7  highlighting draws the attention of the recipient to all of the

8  fields that need to be filled out.  They can see where we have

9  pre-filled from the voter file.  They can see that they need to

10  fill out the date of birth, their signature and the date that they

11  are signing.

12  **Q.**  Why do you include a pre-filled version of the application in

13  the mailers you send?

14  **A.**  There are a number of reasons to include pre-filled.  It

15  increases the effectiveness of our mailing.  You can also envision

16  a scenario where a person may not remember when they registered to

17  vote, did I register as Thomas or did I register as Tom?  Did a

18  person use a maiden name?  Do they have a hyphenated name?  There

19  are any number of complications.  By using the official voter file

20  to pre-fill, what we are sending to the voter is what is on record

21  with the state or the county election office so that when they

22  send back, they are sending back accurate information.  It has the

23  added benefit on the receiving end that the elections office, one,

24  isn't dealing with bad penmanship; two, they aren't guessing is

25  Jim Smith the same as Jimmy Smith?  It has the accurate

1  information from the voter file.

2  **Q.**  Thank you.

3  Turning to the next page in this document.  What is this?

4  **A.**  This -- in 2020 the Georgia vote-by-mail application was

5  one-sided, and so the backside of the form was empty and left

6  space for us to fill in information.  My understanding is that the

7  2022 form is two-sided, so this is not an option.

8  We printed on the backside of the vote-by-mail application

9  what you see here on this page.  Simple reminder about how easy it

10 is to fill out a vote-by-mail application and return it.

11 **Q.**  Turning one more page to the last page of this document, what

12 is this?

13 **A.**  This is a copy of the return envelope from the person we have

14 sent the mail to, whose name is in the upper left, to the local

15 elections office.  And you'll note above the local elections

16 office address is the unique barcode that I had previously

17 mentioned that enable us to track who is signed up to vote or who

18 has applied to vote by mail.

19 **Q.**  What is the small oval icon in the bottom left-hand corner of

20 this envelope?

21 **A.**  The small oval icon in the bottom left-hand corner of this is

22 the printing union bug indicating which union shop the printer is

23 a member of.

24 **Q.**  And then where the stamp should go, it says "US Postage Paid."

25 Why do VPC and CVI include a postage-paid and pre-addressed

1  envelope in the mailer?

2  **A.**   Again, our mission is to increase participation in our

3  democracy.   In a pandemic at any time, it's unclear that people

4  are going to have a stamp in their house.   By having a

5  postage-paid envelope, we are reducing barriers to entry, we are

6  working to increase participation in democracy.   It makes our

7  speech, it makes this package more effective.

8  **Q.**   In total, what are VPC and CVI's rationale for including all

9  three of these items within the mailer they send out?

10  **A.**   All of this works together as one message to reduce barriers,

11  to increase participation in democracy, to make it easier for a

12  registered and eligible voter to get a vote-by-mail application.

13       You can imagine, again, I think I said this, sending the

14  letter without the application leaves the recipient to go hunting

15  for an application and hope they have access to a printer.

16  Sending the application without a letter leads the recipient to

17  wonder what is this, why do I have it?

18       This message, this speech is all intertwined and all in line

19  with our goal of speaking to voters about participating in our

20  democracy.

21  **Q.**   How do VPC and CVI's absentee ballot application mailers fit

22  with any other programming that you conduct in Georgia?

23  **A.**   So VPC in Georgia and nationally run-in series of programs we

24  start with voter registration for folks who are not registered or

25  to voters who have recently moved or to potential voters who just

1  turned 18.  And then we will send vote-by-mail applications to

2  eligible registered people who may want to vote by mail.  And then

3  we will send Get Out The Vote reminders to people who are choosing

4  not to vote by mail but rather to vote in person.  We'll send them

5  education about how to early vote in person or education about how

6  to vote safely on Election Day, where is your voting location,

7  what are the hours that it is open, do I need to bring ID or not,

8  we'll send that sort of information.

9      For people who sign up to vote by mail, they end up on a

10  different track, and we'll send them after mail ballots are sent

11  out a reminder letter, hey, you should have received a mail-in

12  ballot by now, don't forget to fill it out and return it.  So we

13  have various communications in the mail and oftentimes we'll layer

14  digital outreach on top.

15  **Q.**  Who else do Voter Participation Center and Center for Voter

16  Information coordinate with regarding their voter outreach, if

17  anyone?

18  **A.**  In advance of our voting programs in the states where we work,

19  we will work with election administrators to coordinate what we're

20  sending out.  We also work with various national, state and local

21  groups on our mailers so that they can follow up with text

22  messages or door knocks or phone calls once a vote-by-mail

23  application or something has been sent out.

24  **Q.**  What do VPC and CVI do to ensure that these mailers that

25  they're sending include accurate information for the state that

1   they're sending them within?

2   **A.**   Well, first of all, on vote-by-mail applications, the meat of

3   it comes from the voter file.  So the accuracy of the information

4   in a vote-by-mail application directly relates to the accuracy of

5   information in the voter file.

6       Second, before we send it, well before we go to print, we

7   reach out to election administration offices, largely at the state

8   level, sometimes we'll reach out to populace counties, and let

9   them know, hey, we're sending a voter registration mailing; hey,

10  we're sending a vote-by-mail mailing.  Is this still the

11  appropriate form to use?  Is there other feedback you have for us?

12  **Q.**   What states do you do this in?

13  **A.**   We're probably in about 26 states any election cycle.  We look

14  at data about where young people, people of color, unmarried women

15  have discrepancies in their registration and turnout rates.

16  **Q.**   And specifically for communicating with election officials,

17  what states do you do that in?

18  **A.**   Oh, every state where we're running program we reach out to

19  the election officials to ask for input and approval of what we're

20  sending.  We want to be good partners with them.

21  **Q.**   Including Georgia?

22  **A.**   Including Georgia, absolutely.

23  **Q.**   Generally speaking, what communication did VPC or CVI ever

24  receive back from Georgia?

25  **A.**   Georgia e-mailed back a number of times with suggestions,

1  approvals or updates on forms to be used and how we run our

2  program.

3  **Q.**  If you'll please turn to tab 15 in your binder.

4  **A.**  Yes.

5  **Q.**  Are you familiar with this document?

6  **A.**  I am familiar with this document.

7  **Q.**  And what is it?

8  **A.**  This is an e-mail exchange between our compliance counsel and

9  outside attorney we use to check our mailings with election

10  administrators.  And the Georgia State, I believe, Elections

11  Director is the title for Chris Harvey.  Yes, Elections Director

12  Chris Harvey.  This e-mail exchange was in advance of the 2018

13  general election.

14  **Q.**  What materials, if any, were passed along with this e-mail

15  exchange?

16  **A.**  In this e-mail exchange, Jen Carrier, our counsel, sent along

17  an absentee ballot application that we were going to use in

18  Georgia in advance of the 2018 general election.

19  **Q.**  And will you please look at Mr. Harvey's e-mail from

20  August 2nd, 2018.

21  **A.**  Yes.

22  **Q.**  And can you read his response.

23  **A.**  Jen, I don't see any obvious issues with your form.  As you

24  may know, there is no specific form required to request an

25  absentee ballot in Georgia, period.

1  **Q.**  Thank you.

2      Can you please turn to tab 17 now.  Do you recognize this

3  document?

4  **A.**  Yes.

5  **Q.**  And what is it?

6  **A.**  Again, this is an e-mail exchange between our compliance

7  counsel, Jen Carrier, and both Chris Harvey and Kevin Rayburn from

8  the Georgia Secretary of State's Office.  In this e-mail,

9  April 20th, 2020, Jen is letting them know we are sending the

10  attached absentee ballot application for the upcoming primary

11  election, referencing the primary election on June 9th, 2020.

12  **Q.**  And will you please look at the second paragraph of

13  Ms. Carrier's e-mail.

14  **A.**  Yes.

15  **Q.**  And will you please let us know what that says.

16  **A.**  The second paragraph reads:  The mailing will also include the

17  following reminder that I wanted to run by you:  Your election

18  office must receive this request in time to send you an absentee

19  ballot for the primary election on June 9th.

20  **Q.**  Why do VPC and CVI want to include that language in their

21  mailer?

22  **A.**  We want to make certain that the election administrators are

23  comfortable with us including that language, and that they have an

24  opportunity to suggest alternative language should they wish.

25  **Q.**  Why do you think it's important for voters to receive the

1  message in that sentence?

2  **A.**  Elections are about deadlines and timelines and we want to

3  make certain that, one, we're communicative and good partners with

4  election administrators; and, two, we are sharing all necessary

5  information and timelines in a clear and concise manner with

6  voters or potential voters.

7  **Q.**  And then will you please look at Mr. Rayburn's response on

8  April 23rd.

9  **A.**  Yes.

10 **Q.**  And will you please read that response for us.

11 **A.**  Good afternoon.  The form looks accurate when compared to our

12 state request form.  Since the mailing by you is for the June 9th,

13 2020, general primary, can you go ahead and pre-populate

14 06/09/2020 in the date of primary election of runoff spot at the

15 top of the form.  Sincerely, Kevin.

16 **Q.**  What did Voter Participation Center and Center for Voter

17 Information understand that direction to be?

18 **A.**  An ask for us to print June 9th, 2020, in the date of primary

19 election section in the top of the form.

20 **Q.**  And that's the application form contained in your mailer?

21 **A.**  Yes.  And we did so.

22 **Q.**  You pre-filled that --

23 **A.**  We pre-filled that information.  Again, accepted the

24 suggestion from the elections office.  This goes back to why it's

25 so valuable for us to engage with and have a healthy

1  back-and-forth.  It improves the work that we do.

2  **Q.**  Will you turn now to tab 19 in the binder.  And are you

3  familiar with this document?

4  **A.**  Yes, I am.

5  **Q.**  And what is it?

6  **A.**  This, again, is an e-mail exchange between our compliance

7  counsel, Jen Carrier, and Chris Harvey of the Georgia Elections

8  Office.  Let me just make certain.  Kevin Rayburn was copied on

9  the initial e-mail but does not appear to be copied on subsequent

10 responses and back-and-forths.

11 **Q.**  Do you see Director Harvey's June 22nd reply?

12 **A.**  I do.

13 **Q.**  And what does he say in that reply?

14 **A.**  Let me first state, our compliance counsel was informing and

15 asking review of both an upcoming absentee ballot application and

16 a voter registration form.

17     And Mr. Harvey writes:  Jen, we modified our absentee ballot

18 application in number five to indicate that a party ballot request

19 only is required in a primary or a primary runoff.  I would do the

20 same or consider eliminating it altogether if this is a one-time

21 printing.

22 **Q.**  And what is VPC and CVI's response?  What does VPC and CVI do

23 with the information from Director Harvey?

24 **A.**  Jen writes back to Director Harvey:  Is it possible to send me

25 a copy of the updated form?  The one on your website doesn't have

1  the edit in number five, that Director Harvey was referencing, and

2  we want to correspond with what you have.

3  **Q.**  And did she get a reply back from Director Harvey?

4  **A.**  He writes back the next day at 8:13 a.m.:  I thought it had

5  been updated.  I'll check on that.

6     Then Jen writes again a week later:  Hi, I wanted to check

7  back on this.  Thanks.

8  **Q.**  Can you please turn to tab 20 now.

9  **A.**  Yes.

10 **Q.**  Do you recognize this document?

11 **A.**  Yes.

12 **Q.**  And what does it say?

13 **A.**  This is a day after Jen's reminder e-mail to Director Harvey.

14 It's a new e-mail chain on Tuesday, June 30th, where Director

15 Harvey writes to Jen regarding the absentee request and says:  The

16 corrected absentee ballot is live on our web page now.

17    And Jen responds:  Thanks so much.

18 **Q.**  And did VPC and CVI obtain and use the state's updated

19 absentee ballot application form now that it had been updated on

20 the state's website?

21 **A.**  Yes, we did.  This also goes to show the value of having a

22 good communicative relationship with election offices when we're

23 dealing with important forms and we want to be accurate.

24 **Q.**  Will you now please turn to tab 21.

25 **A.**  Yes.

**Q.**   Are you familiar with this document?

**A.**   Yes.

**Q.**   And what is this?

**A.**   This is an e-mail from our compliance counsel, Jen Carrier, to Chris Harvey and Kevin Rayburn in the Secretary of State's Office, updating them on the progress of our vote-by-mail program and attaching a sample of the absentee ballot application we would be sending to Georgia voters in upcoming mailings.  It also indicates that we'll be sending these mailings in waves, with the first wave landing around August 18th and the last wave in mid-September.

Also included in this e-mail is a listing of counties and the number of voters we are mailing in each county.  And copied on this e-mail exchange are election administrator e-mail addresses for the four most populace counties in Georgia.

**Q.**   Why do you include those county election offices in the cc?

**A.**   Again, in this case, these counties in Georgia, as the Court knows better than me, are very large counties, have large populations, and so we wanted to make certain that the administrators, the election administrators for these big counties were aware of what was happening.

**Q.**   And you mentioned a count-by-county breakdown at the bottom. Is that referring to the two columns that are after Ms. Carrier's signature line?

**A.**   Yes.

**Q.**   What is the purpose of that information?

**A.** Again, wanting to be communicative, wanting to be good

partners in letting election administrators know how many

individuals we are targeting with our mailings in each county.

**Q.** Do you see the row of asterisks?

**A.** I do.

**Q.** What is the information that you passed along to the

recipients of this e-mail immediately below that?

**A.** There we provide information about how to unsubscribe from our

mailing list.  We provide a toll-free telephone number.  We

provide an unsubscribed e-mail address and directions on how to be

removed.  And Jen Carrier also offers for the people to be in

touch directly with her.

**Q.** Thank you.

     In all of VPC and CVI's correspondence with Georgia, what

changes were you ever asked to make to your absentee ballot

application mailer programs?

**A.** We were asked to update the form we were using after a change

was made.  We were asked to include a date in advance of the

primary election.  And I believe those are the changes that we

were asked to make from the elections administration office.

**Q.** And that date is a date for you to pre-fill?

**A.** Yes.

**Q.** Was there anything else?

**A.** Not that I remember at this moment.

**Q.** And did the Secretary of State's Office ever ask you to stop

1  sending the absentee ballot applications?

2  **A.**   Not to my knowledge.

3  **Q.**   You're familiar with SB 202's ballot application restrictions?

4  **A.**   Yes.

5  **Q.**   What are the effects of those restrictions on VPC and CVI's

6  operations?

7  **A.**   Can I set the binder aside?

8  **Q.**   Yes.  Thank you.

9  **A.**   SB 202's provisions will impact the way that we engage with

10  voters in Georgia, will impact when and how we speak to voters in

11  Georgia, may have budget implications, and in my estimation will

12  create confusion for voters who receive an official form that

13  we're providing to them that is emblazoned with language that it's

14  not an official form.  It will change the way we run our program

15  in Georgia.

16  **Q.**   Specific to the mailing list restriction, how does the mailing

17  list restriction, what effect does that have on VPC and CVI's

18  operations?

19  **A.**   The mailing list restriction prevents us from sending a

20  vote-by-mail application to somebody who has recently applied to

21  vote by mail.  The window is five days.  And if we do, we will

22  incur a $100 fine per instance.

23      So what that means for us is we will send one wave of

24  vote-by-mail application to Georgia voters on or very close to

25  August 22nd, 2022, which I believe is the first day of

1   vote-by-mail application in Georgia.  By doing that, we will limit

2   our exposure in terms of having sent an application to someone who

3   has already applied.

4       Now, I would flag on that, we send millions of pieces of mail

5   at once.  Human nature is such that not everybody responds or

6   deals with their mail immediately.  There may well be somebody who

7   sits on that for three weeks, applies using another method, and

8   then responds to our mail, and we will incur a $100 fine.  So we

9   will be sending only one wave of direct mail application.

10      And we're sending that wave very early, before Labor Day,

11  before many voters in Georgia are thinking about politics or

12  elections.  This limits our speech.  It tells us what we can say,

13  when we can say it, and indicates that you can't speak to voters

14  twice effectively without incurring fines, you can't speak to

15  voters closer to the Election Day.

16  **Q.**  Will you please -- I told you to put that binder down but now

17  we're going to move over to the second binder.

18      Would you please turn to tab 51.

19  **A.**  Yes.

20  **Q.**  Do you recognize this document?

21  **A.**  I do.  Oh, thank you.  I've been thinking about this.

22  **Q.**  What is this document?

23  **A.**  This was an e-mail our direct mail consulting firm sent me.

24  It is in memo form but she sent it to me as an e-mail on

25  April 6th, 2021, walking through how she would envision complying

1  with SB 202, in particular the five-day window from a printing

2  perspective.

3  **Q.**  And is this a true and correct copy of this memo to the best

4  of your knowledge and belief?

5  **A.**  Yes.

6        MS. HULING:  Your Honor, I would like to submit into

7  evidence this document as Exhibit 51.

8        MR. TYSON:  Your Honor, recognizing the reduced

9  evidentiary requirements in a PI hearing, we would still lodge an

10  objection to hearsay as to this document.  It's from an

11  out-of-court statement offered for the truth of what's being

12  asserted.  That being said, we recognize there's a lower

13  evidentiary standard in this hearing.

14        THE COURT:  Counsel, what's your response?

15        MS. HULING:  This is a document that was received by the

16  witness who's testifying.  He'll be testifying as to what this

17  consultant was giving them, the information that they had asked,

18  and what they understood it to mean and how it affected operations

19  that are directly relevant to the arguments being made at this

20  case.

21        THE COURT:  All right.  Given where we are, I'll allow

22  it.  Go ahead.

23  BY MS. HULING:

24  **Q.**  Please take a minute to review this document.  And can you let

25  us know what you understand the conclusion to be that is drawn

1  through this memo.

2  **A.**   In the memo, the concluding sentence from our direct mail

3  consultant, Maren Hesla, is:  Our conclusion is that it would be

4  physically impossible to comply with the Georgia law.

5  **Q.**   Do you see on the first page of this document the fourth

6  paragraph where it says for the purposes of this memo?

7  **A.**   Yes.

8  **Q.**   What is that introducing?

9  **A.**   This paragraph -- let me read it and then explain it, if I

10  may, it's very brief.  For the purposes of this memo, let's assume

11  we are doing a 20 Million piece total mailing, with 2 Million

12  pieces going to Georgia voters with a drop date of October 5th.

13  This is where Maren is presenting a hypothetical that is based

14  somewhat in reality about what it would mean to operate under SB

15  202 the way we do our business.

16       Clarification, when she says a 20 Million piece total mailing,

17  when we are doing mailings, at the volume that we work we print

18  multiple states together, and we get a significantly discounted

19  rate which makes it able -- makes it -- the dollar go further so

20  we can spend more money registering, signing up vote-by-mail

21  voters, turning out voters, we get a reduced rate.

22       We also have a reduced rate with the US Postal Service when we

23  send at high volume and pre-sort and get all of the mail ready to

24  provide to the postal service in as easy and organized a manner as

25  possible.  That's why she says a 20 Million piece total mailing

1   and 2 Million going to Georgia voters.

2   **Q.**   What's immediately below that paragraph?

3   **A.**   Immediately below that is a timeline discussion relating to

4   what it takes to deal with data, print and mail vote-by-mail

5   applications and contrasting that with the five-day window in --

6   under Georgia law.

7   **Q.**   Would you walk me through your understandings of what's being

8   said in this timeline.

9   **A.**   Yes.  In this timeline it supposes that we would for an

10  October 5th mailing have our data due to the printer on

11  September 1st.  That means we would need to receive from Georgia

12  election officials or their website an updated voter file with a

13  notice of who is a vote-by-mail voter on August 31st.  Then we

14  would begin printing on September 18th.  And that begs the

15  question, what is happening between September 1 and 18?

16      With a  20 Million piece mailing, we are working with data, we

17  are coding.  There are tapes that are used to print each mailing.

18  And these tapes are unique to a state or a demographic.  We may be

19  using one letter for younger African-American male voters and a

20  different letter for older black female voters because we know

21  that the language we use with different populations is a different

22  letter.

23      Further, we're talking about a number of different states

24  which are going to have different forms, different deadlines.  So

25  that intervening two weeks is the time it takes to code and

1  spot-check, edit and prepare 20 Million records.

2      Then we would begin printing on September 18th.  And even if

3  in this process we moved Georgia printing to the very front,

4  printing 2 Million Georgia packages -- remember, the packages, the

5  carrier envelope, the cover letter, the vote-by-mail application,

6  the return envelope would take until September 21, 3 days.  So

7  then we drop in the mail after that.  That would take us three

8  weeks, if not more, from the September -- the August 31 data

9  upload.

10      So then we would have to get a new file and identify who

11  signed up to vote by mail from August 31 until roughly

12  September 21 and manually go through the 2 Million Georgia mailers

13  on pallets, in trays, to pull them out and then mail them.  And,

14  still, anybody who applied after that September 21 data update, we

15  would get fined for.

16      And when you are sending millions of mailers at a time and

17  incur $100 fine per duplicate, that can be onerous and it can

18  reduce the way we engage with voters, the way we speak to voters

19  in Georgia.

20  **Q.**  Will you clarify for me a little bit more the mechanics of

21  taking the second pull of the list of Georgia voters who have

22  applied for an absentee ballot and comparing that to the ballot

23  mailers that have been printed before they're mailed?

24  **A.**  So let's say we have 2 Million pieces of mail that we printed

25  for Georgia on the front end of this 20 Million, those 2 Million

1   pieces would be in not only zip code order but postal carrier

2   order.  We print them in the order of each postal carrier and

3   their route for efficiency sake.  They would need to be laid out

4   in a space large enough.  And then we would take the list of new

5   vote-by-mail applicants from August 31st until September 21, '22,

6   and we would have to manually find each one of those mailings in

7   the 2 Million pieces of mail that are sorted not alphabetically

8   but, rather, by postal carrier route, in trays, and those trays

9   are obviously going to be on pallets.  This is a giant endeavor.

10      There is the added complication in that the rate we are

11  charged by the postal service is determined by the number of

12  pieces of mail we are sending in each carrier route, and if we

13  start pulling printed mailers from one, it could change our postal

14  rate.

15      It's not just simple five days.  The work we do is data

16  intensive, intentional, high volume and complicated.  It's not

17  simple.

18  **Q.**  How has the analysis provided by your direct mailer consultant

19  in this memo affected VPC and CVI's plans for sending absentee

20  ballot application mailers in Georgia in advance of the 2022

21  election?

22  **A.**  First of all, the hypothetical presented by our direct mail

23  consultant is not out of this world.  We are looking at sending

24  about 1.1 Million vote-by-mail applications into Georgia this

25  year.  So the 2 Million number, a little high but not out of this

1  world.

2     Second, based on what we've seen, we and the law and the

3  presentation here, we have realized we would incur significant

4  fines if we sent two waves of vote-by-mail application to Georgia

5  voters, so we have made the business decision only to send one

6  wave.  It's not necessarily a good use of contributor or donor

7  funds to be spending those funds intended to register and turn out

8  voters on fines.  And we are sending that vote-by-mail application

9  to hit homes as close to August 22nd as possible, again, to avoid

10 fines from duplicates.  That means we are being told what we can

11 say and when we can say it.  And we're being told that our speech,

12 our engagement with voters can't happen at later dates in the

13 election cycle unless we are willing to spend our money intended

14 to engage voters on fines.

15 **Q.**  Given all the mechanics you've just explained for us, why is

16 it you can go through that process in mid-August but that under

17 the mailing list restriction you wouldn't be able to go through

18 that process later without incurring fines?

19 **A.**  If August 22nd is the opening day of the vote-by-mail

20 application season, there will be very few people who will have

21 applied to vote-by-mail in advance of our mailer.  So the number

22 of duplicate applications that are generated from our program

23 would be significantly reduced.

24    We would still increase fines -- or we would still receive

25 fines because there inevitably at the volume we work would be some

 1  duplicate but would drastically reduce it by sending our mailing

 2  to drop on opening day.

 3  **Q.**  What if VPC and CVI just stopped including applications in

 4  their mailers?

 5  **A.**  As I've said before, everything we do, our mission is to

 6  increase engagement in our democracy.  And I'm embarrassed that I

 7  have to say that.  That is a laudable mission to try and help

 8  eligible Americans vote.

 9     If we were to remove the vote-by-mail application from our

10  mailing and leave it to a voter to go online, to go to their

11  election office to find it on their own, it's not going to happen.

12  That is creating a barrier to entry.  It would make our speech, it

13  would make our engagement and our work less effective.

14  **Q.**  How so?

15  **A.**  People wouldn't respond.  People wouldn't take the time to go

16  find the form.  Not everyone has a printer.  Not everyone can take

17  time off of work, get in their car or, imagine this, people don't

18  have cars, get on the bus, make it to an elections office in time

19  to get a printed form from the elections office and get back on

20  the bus and get back to work in time to participate in our

21  democracy.  We are providing the form they need as part of our

22  speech.

23  **Q.**  Do VPC and CVI currently run any vote-by-mail programs

24  anywhere in the country that don't include a copy of their -- of

25  that state's ballot application form?

1  **A.**  No.  In the states where we run vote-by-mail programs, we use

2  that state's vote-by-mail application.

3  **Q.**  Are there any states where you have vote-by-mail programming

4  where you are prohibited from including and/or just decided not to

5  include the application?

6  **A.**  In every state where we run vote-by-mail programming, we

7  include the application for that state.

8  **Q.**  Let's turn now to the personalization ban.  Do you understand

9  what I mean when I say that, SB 202's personalization ban?

10  **A.**  Yes.  The pre-filling?

11  **Q.**  Yes.  What effect does that have on VPC and CVI's operations?

12  **A.**  Again, the pre-filling of the vote-by-mail application serves

13  a number of purposes.  It ensures that the recipient has their

14  information the way it is recorded on the state's voter file.  It

15  makes it easier for a state election office to process.  I

16  mentioned bad handwriting.  There are some people whose last names

17  are complicated; Lopach.  A person may have their application

18  keyed in incorrectly, thus preventing them from voting by mail or

19  voting at all.

20      We also know through academic and business studies, when you

21  pre-fill, you have a higher response rate.  So we would see

22  reduced response rate to vote-by-mail applications that we send,

23  again, increasing a barrier to entry and reducing the

24  effectiveness of our speech and our work to register and turn out

25  voters, to increase participation in our democracy by the very

1  people who are already participating at lower rates.

2  **Q.**  And what would -- what does compliance with this

3  personalization ban require of VPC and CVI?

4  **A.**  The personalization ban would mean that we could not pre-fill

5  name, address or any information.  It's funny sitting here to

6  think about, we were asked to pre-fill a primary election date

7  because that was beneficial, and now we're being told not to

8  pre-fill something that we know is beneficial.

9  **Q.**  Thank you.

10     There's a third piece of SB 202 at issue in this case, that's

11  the disclaimer requirement.  Do you understand what I mean when I

12  call it "the disclaimer requirement"?

13  **A.**  I do.

14  **Q.**  What is the effect of that disclaimer requirement on VPC and

15  CVI?

16  **A.**  The effect of that disclaimer requirement is to make us look

17  like an untrusted source trying to confuse voters.  The work that

18  we do, the speech that we engage with with voters is to create a

19  relationship over time from voter registration to vote-by-mail

20  application, to reminder to send back your mail-in ballot, to get

21  out and vote early in person or vote safely on Election Day.

22     It is a relationship we are building of trusted communication

23  over time.  And if we are to present to a voter an official form

24  that we are required to use, which is emblazoned with language

25  that says this is not an official form, voters aren't going to

1  trust us, they aren't going to believe us, they are not going to

2  fill out and return the form.  They may well choose not to vote.

3  They may find this all craziness and phooey, I'm not going to

4  engage in our democracy.

5      I would also add to that the state is mandating our speech

6  both in the form that we are required to use and in a disclaimer

7  that is an absolute lie.  The state is mandating that we lie to

8  the very people we're engaging with.  I can't get my head around

9  that.  I apologize.

10 **Q.**  In light of the three restriction -- or three parts of SB 202

11 that we just discussed, what are VPC and CVI's current plans for

12 running a vote-by-mail program in Georgia?

13 **A.**  We are currently this week in the process of engaging the

14 Secretary of State's Office to review the mailings that we will

15 do.  Our plan is to send one wave of vote-by-mail application as

16 close as possible to August 22nd, which will include an outside

17 carrier envelope, an explanatory letter, a state mandated form

18 with a disclaimer emblazoned on it telling the recipient that this

19 is not an official state form, and a return envelope.  We will do

20 one wave of vote-by-mail mailing to roughly 1.1 Million Georgians

21 on or around August 22nd.

22     In other states we are doing two waves of vote-by-mail

23 mailings, so it's clear we are complying but we will have reduced

24 effectiveness in our speech and engagement with voters.

25 **Q.**  How is this plan for 2022 different than the programs you've

1  run in Georgia previously regarding vote-by-mail?

2  **A.**   In 2020 we ran five waves of vote-by-mail application in

3  Georgia.   2020 was a unique year, and for all of us and for so

4  many reasons I hope it's not repeated.   The pandemic created deep

5  concern that many voters, many high-propensity voters may choose

6  not to vote.

7       When I think about this, I think of my 71-year-old mother back

8  home.   Would she out of fear for her health not have voted could

9  she not have voted by mail?   So 2020 was a high-volume year when

10 we sent five waves.

11      We're not going to do that again.   Now in states that aren't

12 Georgia, we're going to send two waves of vote-by-mail

13 application.   We are separating them by enough time to allow us to

14 get a good sense of how many responded to the first wave, who

15 responded, and then exclude them from the second wave.

16      I think legislating based on the exceptions of 2020 is

17 dangerous and it's worth taking a look at normal election year

18 behavior.

19 **Q.**   What, if anything, would VPC and CVI change about their

20 current plans for their vote-by-mail program in Georgia if not for

21 the ballot applications we've -- restrictions that we've been

22 discussing today?

23 **A.**   If SB 202 -- I want to make sure that I understand the

24 question.   If SB 202 was not in effect, how would we change our

25 plans for this election?

**Q.**  Specific to the three provisions that we've been --

**A.**  First of all, on the form -- on the vote-by-mail form that we send, it would be the state form but it would not be emblazoned with a disclaimer that confuses the voter.

Secondly, we would pre-fill that state form.

Third, we would send a second wave of vote-by-mail application landing in late September encouraging people at a time that they're thinking about election, at a time that they're thinking about politics to sign up to vote by mail.

And the other thing we would include at some point after one of our mailers would be a letter saying you recently received a vote-by-mail application, don't forget to fill it out and send it back.

Surprisingly to me, there's a significant number of people who don't address and deal with their mail the moment they get it out of the mailbox.  There's quite a few who keep it around the house for a little while before addressing it.

**Q.**  Why does VPC and CVI think it's necessary to send a second wave if you're able to?

**A.**  Over 20 years of doing this work with both voter registration and vote-by-mail and, frankly, Get Out The Vote, we know that multiple waves of mail is additive.  Not everybody responds for the first wave of mail.  When I'm doing my work and speaking with donors and traveling, the story that I share ironically is what I envision in my head, and it's Atlanta.  I envision a single mom in

1  Atlanta, an African-American, who's working one or two jobs.  She

2  gets home from work and puts food on the table, helps the kids

3  with homework.  If she's lucky, she gets one hour of mindless TV

4  before passing out.  What she's not doing is reading The Atlanta

5  Journal Constitution or reading every single mailer that gets to

6  her right away.  But she might see the second or third mailer and

7  engage with it because she realizes, I've gotten a couple of

8  these, I better take a look.

9      Our experience over 20 years tells us multiple waves is

10  additive, so we send multiple waves.

11  **Q.**  To be clear, who would receive a second absentee ballot

12  application mailer if you were allowed to send a second wave?

13  **A.**  Based on the timeline and the plans we have in other states, a

14  subset of that 1.1 Million targets who did not reply to the first

15  mailer would receive a second wave.  This would largely be people

16  of color, unmarried women and young people, largely.

17  **Q.**  How would VPC and CVI be able to tell whether a recipient had

18  already applied?

19  **A.**  We would first look at the barcodes on the return envelopes to

20  see which of our targets are scanned as having sent back.  We

21  would then get the most up-to-date voter file.  And usually at

22  that point in an election cycle state election offices are

23  updating the voter file almost daily, and we would look and see

24  which of our targets have successfully signed up to vote by mail

25  and we would exclude them from subsequent mailing.

**Q.** And how come you can't do that process with the SB 202
provisions we've discussed today in place?

**A.** The SB 202 provisions allow only a five-day window.  And so
inevitably there are going to be people who applied in a five-day
window where we are continuing to do data work and printing at
high volume.

**Q.** Absent SB 202's ballot application restrictions, how would you
have characterized the future of VPC and CVI's outreach to Georgia
voters?

**A.** We would continue to do the great, good work we have been
doing since we started in Georgia, which I believe was 2011.  We
would continue to do voter registration, mail and digital, putting
actual voter registration applications in people's hands with an
explanatory letter and return postage-paid envelope.  We would
send two waves of vote-by-mail application in Georgia.  We would
be prepared to engage if there was a runoff in Georgia.  We would
send up to seven waves of Get Out The Vote mail educating Georgia
voters about early voting in-person option and how to safely vote
on Election Day.

     The other thing that we're doing that we're excited about,
through the pandemic people have used -- learned to use QR codes.
We would be sending more mailers with QR codes for those who do
have smart phones to engage with the state election site or the
county election site to know when and where they can vote if there
was a change to voting location and hours.

1  **Q.**  Some of the things you mentioned, are they all implicated by

2  the ballot application restrictions we talked about today?

3  **A.**  The ballot application restrictions change the way we run our

4  vote-by-mail application program in Georgia.

5            MS. HULING:  Thank you.  I will pass the witness.

6            THE COURT:  Is everybody okay we wait for cross before

7  we take a comfort break, particularly Ms. Coudriet who has been

8  typing all this down.

9            MR. TYSON:  I have a lengthy cross-examination of

10 Mr. Lopach so that we may want to take that into account as well.

11           THE COURT:  Thank you.  Let's take a hopefully very

12 short five-minute comfort break.  Thanks, everyone.

13           (After a recess, the proceedings continued as follows:)

14           THE COURT:  Go ahead, Mr. Tyson.

15                      CROSS-EXAMINATION

16 BY MR. TYSON:

17 **Q.**  Good afternoon, Mr. Lopach.  My name is Bryan Tyson.  I

18 represent the defendants in this case.  Can you hear me okay?

19 **A.**  Yes.  Good afternoon.

20 **Q.**  Plexiglas can be a challenge sometimes.

21   I want to work through some of the questions from your

22 declaration and talk through some of the things you discussed with

23 opposing counsel this morning.

24   So, first, I understand that VPC and CVI's mission is to help

25 historically underrepresented groups register and vote, right?

1  **A.**  That is the focus of VPC.

2  **Q.**  And VPC carries out that mission through voter registration,

3  early voting, vote-by-mail and Get Out The Vote resources and

4  information encouraging voters to use those resources, right?

5  **A.**  That is correct.

6  **Q.**  And VPC encourages and assists voters to vote through early

7  and absentee-by-mail voting, right?

8  **A.**  VPC registers and encourages people to vote.  We do not

9  exclusively encourage early vote or vote-by-mail, but we do

10  encourage early voter, vote-by-mail or voting safely on Election

11  Day, all methods that are legal and appropriate.

12  **Q.**  Does CVI also encourage the use of absentee by mail and voting

13  early in some cases?

14  **A.**  Yes.  Amongst the work that CVI does is encouraging vote by

15  mail, early vote in person or voting safely on Election Day.

16  **Q.**  So VPC and CVI provides resources and assistance to voters to

17  request absentee ballots, right?

18  **A.**  Yes.

19  **Q.**  I believe you testified earlier that 80 to 85 percent of the

20  work of VPC and CVI is spent on its direct mail program, is that

21  correct?

22  **A.**  I believe my words were 80 to 85 percent of our program budget

23  are spent on direct mail in comparison to digital.

24  **Q.**  Thank you.

25      Let me make sure that I understand one piece.  My

1  understanding is that in 2020 VPC and CVI jointly sent materials

2  to voters to help request absentee ballots.  Do I have that right?

3  **A.**  Yes.  Can I expand on that for a moment?

4  **Q.**  Certainly.

5  **A.**  When printing, there is a creative code for every individual

6  variation on a mailing when printing the way we do using in-line

7  printers, high volume, so there would be one creative code for

8  each type of vote-by-mail letter in Georgia and another for each

9  type of vote-by-mail letter in South Carolina or Louisiana

10 hypothetically.

11     By sending both VPC and CVI letterhead, you double the number

12 of creative codes.  Because the volume of creatives, because of

13 the increased number of vote-by-mail mailings, because the

14 pandemic just had us increasing our work, we made the business

15 decision to send all vote-by-mail applications under CVI, thus

16 reducing by half the number of creative codes.  Perfectly legal

17 and appropriate.  And then have VPC reimburse CVI for the VPC

18 targets that were mailed wearing a CVI jersey for lack of a better

19 description.

20 **Q.**  And thank you for that.  And just so -- to make this a little

21 bit easier, in your declaration you refer to VPC/CVI consistently.

22 Is the mail program you discussed for Georgia in the 2022 election

23 a joint VPC/CVI program or is it one or the other?

24 **A.**  In 2022 it will be one or the other.

25 **Q.**  And so --

**A.** Excuse me, let me try and -- some people in Georgia in 2022 will receive VPC vote-by-mail applications.  Some people in Georgia in 2022 will receive CVI vote-by-mail applications.  VPC will largely be people of color, unmarried women and young people.  CVI will be folks who don't fall into those categories.

**Q.** Thank you.  That's helpful.

So just for ease of reference then, I'll just refer to VPC/CVI absentee-by-mail applications and that way we'll be on the same page if that works for you.

**A.** Yes.

**Q.** Now, VPC/CVI filed this lawsuit in April of 2021, is that right?

**A.** I don't remember the exact timing of the filing of the lawsuit.  It sounds right.

**Q.** Let me ask it this way then:  Since the filing of this lawsuit -- at least since the filing of this lawsuit VPC/CVI has been aware of the pre-filling prohibitions of Senate Bill 202, right?

**A.** Yes.

**Q.** And since the filing of this lawsuit, at least since then, VPC/CVI has been aware of the disclaimer requirements on the absentee ballot application in Senate Bill 202, right?

**A.** Yes.

**Q.** And at least since the filing of this lawsuit VPC/CVI has been aware of the anti-duplication, or as you refer, to the mailing

 1  list restrictions of Senate Bill 202, correct?

 2  **A.**   Yes.

 3  **Q.**   So if you could get the Volume I notebook that you discussed

 4  earlier and turn with me tab 13.

 5  **A.**   The white binder that you provided, Volume I?

 6  **Q.**   Yes.   Volume I, tab 13.

 7       So beginning with the first page there, these are the

 8  components of the mailers that VPC/CVI provided to Georgia voters

 9  in 2020, right?

10  **A.**   Yes.

11  **Q.**   And the first component we have here is the envelope where

12  everything was contained, is that right?

13  **A.**   I don't view these as components, I view it as one mailer,

14  but, yes, the first page is what we call the carrier envelope, the

15  outside envelope.

16  **Q.**   And that envelope includes a return address referencing CVI,

17  right?

18  **A.**   Yes.

19  **Q.**   Is that return address required by the Postal Service for the

20  type of mail you send?

21  **A.**   I cannot speak to that.

22  **Q.**   And nothing in the provisions that VPC/CVI is challenging in

23  this preliminary injunction affect anything on the first page of

24  tab 13, right?

25  **A.**   Not to my knowledge.

1  **Q.**  If you could turn to the last page of tab 13, this is the

2  postage-paid return envelope that VPC/CVI provides, right?

3  **A.**  Yes.

4  **Q.**  And after the passage of Senate Bill 202, VPC/CVI can still

5  send this same postage-paid envelope to potential voters as it

6  could before the passage of Senate Bill 202, right?

7  **A.**  Yes.

8  **Q.**  You can go to the second page of tab 13.  And I believe you

9  testified this has two components, the left-hand side is a letter

10  and then the right-hand side is the application, correct?

11  **A.**  Correct.

12  **Q.**  And this cover letter explains how a voter can request and

13  cast an absentee ballot, right?

14  **A.**  I would say how, why, the benefits of, yes.

15  **Q.**  And so this letter includes VPC/CVI's advocacy for absentee

16  voting, right?

17  **A.**  Yes.

18  **Q.**  And the letter makes a number of statements saying there's a

19  benefit of voting by absentee, voting by mail is easy, it keeps

20  you healthy and safe, it helps you protect yourself and your

21  family, right?

22  **A.**  Yes.

23  **Q.**  And all those messages in the letter are designed to convey I

24  believe, as you said, VPC/CVI's advocacy for absentee voting,

25  right?

1  **A.**   Yes.

2  **Q.**   And none of the provisions that VPC/CVI is challenging in this

3  preliminary injunction prevents you from sending this letter to

4  Georgia voters, right?

5  **A.**   Correct.

6  **Q.**   And nothing in the provisions that VPC/CVI is challenging here

7  dictates what you can or can't say in this cover letter to

8  potential voters, right?

9  **A.**   Correct.

10 **Q.**   And nothing in the provisions VPC/CVI is challenging here

11 prevents you from using cover letters to express your advocacy

12 around absentee voting, right?

13 **A.**   Correct.

14 **Q.**   You indicated at the top there's a box saying that if you've

15 already submitted a request for a ballot by mail, you don't need

16 to resubmit another one, do you recall that?

17 **A.**   Correct.   Yes.

18 **Q.**   I believe your testimony was that that box was designed to

19 help make things easier for election officials, right?

20 **A.**   Correct.

21 **Q.**   So would you agree with me that it is harder on election

22 officials if voters submit multiple absentee ballot applications?

23 **A.**   I cannot speak to what an election official may experience.

24 **Q.**   But it was your testimony that this box was designed to help

25 make things easier for election officials related to duplicate

1  applications, right?

2  **A.**   That was my testimony, but I cannot speak to what an election

3  official may experience.

4  **Q.**   Have you ever personally processed absentee ballot

5  applications as an election official?

6  **A.**   I have not.

7  **Q.**   Do you know in Georgia what is required for election officials

8  to process an absentee ballot application?

9  **A.**   I do not.

10  **Q.**   Do you know what a Georgia election official does when they

11  receive multiple duplicate absentee ballot applications for the

12  same voter?

13  **A.**   I do not.

14  **Q.**   You made a statement earlier in discussing this letter that

15  fewer people would vote in Georgia if you were not able to send

16  these mailers, do you recall that?

17  **A.**   Yes.

18  **Q.**   What is the basis for your statement that fewer people in

19  Georgia would vote if you were not able to send your mailers?

20  **A.**   We have studied over time and recognize that vote-by-mail

21  mailings increase voter turnout.  There is a turnout impact of

22  vote-by-mail mailings.  In the work that we do, we run randomized

23  control tests so we will have a treatment group and a control

24  group, and we measure things and have for 20 years.

25  **Q.**   You're not the only organizations that sends absentee mail

 1 applications to Georgia voters, right?

 2 **A.**  I can only speak to what we do.  I don't know who else may or

 3 may not do that.

 4 **Q.**  Are you aware that the Secretary of State sent absentee ballot

 5 applications to all active voters for the June 2020 primary?

 6 **A.**  I am aware that in some states Secretaries of State do send

 7 vote-by-mail applications.

 8 **Q.**  Are you aware of the Secretary of State in Georgia sending

 9 applications in 2020?

10 **A.**  I'm not specifically aware of that.

11 **Q.**  So to sum up on the cover letter, VPC/CVI is able to send

12 today the same cover letter to voters that it sent before Senate

13 Bill 202 was adopted, right?

14 **A.**  Correct.

15 **Q.**  So we'll move to the absentee ballot application there on the

16 second -- the right-hand side of that page.

17    You testified VPC/CVI sends absentee ballot applications to

18 make it easier for voters to apply for absentee ballots, right?

19 **A.**  Yes.

20 **Q.**  And nothing in the provisions that VPC/CVI is challenging in

21 this preliminary injunction stops you from providing an absentee

22 ballot application to voters, right?

23 **A.**  The provisions would prevent us from pre-filling the

24 application and would make it challenging for us to send an

25 application to somebody that may have recently applied unbeknownst

1  to us.

2  **Q.**  And my question is a little bit narrower than that.  Does

3  Senate Bill 202 prohibit you completely as a third party from

4  sending absentee ballot applications to Georgia voters?

5  **A.**  It does not.

6  **Q.**  You mention in your declaration the unique scanable barcode

7  tracker on the return envelope which you indicated was on the

8  fourth page of tab 13, right?

9  **A.**  Yes.

10  **Q.**  And VPC/CVI uses that barcode to monitor the messages -- one

11  purpose is to monitor messages to see which communications best

12  advocate for pro-absentee voting viewpoints, right?

13  **A.**  Correct.

14  **Q.**  And nothing in this preliminary injunction or in Senate Bill

15  202 prevents you from including unique scanable barcodes in your

16  mailers to voters, right?

17  **A.**  Correct.

18  **Q.**  I'm sorry to take you back to the letter one more time here,

19  page two.

20      Another component of the VPC/CVI mailers is instructions about

21  how to unsubscribe from these mailings, right?

22  **A.**  I wouldn't use the word "component."  I view this as one

23  package, one set of speech, but, yes, in our mailers there are

24  instructions on how to be removed from our mailing list should a

25  recipient wish to be removed.

1  **Q.**  And after the passage of Senate Bill 202 VPC/CVI can still

2  provide the same instructions for unsubscribing as before its

3  passage, right?

4  **A.**  Correct.

5  **Q.**  You mention in your declaration that VPC/CVI processed

6  numerous unsubscribed requests in 2018 and 2020 from Georgia, is

7  that right?

8  **A.**  We processed unsubscribe requests from Georgia.  I read --

9  reread my declaration recently.  I don't remember that

10 specifically being in the declaration.  It doesn't mean it's not,

11 I'm simply saying.

12 **Q.**  Do you recall approximately how many unsubscribed requests

13 were processed in the 2020 election?

14 **A.**  I do not.

15 **Q.**  Do you recall how many unsubscribed requests were processed in

16 the 2018 election?

17 **A.**  I do not.

18 **Q.**  If you could turn back to tab 12 with me, page 7 in the

19 numbers there at the top.  If you go to paragraph 21, the second

20 full sentence, if you could just read that sentence in paragraph

21 21.

22 **A.**  VPC/CVI processed numerous unsubscribed requests in 2018 and

23 2020 in Georgia ensuring that our messaging would be sent to the

24 correct recipients and that we would continue our associations

25 with those voters.

**Q.**  So you would agree that VPC/CVI did process numerous

unsubscribe requests in 2018 and 2020 from Georgia, right?

**A.**  Yes.

**Q.**  In your declaration I believe you indicate that in 2018 30,000

voters applied for an absentee ballot using VPC/CVI materials in

Georgia, correct?  We can go to paragraph 25 if you want to check.

**A.**  I wouldn't mind going to paragraph 25.

      Yes, that is correct.

**Q.**  Did VPC/CVI send materials in 2018 in the primary or only in

the general election in Georgia?

**A.**  I was not employed here in 2018 and I don't remember.  I would

speculate that we only sent in the general election in 2018.

**Q.**  And in 2020 you indicate in paragraph 25 that 575,000 Georgia

voters submitted an application that VPC/CVI provided, right?

**A.**  Correct.

**Q.**  Does that encompass the primary, primary runoff, general and

general runoff, or is that just for the general election?

**A.**  That's primary and general.  The runoff is reflected in the

88,500 in the next sentence of paragraph 25.

**Q.**  So if a voter used a VPC/CVI application to apply for an

absentee ballot in the primary and then used a VPC/CVI application

to apply in the general, would that person be counted twice in the

575,000 number?

**A.**  Yes.

**Q.**  So it would be correct to say, then, that there were 575,000

1  absentee ballot applications that were provided by VPC/CVI

2  submitted over the election cycle, correct?

3  **A.**   Over the election cycle to exclude the runoff.  The runoff

4  would be possibly additional, possibly duplicative in terms of

5  individuals.

6  **Q.**   Certainly.  And that's what I was getting to.

7       These 575,000 and the 88,500 individuals, only the 88,500

8  individuals are unique individuals, not counted twice, right?

9  **A.**   That sounds right, yes.

10 **Q.**   Now, VPC/CVI provides an e-mail address and also provides its

11 phone number in the letter to voters, right?

12 **A.**   Correct.

13 **Q.**   Does VPC/CVI receive complaints at the phone number in the

14 e-mail address about its mailings?

15 **A.**   VPC and CVI receive all sorts of messages both through the

16 phone line answered by an 800 call service and through the e-mail

17 address.

18 **Q.**   And some of those messages are complaints about VPC/CVI's

19 mailings, right?

20 **A.**   Some messages are complaints.

21 **Q.**   Does VPC/CVI track complaints received at its phone number and

22 e-mail address?

23 **A.**   When the unique code is provided, VPC and CVI will unsubscribe

24 recipients from our future programs.

25 **Q.**   And my question was more specific:  Do you track complaints,

1  not unsubscribe requests, that are received at the phone number

2  and e-mail address?

3  **A.**  Yes.

4  **Q.**  Do you know if any of the complaints received involved

5  receiving duplicate applications by a voter?

6  **A.**  I don't know for certain.

7  **Q.**  Do you know if any of the complaints VPC/CVI received involved

8  incorrect pre-filled information?

9  **A.**  I do not know for certain.

10  **Q.**  Do you know if any of the complaints involve voters thinking

11  VPC/CVI mailers were from government officials?

12  **A.**  I do not know.

13  **Q.**  Does VPC/CVI have any method to track complaints that it

14  receives from voters unrelated to unsubscribe requests?

15  **A.**  Yes.

16  **Q.**  So is there maintained in a database those types of

17  complaints?

18  **A.**  Yes.

19  **Q.**  And you haven't checked that database for complaints

20  specifically about Georgia, right?

21  **A.**  I have not.

22  **Q.**  Now, one of the issues VPC/CVI is challenging in this

23  preliminary injunction relates to the disclaimer provisions of

24  Senate Bill 202, right?

25  **A.**  Yes.

1  **Q.**  I believe you said that the disclaimer had to be emblazoned on

2  the absentee ballot application, is that right?

3  **A.**  Yes.

4  **Q.**  Would you agree with me that nothing in Senate Bill 202 says

5  where the disclaimer has to be located on an absentee ballot

6  application?

7  **A.**  I cannot speak to exactly what it says in SB 202 as to the

8  location of the disclaimer.

9  **Q.**  So you don't know if you're required to put it at the top,

10  bottom, anywhere else on the form, right?

11  **A.**  I cannot speak to the law's language as to the location of the

12  disclaimer language.

13  **Q.**  And the mailers that VPC/CVI sent to Georgia voters in 2020 at

14  tab 13 included a disclaimer on the cover letter, correct?

15  **A.**  What are you referring to as the disclaimer?

16  **Q.**  So at the bottom of the cover letter there's a box and in the

17  box there's a statement:  This mailing has been paid for by the

18  Center for Voter Information.  CVI is a nongovernment, nonprofit

19  501(c)(4) organization.  It then provides a phone number and a

20  website.  And then states:  CVI is not affiliated with state or

21  local election officials.  Do you see that?

22  **A.**  Yes.

23  **Q.**  And you've included this disclaimer to notify voters that you

24  are not a government organization, right?

25  **A.**  Yes.

1  **Q.**  And I believe you testified earlier, you don't know the

2  universe of all organizations that might be mailing absentee

3  ballot applications to Georgia voters, right?

4  **A.**  Correct.

5  **Q.**  You testified earlier that the disclaimer requirements of

6  Senate Bill 202 would make VPC/CVI appear less trustworthy to

7  voters.  Do you recall that?

8  **A.**  I do.

9  **Q.**  But VPC/CVI in its cover letter is telling voters that it is

10  not a government entity, right?

11  **A.**  Correct.

12  **Q.**  Do you have any evidence that the disclaimer requirements of

13  Senate Bill 202 undermines VPC/CVI's mailers concerning its

14  messages of advocacy for absentee voting?

15  **A.**  I do not currently have any evidence.  I suspect if this

16  stands, we will be able to point to a lower response rate.  And I

17  think that logic suggests that indicating this is not a government

18  form on a government form in a voting context in which people

19  already have their antenna up would create confusion.

20  **Q.**  So is it fair to say, then, that your statements that the

21  disclaimer required by Senate Bill 202 on the application dilutes

22  and renders less effective VPC/CVI's message that absentee voting

23  is safe, secure, accessible and beneficial is based on your

24  logical conclusions but you do not yet have evidence to support

25  that statement, right?

1  **A.**  Correct.

2  **Q.**  I'm sorry, was that a yes?

3  **A.**  That was a correct.

4  **Q.**  And sitting here today, you don't have any evidence that the

5  inclusion of the disclaimer on the application as required by

6  Senate Bill 202 will dramatically reduce the effectiveness of

7  VPC/CVI's communications and your credibility with the recipients

8  of your materials, right?

9  **A.**  I do not have any evidence to that effect as we have not

10  tested messages that would contradict what we are trying to do to

11  demonstrate reduced effectiveness.  We are not trying to reduce

12  our effectiveness in the work we do, so we haven't tested

13  something like this.

14  **Q.**  So when you say in your declaration that voter confusion is

15  certain to result from the inclusion of the disclaimer, that's

16  based on your logical deductions, not a study or evidence of any

17  sort, right?

18  **A.**  Correct.

19  **Q.**  I'm sorry?

20  **A.**  Correct.

21  **Q.**  I want to next discuss the printing process that VPC/CVI uses.

22  You can set the notebook aside for the moment, make things a

23  little bit easier for you.

24      Am I correct that VPC/CVI doesn't want to spend its resources

25  sending absentee ballot application to voters who have already

1  voted in an election?

2  **A.**   Would you restate that question.

3  **Q.**   Certainly.

4      Is it correct that VPC/CVI does not want to spend its

5  resources sending absentee ballot applications to voters who have

6  already voted in an election?

7  **A.**   That is generally true.  I would say that most of the

8  vote-by-mail application work happens before ballots are mailed to

9  voters.

10 **Q.**  Does VPC/CVI want to spend resources sending additional

11 absentee ballot applications to voters who have already applied

12 for an absentee ballot?

13 **A.**  VPC and CVI want to increase participation in our elections,

14 and over time we have learned that multiple waves of mail have an

15 additive impact in response rates.  And so to the extent we can

16 increase voter participation and response rates, we will send

17 additional mailings.  When we have sufficient data and time to

18 remove people who have already registered or already applied to

19 vote by mail, we will.

20 **Q.**  And I believe you testified earlier that as to the second wave

21 mailing that you're doing in states in 2022 that are not Georgia

22 as of right now, you are going to utilize information from the

23 voter file in those states and from your barcodes on envelopes to

24 remove voters who have already applied for an absentee ballot, is

25 that right?

1 **A.**  That is correct.

2 **Q.**  And so is it correct to say that the squabble with Senate Bill

3 202's five business day requirement is a question of timing?

4 **A.**  In part, yes.  I think with additional reasonable time

5 something could be worked out.

6 **Q.**  Do you know how often the Georgia Secretary of State updates

7 its public list of voters who have already applied for and

8 returned absentee ballots?

9 **A.**  I know that generally at different points in an election cycle

10 election offices update at different cadences.  Closer to an

11 election updates happen more frequently, and I would assume that

12 is the case in Georgia.

13 **Q.**  But you don't know for certain what that frequency of updates

14 is, right?

15 **A.**  I would assume closer to the election it's probably daily, but

16 I cannot say for certain what the cadence of the Georgia election

17 update is.

18 **Q.**  Do you know whether information that the Georgia Secretary of

19 State's Office provides has to be purchased or whether it is

20 publicly-available information?

21 **A.**  I believe it is publicly-available information.

22 **Q.**  One thing I wanted to understand a little better, I believe

23 you testified that when mailing absentee-by-mail applications to

24 Georgia voters, you use only information in the Georgia voter

25 registration database, is that right?

**A.**   That's my understanding, yes.

**Q.**   In your declaration you refer to a vendor named Catalyst.   Do you recall that?

**A.**   Yes.

**Q.**   And what is the role that Catalyst plays in data for VPC and CVI?

**A.**   Catalyst works to get the voter files from states, or if it's kept by a county, but generally from states, and collects the data files and provides it for us to work on.   Some work with data is done by Catalyst.

**Q.**   Does Catalyst ever add information to the Georgia voter registration database that VPC/CVI uses?

**A.**   I cannot speak to what Catalyst does.   We have asked for the voter file.

**Q.**   So when you say that VPC/CVI only mails to voters who are contained on the voter file, you're relying on Catalyst for that information, not the Georgia voter registration database, right?

**A.**   Correct.   Correct.

**Q.**   And do you know how frequently Catalyst updates its list with Georgia voter information?

**A.**   We make clear to our data vendors that we would like as frequent updates as possible to the data files.   I do not know how frequently in 2020 Catalyst received updates to the Georgia voter file.

**Q.**   And so if Catalyst only updated its list once a month, for

example, there may be outdated information in the list that
VPC/CVI uses when it mails to Georgia voters, right?

**A.**   If Catalyst only received updates once a month, it is possible
that there would be outdated information.

**Q.**   But sitting here today you don't know the frequency of those
updates, so you can't say for sure?

**A.**   I do not.

**Q.**   Now, you discussed -- initially in your declaration you gave a
20-day timeline from an order reaching your printer vendor until
the communications are then put in the mail.  Do you recall that?

**A.**   Yes.

**Q.**   And was that date based on the memo that you reviewed as
Exhibit 51, I believe, from Mission Control?

**A.**   It would have been based both on the memo received from
Mission Control and our own production experience over years of
doing this work.

**Q.**   And you referenced several times the five-day period in Senate
Bill 202 to check data.  Do you recall that?

**A.**   Yes.

**Q.**   And that's five business days, not five calendar days, right?

**A.**   I can't speak to if it's business or calendar.

**Q.**   You would agree five business days versus five calendar days
could make a difference, right?

**A.**   I would suggest that both of them would be rather limiting
knowing what our data and printing processes are.

1  **Q.**  Are you familiar with the term "seamless entry" as it relates
2  to the United States mail?
3  **A.**  I am not familiar with that term.
4  **Q.**  You reference as well in your declaration that you may have a
5  printer print Georgia, Kansas and Arizona in a single submission.
6  Do you recall that?
7  **A.**  What I was indicating is that multiple states are printed
8  together, yes.
9  **Q.**  And that voter information is separated by state because it's
10  based on carrier route, right?
11  **A.**  So I can't -- I can't speak to the printing exactly if it is
12  done by state first or is it done by creative and then sorted into
13  carrier route.  The -- there are so many variables going into it,
14  I am not the best person to say the ranking of variables in
15  printing, and I wouldn't want to say something to later be proven
16  I was incorrect.
17  **Q.**  And I understand.
18      So it's your testimony, then, that when your printer concludes
19  a printing run -- would that be a reasonable term to use, a
20  "printing run"?
21  **A.**  Yes.
22  **Q.**  So it's your testimony that when your printer concludes a
23  printer run, you don't know for certain whether that information
24  is separated by state or not, right?
25  **A.**  It makes sense that it is separated by state.  However, there

1  are going to be cities that overlap a state's lines where postal

2  carrier routes may be different than obvious geographic

3  breakdowns.  I'm simply saying the number of variables, be it a

4  printer creative, be it a deadline for a state, be it a postal

5  carrier code, are so significant that I cannot tell you today that

6  the overarching significant variable is state versus something

7  else.

8  **Q.**  I understand.

9      You reference the use of in-line printers in your declaration,

10  right?

11  **A.**  Yes.

12  **Q.**  And is that another term for a variable printing press, or do

13  you know?

14  **A.**  My understanding of an in-line printer is an in-line printer

15  will print using one large piece of paper, which is printed and

16  then turned into the various components.  So, my understanding is

17  the carrier envelope that we talk about, the return envelope, the

18  vote-by-mail application, the voter registration form all come

19  from one large piece of paper that is printed and then sliced,

20  diced and folded into what becomes a package.  That's my

21  understanding.

22  **Q.**  Thank you.

23      Now, as I understand your declaration VPC/CVI only uses union

24  printers, correct?

25  **A.**  Whenever possible, and certainly as far as I know since I've

1  been here we have only used union printers.  As far as I know

2  historically we have only used union printers.  I would hate to

3  make an overstatement in case I'm missing something.

4  **Q.**  Certainly.  And you would agree with me that there are

5  non-union printers with in-line capabilities, right?

6  **A.**  I have no knowledge of that.

7  **Q.**  Has VPC/CVI ever explored using a non-union printer for any

8  mailer?

9  **A.**  I do not believe that we have.

10  **Q.**  Did VPC/CVI use the Mission Control entity referenced in the

11  memo as its printer for Georgia mailings in 2020?

12  **A.**  I don't remember which entity was referenced in the memo.  Can

13  we look at the memo?

14  **Q.**  Certainly.  I believe it was tab 51 in the second volume.

15  **A.**  I do not see a specific printer referenced in this memo.  I'm

16  happy to be corrected.

17  **Q.**  And it may be my misunderstanding, is Mission Control, Inc.,

18  in the from line not a printer?

19  **A.**  They are not, they are a direct mail consultant, they work

20  with various printers.  There are two that they primarily worked

21  with in 2020.  And I'm embarrassed to be forgetting their names

22  right now.  But there are print houses that are separate from

23  Mission Control.

24  **Q.**  So looking at the first sentence after, "Hey, Tom," in the

25  memo, tab 51.

1  **A.**  Yes.

2  **Q.**  When Emma and I hopped on the phone with our printer reference

3  there, do you know who "our printer" is?

4  **A.**  It's one of the two companies that I'm blanking on in this

5  moment.

6  **Q.**  But this memo is returning the information from one of those

7  two unknown printers and Mission Control is providing this to you,

8  right?

9  **A.**  Correct.  And perhaps in some follow-up document we can

10  provide the names, I'm just blanking.

11  **Q.**  And do you recall if specific -- or actually do you know if

12  specific parameters were given to the printer for the preparation

13  of this memo?

14  **A.**  I cannot speak to that.

15  **Q.**  And this memo is dated April 6th, 2021, right?

16  **A.**  Yes.

17  **Q.**  So this memo has been in VPC/CVI's possession for over a year,

18  right?

19  **A.**  Yes.

20  **Q.**  Has VPC/CVI asked Mission Control to update this memo based on

21  any additional information after April 6th, 2021?

22  **A.**  No.  No.

23  **Q.**  And you don't know for sure what parameters were given to the

24  printer, so you don't know if there were other parameters that

25  could meet the deadlines set by Senate Bill 202, right?

**A.**  I do not know what parameters were given to the printer when
Maren spoke to the printer.

**Q.**  And this memo describes a process that would involve printing
materials and then physically removing materials from that --
those pallets, correct?

**A.**  Correct.

**Q.**  Are you familiar with the process of scrubbing a mailing list?

**A.**  I could presume based on hearing you use the term.  I am not
familiar with the process of scrubbing a mailing list.

**Q.**  And as I read it, and feel free to take a look, I didn't see
any other process or any list scrubbing process contained in the
memo at tab 51.  And feel free to take a look.  I didn't find one.

**A.**  So I believe if you look at paragraph one, two, three, four,
five, six, beginning September 1, data due to the printer, VPC
would need 24 hours to format a list from the Secretary of State
of voters who had requested a ballot, match that list to our data
files and remove all requesters.  We should assume we have a list
of requesters that is current as of August 31st.

   While not using the term "scrubbing," I would interpret that
section to be what you mean in terms of the word "scrubbing."

**Q.**  And you didn't ask and don't know if anybody asked a printer
whether or not there could be any further adjustments to the list
before September 18th, right?

**A.**  Correct.

**Q.**  And you would agree with me that the time from when printing

1  starts until Georgia printing finishes is three calendar days,

2  right?

3  **A.**   I think that could be interpreted as three or four calendar

4  days if it is the full day of the 18th, the full day of the 19th,

5  the full day of the 20th, and the full day of the 21st, I would

6  interpret that as four days.

7  **Q.**   Thank you.

8      So we can set this notebook off on the side.  I want to ask

9  you about the waves that you've referenced for the ways that

10  VPC/CVI sends mailers.

11     How many waves did VPC/CVI send in Georgia in 2018?

12  **A.**   In 2018, I believe it was two waves, I believe.

13  **Q.**   And two waves you testified is what VPC/CVI would do if not

14  for the provisions of Senate Bill 202 for the 2022 elections in

15  Georgia, right?

16  **A.**   Correct.

17  **Q.**   And I believe you testified that the time between those waves

18  would be usually one around the beginning of vote-by-mail period

19  opening and then some time late September you said when voters

20  were paying attention, is that right?

21  **A.**   Arguably four to five weeks later.

22  **Q.**   And VPC/CVI is still free to spend -- to send a letter without

23  an absentee ballot application to all Georgia voters in late

24  September or October, right?

25  **A.**   Yes.  However, as I think about that, I would have to think if

1  somebody received a letter from us and went on the Secretary of

2  State's website and filled out a vote-by-mail application, yet had

3  already applied to vote by mail previously, would that put it --

4  us at risk of a fine?  And we would work with lawyers to discern

5  that before we even considered sending a simple letter.

6  **Q.**  But sitting here today you are not sure whether or not you

7  could still send a letter based on the provisions of SB 202?

8  **A.**  I believe we could send a letter, the question would be what

9  exposure would we have to being fined for people who apply as a

10 result of our letter and may have already previously applied.

11 **Q.**  So it's your testimony, then, that the mailing list

12 prohibitions, you believe, could apply to non-application

13 mailings, right?

14 **A.**  Those are the questions I'm asking myself sitting here without

15 the benefit of SB 202 or the statute as signed in front of me.

16 **Q.**  Certainly.  And I don't want to cause you to speculate on

17 that.

18    It's correct to say that the universe of voters that VPC/CVI

19 mails to changes with each wave and that it gets smaller, right?

20 **A.**  It would change for a number of reasons.  There are people

21 continually applying -- or registering to vote, and those are

22 additions.  There are people who are moving and changing their

23 address and those are changes.  So one -- a list for one wave and

24 a list for a second wave are going to be different.

25 **Q.**  And do the subsequent waves pre-Senate Bill 202 in Georgia

1   incorporate updates from the Secretary's website of those who

2   requested an absentee ballot?

3   **A.**  In 2020 we sent five waves that were spaced too closely

4   together to ensure that wave two had suppressions from wave one

5   respondents.  We do know that wave three was able to have

6   suppressions from wave one respondents and it skipped a wave

7   moving forward.  That is a unique attribute of 2020, a cycle in

8   which the pandemic concerned us about voter engagement and so we

9   increased the pace at which we engaged voters to vote by mail.

10   **Q.**  Have you ever asked either of the print vendors that you

11   referenced whether they can send out a certain number of absentee

12   ballot application mailers within five business days of receiving

13   the order, or have you only relied on Mission Control for that

14   information?

15   **A.**  I've relied on Mission Control and our program staff.

16   Associated with that is the volume at which we print and the cost

17   reductions, the cost benefits we receive by printing at higher

18   volumes.

19   **Q.**  If I understood your testimony earlier correctly, the only

20   difference Senate Bill 202 will make in terms of the number of

21   mailings you would send to Georgia in 2022 is one wave, right?

22   **A.**  For this cycle, correct, one wave.

23   **Q.**  You testified earlier about the -- I think you called it the

24   union bug on various materials.  Do you recall that?

25   **A.**  Yes, I do.

1  **Q.**  And I believe -- my notes say you said that the union makes

2  the communication more effective or the union bug makes the

3  communication more effective.  Do I have that right?

4  **A.**  I don't believe I said that at all.

5  **Q.**  Do you believe the union bug plays a role in the

6  communications to the voters?

7  **A.**  I believe that it is a business decision on our part to use

8  union printers.  It is in line with our values, and so we use a

9  union printer.  I do not believe that the union bug impacts in any

10  way the mailing.

11  **Q.**  And you would agree with me that using a union printer is a

12  business decision VPC/CVI has made, right?

13  **A.**  VPC and CVI have made the business decision aligned with our

14  values to use a union printer.

15  **Q.**  Is it your testimony that there's not a single union printer

16  in the United States that could print and mail the mailers that

17  your organization sends in a manner compliant with the mailing

18  list restrictions of Senate Bill 202?

19  **A.**  I did not say that.

20  **Q.**  So sitting here today, you don't know if there's a printer who

21  could meet the requirements of Senate Bill 202's anti-duplication

22  provisions, mailing list restrictions, while otherwise printing

23  the materials VPC/CVI sends, right?

24  **A.**  I believe at the volume at which we print and use data and

25  with current printing, coding and data technology, that there is

1  not a printer that could be used to do the work we do at the

2  volume that we do it.

3  **Q.**  But you've done no investigation of that beyond talking with

4  Mission Control and talking to your staff, right?

5  **A.**  Our printing consultant, Mission Control, are exceptional mail

6  consultants who have been working in this field for decades and

7  know the landscape of printers around the country.  In my position

8  as CEO, I am fully confident in the research that they would have

9  done and presented to me as their client.

10 **Q.**  And my question was a little more specific.  You're relying on

11 Mission Control for the conclusion that there's not a printer who

12 could meet those requirements, right?

13 **A.**  I'm confident in the assessment of Mission Control.

14 **Q.**  Do you know if Mission Control ever talked to any non-union

15 printers about those requirements?

16 **A.**  I do not know that.

17         MR. TYSON:  Your Honor, I see we're approaching 1:00,

18 and I'm about to switch directions.  Would you like to stop here

19 or keep going?

20         THE COURT:  How much longer do you think you have?

21         MR. TYSON:  I have a little ways to go.  Probably

22 another 20, 25 minutes.

23         THE COURT:  Okay.  I think your suggestion is a good

24 one, then.  I want to keep us moving and I -- there's a whole

25 courtroom full of people, and I bet some of them have children

1 that are at camps and things, so I would like to adjourn sooner

2 and not later this evening if we can.  So is a 30-minute lunch

3 adequate for everyone?

4          Okay.  Let's do that.  Let's be back in 30 minutes,

5 please.  Thank you.

6          (After a recess, the proceedings continued as follows:)

7          THE COURT:  Go ahead.

8          MR. TYSON:  Thank you, your Honor.

9 BY MR. TYSON:

10 **Q.**  Mr. Lopach, I hope you had a good snack lunch at least.

11    Right before we broke we were talking about whether there was

12 any printer in the United States that could print and mail your

13 materials on the timelines required by Senate Bill 202.  Do you

14 recall that?

15 **A.**  Yes.

16 **Q.**  And your view that no such printer existed is based on the

17 memo from Mission Control at Exhibit 51, right?

18 **A.**  My view is based more broadly than simply the exhibit in tab

19 51 and goes to Mission Control's professionalism, relationship and

20 work with us over more than a decade.

21 **Q.**  Do you know how many printers Mission Control works with?

22 **A.**  I do not know that.

23 **Q.**  And the only thing we know for sure is that Mission Control

24 talked to the one printer in Exhibit 51 that was referenced,

25 right?

**A.**   That is what we know for certain; however, Mission Control,

having been a professional printing consultant, direct mail

consultant for decades and combined from the partners in the firm

have a good understanding of the lay of the land of available

printers and capabilities nationally.

**Q.**   But you personally have not spoken to Mission Control asking

the question if there is any printer in the United States that can

print your materials on the timelines in Senate Bill 202?

**A.**   I have not.  I trust Mission would tell me if there was.

**Q.**   Thank you.

Let me move to pre-filling, try to move this along.  Move to

tab 2 in Volume I, which is the Application for Georgia Official

Absentee Ballot.  Do you see that?

**A.**   I do.

**Q.**   In your declaration you stated that providing pre-filled

applications ensures that voters have everything they need to

request an absentee ballot.  Do you recall that?

**A.**   Were those my exact words?

**Q.**   They were.  And you're welcome to check me on tab 12, at

paragraph 22.

**A.**   Okay.

Is one of the best ways to ensure that voters have everything

they need to request an absentee ballot.

**Q.**   Thank you.  So one of -- your testimony is pre-filling is one

of the best ways to ensure that voters have everything they need

1   to request an absentee ballot, right?

2   **A.**   Yes.

3   **Q.**   Thank you.

4        So I want to look at tab 2.  And is it your understanding this

5   is the new application post-Senate Bill 202?

6   **A.**   I have not seen this document before.  You said just prior to

7   coming back in session to look at tab 2 so we were ready.  I have

8   not seen this document before.  I could assume that this is the

9   new vote-by-mail form for 2022 from Secretary of State

10  Raffensperger's office, but I don't know that with any certainty.

11  **Q.**   Okay.  This document is titled "Application For Georgia

12  Official Absentee Ballot," right?

13  **A.**   Yes.

14  **Q.**   So I want to understand pre-filled information for absentee

15  ballot applications for VPC and CVI, but first I want to look --

16  item number two indicates the voter has to print their name as it

17  appears in their voter registration, right?

18  **A.**   That is what item number two indicates.

19  **Q.**   And item number three is a ballot if it's -- one is required

20  in a primary, a partisan primary, right?

21  **A.**   Yes.

22  **Q.**   And then the voter would have to fill out item four, a

23  residential address, right?

24  **A.**   Correct.

25  **Q.**   And then the voter would have to fill out item number seven,

1   the date of birth and driver's license number.  Do you see that?

2   **A.**   Yes.

3   **Q.**   And then a voter would have to sign down at the bottom of the

4   form in paragraph eight, right?

5   **A.**   Correct.

6   **Q.**   So of information that VPC/CVI pre-fills, they would fill the

7   date of the primary or election, is that right?  In the past, I'm

8   sorry, past forms where you have pre-filled information in 2020.

9   **A.**   In the past we have pre-filled first, middle, last, suffix, if

10  indicated.  Address, city, county, zip.  And at the request of the

11  elections administration office the date of primary election or

12  runoff.

13  **Q.**   And VPC/CVI wouldn't fill in the driver's license number,

14  right?

15  **A.**   We would not.

16  **Q.**   And you wouldn't fill in the date of birth or even the year of

17  birth, right?

18  **A.**   We would not do that.  In all likelihood, we would highlight

19  each of those fields to draw the attention of the recipient to

20  better ensure that they are filling out all required fields.

21  **Q.**   So a pre-filled application that VPC/CVI provides would still

22  require the voter to fill out date of birth and driver's license

23  number and still require the voter to sign, and if a primary,

24  select a ballot or primary party, right?

25  **A.**   Yes, though it would have the added benefit of having the name

1   and address as appears on the voter file making it easier to

2   process on the return.

3   **Q.**   It's correct that in the past VPC/CVI has sent ballot

4   applications with incorrect information for residents in Virginia,

5   right?

6   **A.**   In Virginia VPC/CVI sent ballot applications with incorrect

7   return mailing addresses to election administration offices.

8   **Q.**   And that was incorrect information on those applications?

9   **A.**   In 2020 there was an error at the printer -- let me back up

10  one more step.

11      Virginia is unique in that it has both city and county

12  election administration offices.  In a handful of cases, there are

13  cities and counties with the same name.  Forgive me if I give a

14  made-up example.  Prince William City, Prince William County,

15  that's probably a made-up example.  The printer inverted some code

16  that was sent so that the return mail for Prince William City went

17  to Prince William County.  And the reverse was true, Prince

18  William County return mail was sent to Prince William City.

19      This was an incredibly regrettable error.  As soon as we

20  discovered it, we did the work to figure out how did it happen and

21  then worked with local election offices at our expense to move the

22  vote-by-mail applications from the incorrect jurisdiction to the

23  correct jurisdiction.

24      My memory is that we still had north of 30,000 or -- I believe

25  it was north of 30,000 vote-by-mail applications correctly

1  processed in Virginia.

2  **Q.**  Does VPC/CVI have any evidence on the rate of return for

3  pre-filled voter registration applications versus applications

4  that are not pre-filled?

5  **A.**  Over 20 years of doing this work, and we did test it at some

6  point, I believe, with voter registration, we have seen a higher

7  rate of return with pre-filled voter registration applications

8  compared with blank photo registration applications.

9  **Q.**  So is that a no, CVI/VPC does not have evidence as to absentee

10  ballot application rate of return for pre-filled versus not

11  pre-filled?

12  **A.**  It is that I don't remember in this very second.  We do tests

13  in nearly every mailing that we send.  In this moment, I'm not

14  remembering if we have a vote-by-mail pre-fill versus not pre-fill

15  test.

16  **Q.**  So sitting here today, you can't identify any evidence

17  specifically, correct?

18  **A.**  Sitting here today, I cannot say one way or the other.  I can

19  say over 20 years of doing this work we have found that pre-filled

20  applications are returned at a higher rate than blank.

21  **Q.**  And even after Senate Bill 202 you can still send a blank

22  absentee ballot application with a cover letter to Georgia voters,

23  right?

24  **A.**  Correct.

25  **Q.**  And the only difference on the pre-filling prohibition in

1  Senate Bill 202 is that date of election, name and address are not

2  filled in, but otherwise it's the same as before Senate Bill 202

3  as to the application, right?

4  **A.**   Generally, yes.   What I haven't explored is would we be

5  allowed to highlight fields that need to be completed or not.   And

6  I don't believe the law speaks to that, and I don't know how the

7  Secretary of State would interpret that.

8  **Q.**   But, again, in terms of the pre-filling prohibition, the only

9  difference pre-Senate Bill 202 and post-Senate Bill 202 is that

10  date of election, name and address would not be pre-filled on an

11  application that you would send?

12  **A.**   Correct.

13  **Q.**   Has VPC/CVI ever done a study for how long it takes a voter to

14  fill in his or her name and address?

15  **A.**   We have not.

16  **Q.**   Even if an application is pre-filled with a name and address,

17  the voter still has to complete the rest of the application for it

18  to be processed, right?

19  **A.**   Correct.

20  **Q.**   I want to ask you about a statement in your declaration, at

21  tab 12, paragraph 66, which is on page 29.   The first sentence

22  indicates the pre-filling prohibition also requires VPC/CVI to

23  expend additional resources to put in place specific compliance

24  and verification processes with our vendors for our Georgia

25  communications.   Do you see that?

1  **A.**   I do see that.

2  **Q.**   How does sending a blank form require more resources than

3  sending a form with pre-filled information?

4  **A.**   If we are printing hypothetically four or five states together

5  and the other states allow for pre-filling, and we have to prepare

6  the tapes and the coding, we would have to prepare separate coding

7  for the Georgia to not pre-fill.  And it may be, again, this -- I

8  spoke to earlier, not knowing the hierarchy of variables, it may

9  be that vote-by-mail mailers sent to young African-American men

10  have a specific creative that is different than other creatives.

11  And that we would then have to have a separate tape for Georgia

12  that indicates no pre-filling versus one that may require

13  pre-filling.  It would just introduce one more variable into the

14  work that we are doing.

15  **Q.**   That's based on basically a programming change based on how

16  you have other states set up, is that correct?

17  **A.**   Because we print multiple states together in order to get the

18  volume discount for our programs.

19  **Q.**   You discussed earlier that you seek to be good partners with

20  election officials and communicate with, for example, the Georgia

21  Secretary of State's Office, right?

22  **A.**   Correct.

23  **Q.**   And you don't know if there are other organizations that

24  provide absentee ballot applications that don't communicate with

25  the Secretary's office, right?

1  **A.**  I do not know that one way or the other.

2  **Q.**  If the Secretary of State's Office asked you to include a

3  disclaimer that wasn't required by law on an absentee ballot

4  application, would you do it?

5  **A.**  It depends on the disclaimer.  We would have a serious

6  conversation.  We would ask what is the need for it.  We would

7  look at our creatives and see if there's space.  It's the kind of

8  thing we would absolutely talk through.

9  **Q.**  And you're aware that there are states that prohibit

10 third-party groups from sending absentee ballot applications to

11 voters, right?

12 **A.**  Correct.

13 **Q.**  And Georgia is not one of those states, right?

14 **A.**  Correct.

15 **Q.**  If you could grab the defendant's notebook back there, the

16 black notebook, for me.  I'll ask you to turn to tab 26.

17 **A.**  Yes, I have tab 26 open.

18 **Q.**  And I believe you testified and we tried to nail down earlier

19 the data that VPC and CVI uses is Georgia voter information you

20 purchase from Catalyst, correct?

21 **A.**  Correct.

22 **Q.**  If you could turn to page 40 of this.  And I recognize you

23 haven't seen these documents before.

24          MR. TYSON:  Your Honor, these are -- just for clarity

25 purposes and maybe actually I can do this all at once, we had

discussed with the plaintiffs that any exhibits that were attached

to the various pleadings, which for us is Exhibits 1 through 41,

similarly to the plaintiffs this morning, we had agreed to allow

all those to be admitted.  And I would move their admission at

this time.

THE COURT:  Hearing no objection, they're admitted.

BY MR. TYSON:

Q.  So Mr. -- if you could turn to page 40 there.  And you see

it's an e-mail from a woman named Jill Smith there at the top?

A.  Yes.

Q.  Could you read the description of the violation, please.

A.  Today I received mail at my home address from the Center for

Voter Information addressed to Jeremy Stephen Smith.  I have lived

in this house for 13 years and can verify that this person has

never lived at this address for the last 13 years and I have, nor

for the previous four years.  I'm not certain I understand that

last clause.  Assuming this organization got this person's name

and address from the registered voters, I wanted to call it to

your attention as possible voter fraud.  I Googled this person by

name and there is such a person living in the Atlanta area.  White

Pages has his address as Alpharetta, which is not in DeKalb

County.  I hope you will look into this.  Thanks.

Q.  So how would Ms. Smith have received mail from CVI to someone

that was not registered to vote at this address?

A.  Not having seen this before, if something like this had come

1  to me, I would dive into it and figure out and ask.  In this

2  moment, I can't tell you what happened.  I would wonder if there

3  was a printer error, I would wonder if there was a data error.  I

4  cannot sitting here today tell you what occurred.  It's the kind

5  of thing I would like to look into.

6  **Q.**  Ms. Smith indicates she's concerned this might be voter fraud,

7  do you see that?

8  **A.**  Yes.

9  **Q.**  If you could turn to the next page, 41, from Richard Braun.

10  **A.**  Yes.

11  **Q.**  And there's a redaction in that, but if you can just read that

12  description of violation, please.

13  **A.**  I received a piece of mail addressed to Mary Abney Rathbone

14  from the Center for Voter Information.  This person does not live

15  at, redaction, and to my knowledge she never has.  My wife and I

16  have lived at this address since September 2012.  I am concerned

17  that this person may fraudulently use this address for her voter

18  registration.

19      Can I pause for a moment?

20  **Q.**  I'm sorry?

21  **A.**  Just one clarification now that I read this.  What is not

22  clear in either of these e-mails is if these people received a

23  vote-by-mail application or a voter registration application.  And

24  if you'll allow me a moment of explanation.

25  **Q.**  Certainly.

1  **A.**   There is -- the voter file is a public list of registered

2  voters.   There is not a list of unregistered people in the United

3  States.   So, remember, through this process we've talked about one

4  of our first interactions with voters is registration.   We go out

5  to commercial data vendors and get commercial lists of humans and

6  their addresses.   And then we suppress, exclude those who are

7  already registered to vote.   And then with the remainder, we

8  determine are they deceased?   What does the National Change of

9  Address database from the US Postal Service show for the most

10 current address?   Are they in our core target of people of color,

11 unmarried women and young people?

12    These two complaints, as I read them, don't specify that we

13 sent vote by mail.   It is quite possible we sent voter

14 registration.   If indeed it was voter registration, I would then

15 need to look and see is it possible that Jeremy Stephen Smith

16 signed up for the Pottery Barn catalog at this address or not.   I

17 can't speak to that.

18    So I realize as I'm reading this, it's not clear that this is

19 voter file-based concern or voter registration-based concern.

20 **Q.**   And I believe you testified earlier that you purchased the

21 voter file information from Catalyst, right?

22 **A.**   I don't think I said "purchase."

23 **Q.**   I'm sorry.

24 **A.**   I said that we get our voter file information from Catalyst.

25 Moving forward we are using Catalyst and TargetSmart and another

1  vendor.  And we used TargetSmart for a small bit of data in 2020.

2  **Q.**  Do you know if Catalyst added any information to the Georgia

3  voter file before they provided it to VPC and CVI?

4  **A.**  I do not know if Catalyst added any information to the Georgia

5  file before they provided it to VPC.

6  **Q.**  Do you know if they added any names and addresses to the

7  Georgia voter file before providing it to VPC and CVI?

8  **A.**  I would hope not.

9  **Q.**  But you don't know?

10  **A.**  I don't know that.

11  **Q.**  And ultimately you don't know what Catalyst does with the

12  data, you know you ask for a product and you receive it from them,

13  right?

14  **A.**  Correct.

15  **Q.**  Now, Senate Bill 202 was in place during Georgia's primary

16  election in May, right?

17  **A.**  Yes.

18  **Q.**  And are you aware that there was record voter turnout in that

19  primary election?

20  **A.**  I am aware that there was significant voter turnout.  I do not

21  know if it was record for a primary in Georgia or not.

22  **Q.**  You talk about in your declaration that VPC and CVI work with

23  other civic organizations and share information with them.  Do you

24  recall that?

25  **A.**  Yes.

1   **Q.**   What other civic organizations does VPC/CVI build associations

2   with?

3   **A.**   Nationally we'll do work with League of Conservation Voters,

4   human rights campaigns, sometimes some unions.  At a state level I

5   admit to you I don't have it memorized in every state.  There is a

6   man named Leslie Small who leads a voting organization in Georgia,

7   I remember him, and I don't remember the name of his organization.

8   Various groups that do work largely on the ground, door knocking,

9   phone calling, text messaging to register and turn out voters.

10  **Q.**   Is Fair Fight Action one of the organizations that VPC and CVI

11  has an association with?

12  **A.**   We have done work in the past with Fair Fight Action in the

13  form of making a contribution to them.  At the end of the 2020

14  election cycle, we realized we had more money than we needed and

15  made legally appropriate contributions to other organizations

16  around the country doing voter engagement work.

17      What I don't remember is if Fair Fight Action -- I want to be

18  careful here because I think under the Fair Fight umbrella there

19  are a handful of organizations, and I don't recall the tax status

20  of each organization.  What I don't recall is if within the bounds

21  of the law any work was done to follow up by Fair Fight Action

22  with people we sent mailers to, I just don't recall one way or the

23  other.

24  **Q.**   Do you recall if the contribution to the Fair Fight Action

25  umbrella entity, whatever that was, was a C4 entity or a political

1  organization?

2  **A.**   I don't recall.

3  **Q.**   VPC/CVI supports eliminating the filibuster to pass federal

4  legislation involving voting rights, right?

5  **A.**   Can I ask what you're basing that statement on?

6  **Q.**   Sure.  Do you have an answer to that?

7  **A.**   VPC and CVI are supportive of voting reform and democracy

8  reform legislation.

9  **Q.**   Is the At Voter Center the Voter Participation Center's

10  Twitter account?

11  **A.**   Yes.

12  **Q.**   Do you recall a Tweet from the At Voter Center account quoting

13  you saying:  It is time past for action.  Congress and the

14  administration must act now to protect voters and the future of

15  our democracy?

16  **A.**   I don't recall that specific Tweet.  And I don't hear in that

17  Tweet a call for changing the filibuster.

18  **Q.**   And do you recall that Tweet also appending a CNN article,

19  "Biden Calls on Senate to Change Filibuster Rules to Pass Voting

20  Rights Bills"?

21  **A.**   I don't recall that specific article being appended.

22          MR. TYSON:  Let me mark this, then, as -- this will be,

23  I believe, 51 for us.

24          MS. HULING:  Your Honor, we would object to the scope of

25  this.

```
 1              MR. TYSON:  Your Honor, this goes to bias and the nature
 2  of the organization, its motivation for suing the State of Georgia
 3  on the issues that it's brought before the state here.
 4              THE COURT:  I'll allow it.
 5              MR. TYSON:  Thank you, your Honor.  May I approach?
 6              THE COURT:  Sure.
 7  BY MR. TYSON:
 8  Q.  Mr. Lopach, have you reviewed Exhibit 51?
 9  A.  I have.
10  Q.  Does this remind you of Voter Participation Center's Tweet on
11  this topic?
12  A.  Yes.
13  Q.  And does the Voter Participation Center support eliminating
14  the filibuster to pass voting rights legislation in Congress?
15  A.  The Voter Participation Center and our board have not taken a
16  position on the filibuster.  And while this is lifting up an
17  article, I am not ready in this moment to say that we have a
18  position on the filibuster.
19  Q.  Thank you.
20      You're aware that in the lead-up to the 2020 election some
21  households that had already voted received a total of six absentee
22  ballot applications from VPC/CVI in North Carolina, right?
23  A.  Yes.
24  Q.  Is it your testimony that VPC/CVI mailers can never be
25  mistaken for official government documents?
```

 1  **A.**  I can't speak to how an individual may mistake or receive a

 2  mailer that we send.

 3  **Q.**  Can VPC/CVI mailers create more work for local election

 4  officials after they're sent?

 5  **A.**  I cannot speak to the results of our work for election

 6  officials.

 7  **Q.**  I'm going to hand you what we'll mark as Exhibit 52.  And this

 8  is a ProPublica article entitled "A Nonprofit With Ties to

 9  Democrats is Sending Out Millions of Ballot Applications.

10  Election Officials Wish It Would Stop."  Do you see that?

11  **A.**  I am familiar with this article.

12          MR. TYSON:  Your Honor, we move Exhibit 52 in for

13  impeachment purposes on a couple questions starting on page four.

14          THE COURT:  Hearing no objection, it's admitted.

15  **Q.**  So, Mr. Lopach, if you could turn with me to page 4 of 11 at

16  the bottom.

17  **A.**  Yes.

18  **Q.**  The first full paragraph, the last sentence appears to be

19  quoting you:  He added that some errors are inevitable and that

20  the group also encounters mistakes in official voter files.  Do

21  you see that?

22  **A.**  Yes.

23  **Q.**  And then the next statement is:  He acknowledged that CVI can

24  create more work for local election officials.  Do you see that?

25  **A.**  I do.

1  **Q.**  So you would agree that CVI can create more work for local

2  election officials, right?

3  **A.**  By sending out voter registration forms and vote-by-mail forms

4  that have to be processed, indeed that would result in processing

5  work for election officials.

6  **Q.**  Do you recall the director of Fairfax City, Virginia, saying

7  her staff spent four days responding to calls from confused voters

8  about CVI's mailers?

9          MS. HULER:  Objection, hearsay.

10          MR. TYSON:  I'm asking if he recalls, your Honor.

11          THE COURT:  Overruled.

12          THE WITNESS:  I have vague memory of that statement.  Is

13  that in the article?

14  BY MR. TYSON:

15  **Q.**  I'm trying to locate it for you here momentarily.

16  **A.**  I will say while you are locating that, this article had to be

17  updated two or three times by ProPublica because of inaccuracies

18  in the article.  And we sent a 12-page -- I believe it was a

19  12-page response letter walking through accusation by accusation

20  and refuting it.  So I understand you're using the article.  I

21  also find the article to be bad journalism.

22  **Q.**  If you could go to page number six.  The end of the first full

23  paragraph states:  Brenda Cabrera, Director of Elections for

24  Fairfax City, said her staff spent most of four days responding to

25  calls from confused voters about CVI's mailers.  Do you see that?

1  **A.**   The end of the full first paragraph?

2  **Q.**   The paragraph that begins "a CVI vendor."

3  **A.**   Thank you.

4      Yes.

5  **Q.**   And in September 2021, Florida election officials complained

6  that VPC/CVI had sent mailings to people who were deceased, minor

7  children and even pets, correct?

8  **A.**   Florida election officials have said that.  Over the years of

9  doing this work, we have improved our processes to prevent or

10  minimize any such mailings.

11  **Q.**   So your testimony is that that was -- that was said but

12  processes have changed since that time?

13  **A.**   Processes have improved.  We now use a database of some 30,000

14  common pet names to suppress.  Some people sign up for commercial

15  mail in the name of their pet, which then would impact voter

16  registration mailings.

17  **Q.**   You're aware that the Ohio Secretary of State issued warnings

18  in 2020 and 2022 about absentee ballot applications that were

19  unsolicited going to voters in Ohio from VPC/CVI, right?

20  **A.**   I am indeed aware.  And the Ohio Secretary of State's Office

21  reviewed the forms that we were sending.

22      I would also note that in the 2020 election cycle we helped

23  1.6 Million Americans submit voter registration applications and

24  4.6 Million Americans submit vote-by-mail applications.

25  **Q.**   Mr. Lopach, you use Catalyst as your primary data vendor,

1  correct?

2  **A.**   In 2020 Catalyst was our primary data vendor.

3  **Q.**   Do you realize or are you aware that Catalyst describes itself

4  as the longest running data trust in progressive politics?

5  **A.**   I do not know how they describe themselves.

6  **Q.**   All right.

7           MR. TYSON:  Mark this as 53.

8  **Q.**   If you'll look down at the bottom there, https//:catalyst.us

9  is the website.  Do you see that?

10 **A.**   I do see that.

11 **Q.**   And then there's a "who we are" section.  Do you see that?

12 **A.**   I do see that.

13 **Q.**   And the second full paragraph says:  Our commitment is to

14 strengthen the progressive community year after year by growing

15 and maturing this community asset and related technology and

16 services.  Do you see that?

17 **A.**   I do see that.

18 **Q.**   And the next statement says:  We do this by providing our data

19 only to Democrats and Progressives and only for civic engagement

20 purposes, not for commercial for-profit uses.  Do you see that?

21 **A.**   I do.

22 **Q.**   Is VPC/CVI a progressive organization?

23 **A.**   VPC and CVI are voter engagement organizations.

24 **Q.**   But you receive data from Catalyst, right?

25 **A.**   Yes.  I cannot vouch for how Catalyst describes themselves.

1  **Q.**  Mr. Lopach, you started your career with Democratic

2  Congressman Pat Williams, correct?

3  **A.**  That was my first professional paid job after college with the

4  exception of a short stint as a bank teller for US Bank in Spokane

5  Washington.

6  **Q.**  And you also worked for Democratic Senator Ted Kennedy,

7  including on his re-election campaigns in 2000 and 2006, right?

8  **A.**  I did, indeed.

9  **Q.**  And you were on staff at the Democratic Senatorial Campaign

10  Committee, right?

11  **A.**  Two different times I've worked for the Democratic Senatorial

12  Campaign Committee.

13  **Q.**  And you've served as chief of staff to Democratic Senator John

14  Tester, right?

15  **A.**  That is correct.

16  **Q.**  And you served as chief of staff to Democratic Governor Steve

17  Bullock, right?

18  **A.**  That is correct.

19  **Q.**  And you've never worked on the personal staff of any elected

20  Republican official, right?

21  **A.**  That is correct.

22  **Q.**  Is it correct that VPC and CVI have only sued the States of

23  Kansas and Georgia since you've been the CEO?

24  **A.**  To date that is correct.

25  **Q.**  And Kansas has a Republican super majority in its legislature,

1  right?

2  **A.**  I know that Kansas overrode the governor's veto.  I do not

3  know if they have a super majority or not.  I don't know how they

4  define super majority in Kansas.

5  **Q.**  Certainly.  Thank you.

6     And VPC and CVI were plaintiffs with *New Georgia Project* in a

7  case against the State of Georgia in the 2020 election cycle,

8  right?

9  **A.**  VPC and CVI were plaintiffs with *New Georgia Project* in a case

10  against the Secretary of State in Georgia in 2020?

11  **Q.**  I'm asking, is that correct?

12  **A.**  I don't know that.  And that feels like the kind of thing I

13  would know if it happened after March 16th of 2020 when I started.

14  I admit at 48 I miss things but...

15  **Q.**  And, again, the goal of VPC and CVI is to turn out young

16  people, unmarried women and people of color to vote, right?

17  **A.**  The goal of VPC is to increase engagement in our democracy

18  with a focus on people of color, unmarried women and young people.

19  **Q.**  And VPC sometimes refers to those individuals as the new

20  American majority, right?

21  **A.**  That is correct.

22  **Q.**  And it's your testimony that the work of VPC and CVI is

23  nonpartisan, right?

24  **A.**  Correct.

25           MR. TYSON:  If you give me a moment, Mr. Lopach, I think

1   I might be right at the end.

2   **Q.**  Mr. Lopach, just a couple questions to wrap up here.

3      Even if all the challenged provisions of Senate Bill 202 did

4   not exist, step back to a world pre-Senate Bill 202, there's no

5   guarantee that sending a pre-filled absentee ballot application

6   with no disclaimer on it and as many duplicates as you may send to

7   a voter would result in that voter submitting the application,

8   right?

9   **A.**  There's no guarantee that a recipient of our mailing is going

10  to respond to it.

11  **Q.**  And you are still able to send cover letters urging people to

12  vote absentee by mail to Georgia voters regardless of Senate Bill

13  202, right?

14  **A.**  As I mentioned earlier, I would want to spend time looking at

15  SB 202 in relation to simply sending a cover letter and whether or

16  not that could result in us being fined for a person applying to

17  vote by mail who may have previously applied using another manner

18  to vote my mail.  I can't say that without more study.

19          MR. TYSON:  Thank you, Mr. Lopach.  That's all the

20  questions I have.  Thank you.

21          THE COURT:  Any redirect?

22          MS. HULING:  Just a few, your Honor.

23          THE COURT:  Go ahead.

24                          REDIRECT EXAMINATION

25  BY MS. HULING:

1  **Q.**  Hello, again, Mr. Lopach.  Just a couple follow-up questions.

2     Do VPC or CVI run any vote-by-mail programming in states that

3  prohibit third parties from distributing vote-by-mail

4  applications?

5  **A.**  At this moment we do not run vote-by-mail programs in states

6  that prohibit third-party vote-by-mail programs from being run.

7  **Q.**  And is it your understanding that VPC and CVI could face

8  criminal exposure from the ballot application restrictions we've

9  discussed today?

10  **A.**  Yes.

11  **Q.**  If I could just ask you to turn in Plaintiff's Binder, Part I,

12  to tab 14.

13  **A.**  Yes, ma'am.

14  **Q.**  And specifically I would like you to turn to the cover letter

15  included in that.

16  **A.**  Yes.

17  **Q.**  I'm sorry, I should have first asked, I don't think we've

18  talked about this, are you familiar with this document?

19  **A.**  This looks like a Center for Voter Information vote-by-mail

20  application package.

21  **Q.**  Thank you.

22     I would like to -- when you were answering those previous

23  questions, you testified that you would be able to send a cover

24  letter as it was under the SB 202 restrictions.  I would like to

25  direct you to the first paragraph of this cover letter in the last

1 sentence.  Could you please read that.

2 **A.**  I have sent you the enclosed absentee ballot application for

3 Georgia already filled out with your name and address.

4 **Q.**  Would you be able to included that on your cover letter under

5 SB 202's ballot application restrictions?

6 **A.**  No, I would not be able to include that message as part of the

7 package or the speech we are engaged with.

8 **Q.**  Why is it important enough for VPC and CVI to have included

9 that letter on your prior mailings?

10 **A.**  It establishes a level of trust with the recipient.  It

11 explains what is in the package.  And it helps them realize one

12 step is done and this is going to be an easy process.

13 **Q.**  Thank you.

14  I believe I heard you testify that VPC has no evidence of the

15 disclaimer's effect on your mailers?

16 **A.**  Correct.

17 **Q.**  Did you mean that VPC and CVI specifically do not have any

18 evidence yet?

19 **A.**  To my memory, VPC and CVI have not run a test where we have

20 put a disclaimer on that indicates this official form is not an

21 official form.  So we don't have evidence suggesting that there

22 would be a lower rate of return.  However, logic suggests that it

23 is going to confuse the recipient.

24 **Q.**  And to clarify, you were not speaking to any evidence gathered

25 by experts in this case when you made that statement?

1  **A.**  Not at all.  Experts may well have studies and experience well

2  separate from mine.

3  **Q.**  You testified that VPC and CVI make a business decision to

4  purposefully use union printers?

5  **A.**  Yes.

6  **Q.**  I believe you mentioned VPC/CVI's values --

7  **A.**  Yes.

8  **Q.**  -- in making that decision?

9  **A.**  Yes.

10 **Q.**  What values are being expressed by having a unionized printer?

11 **A.**  By using a unionized printer, we are indicating that we prefer

12 when possible to use a vendor who prioritizes the well-being of

13 their work force, be that benefits, salary, work-life balance.

14 **Q.**  In your understanding how long is VPC and CVI's process for

15 identifying and removing from VPC and CVI's printed mailers any

16 voters who have already requested an application within the State

17 of Georgia?

18 **A.**  That would be -- would be dependent on the size of the

19 printing that we do and the number of individuals who had applied

20 in the intervening printing and data work period.  But I think the

21 process of identifying those individuals, determining which pallet

22 and tray they are on, accessing the pallet and tray and removing

23 the individual is laborious, it's going to take time, hours,

24 possibly days.

25 **Q.**  And what if you did that process of reviewing the Georgia

1  State list of voters who have already applied for a vote by

2  mail -- or have already submitted a vote-by-mail ballot

3  application, what if you did that process prior to printing?

4  **A.**   We still in the printing -- just thinking this through.   It

5  would slow down the time to print, printing would be delayed and

6  so there still would be a gap from the moment we reengaged in

7  updated voter file lists until we started printing, there is a

8  time gap, then there's the printing, and then there's the mailing.

9  So there remains a time gap.

10  **Q.**   Once you had done that verification, how long would it take

11  once you had that verified and finalized list to then prepare that

12  list and start printing?

13  **A.**   It takes two-and-a-half weeks -- two weeks from the first time

14  we prepared data from the raw data to the printing.   After we

15  adjusted the data for a second check, I do not know how long it

16  would take to update the data before printing.   Could be 48 hours,

17  it could be a week, I'm not sure.

18  **Q.**   Your understanding of both the time it takes to review the

19  list of voters who have already submitted an application and the

20  time it takes to prepare a finalized list for printing, what is

21  that based on?

22  **A.**   It is based on the advice and research laid out by one of our

23  direct mail vendors, a professional firm.   And even before the

24  firm existed, the professionals worked at other firms for decades

25  in direct mail, their experience.   It is 20 years of experience

1  internally and our own program planning staff knowing how long

2  these processes take.

3  **Q.**  Finally, do VPC and CVI want to send multiple waves of

4  vote-by-mail to voters in Georgia?

5  **A.**  The ideal would be that vote-by-mail applicants respond to the

6  first wave and then we would be able to remove them.  What VPC and

7  CVI want to do is increase participation in our democracy.  And if

8  we can do that effectively with two waves of mail, we will.

9  **Q.**  And if VPC and CVI thought that it was feasible to send a

10 second wave under SB 202, would VPC and CVI try to do that?

11 **A.**  Yes, we would.

12        MS. HULING:  Thank you.  No further questions, your

13 Honor.

14        MR. TYSON:  Very briefly, your Honor, if I could.

15                    RECROSS-EXAMINATION

16 BY MR. TYSON:

17 **Q.**  Mr. Lopach, just very briefly.

18      You were asked about other states that prohibit third-party

19 applications for absentee ballot -- I'm sorry, third parties that

20 prohibit providing voters with absentee ballot applications.  Do

21 you recall those questions?

22 **A.**  I recall the question.

23 **Q.**  Has VPC/CVI sued any state that prohibits completely third

24 parties from providing absentee ballot applications?

25 **A.**  To date we haven't.  I cannot speak to what we may do in the

1  future.

2  **Q.**  And you indicated that ideally voters would respond to the

3  first wave that you would send requesting an absentee ballot,

4  right?

5  **A.**  In an ideal world, everybody would respond to the first wave

6  and then we could spend money on other things.

7  **Q.**  And you would agree with me that a voter could respond by

8  directly contacting his or her county board of elections to

9  request a absentee ballot and not using VPC and CVI's form,

10  correct?

11  **A.**  A voter could absolutely do that.

12  **Q.**  And then that voter would not be captured by your barcode

13  process but would show up in the Secretary of State's absentee

14  file, right?

15  **A.**  If the county updated their voter file segment in a timely

16  manner and that were then updated at the state level.  I cannot

17  speak to the process or timeline by which counties update their

18  voter files.

19        MR. TYSON:  Thank you.  I do not have any other

20  questions.

21        THE COURT:  Sir, you can step down.  Thank you.

22        THE WITNESS:  Should I do anything with these?

23        THE COURT:  You can leave them.

24        Please call your next witness.

25        (Witness excused)

1          MR. DIAZ:  Your Honor, plaintiffs call Daniel McCarthy.

2     And my colleague Ms. Richardson will be doing the direct.

3          THE COURT:  Wonderful.  Thank you.

4          MR. DIAZ:  Your Honor, just to give a sense of timing, I

5     think we expect this examination to take about 45 minutes.

6          THE COURT:  Very well.

7          Good afternoon.

8          COURTROOM DEPUTY CLERK:  Raise your right hand, please.

9                    _____

10                        DANIEL McCARTHY

11              a witness herein, being first duly sworn,

12                was examined and testified as follows:

13                    _____

14          COURTROOM DEPUTY CLERK:  You may be seated.

15          MS. RICHARDSON:  Good afternoon, your Honor.

16                        DIRECT EXAMINATION

17     BY MS. RICHARDSON:

18     **Q.**  Can you please state your name for the record.

19     **A.**  Daniel McCarthy.

20     **Q.**  What do you do for a living, Mr. McCarthy?

21     **A.**  I'm VP of finance and operations for VoteAmerica.

22     **Q.**  For how long have you served in that role?

23     **A.**  I started at VoteAmerica in January of 2020.

24     **Q.**  What is VoteAmerica?

25     **A.**  VoteAmerica is a nonprofit organization that specializes in

1    creating technology to make it easier for voters to access and

2    participate in the electoral process in addition to providing

3    timely electoral information, trusted information when the voter

4    needs it and accesses it.

5    **Q.**   What is VoteAmerica's mission?

6    **A.**   VoteAmerica's mission is to encourage as many people as

7    possible to participate in our electoral process.  We believe

8    in our representative democracy, that the more people that

9    participate, the more reflective our representation will be.

10   **Q.**   Does VoteAmerica target any particular voters?

11   **A.**   VoteAmerica's toolset and information is available online to

12   all voters, any voter that would happen to find it or utilize it.

13   But we do work in other ways to provide services to individuals

14   that have a -- what is called propensity, a lower propensity

15   score.  Propensity scores are assigned to voters based on their

16   historical participation in elections and they are usually --

17   individuals with lower propensity scores are usually ignored by

18   partisan efforts, partisan outreach efforts.

19   **Q.**   Please describe the programs that VoteAmerica provides to

20   voters, you sort of started there.

21   **A.**   First and foremost, again, our major program, our primary

22   program is providing a toolset online, a digital toolset that is

23   dynamic and responsive to specific voters in addition to a

24   database of rules, regulations and things that are required of

25   voters for the specific jurisdiction where they reside and are

1  registered to vote.

2      In addition to that, we do -- during election cycles or major

3  election cycles we do voter -- Get Out The Vote targeting

4  campaigns such as providing, again, very informative information.

5  We'll put billboards up that just simply say the election is X

6  date.  We will put flyers up on campuses that say, hey, the

7  election is X date, or we will run peer-to-peer texting campaigns

8  encouraging people to participate and vote.

9      In addition to that we have what is called Voter Helpline, and

10  it is a text-based help line that is manned by trained volunteers

11  to assist voters in realtime should they need it.  And that is

12  basically the text-based version of 1-866-Our-Vote, which is the

13  voter protection organization.

14  **Q.**  Can you describe specifically how VoteAmerica's absentee

15  ballot technology works.

16  **A.**  Yeah.  So the voter always actuates an action on our website,

17  they affect the action on our website.  So they come to our

18  website and first and foremost we encourage voters to check to

19  make sure they're registered to vote, to check their voter

20  registration status.  And then there's a workflow involved.  But,

21  again, VoteAmerica does believe that voting by mail is a way for

22  people that would typically otherwise not be able to vote on a

23  specific date at a specific polling place to access their right to

24  vote and participate.  So we do encourage voting by mail.  And the

25  actual tool itself, the voter would show up on our website, they

1 would begin putting in their information, first name, last name,

2 address, phone number and e-mail address, which would populate a

3 specific set of rules and workflow for that specific voter based

4 on their address that they enter into the form.

5    And so the first thing that would then show up for the voter

6 would be an encouragement -- take a step back.  In every instance

7 in every workflow in every state, including Georgia, VoteAmerica

8 wants the voter to access the most smooth path to communicating

9 their information with the state.  So in the event that the state

10 has an online portal or an online application process, we

11 encourage the voter immediately at the very top of that next page

12 to follow that process.

13    In addition to that, I mean, I'm sure all of us here have

14 parents or even may prefer to write checks and pay bills via the

15 mail.  There's a large segment of our users that prefer to do

16 things by mail.  And in that instance we give them an option.

17 First and primarily to receive the ballot application in their

18 e-mail, which they will receive immediately after completing the

19 tool; or we would like to also, based on a pilot program, provide

20 a print-and-mail service where we will at the request of the voter

21 mail them the ballot application.

22 **Q.**  Why does VoteAmerica offer vote-by-mail tools?

23 **A.**  Again, so VoteAmerica really does believe that there are a lot

24 of people -- it's beyond belief, there's evidence to show that

25 there are a lot of people that simply cannot, simply cannot

1  participate in our election process when it's on a specific date

2  in a specific location because they may be disabled, they may be

3  working multiple jobs, they may have elderly family and sick loved

4  ones they're taking care of, and voting by mail is an opportunity

5  for them to cast their ballot without leaving the comfort and

6  safety of their own home.

7  **Q.**  You just mentioned a pilot program for print and mail.  Can

8  you describe that in more detail.

9  **A.**  Yeah.  So, again, we have a set of digital tools and all the

10 actions are effectuated by the voter.  But in 2020 specifically,

11 knowing that we were in the middle of a crisis and a pandemic,

12 there were literally people complaining in the press about

13 whatever it may be, being able to access, right, the polling

14 locations, whether they can wear masks, whether we would even be

15 able to vote.

16      Sorry, repeat the question.  I just completely lost my --

17 **Q.**  Describing print and mail.

18 **A.**  Yep.  Sorry.  So in 2020 believing this was a service that

19 would be used and wanted, we offered a print-and-mail option to

20 voters in four states:  Texas, Montana, Ohio and Utah.

21      During that program and that pilot program we had 33,000

22 individual voters reach out and request that we provide to them,

23 we mail to them a ballot application, mail-in-ballot application,

24 which we then would send to them.  It is almost exactly the same

25 as what they would have received via e-mail, except it comes with

1  the addition of an envelope, postage-paid envelope with the

2  address of their local election official that they would return in

3  the mail-in-ballot application.

4  **Q.**  And just to follow up on that, could you describe, again, what

5  does the print-and-mail feature include?

6  **A.**  Sorry, rephrase the question.

7  **Q.**  What does the print-and-mail feature include?

8  **A.**  It's just an option, it's a button, an option for them to have

9  the same thing they're getting e-mailed actually printed for them

10  and mailed to them so this will help them in the event they don't

11  have a printer, they don't have access to a printer, they can't

12  afford to print something at Staples, Fed Ex or what have you, or

13  be able to leave their home, that's what it does.  But it includes

14  the same thing they would receive via e-mail.

15      If you mean the package itself, it includes a postage-paid

16  envelope.  The application, which is pre-filled by the tool, by

17  the information entered in by the voter.  Again, the voter

18  effectuated that action, we did not do that.  And it also includes

19  a blank absentee mail-in ballot and cover sheet that is what we

20  use to communicate the next steps.

21      Again, I think we want to -- I don't think, I know we want to

22  make it as easy as possible and as clear as possible that this is

23  an easy process, and the voter has a right to participate in the

24  process and that we've helped them get this far and they can

25  complete that step.

**Q.**  Can you turn -- we're going to be in binder I, so Plaintiffs'
Exhibit Part I, tab 25.  This was one of the exhibits that was
stipulated to earlier today.

Are you there?

**A.**  (Nods head)

**Q.**  Do you recognize this document or these set of documents in
25?

**A.**  I do.

**Q.**  What are they?

**A.**  This first page is the cover letter that we include with all
of our mail-in-ballot applications.  It would be included if it
were sent to the voter via e-mail.  It would also be included in
what we would print and mail to the voter.  It also includes
information that's helpful and relevant to them, where they need
to send the form, what the deadline may or may not be.

Again, all our tools are dynamic and respond to the rules and
regulations of a specific state and address, municipality,
jurisdiction where the voter actually resides.  We know it is
different everywhere.

We also include on here some of our speech, our pro-voting
speech about the importance of voting and that they have a right
to vote.  And we include -- by doing that, we also include various
different resources to them.  Information on partnerships.  For
example, the Military and Overseas Voters partnership, it's a
resource specifically for voters that are overseas and are

1  military members.  And information about 866-Our-Vote, which is a

2  voter protection help line.

3  **Q.**  Is this the planned print-and-mail mailer for the 2022

4  elections in Georgia?

5  **A.**  As of -- I mean, it will change -- yes, everything about it,

6  yes, except it will change dynamically with any kind of changes in

7  deadlines or due dates, et cetera.

8  **Q.**  Is this the application currently in use for the e-mail tool

9  that you described?

10  **A.**  It is.

11  **Q.**  Can you explain the difference a bit more between the sample

12  sent in the print-and-mail feature and the sample that the voter

13  prints on his or her own.

14  **A.**  There actually is no difference other than the fact that we

15  include a postage-paid envelope with the one that we would print

16  and mail to the voter, they would receive the same package and the

17  same materials.

18  **Q.**  And was a sample such as this one available to Georgia voters

19  in 2020?

20  **A.**  It was.

21  **Q.**  Approximately how many Georgia voters requested an absentee

22  ballot application -- or absentee ballot using this tool and

23  a sample like --

24  **A.**  Nationwide we had over a million voters that requested the

25  actual absentee ballot application for the various different

 1  states and jurisdictions where they lived.  And for Georgian --

 2  specifically for Georgian voters it was over 62,000.

 3  **Q.**  Do you see where it says on the cover sheet on page one the

 4  header "important"?

 5  **A.**  I do.

 6  **Q.**  Can you please read that paragraph under the word "important."

 7  **A.**  Absentee ballots are always counted as long as they arrive by

 8  Election Day.  Your vote matters.  Get the form in on time.

 9  **Q.**  Why does VoteAmerica include this paragraph in its mailer?

10  **A.**  Again, we want to encourage participation.  And we know that

11  there are delays, especially in 2020 there were delays with the

12  United States Postal Services felt by businesses and people alike,

13  and we wanted to make sure that they knew that voting is

14  important, that their vote mattered, that their vote would count,

15  and that they should get the form in on time so that they --

16  obviously the state would have time to get them an absentee

17  ballot.

18  **Q.**  Why does VoteAmerica include messaging referring voters to

19  other organizations, such as the few examples you gave earlier?

20  **A.**  So, again, we are a nonprofit organization that wants to

21  provide as much educational material and resources available as we

22  can that are -- we know to be helpful to voters.  And this is an

23  element of that.  So we know that in the event that a voter is

24  facing any kind of challenge day of, they can call 866-Our-Vote.

25      We know that we have voters that live overseas, we know there

1  are voters in the military.  Again, in every element of the work

2  we do it's to encourage and expand the electorate.  We don't care

3  if you're Republican, we don't care if you're Democrat, we just

4  really want you to participate and want you to vote.  And we want

5  to make it as easy as possible for you to do that.

6  **Q.**  Can you flip to pages two and three of this exhibit.  And once

7  you're there --

8  **A.**  I'm there.  Sorry.

9  **Q.**  Can you describe these pages of the mailer.

10  **A.**  Page two and three is the official application for Georgia

11  Official Absentee Ballot as published and produced by the

12  Secretary of State as obtained by VoteAmerica from the Secretary

13  of State.  It includes the information that the voter effectuated

14  and entered into the form in the process of using our digital

15  tool.

16  **Q.**  Why does the mailer include a personalized application such as

17  this one?

18  **A.**  So the -- again, the voter input this information directly and

19  requested that this form be sent to them.  And that we include it

20  because it's an online digital tool just like any other that would

21  fill in a form.  And it's also something, again, to ease the

22  barrier and burden on the voter in getting them to complete the

23  process and participate.

24  **Q.**  Can you flip to the next two pages, pages four and five of

25  this, and describe them for us.

**A.**   Yep.  So this is the same thing, an application for Georgia Official Absentee Ballot as published by the Secretary of State's Office as obtained by VoteAmerica from the Secretary of State's Office.  It is a blank form that we also include in the package.

We do that for a couple of reasons:  One, people make mistakes.  Like the voters are effectuating these actions, the voters are actually entering this information, and like any other human, we're not infallible, voters make mistakes in entering the information.  And in the event that they see on their pre-filled absentee ballot application that they made a mistake, this gives them an opportunity to start over from scratch.  And it's right there in front of them, they don't have to start over, they don't have to go back out there and get another form, it's right here for them.

In addition to that, it encourages -- you know, if we are able to achieve what we think we're achieving by making that process easy for the voter, it would encourage the voter to share the process or experience with family, a loved one or friend.  And they may say, hey, look, I did this, it was easy, here is a blank application form, you can fill it out also and mail it in following the same instructions that were on the cover sheet that I received from VoteAmerica.

**Q.**   Do you see on the bottom of this page -- actually, pages two through five there the box on the bottom of that page?

**A.**   I do.

1  **Q.**  Can you describe its contents.

2  **A.**  So it -- SB 202 requires VoteAmerica append to an official

3  state form a disclaimer that is in addition to the disclaimer

4  that's already included about fraud by the Secretary of State

5  anywhere on the face of the actual ballot application.  We chose

6  the bottom because it made the most sense based on the text and

7  available spacing on the form.

8      The SB 202 and the regulations produced by the Secretary of

9  State's Office was very specific on everything related to the

10  disclaimer, including what letters had to be capitalized and what

11  letters had not to be capitalized.  They wanted us to capitalize

12  not, not, not.

13          (Interruption by the court reporter).

14          THE WITNESS:  They required, actually they compelled us

15  to append this disclaimer, which is misleading and false, this

16  SB 202 and, thusly, the state is compelling VoteAmerica to lie to

17  its citizens in a disclaimer that is objectively by any reasonable

18  person who is literate stands wrong, false, misleading and a lie,

19  that's what this disclaimer is.

20  BY MS. RICHARDSON:

21  **Q.**  Does VoteAmerica include the disclaimer on the application for

22  both that application that's e-mailed to the voter for her to

23  print on her own and that print-and-mail feature?

24  **A.**  It is not the intention -- yes, it's included in all these

25  packets.  Again, they're the same thing.  The only difference

1  between what gets mailed to the voter and what they receive in the

2  e-mail is the fact that we include a postage-paid envelope.  And

3  it is not our intention to not comply with the state's laws.  In

4  fact, we want to be as compliant as possible with the state's law,

5  we just don't want to be forced to make a statement and speak to

6  the voter in a way that's misleading them or discouraging them

7  from participating in using a form that was officially produced,

8  officially published by the Secretary of State's Office, and then

9  have to append something on to it that says this is not an

10 official form, when, in fact, it is.

11 **Q.**  Does the disclaimer have any effect on the absentee ballot

12 application in the mailer?

13 **A.**  Yeah.  I'm going to go back and say this because I think this

14 is a room full of very highly-educated and intelligent people, and

15 I think this is a room full of people that are not the norm.  And

16 there are a lot of people out there that do not have the same form

17 of skepticism or critical thinking skills that we would in this

18 room.  And we -- when you provide something, a statement of any

19 kind to someone that says this is not official, this is not

20 legitimate, this was not produced by the state, it's going to

21 discourage use, it's going to discourage participation.  They're

22 going to immediately think, oh, this is illegitimate and so is

23 this organization that's sending this to me.  This organization

24 must be a fraud when, in fact, we're not, we're very serious and

25 we take our work very seriously.

1  **Q.**  Does VoteAmerica object to disclosing on the application that
2  the application was sent to the voter by VoteAmerica?
3  **A.**  No, we don't.  Most states, however, prefer we do not append
4  to or change or make any adjustment to their official forms.
5  We've always been very clear when we send information to a voter
6  that we are sending it to them, you know, and all the
7  communications they're receiving, they're seeing, it's coming from
8  VoteAmerica.  And we're happy to allow the state to also know
9  where the form is coming from, it's not like we're trying to hide
10  that.
11     I just want to expand on that a little further.  It's not
12  about the fact that it's saying this is being distributed by
13  VoteAmerica, and it's not about the fact that it has our address
14  on it, none of those things.  This is simply about the part of the
15  disclaimer that says this is not an official government
16  publication and was not provided to you by a government entity and
17  is not a ballot.  Every single instance of that word "not" is all
18  capitalized.
19     SB 202 required us to capitalize the word "not."  It's
20  negative language.  It's going to discourage someone's use of the
21  form.
22  **Q.**  Going back to that print-and-mail feature, why does
23  VoteAmerica include prepaid postage with its mailer?
24  **A.**  Yeah.  So, again, in every instance we want to make it as easy
25  as possible.  In the event that an individual is requesting that

```
 1  this be printed and mailed to them, it's probably also likely that

 2  they may not have the resources to go out of their home and hunt

 3  down a stamp.  If they're not able to go out of their home and

 4  hunt down a printer and they don't have a printer at home, they

 5  may not have a stamp.  Again, we want as many as possible to

 6  participate.  We want to make it as easy as possible for eligible

 7  voters to participate in our electoral processes.

 8      I'm going back to the fact that VoteAmerica believes very

 9  strongly that in a represented democracy the more people that

10  participate, the more representative our government will be of the

11  will of the people.

12  Q.  Why does VoteAmerica include all of these pieces you

13  described, the cover sheet, the pre-filled application, the blank

14  application, and in the case of the print-and-mail feature the

15  prepaid postage envelope all in one package?

16  A.  Yeah.  So, again, this entire package is meant to communicate

17  something very simple, it's that you have what you need to

18  participate, here are the instructions.  Your participation is

19  important.  Here's the ballot application that you need to send.

20  Here's when you need to send it.  The package as a whole is

21  communicating to the voter, we really believe it's important,

22  which is why we're sending this all to you, for you to

23  participate.  We believe that your vote is important, please do

24  participate.  We've already started the process for you.  It's

25  this easy, which is why we do it as a package.  It's our way of
```

1    communicating to the voter our values, our beliefs and making our

2    mission -- fulfilling our mission and driving impact to encourage,

3    again, the people that typically do not participate to participate

4    in our electoral process.

5    **Q.**   Does VoteAmerica operate in Georgia?

6    **A.**   VoteAmerica operates in Georgia to the extent that our tools

7    are publicly available to any Georgian, or anyone on the Internet

8    for that matter.  It also operated in Georgia in 2020.  We ran

9    college outreach Get Out The Vote campaigns.  Again, I said

10   earlier 62,000 -- more than 62,000 Georgian voters utilized our

11   tool to request an absentee ballot application in 2020.  143,000

12   Georgians are currently subscribed to our elections reminders

13   tool, which provides them relevant timely information when there

14   are changes or when there's a specific element of information

15   that's available that we need to make available to the voter.

16         And so, yeah, we do operate in Georgia, and we would like to

17   continue to operate in Georgia.  We would like to also extend to

18   Georgia the same services that are available to other states or

19   that we are making available in other states, which is the

20   print-and-mail option.

21   **Q.**   And how do these other operations you've described fit in with

22   the absentee ballot application program?

23   **A.**   All of the programs I described go to the fact that everything

24   that we do is meant to increase participation and increase voter

25   turnout.  All of these elements are informational.  All of these

1  elements are nonpartisan.  All of these elements are meant to make

2  it easier for voters to know, learn, access and participate in our

3  elections.

4  **Q.**  Does VoteAmerica currently have a plan to operate in Georgia

5  ahead of the 2022 elections?

6  **A.**  Our tools will remain available to Georgians online as they

7  are currently.  We would like to continue, you know, providing

8  what we provide to Georgians, including expanding and providing to

9  them what they request.  Again, I just want to repeat this, that

10 voters come to us when they need something, and we're doing what

11 they're asking us to do.  The voter's effectuating the actions

12 that we're taking.  And we would like to be able to if they need

13 it print and mail these ballot application forms to them.

14     But at the moment SB 202 prevents us from being able to do

15 that because we would run afoul -- potentially run afoul of both

16 the criminal and civil penalty elements that, frankly, we don't

17 have the resources to pay for.  And even if we did have the

18 resources to pay for them, those are charitable-restricted dollars

19 that should be used for VoteAmerica's mission and not be, you

20 know, covering penalties and fees of a state that's overly zealous

21 in preventing its people from voting.

22 **Q.**  We're going to move to Volume II of the binder.  So that

23 second binder of Plaintiff's Exhibit Part II.  And can you turn to

24 tab 52.

25 **A.**  Okay.

**Q.** Do you recognize this document?

**A.** Yeah, I do.

**Q.** What is it?

**A.** This is a document that they would receive -- that the voter would receive after they submitted -- I shouldn't even say "submitted," after they use our tool and they submitted the information through our tool, they would receive this information, which would include a link to, which you can see this clearly, download the form from the state with the information that the voter entered into the form.

And in addition to that, the packet, again, information that we would have provided that we just discussed would be included in that PDF file except for, of course, the postage-paid envelope.

**Q.** Was this document created -- sample document created by VoteAmerica staff?

**A.** So we at the request -- in preparation for doing this, we wanted to make sure that we presented to the Court everything we had available.  We requested that our staff, specifically our analytics team, utilize our publically-available tools to generate this e-mail, but this e-mail is -- so that we could include it as a sample, but this e-mail is, in fact, the same thing that would be received by any voter with the information that was relevant to that voter based on what they entered into our tool.

**Q.** Is this document a true and correct copy of VoteAmerica's sample confirmation e-mail to the best of your knowledge and

1  belief?

2  **A.**   It is.

3           MS. RICHARDSON:  Your Honor, I would like to introduce

4  this copy of VoteAmerica's sample confirmation e-mail into

5  evidence as Plaintiffs' Exhibit 52.

6           MR. BARTOLOMUCCI:  No objection.

7           THE COURT:  It's admitted.

8  BY MS. RICHARDSON:

9  **Q.**   At what point in the process of using VoteAmerica's tools does

10  a voter receive a confirmation e-mail like this?

11  **A.**   Immediately after they submit their information into the tool

12  in the form.

13  **Q.**   Does VoteAmerica effectuate this communication?

14  **A.**   I want to step back a second.  I need to actually clarify that

15  and be more specific.

16      So when they -- again, I'm going to go back to what I said

17  earlier.  VoteAmerica's intention is to direct voters to the most

18  effective, efficient and quick method by which they can get their

19  information and make their requests known to the state in the

20  event that the -- once they enter their information into the form,

21  in the event that the state provides an online portal or an online

22  way of submitting this information, they would be encouraged to do

23  that at the very top of the screen before they receive this

24  e-mail.

25      But they would also then be -- if you would like to or prefer

```
 1  to receive the form and print and mail the form to your local
 2  election official, they then can make that decision.  At that
 3  point they would receive this e-mail.
 4      When the print-and-mail feature or option is available, there
 5  is also next to this basically receive the e-mail and print and
 6  mail it yourself, or we will print it for you and send it to you
 7  at your request.  Those two options are available on the screen.
 8  Q.  Can you flip over to Exhibit 3 in your binder.
 9  A.  Yep.
10  Q.  Do you recognize this document?
11  A.  I do.
12  Q.  Can you describe it for us.
13  A.  So this document includes sample language that would be
14  received by a -- the first section by a voter may they opt in to
15  utilize our tools.  And when they opt in to receive information
16  from us, the first section is based on the tool they use, so if
17  they use the absentee mail-in ballot request tool, the register
18  tool, and the verified voter registration tool, they would receive
19  these text messages.
20      And then in the event, you know -- we want to encourage in the
21  event there's no action taken because I don't -- my e-mail is
22  packed and just because I submit something and receive an e-mail
23  doesn't mean I'm going to respond to it immediately.  If they
24  don't click on the button to download their form, they also
25  receive an e-mail (sic) letting them know that it's still there
```

 1  for them, it's waiting there for them.  And that's if they provide

 2  a phone number to us, which is optional.

 3      Again, in every instance we are not requiring voters to opt in

 4  and receive things from us.  We are doing as they are asking us to

 5  do and they are opting into these lists and providing the

 6  information to us.

 7  **Q.**  Is this document a true and correct copy of VoteAmerica's

 8  sample text messages to voters?

 9  **A.**  Uh-huh (affirmative).

10          MS. RICHARDSON:  Your Honor, I would like to submit this

11  copy of VoteAmerica's sample text messages to voters into

12  evidence --

13          THE COURT:  I thought you said Exhibit 3, but you must

14  have said something else.

15          MS. RICHARDSON:  53, I apologize.

16          MR. BARTOLOMUCCI:  No objection as to 53, your Honor.

17          THE COURT:  It's admitted.

18  BY MS. RICHARDSON:

19  **Q.**  Does VoteAmerica regularly send communications with (sic)

20  voters such as the sample messages in this document?

21  **A.**  We do.  As I mentioned earlier, there is 143,000, more than

22  that probably at this point because it's been a minute since I

23  completed the declaration, but over 143,000 Georgians that have

24  opted into our elections reminders tool, and we would send

25  information to them on a regular basis with relevant information,

1  deadlines and things that they need to respond to.  And a voter

2  that opts into any of our lists has the option to opt out also at

3  any point in time.  Like I'm sure we're all receiving tons of text

4  messages these days, even from commercial interests, and if we say

5  stop, they go away.  Similar to that, they're able to opt out at

6  any point in time.

7  **Q.**  Can you describe a little bit more the other types of

8  follow-up communications that VoteAmerica sends along the lines of

9  these text messages.

10  **A.**  Yeah.  So, again, just direct, straightforward educational

11  information.  We don't want any of our messages to have partisan

12  bend in them, we just really want people to participate.  And they

13  also receive e-mails about relevant information that is happening

14  if they opt into those e-mails.

15  And, you know, just to be very clear for the Court, when we go

16  this way, and everyone in the court, that we're a charity and we

17  do rely on the donations from the public.  We're publicly

18  supported.  So at the bottom of e-mails occasionally it will say

19  if you would like to support our work, please click here and

20  donate.  I'm not going to try to cover that up, we are a charity

21  and we are reliant on the donations of generous voters who like

22  and use and enjoy the services we provide to continue providing

23  those services.

24  **Q.**  Do voters opt in to associate with VoteAmerica through these

25  communications?

**A.**  They do.

**Q.**  Did VoteAmerica send follow-up text messages like these to Georgia voters in 2020?

**A.**  It did.

**Q.**  And just to clarify, I believe you stated -- approximately how many Georgia voters have received these follow-up communications after using VoteAmerica's tools?

**A.**  So I stated earlier that more than 143,000 Georgia voters are currently -- at the time in which the declaration was populated and drafted had opted into our elections reminder campaign, but that's not inclusive of the communications that would be received by the Georgian voters that used our other tools and opted in to receive that information.

So as I stated earlier, in 2020 specifically, of the million voters in the United States that utilized our absentee ballot request tool, 62,000 of those, more than 62,000 of those were Georgians.  And there's probably -- not probably, there is a high likelihood that those individuals are still subscribed to our messaging and our educational materials that we would send out. So 143,000, plus the 62,000, plus whoever has joined in since then in Georgia.

**Q.**  Does SB 202 effect VoteAmerica's ability to send follow-up communications such as these?

**A.**  Via text message and via e-mail, no.  What it does do is prevents us -- well, I should say this:  It does compel us to

 1   include a disclaimer on the form we were just talking about, even

 2   if it's sent to them in an e-mail, which is, you know, just a lie.

 3        And then the other element is that we are not able to move

 4   forward at this juncture with our plans to offer the

 5   print-and-mail option to Georgian voters because SB 202 would

 6   become prohibitive in trying to comply with the mailing list

 7   restriction, so we are not able to move forward.  Right now that

 8   tool or option set is established and built, we built it in

 9   November of 2021, and we've been sitting on it because we can't

10   roll it out yet because of SB 202.  We would have to alter the

11   tool to exclude Georgians in order to comply with the mailing list

12   restrictions.

13        Again, if the voter effectuates these actions, it's very

14   unreasonable for the state to expect us to in realtime check to

15   determine whether or not a voter had already submitted an absentee

16   ballot application form when they are requesting this be sent to

17   them and mailed to them.

18        In addition to that, I just want to state that the state's own

19   website doesn't have a way to prevent a voter from downloading an

20   absentee ballot application form again, filling it out and mailing

21   it in.  So the state's own website doesn't even have that

22   restriction.  And we're a small charity, we don't have the

23   technology.  We would have to develop it, if it's even possible.

24   Q.  Is VoteAmerica's absentee ballot application tool available

25   exclusively on VoteAmerica's website?

1  **A.**   It is not.

2  **Q.**   Where else is the vote-by-mail tool available?

3  **A.**   So we have embed codes that are free for anyone to use.  Our

4  tools can be embedded on any website for free.

5      In addition to that, we offer what we call a premium service

6  to individuals that want to subscribe to the dashboard, the

7  premium dashboard, which allows for partner organizations or

8  subscribing organizations to track the efficacy and impact of the

9  campaigns that they have on their websites.  So they would embed,

10  of course, these custom embed codes specific to them.  And any

11  traffic that went through their website would be trackable and

12  available to them through that dashboard.

13  **Q.**   Is the vote-by-mail tool available for partners to use to

14  engage voters in Georgia?

15  **A.**   Yes, our entire toolset is available for anyone to use.

16  **Q.**   Why does VoteAmerica share its technology -- its absentee

17  ballot technology with other organizations and individuals?

18  **A.**   So we want -- we want to be as prolific as possible and

19  available as possible to voters.  We want our tools to be

20  available everywhere and easy for voters to access where the voter

21  is.  Again, going back to the fact that the voters opt into our

22  services, the voters opt into our messaging, and we want to meet

23  the voters where they are.

24      So if they're at a partner website, we want to make sure we're

25  providing our toolset, which is beneficial and makes the process

1  easier there for them as well.

2  **Q.**  Does VoteAmerica have plans to continue associating with other

3  organizations during the upcoming 2022 election cycle?

4  **A.**  We associate with all organizations, so, yes.  I think that,

5  again, anyone can use our tools, any organization can use our

6  tools, any individual that has a website could use our tools.  So,

7  yeah, we do plan to continue to associate with, partner with any

8  group that wants to utilize the VoteAmerica technology and toolset

9  to help voters.

10  **Q.**  Does VoteAmerica plan to make the print-and-mail feature

11  available to partner organizations in 2022?

12  **A.**  We do.

13  **Q.**  Does VoteAmerica plan to make the print-and-mail feature

14  available to partner organizations in Georgia?

15  **A.**  We do, as long as we can with SB 202 in place.

16  **Q.**  Mr. McCarthy, you're familiar with the ballot application

17  restrictions, correct?

18  **A.**  Is it the mailing list restrictions.

19  **Q.**  I said ballot application restrictions, the three we

20  described.

21  **A.**  Yes.  Yep.

22  **Q.**  And you testified earlier that VoteAmerica plans to continue

23  operating its vote-by-mail program in Georgia this year, correct?

24  **A.**  Yes.

25  **Q.**  Does SB 202 or the ballot application restrictions affect

1  VoteAmerica's ability to operate its print-and-mail feature in

2  Georgia?

3  **A.**   The print-and-mail feature, yes.  At the moment, again, we

4  would run afoul of SB 202's mailing list restrictions if we were

5  to print and mail a ballot application at the request of a voter

6  that had already submitted one of these applications to the state.

7       The technology -- or, excuse me, not the technology, but the

8  data that as far as I'm aware that is being made publicly

9  available by the state is in the form of an Excel file.  There's

10 no API, there's no way for us to immediately make that machine

11 readable, especially in realtime.

12      And there are other elements, too, of concern around exposure

13 to liabilities because the state overrides that file on a daily

14 basis.  And in order to protect ourselves from the state, which

15 has shown itself to be aggressive in investigating other groups

16 that are trying to do work to help voters, at this point we would

17 have to keep versioning of those files on a database, which would

18 run afoul of the requirement that we not maintain any voter

19 information.

20      So the bill itself just makes it very improbable and

21 complicated for VoteAmerica to continue to provide and expand to

22 voters services that they are requesting because we can't -- we

23 simply can't afford to build out technology.  We know that the

24 algorithms aren't perfect, we know that data matching isn't

25 perfect, we know that there's so much exposure to both civil and

 1  criminal penalties if we were to run afoul of that.  So, yeah, it
 2  does, it's really caused a lot of stress and anxiety on our team.
 3  **Q.**  Could you describe what more VoteAmerica would need to do in
 4  order to comply with the mailing list restriction?
 5  **A.**  So if it's even possible, we would need to build out a
 6  matching algorithm.  And on a routine basis, probably on some
 7  scheduled basis, we would need to go out to the Secretary of
 8  State's website and pull down their publicly-available file, which
 9  is currently in Excel format.  We would then need to feed it into
10  the algorithm and upload it into the program that we were using.
11  And that algorithm would then match against what the voter was
12  entering in when the voter was entering it in their information.
13       The technology, you know, even if it is possible -- you know,
14  based on conversations with our engineers -- I'm not an engineer
15  and I can't tell you how many man-hours necessarily it would take,
16  but based on conversations with our internal engineers, if we have
17  the resources available internally, it could take two to three
18  months to produce such an algorithm.  And we estimate that the
19  cost would be about $52,000 in just direct labor costs of
20  engineers.
21       And if we had to outsource that because we didn't have the
22  capacity, we could probably end up paying up to $250,000 to have
23  that type of algorithm developed, and that's $250,000 of resources
24  that could be better spent helping voters.
25  **Q.**  Is it possible to comply with the mailing list restrictions

1  five days safe harbor?

2  **A.**   So even if it were possible to build out that algorithm in

3  that tool, again algorithms are non-fallible.   There are matching

4  challenges that exist within those types of softwares and tools.

5  And there's still a chance that not only would it potentially

6  disenfranchise a voter because it would prevent them from taking

7  an action thinking they somehow falsely matched against this list,

8  but it would also -- it would also continue to expose us to

9  potential liabilities in the event that there was a false negative

10  that we checked against the list and they were in the list but the

11  algorithm missed it.

12     And because of any variation in the text that could have been

13  entered, the name, the way the name was spelt, the full name, the

14  partial name of the voter, that we would still be exposed to

15  penalties, civil and criminal penalties, in Georgia from doing

16  work helping voters in Georgia.

17  **Q.**   And how does the required disclaimer affect VoteAmerica's

18  operations in Georgia?

19  **A.**   So, as I stated earlier, we included the disclaimer on our

20  forms because we do want to comply with every state's various

21  different election administration code and laws.   But we know that

22  negative language, and specifically very flagrant negative

23  language that has capital "nots" that's enforced and compelled by

24  the state, it would discourage individual people from

25  participating and using the forms.

1    If I saw something that said this was not official, I probably

2 wouldn't fill it out, and I'm a CPA, right?  Y'all are attorneys

3 and if you saw something that said this is not official, would you

4 fill it out?  No.  So we know just based on reasonable rational

5 reality that this disclaimer will discourage participation, which

6 is antithetical to our entire mission, our entire objective in

7 turning out as many voters as possible.

8    We are now at the point where we're mission critical.  We

9 would like to either change the disclaimer to something that's

10 normal and reasonable, like this being distributed by VoteAmerica,

11 or get rid of it entirely.  We don't want to scare voters away.

12 We don't want voters not to be able to use a form because they

13 think it's illegitimate.  And we don't want to be associated with

14 a thought that a voter might have that we are illegitimate because

15 we are not.  We have the best intention behind helping voters

16 participate as we possibly could.

17 **Q.**  And, finally, is there anything else that you would like to

18 tell the Court about the impact of SB 202 on VoteAmerica?

19 **A.**  So even as this bill was being debated by the legislators in

20 Georgia, we started talking about how this would impact us.  And

21 we never thought it would pass with the various provisions that

22 actually passed and were signed into law.  These provisions

23 specifically just don't make sense as they impact charities that

24 are trying to do this work.

25    And it's interesting -- there's been so much stress and

 1  anxiety about this because, again, VoteAmerica's objective mission

 2  is to expand participation.  We are helping people, specifically

 3  people that we know partisan groups ignore because they're not

 4  worth the money, so to speak.  And we want to do everything we

 5  can, but these rules prevent us from doing that.  And I don't

 6  think that it's necessarily in the state's best interest to ever

 7  dissuade or discourage or make their voters fearful about

 8  participating in their civil right to vote.

 9      So I shouldn't even be sitting here.  Like, you know,

10  VoteAmerica is expending resources for travel, for food, for

11  hotels just to sit here and fight against something that's very

12  blatantly, in my opinion -- I'm a CPA, so take it for what it's

13  worth -- unconstitutional.  And it's unfortunate that this is

14  where we are.

15          MS. RICHARDSON:  I'll pass the witness.  Thank you so

16  much.

17          MR. BARTOLOMUCCI:  Your Honor, would it be possible to

18  have a five-minute comfort break before we start cross?

19          THE COURT:  Sure.

20          MR. BARTOLOMUCCI:  Thank you, your Honor.

21          (After a recess, the proceedings continued as follows:)

22          THE COURT:  Whenever you're ready, counsel.

23          MR. BARTOLOMUCCI:  Thank you, your Honor.

24                          CROSS-EXAMINATION

25  BY MR. BARTOLOMUCCI:

1 **Q.**  Mr. McCarthy, my name is Chris Bartolomucci.  I represent the

2 defendants in this matter.

3 Yes, it's Bartolomucci.

4 You are the vice president of finance and operations at

5 VoteAmerica, correct?

6 **A.**  Finance and operations, that's correct.

7 **Q.**  And your background is in accounting, is that right?

8 **A.**  I'm a CPA.  My background is in accounting, but my background

9 is also in programmatic management.  Just because my title says VP

10 of finance and operations, in a charity we wear many, many hats,

11 and I serve on the executive team and help manage programs and

12 people as well.

13 **Q.**  Would it be fair to say that you run the day-to-day operations

14 at VoteAmerica?

15 **A.**  It would be fair to say I am one of several people that run

16 the day-to-day operations of VoteAmerica.  Again, we all wear many

17 hats.  We're a small charity.

18 **Q.**  Are you the only vice president at VoteAmerica?

19 **A.**  I am.

20 **Q.**  On the staff at VoteAmerica you have some people who are

21 engineers and IT people, is that correct?

22 **A.**  We currently have two engineers, yep.  We have a director of

23 technology in engineering and we have a senior engineer.

24 **Q.**  Now, your job at VoteAmerica is not a full-time job, is that

25 right?

**A.**   My job at VoteAmerica is a full-time job.  I work 40 hours a
week for VoteAmerica.

**Q.**   Are you not also a president and CEO of an entity called
BlueMissionOps?

**A.**   Blue Ledger Group, BlueMissionOps, that is absolutely correct.
That is my side hustle.  We all have side hustles or a lot of us
do.  Yes.  I'm an accountant, I'm a CPA, and I provide CPA-type
services to people, friends, family and other organizations.

**Q.**   So VoteAmerica is a full-time job?

**A.**   Yes.

**Q.**   But you have a side hustle at -- can I call it BlueMissionOps?

**A.**   Sure, if that's what you want to call it.  I am a workaholic,
so there is that.

**Q.**   Now, is the word "blue" in BlueMissionOps a synonym for
democratic, you know, like blue state, red state?

**A.**   You might find it interesting to know that the color blue
demonstrates trust.  And tests that people have done on various
colors show various elements.  They say if you want a calm room,
you paint it blue.  And people are usually very nervous and
anxious about accounting and compliance specifically, and I wanted
to communicate out that I am a trusted source, a calm source and a
person they can talk to that will help them.

   It's a small -- that's a very small element of what I do.
Again, that's a side hustle.

**Q.**   I understand.

1      And BlueMissionOps has a website, is that right?

2  **A.**   It does.

3  **Q.**   You're responsible for the content of that website?

4  **A.**   Yeah, I created it a couple years ago.  If you're going

5  towards my resume, I can just read it to you.  I'm happy to talk

6  about my partisan experiences.  I'm not hiding anything here.

7  **Q.**   We'll get there, Mr. McCarthy.

8  **A.**   Okay.

9  **Q.**   Now, one thing that I saw on the BlueMissionOps website is

10  that it is a boutique accounting firm that partners with

11  progressive-exempt organizations, is that correct?

12  **A.**   That is correct.

13  **Q.**   What is a progressive-exempt organization?

14  **A.**   I am a progressive human, as I'm sure you are -- or not

15  progressive necessarily but partisan human.  I'm a partisan human.

16  Progressive organizations are organizations that I believe share

17  the same values that I do.  One of those values that I share is

18  that we live in a representative democracy, and the more people

19  that participate in a democracy that is a representative

20  democracy, the more representative our elected leaders will be of

21  the needs of the people.

22      Progressive values in that I believe that we have a climate

23  crisis on our hands.  Progressive values meaning that I believe in

24  science and studies and that, you know, the earth is on fire.  And

25  I want to help organizations that are fighting for those good

1  causes.

2  **Q.**  And do you advance that mission with the work you do at

3  VoteAmerica?

4  **A.**  If we are trying to make the connection that helping voters to

5  vote is progressive, then, yes, I do progress helping voters to

6  vote in a democracy.

7  **Q.**  So I heard you testify a couple of times today that

8  VoteAmerica is nonpartisan?

9  **A.**  We are nonpartisan.

10 **Q.**  But I also believe I heard you testify a minute ago that you,

11 yourself, are partisan?

12 **A.**  Let me be real clear that as an individual, right, I'm a

13 partisan individual.  I think most judges are partisan

14 individuals.  Federal employees that are responsible to responding

15 to the Hatch Act, which I also have experience with, are partisan

16 individuals.  It's how they apply that, right?

17    And what I can tell you is that the work of VoteAmerica is

18 nonpartisan.  We don't care how you vote.  We don't care if you're

19 Republican.  We don't care if you're a Democrat.  We believe that

20 we want as many people to participate as possible.  We want to

21 expand the electorate.

22    VoteAmerica knows, right, based on actual studies and data

23 that in the United States a democracy, we have one of the lowest

24 participation rates of voters in the free world.  That is not a

25 healthy democracy.  So the work that we are doing, whether you

1   want to call it progressive or not, helping voters is nonpartisan.

2   Again, we want everyone to participate because we believe that the

3   more people that participate, the more representative our

4   democracy will be and our elected officials will be of the needs

5   of our people.

6   **Q.**   Now, in 2019 you had a position on a Presidential campaign,

7   did you not?

8   **A.**   I worked for several Presidential candidates.

9   **Q.**   In 2019 you worked for several candidates?

10  **A.**   In 2019 specifically I worked for several Presidential

11  candidates, yes.

12  **Q.**   Did you have a position with the Biden for President campaign?

13  **A.**   I did.

14  **Q.**   What was your title there?

15  **A.**   I was the CFO and COO for the Primary Biden Campaign, BFPCC,

16  Incorporated, stands for Biden for President Campaign Committee,

17  Incorporated.  And I do want to be clear that I'm a CPA and I do

18  operations compliance.  I wasn't in the field knocking on doors

19  communicating partisan messages, I was keeping the organization

20  compliant with the law.

21      It's a corporation after all.  All campaigns are corporations.

22  Other entities are corporations.  Corporations have needs that are

23  actually related to compliance accounting, finance, that type of

24  thing.  So, yes, I worked for BFPCC, Incorporated, in 2019 and

25  built the now President Biden's campaign headquarters in

1    Philadelphia.

2    **Q.**  In going back further, in 2016 and 2017 you had a position on

3    the Hillary Clinton For President Campaign, did you not?

4    **A.**  Yeah, I did.

5    **Q.**  What was your title there, if you can recall?

6    **A.**  During the primary I was the deputy controller, senior

7    accountant and deputy controller.  And then during the general

8    under current secretary for the SEC, Gary Gensler, I served as the

9    deputy chief financial officer.  And those historical works don't

10   impact what I do for VoteAmerica.

11   **Q.**  I didn't mean to cut you off.  Did you finish your answer?

12   **A.**  Just want to be clear.

13   **Q.**  Now, you also, if -- tell me if I'm wrong, but you made 36

14   separate monetary contributions to the Hillary Clinton Campaign or

15   to her political action committee, is that correct?

16          MS. RICHARDSON:  Your Honor, we would like to object to

17   scope knowing that we have limited time in this forum today.

18          THE WITNESS:  I don't how that's relevant.

19          MR. BARTOLOMUCCI:  Your Honor --

20          THE COURT:  Hold on a second.  Mr. McCarthy, with all

21   due respect, you're the witness and right now I'm discussing with

22   the attorneys an objection, okay?

23          THE WITNESS:  Apologies, your Honor.

24          THE COURT:  Thank you.  All right.  Counsel, let me hear

25   your response to her objection.

1          MR. BARTOLOMUCCI:  It goes to bias, your Honor, for much

2     of the same reasons that my colleague Mr. Tyson asked some similar

3     questions of the last witness.

4          THE COURT:  I'm going to overrule the objection.  You're

5     correct, we do have limited time, but if they want to spend their

6     time on this, I'm going to let them.  Go ahead.

7          MR. BARTOLOMUCCI:  Thank you, your Honor.

8     BY MR. BARTOLOMUCCI:

9     Q.  Mr. McCarthy, am I right that you made 36 separate monetary

10    contributions to the Hillary Clinton Campaign or her political

11    action committee?

12    A.  I maxed out to the Hillary Clinton Campaign.

13    Q.  What does it mean to "max out"?

14    A.  There are specific limitations that an individual has in how

15    much they can give to a specific candidate on their campaign

16    committee.  And I gave the maximum, as I've given to a lot of

17    other political candidates over time, including local political

18    candidates.

19        Again, just repeating what I've already told you, I'm am a

20    partisan individual and that doesn't impact my work at

21    VoteAmerica.

22    Q.  And am I right, as I asked, that you made 36 separate

23    contributions?

24    A.  I was an employee there.  Every time I got paid I made a

25    little bit, I just gave a little bit, gave a little bit, and I

1  ended up maxing out, yes.

2  Q.  Let's talk about your declaration in this case.  You said that

3  in paragraph six some states allow voters to apply online for

4  absentee ballots.  Is Georgia one of those states?

5  A.  As of the time in which I completed that declaration,

6  Georgia's online portal was not available or active.  It is now,

7  to the best of my ability, available and active.  But I think that

8  because of some kind of recent changes around wet signatures that

9  it is similar to our workflow where eventually it has to be

10  printed and signed no matter how they go about that process.

11      Many states, from what I understand -- again, I'm not an

12  engineer, but from what I understand, require a driver's license

13  or potentially even a social security number in their online

14  portals to verify the identity of the individual that is taking

15  the action, or the voter that is taking the action, which is why I

16  believe that those things are requested on the absentee ballot

17  application form that was officially published by the state, the

18  Secretary of State's Office in Georgia.

19      So at the -- at the time that was released the portal was not

20  available, and I believe it is now.  Other states also have APIs

21  that allow third-party groups such as VoteAmerica to integrate

22  directly with their online portals, and I can tell you Georgia

23  does not do that.

24  Q.  But as you sit here today, it's your understanding that

25  Georgia does have an online process for requesting an absentee

1   ballot?

2   **A.**   Yes, sir.  And as I testified earlier, we direct people to

3   that process in the beginning of the stages of their using our

4   tools.  Again, we want them to utilize the most effective and

5   efficient method of communicating their information and wishes and

6   desires with the state.  We don't, again, care if they use our

7   tool or if they use your tool as long as they use a tool, right?

8   That's what's most important.  We want participation.  Our mission

9   is to increase the number of people that participate in our

10  electoral process.

11  **Q.**   Let's talk about VoteAmerica's absentee tool.  So it let's

12  voters fill in their name, date of birth, address and other

13  personal information, is that right?

14  **A.**   Name, date of birth, address, phone number and e-mail address,

15  I believe that's the only thing that's requested.

16  **Q.**   Then VoteAmerica, after receiving that data, will partially

17  fill out an absentee ballot application form and send it to the

18  voter, is that right?

19  **A.**   The technology does.  VoteAmerica doesn't do anything, the

20  technology that VoteAmerica developed does do that.  It inputs the

21  information that was typed in and effectuated by the voter

22  directly onto the form in the appropriate spaces that would be

23  required.

24  **Q.**   Georgia SB 202 allows you to use that technology, correct?

25  **A.**   It does.  And, in fact, I think there was a recent regulation

1  that was released that clarified that if a voter is using a

2  digital tool, that it is completely and totally acceptable for

3  that form to be pre-filled, as it does with any other digital

4  tool.

5  **Q.**  To be clear, nothing in SB 202 forbids your absentee tool?

6  **A.**  Nothing in SB 202 -- forbids is -- no, let's just say -- yes,

7  you're right, nothing forbids our absentee tool.

8  **Q.**  Now, I assume VoteAmerica hopes that a voter who receives an

9  absentee ballot application from VoteAmerica will complete the

10  form, send it in and cast an absentee ballot, right?

11  **A.**  I mean, there's always a chance they won't cast an absentee

12  ballot.  Just because something is sent to them, as I think was

13  testified to earlier, we're human beings, we have very busy lives

14  and it's possible that they won't do that, but it is our hope that

15  they will.

16      And we want to speak to them and encourage them to

17  participate.  We want to tell them that it's important.  We want

18  them to understand that their vote matters.  And we want them to

19  participate, yes.

20  **Q.**  Some voters might just forget to mail in their absentee

21  ballot, correct?

22  **A.**  Yeah, I'm not going to speak to hypotheticals.  Yes, I guess

23  so.  Like it is hypothetically possible that an individual would

24  forget to mail in an absentee ballot, yes.

25  **Q.**  Some voters who have received an absentee ballot application

1 form from VoteAmerica might just decide not to send it in for

2 whatever reason?

3 **A.**   Again, hypothetically speaking, yes.  Some individual may

4 just decide not to send it in, probably because a disclaimer has

5 negative language on it that dissuades them from thinking it's a

6 legitimate form, that could be part of it.

7 **Q.**   Well, you're speculating there, Mr. McCarthy, aren't you?

8 **A.**   Maybe.  So are you.

9 **Q.**   What evidence do you have that that disclaimer discourages

10 voting?  I heard you testify to that several times in your

11 opening.  So what evidence do you have that supports your opinion

12 in that regard?

13 **A.**   We haven't run a test on that yet, so I want to say that

14 evidence is -- if we're talking about explicit documented evidence

15 doesn't exist.  But I can tell you as an intelligent, reasonable,

16 rational human being sitting in front of you that if I see

17 something that states it's unofficial, I'm not going to use it.

18 As an attorney, would you use a form that says this is not an

19 official form?

20 **Q.**   Well, we're going to have to let me ask the questions today,

21 Mr. McCarthy.  You can depose me some other time.

22 **A.**   That was my answer.

23 **Q.**   Okay.

24     Now, thinking about all the reasons why a voter who has

25 received an absentee ballot application from VoteAmerica might not

1  send it in, isn't it true that SB 202 doesn't cause a voter to

2  make those decisions?

3  **A.**   Again, I'm going to go back to the fact that this State of

4  Georgia and SB 202 is compelling us to add a disclaimer to a form

5  that discourages its use.  So I do think that, in fact, SB 202 is

6  requiring VoteAmerica to do something that is detrimental to

7  VoteAmerica's mission and antithetical to our values.  And, I

8  mean, in what world does the state require an organization to lie

9  to its own citizens?

10 **Q.**   Well, hypothetically if a voter sees the disclosure and

11 decides I'm just going to go vote in person, so that person still

12 has voted, right?

13 **A.**   I'm happy they're voting.

14 **Q.**   You're happy with that?

15 **A.**   Yeah.

16 **Q.**   Now, in paragraph 12 of your declaration, you talked about

17 VoteAmerica's communication of its civic engagement message.

18 **A.**   Uh-huh (affirmative).

19 **Q.**   Do you remember saying that?

20 **A.**   Yep.

21 **Q.**   When a voter uses your absentee tool, they are automatically

22 signed up for follow-up communications like text messages, right?

23 **A.**   So there's disclosure language on the -- and during the

24 process of them signing up, which makes it -- indicates to them

25 that by signing up or by putting in their information they are

1   going to be opting in to receiving this information and they can

2   opt out at any time.  So I'm automatic yes, but to the point that

3   it is disclosed to them that what is happening when they provide

4   that information to us.

5   **Q.**  And SB 202 allows you to send those follow-up communications,

6   right?

7   **A.**  Yes.

8   **Q.**  You went on to say in paragraph 12 of your declaration that

9   voters receive follow-up engagement messages in the form of

10  e-mails, text messages and other electronic communications to

11  encourage their future participation in elections, is that right?

12  **A.**  That's correct.

13  **Q.**  And SB 202 allows all of that, correct?

14  **A.**  It does.

15  **Q.**  Just continuing with paragraph 12, you said that VoteAmerica

16  also uses other forms of outreach and engagement, like

17  peer-to-peer texting, campus engagement, billboards and digital ad

18  campaigns to guide voters to use VoteAmerica's online tools and

19  resources, is that right?

20  **A.**  That's correct.

21  **Q.**  And the same question about SB 202, it doesn't restrict you

22  from doing any of that, does it?

23  **A.**  SB 202 restricts other programs that we have.  We are talking

24  about our absentee ballot application program here --

25  **Q.**  Well, I want you to answer my question.

**A.**  I will say that, yeah, we can do a lot of things that do

not -- that come into the cross hairs of SB 202, but specifically

it does impede and mute, mute our speech in the form of our

program trying to encourage people to participate in mailing in a

ballot application.

**Q.**  So also in paragraph 12 you said that more than 143,700

Georgia voters currently subscribe to VoteAmerica's educational

e-mails and reminder text messages?

**A.**  Yep.  Our elections -- elections reminders tool, yes, sir.

**Q.**  What is the as-of date of that figure?

**A.**  What was the date that I signed the declaration?

**Q.**  Do you remember when you signed your declaration?

**A.**  I don't remember the date.

**Q.**  If I told you it was late April, would you believe me?

**A.**  That makes sense.  I mean, it's close enough.

**Q.**  Since late April has that number gone up or down?

**A.**  Most likely it's gone up.  I mean, we have continued to

receive over time increased, you know, utilization and -- well,

as you're aware, elections are cyclical, so I should say that,

too.  Traffic ebbs and flows with election cycles, just like the

Secretary of State's Office will have certain times they're busier

than normal.  Elections -- VoteAmerica is the same way.  When that

was done in April, I would imagine that any Georgian, if they have

used our tool since then, they have possibly, again

hypothetically, without looking at the data I wouldn't be able to

1  tell you, signed up and opted into receiving that information.

2  **Q.**  So your belief is that the number has gone up since April?

3  **A.**  Possibly.  Very, very, very minorly.  It continues to grow,

4  yes.

5  **Q.**  Has the figure gone up since the enactment of SB 202?

6  **A.**  I think you know the answer to that.  If I just said it's gone

7  up since I signed the declaration, SB 202 has been in place for

8  awhile, then yes.

9  **Q.**  Let's talk about VoteAmerica's print-and-mail feature.

10     Now, in your declaration from -- again, from late April, you

11  said that VoteAmerica had not yet gone live with this nationwide

12  tool --

13  **A.**  That's correct.

14  **Q.**  -- is that right?

15     Is it ready to go live now?

16  **A.**  It is.

17  **Q.**  It is.  Has it gone live nationwide?

18  **A.**  It has not.

19  **Q.**  And why is that?

20  **A.**  Because of SB 202.  We don't want to expose ourselves to civil

21  and criminal penalties if we are not able to detect whether or not

22  a voter has already submitted an absentee ballot application.  We

23  don't want to -- again, my goal here is not to not comply, right,

24  with the laws of various different states' election

25  administration.  Our goal here is to increase participation.  And

1  then if a voter is using that tool, it could potentially put us in

2  the cross hairs of being fined both civilly and criminally, I'm

3  saying criminally, for an activity that the voter effectuated.

4  **Q.**  So when you say it's ready to go live nationwide, does that

5  mean you could offer it in every state other than Georgia?

6  **A.**  We can offer the print-and-mail in any state that allows for

7  the distribution of print-and-mail applications, which Georgia

8  does.

9  **Q.**  So is that what you're doing, are you offering it in every

10  state except for Georgia and states similar to Georgia?

11  **A.**  We're not offering it to any state right now because, again,

12  we built the technology and tool to be nationwide exclusive of

13  those states that do not allow the distribution via

14  print-and-mail, but Georgia does allow the distribution via

15  print-and-mail, but we're not moving forward because we don't want

16  to take the time to further develop and invest more money and

17  resources into not knowing whether or not we're going to be

18  civilly and criminally penalized for running this program in the

19  State of Georgia.

20     We have a research team that researches changes to the laws of

21  the state's election administrators ongoing.  We know there are

22  states that don't permit us to mail or distribute mail-in-ballot

23  applications.  There are states that don't allow mail-in ballots

24  at all.  So I'm -- yes.  Like we are holding right now.  We've

25  developed this tool, it was finished in November of 2021.  We know

1 this whole case has been in process for quite some time, but now

2 it's eminent because we want to move forward, we have a major

3 election coming up, midterm election.  We know there's a lot of

4 voters that are going to need and want to utilize that service,

5 but we can't move forward because it will expose us in Georgia to

6 civil and criminal penalties.

7 **Q.**  VoteAmerica in 2020 offered this print-and-mail feature in

8 four states, right?

9 **A.**  Correct.

10 **Q.**  Are you saying that VoteAmerica is not offering it in those

11 four states now?

12 **A.**  Not currently.

13 **Q.**  So you took it down in those four states?

14 **A.**  We further developed the tool.  So it was a test and it was a

15 pilot program, right?  And the technology at that time was more

16 crude than we would have liked it to be.  And before SB 202 was

17 implemented, we had started developing and building out this

18 technology to be much more robust, much more dynamic.

19     You know, a technology that's dynamic has logic.  And that's

20 an engineering term I don't understand.  But it does things based

21 on specific rules, right, per a state based on the address that's

22 actually put into the tool by the voter.  And in 2020 it was a

23 limited pilot program.  33,000 people in the four states that I

24 previously mentioned participated, so we know there's a need.

25     And we also have received e-mails from Georgians that have

1  received our e-mail that included the absentee ballot that said,

2  hey, I don't have a printer, what do I do?  Well, right now, what

3  do you do?  You have to go find your own printer because we can't

4  help you because we can't expose ourselves to criminal and civil

5  penalties in the event that you, as the voter, had already

6  submitted an application but we don't necessarily know about or

7  having caught it.

8  **Q.**  So when were you ready to take this tool nationwide, what

9  month?

10 **A.**  The technology had been ready to deploy, also an engineering

11 term, in the end of -- end of November of 2021.  But at that point

12 in time, again, we were like, well, we can't, we can't move

13 forward, there's this pending litigation and we have to figure out

14 what we can and cannot do.

15 **Q.**  So November of 2021 was some number of months ago, I'm just

16 wondering why you didn't seek a preliminary injunction, you know,

17 back then so you could get that tool live?

18 **A.**  There are various different elements of this case that we

19 hoped that would progress faster than it has, but it hasn't.  And

20 now we're at a juncture point where we know because -- as,

21 obviously, you would know this too as a lawyer that works in

22 elections, that the need for the voters is now.

23     We're approaching a midterm general election, it's a

24 nationwide election, there will be voters in Georgia that utilize

25 and want to utilize our services and opt into our services that

```
 1  will have a need to receive this via the mail.  And we would like
 2  to move forward now but we can't, so now we are here, sitting here
 3  trying to figure out how we can move forward and combatting
 4  something that's prohibiting us from helping Georgians.
 5  Q.  But just so I have this clear, so the record is clear, the
 6  tool was ready to go in November of last year, it's an important
 7  tool to you, you're not deploying it because of Georgia, yet in
 8  November or December you didn't file a PI motion, is that right?
 9  A.  2021, it was what we call an off year in what people who work
10  in elections know.  There's very little voter activity in an off
11  year, especially at the scale that you will have in a general
12  election year.
13      We also don't necessarily want to -- again, we are
14  nonpartisan, so primaries in most states are partisan activities.
15  A lot of times primaries are actually run by partisan political
16  organizations and parties, and we do not participate in those
17  either.  So we are sitting here thinking, okay, we're going to get
18  through this, we know this is going to be worked out in time.  And
19  now here we are in June of 2022, just a few months away from a
20  critical election in our country.  "Critical" meaning it's a
21  general election where there will be a lot of voters that need our
22  services, and we're prohibited from doing what we need to do to
23  help Georgians because of SB 202.
24  Q.  And you knew in November of 2021 that there would be a
25  critical election in November of 2022, right?
```

1  **A.**  Obviously, yeah.

2  **Q.**  Now, when the voter uses the print-and-mail feature and they

3  get a partially filled-in absentee ballot application, your

4  organization also sends them an additional form, a blank -- a

5  totally blank absentee ballot application form, right?

6  **A.**  As I testified earlier, yes, that is true.

7  **Q.**  And so is this on the theory of, you know, act now and we'll

8  double your order?  Why do you send them two absentee ballot

9  applications?

10  **A.**  We're not a commercial entity.  I'm not trying to get anyone

11  to apply to something twice.  As I testified earlier, which I

12  believe you were in the room and heard, that we want to give the

13  voter an opportunity to correct a mistake that they may have made

14  when they entered their information into the tool that populated

15  the form.

16      In addition to that, there is something called an association

17  within elections where people bring friends and family with them

18  to vote.  These are eligible citizens, these are eligible voters,

19  and they have just as much a right to fill out an absentee ballot

20  application as anyone else.  And if you have this one sitting

21  around, and, again, VoteAmerica has done its job by communicating

22  this is actually an easy process and we're providing you

23  everything you need to complete this process and participate, then

24  they may take advantage of that additional form should they not

25  need to complete it.

1  **Q.**  Mr. McCarthy, did your declaration cite any evidence that

2  voters ever give the blank absentee ballot application to other

3  voters so that they might fill them out?

4  **A.**  It did not.  And I'm not a behavioral scientist, but I can

5  tell you from the years and years of work that's been done in

6  elections that there is a high probability that people bring

7  people, people tell their friends, people tell their family

8  members.  There is a high probability that somebody would utilize

9  and help their friend or family member by giving them this

10  absentee ballot application.

11      And I also believe that there are people that are experts that

12  can speak to that, which is why it's not in my declaration because

13  I'm not an expert and can't speak specifically to any specific

14  stats or data on that topic.

15  **Q.**  Let's move to another topic, which is SB 202 anti-duplication

16  rule.

17      Now, am I right that this rule prevents VoteAmerica from

18  offering the print-and-mail feature to voters who have already

19  requested an absentee ballot?

20  **A.**  It exposes VoteAmerica to civil and criminal penalties in the

21  event that we would mail this to a voter that has already

22  requested an absentee ballot, that is correct.

23  **Q.**  Do you understand why the State of Georgia does not want

24  absentee ballot applications to be sent to voters who have already

25  requested one?

**A.**  Certainly, I can understand the rationale behind it.

**Q.**  Isn't it right that some voters could wonder why they're receiving an absentee ballot application when they've already asked for one and perhaps have already received an absentee ballot?

**A.**  VoteAmerica specifically, because a voter is effectuating all of our actions, has not had any complaints where a voter has received something from VoteAmerica that they didn't know was coming.  Again, a voter is making this request of us and we're simply providing them that service.  This isn't a proactive outreach of VoteAmerica.  We're not putting this information into any form from a voter file.  This is coming directly from a Georgian voter.  And if they are surprised by something that they have requested, we're there to help them, you know, answer any questions they might have.  But we have not had a complaint from any voter at VoteAmerica specifically because they're confused about why VoteAmerica sent them something that they requested.

**Q.**  Now, the Georgia Secretary of State, you know, publishes on a daily basis or virtually daily basis the list of voters who have already requested, received or voted an absentee ballot, right?

**A.**  My understanding is that the Secretary of State has committed to publishing that on a daily basis.  I'm not certain that that's actually happening.  Also my understanding from the data and the things that we've seen, is that that file is overridden on a daily basis, which is, you know, problematic because it creates the

1  potential possibility that there's even an error the state makes

2  and that something is included or omitted or changed which would

3  require, again, you know, to protect ourselves from these civil

4  and criminal penalties, us to keep versioning of those documents

5  programatically, which is also afoul of SB 202 which requires us

6  not to maintain or store voter data, as well as a lot of other

7  things.

8      But the point is, yes, I understand that the Secretary of

9  State's Office has committed to publish this on a recurring basis.

10 **Q.**  And you are aware, are you not, that SB 202 has a

11 five-business-day safe harbor for those who rely upon the

12 published list?

13 **A.**  Yep.

14 **Q.**  So when you testified earlier today that you would have to

15 monitor that list in realtime --

16 **A.**  Yep.

17 **Q.**  -- that was a bit of an overstatement, right, because it's a

18 five-business-day --

19 **A.**  Nope.

20 **Q.**  -- realtime?

21 **A.**  I don't think it is an overstatement.  Monitoring in realtime,

22 let's say that the voter submitted that application five business

23 days ago and the list just hasn't been updated yet and they go to

24 put their information into VoteAmerica's tool maybe because the

25 state is taking too long to get them their ballot and they're a

1   little concerned and they fill out our tool and we end up mailing

2   them something they requested us mail to them.  And then, guess

3   what?  We're now subject to criminal and civil penalties because

4   of SB 202 for helping a voter that actually made a request of us.

5   **Q.**  Now, in paragraph 27 of your declaration, you said that

6   VoteAmerica is exploring whether it can develop a technology to

7   check every Georgia voter using the print-and-mail feature against

8   the state's most recently available list of voters who have

9   already sought an absentee ballot, is that right?

10  **A.**  That is correct.

11  **Q.**  So who at VoteAmerica precisely is doing that exploring?

12  **A.**  Our director of technology and engineering began the process.

13  We did some preliminary what would be requirements of a technology

14  that could potentially do that to figure out how many, you know --

15  and, again, this was -- so my declaration was signed -- drafted

16  and signed in late April, and it was at that point in time where

17  we understood that -- what currently existed.  I don't know how

18  long that the data has been actually being published by the

19  Secretary of State's Office, I'm not sure what the timeline is

20  there, I want to just make that clear.  But he has been exploring

21  the requirements, the algorithm, a tool, right, a digital tool

22  would need to match those databases to try to figure out, hey,

23  this person just entered this information, do they already exist

24  on the list?

25  **Q.**  When exactly did VoteAmerica start this exploration?

**A.**   Of complying with that specific provision?

**Q.**   Of developing an algorithm to check your list against the state's list?

**A.**   Again, we've been talking about this since this bill was being debated in the Georgia Legislature.  So we've been talking about whether or not this was possible.  We didn't know the extent -- because the bill had not been passed yet, we didn't see the full language of the passed bill at that time.  Again, we've been developing various different technologies since that time.

And, you know, our dollars, our charitable dollars, which are restricted to helping voters, there is no donor in the world that's going to say, I'm going to give you $10 because I want you to comply with this aggressive bill that Georgia just passed. That's not reality.  They want us to help voters.  So we take our dollars and do the best we can to actually help voters.  And the SB 202 is just a deflection of resources that would be doing that.

**Q.**   So if I understand you correctly, you're saying that the technology is there, but you don't want to pay for it?

**A.**   That's not what I'm saying.  I'm not an engineer, and I can't speak to the way that the technology has been built.  What I'm telling you is that there were some preliminary requirements that an engineer came up with that would -- he thought would potentially make it possible to do this checking.

You know, in later conversations, though, even if it were doing this checking, we know that this type of technology that

1   checks against lists in various different databases that are

2   turning over is not infallible.  There are mismatches that happen

3   on a regular basis and VoteAmerica would take the more

4   conservative route there to protect, you know, the voter and

5   itself in that situation, and we haven't moved forward because of

6   that situation.  In order to comply with the mailing list

7   restriction, VoteAmerica would have to direct financial resources

8   and time and efforts into developing a technology that does not

9   currently exist.  If the state would like to provide it, we would

10  be happy to take it, but currently does not exist, at least in

11  VoteAmerica's world and tool's technology stack.

12      So, again, like we want to comply, we really do, that's why

13  we're sitting here, but at the same time we know that we don't --

14  we can't be exposed to civil and criminal penalties.  We are a

15  small charity, we cannot afford that.

16  **Q.**  In paragraph 28 of your declaration you said, quote,

17  "Developing such technology would cost a minimum of $52,500," end

18  quote.  Now, I took from that -- here's the question:  I took from

19  that that you could develop the technology but it would cost you

20  north of 50,000 bucks?

21  **A.**  It will cost us north of $250,000 we believe if we don't think

22  we have the internal resources to build it out at this moment.

23  But I said "if" -- I'm pretty sure my declaration said "if" we

24  have the resources internally, we could potentially do that with

25  raw hours, raw engineering hours.  That does not include

1  engineering time, that does not include my time, that does not

2  include other people's time in consulting and providing

3  information and testing and quality control.  That is just raw

4  engineering development of a technology that we don't even think

5  will completely protect us from the actual civil and criminal

6  penalties in SB 202.

7  **Q.**  Who calculated this figure of $250,000?

8  **A.**  Myself and the engineer.

9  **Q.**  How do you calculate that?

10  **A.**  I don't have the calculation in front of me.  I would need to

11  pull that up.  It's based on the hours -- it's based on the hours

12  our engineering -- two people, we have two people that are

13  engineers.  It's based on what they're paid hourly and how much

14  are the estimate that they believe it will take to develop such a

15  tool internally.

16  **Q.**  So that's based on an hourly rate that would be paid to the

17  engineer that would do the work?

18  **A.**  I mean, our internal engineers are salaried, right, and there

19  are a lot of things on their plates that they're trying to

20  develop.  It's based on what their salaried rate would be, divided

21  by 2,080, which is the average number of hours that an American

22  would work in a 40-hour workweek.

23  **Q.**  But, wait, you're saying your engineers are salaried?

24  **A.**  Correct.

25  **Q.**  So it's not like you have an additional $52,000 charge out of

1  pocket, it's just that they couldn't be working on something else

2  when they're doing -- if that were their job for the time it took

3  to do it, right?

4  **A.**  Yeah.  I don't want to jump into the theory behind cost

5  accounting but every --

6  **Q.**  Please don't.

7  **A.**  Yeah.  Every action an individual takes, no matter what it is

8  they're working on, has an expense.  The fact that you're standing

9  there right now probably are billable hours.  There's an expense

10  on your time, right, sir?  There's an expense to an engineer's

11  time, too.  Whatever we are allocating, the $52,000, let's say

12  that, okay, we're already paying that to their salary, that's

13  fine.  We're taking that money and allocating it to a specific

14  development of a technology that does not currently exist and we

15  are diverting that $52,000 from helping voters by applying it to

16  all our other programs and costs.

17      For example, we would really, really like to hire a program

18  strategist that cost money, and that $52,000 could potentially be

19  shifted to them, right?  So there is -- I get what you're saying,

20  but there's an actual theory and a way we account for time and

21  time is money.

22  **Q.**  Okay.  But I'm not an accountant and I went to law school

23  because I can't do math, all right, so indulge me.  You're not

24  saying that you would incur an out-of-pocket cost of $52,000 --

25  let me finish -- it's that your salaried engineers would have to

1  do work and you value the time that would be spent at $52,000?

2  **A.**   We're a team of ten people total --

3  **Q.**   But yes or no to --

4  **A.**   We wear lots of hats, right?  We have a lot of work to do and

5  we're very, very busy.  So, yes, that is a $52,000 allotment of

6  time that we would have to potentially use to develop a tool that

7  we don't even know if we can possibly, you know, create yet to

8  completely protect ourselves from the civil and criminal penalties

9  of SB 202.

10     So, yes, it is an allotment of time that would be allocated

11  from other resources, yes.

12  **Q.**   What is VoteAmerica's annual budget, Mr. McCarthy?

13  **A.**   VoteAmerica's annual budget changes, it's cyclical.

14  **Q.**   Okay.  What is it in 2022?

15  **A.**   In 2022 our approved budget with the board was approximately

16  $5 Million.

17  **Q.**   How about in 2020?

18  **A.**   In 2020, the publically-available 990, as I'm sure you looked

19  at, would show you that we raised about $10.7 Million and spent

20  almost all of it.

21  **Q.**   So you've decided that it's not worth this $52,000 implied

22  charge in order to take live and nationwide this tool that you

23  think is so important?

24  **A.**   No, we really want to take this tool live and nationwide,

25  we're going to, even if we have to exclude Georgians.  We're here

1   to help Georgians, though, we don't want to exclude Georgians.  As

2   I testified earlier, it is our intention to comply with state

3   election administration rules where we can.  It is not our

4   intention, sir, to be exposed to civil and criminal penalties

5   because there is a technology -- we are being required by the

6   state, right?  What do they call that?  An unfunded mandate that

7   the state is requiring us to develop something, to spend resources

8   on something that currently doesn't exist to comply with something

9   that as a small charity we shouldn't be held liable if a voter

10  requests something.  The voter is requesting this form be mailed

11  to them, it's not like we're doing it proactively when there's a

12  list that exists.

13  **Q.**  So I believe you just testified that you could do this in the

14  49 other states --

15  **A.**  Not 49.

16  **Q.**  -- right?

17  **A.**  I said we plan to do it in all the states where it's possible,

18  that's what I'm saying.  We're going to move forward --

19  **Q.**  You said 49 states, sir.

20  **A.**  Okay.  If I did, I apologize.  There are states that don't

21  allow the distribution of absentee ballot applications but --

22  **Q.**  Let's say it's 45, you could do 45 states?

23  **A.**  We are planning to roll this out even if we have to exclude

24  Georgia, but I don't see why the state would want us not to help

25  Georgian voters, that would not be in the best interest of the

1  state.

2  **Q.**  Why are you disadvantaging, you know, 44 other states because

3  of what's happening in Georgia?

4  **A.**  SB 202 is disadvantaging Georgians.  Not other states.  We are

5  not at that point yet.  So we are, again, here because we're at a

6  critical decision point.  Right now we are a critical decision

7  point.  This hearing right now and the honorable judge's decision

8  related to this hearing will change the direction potentially that

9  VoteAmerica had planned to go in, right?  That is what I'm saying.

10  That is what I am saying right now to you, that we will move

11  forward, we will help voters.

12      It is in our mission to help voters, so we will do that even

13  if we have to exclude Georgians, but I don't want to exclude

14  Georgians.  Georgians need help, too.

15  **Q.**  I understand that.  But the decision not to make it available

16  in 40, 45 other states, that's a decision that VoteAmerica has

17  made on its own?

18          MS. RICHARDSON:  Objection, your Honor, asked and

19  answered.

20          THE COURT:  Any response to the objection?

21          MR. BARTOLOMUCCI:  I believe it's a different question,

22  I don't think I've heard the answer to it.

23          THE COURT:  I'm going to overrule the objection.  Go

24  ahead.

25          THE WITNESS:  I said that we were going to offer it.  We

```
 1  are at a critical junction point.  So I did answer the question.

 2  We are going to move forward and offer it to all the states even

 3  if we have to exclude Georgia.  At the moment the tool's developed

 4  to help Georgians, which is why it's not live because it would

 5  expose us to penalties.  I think I said that multiple times.

 6          So this is where we're sitting, this junction point, and

 7  I want to move forward and offer to voters something that they

 8  clearly need and are asking for but can't because it exposes us to

 9  penalties in Georgia.

10          So, yes, sir, we are going to move forward and help

11  voters outside of Georgia in order to comply with the law, but

12  that is actually disenfranchising voters in Georgia.  The state,

13  therefore, is prohibiting us from helping Georgians, from

14  communicating with Georgians, from speaking to Georgians, from

15  assisting in the way that we do to fulfill our mission as a

16  charity.

17  Q.  Let me ask you a few questions about the disclosure

18  requirement or disclaimer requirement in SB 202.

19  A.  Sure.

20  Q.  Now, does that disclosure, may it go at the top or bottom of

21  the form, or where are you allowed to put it?

22  A.  If my memory serves me correctly, I believe that the

23  disclosure has to be on the face of the form.  I think the law

24  states it has to be on the face of the form.  I don't think it

25  tells you where on the face of the form it has to go, but it does
```

```
 1  have to be on the face of the form.
 2      And if you look at the face of the form, there's not a lot of
 3  places on the face of the form other than in the bottom, where the
 4  state itself has already placed a disclosure that clearly gets to
 5  the fact that the form -- that they should -- the voter should
 6  communicate their concerns about fraud.
 7  Q.  Now, the disclosure requirement requires that VoteAmerica say
 8  on its form that these forms are not ballots, right?
 9  A.  Yeah.  I'm okay with that.
10  Q.  So that's a true statement?
11  A.  That is a true statement.
12  Q.  It's not a lie?
13  A.  That is not a lie.
14  Q.  It's also a true statement, is it not, that the voters who
15  receive the forms that VoteAmerica sends out are not receiving the
16  forms from a government entity?
17  A.  That is a true statement as well.
18  Q.  And it's not a lie?
19  A.  That statement is not a lie.
20  Q.  Now, on the third one, when VoteAmerica sends out these forms,
21  the forms are not printed by the government, are they?
22  A.  The form is published by the government online, which is the
23  same place a voter would obtain the form, which is the same place
24  VoteAmerica obtained the form.  The form was published by the
25  State of Georgia.
```

1 **Q.**  I asked you a different question, Mr. McCarthy.

2 **A.**  I answered it.  It was published online.  The state didn't

3 print it.  The state didn't print it, but is printing and

4 publishing the same thing?  I'm not sure.  Could you tell me the

5 definition of the --

6 **Q.**  That may be a question for Judge Boulee.

7 **A.**  Okay.

8         THE COURT:  I would love a good answer from somebody on

9 that question I assure you, counsel.

10         MR. BARTOLOMUCCI:  I nominate Mr. Schaerr for that one.

11 **A.**  Sir, I want to say this, because this -- those statements

12 may -- at least the second two statements, the two statements you

13 read first, may, in fact, be factual.  But the law itself requires

14 a font size, it requires that we capitalize the word "not" three,

15 three times.  Three times.  What would be the intention of making

16 that word, which is a negative word in the English language,

17 capitalized if not to draw attention to those specific statements

18 and that -- those specific statements in a row, right?  There are

19 three statements, but the very first statement by my objective --

20 or, excuse me, subjective opinion as a reasonable human being that

21 uses forms on a regular basis, is, in fact, misleading and a lie.

22 That is my opinion.

23     And so when you put the three sentences together, whether you

24 want to break them up or not -- I think we've talked about how our

25 speech is this packet, right?  Throughout this entire thing I've

1   testified that the speech is a packet, right?  When you put those

2   things together, they're not individual, they're together.

3   Therefore, you are the very first statement misleading the voter.

4   You are compelling VoteAmerica to use a statement that is

5   misleading the voter and immediately that would draw my attention

6   to it as a professional with an education and two Master's degrees

7   to thinking this is an illegitimate form, why would I use it?

8   **Q.**   I do believe I understand what your opinion is, but you're not

9   testifying today as an expert witness, are you?

10  **A.**   I think I'm testifying today as an expert to the work I'm

11  doing at VoteAmerica.

12  **Q.**   You're testifying to the facts of what you're doing at

13  VoteAmerica, correct?

14  **A.**   What I'm doing at VoteAmerica and what my subjective

15  professional opinion is based on what I'm doing at VoteAmerica and

16  my experience at VoteAmerica how this will impact the voters that

17  we serve.

18  **Q.**   Do you understand what an expert witness is in litigation?

19  **A.**   Yes.

20  **Q.**   Professor Green?

21  **A.**   (Nods head)

22  **Q.**   Okay.  You're not one of those, right?

23  **A.**   I'm an expert in the work that VoteAmerica does.

24  **Q.**   You're an expert in what VoteAmerica does?

25  **A.**   In the work that VoteAmerica does.

**Q.**  Just one question or two about the pre-filling provision and I

think we'll be done here.  So I want to read paragraph 44 of your

declaration, a quote:  "However, since the passage of SB 202, the

Georgia State Election Board enacted a regulation permitting

web-based tools that enable voters to partially complete their

absentee ballot applications online.  VoteAmerica interprets this

regulation to exempt its absentee tool from the pre-filling

prohibition," end quote.

**A.**  We're very thankful for that regulation that was released by

the state.  We were hoping there would be others that were

released by the state but there have not been.

**Q.**  Just to be clear, since VoteAmerica is not aggrieved by the

pre-filling prohibition, VoteAmerica is not challenging that

particular provision in this lawsuit?

**A.**  I think that the bill as a whole presents many, many problems

for VoteAmerica.  And I don't want to speak to what, you know, my

counsel will be bringing up as a legal argument because that is

not something I'm an expert in; I am not an attorney.

**Q.**  But I'm right, aren't I, that that particular provision about

pre-filling, you don't have a problem with the way it's being

interpreted, you comply with it?

**A.**  Yeah.  We can comply with it.  We're very thankful for that

release in that regulation.

          MR. BARTOLOMUCCI:  I'm going to pass the witness, your

Honor.

 1              MS. RICHARDSON:  No more questions, your Honor.

 2              THE COURT:  Sir, you can step down.  Thank you.

 3              THE WITNESS:  Thank you, your Honor.

 4              THE COURT:  Off the record for a second.

 5              (Off-the-record discussion)

 6              THE COURT:  Please call your next witness.

 7              MS. LANG:  Thank you, your Honor.  Plaintiffs call

 8  Dr. Green.  And my colleague Mr. Johnson will be taking

 9  Mr. Green's testimony.

10              THE COURT:  Thank you.  Good afternoon.

11              MR. JOHNSON:  Good afternoon.  It's a pleasure to be

12  here.

13              COURTROOM DEPUTY CLERK:  Sir, remain standing and raise

14  your right hand.

15                      _____

16                            DONALD GREEN

17          a witness herein, being first duly sworn,

18            was examined and testified as follows:

19                      _____

20          COURTROOM DEPUTY CLERK:  You may be seated.

21          MR. JOHNSON:  Good evening, your Honor.

22                         DIRECT EXAMINATION

23  BY MR. JOHNSON:

24  Q.  Good evening, Dr. Green.  Will you please state your full name

25  for the record.

**A.**  Donald Green.

**Q.**  Were you retained as an expert witness in this case for plaintiffs?

**A.**  Yes.

**Q.**  Did you prepare an expert report in this case?

**A.**  Yes.

**Q.**  Do you mind flipping in your first binder to Plaintiffs' Exhibit 26.  Is that a true and correct copy of your expert report for this case?

**A.**  Yes.

**Q.**  Did you review any other submitted reports for this case?

**A.**  Yes, I reviewed the report -- the rebuttal report by Professor Grimmer.  I also reviewed the various legal briefs that were filed initially.

**Q.**  Thank you, Dr. Green.

   And do you mind just turning to Plaintiffs' Exhibit 37.

**A.**  Yes.

**Q.**  Is that a true and correct copy of Dr. Grimmer's report that you reviewed?

**A.**  Yes.

**Q.**  If you don't mind grabbing the second binder, please.

   Did you prepare any other reports in this case?

**A.**  Yes.

**Q.**  Do you mind turning to Plaintiffs' Exhibit 46.

   Is Plaintiffs' Exhibit 46 the other report that you prepared?

1  **A.**  Yes.

2  **Q.**  Then still in that binder, would you please turn to

3  Plaintiffs' Exhibit 54.

4     Is 54 the current copy of your CV?

5  **A.**  It is.

6  **Q.**  Let's discuss Plaintiffs' Exhibit 54.  So can you describe

7  your educational qualifications as an expert.

8  **A.**  I was an undergraduate in political science and history at

9  University of California, Los Angeles.  In 1983 I graduated.

10        In 1984 I went to the University of California Berkeley

11  for graduate school in political science.  I received my Master's

12  degree in '84.

13        I received my PhD in '85.

14        I started teaching at Yale as an assistant professor in

15  '89.  I became a full professor in '94.  I received an endowed

16  chair in '96.

17        I left Yale for Columbia in 2011.  I was appointed as a

18  full professor.  I'm now the holder of an endowed chair there,

19  too.

20  **Q.**  If you don't mind, if we just step back just a moment.

21     What was the subject of your PhD study?

22  **A.**  It was a political behavior and public opinion study on the

23  effects of self-interest on political behavior and social

24  attitudes.

25  **Q.**  That's in American politics?

1  **A.**  American politics.

2  **Q.**  And you mentioned your current position and that's at Columbia

3  University.  How long have you held that current position?

4  **A.**  Since 2011.

5  **Q.**  In general what is the focus of your academic work now?

6  **A.**  I study voting behavior, voter turnout, voter registration.  I

7  study public opinion, political psychology, political behavior of

8  all kinds.  I study media effects.  I study the effects of

9  interpersonal communication, social networks.  I'm quite

10 interested in a wide array of topics in the broad field of

11 research methodology focusing not exclusively but largely these

12 days on experiments in -- experiments in general but field

13 experiments in particular.  I'm also just broadly interested in

14 survey research and public opinion.

15 **Q.**  Do you teach classes on these subjects?

16 **A.**  I do indeed.

17 **Q.**  To undergraduates, graduates?

18 **A.**  About two-thirds, maybe three-quarters of my classes are aimed

19 at graduate students.  I teach courses in general survey, courses

20 for the American politics, doctoral field exam students.  I teach

21 courses specifically in public opinion, political psychology,

22 economic -- I'm sorry, experimental design in a variety of courses

23 just generally on research methods.

24 **Q.**  How about publications on these subjects?

25 **A.**  Sorry, the question is?

1  **Q.**  Have you produced publication on these subjects?

2  **A.**  Yes, I've probably exceeded my lifetime quota of publications.

3  I publish extensively on pretty much all the topics that I've

4  mentioned.

5  **Q.**  Can you describe what of your publication work relates most

6  closely to this case?  Which publication would you say is most

7  related?

8  **A.**  Although I've conducted a wide array of field experiments

9  myself with groups from the right, left, the center, I would say

10  that the publication that is most directly relevant is the Fourth

11  Edition of my Get Out The Vote, How to Increase Voter Turnout

12  book.  It is a compendium of literally hundreds of randomized

13  trials spanning a wide array of different topics from voter

14  registration to voter turnout, messaging, different kinds of

15  tactics and summarizing for a general audience the implications of

16  those experiments.

17  **Q.**  You just mentioned right, left and center.  Does that mean

18  that you've provided consulting services for Democrats,

19  Republicans and Independents?

20  **A.**  Not so much consulting services because I tend not to do it

21  for money, but I collaborate with Republican campaigns, Democratic

22  campaigns, nonpartisan campaigns conducting randomized trials to

23  assess the conditions under which -- and the extent to which

24  different kinds of efforts to either mobilize voters or encourage

25  them to register actually bear fruit.

1  **Q.**  Can you tell us a little bit more about your experience

2  conducting quantitative statistical analysis.

3  **A.**  Yes.  Essentially the corpus of my work is overwhelmingly

4  focused on quantitative analysis.  A lot of it involves

5  experimentation, either survey experimentation or field

6  experimentation.  Much of it involves survey analysis, including

7  measurement.  I think you could certainly classify me as primarily

8  a quantitative researcher.

9  **Q.**  With that said, what's your experience conducting qualitative

10  studies?

11  **A.**  You know, although I've not published standalone pieces on

12  qualitative research, and I don't consider myself particularly

13  interested in the full panoply of things that are often under the

14  rubric of qualitative research, such as ethnography or comparative

15  case studies, historiography, I am quite interested in an eager

16  user of certain forms of qualitative research involving especially

17  depth interviews or semistructured interviews, more projective

18  tests of the experimental outcomes.  So I have incorporated those

19  extensively into my work.  And although I don't know that the work

20  is necessarily remembered for that aspect, it's absolutely crucial

21  in terms of the formative phases of those papers.

22  **Q.**  For this case, did you reach any opinions based on the

23  analysis you were requested to do?

24  **A.**  Yes, I did.

25  **Q.**  Are your opinions and the bases for those opinions set forth

1  in the reports that you prepared for this case?

2  **A.**   Yes, they are.

3         MR. JOHNSON:  Your Honor, plaintiffs move to tender

4  Dr. Green as an expert in the field of American politics, voting

5  behavior, quantitative statistical methods, qualitative field

6  study methods under Rule 702.

7         MR. BARTOLOMUCCI:  Your Honor, the state does not

8  dispute that Dr. Green is qualified in those areas; however, we

9  reserve the right to move to exclude his testimony based on the

10  *Daubert* doctrine, in particular his failure to offer a proper

11  scientific methodology.  And that will be, I believe, further

12  developed once we've heard his full testimony today.

13         THE COURT:  All right.  Thank you.  He's admitted, and I

14  recognize the reservation.

15         MR. JOHNSON:  Thank you, your Honor.

16  BY MR. JOHNSON:

17  **Q.**  Dr. Green, let's turn next to your report.

18     So what were you asked to do in your engagement as an expert

19  witness for plaintiffs in this case?

20  **A.**  Asked to evaluate the implications of SB 202 for the groups

21  that use voter outreach as their sort of primary focus.  They're

22  focused on getting voters to vote, in particular getting them to

23  vote in a way that is convenient for them.  In some cases that

24  means voting by mail.  And so I was asked to assess the

25  implications of several aspects of SB 202 to -- for their -- their

1  operations, as well as to render an opinion about what I thought

2  the likely implications would be for voters who are going to see a

3  different kind of communication from those groups under SB 202's

4  rules.

5  **Q.** So what role can civic organizations play affecting voter

6  behavior?

7  **A.** I would say two roles.  One of them is motivational.  And the

8  other one is to reduce transaction costs.  The motivation side is

9  about encouraging voters to think that the upcoming election is

10  interesting and important and worth their time.  In some ways it's

11  about revving them up in terms of their sense of civic duty.  In

12  other cases it's about revving up their partisan sensibilities.

13  But that's the motivational side.

14      And different groups have different objectives.  Some are

15  strictly nonpartisan, others are quite partisan, some are in

16  between.  Other groups have specific mandates for specific

17  demographic groups, religious groups, ethic groups and so on.

18      The other side of what these groups do is reduce transaction

19  costs.  So transaction costs, it's kind of a pointed-headed

20  microeconomic term for the kinds of frictions associated with the

21  cost of filling out forms or the time it takes to actually get

22  through a -- wind one's way through a bureaucracy.  And very often

23  these groups are -- they see their principle mission as greasing

24  the path for voters to participate, making it easier for voters,

25  especially voters who very often lack the kind of educational

background or resources to do it as seamlessly as people who
perhaps grew up in a more well-healed environment and consumed
politics as part of their day-to-day upbringing.

**Q.**  So does absentee voting play a role in terms of reducing
transaction costs?

**A.**  It does in the sense -- it does.  And I want to make sure that
I have the proper sense of proportion here.  When people talk
about absentee voting, reducing transaction costs, I think they're
100 percent right, that it does reduce transaction costs.  But
that does not mean that states or counties that introduce absentee
voting, or even an all vote-by-mail system as in, for example, the
State of Colorado or Oregon, see a gigantic surge of turnout.
They see a noticeable, an indisputable surge in turnout.  So I'm
not saying that transaction costs are the only thing, but they are
an important thing.  And that's why you could see why it is that
groups that work with this kind of fiery of change are so adamant
about deploying the strategy because they know that it does
produce results.

**Q.**  So what are the transaction costs involved in submitting or
requesting an absentee ballot application?

**A.**  Well, in some sense the very -- the very beginning of the
process is simply knowing that that is something that you need to
do if you want to vote by mail or if you want to vote at all.
There's also the question of how will you get a form?  Will you
print it out yourself?  Will you find it online?  Where will you

find it?  And when you get it, what do you need to do with it?  Do you need identification?  You know, how do you find those numbers?  And so on and so forth.

So filling out a form is something that, of course, highly-educated people do relatively seamlessly, but forms are unquestionably intimidating to many people who see it as a kind of thing to be avoided in life.  And so the transaction costs associated with filling out a form is sort of a famous topic in political science.

**Q.**  So does that include accurately placing your information on the form?

**A.**  Yes, I would say -- or at least the transaction costs of making sure that it's accurate are not trivial.

**Q.**  Given this role of transaction costs, why might a civic organization that does voter persuasion work want to minimize the cost involved?

**A.**  Well, I think that they know that there are many points of slippage in the process.  So that a person who is on the cusp of registering or casting a vote by mail or voting at all, often needs a nudge to get them to get over the behavioral threshold of doing so.

And to the extent that there's an extra step, you know, mail somebody a postcard and encourage them to go to an online site, well, you know, people have a busy life and maybe they're motivated to do it but they just don't get around to do it.  And

1  that extra step in the process is precisely the kind of

2  transaction costs that can be decisive.

3      And groups know that, so what they're trying to do is grease

4  the voter's path, especially a voter who might otherwise be

5  apprehensive about doing something online or filling out a form or

6  knowing how to sign the back of the form, not forgetting to do

7  those kinds of little details.

8  **Q.**  So when you say "behavioral threshold," can you just give us a

9  definition of what that is.

10 **A.**  Oh, I think, you know, you're often just at the cusp of, for

11 example, making an online purchase, but maybe you're thinking, do

12 I really need that?  Nah, I don't know.  And, of course, there's

13 sort of lots of, you know, intuition and lore in online purchasing

14 that the longer somebody tarries, the more they're likely to slip

15 away and have second thoughts.

16     And so in much of the same way, sending someone a form where

17 they actually have the form and very often pre-populated the form,

18 it allows them to feel more confident that they'll get through the

19 process quickly.

20 **Q.**  So what effects does reducing transaction costs have on the

21 rate at which absentee ballot -- absentee voting applications or

22 ballots are rejected?

23 **A.**  Well, I would say that from a study that we're going to talk

24 about in a bit, the Mann and Mayhew 2015 study, there does not

25 appear to be much of an effect.  You know, perhaps encouraging

1   people to fill out forms by themselves elevates the number of

2   errors they will make, but the kinds of error rates are

3   vanishingly low.  In that study it was less than a 10th of a

4   percent.  And the only -- and the gains -- or it was a 10th of a

5   percent, but the gain over the control group or the generic --

6   sorry, the appeal to go online was only six-tenths of a percent.

7   So we're really talking about a relatively trivial kind of

8   nuisance in terms of inflicting extra time commitments on election

9   officials.

10  **Q.**  So you just mentioned Mann and Mayhew 2015 and that's

11  contained in your report.  Can you give us just a brief one- or

12  two-sentence summary of what that report says.

13  **A.**  A brief cut-to-the-chase summary of Mann and Mayhew is this

14  was a randomized trial in which there were three randomized arms:

15  A controlled group that received nothing, a treatment group that

16  received encouragement by mail to go to an online e-government

17  site where they could request a vote-by-mail ballot, or a mailed

18  ballot right then and there so they could fill -- I'm sorry, the

19  mail request right then and there so they could fill that out

20  directly or they could go to the e-government site.

21      So the question is what were the results for the absentee

22  voting rate and the voting rate in general.  And the effect is,

23  you know, a surge in absentee voting rate among the people who

24  received the mailed form, and an increase in the voter turnout

25  rate, pretty much as you would expect in a world governed by

1  transaction costs.

2      But what's kind of interesting is that the extra step of going

3  to the e-government site did not produce a harvest of votes.

4  **Q.**  Did you rely on any other voting-related studies or

5  experiments in forming your opinion?

6  **A.**  Yes.  I relied also on the randomized experiment conducted by

7  Hans Hassell.

8  **Q.**  Did you rely on any experiments that concerned the

9  introduction of universal absentee voting in certain states?

10  **A.**  So -- well, the two studies that I cite are not experiments,

11  but they are quasi experiments or natural experiments in the sense

12  they track counties by extension states that move from not

13  allowing -- or not having vote by mail to having vote by mail.

14  And those studies show fairly clearly, especially the rather

15  nicely-executed study by Holbein, it's a nice illustration of a

16  rather exacting comparison between states that -- I'm sorry,

17  counties that adopt sort of in a haphazard way vote-by-mail

18  provisions.  And, sure enough, they have a surge in turnout, not a

19  massive surge but it's -- you know, it's an unmistakable increase,

20  suggesting, again, reducing the costs of voting seems to increase

21  voting, as intuition suggests.

22  **Q.**  Are these studies reliable for you forming your opinion?

23  **A.**  Yes.  I mean, I have a strong preference for the randomized

24  experiments of Mann and Mayhew or Hassell, but I nevertheless very

25  much like the study that was published in 2020 on the transition

1  in states that had county-by-county movement to, although by mail,

2  has an illustration of how vote-by-mail increases voter turnout,

3  not by an avalanche but noticeably.

4  **Q.**  Thank you.

5      And, Dr. Green, I would like to talk a little bit about the

6  difference between statistical significance and substantive

7  significance, so if you don't mind turning to your rebuttal

8  report, that's Plaintiffs' 46 on page 9.  My apologies for you

9  having to flip between two binders here.

10 **A.**  No worries.  Page 9, yes.

11 **Q.**  So at the bottom of that page you talk about statistical

12 significance versus substantive significance.  I'll save us time,

13 you don't have to read it, but do you mind summarizing what that

14 is.

15 **A.**  So I'll try to be as nontechnical as possible.  Substantive

16 significance is asking is the effect size large enough to be of

17 practical significance, of policy significance, of theoretical

18 significance?  Does anyone care about an effect of this size?

19     Now, this kind of concern actually has special reference to

20 Georgians insofar as your elections have been famously close.  So

21 a switch of a percentage point or two would have been decisive in

22 elections that really, really matter.  That's one thing.

23     But then the other thing that economics have been I think

24 complaining about as a kind of example of overzealous and somewhat

25 mechanically-minded statistical analysis dating back interestingly

 1   to the early 1950s is the investigation of statistical

 2   significance.

 3      So what is statistical significance?  It's asking, okay, you

 4   got the number that you got, you got an estimate from a randomized

 5   trial.  Could a number that large, either an absolute value or on

 6   a given number line in one direction, could a number that large

 7   have been generated plausibly by chance if there truly were no

 8   effect?  If there truly were no effect?

 9      So imagine a determined sceptic who says, there really is no

10   effective transaction costs.  So although that sounds to us like

11   someone who denies that water is wet, in this kind of framework

12   you're saying, okay, we're going to forget absolutely everything

13   we know, start de novo and ask:  Could the number we got have been

14   generated purely by chance even if there were no true effect?

15      And, you know, in the study that I -- in the essay, the famous

16   Kish 1959 essay, he kind of goes through chapter and verse,

17   especially through Section 3 of that essay, basically pointing out

18   that the conflation of statistical significance with substantive

19   significance has really set back science because -- and it's

20   especially interesting in the context of a legal case, because in

21   a legal case we're asked as experts to talk about the balance of

22   evidence.  So if you say, well, what did Hassell find about his

23   pre-populated forms versus generic forms, or what did Mann and

24   Mayhew find about e-government postcards as opposed to mailings

25   that actually provided the absentee ballot request form right then

1  and there?  And what's kind of interesting is that both of them

2  find positive effects on absentee voting.  And you would say,

3  yeah.

4      I didn't start de novo because I thought, yeah, if you send

5  somebody an absentee ballot request that they can just fill out

6  right then and there, their transaction costs are reduced, that's

7  likely to have an effect.  So you wouldn't ever, you know, wear

8  the mantle of the determined sceptic turning a blind eye to

9  absolutely everything you know theoretically about transaction

10  costs to analyze this result.

11      And so to summarize, statistical significance is a very

12  mechanical and somewhat mind-numbing activity that is completely

13  antithetical to the question that we're presented with now, which

14  is:  What do we think based on the evidence before us?  If we were

15  betting people and we imagine reproducing the exact same

16  experiment under exactly the same conditions, what would we find?

17  Would it have a zero effect?  Really?  Does anyone think it's

18  going to have zero effect?  Would anybody bet on that as opposed

19  to the number that they actually got?

20      So the idea behind it is let's use our background knowledge

21  and not start de novo as though we were answering an academic

22  question for all time with a single study.

23  **Q.**  Thank you, Dr. Green.

24      So I would like to turn next the SB 202 disclaimer requirement

25  we've been speaking about.

1            MR. JOHNSON:  And, your Honor, I'll give you a heads-up

2    that we'll play a video at some point here, one of my colleagues

3    will pull that up.

4    **A.**   Which tab are you on?

5    **Q.**   I haven't turned to a tab yet, but we'll eventually be pulling

6    up your Plaintiffs' Exhibit 26, which is your initial report.  So

7    you can go ahead and pull that up and turn to page six, please,

8    Dr. Green.

9    **A.**   I'm there.

10   **Q.**   So just what in your general understanding does this

11   disclaimer requirement do?

12   **A.**   The basic requirements of law are to present the disclaimer in

13   a way that is prominently displayed.  So it can't be in small

14   font, it can't be in some recessive part of the form, it has to be

15   prominently displayed.  And it has to have language that I think

16   will cause puzzlement, consternation, confusion, reluctance on the

17   part of people who are encountering it.

18       Why?  Because unlike regular language, it's almost like a kind

19   of -- it's almost like the kind of thing you would see in like a

20   troll's e-mail or troll's social media post with repeated

21   capitalized letters that are designed in some ways to put off

22   voters for no apparent reason.

23       The reading of this thing is especially odd because when you

24   say what is -- what does the disclosure actually require, it says

25   this is not, capital not, an official government publication.  All

```
 1  right.  True.  But it's identical, it's required to be identical
 2  to an official publication.  And was not provided to you by any
 3  governmental entity.  Okay.  True.  And this is not a ballot,
 4  which is -- it's a very strange thing to include, especially again
 5  with a capital not.  Yes, it's not a ballot, it's not a fishing
 6  license, it's not a death certificate, it's not a lot of things,
 7  but no one ever would think this is a ballot because there's
 8  nobody to vote for.  A ballot has something else going on.  So it
 9  seems as though this is a disclaimer that is meant to discredit
10  the form more than it is likely to disclose information.
11      It also requires that you disclose information.  And as we've
12  already seen from some of the other forms that these groups
13  routinely send, they're already disclosing information.  I'm happy
14  to have them to be required to disclose information, but this
15  particular disclosure in my assessment of public opinion, you
16  know, would put off voters.
17  Q.  Let's turn to the actual form that the state has recently
18  posted at its website, and that's Plaintiffs' Exhibit 2.
19  A.  Good.  Okay, I'm there.
20  Q.  So do you see the title at the top of the first page of that
21  document?
22  A.  Yes.  It's Application For Georgia Official Absentee Ballot.
23  Q.  And do you see the gray box at the bottom of the first and
24  second page?
25  A.  Yes.  In fact, I'm going to go to the -- yeah, for the heck of
```

1  it, I'm going to go to the bottom of the first page.  So you're

2  referring to the part that "this is not an official government

3  publication," the one at the very bottom?

4  **Q.**  Yes.  So that's the disclaimer requirement, right?

5  **A.**  That's the disclaimer.  And then just above it?

6  **Q.**  Yeah, just above it, what is that?

7  **A.**  I almost fell over when I read this for the first time because

8  I hadn't seen this form for reasons that I'll explain until we had

9  already gone down -- pretty far down the tracks.  But when you

10  look at the note that --

11            THE COURT:  Give me one second, Professor.

12            THE WITNESS:  Yeah, sure.

13            THE COURT:  Thank you.  Go ahead.

14            THE WITNESS:  The grayish box above the disclaimer

15  reads:  If you receive this application with your information

16  pre-filled, received multiple or duplicate copies in the mail, I'm

17  not sure what the difference is between multiple or duplicate,

18  but, all right, multiple or duplicate, or if an unauthorized

19  person offers to return your absentee ballot application, please

20  report this to reportfraud@sos.ga.gov.

21            Now, that is the thing that would greet your eye just

22  before you saw the disclaimer, so you're in some sense primed to

23  read the disclaimer with a fresh concern about fraud.  And what

24  kind of fraud might you be on the lookout for?  Receiving multiple

25  or duplicate copies in the mail, which is not a -- does not

1  constitute fraud but is precisely the kind of thing that would

2  stir up concern, right?  It's quite likely that people would

3  receive multiple copies because there are so many groups that want

4  to distribute multiple copies.

5          And that is going to be the kind of thing that will be

6  fresh in mind, top of mind as they encountered the disclaimer that

7  says "this is not an official government publication."

8  **Q.**  How in your view do these three parts you just read, how do

9  they relate when they're received by an ordinary voter in Georgia?

10 **A.**  Well, I think the net effect is to lead to confusion because

11 although the form is itself identical to the actual official form,

12 except for the disclaimer, the law prevents a third-party group

13 from actually clarifying that this is the same form that you would

14 fill out online, you would fill out elsewhere but we're saving you

15 a step.

16     So I think it creates this concern that there's something

17 nefarious going on, something concerning.  And I think that that's

18 enough to take a voter who is close to the behavioral threshold

19 and push them on the take-no-action side.

20 **Q.**  So you've said that the -- it will cause confusion or

21 reluctance or concern when an ordinary voter reads those things.

22 On what did you base your opinion on this?

23 **A.**  I guess a few different things.  You know, in -- very

24 importantly it's my facial reading of the text.

25     But, secondly, I've been studying public opinion for a long

1   time, and I would say that one of the things that people who study

2   public opinion very often do is they, especially in classroom

3   situations, will get into almost like a little college bowl game

4   where you're talking about, say, survey experiments where you're

5   varying the wording or the question content or the ordering or the

6   response options and asking:  What do you think the results of

7   these variations will be?  And, you know, I consider myself to be

8   as good as anybody else at that little game.

9        And part of the work that I've done, you know, with campaigns

10  who are interested, for example, in promoting ballot measures is

11  to do experiments where you titrate the wording of different

12  ballot measures until you find the ones that are going to be the

13  most popular with voters.  There's no doubt in my mind that if you

14  put some capital "nots" in a proposition that voters are going to

15  encounter in a disclaimer, in an official form, a person that's

16  already somewhat ambivalent is going to say, I've had enough of

17  this.  So that's my intuition based on public opinion research.

18       And the -- you know, to make sure that I wasn't just kind of

19  dreaming this up, we engaged in a little bit of qualitative

20  semi-structured interviewing, and so that's the next phase.

21  BY MR. JOHNSON:

22  **Q.**  What is the purpose of this qualitative semi-structured

23  interview?  Actually, Dr. Green, maybe would you mind just

24  defining what is qualitative semi-structured interviews.

25  **A.**  So in contrast to a closed-ended interview where you provide

1  respondents with a question and a series of pre-defined response
2  options, a semi-structured interview is one in which you pose a
3  question, very often a very, you know, amorphous question, you
4  know, tell me what you think, and simply hold back and allow the
5  respondent to talk through their mental process as they encounter
6  a stimulus object.  So it could be a movie, or it could be the
7  wording of a question.  In this case, we wanted to get their sense
8  of the form and in particular of the disclaimer.

9      This isn't a causal question, this is the question of -- it's
10  more a phenomenological question, what do they think when they
11  encounter this form?  And we didn't expect to get -- to recover a
12  quantitative answer because a quantitative answer would be a very
13  difficult thing to assess given this research methodology and
14  given, you know, the constraints that we were facing.

15     But what we could get a sense of is when people read this
16  disclaimer, not some hypothetical disclaimer, but the actual
17  disclaimer, what did they make of it?
18  **Q.**  So just to drill down a little bit, what was the primary
19  purpose of conducting this qualitative study?
20  **A.**  I would say the primary purpose was to get a sense of what a
21  non-activist, non-lawyers, non-academics, ordinary people think
22  when they encounter this language.
23  **Q.**  Was the primary purpose whether they would encounter this
24  language?
25  **A.**  You know, I was certainly curious to know whether they would

1  notice it spontaneously, but I didn't necessarily pre-suppose that
2  they would.  If they didn't not notice it spontaneously, I wanted
3  them to notice it, take notice of it and talk through how they
4  read it.

5  **Q.**  You mentioned this semi-structured technique.  What were some
6  of the other parameters that you set on this qualitative study?

7  **A.**  I wanted the interviewer, a woman named Elisa Hamilton, to
8  find ordinary people, so don't go to college campuses, don't go
9  to, you know, some business district, find people who are not
10  lawyers, not politicians, not activists, not student activists,
11  find people perhaps in their day-to-day life.  And so she went to
12  transit centers and interviewed people there.

13    I wanted her to videotape everything that she did so it would
14  be fully transparent and reproducible, not only for other people
15  to look at and critique, but also so that we all could gauge the
16  nonverbal communication that's going on as people go through it.

17    If we had asked Ms. Hamilton to simply give us her field notes
18  and return to us her impressions, we would wonder whether there
19  was some slippage between the comments that were actually given
20  and what she happened to write up.  And that's a common criticism
21  lodged at qualitative research.  So we tried to eliminate as much
22  of the subjective assessment as possible.

23    I wanted her to ask open-ended questions and then hold back,
24  so not intervene.  And it took a few tries to get her to actually
25  do that.  So the example that I adduce in my report is video five,

1  which I think you'll see.  Interestingly, I think she was getting

2  the hang of it in video four, which interestingly is a case where

3  the respondent was unphased by the disclaimer.  So it is not my

4  view that there's something about her method or her that was kind

5  of -- that was going to bake in a kind of recoiled response to the

6  disclaimer, that's not my view, because I'm happy to show you

7  video four where a person's completely unphased by it, even when

8  he's instructed to read it in the same way.

9      But in video five she does I think everything right as well.

10  She's not coaching.  She tells people at the beginning that

11  there's no right or wrong answer.  And she shuts up to allow the

12  respondent to talk through things in a way that isn't time

13  limited.

14  **Q.**  Dr. Green, we'll play video five shortly here, but before we

15  get there you mentioned five videos.  Does that mean there were

16  five respondents?

17  **A.**  Yes.

18  **Q.**  And why did you have five respondents in this type of

19  qualitative semi-structured interview?

20  **A.**  You know, I wanted her to keep going, but by the time we

21  reached five, I had to write my report.  I think it was already --

22  within one day of my report being due.  So in a perfect world we

23  would be going on and on, but, you know, in this particular case I

24  had to wrap it up and move on.

25  **Q.**  You viewed that as sufficient?

**A.**   Well, you know, again, in a perfect world we would have more Georgians, and we would have a broader swath of Georgians, but in this particular case I would say it's sufficient for two reasons.

One is we know from the combination of videos four and five that there isn't necessarily an inherent bias in terms of finding people who recoil at the reading of the disclaimer.  Some do, some don't.  So it's not baked into the research methodology.

The second is what's kind of interesting about these two interviews is that there's no reason in listening to these respondents to think that they were especially responsive, especially affected by this category of treatment, or that they were especially different from other Georgians who might have been found elsewhere.  You will see that these are a rather ordinary people.  They're friendly and talkative, a little bit funny, but, you know, otherwise quite serious.

And I think what's kind of interesting about it is in my experience as a researcher, one of the most interesting things, much to the frustration perhaps of my collaborators and colleagues, is the lack of treatment effect heterogeneity.  What does that mean?  That means that surprisingly, very surprisingly, there do not appear to be many experiments where Democrats and Republicans, old and young, rich and poor, respond very, very differently to survey stimuli.  There are exceptions, but in the case of instances where people are being provided with sort of drab factual stuff, the results tend to suggest that pretty much

 1  everybody moves together with the exception of the super active,

 2  the super engaged, they have an agenda.  But for the typical

 3  American that is not passionately concerned about politics, you

 4  have a relatively similar kind of response.

 5      So if I had to bet, my bet would be if we got another five and

 6  another five and another five, we would find more or less the same

 7  pattern, that when people read this statement with three

 8  capitalized nots, they think maybe there's really something wrong

 9  with this form.

10  **Q.**  Dr. Green, can you just briefly describe do you judge

11  qualitative studies and quantitative studies by the same

12  standards?

13  **A.**  No.  No.  And I think that when I use qualitative studies, I'm

14  using them as measurement tools.  I want to get inside the heads

15  of the people I'm trying to understand and get a sense of how they

16  see the same thing that I'm seeing.

17      So in a lot of my work, especially over the last, say, decade

18  or two, the advanced work before we do a randomized trial is very

19  often to do depth interviews or semi-structured interviews in

20  order to get a sense of whether people are answering the questions

21  that we think we're asking, whether people are evaluating the

22  media portrayals that we think we're presenting.  And in that

23  sense, I think it's very, very valuable but it's fundamentally a

24  descriptive tool as opposed to a tool for causal inference.

25  **Q.**  Was this type of qualitative study, is that consistent with

the standards and practices that are common in your field of

political science?

**A.**  Yes.  This kind of work is quite common, especially among

those who are sort of on the, let's say, behavioral end of

political science as opposed to the people who are congressional

scholars or judicial scholars or Presidential scholars.  The

people who study behavioral politics or public opinion would find

this relatively unexceptional.

**Q.**  Thank you, Dr. Green.

    We'll next pull up and play video five.  In the interest of

time, we'll just play that one.  That's at Plaintiffs' 66.

        MR. JOHNSON:  And, your Honor, we have a flash drive

that we'll present to the Court.  But my colleague is currently

pulling up video five from Dr. Green's analysis.

        (Plaintiffs' Exhibit 66 published in open court)

        MR. JOHNSON:  Thank you.

BY MR. JOHNSON:

**Q.**  So, Dr. Green, what does video five tell you?

**A.**  He didn't like the caption up there.  And I think it was kind

of an interesting thing that the -- the disclaimer had precisely

the effect that I think it was designed to have, which is to just

stir up confusion and distrust.

    By the end, even though he knows it's not a ballot, he's

saying it's not a ballot.  I mean, it's not a ballot, yes, that's

right, but that's sufficient to get him to say I wouldn't fill it

1  out, it would go in the trash.  So he says he's -- he's prone to

2  vote in person, he's not necessarily especially prone to vote by

3  mail, but if he were closer to the behavioral threshold, we would

4  say, well, no way is he going to go this direction if this is sent

5  by a third party.

6  **Q.**  So what do you make of his reference when he's shown the

7  second form as referenced the Secretary of State?

8  **A.**  Yeah, I think the form seems more authoritative to him.  And

9  one could argue, oh, well, then he should just go to the Secretary

10 of State's website and print out the form and fill it out there

11 and then he won't have any misgivings.  But, of course, we know

12 that the extra transaction costs of getting him to take those

13 steps and actually complete them are relatively forboding.

14 **Q.**  Dr. Green, any other videos that the respondents have a

15 negative reaction to the disclaimer?

16 **A.**  Yeah, they did.  For example, in video one.  Video one is not

17 done to my standards, but it is obvious that once the respondent

18 reads the disclaimer, she is taken aback and thinks that there's

19 something suspicious or wrong about it.

20     In video three, it's kind of interesting, once the woman reads

21 the disclaimer, then she basically says a plague on both your

22 houses and doesn't want to fill out any form regardless of whether

23 it's got a disclaimer or not on the grounds that, you know, how

24 can we trust anything?

25     And as I mentioned in the case of video four, it was

1  interesting that even though it went through almost exactly the

2  same language the respondent said, I would fill it out, that

3  disclaimer doesn't matter to me.

4  **Q.**  And in your opinion having done these qualitative studies,

5  were those reactions, sort of organic reactions by the respondent

6  in the end?

7  **A.**  Yes, I think so, especially in the case of four and five.  By

8  that point Elisa Hamilton is hanging back and letting them talk as

9  they read the form.

10  **Q.**  Dr. Green, will you please turn to Plaintiffs' 65 in the

11  second binder.  That's the document that you used to show voters

12  during this study.

13  **A.**  Okay.  I'm there.

14  **Q.**  Is that a true and correct copy of the sample application you

15  used?

16  **A.**  Yes, it is.

17  **Q.**  Does that form contain the required disclaimer?

18  **A.**  It does.  It's at the very top in this case.

19  **Q.**  At the top in that black box there?

20  **A.**  Yes.

21  **Q.**  Why did you use this version of the form for your study?

22  **A.**  Well, at the time that we launched this study, there was, to

23  our knowledge, no form online.  We were unaware that the state was

24  hatching a new form.  So we thought we had to confect one

25  ourselves.  And because the law prevents us from changing the form

 1  in any material way, it seemed as though the only place where you

 2  could squeeze in the disclaimer was at the very top of the form

 3  because the bottom is already quite cramped.  So it wasn't as

 4  though we had some evil purpose in mind putting it at the top, it

 5  seemed as though it was the only actionable step.

 6  **Q.**  In your view was that in compliance with the law having the

 7  disclaimer be clear and prominent?

 8  **A.**  Yes, clear and prominent, and we were not allowed to change

 9  the form.

10  **Q.**  Did you base your opinion concerning the disclaimer

11  requirements solely on this qualitative study?

12  **A.**  No, because, as I mentioned, I was drawing on the wealth of

13  knowledge I've accumulated over decades studying public opinion

14  and also conducting randomized trials and reading about randomized

15  trials involving things like voter turnout and absentee voting or

16  registration.

17  **Q.**  Thank you, Dr. Green.

18          MR. JOHNSON:  Your Honor, we move to admit Plaintiffs'

19  65, which was the sample used in the studies, as well as

20  Plaintiffs' 66, which were the five videos that we've exchanged

21  with Dr. Green the defendants have seen.

22          MR. BARTOLOMUCCI:  No objection.

23          THE COURT:  They're admitted.

24  BY MR. JOHNSON:

25  **Q.**  So moving on from the disclaimer, Dr. Green, will you please

1  turn back to your initial report, which is Plaintiffs' 26, and we

2  can start on page eight.  I'm sorry for the back-and-forth.

3  **A.**  It saves me a trip to the gym.

4      26?

5  **Q.**  26, page 8, yes, please.

6  **A.**  Got it.

7  **Q.**  And here in your initial report do you discuss the SB 202

8  pre-filling prohibition?

9  **A.**  Yes.

10 **Q.**  And what, in your general understanding, does the pre-filling

11 prohibition do?

12 **A.**  Except in instances, I think, involving disability, you're not

13 allowed to pre-populate a form with information that essentially

14 gives the voter a head start.  So, for example, their name or

15 their address.  So as a result, your -- the effect of the

16 prohibition is to just raise a few grains higher the, you know,

17 transaction costs.

18 **Q.**  So why do civic organizations engage in pre-filling voting

19 materials, can you just explain that?

20 **A.**  It is quite interesting to think about why they're doing it

21 because it is much more expensive.  It's much more expensive to

22 customize every single piece of mail.  It requires a vast, you

23 know, kind of baggage train of logistics, not to mention, you

24 know, data-basing and programming and all that kind of stuff.

25      So why do they do it?  Because these are fairly lean

1  organizations and they are very evidence-driven organizations.  I

2  don't think it's easy to appreciate the extent to which these

3  particular organizations have conducted randomized trials long

4  before other people -- other groups thought that was interesting,

5  thought that was a worthwhile activity.  They were doing it not

6  long after I started doing it, and it was darn rare when I did it

7  in the 1990s.

8      What's kind of interesting about it is they know full well

9  that it's worth the extra money to have this customization because

10 they know from their own internal experience based on randomized

11 trials that it works.  And you can sort of see that in the

12 research literature that I adduced, which is different because

13 it's public-facing research literature, where as what they're

14 focusing on is proprietary literature that isn't disclosed to

15 academics like me.

16 **Q.**  In what other contexts have you observed pre-filling being

17 used, like that technique?

18 **A.**  You certainly see it all the time in commercial transactions.

19 You know, you pretty much -- in fact, I had to change my ticket --

20 not to complain, I had to change my ticket because I was

21 originally scheduled to leave at 6:10.  So when I changed my

22 ticket, my Visa is pre-populated everywhere.  You know, all I have

23 to do is click to send it off because they don't want me to back

24 out.

25 **Q.**  So going back to this pre-filling prohibition, what will be

1   the effect on civic organizations or 501(c)(3) or (c)(4)

2   organizations?

3   **A.**   It essentially kneecaps them.  It prevents them from doing the

4   thing that is most efficient in terms of messaging.  So what it

5   means is for them to achieve the same goals of encouraging people

6   to actually get over the threshold and cast an absentee ballot is

7   going to take a larger avalanche of mail to do so.  So it's going

8   to cost them money.

9   **Q.**   How will the pre-filling prohibition affect voters?

10  **A.**   Well, I can say that in two ways.  First of all, they're

11  likely to be -- have more mail inflicted on them.  But, secondly,

12  and more importantly, when they fill out the forms, they're likely

13  to introduce incidental errors insofar is the material -- the

14  database that would ordinarily be used to populate the form comes

15  from the voter file.  So to the extent that their handwriting is

16  illegible or that they make minor mistakes in writing out their

17  address or other kinds of information, now that puts a burden on

18  election officials to adjudicate minor disputes between what

19  they're putting in and what's already on the file.

20  **Q.**   So when you mention the pre-populating the form with accurate

21  information, that's being drawn from the voter file, correct?

22  **A.**   I believe so, or at least -- even if the voter file is being

23  augmented by other files, typically the voter file information is

24  used to fill this part in because nobody wants to get this wrong.

25  This information has already been vetted by the registrar and is

1   already part of the, you know, official reference point.

2   **Q.**   And that applies to vote-by-mail mailers, correct?

3   **A.**   Correct.

4   **Q.**   And so that wouldn't be the case for a registration mailer?

5   **A.**   That's right, that's altogether different.

6   **Q.**   So on what did you base your opinion about the pre-filling

7   prohibition, the effects on civic organizations, voters and

8   election officials?

9   **A.**   Well, you know, I think that a lot of it just has to do with

10  this basic microeconomic theory of transaction costs.  But beyond

11  that and beyond the usually theoretical intuitions about

12  transaction costs, there's also the study by Hans Hassell, which

13  is a randomized trial, which he basically compares pre-populated

14  forms to generic forms and examines the consequences for the rates

15  of absentee voting and voting in general.

16  **Q.**   Can you turn to Plaintiffs' Exhibit 46.  This is your rebuttal

17  report.  On page 8 do you discuss the Hassell report there?

18  **A.**   I think there's a Marx Brother's routine that is predicated by

19  this idea of having a whole bunch of binders set in Santa Anita

20  Racetrack.

21      I realize my confusion.  There's 46.  Okay.  Which page?

22  **Q.**   Page 8, please.

23  **A.**   Got it.

24  **Q.**   So can you describe, what was the Hassell study?

25  **A.**   So the Hassell study is a randomized trial conducted in the

1  State of Minnesota focusing on a target population of

2  non-Democrats.  So this is a Republican campaign to register

3  non-Democrats -- I'm sorry, not register.  To get them to vote

4  absentee.  And it's a randomized trial involving thousands of

5  people who are assigned to the three conditions:  A control

6  condition that receives nothing; a generic condition; and a

7  pre-filled condition.

8      And the question of the study is to what extent does the

9  pre-filled condition lead to an uptick in absentee voting and

10  voting more generally?

11 **Q.**  So when you say an "uptick," can you affix a number to what

12  the study showed?

13 **A.**  Yes.  So quoting actually Dr. Grimmer's report, on page eight

14  it's -- Hassell reports that 2.57 percent of the individuals who

15  received a pre-filled ballot application voted by absentee, while

16  2.05 percent voted absentee received a generic absentee ballot

17  application.  That was from his report on Section 33.

18 **Q.**  So what does that mean in sort of real-life understanding,

19  2.57 versus 2.05?

20 **A.**  So if you divide 2.57 by 2.05 and subtract 1, you see that's a

21  25 percent increase in success.

22 **Q.**  A 25 percent increase in success in pre-populated versus

23  generic?

24 **A.**  Correct.  So pre-populated is clearly superior, as one would

25  expect based on intuition.  So it's kind of silly to say, yes, but

1  could it have been explained by a world in which there was no true

2  effect?  No.  Nobody is going to be betting against pre-populated

3  forms.

4  **Q.**  So if you turn just to the next page, on page nine of your

5  rebuttal, you have there Dr. Grimmer's conclusion that this isn't

6  statistically significant.  Do you agree with that?

7  **A.**  I agree that by the usual academic standards of the 5 percent

8  threshold, which, incidentally, is not rooted in any theorem, it

9  was purely kind of seat-of-the-pants conjecture by RA Fisher in

10  the 1920s.  It's not as though there's something about 5 percent

11  that is magical.

12      At any rate, he says, look, the probability that you would

13  have seen an effect as large as one sees the pre-populated effect

14  being in the Hassell study, if there truly were no effect, is

15  about 20 percent, and that's about 5 percent.  Therefore, this

16  result is not statistically significant.

17  **Q.**  Why is it nonetheless significant for this case?

18  **A.**  Well, the question before us presumably is what do we conclude

19  in light of this evidence about the effectiveness of

20  pre-populating a form?  Not could a determined sceptic potentially

21  have it right?  No.  It's to say if you were casting a bet, what

22  would your best guess be?  And the answer would be:  You would

23  guess that pre-populated forms increase turnout overall, and

24  absentee voting in particular.  And, moreover, the chances that

25  the true effect is zero, it's about eight or nine to one against.

 1    So it's true that the academic standard tends to be 19 to 1,

 2  but it's a purely arbitrary standard.  And if we're asking the

 3  balance of evidence in a court proceeding, 9 to 1 is a pretty long

 4  bet.  And that seems like pretty convincing evidence.

 5    And the most important thing is, remember, that calculation

 6  pre-supposes that we turn a blind eye to absolutely everything

 7  else we know, including our theoretical intuitions about the world

 8  and transaction costs.

 9    So, yes, if we knew nothing about transaction costs -- if

10  you went to the cafeteria at lunchtime and you knew nothing about

11  transaction costs, you saw that when they opened up the new

12  cashier line, right, are you really saying that nobody would go to

13  the new cashier because they're just indifferent between the line

14  they're in and the line they could join?  No.  Of course,

15  everybody wants to go to the faster line.  So they open up the new

16  cashier line and half the people go to the new cashier line.

17  That's the underlying theory here.  It's exactly the same theory.

18    So it's no accident that these 501(c)(3) and 501(c)(4) groups

19  want to send pre-populated forms and they're willing to spend the

20  extra money to do it, because even though they spend extra money,

21  it's still worth it.

22  **Q.**  So setting aside any preconceptions and you were just to read

23  the Hassell study and you had to bet on pre-populated form or

24  generic form, what's the betting odds involved there?

25  **A.**  It's about eight or nine to one in favor of the pre-populated

1  form.

2  **Q.**  Would you please turn to page 12 of the same document, of your

3  rebuttal report, Plaintiffs' 46.

4  **A.**  Okay.

5  **Q.**  If you look at the last paragraph, the second sentence, what

6  does that say?

7  **A.**  This is -- Hassell studied only Republicans and Independents,

8  not Democrats.

9       MR. JOHNSON:  Your indulgence, your Honor, one moment.

10  **A.**  My mistake.  I apologize.  It's -- he writes, "he" being

11  Dr. Grimmer:  It is impossible to know if the results of the

12  Hassell study will extrapolate to Georgia.

13  **Q.**  Yes.  That's the second sentence in the first paragraph.

14       So do you agree with that conclusion?

15  **A.**  Well, not at all.  And it's not because it's an unusual

16  viewpoint, it's just that I think that it's completely at odds

17  with the things that I've learned for more than two decades of

18  conducting randomized trials.

19       What's really surprising, and perhaps even disappointing to

20  scholars, is that there isn't more treatment effect heterogeneity.

21  Why?  Why is that disappointing?  Because scholars absolutely love

22  a good story about how a treatment effect works really well for

23  Democrats but badly for Republicans or vice versa, or it works

24  great for, you know, young people, but badly for old people.  I

25  mean, that's a fast path to publication.

 1      And what's interesting is you just don't see very much of it.

 2  I mean, you want to see it.  And it's no accident, for example,

 3  that Mann and Mayhew trot this out, too, because everybody is

 4  curious about it.  But what's so interesting about these studies

 5  is when they mount up, you just don't tend to see a whole lot of

 6  evidence that state-to-state variation causes very different

 7  responses to Get Out The Vote drives, absentee ballot drives.

 8      And going back to the Barber and Holbein study that I

 9  mentioned earlier about the effect of going to an all vote-by-mail

10  system in states like Utah is that they find there's no partisan

11  effect.

12      Remember when everybody was worried about the consequences of

13  vote-by-mail for partisan outcomes?  There's a huge literature,

14  and it's the most boring literature in political science, showing

15  again and again that nobody can find a partisan effect.  Nobody

16  has ever found a partisan effect.  Why is that?  Because the

17  movement to an all vote-by-mail system has about the same effects

18  on Democrats and Republicans.

19      So the premise of Dr. Grimmer's critique is at odds with this

20  vast literature suggesting that state-to-state treatment effect

21  heterogeneity is negligible.  Party-to-party treatment effect

22  heterogeneity is negligible.

23      So, yeah, it's possible that Minnesotans are different than

24  Georgians, but the example that Dr. Grimmer gives is that

25  Democrats will be less likely to be influenced by the vote by

1  absentee ballot appeal because they're already closer to the

2  behavioral threshold, they're already more likely to vote by mail.

3  But that's backwards.  There are more Democrats who are closer to

4  the behavioral threshold of actually doing it, so presumably the

5  effect should have been larger if the Hassell study were done

6  among Democrats.

7      So I don't really think there is much evidence of

8  heterogeneity.  But if there is evidence of heterogeneity, then

9  there's not much sense to this critique.

10 **Q.**  Just in total what role does pre-filling an absentee ballot

11 application play in terms of voter transaction costs?

12 **A.**  I think it reduces them.

13 **Q.**  Dr. Green, next I would like to talk about the mailing list

14 restrictions, so if you don't mind grabbing your initial report on

15 Plaintiffs' 26 at page 9.

16     Can you just, again, give a general -- your understanding of

17 what does the mailing list restriction do.

18 **A.**  Essentially it says that with, you know, various unusual

19 exceptions you cannot mail applications to individuals who have

20 already requested, received or voted an absentee ballot.

21 And there's special excuses having to do with extenuating

22 circumstances, but basically the main excuse is if such person or

23 entity relied upon information made available by the Secretary of

24 State within five business days prior to the date such

25 applications are mailed.

**Q.**  So what in your professional opinion will be the effect of this mailing list restriction on civic organizations?

**A.**  Well, I think that the effect is slightly different depending on whether we're talking about a relatively small scale unprofessionalized group, like a church group, or a fairly sophisticated group, like the plaintiffs.

For a sophisticated group like the plaintiffs, sending out vast amounts of mail, the fact that there are now going to be fines and potentially criminal penalties per infraction will essentially put them out of this business.  Why?  Because the rate of error, even if it's something like a hundredth of a percent error, becomes so ominous that I think that their staff will just quit if they even broach the subject of doing this.  Because suppose you send out, as I give in my example in my rebuttal, you know, something like 500,000 mailings and you end up with 50 infractions, if we're talking about criminal penalties of up to a year per infraction, you only need like a whiff of grapeshot from an overzealous prosecutor and everybody quits because nobody is going to engage in any kind of activity that's going to subject them to jail time.  Because even if the judge were to give them one day per infraction, what kind of employee is going to suffer that risk?  So I think it becomes a risk that puts this activity completely out of reach of these groups.

I also think that for the large groups, you know, even a hundredth of a percent error rate, even the most innocent and

1  well-oiled machine cannot sift through millions of people --

2  millions of pieces of presorted people-specific mailings on

3  pallets sorted by, you know, postal order, I mean, just -- just

4  kind of -- give yourself a kind of thought exercise.  What would

5  it take to extract, say, a thousand offending mailings from

6  pallets containing 2 Million mailings?  That's like -- I mean,

7  it's beyond a needle in a haystack.  I don't think people are

8  imagining 2 Million pieces of hay from the haystack from which

9  they're trying to extract the needle.  This is a much bigger

10 haystack than anyone can even imagine.  And if you don't do it

11 exactly, you're subject to criminal penalties as well as fines,

12 but I think it's the criminal penalties that are the most ominous

13 here.

14 **Q.**  What about the five-day grace period that we've been

15 discussing?

16 **A.**  Well, I think the five-day grace period is just completely out

17 of keeping of the realities of the processing of mailings this

18 large.  And for small groups, like the church group, I don't know

19 if they have the professional staff in order to, you know,

20 actually do the daily reckoning of the state's updated list in

21 order to catch their mailings in time.  I mean, maybe they do, but

22 maybe they don't.  But I'm guessing that the moment they get a

23 whiff of the potential criminal penalties, they'll say, we're

24 going to try to find a different way to --

25 **Q.**  How might this restriction effect research campaigns like

along the lines of Hassell or Mann and Mayhew?

**A.**   I don't think anybody would take this kind of risk, because if you're conducting an experiment on the Hassell scale, where I think one of his treatment groups has 25,369 people, even if you have a tiny error rate, you could basically put your research group out of business.

**Q.**   So who do civic organizations want to send their absentee ballot application communications to?

**A.**   They want to send them to voters who are close to the behavioral threshold, but not anybody who actually has already cast a ballot or somebody who doesn't have already in hand an application.

So, I mean, that's what's kind of funny.  When I first read SB 202, I thought, aren't the incentives already pretty well aligned? These are very lean and evidence-based groups, they don't want to waste a lot of money.  And so it's true that they believe that the more the more, but the reason they think that is because they think they're targeting voters who are just, you know, very, very difficult to move over the behavioral threshold.  But if they thought that somebody already voted, they would never send anything to them.

**Q.**   Speaking of incentives, what is the effect of these potential penalties on civic organizations overall?

**A.**   I think it puts them out of the business of distributing this form.

1          MR. JOHNSON:  No more questions, your Honor.  I'll pass

2     the witness.  But I would like to -- I forgot to move into

3     evidence Dr. Green's CV, which is Plaintiffs' 54.

4          MR. BARTOLOMUCCI:  No objection.

5          THE COURT:  It's admitted.

6          Let's take a five-minute comfort break, and then I

7     assume the defense may have some questions.  And then we'll figure

8     out what we're going to do as far as tonight versus tomorrow.

9     Thank you.

10          MR. JOHNSON:  Thank you, your Honor.

11          (After a recess, the proceedings continued as follows:)

12                         CROSS-EXAMINATION

13     BY MR. BARTOLOMUCCI:

14     **Q.**  Professor Green, just to reintroduce myself, I'm Chris

15     Bartolomucci.  I represent the defendants in this action.  Why

16     don't we start by talking about your opinions with respect to the

17     disclosure provision of SB 202.

18        Now, in your expert report you opine that the disclosure

19     provision is likely to discourage voters from filling out the

20     application.  That was and is your opinion, correct?

21     **A.**  That's correct.

22     **Q.**  Now, you admit, don't you, that some parts of the disclosure

23     provision are true --

24     **A.**  Yes.

25     **Q.**  -- such as the provision that -- the part of the disclosure

1   that says "this is not a ballot"?

2   **A.**   Absolutely true.

3   **Q.**   That's true?

4   **A.**   It's not a marriage license, it's not a lot of things.

5   **Q.**   But it's not a ballot?

6   **A.**   Not a ballot.

7   **Q.**   And the part of the disclosure that says that it's not -- it's

8   not being distributed by a government entity, you have no quarrel

9   with that one, correct?

10  **A.**   No.

11  **Q.**   So, Professor, your opinions about the disclosure provision

12  are in Section 2 of your expert report, pages 6 through 8 --

13  **A.**   Is that 26?

14  **Q.**   I'm afraid I don't know where your report is in your binder

15  but...

16  **A.**   We'll just go for it.

17  **Q.**   It's Section 2 of your report, pages 6 through 8.  In that

18  section on those pages, Professor, did you cite any published

19  studies?

20  **A.**   No.

21  **Q.**   Did you cite any published literature at all in that section

22  of your report?

23  **A.**   No.

24  **Q.**   Professor, I'm trying to understand what methodology you used

25  to arrive at your opinions about the disclosure provision.  Am I

1  right that at least in large part your methodology was simply to

2  read SB 202 and write down what you think about it?

3  **A.**  It's sort of funny to think of how long I've been doing this.

4  I mean, when I first started in the survey biz, I had a full head

5  of hair and, you know, Jimmy Carter was in office.  So it's been a

6  long time.  And that's why I feel as though I have a rather good

7  grasp on voter's likely reactions to things.  And I think that's

8  been sharpened over the years by two things:

9  One is that I'm a voracious reader.  It's kind of a nerdy-type

10  thing, but I read extensively, public opinion research, especially

11  experimental research that looks at the effects of presenting

12  people with stimuli very much like this.

13  And then the other is I think having done enough work where

14  one is randomly varying the ballot propositions that are presented

15  to voters and examining the consequences for their willingness to

16  vote for a proposition gives one a very clear sense of this sort

17  of seat-of-the-pants intuitions that voters themselves employ when

18  they are reading a statement with lots of capital letters saying

19  "not" three times.

20  **Q.**  Well, forgive me, Professor, but what I hear you saying is,

21  trust me, I'm an expert, is that fair?

22  **A.**  I'm an expert.

23  **Q.**  Okay.  Can you tell me what methodology you used to develop

24  your opinions with respect to the disclosure provision of SB 202?

25  **A.**  I would say the method is to give a fair and honest assessment

1  of the corpus of work that I've encountered in public opinion

2  research for more than three decades.

3  **Q.**  In your report you discuss the prestigious political science

4  journals in which you have published.  You cited American

5  Political Science Review, American Journal of Political Science,

6  the Journal of Politics.  Have you submitted your analysis of SB

7  202's disclosure provision for publication in any of these

8  journals?

9  **A.**  No, I have not.

10  **Q.**  Have you submitted your analysis for publication in any

11  journal?

12  **A.**  Sorry, the analysis of SB 202?

13  **Q.**  Yes.  In particular, the disclosure provision.

14  **A.**  No.

15  **Q.**  Do you intend to submit your analysis of the disclosure

16  provision for publication in any journal?

17  **A.**  No, I really haven't thought about it until you raise it now.

18  You know, my wiseable dissertation advisor used to say don't do it

19  unless it's publishable or tax deductible.  Maybe I should give

20  some thought to it.

21  **Q.**  Do you think it's tax deductible?

22  **A.**  Probably not.

23  **Q.**  Do you think it's publishable?

24  **A.**  Well, I think it all depends on what the audience is.

25      You know, one interesting thing about this is if it -- if I'm

1   correct in my intuition that this law is going to put 501(c)(3)s

2   and 501(c)(4)s out of the business of distributing these kinds of

3   voting aid-type applications, then it probably would be something

4   to write about because it's a good example of the interplay

5   between legislative politics and electoral politics.

6   **Q.**   So you have this intuition.  And, I guess, one of the things

7   you did to try to test it somewhat was the procedure with the

8   interviewing the five Georgians, is that right?

9   **A.**   That was part of it, yes.

10  **Q.**   So let's talk about that.

11      Who is Ms. Hamilton, the person who did the interviewing?

12  **A.**   She is the principal of a research firm, I think it's called

13  Harvest Research.  So she does essentially market research.  And

14  we did not need somebody -- in fact, I didn't even want somebody

15  who was a political pollster, I wanted somebody who was more like

16  a farm fresh egg, a person who's avuncular, friendly, willing to

17  go off into the world and interview people in the wild.  And

18  that's why there was a learning curve involved because she hadn't

19  done this kind of work before.

20  **Q.**   How did you come to know her?

21  **A.**   I honestly don't recall how we came to her.  I just -- I can't

22  reconstruct the sequence of events that led us to her, but I

23  remember that one day I was told, well, here's a person who might

24  be good for us, can you interview her and see whether she would be

25  suitable.

1  **Q.**  So she wasn't, at least initially, your choice?

2  **A.**  No, because I didn't know anybody in the area whom I could

3  call on for this kind of hurry-up, ASAP kind of job.  And I think

4  it -- I couldn't ask my friends at Emory because it's not as

5  though they're going to drop everything and conduct a

6  qualitative interview.

7  **Q.**  Who was it that suggested Ms. Hamilton for this hurry-up job?

8  **A.**  This is the part I can't recall.

9  **Q.**  You can't recall, okay.

10  Did you meet with her before she went off to do her thing?

11  **A.**  Yeah.  Well, we met online, not face to face.

12  **Q.**  Okay.  Zoom call?

13  **A.**  Zoom call indeed.

14  **Q.**  When did she conduct these five interviews?

15  **A.**  It was roughly the week before I submitted my report.  I don't

16  remember the exact start date, but it was on or about May 11th.

17  So the reason it's material, and I'm sorry that I don't have

18  it at the top of my head, is that we started these interviews

19  before the state apparently finalized its form online, and that's

20  why we used a non-standard form.  In a perfect world I would have

21  much preferred to use their actual form, and I think it actually

22  would have made the point more compellingly.

23  **Q.**  Did she do all five interviews on the same day?

24  **A.**  No, I think she did them over time, because I remember giving

25  her feedback about some of the early interviews before she went on

1   to do the culminating interviews.

2   **Q.**   So over what period of time did it take to get these five

3   interviews?

4   **A.**   I think it was something on the order of five or six days.  I

5   don't think they were done specifically on a particular day

6   because, you know, she had a busy schedule, she was doing this as

7   time permitted.

8   **Q.**   Now, did you instruct her to go and interview five people and

9   only five?

10  **A.**   I instructed her to do as many interviews as she could, you

11  know, given the constraints.  And so I -- and then after each one

12  I wanted to get the video and review it for myself.

13  **Q.**   I'm now recalling that I think you testified on direct that

14  you actually wanted her to do more, but you ran out of time

15  because you had to write your report, is that right?

16  **A.**   That's right.

17  **Q.**   Okay.  Did she interview people other than those five?

18  **A.**   No, not -- at least not so far as I know.  I haven't seen any

19  videos other than the ones that we shared.  And, indeed, you know,

20  that was the whole point in some sense, to do the kind of

21  transparent disclosure of all the videos.

22  **Q.**   And did you tell her to go to a train station or a bus station

23  to do the interviews?

24  **A.**   No, I just told her to go find people, you now, ordinary

25  people where they happen to be, wherever they can be found,

1  wherever they might be friendly.  So it could be a supermarket, it
2  could be anywhere.
3  **Q.**  Was this Atlanta where she conducted the interviews?
4  **A.**  I believe so, yes.
5  **Q.**  Is she from Georgia?
6  **A.**  I believe so, yes.
7  **Q.**  Did she pick the people she interviewed at random?
8  **A.**  I don't think the technical term "random" would describe her
9  sampling method because random literally means you enumerate a
10 population and then you use a known probabilistic process to
11 select a particular respondent, and I don't think that she did
12 that.  I think what she did was scope out an area where a person
13 wasn't sitting so close to other people that they couldn't be
14 interviewed more or less in private, and then she accosted them.
15 **Q.**  How did she pick out who she would talk to?
16 **A.**  I think that it was that process, find somebody whose
17 seemingly sitting alone and intercept them and ask them would they
18 be willing to do this for a little bit of money, and, you know,
19 whether they would be willing to sign a consent form to allow it
20 to be shared with people like me.
21 **Q.**  What did you just say about money?
22 **A.**  I think they were paid in order to conduct this interview.
23 **Q.**  Oh, I didn't know that.  I didn't read that anywhere.
24 **A.**  I don't remember what the amount was.  It was not a big
25 amount, but it was the kind of thing that was -- basically the

 1  kind of thing you would do with any respondent, you usually pay

 2  them for their time.

 3  **Q.**  Well, help me out.  How much were they paid?

 4  **A.**  I would have to just get more information and get back to you

 5  on that.  I think it's something in the order of $10, $5.

 6  **Q.**  Would you mind doing that, would you let us know how much each

 7  of them was paid?

 8  **A.**  I would be happy to.  It's not an out-of-the-ordinary thing in

 9  the context of these kinds of surveys.

10  **Q.**  Now, did she approach some people who refused to talk to her?

11  **A.**  I assume so, although I really don't know the issues

12  associated with non-response.  I couldn't quite get a sense of who

13  the broader group was who did or didn't cooperate.  And as you

14  could see from I believe it's interview three, some of the people

15  were willing to talk but were about to catch the next train, so

16  their availability was constrained.

17  **Q.**  It made me wonder whether the train station was an appropriate

18  place to do these interviews.  In the one video there's -- the

19  interview gets cut short because the train is coming up and the

20  interviewee has to go get on the train, right?

21  **A.**  Yep.

22  **Q.**  But you said you didn't yourself suggest a train station or

23  bus station?

24  **A.**  No.  No.  But I think that the train station has pros and

25  cons.  The good thing about it is that people are chilling out,

1  waiting for something that's going to happen in a few minutes and

2  they are willing to talk because they have nothing better to do.

3      It's also the kind of place where you wouldn't -- it wouldn't

4  seem so out of the ordinary to talk to a stranger in a train

5  station or bus station, transit station.  So I think that those --

6  in that sense it's conducive to this kind of convenient

7  sample-type interviewing.

8  Q.  She got five interviews over the course of I think you said

9  five or six days.  Is it wrong for me to think that she had

10 trouble getting people who were willing to talk to her on camera?

11 A.  Yeah, I don't get a sense that it was difficult for her to get

12 the interviews.  It sounded as though the limiting factor was just

13 her scrambling from one thing to the next, you know, in her other

14 work.

15 Q.  But she spent five days on this and got five interviews?

16 A.  Not five continuous days.  There were five days altogether or

17 there were -- five days elapsed and then she delivered the videos

18 four and five, which were the culminating videos, but it wasn't as

19 though she was working steadily on this.

20 Q.  Okay.  But it seems to me that she didn't have much to show

21 for her efforts, is that unfair?

22 A.  I don't know.

23 Q.  Now, I noticed that all five of the interviewees are

24 African-American.  Was that a deliberate choice?

25 A.  No, not on my part.

1   **Q.**  Could it have been on her part?

2   **A.**  Not necessarily because those were not -- those were not the

3   instructions.

4   **Q.**  So you don't know whether she decided to pick out only

5   African-Americans?

6   **A.**  My sense is that she would have talked to anybody in those

7   transit stations or in the transit station where she went

8   repeatedly, but that was the clientele that day or those days.

9   But I did not give her specific instructions to focus on any

10  particular group.

11  **Q.**  So you'll agree with me that the five persons that

12  Ms. Hamilton interviewed are not representative of the Georgia

13  electorate as a whole?

14  **A.**  Well, yes and no.  I mean, you know, we don't have ID cards

15  that state our race.  So whether somebody's, you know, black or

16  not is kind of -- it's kind of a matter of conjecture as to

17  whether that makes them unrepresentative.  With that said --

18  **Q.**  The Georgia electorate is not 100 percent African-American,

19  right?

20  **A.**  Granted, but that's only one way to classify them.  Another

21  way to classify them would be to say, you know, are these the

22  kinds of people that have the level of information about politics

23  or the interest of politics that would be typical of Georgians?

24  And in that sense I kind of got the sense from their interviews

25  that the answer is maybe they're about average.

**Q.**  Now, did you script the questions for Ms. Hamilton?

**A.**  In a way, yes, because I told her what I wanted her to say.
And as -- again, as the learning curve progressed, in particular
after I saw the first couple, I wanted her specifically to say
there are no right or wrong answers, we're not looking for a
particular answer.  And I also wanted her to hold back and say
less so that respondents would fill in the blanks and say more.

So this in particular meant if they didn't notice the
disclaimer, I wanted her to ask them what they make of it.

**Q.**  I think I heard you say that you were really only happy or
most happy with the fifth interview?

**A.**  Fourth and fifth.

**Q.**  Fourth and fifth?

**A.**  The fourth was, you know, not consistent with my hypothesis,
but the fifth was.  But it wasn't as though I was tallying it up.
I'm not trying to make the qualitative study a quantitative study,
I'm simply asking did she do what I wanted her to do, which was
to get people to talk through their thoughts as they read the
disclaimer so that it's not my perspective, it's their
perspective.

**Q.**  Now, you already told us that in the version of the form that
had the disclosure, you put it on top?

**A.**  Yes.

**Q.**  But now you understand that the version published by the
Secretary of State actually puts it on the bottom?

**A.**   That's right.  But importantly, sir, it puts it on the bottom right below the other warning about fraud.  So my strong suspicion is that if we went back to those transit centers and we found some new respondents that were very much like the respondents we had before and we had them, again, talk through their reactions to those two boxes, I think it would be much more negative.

**Q.**   You may suspect that, but you haven't done that analysis, have you, sir?

**A.**   I'm a betting man.  I'm willing to bet on it.

**Q.**   Can moving the location of the disclosure on the face of the form affect the influence, if any, it has on a voter?

**A.**   Possibly.  Although what's kind of interesting is, you know, there's one question, which is:  Will people notice the disclaimer spontaneously?

And another question is:  Given that we want them to talk through the disclaimer once, conditional on reading it, what will their reaction be?

And so this study was curious about the first but mainly was focused on the latter.  So in that sense, I don't think it made much of a material difference as to whether it was on the top or the bottom.

**Q.**   Now, none of the five noticed it spontaneously?

**A.**   That's right.  However, the funny thing is that's a rather ironic twist to -- you could hardly defend the law on the grounds that, well, some people might not notice this off-putting

1  disclaimer.

2  **Q.**  But isn't it fair for the state to assume that they're not

3  going to be reading it at the train station?

4  **A.**  Very well.  But then this question of what is the effect

5  conditional on reading it is kind of off the table.  Now you're

6  saying, well, if they really were at their kitchen table, they

7  would read it.

8  **Q.**  Now, in your report you quoted comments only by interviewee

9  number five, right?

10  **A.**  Yes.

11  **Q.**  Why didn't you quote anybody else?

12  **A.**  Well, I thought it was -- what was interesting about number

13  five is that number five is a bit -- number five functions a bit

14  like an existence proof.  Like when you watch number five read the

15  disclaimer and simply give his verbal and nonverbal reaction, you

16  realize that is what this disclaimer was designed to elicit from

17  people, this kind of visceral reaction that says I would just

18  throw it in the trash.

19  **Q.**  So basically interviewee number five fit your preconceived

20  notion of the effectivity of the form, right?

21  **A.**  No, no, no.  It's not that five is consistent with my

22  hypothesis because I was perfectly happy to talk about four, it's

23  just that -- the point about five is that lest you think that no

24  ordinary voter would read this disclaimer and recoil at it, no,

25  no, no, it clearly has -- it is possible for this disclaimer to

```
 1  generate suspicion and reluctance, and that's what five
 2  illustrates.
 3       Now, four is very important, I wish I had spent more time
 4  talking about four because four says the research methodology is
 5  not baking in that kind of effect.  Some people don't care.
 6  Q.  By the way, did you write your report yourself?
 7  A.  This report?
 8  Q.  Your expert report, yeah.
 9       Did you write it yourself?
10  A.  Yes, I did.
11  Q.  Did you have an assistant help you?
12  A.  I certainly got lots of feedback from counsel, but I did not
13  have an assistant.
14  Q.  So no one drafted it for you?
15  A.  No.  The mistakes are purely my own.
16  Q.  Now, Ms. Hamilton asked a lot of leading questions, didn't
17  she?
18  A.  In the beginning, you know, and that's why I regard interview
19  one and two and maybe a little bit of three as, you know, part of
20  the learning curve.  And I tried to coach her and say, look, I
21  don't want you to ask -- I don't want you to interrupt people.
22  Coaching is kind of secondary, I just don't want you to interrupt
23  people, let them talk.
24  Q.  So, she asked the first interviewee, quote, "Now, is there
25  anything about that form that looks out of place or that you would
```

1   have concerns about filling out," end quote.  She asked that,

2   didn't she?

3   **A.**   She did.

4   **Q.**   That's a leading question, isn't it?

5   **A.**   I think it's kind -- the answer to -- it is a -- it's asking a

6   question that addresses a research question other than the one

7   that I wanted to pose.  It's an interesting question as to whether

8   or not when you ask somebody is there something wrong with this,

9   they say yes or no.  But that's not what I wanted to do.  I wanted

10   them to simply talk through the disclaimer so they could tell us

11   what goes through their minds.

12   **Q.**   The first interviewee's answer was, quote, "I don't see

13   anything out of place from what I'm looking at," end quote?

14   **A.**   Right.

15   **Q.**   Let me repeat that, "I don't see anything out of place from

16   what I'm looking at."  She said that, didn't she?

17   **A.**   Correct.  By the way, I regard that as a strike in

18   Ms. Hamilton's favor.

19   **Q.**   Now, the first interviewee also said, I'm not really a voter,

20   remember that?

21   **A.**   Yes.

22   **Q.**   Did Ms. Hamilton ask if these interviewees were registered to

23   vote?

24   **A.**   No.

25   **Q.**   Did she ask whether they were regular voters?

**A.**   No.  Although, interestingly, you'll notice that some of the voters, including number four and five, volunteered that information.  And from the standpoint of a semi-structured interview, that's better, because if we had asked them, are you a voter, now the expectation is they've got to look at the form as though they're defending their credentials as a voter, so not asking it doesn't prime them in that way.

**Q.**   The first interviewee didn't say anything about the disclosure until Ms. Hamilton drew her attention to it and asked about it specifically, right?

**A.**   Correct.

**Q.**   Now, the second interviewee, Ms. Hamilton asked her, quote, "Do you notice anything different about it or is there anything that would make you concerned or question it," end quote?  Wasn't that her question?

**A.**   That was her question.

**Q.**   And I pronounced the word "concerned" the way I did deliberately because I think that's --

**A.**   I hope it gets into the record with extra Os.

**Q.**   Concerned.

        MR. BARTOLOMUCCI:  That's going to be hard to transcribe.  Good luck.

**Q.**   And the answer from the second interviewee was, quote, "As far as what," end quote, right?

**A.**   Right.

1 **Q.** Have you ever heard the phrase "garbage in, garbage out"?

2 **A.** I have indeed.

3 **Q.** What does that mean?

4 **A.** You know, I think in different disciplines it means different

5 things, but basically it is -- it's a way of disparaging weak

6 thinking on the grounds that if it's based on faulty premises, the

7 implications are dubious.

8 **Q.** I'm not saying she did, but if Ms. Hamilton asked bad

9 questions, then she would get bad data as a result, right?

10 **A.** Well, I guess it all depends on what we mean by a "bad

11 questions." We do get interesting answers in the sense that

12 sometimes even when she is prompting people to think about the

13 disclaimer, they don't all reject it, right? They -- some do,

14 some don't, which suggests that one thing about Ms. Hamilton that

15 I appreciate is that she was the kind of friendly and open and

16 approachable kind of interviewer who didn't make the respondent

17 feel as though they had to give the right answer, the expected

18 answer, lest they incur some disapprobation on her part.

19 **Q.** Now, the third interview subject was named Joe, did you catch

20 that on the video? She calls him Joe?

21 **A.** (Shakes head)

22 **Q.** Let's assume his name is Joe. And Ms. Hamilton gave him an

23 absentee ballot application with the disclosure, and she asked

24 him, quote, "Would you be comfortable using that ballot

25 application to apply for an absentee ballot application in

1  Georgia," end quote?  And his answer, without any hesitation, was

2  "yes."  Is that right?

3  **A.**  Yes.

4  **Q.**  Ms. Hamilton then asked him, quote, "Okay.  Do you have any

5  concerns about that box up here," end quote, meaning the

6  disclaimer?

7  **A.**  Right.

8  **Q.**  And his answer was:  No.

9  **A.**  Right.

10 **Q.**  Isn't that right?

11 **A.**  That's right.

12 **Q.**  Ms. Hamilton asked Joe what he would do if he received two

13 absentee ballot applications, one with a disclaimer and one

14 without.  And he said, quote, "I would probably use either one

15 equally," end quote.  That's what he said, right?

16 **A.**  Yes.

17 **Q.**  Now, the fourth interview subject, I believe you testified

18 that he seemed unphased by the disclosure.  Was that your

19 testimony?

20 **A.**  Yes.  I think we're thinking of the same numbering.  He is

21 the person who reads it and says he's not concerned about the

22 language.  Now, he may be the person you're talking about as Joe,

23 number three.

24 **Q.**  Okay.  When you testified, I thought you were talking about

25 Joe.  I have him as the third.

**A.**   Okay.  I have him perhaps mentally as the fourth.  So I
considered that to be a good interview and one that does not
support the idea that voters automatically recoil from this
reading.

**Q.**   The fourth interview subject was the one who seemed to be
skeptical of both forms?

**A.**   Oh, okay.  Now I see.  This is the woman who basically says a
plague on both your houses, yes.

**Q.**   Yes.  In commenting on your form without a disclaimer, she
said, quote, "But just because it doesn't say that doesn't mean
that this may not be official either.  It's also the things that
are left out as well," end quote.  That's what she said, right?

**A.**   Correct.  And I think it's kind of an interesting commentary
actually on the ambient level of voter suspicion and mistrust.

**Q.**   And the fourth interview was the one that was cut short
because the train was coming, she had to catch it, right?
Remember that?

**A.**   I had called that the -- I had called Joe the fourth, but,
yes, I now see I had my numbering reversed.  Number three was cut
short.

**Q.**   Now, we watched the video for the fifth interviewee.  I just
want to highlight one thing he said.  Ms. Hamilton asked him, you
know, what would you think if you got, you know, this in the mail.
And his answer was, quote, "I pretty much would fill it out, put
all my name and identification stuff on it and sign it and just

1   basically wait for my ballot to come back," end quote.  Isn't that

2   exactly what he said?

3   **A.**   Yes.

4   **Q.**   And then he also said, quote, "I usually just go to the polls.

5   I always learned that from my mom, to go to the polls or the early

6   voting stuff," end quote?

7   **A.**   Yes.

8   **Q.**   So does he even seem like a likely absentee voter if he goes

9   to the polls?

10  **A.**   Yes.  I could see -- in fact, in some ways he fits the term

11  absentee quite well because although it's I think more sort of

12  politically correct these days to call it voting by mail as

13  opposed to absentee voting, he would be the kind of person who's

14  used to voting who would cast an absentee ballot if he were, in

15  fact, absent.

16  **Q.**   Now, there's a sentence in your report that I thought was

17  important.

18  **A.**   Only one?

19  **Q.**   Well, I have one in mind.  I think it's important right now.

20      On page eight you wrote, quote, "A qualitative study of this

21  kind cannot tell us what proportion of mailings would end up in

22  the trash on account of the disclaimer."  I'm leaving off the rest

23  of the sentence, but that -- you wrote that, right?

24  **A.**   That's right.

25  **Q.**   That's part of your opinion in this case?

**A.**   And that's right.  And I think it's an important point to note
in part because it helps draw the distinction between a
quantitative study and a qualitative study.  In a quantitative
study you're trying to assess the causal effect of the disclaimer.
In a qualitative study you're trying to find out how do ordinary
people make sense of this disclaimer when they do read it.

**Q.**   So based on the five-person study, no one in this courtroom
today, not you, not me, not the good Judge Boulee, can possibly
know what percentage of mailings would not be completed because of
the disclosure, right?

**A.**   Well, the phrase "could not possibly know" is a rather extreme
statement.  I mean, of course we have implicit prior beliefs about
it and we would be willing to put bets on it.  You know, if we
were to do the forbidden randomized trial, and I say it's
forbidden because we know we cannot as an outside organization, as
a bunch of academics distribute the official form.  We're not
allowed to distribute the official form.  Only the government can
distribute the official form.  But if we could and we could do the
randomized trial and we put our betting odds on what we're going
to find, my money is very decisively on the no disclaimer forms.

**Q.**   So, Dr. Green, you're an academic and you're a gambler?

**A.**   You know, the funny thing about gambling is that even though I
don't actually spend any money on gambling, even though I -- I
digress.  There is an academic theory associated with the
statistical approach that I'm using called -- it's basically a

1  philosophical argument called Making Dutch Book.  It's saying that

2  anybody who gives you some kind of statement, some kind of claim,

3  empirical claim, is implicitly giving you -- if they're really

4  serious, they're implicitly giving you betting odds.  There's a

5  probability distribution of all the things that could happen, and

6  if they're being honest, you could extract their true beliefs by

7  making them cast wagers.  So these wagers are important.

8      And that's why I would ask you, sir, you know, imagine we were

9  doing this randomized trial, would you really place your money on

10  the disclaimer form?  I mean, obviously you're in no -- you're

11  under no obligation to answer anything, but I would be shocked if

12  you were to put your money on the disclaimer form.

13  **Q.**  As I've said before, I'll have to ask the questions today, you

14  can depose me some other time.

15  **A.**  It would be a purely rhetorical question, but it's certainly

16  something for the Court to consider because, yes, we haven't been

17  able to do that randomized trial for obvious reasons, but I think

18  we have very clear expectations of how it would come out.

19      So to say we have no evidence is running afoul directly of the

20  so-called Dutch Book argument.

21  **Q.**  Well, you can't do a randomized trial using the exact Georgia

22  forms, but you could do an experiment with very similar forms

23  perhaps in another state, couldn't you?

24  **A.**  One could, sure.

25  **Q.**  But you haven't done that?

**A.**  I have not done that.  But, again, back to the Dutch Book argument, is there really any ambiguity as to how it would come out?  And part of the reason it's not publishable or tax deductible is that it's like proving that water is wet.  It's going to be tough to publish a study that shows that this kind of ominous disclaimer actually discourages voters because the reviewers are going to say, so what else is new?

**Q.**  Well, Professor, you know, I've got to tell you what I hear you saying is on the one hand, hey, I'm an expert, I know what I know, and on the other hand, hey, who the heck knows, it's all a big guess, there's no way to figure it out.

**A.**  No, no, no, that's not my position.  It's the opposite.  It's saying I know what I know and, therefore, I don't go into the world like a farm fresh egg, I go in with prior beliefs about how the world is going to work.  So if you said, okay, we're not going to be able to do this in Georgia, let's go to Mississippi, let's do this in Mississippi, how do you think it's going to come out?

Now, before we get the results, there are things called the social science prediction markets that allow you to bet on the results.  And I don't think there's any ambiguity if we showed people the state form and the disclaimer form what the betting market is going to say by way of an answer.

**Q.**  But you didn't test the betting markets, right, you didn't show this form to the betting markets to see what their thought was?

1  **A.**   No, I'm just telling you what I forecast.

2  **Q.**   You're saying things that you could have done but you didn't

3  do?

4  **A.**   Correct.

5  **Q.**   So there's one sentence from your expert report, your second

6  report, that I want to lift up.  And this appears on page four.

7  You wrote, quote, "I did not represent this study as an attempt to

8  quantify a causal effect of the disclaimer on the rate at which

9  the disclaimer would be noticed by voters or on the rate at which

10 absentee ballot applications bearing the disclaimer would be

11 completed," end quote.

12    I'm only going to ask you:  Is that what you said?

13 **A.**   It is indeed what I said.  And I wish I had said it in a more

14 felicitous way but it's okay.

15 **Q.**   So the five-person qualitative study, if you want to call it

16 that, doesn't really prove much of anything, does it?

17 **A.**   Oh, no, no, no.  No, no, no.  Even if it doesn't give us an

18 answer to the question what is the causal effect of this

19 disclaimer, it surely gives us an answer to the question how would

20 an ordinary person, not an academic, not a lawyer, read this

21 disclaimer?  What would they think?

22 **Q.**   Well, it tells you how these five voters perceived it, right,

23 or reacted to it or to the questions asked of them, right?

24 **A.**   Right.  So then the question is how would you extrapolate from

25 these five to some other group?  And that would be based on these

1   same underlying principles of causal effect generalization.

2   **Q.**  So isn't it fair to say that the five-person study proves that

3   the five people said what they said after Ms. Hamilton asked what

4   she asked?

5   **A.**  No, that's way too nihilistic.  I would say -- what's kind of

6   interesting is there was no automatic negative reaction.  Some

7   people were okay with the disclaimer, even after reading it in a

8   way that was not particularly leading.  In fact, some were okay

9   even reading it when it was asked in a somewhat leading way.

10      However, there was certainly an element of concern.  And we

11  have to -- this is actually a crucial point.  We have to remember,

12  okay, this is not a quantitative study, but remember what kind of

13  effect we are talking about in the world.  Remember that the

14  effect size that we're talking about in the world is on the order

15  of two or three percentage points.  That means that when you send

16  one of these requests or blandishments of any kind, roughly 1 out

17  of 50 people are taking you up on it.

18      So if you do a small study and you find that one out of five,

19  again, it's not a quantitative study, but you find some people are

20  clearly having a negative reaction.  That is easily enough to

21  offset whatever small effect your blandishments are having in the

22  aggregate.

23  **Q.**  These statistics you just quoted in your answer, where are you

24  getting those?

25  **A.**  So I'm thinking of the effects of the transition to vote by

1  mail, it's roughly 3 percentage points.  The effects of sending

2  people these pre-filled applications, again, similar magnitude

3  effects.  So we're talking about effects that by the standards of

4  Get Out The Vote research are substantial enough to be politically

5  meaningful, but they're small enough so that if you have an

6  untoward messaging strategy like having a big fat disclaimer that

7  has three capital "nots," you could undercut the little effect

8  that you have.

9  **Q.**  Where are these statistics in your expert report?

10 **A.**  By "these statistics," you mean the --

11 **Q.**  The numbers that you just quoted me, where are they?

12 **A.**  Those numbers, like treatment effects, those are my -- part of

13 my reading of the Mann and Mayhew study or the Hassell study.

14 Those studies are -- actually, even in Dr. Grimmer's report he

15 summarizes those treatment effects.

16     So I'm simply using them to illustrate the scale of the

17 treatment effects that we're talking about.

18 **Q.**  Mann and Mayhew had nothing to do with a disclosure, right?

19 **A.**  I agree.  It's not about the disclosure.  My point is not

20 about disclosure, my point is about the kinds of treatment effects

21 that we're talking about when we're talking about effects.  And in

22 this domain we're typically talking about 1, 2, 3, 4 percentage

23 points.

24 **Q.**  Let's talk about a new subject.  Let's talk about SB 202 and

25 pre-filled forms.  Okay.  So now we're in Hassell land?

**A.**   Yes.

**Q.**   So this is Section 3 of your report.  It's pages eight to nine, right?  And you cited the Hassell study obviously.  Did you cite any other studies?

**A.**   No.

**Q.**   Did you cite any other published literature?

**A.**   No.

**Q.**   Did you perform any studies or tests concerning pre-filled forms?

**A.**   No.

**Q.**   Have you ever done a study or any research regarding pre-filled forms?

**A.**   No.

**Q.**   Did you send out Ms. Hamilton to interview anybody about pre-filled forms?

**A.**   No.

**Q.**   Now, in the Hassell study I wanted to lift up a couple of passages.

**A.**   Do you know which tab it's under?

        MR. BARTOLOMUCCI:  Anyone?

        THE WITNESS:  I don't think we're referring to the report, it's the study itself.

        MS. LANG:  Do you have a copy to provide to him?

        MR. BARTOLOMUCCI:  I need to read from my copy.  I wasn't going to put this into evidence, but I mean...

1           THE WITNESS:  It's not crucial then.  If you don't have

2  a copy, I'll wing it.

3  BY MR. BARTOLOMUCCI:

4  Q.  Well, I only have the one copy but -- let me read it to you

5  and I'll give it to you.

6  A.  Exactly.  If I need to look at it, I'll ask for it.

7  Q.  I'm going to read two parts, Footnote 10 --

8           MR. JOHNSON:  Your Honor, sorry to interrupt.  I do have

9  a copy of the Hassell study.  May I provide that to Dr. Green so

10 he has it before him?

11          THE COURT:  Sure.

12 A.  Thanks.  I'm ready.

13 Q.  Footnote 10 in the Hassell study said, quote, There is no

14 significant difference between the rate of absentee voting among

15 the pre-filled and non-pre-filled absentee ballot treatments.

16 Then there's a little parenthesis with P is less than .37, a

17 two-tailed test.

18     And then it goes on to say:  Nor is there a significant

19 difference in turnout, parenthesis, P less than .11, two-tailed

20 test.

21     Did I read that correctly or close to correctly?

22 A.  Yeah.  I'm just curious, do you know what a two-tailed test

23 is?

24 Q.  I have no idea.  Do you?

25 A.  Let me give you a two-line summary because it's actually kind

1  of material here.

2      When you conduct a two-tailed test, you're asking could a

3  world in which there really were no effect of pre-populated forms

4  generate either a number as large as what is observed or as large

5  as the negative of what's observed?  So you're asking basically a

6  question could we have found a big positive effect or big negative

7  effect?  But no one, no one thinks it's going to generate a big

8  negative effect.  So this is a classic instance where you would

9  only use a one-tailed test.  But a one-tail P value is half as big

10  as two-tailed.  So the irony here is it's just short of the finish

11  line when he says it's not a significance effect on voting, it's

12  because P is .11 and half of the two-tailed test is .055, so it

13  slid into second base but was just tagged out.

14  Q.  So set aside your criticism -- of what seems to be a criticism

15  of Hassell here, but he himself found no significance difference

16  between pre-filled and non-pre-filled, right?

17  A.  He's doing the kind of mindless mechanical statistical

18  significance testing that I decried earlier.

19  Q.  So before you were on the pro-Hassell team, and now you're on

20  the anti-Hassell team, right?

21  A.  No.  I'm on the pro-Hassell team because I applaud the

22  creativity of his randomized trial.  But if I leave it to him to

23  analyze the data, I've kind of -- you know, I've abdicated my

24  responsibility as a reader.  I can read randomized trials.

25  Q.  Now, Footnote 10 comes attached to a sentence on page three

1  that says, quote, Likewise, 2.6 percent of those who receive the

2  pre-filled absentee ballot request voted by mail, and 17.0 percent

3  voted overall, which is not significantly different from the

4  controlled group.  Is that what it says?

5  **A.**   That's right.

6  **Q.**   And the controlled group didn't get any kind of absentee

7  ballot?

8  **A.**   They got nothing.

9  **Q.**   Right.  So, again, Hassell found no significant difference

10  between getting a pre-filled ballot and getting nothing?

11  **A.**   Again, no significant difference.

12  **Q.**   No significant difference?

13  **A.**   That's right.  If he's solely interested in the question of

14  could the effect of pre-filled ballots versus nothing have been --

15  the apparent effect have been generated purely by chance in a

16  world where we knew nothing, we had no prior beliefs about

17  pre-filled forms?  The answer is:  We can't rule it out in usual

18  scientific standards of 19 to 1 odds.

19  **Q.**   Now, Dr. Green, on your direct I think I heard you, you know,

20  criticize the standard test for significance as being kind of

21  arbitrary.  Did I hear you right?

22  **A.**   No, not arbitrary.

23  **Q.**   Not arbitrary?

24  **A.**   Mechanical, but not arbitrary.

25  **Q.**   Mechanical, okay.

1      But was I wrong that you seemed to be suggesting that the

2  standard test, which is, what, zero point -- .05 is too strict?

3  **A.**   It's neither too strict nor too loose.   It's something that

4  comes out of nowhere.

5  **Q.**   Well, that's what I meant by arbitrary, you said --

6  **A.**   Well --

7  **Q.**   It comes out of nowhere?

8  **A.**   It's not rooted in any kind of mathematical theory, it's just

9  a convention.   So it's -- yeah, it's a -- it's a widely-used

10 convention.   I don't deny it's widely used, it's ubiquitous, but

11 it's applied in a kind of unthinking way.

12 **Q.**   Now, Dr. Green, didn't you publish an article or co-author an

13 article in 2018 in which you advocated for an even more demanding

14 standard of significance?

15 **A.**   I'm very glad that you brought that up.   Do you have that

16 article in front of you?

17 **Q.**   I do.

18 **A.**   Do I have a copy?

19 **Q.**   I doubt it.

20 **A.**   Because I would like to talk about that article.

21 **Q.**   Okay.   Here, I'll give it to you if you promise to be brief.

22 **A.**   I will be brief.

23 **Q.**   Oh, it's Defendant's 49 I'm reliably informed.

24 **A.**   Thank you.   I realize it's getting late and --

25 **Q.**   Apparently, Dr. Green, check the black notebook.   Just for

the record, this is an article called "Redefine Statistical
Significance."  The first named author is Daniel J. Benjamin.  The
journal is "Nature, Human Behavior", Volume II, January 2018.  One
of many co-authors is Donald P. Green.  Is that you, sir?

**A.**  That is indeed me.

So one of the most important things, sir, to appreciate about
this article is that it has a blissfully short one-line abstract.
Let me read it.  It's only one line.  We propose to change the
default P value threshold for statistical significance from .05 to
.005 for claims for new discoveries, claims of new discoveries.
So new discoveries is the crucial feature of this study.  And it
appears in the one-line abstract and it appears in the first
paragraph and in the second paragraph.  So make no mistake about
what is being proposed here.  This is not in any way like testing
whether pre-filled forms increase compliance with the
blandishments of the forms.  That's like asking is water wet?
This is saying a new discovery.

**Q.**  What do you mean by "a new discovery," what's your definition
of that?  What's the scope of this proposal?

**A.**  Something that's theoretically novel.  For example, a new
discovery that burst on to the scenes was this idea that in very
poor countries, when you reach the end of the summer season and
people are short on food because the harvest has not come, there
is a market drop in IQ, in measured IQ.

**Q.**  That's a new discovery?

**A.**   That is a new discovery.

**Q.**   Why isn't it a new discovery to say, hey, there's no difference between getting a pre-filled form or getting no form?

**A.**   Look at equation two in the article.  That's answering your question.  So equation two in the article is saying let's consider the degree of belief that you put in the null hypothesis, the hypothesis that says pre-filled forms don't do anything. Pre-filled forms, not pre-filled forms, they're identical, they're interchangeable, have no effect.  Okay.  If you accord that hypothesis relatively little weight, then you would not have a problem of false discovery.  And so this problem of false discovery applies in particular to new discoveries because it's in the case of new discoveries that you just don't know about the null hypothesis.  Which in the case of transaction costs, I mean, transaction costs, that theory is with us every day.  You can't drive on the roads, you can't fill out a form online, you can't do anything without that theory kind of rearing its head.

So nobody accords the null hypothesis a lot of weight before they see the data.

**Q.**   I think I'm going to leave that topic there and ask you this: In your expert rebuttal report, so your second report, you said that you made a mistake in your first report in how you describe Hassell.  Do you remember that?

**A.**   Yeah.  It was so stupid.

**Q.**   Tell us what happened.

1  **A.**  I simply said ballot requests when I meant casting an absentee

2  ballot, voting by absentee.

3  **Q.**  So there is a difference, isn't there, between submitting an

4  absentee ballot request form and actually obtaining an absentee

5  ballot --

6  **A.**  And casting.

7  **Q.**  -- correct?

8  **A.**  Yes.  Although, I mean, not to make excuses, because it really

9  was a stupid mistake, but it's hard to imagine a causal mechanism

10  that would lead to elevated rates of absentee voting from having

11  gotten this blandishment that doesn't have some, you know, causal

12  pathway that goes through requesting the form.  Presumably

13  requesting the form is the reason why you have elevated rates of

14  voting by mail.

15  **Q.**  Did the Hassell study evaluate the rate at which the

16  submission of pre-filled forms results in a ballot actually being

17  sent to voters?

18  **A.**  No, I don't think it did.

19  **Q.**  Now, if someone other than a voter pre-fills an application

20  and puts in incorrect personal information, the voter might not

21  get a ballot from the government, right?

22  **A.**  Correct.

23  **Q.**  Now, you say in your expert report that it's more convenient

24  for election officials to process pre-filled forms than forms that

25  have been completed by hand.  Did you say that?

1  **A.**   Yes.

2  **Q.**   You didn't cite anything for that, did you?

3  **A.**   No.

4  **Q.**   Have you ever been an election official?

5  **A.**   I have not.

6  **Q.**   Have you ever processed absentee ballot application forms,

7  sir?

8  **A.**   I have not.

9  **Q.**   If an absentee ballot application form has errors with respect

10 to a voter's personal information, is it more difficult to process

11 that form?

12 **A.**   Yes.

13 **Q.**   Let's move now to the third part of SB 202, the

14 anti-duplication provision.

15    Now, is it your understanding that this provision says you

16 can't send an absentee ballot application to someone who has

17 already requested, received or voted an absentee ballot?

18 **A.**   Yes.

19 **Q.**   Now, there are some good reasons not to send an absentee

20 ballot application to someone who has already requested, received

21 or voted an absentee ballot, right?

22 **A.**   Yes.

23 **Q.**   It could result in a voter sending in a second request for an

24 absentee ballot, right?

25 **A.**   Correct.

**Q.**   It could confuse the voter?

**A.**   Correct.

**Q.**   Now, if I'm reading your report correctly -- strike that.  I'm going to skip that in the interest of time.

Section 4 of your report deals with the anti-duplication provision, so this is pages nine and ten.  You don't cite any studies in this section of your report, do you?

**A.**   No.

**Q.**   And you don't cite any published literature in this section?

**A.**   No.

**Q.**   You didn't perform any studies or tests regarding the anti-duplication provision?

**A.**   No, because the key feature of the provision is something about through point, it's not about the causal effect of anything. It's asking, from what I know about the process by which bulk mail is delivered, sorted, printed, sorted, delivered, what kind of inferences would I draw about the feasibility of adhering to these kinds of regulations?  And there I feel as though I do have good expertise because part of my Get Out The Vote book is that multiple additions, we've talked about the mechanics of actually issuing massive amounts of direct mail.

**Q.**   I just want to know if you did any studies or tests, and the answer to that is no, correct?

**A.**   No.

**Q.**   Did you send out the intrepid Ms. Hamilton to interview

1  anybody about this provision?

2  **A.**   I did not.

3  **Q.**   Okay.

4      Now, sir, if one of the plaintiff organizations in this case

5  gave you a spreadsheet of Georgia voters, you know, on the

6  Secretary of State's list of voters who have already asked for an

7  absentee ballot, and they gave you, you know, another spreadsheet

8  of voters that they want to send absentee ballots to, do you think

9  with your expertise you could do an analysis or design an

10 algorithm to figure out whether there's overlap between the two

11 list?

12 **A.**   Yes.

13 **Q.**   You could?  Okay.  How would you do that?

14 **A.**   Relatively simple case of merging two databases.  But, you

15 know, I do have one of those whacky PhDs.

16 **Q.**   I think I only have two more questions for you, Dr. Green.

17 You ready?

18 **A.**   I'm ready.

19 **Q.**   That doesn't count as one of them.  Okay.

20     On the last page of your report, page 11, you said:  It should

21 be stressed that groups that distribute absentee ballot forms

22 already have strong incentives not to send mail to people who have

23 already requested, received or voted an absentee ballot.  To do so

24 is a complete waste of money.  Is that what you said?

25 **A.**   That's right.

1  **Q.**  Okay.

2      Now, if it costs less to send out an absentee ballot

3  application to a voter than it does to go through the process of

4  figuring out whether the voter has already asked for one, the

5  group would be incentivized to just send out the application,

6  right?

7  **A.**  Probably not.  And the reason is, again, these are lean

8  organizations.  They care very much about reporting back to their

9  donors about the efficiency with which they are generating votes.

10     One of the features of my book, which I think is very

11 congenial to their way of thinking, is that the book generates the

12 cost per vote of different types of messaging, different types of

13 modes of communicating with voters.  And they are really attuned

14 to that efficiency concern.  So if they start larding up their

15 mailing lists with people who have already voted, that is

16 fattening up the waste associated with their expenditures and

17 giving them nothing in return in terms of the numerator.

18     So I don't think that they would be so cavalier as to just say

19 let's send out more mail because we just don't care to find out.

20 Their view is if we're going to send out mail at the scale that

21 they're sending out mail, they better get the list expunged of

22 people who voted.  And that's what they do.

23 **Q.**  But you haven't interviewed any of these organizations to

24 confirm your intuitions?

25 **A.**  Well, I haven't interviewed the organization, but you have to

 1  understand the extent to which I've poisoned the minds of lots of

 2  people who have worked in those organizations with my teaching

 3  about randomized trials.  Many of the people who worked for these

 4  groups are my former students.

 5          MR. BARTOLOMUCCI:  Thank you, Dr. Green.

 6          Your Honor, I'll pass the witness.

 7          THE COURT:  Any redirect for this witness?

 8          MR. JOHNSON:  Your Honor, on redirect we just would play

 9  the videos and discuss them with Dr. Green to give some context to

10  my opposing counsel's lifted quotes.  But in the interest of time,

11  I think we just submit the Court should just watch the videos,

12  they speak for themselves, if that's okay.

13          THE COURT:  That's okay.  Very well.  Thank you,

14  Professor.

15          THE WITNESS:  Thanks for having me.

16          THE COURT:  Take care.  Safe travels.

17          (Witness excused)

18          THE COURT:  All right, counsel.  I don't have a

19  stopwatch, but I do have that big clock back there.  So I think

20  we've used up our three-and-a-half hours a side.  I'm guessing

21  it's not because you just disregarded by instructions to try to

22  keep it to three-and-a-half hours but instead it's because you

23  were trying really hard and just couldn't get it done and you do,

24  indeed, need more time tomorrow morning.  Is that right, counsel?

25          MS. LANG:  Well, I can tell you, your Honor, that

1 plaintiffs are done with their presentation, so, I mean, in that

2 sense no, you know --

3          THE COURT:  Do the plaintiffs want to do

4 cross-examination of any of the defense witnesses or do any

5 closing?

6          MS. LANG:  We would certainly seek cross-examination,

7 especially since otherwise it would mean that defendants' counsel

8 would be putting on significantly more time and testimony than we

9 would because per my count defendants' used about the same amount

10 of time today --

11          THE COURT:  Let me interrupt you.

12          MS. LANG:  -- as we did.

13          THE COURT:  Let me interrupt you.  I kind of asked a

14 joking leading question, but it obviously wasn't leading and

15 joking enough.

16          MS. LANG:  Fair.

17          THE COURT:  Am I correct in thinking that both the

18 plaintiffs and the two defense groups would like more time in the

19 morning?

20          MR. SCHAERR:  Yes, your Honor.

21          THE COURT:  How much time does everyone think they need?

22          MR. SCHAERR:  Your Honor, we estimate it would take 2

23 hours and 15 minutes for us to put on our three witnesses.

24          THE COURT:  Okay.  Ms. Diaz (sic)?

25          MS. LANG:  Assuming that's the case, 2 hours and

```
 1  15 minutes for direct, you know, we would endeavor to try to keep
 2  our, you know, cross-examination to, you know, an hour, an hour
 3  and a half.  You know, I certainly think cross should be shorter
 4  than direct.
 5          THE COURT:  All right.  So plaintiffs don't have any
 6  remaining witnesses then?
 7          MS. LANG:  No remaining witnesses, your Honor.
 8          THE COURT:  All right.  Is there any reason we can't
 9  start at 9:00 tomorrow morning?
10          MS. LANG:  Not for us.
11          THE COURT:  Administratively can we do that with the
12  couple things we have going on?
13          COURTROOM DEPUTY CLERK:  Yes.
14          THE COURT:  Let's try to start at 9:00 tomorrow morning
15  then.  We'll take the time we need with the hopes we might be done
16  close to the lunch hour.  All right.
17          All right.  Good to see everyone.  Hope everyone has a
18  good evening.  Take care.
19          (PROCEEDINGS REPORTED WERE CONCLUDED AT 6:29 P.M.)
20                    _____
21
22
23
24
25
```

1                        C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true and

7    correct transcript of the proceedings taken down by me in the case

8    aforesaid.

9        This the 20th day of June, 2022.

10

11

12

13

14        _____

15                    PENNY PRITTY COUDRIET, RMR, CRR
                       OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25