THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT. OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90 DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER THE COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT; HOWEVER, YOU ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY DOCUMENT FILED WITH THE COURT.

1                    UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
2                         ATLANTA DIVISION

3

4  VOTEAMERICA, ET AL,              )
                                    )
5        PLAINTIFFS,                )
                                    ) DOCKET NO. 1:21-CV-01390-JPB
6        -VS-                       ) VOLUME 2
                                    )
7  BRAD RAFFENSPERGER, ET AL,       )
                                    )
8        DEFENDANTS.                )

9

10

11        **TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
            **BEFORE THE HONORABLE J.P. BOULEE**
12             **UNITED STATES DISTRICT JUDGE**
                    **JUNE 10, 2022**
13

14

15

16

17

18

19

20  STENOGRAPHICALLY RECORDED BY:

21

                    PENNY PRITTY COUDRIET, RMR, CRR
22                     OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
23                        ATLANTA, GEORGIA

24

25

1                    A P P E A R A N C E S

2

ON BEHALF OF THE PLAINTIFF - VOTEAMERICA, VOTER PARTICIPATION
3  CENTER AND CENTER FOR VOTER INFORMATION

4        KATHERINE LEIGH D'AMBROSIO
         SMITH GAMBRELL & RUSSELL, LLP
5
         JONATHAN DIAZ, ESQ.
6        DANIELLE M. LANG, ESQ.
         VALENCIA RICHARDSON, ESQ.
7        HAYDEN JOHNSON, ESQ.
         ALICE CLARE CAMPBELL HULING, ESQ.
8        CAMPAIGN LEGAL CENTER

9

ON BEHALF OF THE DEFENDANTS - BRAD RAFFENSPERGER, SARA GHAZAL,
10  JANICE JOHNSTON, EDWARD LINDSEY, MATTHEW MASHBURN

11       GENE C. SCHAERR, ESQ.
         H. CHRISTOPHER BARTOLOMUCCI, ESQ.
12       BRIAN FIELD, ESQ.
         SCHAERR JAFFE, LLP.
13
         BRYAN P. TYSON, ESQ.
14       TAYLOR ENGLISH DUMA, LLP.

15

ON BEHALF OF THE INTERVENOR DEFENDANTS - REPUBLICAN NATIONAL
16  COMMITTEE, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, NATIONAL
    REPUBLICAN CONGRESSIONAL COMMITTEE, GEORGIA REPUBLICAN PARTY,
17  INC.,

18       CAMERON T. NORRIS, ESQ.
         CONSOVOY MCCARTHY, PLLC.
19

20

21

22

23

24

25

1                          I N D E X

2

3    WITNESS:                                        PAGE:

4    1.   RYAN GERMANY

5            DIRECT EXAMINATION...............................5
             CROSS-EXAMINATION...............................52
6            REDIRECT EXAMINATION...........................115
             RECROSS-EXAMINATION............................121
7
     2.   BRANDON WATERS

8
             DIRECT EXAMINATION.............................134
9            CROSS-EXAMINATION..............................138

10
     3.   JUSTIN GRIMMER

11
             DIRECT EXAMINATION.............................146
12           CROSS-EXAMINATION..............................186
             REDIRECT EXAMINATION...........................211
13           RECROSS-EXAMINATION............................215

14                          - - - - -

15

16

17

18

19

20

21

22

23

24

25

```
 1          (PROCEEDINGS HELD IN OPEN COURT AT 9:15 A.M., ATLANTA)
 2              THE COURT:  I think we're ready for the defense's case.
 3   You have the floor.
 4              COURTROOM DEPUTY CLERK:  The Court set has set aside
 5   time to resume the motion hearing in case VoteAmerica, et al, v.
 6   Raffensperger, et al, Case 1:21-CV- 1390.
 7              MR. SCHAERR:  Thank you, your Honor.  The state calls as
 8   its first witness Mr. Ryan Germany.  And he will be examined by
 9   Brian Field.
10              THE COURT:  Good morning.
11              MR. FIELD:  Good morning, your Honor.
12              THE COURT:  Good morning.
13              MR. GERMANY:  Good morning.
14                   _____
15                              RYAN GERMANY
16              a witness herein, being first duly sworn,
17                was examined and testified as follows:
18                   _____
19                           DIRECT EXAMINATION
20   BY MR. FIELD:
21   Q.  Good morning, Mr. Germany.  Could you state your full name for
22   the record.
23   A.  Charles Ryan Germany.
24   Q.  You're currently the general counsel of the Secretary of
25   State's Office, correct?
```

1  **A.**   Yes.

2  **Q.**   How long have you been in that role?

3  **A.**   Started in that role in 2014.

4  **Q.**   Just generally and briefly what are your responsibilities as

5  general counsel?

6  **A.**   So basically anything legal that touches the Secretary of

7  State's Office.  I work with each division of the office;

8  elections, corporations, professional licensing, securities.  And

9  we have other kinds of administrative functions as well; HR and

10  legislative-type things.

11       So I work with legal things, whether it's litigation,

12  contracts, work with our outside counsel and work with the AG's

13  Office.  Basically any kind of legal component to the duties of

14  our office I'm involved in.

15  **Q.**  And for our purposes today, does that include roles and

16  responsibilities regarding absentee ballot applications?

17  **A.**  Yes.  Yes, I think primarily that that falls under our

18  elections division, and then I work with those employees to help

19  carry out those duties.

20  **Q.**  Do you interact regularly with county elections officials?

21  **A.**  Yes.  I get -- over the years I've gotten to know some of the

22  county election officials, and I attend the conferences, the

23  training conferences where they all go to.  So sometimes they'll

24  reach out to me directly with a question they think has a legal

25  component.  A lot of times it's open record requests, we get a lot

1  of those, or if they're trying to implement something or if they

2  have a kind of novel issue they've come across, they might reach

3  out to me, or they might reach out to our elections division and

4  then it will sort of filter up to me.

5  **Q.**  For our purposes today, does that also include receiving

6  complaints that voters have submitted to county elections

7  officials?

8  **A.**  Yes.  If they have a complaint that I think maybe they have a

9  question about or want to make us aware of, they would send it

10  sometimes directly to me if it's someone that I know at the county

11  level, or it might go through our elections division.  And then

12  we, of course, get complaints directly sent to our office as well,

13  too, complaints from voters that come into our office and a lot of

14  those I end up seeing as well.

15  **Q.**  Does the Secretary of State's Office also play a role in

16  developing training that is used for county election officials?

17  **A.**  Yes.  Yes.  The way that the training is set up is the

18  Secretary of State's Office trains the county election directors,

19  and then the county election directors train the people in the

20  county; so the poll workers, the people actually doing the

21  absentee ballot processing.  But we put together training

22  materials for county election directors on a myriad topics.

23  **Q.**  Now, you were mentioning earlier the various sections or

24  divisions within the Secretary's office.  I would like to just

25  discuss briefly the investigations division.

1      Do they investigate more than just election-related issues?

2  **A.**  Yes.  We have an investigations division.  It consists of

3  about a little more than 20, I think, POST-certified law

4  enforcement officers, law enforcement investigators.  We also have

5  an inspections division that's not -- that they more deal with

6  kind of the inspections part of it, so it's not a POST-certified

7  law enforcement position.  But from the POST-certified side,

8  that's about 20 people, and they investigate election complaints,

9  professional licensing complaints, corporations issues, and

10  securities as well.

11  **Q.**  Generally, how does a voter submit an election-related

12  complaint to the Secretary of State's Office?

13  **A.**  Generally we get them through e-mail.  We have kind of web

14  forms that so if you go to our website and you can click, you

15  know, contact the elections division or contact the Secretary of

16  State's Office, it will take you to a web form, but then that

17  comes to our office like an e-mail and then goes to certain people

18  monitoring each inbox; whether it's the elections, we have kind of

19  a voter fraud e-mail, we have an investigations e-mail, and we

20  have kind of SOS contact is sort of the broad one that a lot of

21  them might end up falling into.

22  **Q.**  Do folks also call the office?

23  **A.**  Yes, phone calls as well.

24  **Q.**  And I see in your declaration a lot of complaints at a

25  voterfraudmailalerts@sos.ga.gov.  Is that one of those e-mail

1  addresses.

2  **A.**   Yes.

3  **Q.**   When was that created and why?

4  **A.**   I'm not sure.  We've had kind of those general e-mails for as

5  long as I've been at the office, including a kind of voter fraud

6  one, election division, SOS contact, those general e-mails have

7  been around for as long as I've been in the office.

8  **Q.**   Why do you have those e-mail addresses?

9  **A.**   It's because we want to hear from constituents.  We want to

10  hopefully resolve their issue.  We do have a call center, so the

11  call center is busy as well, but sometimes it's helpful to have

12  another way to get in touch.  And so we want to hear from our

13  constituents and hopefully resolve as many issues as we can.

14  **Q.**   What about county election offices, do voters also submit

15  complaints there?

16  **A.**   Yes.  Generally the county elections office will have a

17  general e-mail address as well, if not more than one depending on

18  the size of the county.

19  **Q.**   And just very briefly, can you talk me through the lifecycle

20  of a complaint.  We see the complaints in your declaration, what

21  happens to them after that point?

22  **A.**   You're talking about elections complaints?

23  **Q.**   I'm sorry, yes, with election-related complaints.

24  **A.**   Sure.  It kind of depends because sometimes it might be a

25  voter just reaching out and saying, here's the issue, I'm having a

1    specific issue.  And then we might just reach out to the voter, we

2    could solve the issue, reach out to the county.  And that's

3    probably going to be handled in our elections division.

4        The other ones are complaints that might be alleging like a

5    violation of election law or State Election Board rule.  And then

6    those would really be sent to our investigations division for

7    actual investigation.  And then our investigators will reach out

8    to the complainant probably or if it's involving a county, maybe

9    reach out to that county first.

10       If it can't -- if it's not an issue that they can resolve,

11   then it goes through the more formal State Election Board process

12   where our investigators do a formal investigation, put together a

13   report of that investigation.  That's presented to the State

14   Election Board.  The State Election Board can then decide what

15   action they want to take.  And the actions that they take are

16   generally refer somebody to the Attorney General's Office if they

17   think it does look like a violation, do a letter of instruction if

18   it's -- it could be a technical violation but something that seems

19   to have been remedied, or dismiss the complaint if it doesn't look

20   like a violation actually occurred.

21   Q.  Now, you've spoken a bit about rules handled by counties,

22   rules handled by the Secretary of State's Office.  For the purpose

23   of absentee ballot applications, can you just very briefly

24   describe the process, who's doing what between the voter, the

25   county and the state?

**A.**   Sure.  So the state's role is we designed the new absentee

ballot application.  We worked with some third parties to help us

do that, kind of the third parties who do form design-type things

to try to make it more -- as intuitive as possible for voters.  So

we designed that.  We provided that form to counties and to voters

and anybody, you know, it's available on our website.

     And then the completed applications, they all go to the

county, that goes directly to your county where you're registered,

and the county officials process your application, you know, will

kind of input that in the voter registration system.  And then

they'll -- they're the ones who will mail you your ballot as well.

And then, of course, your ballot, once you voted and complete

that, is returned back to your county.

     So our role, all the processing and everything really happens

at the county level.

**Q.**   Just generally, I know county size is different but -- sizes

differ, how large is a county elections office?

**A.**   It really depends.  We have 159 counties; some are very small

and some are very large.  So I think our smallest county is

Taliaferro County.  And some of those small counties might have

one person working in their elections office, especially when it's

not election time.  And pretty much every county does have to

basically increase their people for -- when voting starts to

happen.  You know, I'm more familiar with how that occurs in big

counties because that seems to be where more issues are, it's more

1  difficult kind of obviously.  But they have temp workers that they

2  get that come help them process, to come help work polls.  But

3  even in small counties, you know, they, of course, have to find

4  poll workers and things like that as well.

5      I think -- my sense is in smaller counties they're just

6  pulling people kind of directly -- not really utilizing sort of

7  temporary workers services, more just pulling people from the

8  community.

9  **Q.**  Under SB 202, when can a voter submit an absentee ballot

10  application?

11  **A.**  The absentee ballot --

12  **Q.**  For general election, my apologies.

13  **A.**  Well, it opens up 78 days before the election, which for the

14  upcoming general election is about August 22nd, I believe.

15  **Q.**  But when are the applications themselves available?

16  **A.**  So they're available all the time.  You can go on our website

17  and get them.  You can go on a county election website and get

18  them.  There's other websites, kind of -- there's like a

19  georgia.gov website that has it as well.

20  **Q.**  So a voter could already be getting them him or herself or

21  from third parties, correct?

22  **A.**  Correct.

23  **Q.**  So with respect to third-party organizations sending these

24  ballot applications, is that a new phenomenon or has that been

25  going on for awhile?

A.   So I started in 2014, and before that I did not have really

election administration experience, so my knowledge really starts

there.

     And I think it's pretty typical for campaigns to send out

absentee ballot applications.  My sense is it wasn't something

that was really kind of blanketed across the electorate.  My -- we

really started seeing that I think more so in 2018.

     And backing up a little bit, I think when it's a campaign or a

party sending it out, the voter was a little more aware of, okay,

this is who this is coming from, this is, you know, this guy who

is running for state senate or whatever.

     And then I think in -- it really was 2018 when we started

seeing more blanket applications that led to questions about who

is this?  What is this?  Is this something I have to fill out?

Generated a lot of calls to counties and to the state.

     We also saw in 2018 people utilizing really, really

paired-down application forms that I think also -- that was really

the first time that we saw that.  So that generated some

complaints and confusion as well.

Q.   Just to make sure that's clear, so before 2018 there was no

requirement for what needed to be included in the form of a ballot

application that a third party sends out, right?

A.   Well, there was -- there was -- you had to have certain

information, a voter had to include certain information to request

an absentee ballot, but there wasn't a law or regulation that said

```
 1  it has to be kind of on this form or on a form that looks
 2  substantially like this, so they're able to basically set it up
 3  however they wanted to.  And the way it -- the actual kind of
 4  official application for absentee ballot, the way it looked then,
 5  it had a lot more information on it than what was legally
 6  required.  And I think it just kind of over time developed as,
 7  okay, here's what counties need in order to process.  And I think
 8  the law didn't really keep up with that.  So then when people went
 9  back to, okay, here's the bare minimum the law requires, you know,
10  yes, that -- they were -- they process those forms, but we did get
11  complaints from counties and from voters about, okay, what is
12  this?  It looked like something different.
13  Q.  So then in 2018 a rule comes in to require more compliance, is
14  that right?
15  A.  So after the 2018 election, so that would have been 2019, a
16  rule was passed by the State Election Board that said, okay, third
17  parties, if you're going to use a state -- if you're going to send
18  an absentee ballot application, you've got to use something that's
19  substantially similar to the state application.
20  Q.  And then the next iteration of this evolution is the
21  requirement to use the official ballot application document that
22  you can get?
23          MS. LANG:  Objection, leading.
24          MR. FIELD:  Your Honor, I would just -- in the interest
25  of time, I am trying to move this along a bit.  If your Honor
```

1  would like, I'm happy to pare down the leading.

2          THE COURT:  Given the objection, why don't you pare it

3  down.

4          MR. FIELD:  Certainly.

5          THE WITNESS:  I wanted to say one thing, too, about the

6  2018 -- the -- I guess there was a rule passed in 2019.  One issue

7  that we saw before there was a requirement to have that sort of

8  use a form substantially similar to the state form was when -- you

9  know, counties are trying to train their people on here's what

10  this form needs to look like -- or here's what it's going to look

11  like and here's how you process it.  Well, that becomes much more

12  difficult when there's all types of different looking forms with

13  different information in different places.  So that was -- part of

14  the idea of that was, okay, let's make it easier for counties to

15  process these forms.  And then -- okay, sorry.

16  **Q.**  Was there any development in -- after that 2019 rule regarding

17  what needed to be included in the ballot applications that third

18  parties sent?

19  **A.**  Yes.  So 2019 that rule came into effect.  And then, you know,

20  of course, in 2020 with COVID the number of absentee ballots just

21  skyrocketed and absentee ballot applications, of course, as well.

22  And I think -- so I think you had COVID, and then you also had

23  just a tremendous amount of kind of third-party interest in

24  Georgia elections.  And so there was just a lot more of these

25  applications and different forms floating around and being kind of

1   circulated to voters.

2      I think you still saw kind of ones coming from parties and

3   things like that, like we -- you have seen kind of previously, but

4   then I don't really recall seeing as many third-party

5   applications.  And those are the ones that really generate the

6   calls to the county, to the state of what is this, who is this

7   from, I didn't ask for this, what do I need to do with this type

8   thing.

9      So then following the 2020 election and then the law that's

10  kind of at issue in this case, the legislature changed the law to

11  then say, okay, you've got to use the official application for --

12  if you're a third party, you've got to use the official

13  application and then -- and then added some additional

14  requirements as well.

15  **Q.**  So on this point regarding the content of these applications,

16  do you recall hearing testimony yesterday about back-and-forth the

17  plaintiffs' organizations had with Chris Harvey, e-mail exchanges

18  with Chris Harvey?

19  **A.**  Yes.

20  **Q.**  And who is Chris Harvey?

21  **A.**  Chris Harvey was -- he was our chief investigator, and then

22  probably in about 2017 or '18 he became our elections director,

23  and he was in that role until following the 2020 election.

24  **Q.**  And to your knowledge, do other third-party organizations

25  beyond VPC and CVI also send out absentee ballot applications to

1  voters?

2  **A.**   Yes.   I should say they did, in 2020 was really the first

3  time.   I think 2018 and 2020 was really the first time we started

4  seeing that to my knowledge.

5  **Q.**   How would Mr. Harvey's job be affected if all those

6  organizations e-mailed him to ask him for his views on the forms

7  of the applications or information?

8  **A.**   Well, that would be almost a full-time job basically.   And

9  he's got, you know, a job of running our elections division and,

10  you know, that includes working with our staff.   He also has spent

11  a lot of time working with counties, and so, you know, that would

12  basically pull him off of what I think his like real duties of

13  here's what he needs to accomplish for -- in terms of the duties

14  we have to accomplish.

15  **Q.**   One other point on those discussions from yesterday, do you

16  recall as part of that line of questioning testimony that Director

17  Harvey suggested, including the election date on the application?

18  **A.**   In terms of pre-filling the election date?

19  **Q.**   That's correct.

20  **A.**   Yes.

21  **Q.**   Under SB 202 is there anything that would prevent plaintiffs

22  from continuing to include the date on applications in the future?

23  **A.**   No.

24  **Q.**   I would like to talk with you about some of the complaints

25  that you appended to your declaration.   Do you recall those?

1  **A.**   Yes, generally.

2  **Q.**   And do you recall there being three categories of complaints

3  that were attached?

4  **A.**   I --

5  **Q.**   Let's do it this way:  I would like to talk to you about your

6  first category of complaints that you attached, which is -- do you

7  recall attaching complaints where voters reference incorrect

8  information on applications?

9  **A.**   Voters referencing what?

10  **Q.**   Incorrect information --

11  **A.**   Yes.

12  **Q.**   -- on applications?

13  **A.**   Yes.  You're talking about if they would get a pre-filled

14  application but it was either sent to somebody -- or sent to their

15  address to someone who either didn't live there anymore or never

16  lived there to their knowledge; or we also had, I think,

17  complaints of, okay, this is addressed to me, but I don't live at

18  this address anymore in Georgia, I live somewhere else; or this is

19  not my -- one I remember was this is not my middle name, this is

20  somebody else, and this person doesn't live here.

21  **Q.**   And the examples that were attached to your declaration, is

22  that the entirety of the complaints that the Secretary of State's

23  Office received about incorrectly pre-filled applications?

24  **A.**   No.

25           MR. FIELD:  If we can pull up the demonstrative

1  exhibits, slide five.

2  **Q.**  Can you see that on your screen, Mr. Germany?

3  **A.**  Yes.

4  **Q.**  This is just the selection of the complaints that were

5  attached to your declaration.  I would like to draw your attention

6  first to the second bullet point, it begins "to date."  Could you

7  read that to us.

8  **A.**  To date there have been at least three pre-filled applications

9  for absentee ballots from the Center for Voter Information in

10  Atlanta.  Each is addressed to a subject who has absolutely no

11  affiliation with this address.  My concern is that someone has

12  fraudulently registered to vote under two different names using

13  this address.

14  **Q.**  And as you've likely seen in the papers filed in this case,

15  plaintiffs call it conspiratorial.  Do you recall that to be a

16  conspiratorial complaint?

17  **A.**  What's on the bullet point right here, it just looks very sort

18  of factual here's what happened to me, here was the experience

19  that I had.

20  **Q.**  And looking at the date, that was submitted before the 2020

21  election, is that right?

22  **A.**  That's what it says on here.

23  **Q.**  If we jump down to the fourth bullet point, could you read

24  that one.

25  **A.**  After receiving multiple applications, I received mail to my

1  address with someone else's name.  This was from the Voter

2  Participation Center and says it's a vote-at-home ballot request.

3  It seems to me if I were willing to commit fraud, which I'm not,

4  receiving six applications in the mail for absentee ballots that I

5  did not request is troublesome to say the least.

6  **Q.**  Here again, does it strike you as conspiratorial, to borrow

7  plaintiffs' word, to be troubled about receiving multiple

8  applications --

9        MS. LANG:  Objection.  This misrepresents plaintiffs'

10  allegations.  And I also want to lodge a complaint to the extent

11  that these are being sought to be submitted for the truth of the

12  matter asserted.  We have not objected to their entry into the

13  record because they could be used for the effect that they had on

14  the Secretary of State, but to the extent that Mr. Germany is

15  testifying that these are factual and truthful complaints, we do

16  object to their entry into the record for the truth of the matter

17  asserted.

18        THE COURT:  Counsel.

19        MR. FIELD:  Your Honor, we are -- at the -- at this

20  stage we are talking with Mr. Germany about the effect they had on

21  the Secretary of State's Office, which, as I understand the

22  objection, that their objection does not apply to these complaints

23  used for that purpose.  And I would submit also that the lower

24  standard of evidentiary rules during a preliminary injunction

25  hearing would suggest that this Court can, in fact, rely on

1  hearsay.

2          THE COURT:  Overruled.  Go ahead.

3  BY MR. FIELD:

4  **Q.**  So just to make sure we had it clear, does that strike you as

5  a conspiratorial complaint?

6  **A.**  No.  And I would say what we look at when we receive a

7  complaint, too, is the factual kind of allegation of here's what

8  happened to me, I received six absentee ballot requests.  You

9  know, the voter's conclusion at the end about kind of how that can

10 lead to fraud or like this is rampant voter fraud, you know,

11 that's more of something -- it's of interest to our office because

12 it does, I think, give insight into how voters might react to

13 something, at least the ones that are reaching out to us.  But

14 from a kind of investigatory standpoint, we're going to look at,

15 hey, what are the facts that are alleged, not necessarily what are

16 the -- what's the voter's conclusion.

17    I remember when I came into this office in 2014, I just kind

18 of thought you went to vote and then you turn on the TV and you

19 saw who won.  But I've learned since then that there's a lot more

20 that goes into elections.  It's a very, you know, sort of

21 complicated logistical exercise by a lot of different people

22 across the state.  And that's just one state.

23    So I guess it's the -- the voter's conclusions, there's

24 someone who is more like me before I worked at the Secretary of

25 State's Office where they're not really expected to sort of

1  understand how it's all going to work, but we do want to see

2  what's the factual allegation and, okay, what's the sort of effect

3  that it seems to be having on the voter.

4  **Q.**  And did the Secretary of State's Office receive any complaints

5  from voters complaining that these applications left the door open

6  to fraud and suggesting they may or may not continue participating

7  in the electoral process?

8  **A.**  Yes, we did get complaints like that.

9  **Q.**  Did those complaints say that the voters would or would not

10  continue participating in the electoral process?

11  **A.**  Yes.  Yes, we got complaints that said, look, this is -- we

12  got complaints that basically said this looks like rampant fraud

13  to me, I don't see any reason to participate in the process if

14  this is what the process is.

15  **Q.**  The other thing we heard yesterday was about mismanaged voter

16  files.  Do you remember hearing that testimony?

17  **A.**  Are you talking about sort of the fact that --

18  **Q.**  I'm sorry, let me ask that again.

19  Do you recall testimony yesterday from plaintiffs'

20  representatives discussing the accuracy of the state's data?

21  MS. LANG:  Objection.  Lack of foundation.  I don't

22  recall such testimony.

23  **Q.**  Well, do you recall any testimony yesterday about where VPC

24  and CVI get their data?

25  **A.**  Yes.

1  **Q.**  Do you recall whether or not VPC or CVI's representatives

2  testified that they get their data from the state?

3  **A.**  Well, so my recollection is they were saying they use the

4  state data.  I think it came out that they actually get it from a

5  third party who, you know, might add some additional things or

6  change things that I think was not -- they were not quite sure.

7  But I know that the state voter file is something that you can

8  purchase directly from our office.  It's a public document.

9       And I know one thing about the voter file, of course, it's

10  basically -- it represents what is put into it by counties, which

11  represent -- they put in what's sent to them by voters on voter

12  registration applications.  We do have ways to check like

13  through -- like HAVA's a federal law who requires you run a match

14  on someone's name and driver's license number and date of birth

15  and things like that, so that helps.

16       There's not a way to match basically address, so that's

17  something that comes from the voter to the county, put into the

18  state voter registration system and then, you know, that's the

19  address.

20       And I would say I think we do a very good job keeping our

21  voter rolls clean.  We use -- we have automatic voter registration

22  through Department of Driver Services, and so that means when you

23  go update your -- get a license or ID card and -- or update your

24  address, it automatically comes over to the state unless you opt

25  out.  And Georgia -- Georgia's Department of Driver Services is

1   100 percent real ID compliant, so they are doing some checking on

2   address, and then that, I think, helps ensure accuracy of our

3   data.

4       And then, of course, we use -- in different less maintenance

5   procedures there's a group called ERIC, E-R-I-C, where states

6   share their voters' lists and drivers' license information with

7   each other.  There's about 30 states in it.  We use that to

8   compare information, keep it up to date.  We use the National

9   Change of Address Registry.  We get death information from the

10  Bureau of Idle Statistics every month and also from the Social

11  Security Administration.  So I think we're doing as much as we can

12  to keep our voter rolls clean.

13      We are restricted by federal law in terms of how and when we

14  can do that.  The list maintenance, the voter list maintenance, we

15  can't do it within 90 days of a federal election.  And in an

16  election year, like this year, it makes it really hard to do it at

17  all.

18      And then once we have identified someone who is no longer in

19  Georgia or who has moved, for instance, if the county has received

20  return mail from their address, that generates a card that says,

21  hey, if you don't live -- if you're not there, where are you?  And

22  if they -- if the county doesn't receive anything back, the voter

23  is still on the rolls in inactive status, but they have to stay in

24  that status for two general election cycles.  So essentially we're

25  like -- and that's a federal requirement as well.  So we're

1 basically federally required to have a list that we know is out of

2 date.

3 **Q.**  I would like to talk to you a bit about the fraud allegations.

4 And in your declaration you talked about the risk of fraud.  And

5 what I want to understand is with respect to pre-filled

6 applications, how would receiving a pre-filled application risk

7 voter fraud?

8 **A.**  I think it definitely increases the concern of voter fraud on

9 the -- to the voter's perspective.  Like that was most of the

10 complaints that we got, was, hey, I'm receiving this application

11 that's pre-filled, this person does not live here.  You know, a

12 lot of their allegations we saw were, I'm concerned that this is

13 voter registration fraud, that someone registered using my

14 address.

15     And then, you know, I think the other -- that the other

16 concern would be with the pre-filled application.  And we saw this

17 happen, where if the information is not correct, if a voter

18 doesn't really engage with that form and make sure the information

19 is correct, it can lead to a ballot being sent to an out-of-date

20 address or a wrong address, and then you basically have a live

21 ballot sent somewhere else.

22     We had a case last year where that happened, someone got a

23 ballot in a PO box that I think used to belong to the voter who

24 actually requested the ballot, and that person attempted to vote

25 that ballot.  It was caught by the county and not counted.  The

1  person initially I think denied doing that, but then our

2  investigators partnered with GBI and found, I think, a fingerprint

3  on the inner envelope suggesting that, okay, this was the

4  fingerprint of the person who received the ballot who did not

5  request it and then who attempted to vote it.

6  **Q.**  You mentioned concerns about fraud amongst voters.  Why is the

7  state concerned about that?

8  **A.**  Well, concerns about fraud, I mean, really go to the

9  confidence of voters in the process, and we've seen that I think

10 coming from both sides.  When voters have complaints about the

11 process, that can affect their -- whether it's from the -- you

12 know, we've gotten complaints about fraud, we've gotten complaints

13 about suppression and that leads the voters basically not having

14 confidence in the election results and then, therefore, kind of

15 illegitimacy of the election.

16 **Q.**  Do you recall in your declaration also talking about the

17 stress on the system?

18 **A.**  Yes.

19 **Q.**  And can you tell me a bit about how a pre-filled application

20 could cause stress on the electoral system.

21 **A.**  So it causes stress in a lot of different ways.  One, it leads

22 to a lot of phone calls to us, to counties, basically asking what

23 is this, I didn't request this, I thought I was already registered

24 to vote, what do I need to do with this?  That happens often.

25 And, again, that pulls the -- our people and the county people off

of really what they should be doing to prepare for the election,

especially in an election year.  And they want to respond to their

voters, so, I mean, I know that's important to them.  So you see

that.

     And then we also see with the pre-filling -- I'm sorry, can

you sort of ask the question again.

**Q.**  Certainly.  I had asked you how pre-filled ballots or

incorrectly pre-filled ballots stress the electoral system.

**A.**  Incorrectly pre-filled can stress the system if something with

wrong information is basically input into the county, and then if

it's sent -- if the ballot is sent to the wrong address -- and

there was a lawsuit filed about that earlier this year, where it

was basically two different people with the same first name and

somehow the county just got it wrong, but then that stresses the

system of, okay, where's the actual voter's ballot?  And the other

voter, well, why do I have this ballot?

     But it also leads to, I think, people -- we had a lot of

people in 2020 who had requested absentee ballots but then seemed

to have forgotten or just didn't really maybe understand that the

form they filled out was for an absentee ballot request.  So then

when they showed up to vote in person, they -- and they were told

if you show up to vote in person, the system has a way of saying,

hey, you've requested an absentee ballot, so we need to kind of

deal with that first, make sure it hasn't been voted, cancel it

before you're allowed to vote in person.  But a lot of them would

1    say, well, I didn't request an absentee ballot.  So we got a lot

2    of complaints like that.  And what we saw is people I think had

3    kind of forgotten they had or maybe not realized that the form

4    they filled out was for that.

5    **Q.**  On that point, if I could just interject, can you talk -- just

6    explain to the Court briefly what the process is in a polling

7    location when a voter needs to have his or her absentee ballot

8    canceled.

9    **A.**  Sure.  There's two different kinds of ways that can happen.

10   One is you can show up with your blank -- I'll back up a little

11   bit.

12       A voter's requested an absentee ballot.  If they've received

13   it and they basically just say, oh, I don't want to vote it, I

14   want to vote in person, they can bring that blank ballot to the

15   polling place, surrender it to the poll workers or to the poll

16   manager.  At that point they still -- the poll manager still has

17   to contact the kind of county headquarters and ensure that that

18   absentee ballot is canceled in the system.  And the -- that

19   basically means it can't be voted.  If a -- if a ballot shows up

20   for that voter, the county would know, well, there was no actual

21   existing request, so this is not a good ballot.

22       Or a voter can show up without a ballot, and then when they're

23   checked in, the poll worker will see, oh, they've requested an

24   absentee ballot.  And the voter will say, oh, maybe I lost it or

25   it hasn't gotten here yet, I would like to vote in person.  So

1    then the county has to contact the deputy registrar.  Some of the

2    larger counties will have the deputy registrars at the actual

3    polling place, but some of the smaller ones will not.  And they

4    have to contact the deputy registrar, get the absentee ballot

5    request canceled, and then the voter's allowed to vote in person.

6        So that call to -- usually a lot of times it's a call that can

7    take a little bit of time.  And also it can lead to what I was

8    talking about earlier where the voter said, well, I didn't request

9    an absentee ballot, you're saying someone's voted an absentee

10   ballot for me?  That's the other problem, too, is sometimes --

11   remember, poll workers are not -- these are not people that do

12   this job every day, they do this a few times a year and they're

13   trained.  But I think sometimes there were some things lost in

14   translation where the system, when they were checking in, was

15   showing the voter had requested an absentee ballot, but it might

16   have either kind of been relayed to the voter or sounded to the

17   voter like you voted an absentee ballot.  And they said, I didn't

18   vote, someone must have voted for me and that sounds like voter

19   fraud.

20       And the other thing that we heard was if people were kind of

21   maybe three or four people behind that voter in line and hearing

22   this conversation, they would -- it could be relayed back to, hey,

23   they say this voter had already voted and then they let them vote

24   again, and we got a lot of complaints about that also.

25       I think overall the cancelation process -- and we saw a big

1  increase in canceled absentee ballots in 2020, but that can

2  definitely lead to issues at the polls, lines at the poll, which

3  we very much want to avoid because we want to have a smooth voting

4  experience for everybody.

5          MR. FIELD:  We can move to one slide earlier.

6  **Q.**  Take a look at what's before you.  Can you explain what has

7  happened with the number of canceled ballots in the last three

8  primary elections?

9  **A.**  Sure.  So this is the number of absentee ballots that have

10  been canceled in the last three primary elections.  The most --

11  like by far the biggest reason why an absentee ballot is canceled

12  is because someone has shown up to vote in person, either in early

13  voting or on Election Day.  There's other reasons, so it's not

14  that all of these are going to be that, but I think the vast, vast

15  majority, probably into the 90 percents, are going to be people

16  who showed up to vote in person.

17      In 2018 we saw 1,157 ballots canceled in the primary.  And

18  then in 2018 (sic) it went way up in the primary.  And that was in

19  the middle of COVID obviously.  And so, you know, the state had

20  actually sent out absentee ballot applications to everybody, so,

21  you know, we understand that's going to be higher.

22      And then for the 2022 when we see it going back down to a

23  higher number just because of the -- there's actually more

24  absentee ballots in 2022 than in 2018 but a lower percent

25  canceled, which is good.

1          MR. FIELD:  If we can go to the preceding slide, slide

2     three, just to show the math.

3  **Q.**  Those percentages are percentages of the total absentee

4     ballots cast, right?

5  **A.**  Yes.  Yes.  So on this slide, this is the absentee ballots

6     cast in the last three primaries, in 2018, 2020 and 2022.

7          So in 2018 we saw 32,000 and change absentee ballots in the

8     primary.

9          In 2020, again, in the middle of COVID, 1.2 Million, so that

10    was, you know, basically unheard of and put a lot of stress on the

11    system.

12         And then in the 2022 primary, it was a pretty healthy amount,

13    84,500 absentee ballots in the last primary.

14 **Q.**  So my last question with respect to the pre-filled

15    applications, you set forth several concerns that the state heard.

16    Why didn't the state just prohibit third parties from sending out

17    absentee ballot applications altogether?

18 **A.**  I think the legislature was looking for balance.  I mean, I

19    think there was -- following the 2020 election there was a lot of

20    sort of ideas thrown around by the legislature, and I was at a lot

21    of those hearings.  But I think they were kind of looking for

22    balance in terms of, okay, there is some value to this process,

23    you know, there is some value to these groups, but how can we try

24    to deal with the complaints, the voter confusion that we know this

25    causes and sort of the effect on confidence that we knew it had

1  from the complaints we were getting.

2  **Q.**  Since SB 202 has been enacted, has the state received greater

3  or fewer complaints about incorrectly pre-filled applications?

4  **A.**  Fewer.

5  **Q.**  I would like to turn then to the duplicate ballot

6  applications.

7          MR. FIELD:  You can take down the slide.

8  **Q.**  So in your declaration do you recall attaching examples of

9  people receiving multiple applications?

10 **A.**  Yes.

11 **Q.**  And do you recall hearing any -- well, let me try it this way:

12 Can you describe generally what type of complaints you received

13 about duplicate applications.

14 **A.**  We received a few complaints.  One of them -- a big one was, I

15 already requested an absentee ballot, why am I getting this?  Was

16 there a problem with my first request?  What happened?  What do I

17 need to do?  And, of course, that's going to generate calls to the

18 county and to the state.

19     And the other one I think was basically -- a lot of them were

20 I've received six ballots here and that looks like voter fraud.

21 And oftentimes we would call that voter and say, can you describe

22 what the ballots looked like.  And they were -- and I think we --

23 that's a thing that often happens with voters and, frankly,

24 everybody.  Sometimes I say absentee ballot when I mean absentee

25 ballot application, but I think with voters it's real -- it really

1  is -- can be confusing.

2      And so they would say, I've received six absentee ballots, and

3  what we suspected and what turned out to be the case generally was

4  they received six absentee ballot applications, but to the voter

5  it was concerning.

6  **Q.**   I would like to talk about two aspects of this.  So looking

7  first at a voter receiving multiple applications, why is it

8  problematic for a voter to receive multiple applications?

9  **A.**   Well, one, the effect on the voter can be, I -- I've already

10  requested an absentee ballot, if they have; or basically they want

11  to vote in person and they're not sure why they're receiving them.

12      So if they have requested an absentee ballot, it's more like

13  is there a problem with my first request?  If they aren't planning

14  to request one, then I think they just see it more as what is

15  this?  The fact that I keep getting this, is this something that I

16  need to do?  Am I supposed to do this?  So it can lead to that

17  type of confusion.

18      And then the other thing is it basically leads to they can --

19  they might just send in all of them that they get.  You know, some

20  of these forms are designed to look -- are designed to look like

21  they're coming from the government.  And we see that not just in

22  elections, you know, we do corporations as well, and when you

23  start -- if you start a new LLC, it generates a lot of mail that

24  then you get that's kind of designed to look like official

25  government stuff that you have to do.  And a lot of it is

1  basically -- in that context is just kind of a rip-off frankly.

2  It's like, oh, we'll sell you this for $50, and they make it sound

3  like you have to get it when you don't have to, and you can buy it

4  for $10 from our website.

5      So I think -- but the concern is, and we did see this, where

6  people would -- I remember one call in particular that Chris

7  Harvey told me about where he talked to a lady and she said, why

8  do I keep getting these?  I've been sending them all in.  I've

9  probably sent six or seven of these applications in.  She's like,

10 what's the problem?  Why do I keep getting these?

11     And so Chris Harvey explained to her they're absentee ballot

12 applications, you don't need to keep sending them in.  If you've

13 already requested one, you're fine.  And then she said, well, it

14 doesn't matter, I'm going to vote in person anyway.  So I just

15 think about -- I think she was in DeKalb County, and I just think

16 about the work that that one voter put on the county elections

17 office where they had to process each application -- when they

18 receive a duplicate, the county processes it as a duplicate

19 application.  So, it's like, okay, received but duplicate, so the

20 voter's already got a ballot request, they'll get their ballot.

21 But then that voter was then going to show up in person and the

22 county was going to have to go through the absentee ballot

23 cancelation procedure that we talked about earlier, that has it's

24 own problems.

25     And the counties just aren't set up to have that many sort of

```
 1  touches for each voter, like that's not how they're structured.

 2  That can really quickly get overwhelming.  And when they get

 3  overwhelmed, then you can see mistakes happen.  And when you see

 4  mistakes happen, then it leads to things -- it leads to

 5  allegations of fraud, of suppression, of whatever sort of I think

 6  fits the voter's -- a lot of times their preexisting views and

 7  then -- but that sort of can be the hook that the voter is looking

 8  for.

 9      So in elections we really need to -- you have all these people

10  doing this who don't do it every day, they do it not very often,

11  and we've got to minimize mistakes because it's a big logistical

12  thing, but mistakes can really have -- can really be kind of, I

13  think, made to look like -- like nefarious or something that can

14  really lead to a lack of confidence in the election results.

15  Q.  Now --

16  A.  We saw that recently, I'm sorry, in the DeKalb County primary.

17  You know, we saw some mistakes in the process based on late

18  changes, and that's why late changes are dangerous.  And now --

19  fortunately it was -- the mistake was caught.  Now it wasn't -- it

20  was caught later than it should have been but that's why there's

21  multiple checks in the process.  And we were able to -- DeKalb,

22  and we worked with them, were able to correct it, but it's

23  something that we still hear about.  There's been lawsuits filed.

24  It's people that want to sort of cast doubt on the election are

25  utilizing that what was really a mistake to kind of say this is
```

1  now the evidence, this shows the machine's flipped votes, this is

2  kind of why we shouldn't have confidence in the election results.

3  **Q.**  Now, the anti-duplication provision, do you understand what I

4  mean when I use that term?

5  **A.**  Yes.

6  **Q.**  Does that provision of SB 202 contain any safe harbor?

7  **A.**  Yes.  So SB 202 says that you -- if you -- you can't send a

8  duplicate request to someone who's already applied for an absentee

9  ballot.  But if you check the state's absentee voter file within

10 five business days, then you're basically safe.

11 **Q.**  And that's what I just wanted to confirm.  So we heard

12 testimony yesterday about a question, if it was business or

13 calendar days.  Do you --

14 **A.**  I believe it's business days, five business days.

15 **Q.**  So in order to comply with the anti-duplication provision, how

16 would an organization like plaintiffs obtain the information

17 necessary to get the list of people to whom they can send ballots

18 or ballot applications?  Does the state provide that?

19 **A.**  There's a file called the "Absentee Voter File," it's on our

20 website.  It's very heavily utilized by campaigns and kind of

21 political groups or -- you know, kind of third-party groups as

22 well that shows who's requested an absentee ballot, who's voted

23 that absentee ballot.  Of course, it doesn't show how they've

24 voted.  In the primary it does show what ballot they've requested,

25 so that -- that is public information.  It shows when the ballot

1  has been mailed.  So it's a very heavily utilized tool.  And it's

2  updated every day during the election cycle.  And that starts with

3  when the absentee ballots can start being -- sorry, when the

4  absentee ballot applications can start being accepted in 78 days

5  before the election, then that file is updated every day and it's

6  public on our website so you can see who's requested an absentee

7  ballot.

8  **Q.**  Now, before we turn to the disclaimer provision, I just want

9  to clarify something we heard yesterday.  Do you recall hearing

10  testimony from Mr. McCarthy, from Plaintiff VoteAmerica,

11  discussing their print-and-mail tool?

12  **A.**  Yes.

13  **Q.**  What is your understanding of their print-and-mail tool?

14  **A.**  So my understanding is that they have a tool that basically

15  you go to their website, you can enter your information, and then

16  they use that information to populate the application.  It's

17  pretty similar to our online ballot application portal where

18  that's how you -- you put in your information, it populates the

19  form, and then you can print it out and submit it essentially

20  right then.  And I think they have -- probably had that option,

21  too, where you can just print it out right then or get it e-mailed

22  to you.

23    Then I think they also have it where you can ask VoteAmerica

24  to mail that application to you, that was my -- that you've

25  basically filled out utilizing their web-based application.

1   **Q.**  And, if you could, could you look at Volume I of plaintiff's

2   exhibits, that's the white binder that says Volume I.  It should

3   be on your left.  And if you would look at tab 3, please.  Let me

4   know when you're there.

5   **A.**  I'm at tab three.

6   **Q.**  And if you flip past, there's a page that says Exhibit B.  Do

7   you see a State Election Board regulation there?

8   **A.**  Yes.

9   **Q.**  Are you familiar with this regulation?

10  **A.**  Yes.

11  **Q.**  I would like to draw your attention specifically to part two

12  right in the middle of the page.  Are you familiar with that

13  provision of this regulation?

14  **A.**  Yes.

15  **Q.**  And what is the purpose of that provision?

16  **A.**  This was a provision that was enacted by the State Election

17  Board subsequent to SB 202 I think to clarify that web-based tools

18  or applications -- I'm reading from it now -- web-based tools or

19  applications that allow people who are otherwise eligible to

20  request absentee ballots in Georgia, i.e., voters or eligible

21  family members, by entering personal information into the

22  web-based application by the voter or eligible family member, to

23  partially complete the absentee ballot application described in

24  Section 1 of this rule are permitted.  That's the first sentence.

25  **Q.**  Can you put it in your own words, what does that mean?

1  **A.**   That basically means what -- the type of thing -- I think it

2  was really aimed at exactly the type of thing that VoteAmerica

3  does, where -- to help someone kind of fill out the application

4  that way or to -- really to allow them to fill out their own

5  application that way is perfectly fine.

6  **Q.**   Do you read this to mean that VoteAmerica's print-and-mail

7  tool would be permitted under SB 202?

8  **A.**   Yes.

9  **Q.**   And that's with respect to the pre-filing prohibition?

10 **A.**   Pre-filling?

11 **Q.**   I'm sorry.  Pre-filling prohibition and the anti-duplication

12 provision?

13 **A.**   Yes.  I read permitted to mean permitted -- this was enacted

14 subsequent to SB 202, so I think it was in direct response to try

15 to clarify that.

16 **Q.**   Are there any other limitations or caveats to that in this

17 particular provision?

18 **A.**   Yes.  The next sentence deals with how the groups that I guess

19 run the web-based application, how they store -- I'm sorry, it

20 deals with how those groups store voter information and it puts

21 restrictions on that.

22 **Q.**   So I would like to now discuss the disclaimer provision.  Are

23 you familiar with that term when I use that?

24 **A.**   Yes.

25 **Q.**   Can you explain -- actually, strike that, we've already

1  covered that.

2     So before SB 202 was enacted, do you recall whether or not

3  there were any instances of voters being confused about who sent

4  an absentee ballot application?

5  **A.**   Yes.  We received that quite often in terms of why am I

6  getting this?  Who is sending me this?  Oftentimes they thought it

7  was the county or the state sending it, so they would call and

8  say, why are you sending me this basically, what do I need to do

9  with this?

10  **Q.**  And why does that matter to the state, how does that affect

11  the state?

12  **A.**   It pulls -- it pulls people off what they need to be doing.

13  Especially when it's really large mailings, it can really -- it's

14  definitely noticeable when those mailings I think hit mailboxes.

15  I think that's why -- and I know we generally do get e-mails

16  from -- I'm forgetting the exact order of the letters but --

17  **Q.**  VPC and CVI?

18  **A.**   Yeah.

19     -- VPC and CVI saying, hey, we expect this mailing to hit

20  mailboxes on this day, because I think they know that it generates

21  a lot of calls to elections offices, county or state.  And that

22  can be a substantial, I think, thing to try to explain to voters,

23  hey, this is -- here's what this is, it's not from us, you don't

24  have to do anything with it.  If you've already registered to

25  vote, if it's a voter history mailing, you don't have to do

1 anything, this is not indicating you're not.  If you -- on an

2 absentee ballot application -- if you don't want to vote absentee,

3 you don't have to do anything, you don't have to do this to

4 register to vote.  We get a lot of questions.

5     I mean, one thing that I've heard from county election

6 officials, particularly about absentee ballots, is they -- they've

7 told me every time they think they've seen everything a voter

8 could possibly do on an absentee ballot, then they get something

9 and they say, well, what is this?  I mean, how did this voter

10 think this is going to basically work to vote their ballot?  And

11 this is coming from long-time county election officials who have

12 seen a lot.

13     So that's -- you know, voters don't interact with this every

14 day, and so when they do get things like that, it is going to

15 generate confusion and calls and they want to understand what it's

16 about.

17 **Q.**  Let's actually take a look at the disclaimer provision itself.

18 In the binder you have, could you turn over to tab two.

19 **A.**  Yes.

20 **Q.**  And are you familiar with that document?

21 **A.**  Yes.

22 **Q.**  And do you see the disclaimer at the bottom that you were

23 discussing?

24 **A.**  Yes.

25 **Q.**  I would like to talk about it now in a few parts.

 1    So I would like to begin first with discussing the following:

 2   This is not an official government publication.  Do you see that?

 3   **A.**  Yes.

 4   **Q.**  Do you recall hearing yesterday testimony from Dr. Green that

 5   that sentence was true?

 6   **A.**  Yes.

 7   **Q.**  Why is this document not an official government publication?

 8   **A.**  I think the point that that's trying to get across is this is

 9   not something that you have to interact with.  This is not

10   something that you have to fill out and return.

11    You know, I know in the legislative process of SB 202 one of

12   the big concerns was space.  I mean, I don't think -- you can't

13   really put everything in a disclaimer that you might want to

14   because, you know, there is concern about space.  But I think the

15   real point to get across was this is not something that you have

16   to fill out and return because voters would think that -- some

17   voters would call and we can explain you don't have to do this,

18   but some voters would just fill it out, which, you know, if they

19   want to then -- if they want to then vote absentee, that's fine,

20   but if they don't realize that's what this is -- and we did try to

21   improve this form post-SB 202 to make clearer this isn't a -- your

22   requesting an official absentee ballot.

23    And that was also I think one of the purposes of the

24   pre-filling prohibition, is that if you have to actually fill out

25   the form, it really requires a voter to engage more with the form

1  and really see what it is, what they're writing down, what they're

2  essentially swearing to because they can get -- they could get in

3  trouble if there's something incorrect on here.

4      I think that's really the purpose of that, is to say this is

5  not -- they didn't go and get this from the government, you know,

6  that's why it's only required when they're getting it from a third

7  party.

8  Q.  So, then, let's go to the next clause.  And some of this will

9  dovetail likely with what you've already testified, but let's talk

10  about the clause that reads:  And was not provided to you by any

11  government entity.

12  A.  Right.  I think that's going to -- that was one of the main

13  questions that the counties and us would get, is why are you

14  sending me this?  And so this tries to answer that question of,

15  okay, it's not sent to you by the government, and trying to kind

16  of hammer home, you don't have to do something with this.  You

17  know, it's two separate things, right, like who is sending me this

18  and what do I have to do with it?  So I think both of those things

19  are trying to kind of hammer that point home.

20  Q.  Did you testify earlier about who voters call when the VPC and

21  CVI applications land in folks mailboxes?

22  A.  I know they call the county and the state a lot.  A lot of

23  times they'll call counties and then we'll hear from counties as

24  well.  And I know they call the state or e-mail the state.  I

25  mean, I heard yesterday they might also reach out to VPC and CVI,

1  but I don't have really insight into that.

2  **Q.**  And the last clause that I want to talk with you about is:

3  This is not a ballot.  Do you see that language?

4  **A.**  Yes.

5  **Q.**  Do you recall testimony yesterday from Dr. Green stating that

6  nobody would think this is a ballot because there's nobody to vote

7  for?

8  **A.**  We get a lot of complaints about thinking it's a ballot.

9  Whether it's, you know, I just received six ballots.  There was a

10  story in 2018 where somebody using one of those pared-down forms

11  thought it was a ballot and wrote on there "Stacey Abrams" because

12  that's who she wanted to vote for in terms of where she was

13  supposed to write her own name.  And then that -- again, that was

14  in DeKalb County.  The voter -- or, sorry, the election worker

15  then issued a ballot to Stacey Abrams.  Now, she shouldn't have,

16  it was a mistake basically, it should have been kind of caught,

17  this was not what that was meant to be.

18      But go back to what I said earlier, these are -- DeKalb

19  County's one that has to kind of do some surge hiring during

20  election time and you train people.  And that's why the form was

21  changed in 2018 to say, okay, you can't -- that's too confusing

22  for counties.

23      But so, yeah, people -- there are certain instances --

24  there are definitely instances of people thinking -- it's one of

25  the most common things we get thinking the application is a

1  ballot.

2  **Q.**  And before we conclude, just moving past the disclaimer

3  provision, I would like to discuss with you what third-party

4  organizations may or may not be able to do now that SB 202 is

5  enacted.

6     So under SB 202 may an organization like plaintiffs send blank

7  absentee ballot applications to Georgia voters?

8  **A.**  Yes.

9  **Q.**  How often?

10  **A.**  As often as they want until the voter requests an absentee

11  ballot.

12  **Q.**  And may the plaintiffs include -- and other third-party

13  organizations include cover letters with those absentee ballot

14  applications?

15  **A.**  Yes.

16  **Q.**  And could those cover letters include a statement explaining

17  what this disclaimer means?

18  **A.**  Yes.

19  **Q.**  And then after plaintiffs or other third-party organizations

20  send an initial wave of applications, may they send follow-up

21  letters reminding voters that they sent an application to them

22  previously?

23  **A.**  Yes.

24  **Q.**  And may organizations like plaintiffs also include a link in

25  that cover letter to where they can obtain another copy of the

 1  application?

 2  **A.**   Yes.

 3  **Q.**   Just more generally, under SB 202 may plaintiffs continue

 4  sending letters to Georgians expressing their support for absentee

 5  voting?

 6  **A.**   Yes.

 7  **Q.**   How often can they send those letters?

 8  **A.**   As often as they would like.

 9  **Q.**   The last thing I would like to discuss with you, let's say

10  that this Court were to enter a preliminary injunction on the

11  three provisions that we've talked about, how would that affect

12  the operations of the Secretary of State's Office?

13  **A.**   Well, I think it could affect the operations substantially of

14  our office and of county election officials.  What I've learned in

15  elections is it is a big logistical thing that's done by a lot of

16  different people, and so you move one piece, it kind of requires

17  moving another piece, requires moving another piece.  And even if

18  they're small moves, at the end of this chain that, frankly, I am

19  usually not smart enough to see the very end of it, it can affect

20  something that we really didn't think we would have an effect on.

21      That's exactly what happened in DeKalb County in the last

22  primary where we found a -- there were all these things that

23  happened, some outside of the control of the state and the

24  counties and some not, but there was a redistricting change that

25  was missed, so that had to be kind of fixed late, which that made

1   things more complicated.  And then a candidate withdrew, and that
2   made things more complicated.  And then there was an issue with a
3   party question, and that had to be resolved.  So all these late
4   changes that in and of themselves shouldn't have been I think like
5   fatal, turned out to be really big issues at the end of the day
6   when the results started coming in and they were clearly not
7   accurate.  So then that led to a lot more work for the county
8   after the election.
9       You know, we're in -- we have a runoff next week, a week after
10  next.  I'm confused.  Coming up very quickly.  And that's the
11  thing I think about elections, is -- that's another thing I've
12  learned, it's not a one-day thing.  We're doing a recount -- I say
13  "we," ten counties are doing a recount right now in the May
14  primary in Congressional District 10, and that's a complicated
15  process.  So they're still trying to finish up the primary
16  election at the same time while they're preparing for a statewide
17  runoff election and -- week after next.
18      And then after that runoff election, which is late June,
19  they've got to then do all the work to certify that election, kind
20  of all the post-election checks that are vital, like that's how
21  that issue was caught in DeKalb County that's been resolved.  And
22  then the state does its post-election checks and leads to state
23  certification.
24      And then after certification is when you have recounts and
25  election contests, and we have both of those things going on right

1  now for the primary, both an election contest and a recount.  And

2  so I wouldn't be surprised to see similar things happen after the

3  runoff, so that kind of extends -- I don't want people thinking,

4  okay, after the runoff they don't have anything to do.

5      And then, you know, we've already got plans for what we kind

6  of want to hit counties with with training in July and August

7  because November is going to be a big election.  They have to do a

8  risk-limiting audit.  They've never really done it before.  We

9  were supposed to do it in 2020, but the election results made it

10 so that the risk-limiting audit turned into a full hand count,

11 which is a type of risk-limiting audit but it's not the type that

12 we expected to have to do.

13     So now counties are kind of having to learn that, so we've

14 been working on that all year.  And that's I think one thing that

15 I've learned, too, is counties use a lot of the same people for

16 their poll managers, for their poll workers, for their election

17 office workers for absentee ballots throughout the year.  So they

18 kind of see -- you see sort of improvement, right, as they

19 learn -- as the workers experience a job and learn a little bit

20 more.  But you have to see that because we saw, what, almost 2

21 Million people vote in the primary, but it's going to be probably

22 more than twice that in November.  And you're -- it's a very

23 different thing.  So they really have to get more efficient at

24 each of their tasks.

25     So the training that they'll do with their poll workers and

1  workers will hopefully be -- it can move to kind of 202 type

2  training, where earlier this year it was more 101 kind of

3  reminders and then it kind of gets more advanced.  And so they've

4  got a full plate.

5      The absentee ballot applications start being accepted in

6  August.  Before that they start -- our office builds ballots and

7  then sends to counties for proofing and that's a vital process

8  because if -- again, going back to the DeKalb County thing that

9  happened, if that proofing -- if we hadn't made a mistake in

10  ballot building, and then if they had caught that mistake in

11  proofing, then we could have avoided a whole issue.  So like that

12  whole -- like each of these steps is really vital.

13      And when we have things like -- that's one thing that came up

14  yesterday, all we have to do is not enforce, I don't think that's

15  accurate because what's going to happen is it is -- we know it's

16  going to generate like all these calls that I think the point of

17  SB 202 was to try to avoid.  And when it pulls county election

18  workers and state workers into trying to respond to that to try to

19  sort of mollify that voter confusion, then they're pulled off of

20  some of these really -- like proofing a ballot is a very -- what's

21  the word?  I mean, it is a very like intensive and sort of

22  deliberate process and you've got to go step by step.  And you've

23  got to have multiple people do it because people make mistakes,

24  and you've got to then catch mistakes.  So, you know, it's all --

25  like this would -- what I've just learned is any late change

1  basically has effects that sometimes don't become apparent until

2  later.

3  **Q.**  You mentioned in there training materials and trainings.  As a

4  general matter, does the state provide trainings to counties that

5  address absentee ballot application rules?

6  **A.**  Yes.

7  **Q.**  Would any of that need to be changed?

8  **A.**  Well, what we would have to do is I think do like new training

9  on it essentially.  And I know our elections division already has

10 kind of, okay, here's what we want to train on for November so

11 that we can ensure November goes well.  So that -- and there's a

12 limited amount of people and time so, you know, you can't just

13 say, okay, well, let's just add this, okay?  It's going to take a

14 balancing act.

15     The other thing that we are going to try to do this year,

16 there is a window of time where we can do list maintenance in

17 July, so that's happening right now.  And then the counties would

18 be processing what they get back from voters from list maintenance

19 in July.  So that's another thing that they'll be doing kind of in

20 the lead-up to when ballot applications can start being accepted

21 in August and then ballots, live ballots, go out very soon

22 after -- they have to go out 49 days in advance of the November

23 election to overseas and military voters, which is sometime kind

24 of like mid-September-type time frame is when actual live

25 ballots -- so here's something about live ballots, you've got to

1  have everything done basically by mid-September and ready to go,

2  which means you really need to have it done before then.

3  **Q.**  You mentioned in addition to some trainings and so forth

4  relative to absentee ballot applications, you've talked about a

5  lot of other topics.  How would enjoining the ballot application

6  provisions that we're talking about affect those other operations

7  of the Secretary of State's Office over the next few months?

8  **A.**  Well, I would basically pull people off of I think those

9  things that our election division has identified as the things

10  they want to be doing to really ensure a successful November

11  election to -- basically to these topics.

12  **Q.**  Are those other things topics and tasks that could just be

13  slid to other times?

14  **A.**  No, they have to be accomplished before the November election.

15  **Q.**  And would all these changes that you were discussing, would it

16  inject any confusion or hardship to voters?

17  **A.**  I think it would.  I think that's what we've seen really

18  starting in 2018 and definitely in 2020 about what is this?

19     You know, one of the main things that I think we've seen with

20  the increase in canceled absentee ballots, that leads to longer

21  lines at the polls because that's something that's got to be

22  handled at the polls.  So there's provisions in SB 202 that deal

23  with line management, but I think these provisions are part of

24  that as well, where it's like, hey, this is -- we want to ensure a

25  smoother experience at the polls for voters because, again, that

1  goes to confidence.

2      I think what we've learned from some of the complaints we get

3  is that it's not just your personal experience, you also see other

4  voters' experience at the polls.  So we want everyone to have a

5  smooth experience.

6              MR. FIELD:  No other questions at this time, your Honor.

7              THE COURT:  Thank you.  Any cross?

8              MS. LANG:  Yes.

9              THE COURT:  Go ahead.

10                        CROSS-EXAMINATION

11  BY MS. LANG:

12  **Q.**  Good morning, Mr. Germany.  My name Danielle Lang, and I

13  represent the plaintiffs.

14  **A.**  Good morning.

15  **Q.**  Before I get to the questioning I prepared for you, I do have

16  a question -- a few questions related to some of the testimony you

17  put -- that you just testified to about VoteAmerica's

18  print-and-mail tool.

19      You're an attorney, right?

20  **A.**  Yes.

21  **Q.**  And, Mr. Germany, have you been working with your

22  representation on their defense of this case?

23  **A.**  Yes.

24              MR. FIELD:  Your Honor, I'm going to object to this if

25  any of this goes into attorney/client communications.

1           MS. LANG:  No.

2           MR. FIELD:  Just advising the witness to not divulge any

3    communications.

4           MS. LANG:  Certainly.

5    BY MS. LANG:

6    **Q.**  Did you read the opposition to the motion for preliminary

7    injunction that was submitted on your behalf, on the behalf of the

8    office?

9    **A.**  I would have read it, yes.

10   **Q.**  Okay.

11          MS. LANG:  With your permission to approach, I would

12   like to show Mr. Germany part of that opposition --

13          THE COURT:  Y'all can move around the courtroom as much

14   as you would like.  Thank you.

15   **Q.**  So, Mr. Germany, I'll represent to you that this is page 25

16   of the defendant's opposition.  And this is a portion of the

17   opposition that is talking about the mailing list restriction, as

18   they call it, the anti-duplication provision.  And there's a

19   footnote, footnote seven, do you see that there?

20   **A.**  Yes.

21   **Q.**  Can you read it.

22   **A.**  Plaintiffs ask for an even narrower provision with an

23   exception for those requesting a ballot through an online request

24   tool, but they rightly do not claim that the state must adopt the

25   least restrictive means available to further its interest.  And

1 narrow tailoring does not require a perfect fit, only a reasonable

2 one.  Thus, the state reasonably crafted a single rule for

3 duplicate applications.

4 **Q.**  Okay.  So, I guess, I'm a little confused.  Is it the

5 Secretary's position that there is a single rule for duplicate

6 applications regardless of whether or not they come from an online

7 tool, or is it not the Secretary's position that there's a single

8 rule regardless of whether or not they come from an online tool?

9 **A.**  I'm not really sure what "single rule" means.

10 **Q.**  Well, it's from your opposition.  So it says:  There's a

11 single rule for duplicate applications for both online request

12 tools and for other mailings.  But earlier you testified that you

13 believe that the regulation exempts tools like VoteAmerica's.

14 So --

15 **A.**  I think the regulation -- I think what I said about the

16 regulation is accurate.  I think about this footnote might be a

17 better question for our lawyers.

18 **Q.**  Okay.  Could you understand how VoteAmerica would believe that

19 they were covered by the anti-duplication provision given the

20 representations from your lawyers?

21 **A.**  I can't really speak to what they understood.  I will say that

22 I think there was a request for admission about it.  And I know

23 the regulation also has rules about what you do with data, and

24 that wasn't something that we had knowledge about, about how

25 VoteAmerica handles that.

1  Q.  I'm glad you mentioned that.  I would like to look at the

2  request for admission.  That is going to be in tab four of the

3  white binders.  And I would like to look at number two, which is

4  on the second page.

5      So plaintiff specifically asked the state to admit that the

6  mailing list restriction only applies to physical mailings by the

7  United States Postal Service or other postal carrier and does not

8  apply to electronic mail.

9      And do you see -- was that something that the defendants were

10 willing to admit to?

11 A.  The response says:  Defendants object to this request because

12 it seeks a pure legal conclusion, which is improper for a request

13 for admission.

14 Q.  And so the state did not admit to that?

15 A.  They objected to the request is what it looks like.

16 Q.  And number one specifically asks if the pre-filling

17 prohibition would not apply to online absentee ballot application

18 tools which allow a voter or eligible family member to pre-fill

19 the absentee ballot application, including but not limited to the

20 model used by Plaintiff VoteAmerica as described in 19 of

21 plaintiffs' complaint.

22     And what was the response?

23 A.  Defendants object to this request as it fails to define its

24 key terms sufficiently, including absentee ballot application

25 tools and the model used.  Defendants further object to this

1  request because it seeks a purely legal conclusion, which is

2  improper for a request for admission.

3  **Q.**   So defendants did not admit to that, is that correct?

4  **A.**   It looks like the defendants objected to the request.

5  **Q.**   And would you object to any order from this Court that made

6  clear that the anti-duplication provision does not apply to the

7  tools described in the regulation?

8  **A.**   Yes.

9  **Q.**   Why would you object to that?

10 **A.**   That's the whole complicated thing about, you know, basically

11 an order for preliminary injunction that basically states what the

12 law I think already says, we would appeal, there would be like

13 attorney fees things.  So, yeah, we would definitely object.

14 **Q.**   Would you object to issuing a clarification from the Secretary

15 of State's Office that makes clear that the regulation does not --

16 exempts organizations described and tools described in paragraph

17 two, not only from the pre-filling prohibition but also from the

18 mailing list restriction?

19 **A.**   I would be happy to work on something like that.

20 **Q.**   Okay.  Because it -- would you agree that based on footnote

21 seven it appears that your lawyers did not understand that to be

22 the case?

23 **A.**   I don't -- I can't really speak to the footnote very well, I'm

24 sorry.

25 **Q.**   Okay.

1    So I want to go back and just do a little table-setting now
2  that we've cleared that up.
3    You're general counsel for the Secretary of State's Office, is
4  that right?
5  **A.**   Yes.
6  **Q.**   Is there an elections director for the elections division?
7  **A.**   Yes.
8  **Q.**   And who is that right now?
9  **A.**   Blake Evans.
10 **Q.**   And I know that sometimes voter complaints do filter up to
11 you, but is it your job primarily to respond to voter complaints?
12 **A.**   No.
13 **Q.**   Do you interface with voters very often with respect to
14 complaints?
15 **A.**   Probably not very often.
16 **Q.**   Okay.  When was the last time that you did that?
17 **A.**   I mean, I got a complaint from a voter yesterday.  I have not
18 interfaced with the voter yet.
19 **Q.**   Are you planning to personally interface with the voter?
20 **A.**   I don't know.  I don't know.  Some of the complaints we get
21 are difficult to respond to.
22 **Q.**   But in the ordinary course you're not the person responding to
23 voter complaints?
24 **A.**   It really depends.  I mean, if it's kind of a simple, hey,
25 here's the issue the voter is having and it can be solved

1  basically with some research and looking out to counties, then,

2  no, that would not be my job.

3  **Q.**  Do you typically conduct the trainings of county election

4  officials?

5  **A.**  No.

6  **Q.**  Who does that?

7  **A.**  We have people on our elections division, we have a training

8  coordinator, we have a deputy director, Dr. Jesse Harris, who

9  oversees that and he overseas that along with our training

10  coordinator and I believe other people in the elections division.

11  And we also have some I think -- I guess contractors is the best

12  word, who would assist us with that.

13  **Q.**  How many staff does the elections division have?

14  **A.**  It's a small staff.  I mean, it's probably maybe ten people.

15  **Q.**  Okay.  And do you have -- but you have contractors as well?

16  **A.**  We have the one I was -- the one I was specifically thinking

17  of is we have a retired elections director who we have a contract

18  with to help.  You know, really she's just kind of an expert in

19  Georgia elections, and so we utilize her for -- to try to make

20  sure we're running -- doing things in a way that's going to work

21  for counties, and she can really help us tailor a message that's

22  going to be best received by counties.

23  **Q.**  And that ten individuals, does that include your

24  investigations division?

25  **A.**  No.

**Q.**  How many folks work in the investigations division?

**A.**  There's about I would say like maybe 22 I want to say
POST-certified investigators.  That's kind of the Georgia like
certification they have to have to -- they basically carry guns,
so they have to have that.  And then there's other -- there's
inspectors as well who are not POST-certified.  We utilize the
inspectors in elections but really just kind of while voting is
taking place to go look at different early voting locations or
polling places.  They have a form they can see to make sure, okay,
how does everything look here?  But generally their job is not
going to be election related.

**Q.**  Certainly.

    And as I understand your testimony, it's primarily the
investigations division that's going to kind of look under --
review the facts and analyze and maybe investigate the facts of
these complaints, is that correct?

**A.**  Well, if the complaint really gets to a -- like an allegation
of a violation, right?  Some complaints are I'm having this issue
or I'm having this concern.  Some complaints are, hey, this looks
like a violation of law or rules.  And some are just kind of
general, you know, unhappiness.  And so there's kind of a triage
of, okay, where does this best go?  And I would say our elections
director, our deputy chief investigator, myself are kind of
involved in, okay, where -- how's the best way to handle this
if it -- some of them are clear, which is good, but many of them

1  are not.

2  **Q.**  All right.

3      So I want to talk a little bit about the pre-filling

4  prohibition first.  As I understand it, you believe that the

5  pre-filling prohibition is useful to the state because it prevents

6  distribution of incorrect or outdated information, is that right?

7  **A.**  Yes.

8  **Q.**  So I want to make sure that the Court understands the process,

9  I think you've already described this, but when an absentee ballot

10  application is received, it is compared to the state's voter

11  registration file, is that right?

12  **A.**  Yes.  Well, that's how you look up -- that's how they would

13  look up the voter.  Basically they would look up the voter to make

14  sure they're a registered voter.

15  **Q.**  And they try to match the data on the absentee ballot

16  application to the voter registration file, is that right?

17  **A.**  Yes.

18  **Q.**  And what happens if it doesn't match?

19  **A.**  It depends on, you know, as to what doesn't match.  I mean, I

20  think the general thing is you get a provisional absentee ballot

21  that says, hey, there was an issue, here's your provisional

22  ballot, but when you turn it in, you need to basically fill out

23  this affidavit and include your ID that says -- that kind of

24  proves who you are.

25      One of the things that it can't match, we really can't match

1  is a lot of voters -- and it could -- in a very typical absentee

2  process a voter is requesting a ballot to be sent to a different

3  address where they might not be.  So the state really has no way

4  of kind of verifying that address, that relies on the voter.

5  **Q.**   So that information doesn't have to match?

6  **A.**   Well, there's nothing to really match it to.  Like the voter

7  is saying, I'm not at my home address, please send it to this

8  other address.  It has to be outside of your county.  If -- a lot

9  of times -- a typical situation is college students, they will get

10 them -- a lot of times it's their parents requesting it for them,

11 which is allowed, but to send it to their address at college.

12 **Q.**   Right.  But on the application you also have to put your

13 residential address, is that right?

14 **A.**   Correct.

15 **Q.**   And do the officials match the residential address to the

16 voter registration file?

17 **A.**   They would match that.  And I'll have to remember because we

18 have talked about what happens when that doesn't match, and it's

19 certainly not like fatal to the application.  I can't remember as

20 I'm sitting here if they used that to -- if they used that

21 application to update the voter's address, or if that would kind

22 of lead to basically a reach-out to the voter to say, hey, you

23 have this address on your application, is that your residential

24 address now?

25 **Q.**   So that kind of mismatch is not one that would lead to a

1  provisional ballot --

2  **A.**  I think it -- I can't really say that as I sit here.  It may.

3  **Q.**  So some mismatches between the absentee ballot application and

4  the voter registration file will lead to a provisional ballot

5  being issued with a cure form, is that correct?

6  **A.**  Correct.  And that was a change following 2018.  Before the

7  2018 election -- or during 2018 election they would just get

8  rejected.  And then the legislature made a change in 2019 to say,

9  hey, let's not -- it's actually still technically rejected but the

10  rejected leads to a provisional absentee ballot that can be cured.

11  **Q.**  And can you look at the other white binder, Part II,

12  Exhibit 63.

13  **A.**  Exhibit --

14  **Q.**  63.

15  **A.**  63, okay.

16  **Q.**  Is that the absentee ballot application cure affidavit form

17  that you were just referring to?

18  **A.**  Yes, it looks like it.

19         MS. LANG:  I would like to move Exhibit 63 into

20  evidence.

21         MR. FIELD:  No objection.

22         THE COURT:  It's admitted.

23         MS. LANG:  Okay.

24         THE COURT:  Let's go off the record one second.

25         (Off-the-record discussion)

1            THE COURT:  Go ahead.

2   BY MS. LANG:

3   **Q.**  So I would like you to accept my hypothetical for the purpose

4   of this question, okay?  If a third party uses the state voter

5   file to send pre-filled absentee ballot applications, wouldn't it

6   stand to reason that the information that they pre-fill on an

7   application will match the voter file that they used to do the

8   pre-filling?

9   **A.**  Yes.  I would say especially if they use the active voters.

10  There's active voters and inactive.  Even if they use inactive, it

11  will still match what's on the voter file, it might not match the

12  voter's actual address, which I think is part of the -- what leads

13  to I think some of the complaints we got.

14  **Q.**  Okay.  And during the 2020 primary, the secretary sent out

15  absentee ballot applications to every voter, isn't that right?

16  **A.**  To every active voter, yes.

17  **Q.**  And did they use the voter file to send out those

18  applications?

19  **A.**  Yes.

20  **Q.**  Did you pre-fill them?

21  **A.**  Yes.  And we also included a bar code that basically allowed

22  the county to kind of pull up the voter directly.  What we were

23  trying to do was really make counties -- we knew there would be

24  kind of an onslaught, so we were trying to sort of manage the

25  onslaught in the best way we could for counties.

**Q.**  One of the ways you did that was to pre-fill applications?

**A.**  Yes.  I think pre-filling, I mean, has some benefit, that came up yesterday, with like -- it's easier to read generally when something is typed.  I think that's part of the regulation we were talking about before, the SCB wanted to make clear that was allowed pretty early on in the process.  So, yeah, it basically -- to me pre-filling has some benefits and some drawbacks.

**Q.**  And some counties sent absentee ballot applications out during the general election in 2020 as well, is that right?

**A.**  I don't know that I know that.  I think that may be the case.

**Q.**  Okay.

Do you know if the legislature considered instructing third parties that were going to pre-fill to use the voter file to ensure accuracy rather than a prohibition?

**A.**  I don't know.  I do know that I think some of the things that came up were kind of moving away from no excuse absentee, you know, moving to where third parties can't send out anything at all, but I don't recall the -- using the voter file.

**Q.**  So they were considering harsher restrictions, not even more tailored restrictions, is that right, based on your recollection?

**A.**  I don't know.  I don't know if I can say that.  I don't recall them considering that -- I don't recall that -- I shouldn't say what they considered because I don't really know, but I don't recall hearing about that.

**Q.**  If a third party uses the voter file, wouldn't any outdated or

1   inaccurate information in the pre-filling alert the voter

2   potentially to inaccuracy or outdated information in the voter

3   file?

4   **A.**   Potentially, but that's not -- you know, I think some of the

5   problems I talked about earlier where we know there's going to be

6   out-of-date information in the voter file.  There's kind of

7   federal laws that essentially mandate that.  And I think, you

8   know, we've tried to make it as easy as possible for people to

9   update their information with automatic voter registration, you

10  can do it online, too.  So potentially.

11  **Q.**   Okay.  So if you could turn to --

12  **A.**   I'm sorry, I was -- I drew a blank, but I think one thing

13  is -- the question was, I think, what are they then going to do

14  with that?  So it could say, oh, I need to update my driver's

15  license -- I'm sorry, update my voter registration.  But it also

16  could be like, this is not me, I don't live here or like -- it

17  kind of -- it could have multiple effects on a voter.

18  **Q.**   Okay.  Can you turn to tab 28, and that's in Part I.  Sorry to

19  have you negotiating so many exhibits.

20  **A.**   Yes.

21  **Q.**   So can you turn to what's labeled as page 25 on the top, page

22  25 of 114.

23  **A.**   Yes.  I'm there.

24  **Q.**   So this voter identifies that she's been getting absentee

25  ballot applications in the mail, even though she lives in Florida,

1  is that right?

2  **A.**   Yes.

3  **Q.**   And then she says:  I'm an active registered voter in Georgia,

4  is that right?  Your website shows that I'm an active registered

5  voter in Georgia, is that right?

6  **A.**   Yes.

7  **Q.**   So that led her to discover that she was still on the rolls

8  despite that she moved in 2014, is that right?

9  **A.**   Yes.

10  **Q.**   And she asks to have her voter registration deactivated

11  immediately, is that right?

12  **A.**   Yes.  Now, we do have to -- legally you have to have a signed

13  document asking for that, for us to actually do it, but...

14  **Q.**   Okay.  So do you know what happened to this voter?

15  **A.**   I don't know specifically, I mean what -- for this voter.

16  Generally what we would do if we get a request like that is send

17  them -- there's a form, kind of a cancelation form that they can

18  send to their county, I think it's online as well, but it does

19  require a signature.  So -- and that's I think so people can't be

20  doing that for other people theoretically.

21  **Q.**   Certainly.  But this was how she learned she was still a

22  registered voter in Georgia, is that right?

23  **A.**   It appears so, yes.

24  **Q.**   And led her to take some action to try to start the process of

25  being removed, is that right?

**A.**   Yes.

**Q.**   If can you turn in the same exhibit to page 44.

**A.**   I will say on this, like if she had moved to Florida, based on our list maintenance procedures, assuming she filed a National Change of Address, then she would have gotten a notice from the State of Georgia before this that she might have missed or might not have gotten to her or -- and -- or -- then now with ERIC, too, which I don't know if that -- it wouldn't have happened before then.  Florida is a member of ERIC also, so that would help us catch that, too.  But she should have got a notice previously. Because she was maybe in the process of moving, did she receive the earlier notice?  I'm not sure.

**Q.**   Right.  So voters fall through the cracks of list maintenance one way or another, and this was a way that she caught that, is that right?

**A.**   I think it is but -- you know, I think there's a better way to do that.  If you want to say to a voter, hey, you might -- your information might be out of date, you might be in the wrong state, getting a pre-filled absentee ballot application doesn't really scream that to me.

**Q.**   Sure, Mr. Germany.  That's not my question, just for sake of time.

        Can you turn to page 44.

**A.**   Okay.

**Q.**   Page 44 of the same exhibit, I'm sorry.  I think the page

1  numbering is the easiest way.

2  **A.**   Yep, I'm there.

3  **Q.**   Okay.  So if you kind of turn to the next page where you see

4  the beginning of the chain, this is somebody complaining that

5  members of their family were registered at their address, is that

6  right?

7  **A.**   Yes.

8  **Q.**   I don't see anything in there about receiving mail.  Did I

9  miss it?  Oh, I see it now, in the first page.

10     So these were folks that were registered at the wrong address

11  it appears, according to this voter, is that right?

12  **A.**   Yes.

13  **Q.**   So it wasn't that whoever sent this mail made a mistake,

14  it's that they relied on the voter file, is that right?

15  **A.**   Well, they relied on the voter file, but, like I said, you

16  know, the voter file is populated by what is sent in by voters,

17  and then what's input by counties.  So like I know, for instance,

18  VPC -- VPC and CVI send out voter registration applications that

19  are pre-filled that don't use the voter application.  So if

20  there's mistakes there and they're utilized, you know, that could

21  just kind of be moved over to the voter file, especially with an

22  address.

23  **Q.**   So the Secretary of State would have sent these voters

24  absentee ballot applications that were pre-filled in June of 2020,

25  isn't that right?

1  **A.**  If they're active voters, yes.  If they were active voters at

2  that point, yes.

3  **Q.**  And they were active voters according to page 45, is that

4  right?

5  **A.**  It does say they are in the system as active registered voters

6  at my address.

7  **Q.**  And somebody from your office in response indicated that the

8  county should be notified and there should be a challenge so that

9  those voters could be removed, is that right?

10  **A.**  That's the process for if -- if there's -- as you're kind of

11  aware of somebody who doesn't live at the address, then you can

12  challenge them at your county, and then there's a hearing process

13  that occurs and -- at the county.

14  **Q.**  Can you turn to Exhibit 31, and page 62 in Exhibit 31.

15  **A.**  Yes.

16  **Q.**  Is this another example of a voter who discovered because of

17  election mail that they were still registered in Georgia despite

18  moving to Florida?  Is that right?

19  **A.**  Yes, but, again, I think there's a better way to do that

20  because --

21  **Q.**  I understand.

22  **A.**  -- another thing that can happen, that we did see happen, is

23  people getting mail or text messages saying, oh, you're registered

24  to vote in Georgia.  And some people might assume, okay, I guess I

25  can still vote in Georgia, I didn't know that.  And we saw a lot

1  of complaints about that as well in 2020.

2  **Q.**  That voters didn't know what state they lived in?

3  **A.**  Voters would get things from third-party groups saying --

4  there was -- I can recall one where, you know, they got something

5  from a third-party group saying, oh, you're registered to vote in

6  Georgia.  And, again, I don't know if voters always understand,

7  oh, well, I used to live in Georgia, maybe I can still vote there.

8  And I can recall one where someone said, I don't live in Georgia

9  anymore.  And the third-party group, I don't think it was one of

10 these -- anyone you're representing, said, oh, that's okay, here's

11 the link to the online absentee ballot application.  And part of

12 that problem is because under federal law we have to keep people

13 on the rolls even after they've moved.

14    And it's just -- when you get an absentee ballot application,

15 like that's kind of -- that can lead to a ballot.  And so that's I

16 think why you see restrictions on absentee ballot applications

17 that, you know, are not in place for like voter registration or

18 things like that.  That's what's like this is kind of a step to

19 get a ballot, which is a little bit different.

20 **Q.**  But the Secretary found it appropriate to use the active voter

21 file to send pre-filled absentee ballot applications to all voters

22 in June 2020, is that correct?

23 **A.**  We did that for the primary election in 2020 because of COVID

24 really to help counties -- and the other reason we did it is we

25 heard that some counties were going to do that, and it was really

1  the counties that kind of had resources to do that, so we felt

2  like there was kind of a fairness issue for kind of the whole --

3  the entire state.

4  **Q.**  I would like to move on to talking a little bit about the

5  mailing list restriction.

6      As I understand it -- and this is what your counsel refers to

7  as the anti-duplication provision.  So will you understand me if I

8  say mailing list restriction?

9  **A.**  Sure.

10 **Q.**  This restriction, as I understand it, is aimed at alleviating

11 voter concerns and alleged confusion surrounding the receipt of

12 multiple applications, is that correct?

13 **A.**  Yes.

14 **Q.**  And in support you've gathered some voter complaints about

15 getting -- duplicate applications, is that right?

16 **A.**  Are you talking about the ones that are attached to my -- yes.

17 **Q.**  And so, for example, in the same exhibit that we were looking

18 at, Exhibit 31, can you go to page 64.  And I would ask you just

19 to quickly review 64, 65, 67 and 69.

20 **A.**  64, 65.

21 **Q.**  65.  And then 67 and 69.

22 **A.**  Yes.

23 **Q.**  And these are all just complaints about the receipt of

24 unsolicited absentee ballot applications, is that right?

25 **A.**  Yes.

1  **Q.**  None of these voters say that they had already requested or

2  received an absentee ballot?

3  **A.**  Correct.

4  **Q.**  And there's no allegations in here about inaccuracy, is that

5  right?

6  **A.**  I think there's some about being sent to non-residents that I

7  saw.

8  **Q.**  On those pages?

9  **A.**  What were the pages?

10  **Q.**  64, 65, 67, and 69.

11  **A.**  Oh, I think they might have been on the pages in between; 66

12  and 68.

13  **Q.**  Okay.  And SB 202 would not stop these voters from receiving

14  unsolicited applications, is that right?

15  **A.**  Correct.

16  **Q.**  And it would not stop these voters from receiving duplicate

17  unsolicited applications, is that right?

18  **A.**  If they don't request -- the only other thing is once a voter

19  has voted, that's -- like if you vote in person, that's -- if you

20  vote early in person, that's considered absentee in person, so

21  that voter would show up as having voted absentee.

22  **Q.**  But absent having already sought an absentee ballot or voted,

23  it would not stop them from receiving duplicates, is that right?

24  **A.**  Correct.  And I think that goes to kind of the balance that I

25  was talking about where -- I don't think they would say they were

1  able to deal with every complaint, but these were the kinds of

2  complaints we were getting.

3  **Q.**  In order to take advantage of the five-day safe harbor that

4  you mentioned, third parties are supposed to rely on the absentee

5  voter file that you maintain on a daily basis on the website, is

6  that right?

7  **A.**  That our office maintains, yes.  I don't maintain it.

8  **Q.**  And the absentee voter file is available by county and then

9  also statewide, is that right?

10  **A.**  Yes.

11  **Q.**  It's my understanding that the -- the data that's in that file

12  is collected by the counties and inputted by the counties, is that

13  right?

14  **A.**  Yes.

15  **Q.**  Is it your understanding that 100 percent of the counties

16  update this list on a daily base in realtime as they process

17  applications?

18  **A.**  They -- they process an application in E-Net, that's how you

19  process an application.  That automatically updates that file.

20  That's where that comes from.  They don't have to do anything

21  separate other than once they process the application, that list

22  is updated.  When I say -- sorry.

23           THE COURT:  Go ahead.

24  **A.**  I was going to say then if they process it on a Wednesday, for

25  instance, it will be on -- it will be in E-Net that same day and

 1  it will be on the absentee voter file on Thursday.

 2          THE COURT:  Ms. Lang, let me break in for one second.  I

 3  don't care how much longer you have, but are you close or not

 4  close?  If you're not close, I think we should probably go ahead

 5  and take a break, it's been a couple hours.

 6          MS. LANG:  I'm not.

 7          THE COURT:  Let's take a five-minute or so comfort

 8  break.  Thank you.

 9          (After a recess, the proceedings continued as follows:)

10          THE COURT:  Ms. Lang, you have the floor.  Go ahead.

11          MS. LANG:  Thank you.

12  BY MS. LANG:

13  **Q.**  Mr. Germany, I do have a couple last questions about

14  information -- inaccurate information and mailings before I move

15  on.

16      If you could turn back to Exhibit 28.  And it's the first page

17  after the kind of cover page.

18  **A.**  Okay.

19  **Q.**  And this was a complaint that your counsel had referred you to

20  about inaccurate information as it relates to the pre-filling

21  prohibition.  But I wanted to ask you whether or not there's

22  anything in this complaint that actually talks about pre-filling

23  of applications rather than just the addressing of the mail

24  itself?

25  **A.**  No, I don't see anything about pre-filling.

**Q.**  And you also referred to this one case you knew of where an actual ballot was sent to the wrong post office box and someone voted that ballot, is that right?

**A.**  Correct.  Well, they tried to vote that ballot.

**Q.**  Thank you for that clarification.

You don't have any evidence that that was in any way linked to a third-party mailing?

**A.**  No.

**Q.**  Or any pre-filling?

**A.**  Nope.  It could have been an inaccuracy input by the voter.

**Q.**  It could have been?

**A.**  Sure.

**Q.**  But you don't know?

**A.**  I don't know.

**Q.**  And in any event, that issue was caught and resolved and the ballot was not voted, is that correct?

**A.**  Correct.  And the person I think has been referred for charges.

**Q.**  So we've already talked about this a number of times, but in support of your declaration you gathered quite a few voter complaints to submit in this case, right?

**A.**  Correct.

**Q.**  And most of those were sent to voterfraudemailalerts@sos.ga.gov, is that right?

**A.**  I don't know if -- I know a lot of them were, I can't say if

1  most of them were.

2  **Q.**  Did you provide any evidence here that any of the allegations

3  of fraud or wrongdoing in the complaints were substantiated?

4  **A.**  We -- I didn't look at kind of what was the result of these

5  complaints, you know.  And I think a lot of times the conclusion

6  of the voter was like this -- this feels like fraud.  And, you

7  know, we knew, oh, this is not something that is illegal, like,

8  you know, they were upset about receiving so many applications

9  but, you know, that was not illegal.  It's still not if they

10  haven't voted.  So we were -- I was looking at them more for the

11  substance of the -- I guess the factual allegation of the voter.

12  **Q.**  I understand.

13  **A.**  Because I think these were ones that I don't think they really

14  even alleged fraud, it was like this is happening, this feels like

15  fraud to me.

16  **Q.**  I understand.  The question is just whether or not there was

17  any evidence submitted that there -- that any of the complaints

18  were substantiated as to fraud or wrongdoing?

19  **A.**  I think they were substantiated as to like the allegation,

20  like the, I'm getting this, but, yes.

21  **Q.**  Did you submit any evidence of that?

22  **A.**  I'm not sure.

23  **Q.**  Was there any evidence attached to your declaration that

24  actually substantiated any of the allegations in the complaints?

25  **A.**  I know our general practice was -- like basically our

1  investigator would call -- especially when it's like, hey, I just

2  got six ballots, they would call and say, what do they look like?

3  And --

4  **Q.**  Mr. Germany, I'm just on a clock a little bit here.  So did

5  you attach any evidence --

6  **A.**  I don't know.  I would have to like review everything

7  attached, so I can't answer that.

8  **Q.**  Okay.  And your office conducted an absentee ballot audit in

9  December 2020 in Cobb County?

10  **A.**  A signature audit, yes.

11  **Q.**  And you found no fraudulent absentee ballots as a result of

12  that?

13  **A.**  We found that the county properly did the signature match in

14  every case other than two, which was a very, very high percentage

15  of doing it correctly.

16  **Q.**  99.99 percent accuracy rate?

17  **A.**  That sounds right.

18  **Q.**  If you could just look quickly at Exhibit 7.  This is a press

19  release from the Secretary of State's Office, is that right?

20  **A.**  Yes.

21  **Q.**  If you look at the fourth paragraph down it says that the

22  audit found, quote:  No fraudulent absentee ballots.  Is that

23  correct?

24  **A.**  Yes, that's correct.  That's my recollection as well.  The two

25  that we found where the county had maybe not done a signature

1  properly, we went and found the voters and then confirmed, yes, I

2  forgot to sign my ballot; or I think in one case a wife had signed

3  for a husband but it was, like, the voter had voted the ballot.

4  **Q.**  So even in the two cases you mentioned, there wasn't actually

5  any fraud found --

6  **A.**  Correct.

7  **Q.**  -- found?

8  **A.**  And I should say like that's kind of -- a wife shouldn't be

9  signing the ballot for their husband, that's not allowed, but I

10  don't consider it fraud assuming that the voter is actually voting

11  the ballot?

12  **Q.**  Sure.  If we can go back to Exhibit 28.

13  **A.**  Yes.

14  **Q.**  If you could just quickly flip through the first 15 pages or

15  so, it's 24 to 38, just looking at the dates.  And let me know

16  when you're ready.

17  **A.**  Okay.

18  **Q.**  What's the time period there about for those?

19  **A.**  It looks like most of these came in after the November

20  election, so in between the November election and the January

21  runoffs.  And that's kind of consistent with what I found -- or

22  what we found, too, like following the 2018 election, where like

23  after the election is when a lot of complaints started coming in

24  about, oh, this happened to me like three weeks ago when I early

25  voted and, you know, that is wrong basically.

1  **Q.**  But most of these are not from 2018, they're from 2020?

2  **A.**  These are from 2020, I believe.

3  **Q.**  And if you could skip to Exhibit 31 and flip through for the

4  same purpose, 57 through 74.

5  **A.**  I mean, I'm aware generally that most of these complaints

6  started coming in after the election.  And I kind differentiate

7  that -- again, it's the same thing we saw in 2018.  When we saw --

8  when complaints come in kind of like in realtime, a lot of times

9  it's something like, oh, the voter's actually having an issue and

10 how can we help them resolve this.

11     Post-election, you know, we still have to look into complaints

12 and verify them.  It becomes more difficult but it's not uncommon.

13 **Q.**  Yeah.  Could that be because some voters are complaining

14 because they were unhappy with the results of the election?

15 **A.**  I think that was a big part of it in 2018 and in 2020.

16 **Q.**  And in 2020 in particular, during the time of November and

17 December there was a lot of attention on false allegations of

18 voter fraud in Georgia, isn't that correct?

19 **A.**  I -- following the November election -- and the other thing

20 going on was we had the January runoff.  So I think one thing

21 that's a little bit different with these complaints is they're

22 complaining about kind of -- I think it probably was kind of

23 colored by the November results, but a lot of complaints are about

24 stuff they were getting regarding the -- so it's, you know --

25 another election -- unlike in 2018 another election was coming up,

```
 1  and it was one where they were getting -- everyone was getting

 2  inundated with a lot of stuff.

 3  Q.  I understand that.

 4  A.  But, I sorry, I didn't -- I kind of forgot your question.

 5  Q.  Yeah.  So my question is just, and I think you have some

 6  personal experience with this, there was a lot of attention on

 7  Georgia and on what were false allegations of voter fraud in the

 8  Georgia November 2020 election, isn't that right?

 9  A.  I mean, for me personally it was kind of the same amount of

10  attention post 2018 as post 2020.  There was definitely more

11  attention in 2020, but like my personal sort of what we had to

12  deal with on a daily basis was very similar post 2018 as it was

13  post 2020.

14  Q.  Fair.  But in 2020 nationally --

15  A.  Correct.

16  Q.  -- there was an enormous amount of attention on false

17  allegations of voter fraud, is that correct?

18  A.  There was attention on -- yes, I think the allegations were

19  false.  The attention was coming kind of -- like some people were

20  saying they were false, some people were saying they were true,

21  yes.

22  Q.  Right.  And, in fact, some very influential leaders were

23  saying they were true, isn't that right?

24  A.  Correct.

25  Q.  Including the President of the United States?
```

**A.**   Yeah.  It's the same thing we saw following post 2018.  Not about voter fraud, about voter suppression.  But the interesting thing is a lot of the complaints are kind of similar.  It's like here's my -- here's what happened to me and I think that's voter fraud, or here's what happened to me and I think that's voter suppression.

**Q.**   So you believe a lot of these complaints were colored by that attention and by those allegations, is that right?

**A.**   Yes.

**Q.**   And they were a response many times to unhappiness with the result of the election?

**A.**   They were -- I'm sorry, they were what?

**Q.**   And they were colored by or moved to complain because they were unhappy with the results of the election?

**A.**   I suspect that.  I can't really speak for them.

**Q.**   That's your impression?

**A.**   That was -- that is my -- I suspect that, yes.

**Q.**   Now, your counsel asked you whether or not some complaints looked conspiratorial to you.  And I would agree with you that the ones he pointed you to were not conspiratorial.

Were there some complaints that you received that were -- that referenced conspiracy theories?

**A.**   We still receive those, so, yes.

**Q.**   And --

**A.**   And the difficult thing about that, too, is like we still kind

1   of have to deal with them somehow, and they're exceedingly

2   difficult to deal with.  And we have to deal with them, counties

3   have to deal with them, because whether or not you're a conspiracy

4   theorist, you can still submit open records request and you can

5   still sort of engage the mechanisms of government.  And so that's

6   really changed I think county -- election official's job at the

7   county level and at the state level as well.

8   **Q.**  I have to start asking my next question faster, Mr. Germany,

9   because you think of more things to share with us.

10      If you can turn to Exhibit 28 again and page 39.

11  **A.**  Oh, I'm sorry page --

12  **Q.**  Exhibit 28, page 39.

13      My question is whether or not there's any mention of absentee

14  ballot applications here?

15  **A.**  There's not.

16  **Q.**  And could you turn to the next page.

17  **A.**  (Witness complies)

18  **Q.**  Is there any mention of absentee ballot applications there?

19  **A.**  No.  And, you know, I think some of this goes to the fact that

20  I don't think voters necessarily make these distinguishing sort of

21  conclusions as much as --

22  **Q.**  I understand.  But we have no way to know what exactly this

23  voter received, isn't that right?  There's all sorts of election

24  mail?

25  **A.**  Well, the first one talks about -- implying about how the

1  voter -- it sounds to me kind of like the voter engagement

2  mailing.  And we got a lot of complaints about that, too.  It's

3  something where it says -- it pretty much always says you're below

4  average from your neighbors in terms of voter engagement.

5  **Q.**  Right.

6  **A.**  And we got a lot of complaints about that because it's saying,

7  hey, I did vote and it must not have been counting my vote.  And

8  so --

9  **Q.**  Right.  I'm just trying to understand which ones of these

10  relate to absentee ballot applications.

11  **A.**  I think they relate more to like using -- getting inaccurate

12  information and then having to deal with it.

13  **Q.**  Okay.  So on page 41 is there any mention of absentee ballot

14  applications?

15  **A.**  It just says:  A piece of mail from the Center for Voter

16  Information, this person does not live at the address.

17  **Q.**  So you would agree with me that not all the complaints that

18  you attached to your declaration relate at all to the ballot

19  application restrictions?

20  **A.**  I think that goes to like the ballots of the -- the absentee

21  ballot application is different --

22  **Q.**  That's not my question, Mr. Germany.  Just not all of the mail

23  here is specifically related to the absentee ballot application

24  restrictions?

25  **A.**  I don't know.  Not all of the complaints specifically mention

1    that it's an absentee ballot.

2    **Q.**   Okay.   Who --

3    **A.**   An absentee ballot application.   I'm sorry.

4    **Q.**   Who gathered these complaints to attach to your declaration?

5    **A.**   Our counsel.

6    **Q.**   About how many complaints did you receive from that hotline in

7    November and December of 2020?

8    **A.**   What do you mean by "hotline"?   We have --

9    **Q.**   The e-mail address, the voter fraud e-mail address.

10   **A.**   We had a -- we had a phone number hotline as well.   And both

11   of them received a lot of complaints.

12   **Q.**   Thousands?

13   **A.**   I feel comfortable saying that, yes, but I really have no

14   idea.

15   **Q.**   Potentially tens of thousands?

16   **A.**   Yes.

17   **Q.**   Potentially hundreds of thousands?

18   **A.**   I would hope not, but I don't know.   I don't know.

19   **Q.**   Okay.   All right.

20       And I think you testified already to this, that you didn't

21   look into the results of the investigations into any of these

22   complaints before you submitted these, is that correct?

23   **A.**   Correct.   And, again, I'm not sure that they were really -- I

24   don't think they necessarily fell into that bucket of alleging a

25   violation.

1  **Q.**  Uh-huh (affirmative).

2     And did you -- to switch gears a little bit, I want to talk a

3  little bit about absentee ballot cancelations and duplicate

4  applications.

5     So you remember you testified a little bit about the increase

6  in the number of -- let's talk about cancelations first, the

7  increase of numbers of absentee ballot applications that were

8  canceled in 2020, is that right?

9  **A.**  We were talking about absentee ballots that were canceled.

10 **Q.**  Ballots.  I'm going to get to that in a moment but -- and I

11 would like you to turn in Part II to Exhibit 68, which is the very

12 last exhibit.  And this is just a demonstrative, similar to the

13 one that your counsel showed you.

14 **A.**  Yes.

15 **Q.**  And the only difference between this demonstrative is that it

16 is based on general elections rather than primary elections.  Do

17 you see that?

18 **A.**  Yes.

19 **Q.**  I'll have you switch to the second page.  It has the

20 cancelation rates by percentage for the general election.  Can

21 read what they were for 2016, 2018 and 2020, the percentages of

22 cancelations.

23 **A.**  For 2016 it was 1.53 percent canceled.  For 2018, 2.45 percent

24 canceled.  And for 2020 3.1 percent canceled.

25 **Q.**  If I remember correctly, in this most recent primary the rate

1  was 2.98 percent, is that right?

2  **A.**  Yes.

3  **Q.**  So a little bit of a -- about a .1 difference between the 2020

4  general election and the 2022 primary?

5  **A.**  That sounds right.

6  **Q.**  But there was one number that stood out as a much higher

7  cancelation rate when you were talking to your counsel, and that

8  was the 2020 primary, is that right?

9  **A.**  Yes.

10  **Q.**  And that percentage was 8.5 percent?

11  **A.**  Something like that, yes.

12  **Q.**  So all of the other elections that we've talked about, it was

13  between one-and-a-half and three-and-a-half percent cancelation

14  rate, is that right?

15  **A.**  That sounds right.

16  **Q.**  What are some other differentiating -- well, in the 2020

17  primary the state sent absentee ballot applications to everyone in

18  the state, is that right?

19  **A.**  Correct.

20  **Q.**  And the 2020 primary --

21  **A.**  Well, I should say, sorry, to every active voter, to every

22  active registered voter.

23  **Q.**  And the 2020 primary was also the very first election that was

24  held after COVID, is that right?

25  **A.**  During COVID I would say, yes.

1  **Q.**  After the onset of COVID, yes.

2  **A.**  Yes.

3  **Q.**  And a lot of voters, probably hundreds of thousands of

4  Georgians were learning how to vote by mail for the very first

5  time?

6  **A.**  Yes, I would agree with that.

7  **Q.**  Okay.  Do you think that those factors contributed to the high

8  rate of cancelation in the 2020 primary?

9  **A.**  I'm sure -- I think they probably did among -- probably among

10  others as well.

11  **Q.**  And you would agree that the difference between the 2020

12  general election and the 2022 primary election, the rate

13  differential for calculations is very small?

14  **A.**  Yes.

15  **Q.**  And even the rate difference between the 2018 general election

16  and the 2020 general election was about half a percent?

17  **A.**  It was half a percent.  It was obviously a much larger number

18  than 2020.

19  **Q.**  Right.  But that was a result of there being a larger number

20  of absentee ballot applications overall?

21  **A.**  Correct.  But that larger number is going to have an effect

22  kind of at the polling place like we talked about.

23  **Q.**  Of course.

24      In addition to nonprofit groups like my clients, I think you

25  testified that campaigns are often the ones sending out absentee

1 | ballot applications, is that correct?

2 | **A.**  That's my impression.

3 | **Q.**  And why do you think they do that?

4 | **A.**  Because they want to -- I think kind of like your clients,

5 | they have voters they've targeted and they want to try to make

6 | sure they vote.

7 | **Q.**  Okay.  And are you aware that approximately 660,000 Georgia

8 | voters applied to vote by mail using VPC and CVI's mailers?

9 | **A.**  I heard that yesterday.

10 | **Q.**  And do you think that voter education mail can make a positive

11 | difference in voter participation?

12 | **A.**  Yes, I would agree with that.

13 | **Q.**  I want to move on to talking about the disclaimer provision.

14 | And I think the state has said that one of the things that the

15 | disclaimer provision is meant to address is voter confusion about

16 | who was disseminating these applications, is that right?

17 | **A.**  Yes.

18 | **Q.**  Is it your understanding that third parties were not

19 | previously identifying themselves as the source of the mailers?

20 | **A.**  I'm not sure.  I know that we got a lot of calls and sort

21 | of -- and counties did as well.  So I think it might have been --

22 | I'm not sure they were identifying themselves on the actual

23 | application.

24 | **Q.**  Would they have been permitted to identify themselves on the

25 | actual application?

1   **A.**   Yes.

2   **Q.**   Is there a law that prohibits third parties from modifying

3   state forms?

4   **A.**   So before 2018 it was -- you just had to have certain

5   information.  As I say before, kind of through the 2018 election

6   you just had to have certain information on that form.

7   **Q.**   But in 2020, for example?

8   **A.**   In 2020 you had -- the form had to basically be in substantial

9   compliance with the state form, but you could kind of -- and often

10   people did, kind of brand it, whether at the top or kind of around

11   it, as coming from the candidate or the party or somebody.

12   **Q.**   So when they did modify the form, they did it to identify

13   themselves, is that right?

14   **A.**   That was my impression, yes.

15   **Q.**   But sometimes they just wanted to use the official form, is

16   that right?

17   **A.**   I mean, I don't know what they wanted, but I think sometimes

18   they did.

19   **Q.**   And if they did use the official form, they wouldn't be

20   permitted to modify it, is that right?

21   **A.**   You were permitted to.

22   **Q.**   I'm under the impression that the Georgia State Election Code

23   has a felony provision for modifying state forms.  Is that

24   incorrect?

25   **A.**   I know generally -- I mean, I'm not really sure exactly what

1  you're referring to.  I mean, in this context people would often

2  put their own kind of branding on the -- even in 2020.  And they

3  would keep the formatting and kind of the substance the same.

4  **Q.**  But would they use the exact form with the seal on it and then

5  modify it?

6  **A.**  I can't recall if the form -- the previous form had that

7  information on it.

8  **Q.**  Okay.

9  **A.**  But they wouldn't -- I think the difference was they wouldn't

10  necessarily modify the substance of the form.

11  **Q.**  Okay.  In any event, is it your understanding that third

12  parties were not identifying themselves as the source either on

13  the application or in the materials?

14  **A.**  I mean, I know it caused a lot of confusion and calls.  So

15  I -- we didn't -- we oftentimes don't get to see the actual

16  mailing, we deal with kind of the after effects of the mailing.

17  **Q.**  Who would see the mailing, would that be the county election

18  officials potentially?

19  **A.**  It would be the voters primarily.

20  **Q.**  Okay.  And sometimes maybe the election officials if it was on

21  the actual application as you mentioned?

22  **A.**  If the voter sends in the form?

23  **Q.**  Yes.

24  **A.**  Then county officials would see it as well, yes.

25  **Q.**  Did you attend the deposition of Milton Kidd?

1  **A.**  No.

2  **Q.**  Who is Milton Kidd, do you know?

3  **A.**  Milton is the elections director in Douglas County.

4  **Q.**  Do you have -- could you look at Exhibit 57 in Part II of your

5  binders.  Move to page 214.

6      Do you --

7  **A.**  Where's the page number?  Page 14?

8  **Q.**  214.

9  **A.**  214.

10  **Q.**  In the deposition.  The page numbers are on the top right

11  corner.

12  **A.**  I see it.  Okay.

13  **Q.**  Could you read Mr. Kidd's testimony from line 16 to 18.

14  **A.**  I have yet to see a third-party form that did not have any

15  indicator of who disseminated that form.

16  **Q.**  Do you have any reason to doubt Mr. Kidd's testimony on that

17  front?

18  **A.**  No.

19          MS. LANG:  And I would like to move Exhibit 57 into the

20  record.

21          MR. FIELD:  I have no objection.  I think it was

22  attached to our --

23          MS. LANG:  These are separate excerpts.

24          MR. FIELD:  No objection.

25          THE COURT:  Admitted.

1  BY MS. LANG:

2  **Q.**  I would like to look at Exhibit 32 back in your first binder.

3  **A.**  32?

4  **Q.**  This is Exhibit E to your declaration, is that right?

5  **A.**  Yes.

6  **Q.**  And I believe this was labeled as exhibits that would relate

7  to kind of confusion about the source of the applications, is that

8  your understanding?

9  **A.**  I'll take your word for it.  I would have to go check, but I

10 believe you.

11 **Q.**  Okay.  And can you -- the very first page is an e-mail from a

12 supervisor of elections, Brenda Hodges, to Chris Harvey, who I

13 believe you testified was the elections director, is that right?

14 **A.**  Correct.

15 **Q.**  And Ms. Hodges is not happy with our client VPC's mailer.  But

16 she identifies correctly that these mailers are coming from the

17 Center of Voter Information, isn't that right?

18 **A.**  Yes.

19 **Q.**  And can you look at the next page.  And this voter is also

20 unhappy to be receiving absentee ballot applications, but she

21 also -- or he also identifies all of the organizations that sent

22 these absentee ballot applications to him, correct?

23 **A.**  Correct.

24 **Q.**  And on the next page, similarly, Ms. Briner, is unhappy about

25 receiving this correspondence, but also says that she knows

1 exactly where it's coming from, it's coming from Democracy For

2 America and America Votes, is that right?

3 **A.**   Yes.   I'm not clear, they might be the same.   I'm not sure if

4 she's saying they're two different entities or the same entity

5 but -- yes, she mentions those two names.

6 **Q.**   Okay.   And are there any other complaints attached to

7 Exhibit E?

8 **A.**   The one thing I would add is that I think Brenda probably

9 reached out to Chris, Brenda's elections director in Charlton

10 County, because she was probably getting calls from her voters

11 that she was then having to deal with that then causes her to look

12 into, okay, what is this?

13 **Q.**   Are there any other complaints attached to Exhibit E?

14 **A.**   Not in here.

15 **Q.**   So did you submit any evidence that voters did not know where

16 the applications were coming from?

17 **A.**   I believe we -- I said that in my declaration and so I know

18 that --

19 **Q.**   Any attached complaints from voters that show that?

20 **A.**   I'm not sure.

21 **Q.**   Are you aware that the legislature considered a bill this

22 session that would have amended the disclaimer language?

23 **A.**   Yes.

24 **Q.**   And can you look at Exhibit 56.   Is that the proposed bill?

25 **A.**   I think it might have shown up in multiple bills, but I'm just

1  checking this.  But this bill does have some amended disclaimer

2  language.

3  **Q.**  And that's on page eight, correct?

4  **A.**  On page eight, yes.

5  **Q.**  And can you tell us how this bill would have changed the

6  disclaimer?

7  **A.**  It would have said this application is being distributed by,

8  insert name and address of person, organizations or other entity,

9  distributing such document or material not by any governmental

10  agency or any state or local election office.  This is not a

11  ballot.

12  **Q.**  Okay.  And so this would have eliminated the language that

13  says this is not an official government publication, is that

14  right?

15  **A.**  Yes.

16  **Q.**  Do you understand that to be the primary complaint that

17  plaintiffs have with the disclaimer provision?

18  **A.**  I -- that's what I heard yesterday, yes.

19  **Q.**  And it's your understanding that the plaintiffs have no

20  problem with identifying themselves on the application, isn't that

21  right?

22  **A.**  That's what I heard yesterday.

23  **Q.**  Okay.  Did the legislature ultimately pass this language

24  changing the disclaimer?

25  **A.**  No.

1  **Q.**  Did your office provide any input on this bill or other bills

2  that would have changed the disclaimer language?

3  **A.**  Yes.

4  **Q.**  And who in your office did that?

5  **A.**  I would have.

6  **Q.**  And what was your input to the legislators?

7  **A.**  This language was my input.

8  **Q.**  You were supportive of this language?

9  **A.**  Yes.

10  **Q.**  And you suggested deleting "This is not an official government

11  publication"?

12  **A.**  Yes.

13  **Q.**  And why?

14  **A.**  Because I thought it was potentially -- I think the disclaimer

15  as it stands now tries to deal with kind of confusion, and I think

16  it does help do that.  Again, you know, when you're trying to

17  write something succinct, then you might not be able to get across

18  everything you want to perfectly.  So I thought this language in

19  this bill would accomplish the same thing but the legislature

20  didn't pass it.

21  **Q.**  I do want to circle around on one thing that you and I have

22  both, I think, done accidentally in this cross, which is say

23  ballot when we meant ballot application, is that right?

24  **A.**  Yes.

25  **Q.**  But you're not confused about the actual difference between

1  the two, it's just a kind of trip of the tongue in the way that

2  we're talking in shorthand, is that right?

3  **A.**  I would -- I would say generally.

4  **Q.**  I'm asking about you --

5  **A.**  I'm not confused, but I just know it comes up in my office and

6  with election officials and we have to say, wait a second, let's

7  just -- we're talking about applications now.  And everyone's like

8  yeah, yeah, yeah, but -- so, yes, it does happen.

9  **Q.**  That's what I want to clarify.  And to be clear, I'm not

10  suggesting that no one has ever been confused between the

11  difference between a ballot and a ballot application.  Certainly

12  the person who put Stacey Abrams in was confused, right?

13  **A.**  Correct.

14  **Q.**  But every instance in which someone says "ballot" and not

15  "ballot application" doesn't mean that the person is actually

16  confused about that difference?

17  **A.**  Generally our experience has been when we call the voters and

18  explain it to them, I think they accept the, oh, okay, these are

19  applications, but it does seem like they were actually confused.

20  **Q.**  Some voters are confused?

21  **A.**  Yes.

22  **Q.**  But not every time that someone says "ballot" instead of

23  "ballot application," that does not by itself mean that they

24  actually are confused?

25  **A.**  Like when I say it, I think it's generally a slip of the

1  tongue I hope.  But our experience has been voters -- voters,

2  especially the ones that are reaching out to us, there does seem

3  to be -- it does seem to be genuine confusion.  They then say, oh,

4  okay, I see what you're saying now.

5  **Q.**  Okay.

6     Can you turn to Exhibit 2.  And can you identify the document

7  when you get to it.

8  **A.**  This is the Application for Georgia Official Absentee Ballot,

9  and it looks like this was the one -- oh, this is the one that --

10 this is the current one, I believe.

11 **Q.**  The current one for third parties to use, is that right?

12 **A.**  Yes.  And, you know, this is one we kind of made available

13 with the disclaimer.  I mean, they don't necessarily have to do

14 exactly what we did, but we were trying to make it a little bit

15 easier.

16 **Q.**  Yeah.  You stole my next question, which was to ask if -- they

17 don't have to use this but you created it for ease of use?

18 **A.**  Yes, especially for like the people that -- not unlike your

19 clients but may be like smaller organizations, smaller even than

20 your clients.  I know they're all small non-profits I heard

21 yesterday.

22 **Q.**  When did you create this document?

23 **A.**  This was something that we created -- okay.  Well, the

24 application was something we created post-SB 202, and that took a

25 lot of I think iterations to try to, you know, make it better, and

1  I'm sure there's ways we can even still make it better.  So after

2  we created the document -- the document, then we -- we always

3  wanted to kind of add the disclaimer.

4      So I'm not -- so like when did we like create it or when did

5  we -- I don't remember when we put it on our website exactly.

6  **Q.**  So, as I understand your testimony, first you did a lot of

7  work to create the new application, right?

8  **A.**  Correct.

9  **Q.**  And that took a long time?

10  **A.**  Yes.

11  **Q.**  And then you took that completed application and you appended

12  this disclaimer, is that right?

13  **A.**  Correct.

14  **Q.**  Did that also take a really long time to do?

15  **A.**  No.

16  **Q.**  That was relatively easy?

17  **A.**  Yes.

18  **Q.**  Okay.  And when about did you do the adding of the disclaimer?

19  **A.**  I mean, I think earlier this year.

20  **Q.**  And do you have any estimate as to when you put this

21  application on your website?

22  **A.**  I'm not really very good with time.

23  **Q.**  Okay.  If I said sometime in March of 2022 --

24  **A.**  That could be right.  When I say "last year," I generally mean

25  2020, so -- but that sounds right.

1   **Q.**  Fair enough.  And to be clear, I'm guessing here.  I don't

2   know.

3   **A.**  We wanted to get it out I think before people -- people were

4   allowed to start getting -- people were allowed to start

5   submitting absentee ballot applications for the primary.

6   **Q.**  Do you know if you did anything to kind of disseminate this

7   application, let third-party groups know that it existed?

8   **A.**  I don't know.  I don't think so.  I think we just put it on

9   our website.

10  **Q.**  Okay.  And who was involved in the process of adding the

11  disclaimer?  Not the whole process of creating the new application

12  but just adding the disclaimer.

13  **A.**  I would have been.  We have a sort of graphic designer who

14  would have placed it and tried to make it kind of the most -- the

15  least kind of interference possible for voters, but then also like

16  clear to people.  So she would have been involved.  Our elections

17  division would have been the people who actually like posted it.

18  **Q.**  Uh-huh (affirmative).

19      And the statute requires that the disclaimer be clear and

20  prominent, right?

21  **A.**  Yes.

22  **Q.**  And how did you decide that this was sufficiently prominent?

23  **A.**  We used some of their -- there's some language in the SCB

24  regulation that we looked at earlier, so we looked at that.  It's

25  kind of comparable to like political mail, is sort of what we were

1  thinking, kind of the paid for by, like that was some of the

2  guidance that we looked at.

3  Q.  Right.  And you mentioned the regulation.  Let's look at that.

4  It's Exhibit 3.  And it's the second page that we'll want to refer

5  to, which is about the disclaimer.

6      I see here that it -- the regulation was updated in October

7  and then in November.  Do you know what the difference was between

8  those two updates?  If you don't, that's okay.

9  A.  So what happens in the SCB regulation process is we will post

10  a rule and then -- I'm sorry, I know, but it takes a little bit.

11     We post a rule and then 30 days later the State Election Board

12  can adopt it, but the people can also provide public comment.  And

13  so they might adopt the rule, but then also post an amended rule

14  based on some public comment.  So I -- that would have been what

15  happened, but I don't remember what the exactly change would have

16  been.

17  Q.  Sounds good.

18  A.  It would have been kind of probably like something not a very

19  major change.

20  Q.  Did you provide input on this regulation?

21  A.  Yes.

22  Q.  I have a similar question as to my question about the form,

23  which is:  Do you know if you all did any work to let third

24  parties know about the adoption of this regulation?

25  A.  So it's a public process and we got public comment, I believe,

1  from some third parties.  So they -- they were generally aware of

2  it just through its public nature.

3  **Q.**  Okay.  But did you do anything kind of actively to try to let

4  third parties know about the process?

5  **A.**  So we did what we normally do, we have to send out a rule to

6  all the interested parties who are on the State Election Board

7  mailing list, and then post it publicly, which includes online,

8  and then get public comment that way.

9  **Q.**  How do you get on the interested party mailing list?

10  **A.**  You just sign up for it on the State Election Board website.

11  **Q.**  We're looking at Section 3, which is about the disclaimer.

12  And it says that it has to be a font size of size 12, is that

13  right?

14  **A.**  Yes.

15  **Q.**  And so I assume that on the form that you created it's font

16  size 12, is that right?

17  **A.**  I assume.  I believe we would have made sure of that.

18  **Q.**  Okay.

19     And then the second requirement is that it be printed in a box

20  set apart from the other content of the communication.  And I see

21  that that's the case, is that right?

22  **A.**  Yes.

23  **Q.**  And then the third one is the one I'm a little confused about,

24  which is to say it needs to be printed -- printed with a

25  reasonable degree of color contrast between the background and

1  printed disclaimer.  Do you see that?

2  **A.**  Yes.

3  **Q.**  Can you read number one under there.

4  **A.**  A disclaimer satisfies the color contrast requirement if it is

5  printed in white text on a black background, or if the degree of

6  contrast between the background color and the disclaimer text

7  color is at least as great as the degree of contrast between the

8  background color and the color of the largest text in the

9  communication.

10  **Q.**  So it's not white on black, so we're working with that second

11  half, right?  Or if the degree of contrast between the background

12  color and the disclaimer text color is at least as great?

13  **A.**  I would say that's kind of a safe harbor.  Like the rule is

14  it's got to be a reasonable degree of color contrast.  And I think

15  we copied this kind of directly from some like political mail

16  requirements.

17  **Q.**  But would you agree that the form that you all created doesn't

18  comply with that safe harbor?

19  **A.**  I think the form has a reasonable degree of color contrast

20  between the background and the printed disclaimer.

21  **Q.**  Not my question, though.  It doesn't comply with the safe

22  harbor --

23  **A.**  I don't think that's -- I mean, it complies with the

24  regulation.

25  **Q.**  That's not my question, Mr. Germany.  I'm not saying it

 1  doesn't comply with the regulation, I'm just asking does it like

 2  fit the language of the safe harbor provision in number one?

 3  **A.**   Is at least as great as the degree of contrast between the

 4  background color and the color of the largest text in the

 5  communication.

 6  **Q.**   Yes.  And the largest text is bolded and on white, and the

 7  disclaimer is not bolded and it's on gray, is that right?

 8  **A.**   Right.

 9  **Q.**   So no is the answer, right?

10  **A.**   I think it complies with the regulation, so --

11  **Q.**   It's just a yes-or-no question, though.  Does it comply with

12  number one of the safe harbor --

13  **A.**   Well, I think the question is a little bit like -- I mean, the

14  safe harbor --

15  **Q.**   Would it meet the safe harbor requirements?

16  **A.**   I mean, I think you're asking would it fall into like a narrow

17  regulation, and the answer is maybe no, but I do think it complies

18  with this regulation.

19  **Q.**   I'm not asking either of those questions, I'm only asking

20  would this application fall within the language described in

21  number one --

22  **A.**   It seems like no.

23  **Q.**   Okay.

24  **A.**   But I don't see the relevance of that.

25  **Q.**   That's okay.

1    Are you aware --

2  **A.**   I think the point that we're trying to get to, too, is like

3  sometimes in political mail, I think before these regulations

4  existed, people would try to put disclaimers like as the same

5  color as the background.

6  **Q.**   I understand, Mr. Germany.

7    Are you aware of your expert report in this case?

8  **A.**   Generally.   You mean the state's expert report?

9  **Q.**   Yes.

10  **A.**   Generally.

11  **Q.**   Have you read Mr. Grimmer's report?

12  **A.**   Yes.

13  **Q.**   Are you aware that Mr. Grimmer criticizes the plaintiffs for

14  not having a black on gray rather than black on white disclaimer

15  because it makes it more prominent?

16  **A.**   I don't recall that.

17  **Q.**   Okay.

18    Looking at number two of the application again, can you read

19  the sentence that's right above the disclaimer.

20  **A.**   If you receive this application with your information

21  pre-filled, receive multiple or duplicate copies in the mail, or

22  if an unauthorized person offers to return your absentee ballot

23  application, please report this to reportfraud@sos.ga.gov.

24  **Q.**   And who drafted that language?

25  **A.**   I don't remember.   Someone in our office would have drafted

1   it.

2   **Q.**   Were you involved in approving that language?

3   **A.**   Yes, I would have been.

4   **Q.**   Is sending duplicate copies in the mail unlawful?

5   **A.**   No.  If you haven't already requested a ballot, no.

6   **Q.**   So why would you ask individuals to send reports of duplicates

7   to the fraud hotline?

8   **A.**   It seems like that should maybe be updated.

9   **Q.**   Okay.  Is that something that you would do pretty quickly --

10   **A.**   Yes.

11   **Q.**   -- now that it's to your attention?

12   **A.**   Yes.

13   **Q.**   And you could do that quickly?

14   **A.**   I think so.

15   **Q.**   Even though we're in the middle of an election cycle?

16   **A.**   Well, now, it would still -- like there would still be kind

17   of -- the other form kind of would largely be out there.

18   **Q.**   But you could change this one going forward?

19   **A.**   Sure.

20   **Q.**   And similarly if this Court were to order you to change the

21   disclaimer, you could remove that first sentence from the form, is

22   that right?

23   **A.**   Yes.

24   **Q.**   Even though it's in the middle of an election cycle?

25   **A.**   Yes.  And I think the old disclaimer would like largely be out

 1  there still.

 2  **Q.**  Right.

 3  **A.**  But we could post a new copy on our website.

 4  **Q.**  Okay.

 5  **A.**  Now, I guess I should say I would -- we probably would have to

 6  figure out -- kind of discuss it with our lawyers and stuff in

 7  terms of what they would then do.

 8  **Q.**  As a practical effect, though?

 9  **A.**  Sure.  Practically, yeah.

10  **Q.**  Okay.  So I have a last section of questions for you.  And

11  that's about training.

12     So could you provide a brief overview of the types of training

13  that your office provides to election officials.

14  **A.**  Well, we try to provide a lot of training and it's --

15  **Q.**  I understand your answer won't be comprehensive.

16  **A.**  It's meant to be very comprehensive training.  There's

17  certification training which is for new election directors.  And

18  that's kind of an online application I guess is maybe the best

19  thing.  And they go through and review different modules and take

20  tests.  And that's for new election directors.  So there's that.

21     And then we try to provide training kind of throughout the

22  year based on different topics.

23  **Q.**  Right.

24  **A.**  And then there's a conference that the Georgia election

25  officials go to.  And that happened -- I believe that was March of

1  this year also, where our office provides training, county

2  election officials will provide training, and that's really a good

3  time where they're all together.

4  **Q.**  Yeah.

5  **A.**  But that's already occurred this year.

6  **Q.**  And that was in March?

7  **A.**  I believe so.

8  **Q.**  Okay.  And can you turn to Exhibit 62.

9  **A.**  Yes.

10  **Q.**  What is that?

11  **A.**  This is an overview of absentee voting, ballot issuing/mailing

12  and processing returns.

13  **Q.**  Okay.  And if you look at the -- starting on the third page

14  there's, you know, a footer that says this was from the conference

15  in March of 2022, is that right?

16  **A.**  Yes.  This looks like some training put together by Dr. Harris

17  in our office for counties.

18  **Q.**  Did you attend that training?

19  **A.**  Yes.  Well, I should say I attended the conference.  I can't

20  recall if I was at this specific -- what's the word -- like

21  breakout.

22  **Q.**  Panel?

23  **A.**  Panel, yeah.

24  **Q.**  Do you know if any of the training that is -- was in the

25  overview of absentee voting talked about the ballot application

1  restrictions that are at issue in this case?

2  **A.**  I don't know.

3  **Q.**  If I represented to you that nowhere in this PowerPoint

4  presentation is there any mention of those restrictions, would you

5  have any reason to doubt me?

6  **A.**  No.

7  **Q.**  And you're not aware of Dr. Harris giving any guidance on the

8  absentee ballot application restrictions?

9  **A.**  No.

10  **Q.**  And if an absentee ballot application appears to have been

11  pre-filled by a third party, an election official says, hey, I

12  think this was pre-filled, is that a reason to reject the

13  application?

14  **A.**  No.

15  **Q.**  Okay.

16     If an election official receives an absentee ballot

17  application and doesn't have a disclaimer and for whatever reason

18  the election official believes that it came from a third party, is

19  that a reason to reject the absentee ballot application?

20  **A.**  No.

21  **Q.**  And if an official receives an absentee ballot application and

22  it's a duplicate, meaning the person has already requested,

23  there's a process for that, is that right?

24  **A.**  You mean if they submit it?

25  **Q.**  Uh-huh (affirmative).

1  **A.**   Yes.

2  **Q.**   And is that process any different depending on whether or not

3  the duplicate came from a third party or not?

4  **A.**   No.

5  **Q.**   And if we could look at Exhibit 58.  Could you identify this

6  document.

7  **A.**   This is the certification training that I was talking about

8  earlier that's like the new -- for new directors.  This looks like

9  one of the courses in that.  And it's called absentee ballot

10 procedures.

11 **Q.**   And are you involved in the creation of these materials at

12 all?

13 **A.**   No.

14 **Q.**   Are you aware if the absentee ballot application restrictions

15 are anywhere in this material?

16 **A.**   I'm not aware.

17 **Q.**   If I represented to you just for sake of time that it's not,

18 would you have any reason to disagree?

19 **A.**   No.

20 **Q.**   Are you aware of any inclusion of absentee ballot application

21 restrictions in the certification program?

22 **A.**   No.

23 **Q.**   Can you look at Exhibit 59.

24 **A.**   Yes.  I'm looking at it.

25 **Q.**   What's this?

1  **A.**  This looks like -- okay.  So this is -- there's election

2  superintendents and there's registrars, and so registrars have to

3  have the same initial training, initial certification as -- they

4  have to be initially certified too when they first start, so this

5  is a course from that, absentee ballot procedures.  It's probably

6  pretty similar to the one -- the previous exhibit.

7  **Q.**  If I were to represent to you that nowhere in here is there

8  any discussion of the absentee ballot application restrictions,

9  would you have any reason to doubt me?

10  **A.**  No.

11  **Q.**  Are you aware of any training on the absentee ballot

12  application restrictions as part of the certification program?

13  **A.**  Nope.

14          MS. LANG:  I would like to move 58, 59 and 62 into

15  evidence.

16          MR. FIELD:  No objection.

17          THE COURT:  Admitted.  They're admitted.

18  BY MS. LANG:

19  **Q.**  And can we look at Exhibit 60.  Can you identify this

20  document.

21  **A.**  This is an elections forum which is one of -- in April

22  of 2021, which that's more of kind of the training that we would

23  do outside of the certification or the conference for counties.

24  They're usually a webinar-type event.

25  **Q.**  And it looks to me, I mean, if you skip six or seven pages

1  in -- or about -- there.

2      So part of the reason for this training was the passage of

3  Senate Bill 202, is that right?

4  **A.**  It's a topic in it, yes.

5  **Q.**  And if I were to represent to you that there are extensive

6  training on the new provisions of Senate Bill 202 in here, could

7  you flip through and let me know if you agree with me there.

8  **A.**  Yes.

9  **Q.**  But if I were to represent to you that there's no training on

10 the absentee ballot application restrictions in this document, do

11 you have any reason to disagree?

12 **A.**  I think there's probably training, I haven't -- on absentee

13 ballots in general.

14 **Q.**  Yes.

15 **A.**  But not the provisions that we're -- you're talking about.

16 **Q.**  Right.  In fact, there's extensive training on various

17 absentee ballot provisions but not the ballot application

18 restrictions, is that right?

19 **A.**  Correct.  I mean, I don't have a reason to dispute that.

20 **Q.**  Okay.  And if you were to flip to Exhibit 61 and identify that

21 for me.

22 **A.**  This is pretty much the same but it's the next month, it's May

23 2021, the training from that.

24 **Q.**  And, again, some topics about SB 202 are in there, including

25 frequently asked questions, is that right?

1  **A.**   Yes.

2  **Q.**   And if I were to represent to you that there's no training on

3  the absentee ballot application restrictions in there, would you

4  have any reason to disagree?

5  **A.**   No.   And that wouldn't be surprising because the training is

6  supposed to hit the parts that -- these are your changes to your

7  processes, county, whereas what you're talking about are changes

8  really to your clients' processes, not necessarily a county

9  process.

10  **Q.**   I agree.

11  **A.**   The point of it is to hopefully take some work off of the

12  counties to make their jobs easier.

13  **Q.**   Yeah.

14          MS. LANG:  So I would like to move 60 and 61 into

15  evidence.

16          MR. FIELD:  No objection, your Honor.

17          THE COURT:  They're admitted.

18  BY MS. LANG:

19  **Q.**   Are you aware of any training that was done for election

20  officials on the absentee ballot application restrictions?

21  **A.**   I don't know.

22  **Q.**   And if not, would that be because these restrictions really

23  relate to third parties and do not change anything about what

24  election officials should do in their job on a day-to-day basis?

25  **A.**   I think they do change a lot of things the election officials

1  would have to do based off of volume, based off of complaints.

2  **Q.**  I understand that.  That's not quite my question.

3      My question is only:  It doesn't change anything about the

4  instructions that you would give to an election official on how to

5  process an absentee ballot application, is that right?

6  **A.**  What's the "it"?  I'm sorry.

7  **Q.**  The absentee ballot restrictions change nothing about the

8  instructions to an election official on how to process absentee

9  ballot applications?

10  **A.**  I would say that's true.  I mean, I think it would have

11  changes but not to that specific thing that you're asking about,

12  but that's only part of their job.

13  **Q.**  I understand that.

14      So regardless of the absentee ballot restrictions, election

15  officials will follow the same cure process, for example, for

16  errors and mismatches on absentee ballot application forms?

17  **A.**  Yes.

18  **Q.**  And regardless of the ballot application restrictions,

19  election officials will follow the same process to screen out

20  duplicate absentee ballot applications, is that right?

21  **A.**  Not screen out but to potentially process those.  I think it

22  would change the volume.

23  **Q.**  Right.  But the same process?

24  **A.**  Yeah, that could -- volume could change processes.

25  **Q.**  Okay.  And election officials will follow the same process for

```
 1   canceling absentee ballots when voters appear in person, is that
 2   right?
 3   A.   Again, volume -- differences in volume could change processes.
 4   Q.   The instructions to election officials will not change?
 5   A.   The sort of what they have to accomplish would not change, in
 6   terms of volume could change how they have to accomplish it.
 7   Q.   And your office has not required local election officials to
 8   track violations of the mailing list restriction, have you?
 9   A.   No.
10   Q.   Or violations of the disclaimer provision?
11   A.   Sorry.  It's getting a little heavy.
12   Q.   That's okay.
13   A.   Can you repeat the question.
14   Q.   And you haven't required local election officials to track
15   violations of the disclaimer provision?
16   A.   No.
17   Q.   And you haven't required local election officials to track
18   violations of the pre-filling prohibition?
19   A.   I don't think we have that requirement for anything.
20   Q.   Have you reviewed the materials that VPC and CVI have sent out
21   to Georgia voters and that were submitted in this case?
22   A.   I saw them yesterday.
23   Q.   And, similarly, did you see yesterday the materials that
24   VoteAmerica sends?
25   A.   I don't know that I did.  I don't really remember them.
```

1  **Q.**  With respect to VPC and CVI, did you have any quarrel with the

2  accuracy of the information that was being provided?

3  **A.**  I can't really -- what do you mean exactly?

4  **Q.**  Did you identify anything on the materials that CVI and VPC

5  were providing --

6  **A.**  Could you direct me to -- I'm sorry, I probably should look at

7  them.

8  **Q.**  Sure.  Yep.

9  **A.**  But, I mean, I don't think so.

10  **Q.**  All right.  Let's look at 13.  And we'll stipulate that you

11  can't speak to the accuracy of the voter information because this

12  is a fake voter.  It's just a sample.

13  **A.**  Right.  I can't speak to the accuracy of the voter information

14  or of the how do you compare with others voting score.

15  No, I wouldn't dispute the accuracy of any other information

16  on there.

17  MS. LANG:  Thank you very much, Mr. Germany.  I don't

18  have any further questions at this time.

19  THE COURT:  Redirect?

20  MR. FIELD:  Yes, sir.

21  THE COURT:  Go ahead.

22  REDIRECT EXAMINATION

23  BY MR. FIELD:

24  **Q.**  Very briefly, Mr. Germany.

25  Let's talk briefly about the print-and-mail tool where I

1  believe you began during this cross-examination.  Did VoteAmerica

2  ever approach the Secretary of State's Office after SB 202 was

3  enacted and ask for the Secretary of State's Office's view on

4  whether the print-and-mail tool would be permitted?

5  **A.**  Not that I know of.

6  **Q.**  And if they had sought such guidance, would you have given

7  then the testimony that you gave today?

8  **A.**  Yes, I think so.

9  **Q.**  And let's talk about the pre-filling prohibition.  There was

10  some conversation earlier about provisional ballots and cure

11  forms.  Do you recall that?

12  **A.**  I'm sorry, could you ask it again.

13  **Q.**  It's been a little while you've been up there.

14      This was the conversation about an incorrectly submitted --

15  strike that.

16      This was a discussion about an absentee ballot application

17  that goes in that has some incorrect information on it.

18          (Interruption by the court reporter)

19  BY MR. FIELD:

20  **Q.**  With incorrect information that was submitted and how that

21  would be treated and whether or not voters have an opportunity to

22  cure.  Do you recall that?

23  **A.**  I'm sorry, I'm having a hard time.  Are you talking about

24  if -- on a pre-filled application if there's incorrect information

25  and that's basically signed and sent to the county?

**Q.**   Correct.

**A.**   And then what's the question?

**Q.**   And then was there a discussion about a cure form?

**A.**   Yes.  Yes.

**Q.**   And about provisional ballots that would go out?

**A.**   Yes.  Yes.

**Q.**   Is the process of a provisional ballot and a cure form more time consuming for the state or for the county official than if the ballot application came in with accurate information?

**A.**   It's more time consuming to do a provisional and have to process a cure.

**Q.**   And there was also a lot of conversation about how these incorrectly completed applications would notify voters that the registration may be out of date.  Do you remember that?

**A.**   Yes.

**Q.**   Is it your opinion that sending out incorrectly pre-filled applications is a good way to notify voters that their registration is outdated?

**A.**   No.

**Q.**   Would there be a better way?

**A.**   In fact, we try to do that through the -- we have a process through ERIC that does that, that says, hey, your information might be out of date, will you check it.  I think that's a much better way to do it than to send an absentee ballot application, which, again, that can lead to a live ballot.

1  **Q.**  And you testified during cross-examination the state also sent

2  out pre-filled applications in 2020, correct?

3  **A.**  Yes.

4  **Q.**  And it's true, I believe, that there were also complaints

5  about applications that were sent out in 2020, correct?

6  **A.**  Yes.

7  **Q.**  And as a general matter, did SB 202 incorporate lessons

8  learned from previous elections?

9  **A.**  Yes, I think so.

10  **Q.**  And then there was also a conversation about substantiation, I

11  believe you were asked whether or not all the complaints that were

12  submitted with your declaration were unsubstantiated.  And you

13  were trying to explain what your office does when you get a

14  complaint, and I believe counsel didn't let you finish that.  So I

15  just wanted to give you an opportunity to explain what happens

16  when a complaint comes in to determine whether or not it's

17  accurate?

18  **A.**  So normally what we would do is reach out to the voter,

19  especially if it's a complaint like the ones that we've been

20  talking about today, to maybe explain to them, hey, this is not

21  from the state.  If it's a mailing that's not, you know, an

22  absentee ballot application, say this is just kind of political

23  mail, it's something people are allowed to do.  I know it can be

24  unpleasant, you know...

25       The same thing with -- on -- if they -- if they thought it was

1  a ballot, you know, try to have that conversation and explain.

2  And the same thing about duplicates and explain, hey, this is

3  not -- no, you don't have to fill this out; if you've already

4  requested one, it's not an indication of a problem.  So that would

5  be kind of the way we would handle I think most of the types of

6  these complaints.

7  **Q.**   With respect to substantiation, do you know whether or not it

8  is substantiated that third-party groups in previous elections

9  sent out incorrectly pre-filled applications?

10  **A.**   Yes.

11  **Q.**   Do you know whether or not third-party organizations sent

12  duplicate or duplicative applications to people who had already

13  requested ballots?

14  **A.**   Yes.

15  **Q.**   You were also discussing then in the anti-duplication

16  provision the safe harbor.  And there was this conversation,

17  right, about the data from the state and updating the voter files,

18  is that correct?

19  **A.**   The absentee voter file, yes.

20  **Q.**   Thank you.

21      And there was a question about the county uploading the data

22  and how frequently the county uploads the data.  Do you recall

23  that?

24  **A.**   Yes.

25  **Q.**   Does that matter here?  Is the safe harbor tied to the

1  counties' uploading of data?

2  **A.**   It's tied to when the county processes the application, but

3  the date should be when the county processes that application,

4  that would be the day that it's entered into the E-Net system, and

5  then the next day the voter file would reflect that.

6  **Q.**  Because the safe harbor provision is tied to the state's voter

7  file, right, not to the county's processing dates or the

8  underlying processing at the county?

9  **A.**   Correct.

10  **Q.**  Almost done.

11      There was a fair bit of conversation during your cross about

12  the timing of these complaints that came in because a lot of them

13  came in during 2020.  And am I correct that we're still in the

14  middle of discovery in this case, right?

15  **A.**   Sure.

16  **Q.**  So we don't -- I believe you testified earlier, this isn't the

17  universe of complaints that the state has received, correct?

18  **A.**   No.

19  **Q.**  But even with respect to timing and whatever atmospherics are

20  going on, does the Secretary of State's Office disregard

21  complaints it receives if it thinks that the conclusion might be a

22  little conspiratorial or unsubstantiated -- or unsupported?

23  **A.**   No.  I mean, a lot of what drives complaints we receive is, I

24  think, unhappiness about the result of an election, but we still

25  have to look into, okay, what's kind of the hook you're using, and

1  then is there anything to what they're saying.  Because then

2  hopefully we can say, okay, we've looked into what you're saying,

3  it doesn't really support your conclusion, and while you might be

4  unhappy, there's no reason to doubt -- you should still have

5  confidence in the result of the election.

6  **Q.**  Lastly, are county election officials -- strike that.

7     Is it important for county election officials to know the

8  state of the law in order to respond to voter questions?

9  **A.**  Yes.

10 **Q.**  And so would it require updating their knowledge about the

11 ballot rules or absentee ballot application rules if this Court

12 were to enjoin the challenged provisions?

13 **A.**  Yes, we would certainly let them know.

14          MR. FIELD:  No other questions, your Honor.

15          THE COURT:  All right.

16          MS. LANG:  Just three questions.

17                    RECROSS-EXAMINATION

18 BY MS. LANG:

19 **Q.**  Mr. Germany, you talked about how it's more difficult to

20 process absentee ballot applications when there are errors in the

21 forms.  Have you done any analysis of whether or not there are

22 more errors in forms that are handwritten by voters versus

23 pre-filled applications?

24 **A.**  I don't know if I said they weren't able to process, but I --

25 I don't know if I meant that.  I meant it could -- inaccuracies in

1  the form would then lead to kind of -- inaccuracies in the

2  information, whether it's pre-filled or by the voter, will lead to

3  problems down the line.  I don't know --

4  **Q.**  Well, processing because it will require a cure process and

5  all of that.  Mr. Fields asked you, you know, is it more difficult

6  when you have to have a cure form and all of that, is that right?

7  **A.**  Okay, yes.  The process of doing a provisional ballot and a

8  cure is going to be more time consuming.  I don't know if there's

9  more inaccuracies in a pre-filled or a -- or a voter filled.  I

10  mean, hopefully the voter, if they're engaging with the form, will

11  put in accurate and up-to-date information.

12  **Q.**  But you mentioned that sometimes handwriting can be illegible,

13  is that right?

14  **A.**  That's true.

15  **Q.**  And also is it possible that sometimes voters will put in

16  information that doesn't exactly match the voter registration

17  database?

18  **A.**  Yes.  And that I think -- especially when it's -- when the

19  county can kind of know the voter put this in, that can generate,

20  you know, what's hopefully kind of like substantive outreach to

21  the voter, like, hey, do you need to -- because you can actually

22  use an absentee application to update an address.

23  **Q.**  Right.  But sometimes voters don't know exactly -- like my

24  daughter's name -- I have not blessed her with an easy life -- is

25  Mary Josephine Iris Pileri-Lang, and maybe she just puts Josephine

1  because that's her -- what she goes by.

2  **A.**  Sure.

3  **Q.**  Those kinds of mistakes can lead to having to reach out to the

4  voter or have a cure form, et cetera, is that right?

5  **A.**  Potentially, yes.

6  **Q.**  And you haven't done any analysis of whether or not there are

7  more errors that lead to provisional ballots and cure forms

8  between voter-filled applications and pre-filled applications?

9  **A.**  I have not.

10 **Q.**  And we talked about the voter file being updated on a daily

11 basis when a county processes an absentee ballot application in

12 E-Net, is that right?

13 **A.**  The absentee voter file, yes, but it's going to be -- the

14 voter file isn't really -- is not public on our website until

15 voters can start --

16 **Q.**  Yes.

17 **A.**  So like now if you went there, it would be for the runoff.

18 **Q.**  Right.

19    Do counties always process absentee ballot applications the

20 day they receive them and put them into E-Net that day?

21 **A.**  No, but I think the day the ballot is -- I forget if it's

22 issue date would be the date they're processed.

23 **Q.**  Okay.

24 **A.**  So if the county sits on it, which they're not supposed to do,

25 they're supposed to process it within three days, the date will be

1  the day they actually process it.

2  **Q.**  Does the state police that three-day deadline?

3  **A.**  Yes.  I would say in COVID it got -- you know, it's obviously

4  going to be a little longer than that based on volume, but we --

5  we enforce it and we remind people like here are the deadlines.

6  And they get tighter as it gets closer to the election, so we try

7  to remind counties, you know, you've got to keep up because once

8  they get -- when you get close to an election, they're on a

9  next-day deadline, so they can't have any backlog.

10 **Q.**  My last question is:  As far as you are aware, the election

11 officials have never been trained in the first place on the

12 absentee ballot application restrictions by the Secretary of

13 State, is that right?

14 **A.**  I don't know that it's been part of our training to them.

15           MS. LANG:  Thank you.

16           MR. FIELD:  No other questions.

17           THE COURT:  Very well.  Sir, you can step down.

18           (Witness excused)

19           THE COURT:  All right.  Where are we in the defense's

20 case?

21           MR. TYSON:  Your Honor, we have two additional

22 witnesses; Mr. Waters who will be testifying via Zoom.  My

23 questions for him are a total of a page and a half after he gets

24 through his introductory information of who he is.  So that may be

25 one we can take now.  And then we our expert, Dr. Grimmer, would

 1  be our last witness.

 2          THE COURT:  Okay.  All right.  I assume he's been

 3  standing by for awhile eagerly on Zoom, is ready to go.  Unless

 4  anyone's starving, why don't we go ahead and get him in now.

 5          MS. LANG:  Your Honor, I have just one housekeeping

 6  item.  I forgot to move into evidence Exhibit 56, which is the

 7  draft bill.  Defendants' counsel can take a look.

 8          MR. FIELD:  No objection.

 9          THE COURT:  Okay.

10          On that, let me break in to counsel with a question.  I

11  think it was plaintiffs, Ms. Lang, you had a question of

12  Mr. Germany of, well, what if the judge enjoined the first line of

13  the disclaimer.  And I think he wisely answered, well, actually I

14  would check in with my attorneys, maybe he was thinking that

15  there's another court just down Pryor Street a few blocks.  But I

16  guess I would like to hear from the parties about the suggestion

17  that I could somehow just blue-pencil this and change it a little

18  bit.  I hadn't seen that in the briefs, and I wasn't aware that

19  was on the table in anyone's eyes.

20          So let me hear from plaintiffs first about your

21  suggestion and any response from the defense on the legality of a

22  judge in an injunction just deciding to change something a little

23  bit.

24          MS. LANG:  Thank you, your Honor.

25          I certainly think that is an option.  And I think it's

 1   because you wouldn't be rewriting anything.  You would just enjoin

 2   the first sentence and say that sentence is compelled speech that

 3   is not in any way supported by any compelling state interest.

 4          So I think that that's not -- you know, ordinarily

 5   courts, you know, are not supposed to be rewriting legislation,

 6   but it actually would be a way of more narrowly, you know,

 7   recognizing the parts of the statute that might be -- it's kind of

 8   like severability, right, that you don't strike down the whole

 9   statute just because you don't like one part, that that's being

10   overzealous in advocacy, and instead the first sentence should be

11   enjoined because it is false and misleading and it is compelled

12   speech that isn't supported by a compelling state interest.

13          THE COURT:  Do you have any case law that would support

14   my ability to just take out the part that plaintiffs think is the

15   worse part?

16          MS. LANG:  I could certainly find some for you over

17   lunch I think, your Honor.  I haven't --

18          THE COURT:  I don't think that -- I don't think this was

19   in the briefs unless I missed it, right?

20          MS. LANG:  We tried to focus, your Honor, on that that

21   is the offending provision.  And I think you're right, that we

22   didn't specifically brief that option, but I think that, you know,

23   narrow relief is often preferred by the federal courts.  And I

24   imagine that the state would prefer the removal of the first

25   sentence over the removal of the entire disclaimer, but, you

1  know --

2          THE COURT:  And by this question, I'm not suggesting

3  that I'm leaning towards striking anything, it's just a new

4  concept that I think you raised in your questions with

5  Mr. Germany, so...

6          MR. SCHAERR:  Your Honor, a couple of comments in

7  response.

8          First of all, there's a serious practical problem with

9  what plaintiffs have suggested here because as the Court is aware,

10 the Court doesn't have authority to enjoin a statute.  The Court's

11 injunctive power has to run against individuals.  So whatever

12 injunction the Court issues has to be issued to, you know -- to

13 state defendants.  There's no practical way that the Court can

14 just kind of blue-line, as you mentioned, a sentence out of a

15 statutory-required disclaimer or disclosure provision.

16         But I think the more fundamental problems beyond the

17 practical problem is a question of federal judicial power

18 vis-a-vis state government.  And, of course, the Eleventh Circuit

19 has often spoken to this.  One of -- in the *New Georgia Project*

20 case from 2020, the Eleventh Circuit wisely commented:  Federal

21 judges can have a lot of power, especially when issuing

22 injunctions.  And sometimes we may even have a good idea or two.

23         And I'm sure listening to this trial, the -- your Honor

24 has probably seen lots of good ideas that could potentially be

25 implemented in a statute.  But the Constitution sets out our

```
 1  sphere of decisionmaking, and that sphere does not extend to

 2  second-guessing and interfering with a state's reasonable,

 3  non-discriminatory election rules.  And that's on page -- that's

 4  just after the Court's discussion of Purcell.  I can't find the

 5  exact page number quickly, but I can get it to your Honor if you

 6  like.

 7          An earlier case along the same lines is a case called

 8  Curry v. Baker from the Eleventh Circuit, 1986, in which the Court

 9  wisely remarked:  Although federal courts closely scrutinize state

10  laws whose very design infringes on the rights of voters,

11  federal courts will not intervene to examine the validity of

12  individual ballots or supervise the administrative details of a

13  local election.

14          And those passages from those two Eleventh Circuit

15  decisions nicely capture exactly what the plaintiffs here are

16  asking the Court to do.  But in this case, there's an even more

17  serious optical problem in that what the Court would be doing

18  would be essentially enacting a statute that the state legislature

19  had rejected.

20          So we think for all those reasons that this is not a

21  good idea, your Honor.

22          MS. LANG:  Could I just respond quickly, your Honor?

23          THE COURT:  Yes.

24          MS. LANG:  So two points.

25          First, you could certainly just enjoin enforcement of
```

1    any violation of the disclaimer provision to the extent that the

2    only violation is not including that first sentence.  So as

3    Mr. Germany testified, they didn't have to create this form at

4    all, they don't have to change the form, I guess, if they don't

5    want to, but it would allow our clients to print only the parts of

6    the disclaimer that are not unconstitutional compelled speech if

7    you were to find that the remainder of the disclaimer was not

8    unconstitutional compelled speech.  So --

9              THE COURT:  Give me one second.

10             MS. LANG:  Sure.

11             THE COURT:  Okay.  Go ahead.

12             MS. LANG:  So as to Mr. Schaerr's first point, I think

13   you don't have to rewrite a statute at all, you just enjoin the

14   enforcement of failure to disclose this is not an official

15   government publication.

16             So the second point is the language that Mr. Schaerr

17   read was about the general idea that the Court should not

18   substitute its policy considerations for the state's.  And

19   certainly we all agree with that.  The question here is if the

20   Court finds that there is a First Amendment violation here, can it

21   issue narrow and tailored relief and, you know, sever the

22   unconstitutional parts from the constitutional parts?  And I think

23   that that's pretty commonplace.  And we'll work on getting you

24   some case law over lunch.

25             THE COURT:  All right.  Anything else from the defense?

1          MR. NORRIS:  Your Honor, can I speak to this?

2          Cam Norris for the Republican intervenors.  It's been

3    awhile since I said anything.

4          Just a couple points from us, your Honor.  This wasn't

5    raised in the briefs.  And I think as my friend from the

6    plaintiffs just alluded to, it's a question of severability in

7    part, which for a state statute is a question of Georgia law, not

8    federal law, which probably requires some briefing.

9          But I think really if this is where the case has gone,

10   and it seems clear that this is where the case is now, that the

11   plaintiffs don't actually dispute the vast majority of the

12   disclaimer provision, I think the PI -- we're at the PI state

13   here, that means it should be denied as overbroad, it's an

14   overbroad request from the plaintiffs.

15         And, lastly, our concern here is the plaintiffs aren't

16   the only groups who send out these mailers.  If you were to enjoin

17   a small part of the disclaimer, some groups probably just wouldn't

18   get the message.  Some groups would choose not to follow this

19   Court's order because they think it would be stayed on appeal or

20   something like that.  But there are other groups, which means

21   there will be other mailers, some with the disclaimer, some

22   without the disclaimer, which I think exacerbates voter confusion

23   because that means some forms will say this is not an official

24   government publication, and some forms will be missing that

25   statement, and I think voter's will be confused as to what the

```
 1   difference is.

 2          Thank you.

 3          MR. SCHAERR:  If I may, your Honor, I agree with what

 4   Mr. Norris just said.

 5          In addition to that, it seems to me this request

 6   highlights the absence of irreparable injury here because, as

 7   Mr. Germany has testified, if the plaintiffs are concerned about

 8   the -- you know, that that first sentence may be confusing or

 9   something -- and, of course, it's now been established from their

10   own evidence that that first sentence is true, is literally true.

11   Their expert, Mr. Green, testified to that effect yesterday.  But

12   there's no irreparable injury to them because, as Mr. Germany

13   testified, they could easily -- they could easily clear up any

14   concerns they have about the confusing character of that first

15   sentence simply by explaining it in their cover letter.

16          So there's -- they really don't need the Court to act in

17   order to clear up the problem that they are left with after the

18   evidence that they've presented.

19          THE COURT:  All right.

20          Ms. Lang, related question.  I don't remember which

21   brief it was in.  And I don't have the case in front of me, sorry,

22   but I think you're probably familiar with it.  It's the case that

23   either the defense or intervenor defendants cited that -- and by

24   asking this, I'm not saying that we're in narrowly-tailored land,

25   we're not.  But it's a case that says if you're in that land, it
```

 1   has to be narrowly tailored, but it doesn't have to be perfect.

 2            Aren't you suggesting that I would -- whatever type of

 3   injunction you would have me do here, isn't that the Court

 4   demanding perfection?

 5            MS. LANG:  No, I don't think so, your Honor.  So to

 6   address your question, I mean, there are three required

 7   disclaimer -- sentences in this disclaimer.  The very first one is

 8   the one that is most offensive.  It is, you know, at least

 9   one-third, if not more, of the compelled speech.  I think it's

10   plainly misleading.  And I don't think that Dr. Green testified

11   that it is true in any kind of plain meaning sense.  Nor is

12   Dr. Green authoritative on that point, and he was quite clear

13   about what he thought the result would be.

14            Two, you know, we have briefed, but it doesn't really

15   make very much sense at all that even the language that says this

16   is not a ballot, for example, is not just included on the form

17   generally.  You know, there is a lot of case law that says where

18   the government could just speak itself compelling speech instead

19   is unconstitutional.  And there's no reason to think that

20   third-party distribution is more likely to cause confusion between

21   a ballot and a ballot application than, you know, when it comes

22   from the government source itself.  But in any event, it is the

23   very first sentence, the entire sentence needs to be struck, I

24   don't think that's demanding perfection at all.

25            With respect to irreparable harm, there's case law

```
 1  directly on point that Mr. Schaerr's argument is not the law, that

 2  compelling speech is unconstitutional First Amendment harm, even

 3  if you could explain it away elsewhere.  And we cite that case law

 4  in our brief.

 5          THE COURT:  All right.  Okay.  Sorry for that

 6  interruption, but I just wanted to ask it because it was on my

 7  mind based on that exam.

 8          MR. SCHAERR:  The case you mentioned is McCutcheon, your

 9  Honor, I think.

10          THE COURT:  Thank you.

11          Mr. Tyson, why don't we see if we can get your witness

12  in before, say, 1:15.  I think the cafeteria may close down at

13  1:30-ish, so I don't want to go much later than maybe 1:15.

14          Am I right about that, Ms. Oduka?

15          COURTROOM DEPUTY CLERK:  Yes.

16          Would you like to recess in place so IT can come and --

17          THE COURT:  Yes.  We're not ready for that?

18          COURTROOM DEPUTY CLERK:  They just told me to call them

19  when we need them, but they're ready by e-mail.

20          THE COURT:  Very well.

21          (Pause in proceedings)

22          MR. TYSON:  Mr. Waters, you're not going to be able to

23  see Ms. Oduka, but I believe she's going to swear you in to get

24  started here.

25          COURTROOM DEPUTY CLERK:  Mr. Waters, if you can raise
```

1  your right hand.

2  _____

3                    BRANDON WATERS

4        a witness herein, being first duly sworn,

5     was examined and testified as follows via Zoom technology:

6  _____

7        COURTROOM DEPUTY CLERK:  Thank you.  You can put your

8  hand down.

9                    DIRECT EXAMINATION

10 BY MR. TYSON:

11 **Q.**  Good afternoon, Mr. Waters.  For us, good morning.

12    If you could please state and spell your name for the Court.

13 **A.**  Brandon Waters, B-R-A-N-D-O-N, W-A-T-E-R-S.

14 **Q.**  What is your profession?

15 **A.**  I am the CEO of a political consulting firm that does mail and

16 video advertising.

17 **Q.**  And is that firm called Arena?

18 **A.**  It is, Arena, LLC.

19 **Q.**  What kind of printing projects does Arena undertake?

20 **A.**  I'm sorry, what kind of what projects?

21 **Q.**  What kind of printing projects does Arena undertake for its

22 clients?

23 **A.**  We can do all printed products from mail to yard signs,

24 brochures.  When it comes to mail, we do pamphlets, small

25 mail-ins, large mail-ins, folded mail-ins, absentee applications,

1   and such.

2   **Q.**   How many pieces of mail did Arena send for its clients in the

3   2020 election cycle?

4   **A.**   We sent about 112 Million individual pieces of mail in 2020.

5   **Q.**   Did Arena mail absentee ballot applications to Georgia voters

6   in 2020?

7   **A.**   We did, we did three mailings to Georgia for absentee

8   applications.

9   **Q.**   Mr. Waters, do you -- are you familiar with union versus

10  non-union printers?

11  **A.**   Yes.

12  **Q.**   And does Arena use union or non-union printers?

13  **A.**   We primarily use non-union printers, but we do on occasion use

14  union printers.

15  **Q.**   And if an Arena client insisted on you only using union

16  printers, would that limit your ability to assist that client?

17  **A.**   It would.

18  **Q.**   Is Arena a seamless entry firm?

19  **A.**   We are, yes.

20  **Q.**   Can you explain to the Court what a seamless entry firm is?

21  **A.**   Sure.  A few years ago in order to streamline some processes

22  with the post office, the US Postal Service instituted a seamless

23  entry process which allows certain mail houses and printers within

24  the country to do what's called seamless entry, where they

25  essentially function as the post office.  So we will -- we produce

1  a mail piece, we will process the paperwork, we will enter it into

2  the US Postal Services systems.  And then at that point when we

3  enter it into their system, it will be calculated as mailed, and

4  then we are responsible for delivering it to the local sorting

5  facility where we're going to drop it, but we don't actually bring

6  it to the post office to get it checked in and technically mailed.

7  **Q.**  Do existing Arena clients update the list that they use for

8  voters based on information from states and counties of who has

9  already voted absentee in an election?

10 **A.**  Yes, they do.

11 **Q.**  And why do they do that?

12 **A.**  Primarily to save money.  And once you've mailed somebody an

13 application, for example, you know, there's no point in sending

14 another one if they've already sent in their application; or if

15 they've already voted, there's no point in continuing to send

16 out messages or applications --

17 **Q.**  Could you repeat from "send out messages," we lost the last

18 part of that, I'm sorry.

19 **A.**  There's no point in sending advocacy messages -- where we're

20 advocating on behalf of a campaign, there's no point in sending an

21 advocacy message to a voter after they have voted.

22 **Q.**  Are you familiar with the provisions of Georgia law related to

23 entities mailing absentee ballot applications to voters and when

24 they have to update their mailing lists?

25 **A.**  I am.

**Q.**  And is it your understanding that is a five business day window to update the data?

**A.**  Yes.

**Q.**  Can Arena update a data file and mail absentee ballot applications within a five business day window?

**A.**  Yes, we can.

**Q.**  And in 2020 did Arena make mailings of absentee ballot applications to Georgia within a five business day window?

**A.**  We did three different mailings, two of them we did in -- I'm sorry, in three business days.  One mailing we did within six business days, and it was actually more about five-and-a-half days but technically it had gone over to the sixth day, and that was primarily because that was when our drop date was scheduled.

**Q.**  Can you describe for the Court what the difference in scrubbing a list and building a list is.

**A.**  Sure.  When you're building a list, you're compiling all of the names of the voters, so you would take the voter file and you would go through a process of choosing and selecting which voters you were going to be mailing a particular mail piece.  You would then have to eliminate households and remove duplicates and such. That process can, you know, take a little while to do just because you're often going back and forth with a client.

When you're scrubbing a list, you are literally taking a list, you know, and in the case of an absentee ballot application you would take the list of people who requested an absentee ballot and

1  simply just match up the voter ID number and remove any of those

2  IDs from the actual mailing list.  That part is a very simple

3  process, it takes a matter of minutes.

4  **Q.**  Thank you.

5      And I know you said Arena is able to process scrub and

6  absentee ballot mail applications within five business days.  Do

7  you know whether other vendors would be able to do the same thing?

8  **A.**  Yes, there's -- a number of our competitors do that.

9  **Q.**  So, Mr. Waters, if someone were to say that a printer would be

10  unable to update and print an absentee ballot application mailing

11  within five business days, would that be true or false?

12  **A.**  False.

13          MR. TYSON:  I don't have any further questions, your

14  Honor.  Thank you, Mr. Waters.  Plaintiffs will have some

15  questions for you.

16          THE WITNESS:  Thank you.

17                    CROSS-EXAMINATION

18  BY MS. LANG:

19  **Q.**  Hi, Mr. Waters.  My name is Danielle Lang, and I represent the

20  plaintiffs in this lawsuit, and I just have a few questions.

21      First, I wanted to clarify something.  You testified that you

22  sent 112 Million mailers in 2020, is that right --

23  **A.**  Right.

24  **Q.**  -- in the 2020 cycle?

25      Your website says you've sent 20 Million mailers.  Is that

1  just an outdated number?

2  **A.**   That might be a typo if that's what it says on our website.

3  **Q.**   Yeah.  Okay.  It does.

4  **A.**   It actually should have probably read Billion.  We've been in

5  existence for 23 years or 25 years, something like that.

6  **Q.**   For the 112 Million mailers, that's for all different types of

7  mail, right?

8  **A.**   Correct.  Yep.

9  **Q.**   So would that include postcards?

10  **A.**   That would be all types of different mail pieces.  We did

11  2,100 unique types of mailings last cycle that made up those 112

12  Million pieces that were sent.

13  **Q.**   Did you send any pieces of mail that included a return

14  envelope?

15  **A.**   Yes, we did.

16  **Q.**   And about how many --

17  **A.**   Like a letter style, yes, we did that.

18  **Q.**   Okay.  So did you send some pieces of mail that had, you know,

19  the envelope -- the outside envelope, a cover letter, an absentee

20  ballot application and a return envelope?

21  **A.**   Yes.

22  **Q.**   And about how many of those did you send?

23  **A.**   I couldn't tell you the breakdown of envelopes versus

24  applications that had self-mailer components where the application

25  would then fold and mail back, but we did 40 different application

1  mailings in 2020.

2  **Q.**  And about how many pieces of mail was that?

3  **A.**  Off the top of my head, that would probably have consisted of

4  a total of about 20 Million pieces.

5  **Q.**  About 20 Million.

6     Are you familiar with VPC and CVI, Voter Participation Center

7  and Center for Voter Information?

8  **A.**  I'm sorry, you're a little bit hard to hear, can you repeat

9  that for me.

10  **Q.**  Yes.  Are you familiar with the Voter Participation Center?

11  **A.**  Yes.

12  **Q.**  And are you familiar with Center for Voter Information?

13  **A.**  I'm sorry, what for voter information?

14  **Q.**  Center for Voter Information.

15  **A.**  No, I'm not.

16  **Q.**  Okay.  Can you tell us what your understanding of Voter

17  Participation Center is, who they are.

18  **A.**  I'm sorry, I may have misunderstood.  You know, my

19  understanding of voter participation center is a voting location

20  where multiple people can vote, so I may not be familiar with what

21  you're referring to.

22  **Q.**  You're not familiar with an organization called Voter

23  Participation Center?

24  **A.**  No.

25  **Q.**  And so you're not familiar with how -- the size of their

1  mailing programs, is that right?

2  **A.**  Correct.

3  **Q.**  And so if I told you that they sent over 300 Million pieces of

4  mail in 2020, that would be about three times the size of your

5  firm, is that right?

6  **A.**  That's correct.

7  **Q.**  And if -- and only 20 Million of those pieces of mail

8  approximately were ones that included absentee ballot

9  applications, is that correct?

10  **A.**  Correct.

11  **Q.**  Does your firm actually run the printing or do you work with

12  vendor printers to do the printing?

13  **A.**  We work with about 30 different printers throughout the

14  country.

15  **Q.**  And what is the average size of like a single printing that

16  you -- order you might send to a printer?

17  **A.**  I'm sorry, you cut out for a second.  Would you repeat.

18  **Q.**  What is the average size of a single run you might do with a

19  printer?

20  **A.**  I would guess it's around 50- to 60,000 on average.

21  **Q.**  So the average size of an order that you do is about 50- to

22  60,000 pieces of mail, is that right?

23  **A.**  Yeah.  Our average application is probably in the 500 to a

24  Million range.  And our average mailings, we talked about

25  postcards and things like that, that brings the total to

1   about 50,000.

2   **Q.**   Can you repeat that, the total.

3   **A.**   Our average absentee application is around in the 500 to a --

4   thousand to a Million range.   And postcards and all the mailings

5   combined, that average is probably around 50- to 60,000.

6   **Q.**   Does your office primarily work with conservative clients?

7   **A.**   Yes.

8   **Q.**   Does it work exclusively with conservative clients?

9   **A.**   No.

10  **Q.**   Do you have any clients who have insisted on using union

11  printers?

12  **A.**   Yes.

13  **Q.**   And who were those clients?

14  **A.**   I couldn't tell you off the top of my head.

15  **Q.**   Is that common?

16  **A.**   Yeah, we have about 300 clients.   I handle a small portion of

17  them.   So we have -- there's 12 different people in our firm who

18  work with a variety of clients.   I do typically handle the

19  majority of absentee application mailings.

20  **Q.**   Does your company use in-line printing?

21  **A.**   We do.

22  **Q.**   When you use a union printer, does the union printer affix any

23  information on its -- on its printing materials?

24  **A.**   Typically they print the union bug, which is a little symbol

25  of their local union, that goes into the mail panel portion of the

1  mailing.

2  **Q.**  Does that union bug signal to anyone who receives that mailer

3  that this was printed by a union printer?

4  **A.**  If they know what that is, I suppose it would.

5  **Q.**  Is that the purpose of the union bug as you understand it?

6  **A.**  I actually don't know what the purpose of the union bug is.

7  **Q.**  Okay.  And since you're not familiar with Voter Participation

8  Center, you are not familiar with their printing logistics or how

9  they handle their mailings, is that right?

10  **A.**  Correct.

11  **Q.**  And you're not familiar with the data quality control work

12  that they might do on their lists, is that right?

13  **A.**  No.  I'm sorry, correct.

14  **Q.**  And I noticed on your website that you bill yourself as the

15  fastest turnaround in the country, is that right?

16  **A.**  I believe there's something to that effect, yes.

17  **Q.**  So you pride yourself on being able to move mail and other

18  products around really quickly, is that right?

19  **A.**  I'm sorry, can you repeat that, please.

20  **Q.**  You pride yourself and your organization on your ability to

21  turn around material and mailings on a quick timeline, is that

22  right?

23  **A.**  Correct.

24  **Q.**  And would you agree with me that faster timelines from

25  printers can translate into additional cost?

1  **A.**   No.

2  **Q.**   I'm sorry, you'll have to indulge me a little bit, I'm

3  confused.

4        THE COURT:  Let's do this, I'm sorry, folks.

5  Mr. Waters, I hate to do this to you but we're going to need to

6  break and come back a little bit later.  I don't think you can see

7  me on your Zoom, but this is JP Boulee, I'm the judge in the case,

8  and unfortunately we're going to have to take a break here.

9        MS. LANG:  This is my last question.

10        THE COURT:  It's your last question?

11        MS. LANG:  Two at most.  Depending on his answer, it

12  could be my last question.

13        THE COURT:  All right, everybody, Ms. Lang, if you don't

14  get lunch, it's her fault.

15        MS. LANG:  I take it.

16  BY MS. LANG:

17  **Q.**   If you have to order a rush order on a mailing, is that more

18  expensive than on an ordinary timeline?

19  **A.**   It's possible but not necessarily true because most of these

20  mailings are anticipated and planned well in advance and so the

21  printer knows what's coming.  It's a matter of actually getting

22  them the deliverable of the printed -- or the printing artwork and

23  the list.  So these things are scheduled, you know, sometimes days

24  but usually weeks and months in advance.

25      And when you work with a printer a lot, they know this

1  information is coming, which pieces are coming.  So when we work

2  with printers, they have an idea of what is coming and, no, they

3  do not charge us more for those jobs.

4  **Q.**  And can you get a discount from printers if you're working at

5  scale, like the larger the size, the less expensive it can be per

6  piece?

7  **A.**  Yes, to a point.  Anything after about 1.5 Million pieces

8  flattens out and there really is a miniscule cost difference.

9          MS. LANG:  Okay.  Thank you.  No further questions.

10          MR. TYSON:  I don't have any further questions either.

11  Thank you, Mr. Waters, for your time.

12          THE COURT:  All right.  Thank you, Mr. Waters.

13          (Witness excused).

14          THE COURT:  All right.  Let's take a break until 2:00.

15  See y'all then.

16          (After a recess, proceedings were continued as follows:)

17          THE COURT:  I think you were about to call your next or

18  final witness.

19          MR. SCHAERR:  That's correct.

20          THE COURT:  Very well.

21          MR. SCHAERR:  Your Honor, the State calls Dr. Justin

22  Grimmer.

23          COURTROOM DEPUTY CLERK:  Dr. Grimmer, can you raise your

24  right hand.

25          _____

1                           JUSTIN GRIMMER

2                 a witness herein, being first duly sworn,

3                  was examined and testified as follows:

4           COURTROOM DEPUTY CLERK:  Thank you.  You can be seated.

5                           DIRECT EXAMINATION

6    BY MR. SCHAERR:

7    **Q.**  Good afternoon, Dr. Grimmer.

8    **A.**  Good afternoon.

9    **Q.**  I think you've already stated your name.

10   Could you briefly describe your educational background.

11   **A.**  Sure.  I received my AB from Wabash College in mathematics in

12   political science.  My PhD in political science from Harvard.  I

13   was hired at Stanford University in 2010 as an assistant

14   professor.

15   I received tenure in 2014, promoted to an associate professor.

16   From 2016 to 2017 I was an associate professor by courtesy in

17   the computer science department.

18   From 2017 to 2018 I went to the University of Chicago where I

19   was an associate professor.

20   I returned to Stanford in 2018, where I took the position of

21   professor of political science.  And I'm also a Senior Fellow at

22   the Hoover Institution.

23   **Q.**  Thank you.

24   What was your PhD in and what was the topic of your

25   dissertation?

**A.** So, my PhD is in the field of political science, but more specifically the subfield of American politics.  The title of my PhD dissertation was Representational Style:  The Central Role of Communication in Representation.

**Q.** Did you do any graduate school coursework that relates to your work here?

**A.** Absolutely.  I did extensive coursework in statistics, political methodology, which is the application of statistics to political science questions, and political science graduate courses.

**Q.** And what kind of teaching do you do that might have relevance to your testimony here?

**A.** Sure.  I do a wide array of teaching about statistical methods, particularly targeted at social science and political science.  So, for example, I've taught a math camp to get our grad students ready for statistics.  I then have taught a first course that teaches the basics of statistical inference for our graduate students.  I teach a course now called introduction to machine learning, which provides extensive introduction to a variety of techniques, including the analysis of experiments in causal inference.  And I've also taught courses on how to analyze collections of texts.

**Q.** Thank you.

And I believe you submitted an expert report in this case, is that right?

1  **A.**   That's right.

2  **Q.**   Along with your CV?

3  **A.**   That's right.

4           MR. SCHAERR:   And I'll represent to the Court that those

5  are in the record in our opposition to the PI motion.

6  **Q.**   Now, as a professor at Stanford, do you have a responsibility

7  to publish articles or books?

8  **A.**   I do.

9  **Q.**   And what are some of the areas in which you have researched

10 and published, especially as related to the topics in this case?

11 **A.**   So I feel obligated to say I publish in a wide variety of

12 areas, but of particular relevance are papers about the

13 statistical analysis of election administration and participation,

14 but also papers on political communication, papers that involve

15 experiments, the statistical analysis of experiments and

16 methodologies therein, and just general papers on research

17 methodology.

18      In addition, I recently published a book about the analysis of

19 large collections of texts.

20 **Q.**   So what would you say are the general areas in which you have

21 researched and published?

22 **A.**   The general areas I work in we would say is the broad field of

23 American politics.   I'm excited to say I've published in every

24 area of political science, with specific focus on elections,

25 political participation, legislative studies.

**Q.**  I think you mentioned earlier you've also done a lot of
research and writing in the areas of statistical analysis of
election administration and participation --

**A.**  That's right.

**Q.**  -- is that accurate?

In addition to publishing articles yourself, have you
peer-reviewed articles and studies written by others on these
issues?

**A.**  I have.  So I've peer-reviewed for every major political
science journal, for prominent and major journals in economics,
computer science, sociology, general interest journals called
Science, Proceedings of the National Academy of Sciences, and
Nature.  In addition to that, I served as an associate editor at
Political Analysis.

**Q.**  What, if any, other professional and academic activities do
you participate in?

**A.**  I regularly -- or, yep, regularly participate in groups at
think tanks.  So, for example, over the summer I participated at a
think tank at AEI.  This past Monday I participated on a think
tank with NextGen about automatic voter registration.  And this
coming Friday, a week from today, I'll be participating on a panel
at RAND.

**Q.**  Thank you.

And are you trained in the accepted methods of conducting
focus group studies?

1   **A.**   I am.

2   **Q.**   What, if any, work or study have you done on methodologies of

3   conducting surveys in the field of political science?

4   **A.**   So, in fact, my most recent publication is a publication about

5   survey methodology and how to accurately measure public opinion.

6   In addition to that, I've published extensively on both surveys

7   and survey experimental methodology.

8   **Q.**   And is it also fair to say that you are trained in the

9   accepted methods of conducting a field study?

10  **A.**   That's right.

11  **Q.**   And how is that different from a focus group study?

12  **A.**   We might say that a field study, or I might interpret that to

13  be a field experiment, is a study that attempts to randomize some

14  intervention in the world in order to estimate a causal effect.

15  **Q.**   In preparation for your testimony today did you review any

16  studies?

17  **A.**   I did.

18  **Q.**   And are those described in your report?

19  **A.**   They are.

20  **Q.**   And besides those, did you review any other studies or

21  analyses?

22  **A.**   I did.  So I reviewed the relevant literature from my field in

23  order to be ready both for the report and this testimony.

24  **Q.**   And did you review the opening report and the rebuttal report

25  prepared by Dr. Green in this case?

1   **A.**   I did.

2   **Q.**   Did you listen to his testimony yesterday?

3   **A.**   I did.

4   **Q.**   Based on your review of those reports and the other things

5   that you read and listened to in preparation for your testimony

6   today, have you reached an opinion about Dr. Green's assessments

7   of the three provisions of SB 202 that plaintiffs are challenging

8   in this case?

9   **A.**   I have.

10  **Q.**   And before you say what that opinion is, could you explain to

11  the Court your understanding of what the ultimate scientific

12  issues are here with respect to Dr. Green's testimony?

13  **A.**   Of course.  So the first provision is a disclaimer provision,

14  and the key question there is whether the disclaimer will cause

15  voters to be less likely to vote by absentee or to vote at all.

16       A second provision is a pre-filing prohibition and there --

17  **Q.**   You mean pre-filling?

18  **A.**   I'm sorry, yes.  Pre-filling prohibition --

19  **Q.**   We've all made that mistake early on here.

20  **A.**   Yeah.  Pre-filling prohibition.  And the key question is

21  whether that pre-filling prohibition, again, is going to cause

22  people to not want to vote by absentee or otherwise turn out to

23  vote.

24       And, finally, there's what is called an anti-duplication

25  provision, or you can't send voters an absentee ballot after

1  they've already requested one.  And the key question there is

2  whether it's possible to comply with that requirement.

3           MR. SCHAERR:  Now, your Honor, based on Dr. Grimmer's

4  training and experience, I move to have the Court recognize him as

5  an expert in American politics, with special expertise in voting

6  and elections, including research methods and statistical analysis

7  of election administration and participation.

8           THE COURT:  Any objection?

9           MR. DIAZ:  No objection, your Honor.

10          THE COURT:  He's so admitted.

11          MR. SCHAERR:  Thank you, your Honor.

12  BY MR. SCHAERR:

13  **Q.**  Well, Dr. Grimmer, I want to start today by talking a little

14  bit more about Dr. Green's testimony.  As you heard, he mentioned

15  that his opinions were based on his intuitions and his experience.

16  Do you recall that testimony?

17  **A.**  I do.

18  **Q.**  Is there any risk from a scientific standpoint in approaching

19  a new problem guided by intuition and prior experience?

20  **A.**  Yes.

21  **Q.**  And what are those risks in your view?

22  **A.**  The key risk or the key feature of science is that we can

23  engage in an open interrogation of the evidence.  So the validity

24  of a scientific claim hinges upon the evidence that's presented

25  and the ability of other researchers to interrogate that evidence.

1   So when a researcher says that a claim is true because they have

2   intuition or even experience in the area without presenting their

3   evidence, it makes it impossible for other researchers to evaluate

4   the evidence that's presented, assess the quality of the evidence,

5   or even know the weight that a scientist is placing on the

6   evidence to reach that conclusion.

7   **Q.**   Does it also have an effect on the reproducibility of the

8   analysis that led to the conclusion?

9   **A.**   Yes, it's effectively impossible to reproduce an analysis

10  based on intuition.

11  **Q.**   Is that considered a problem from a scientific standpoint?

12  **A.**   It is a problem, yes.

13  **Q.**   Now, would other experts in your field draw scientific

14  conclusions based on their intuition or experience?

15  **A.**   They would not.

16  **Q.**   From your review of his work and his testimony yesterday, is

17  it your opinion that Dr. Green used a rigorous scientific

18  methodology to avoid the risks that you've just mentioned?

19  **A.**   No.

20  **Q.**   Is there a statistically rigorous way to aggregate prior

21  literature to reach new conclusions?

22  **A.**   Yes.

23  **Q.**   And what is that?

24  **A.**   It's called a meta-analysis.

25  **Q.**   What does that mean?

**A.**   So with a meta-analysis what we do is we try to come up with a
way to, as you said, aggregate up the literature.  So here's the
basic procedure:  You go and you find studies that are relevant to
the particular question at hand.  And what we'll do is we'll
collect the point estimates from those studies and the uncertainty
of those studies and sometimes researchers will try to gauge the
quality of the evidence from those studies.

**Q.**   Let me stop you there for just a minute.  What do you mean by
a "point estimate"?

**A.**   Exactly.  So when we do a study, say, to assess a causal
effect, so, for example, suppose we're interested in the effect of
pre-filling on the rate at which people will vote absentee or
otherwise turn out to vote, we might run an experiment where we
have an intervention where someone has been sent a ballot
that's -- an absentee ballot application that's pre-filled, an
absentee ballot application that's not.

     And then what we'll do is we'll compare the rates of the
outcome of interests between those two groups usually by taking a
difference in means.  And that difference in means, the average in
one condition compared to the other condition, by that I mean
that's a point estimate, and just -- and then the uncertainty
about that point estimate is a measure of how much variability
there is in that point estimate based on what's called a
statistical inferential procedure.

**Q.**   Okay.  So is it fair to say, then, that a point estimate is

1   in essence, a mathematical way of representing or capturing a

2   relationship between two variables or two events in the world?

3   **A.**   I would say the way to think about it is just a measure of how

4   much the intervention of interest deviates from a comparison

5   condition.  And we can think about that like a relationship, but I

6   think it's perhaps more intuitive to think about it as there's a

7   rate that's something's happening in one group, rate something's

8   happening in another group, and let's just take the comparison

9   between those two.

10  **Q.**   Okay.  So it's a way of representing mathematically that

11  relationship --

12  **A.**   Exactly.

13  **Q.**   -- right?

14      Okay.  And why would you conduct a meta-analysis when you're

15  trying to answer potentially a new question?

16  **A.**   Right.  So one of the things that you would want to do, say,

17  when you're collecting those point estimates so we know the

18  results from an array of studies, immediately that's of interest

19  because it allows the researcher and the individuals interrogating

20  that researcher's conclusion to know what other people have found,

21  and it also helps establish what studies the researcher found is

22  relevant for the particular question.

23      To go further in a meta-analysis, the reason you would want to

24  do a meta-analysis is that it enables the researcher to rigorously

25  define the weight that he or she is applying to those studies --

 1              (Interruption by the court reporter)

 2              THE WITNESS:  Apply a weight or an indication of how

 3    much their conclusions are based on the particular components out

 4    of the meta-analysis, the studies that they have aggregated up.

 5    BY MR. SCHAERR:

 6    **Q.**  Okay.

 7        From what you have read and saw, did -- read and seen, did

 8    Dr. Green's report conduct any meta-analysis of prior literature

 9    on the effects of these kinds of provisions on voting behavior?

10    **A.**  No.

11    **Q.**  Okay.

12        You may recall that Dr. Green testified at some length about

13    how increasing transaction costs can cause people near a

14    behavioral threshold to change their expected behavior.  Do you

15    recall that testimony?

16    **A.**  I do.

17    **Q.**  Did Dr. Green do any kind of a meta-analysis with respect to

18    that question?

19    **A.**  He did not.

20    **Q.**  Did Dr. Green provide any analysis to show where the

21    behavioral threshold of Georgia voters presented with the

22    disclaimer at issue here might be?

23    **A.**  He did not.

24    **Q.**  And did his failure to do that have any effect on the

25    scientific validity or the scientific persuasiveness of the claims

1  that he then made?

2  **A.**   It did.

3  **Q.**   What effect was that?

4  **A.**   So the reason that we would want to do this sort of

5  meta-analysis, other analysis, is that it's actually a quite

6  interesting question when an intervention will have an effect,

7  particularly with voter turnout.  To think about why, we can first

8  think about the distribution of voters' propensity to turn out to

9  vote.

10     One can imagine plausibly that the propensity to turn out to

11  vote could be bimodal, it could have lots of other shapes.

12  **Q.**   What do you mean by "bimodal"?

13  **A.**   Sorry about that.  By bimodal I mean that -- I'll say it in

14  words so it will be in the transcript.  I mean that there could be

15  a large mound of people close to zero or a high proportion of

16  people who have a low propensity to turn out to vote, and there

17  could be a high proportion of people that have a high propensity

18  to vote, but very few people in the middle, or there could be

19  other distributions that could take different shapes.  The effect

20  of an intervention will depend upon that distribution.

21     What's more, even if we think that a study on average lowers

22  the transaction costs, we don't know how much a particular -- an

23  intervention, excuse me, lowers transaction costs, we don't know

24  how much that intervention is lowering the transaction costs.

25     If it is a trivial reduction of costs, we may see very little

1 change at all in the behavior of voters, in particular if it's in

2 an area of the space where there's not many voters.

3     And, finally, there could be a variety of effects of that

4 change on voters.  And what's interesting is that this is actually

5 reflected in the empirical literature, even in the papers that

6 either Dr. Green has published or submitted with his brief and

7 papers that are related to the absentee voting.  So there is --

8 I'm going to blank on the first author's name, Amlani and Collitt

9 paper submitted with Dr. Green's expert report that --

10          (Interruption by the court reporter)

11          THE WITNESS:  A-M-A-L-I-F-F (sic), I believe is the

12 spelling, but I apologize if I got that wrong.

13          So that analyzes the effect of vote-by-mail using a

14 design that -- vote-by-mail changes in policy across states.  And

15 one of the interesting conclusions in that paper is that they find

16 that the move from a state that has no-excuse absentee ballot to a

17 state that sends every voter an absentee ballot application, they

18 estimate a negative effect in that case.

19          Dr. Green's published a --

20 **Q.**  Let's pause there for just a minute.  A negative effect would

21 mean that?

22 **A.**  That move from being a no-excuse absentee voting state to a

23 state that sends voters an absentee ballot application, but based

24 on the testimony from Professor Green yesterday I presume that

25 means that he would say that lowers transaction costs, that

1   actually results in a decrease in the rate individuals are turning

2   out to vote that causes a decrease in the rate that individuals

3   are turning out to vote.

4       If --

5   Q.  And so that -- how does that illustrate the importance of

6   being able to estimate the behavioral threshold of voters?

7   A.  Yeah.  So there we have an instance where it appears that

8   we -- it appears that the transaction costs have lowered but, in

9   fact, it looks like there's a negative effect.  There's actually

10  a -- some evidence from Dr. Green's published work of this.

11      So in 2010 he ran a study in San Mateo County where he sent

12  voters a prepaid envelope to return their absentee ballot.  And

13  they actually found no effect on turnout, and the people in the

14  treatment condition were more likely to vote in person, they

15  speculate in their paper because it disrupted individuals'

16  routine.  And, again, this is why it's difficult to assess

17  transaction costs.

18      Just one final example.  In a paper that came out of -- I

19  should have mentioned earlier that I'm the co-director of the

20  Democracy and Polarization Lab at Stanford, and a paper that my

21  co-director co-authored along with a group of grad students that

22  we co-advise demonstrates that in Indiana and Texas where there's

23  an age-based threshold for absentee voting that individuals just

24  below the absentee -- just below the ability to have access to

25  no-excuse absentee voting, have no difference in turnout rate than

1  individuals just above the threshold, that age-based threshold --

2            (Interruption by the court reporter)

3            THE WITNESS:   Individuals just below the age-based

4  threshold have no difference in their rate of turnout compared to

5  individuals just above that age-based threshold.

6  BY MR. SCHAERR:

7  **Q.**  Okay.  And several of these results that you've described,

8  would it be fair to say that they're somewhat counterintuitive?

9  **A.**  Counterintuitive and, yeah, puzzling, interesting I think I

10  would say as a social scientist, yes.  Yep.

11  **Q.**  And so our intuition doesn't always match up with the actual

12  facts and evidence, is that fair?

13  **A.**  That's true.  I think that's why I get to have a job.  Yeah.

14  Academic job I mean.

15  **Q.**  Right.

16      Now, turning to Dr. Green's analysis of the disclaimer

17  provision, do you recall his calling his semi-structured interview

18  a descriptive tool?

19  **A.**  I recall that.

20  **Q.**  And what effect does that concession have on his analysis of

21  the disclaimer provision?

22  **A.**  By calling it a descriptive tool it just means that it's

23  attempting to uncover some unknown fact about the particular

24  sample or group that's in hand.

25  **Q.**  Okay.  And what does that particular descriptive tool show in

1   your opinion?

2   **A.**   I think there's two ways to answer this.  So in my report --

3   **Q.**   And, I'm sorry, let me pause -- let me just be clear about the

4   descriptive tool we're talking about.  What is the -- when you

5   refer to the descriptive tool, exactly what do you mean?

6   **A.**   I took you to mean the five interviews that were conducted.

7   **Q.**   Okay.

8   **A.**   So there's two ways to answer this.  So one way to answer this

9   question is to say that this conveys the particular way this five

10  groups of individuals in this particular transit center using

11  these particular materials being asked questions in this

12  particular way respond to the disclaimer.

13      Based on Dr. Green's testimony, I take his conclusion to be

14  that they're -- in one half of one interview the respondent

15  described -- had a negative reaction to the disclaimer, and so his

16  conclusion is that in one half of one of the five interviews one

17  individual had a negative reaction to the disclaimer.

18  **Q.**   Okay.  And so in your opinion, would it be fair to make any

19  generalizations based on that descriptive tool or that experiment,

20  that limited experiment that Dr. Green supervised?

21  **A.**   No, not without heroic assumptions.

22  **Q.**   Right.  And why is that?  Why could you -- why would it be

23  scientifically invalid to attempt to draw generalizations from it?

24  **A.**   We just sort of lack the basic requisite information to even

25  know what assumptions we would have to make in order to make that

1  extrapolation.  I don't know how individuals were selected or any

2  other number of features of how individuals ended up in the

3  example.

4  **Q.**  Okay.  Well, let's take one example of that.  From his

5  testimony was Dr. Green able to say why his interviewer chose a

6  transit center in which to conduct those interviews?

7  **A.**  He was not able to say.

8  **Q.**  And you mentioned already that Dr. Green apparently didn't

9  know how those individuals had been selected, is that correct?

10  **A.**  That's correct.

11  **Q.**  Or if those individuals had been selected from among some

12  broader group of individuals that had been identified?

13  **A.**  That's correct.

14  **Q.**  And did Dr. Green know how much money those people had

15  received for participating in the study?

16  **A.**  He did not.

17  **Q.**  If you were conducting a semi-structured interview, would you

18  want to know those things?

19  **A.**  Those are exactly the questions I would want to know.

20  **Q.**  Why would it be important to know those things?

21  **A.**  Just speaks exactly to the value of this as a descriptive

22  tool, because a descriptive tool is trying to uncover some pattern

23  in the dataset you have without making extrapolation to another

24  population --

25              (Interruption by the court reporter)

1          THE WITNESS:  Extrapolation to another population.  The

2    question of interest is how valuable is that population that

3    you're using for description.

4    BY MR. SCHAERR:

5    **Q.**  Okay.  And, by the way, is it standard practice to pay people

6    for their participation in studies?

7    **A.**  It is.

8    **Q.**  Is it also standard to disclose that you were paying them for

9    their participation?

10   **A.**  Yes.  And, in fact, it's part of training that social

11   scientists receive before we do this sort of research in our

12   academic positions.

13   **Q.**  Was that fact disclosed in Dr. Green's analysis?

14   **A.**  No, it was not.

15   **Q.**  Now, do you recall Dr. Green conceding that there were issues

16   with three of the five interview videos that were collected, do

17   you recall that from his testimony?

18   **A.**  I do.  I just want to say that I'm not exactly sure which

19   videos he was not happy about or not because I think he had it

20   misnumbered in his testimony.

21   **Q.**  But you do recall his saying that really only two of those

22   five were, quote:  Up to his standards.  Is that right?

23   **A.**  That's exactly right.  I just don't know which three are in

24   the invalid component and which two are in the valid component.

25   **Q.**  And in one of those videos the subject, the person being

1  interviewed had no problem with the disclaimer, is that accurate?

2  **A.**   That's accurate.

3          MR. DIAZ:  Objection, your Honor.  Counsel is leading

4  the witness.

5          MR. SCHAERR:  I'm sorry?

6          MR. DIAZ:  I object that counsel is leading the witness.

7          MR. SCHAERR:  I'm trying to move things along, your

8  Honor, but...

9          THE COURT:  All right.  Well, given the objection, let's

10  try not to lead.

11          MR. SCHAERR:  Okay.

12  BY MR. SCHAERR:

13  **Q.**   And did both of those two interviewees have a problem with

14  the disclaimer that was shown to them?

15  **A.**   Ultimately the individual in video five did have a problem

16  with the disclaimer but only after he -- his attention was

17  specifically drawn to it.  And the individual in video four had a

18  problem with the disclaimer ultimately as well to my recollection.

19  **Q.**   Okay.  Now, in your opinion, is it possible to draw legitimate

20  conclusions, or at least scientifically plausible conclusions,

21  about the effects of the law based on two interviews that reach

22  somewhat opposing results?

23  **A.**   No, it is not.

24  **Q.**   And why is that?

25  **A.**   Just simply it -- using this small of a sample it's just hard

1    to know why these individuals made this decision, how these

2    individuals ended up in the sample, why they're reacting this

3    particular way to these sets of questions.

4    **Q.**   Okay.  And do you also remember what Dr. Green said about

5    whether it would be possible to conduct a scientifically

6    legitimate quantifiable field experiment about the effects of the

7    disclaimer?

8    **A.**   I recall that.

9    **Q.**   And do you recall what he said?

10   **A.**   He said it would not be possible.

11   **Q.**   And it would not be possible generally or just in Georgia?

12   **A.**   Sorry.  It would not be possible in the State of Georgia

13   because of the prohibition on sending absentee ballot applications

14   that didn't have the disclaimer, effectively that makes it

15   impossible to have a control group for the study.

16   **Q.**   So his point was -- or tell me if this is correct:  Was his

17   point that there can't be a control group in Georgia?

18             MR. DIAZ:  Objection, your Honor, leading.

19             MR. SCHAERR:  I'll rephrase, your Honor.

20   **Q.**   What's the effect of that for Georgia?

21   **A.**   If we were to design a randomized study, I think a reasonable

22   design that we might use would be something like a

23   three-conditioned study.  One condition we would want to have a

24   ballot application with a disclaimer.  A second condition would

25   have the ballot application without the disclaimer.  And the third

 1   condition would have a control group where perhaps we send those

 2   individuals nothing.

 3      And if we were then going to run the experiment, we would

 4   randomly assign individuals to each of those conditions and then

 5   we would assess either their behavior --

 6              (Interruption by the court reporter)

 7              THE WITNESS:  Assign individuals to those conditions and

 8   then assess their behavior in either absentee voting or turnout

 9   overall.  The issue is that in the State of Georgia there would be

10   a prohibition on sending absentee ballot applications that didn't

11   have the disclaimer, and that the key comparison for this -- the

12   key comparison, the scientific question here is the difference

13   between the condition where you have the ballot application with

14   the disclaimer and without.  So it would remove this like very key

15   condition from the study.

16   **Q.**  But would it be possible to construct that kind of a study in

17   another state?

18   **A.**  Yes.

19   **Q.**  Okay.  And how could you do that?

20   **A.**  Using the procedure that I outlined.  So in another state we

21   could send -- where it's allowed to send -- where third parties

22   are allowed to send individuals absentee ballot applications, we

23   could construct one absentee ballot application that had the

24   disclaimer, another that did not contain the disclaimer, and then

25   perhaps a third have this control condition.  We then deploy the

1  study by randomly assigning individuals to the conditions and then

2  assessing the effect.

3  **Q.**  And could that procedure give you a scientifically valid

4  measure of the effect or at least the association between voting

5  behavior and the disclaimer provision?

6  **A.**  It could.

7  **Q.**  Okay.  And do you recall Dr. Green saying that an experiment

8  of this kind would be trivial, similar to asking whether water is

9  wet?

10  **A.**  I recall that assertion.

11  **Q.**  And do you agree with that assertion?

12  **A.**  I do not.

13  **Q.**  And why was he wrong in saying that?

14  **A.**  Again, there's just a large number of studies that reach

15  conclusions that are quite surprising.  So, for example,

16  Dr. Green's published two recent studies that seemed to show that

17  online campaign spending doesn't have an effect on voters, which

18  is quite surprising given the money that campaigns are spending

19  online.

20  **Q.**  Okay.  And when you analyze an experiment, do you generally

21  try to estimate a treatment effect?

22  **A.**  That's correct.  So what goes on is we define a question.  The

23  term of art there is an estimand.  And then we estimate an effect

24  from that experiment.

25  **Q.**  Why do we call that a treatment effect?

**A.**   Because we're assessing the effect of this intervention and the random assignments ensuring that the only difference on average between these groups is the assignment to treatment.

**Q.**   Did Dr. Green attempt to estimate a treatment effect in his testimony or in his semi-structured interview process?

**A.**   He did not.

**Q.**   Okay.  Let's see.  So having reviewed Dr. Green's analysis of the likely effects of the disclaimer provision, in your opinion did it comply with the scientific standards in your field?

**A.**   It did not.

**Q.**   Now, Dr. Green also suggested that you in your analysis conflated the standard for evaluating qualitative versus quantitative studies.  How do you respond to that?

**A.**   Perhaps one of the most cited books in our field argues that there's one logic for inference.  The book is King Keohane, it's K-E-O-H-A-N-E, and Verba.  And the entire thesis of that book, which has over 14,000 citations, is that when we're trying to perform inference in the world, it doesn't matter if we engage in a semi-structured interview or if we're doing a quantitative study, there's a core logic for inference.  There could be different goals for those studies, but there's the same standards for inference.

**Q.**   Well, let's move now to the anti-duplication provision.

Do you recall in Dr. Green's report an assertion that third parties have no incentive to send duplicate applications to those

 1  who have already requested a ballot?

 2  **A.**  I recall that assertion.

 3  **Q.**  And do you consider that assertion to be supported by any

 4  evidence, either in Dr. Green's report or in his testimony?

 5  **A.**  No.

 6  **Q.**  And did you identify any other flaws with respect to that

 7  assertion?

 8  **A.**  I did.

 9  **Q.**  And what other flaws did you see?

10  **A.**  When Dr. Green makes this assertion in his report, he's

11  performing what's called a cost benefit analysis.  And under

12  Dr. Green's logic, these organizations are seeking a benefit.  For

13  them the benefit is turning individuals out to vote.  And there's

14  a cost.  And that cost is distributing some content to those

15  individuals.  And a basic assumption across a lot of the social

16  sciences, particularly political science and economics, is that

17  actors are trying to maximize the benefits while minimizing their

18  costs.

19     And what Dr. Green asserts is because there's no benefit in

20  the sense you can't get someone to be able to vote absentee again

21  after having an absentee ballot application submitted, the group

22  would, therefore, have, again, no upside, so it would be all

23  downside, it would be all cost.  The key issue here though is that

24  you have to compare the cost of simply sending the -- simply

25  sending someone another absentee ballot application to the cost of

1    determining whether someone has already submitted the ballot.  And
2    if the cost of simply sending someone that duplicate application
3    is less than the cost of determining who has already submitted an
4    application, the groups, in fact, would have an incentive to send
5    duplicate applications.
6    **Q.**  Okay.  And is Dr. Green's assumption on that point supported
7    by any evidence in his report or in his testimony?
8    **A.**  No.
9    **Q.**  Okay.  Now, in fact, you heard the testimony yesterday from
10   Mr. Copach (sic) --
11   **A.**  Yes.
12   **Q.**  -- right?
13       And he mentioned that one of his organization's objectives
14   in conducting this kind of voter outreach is to try to develop a
15   longer-term trust relationship with the voter.  Do you recall that
16   testimony?
17   **A.**  I recall that, yes.
18   **Q.**  And might that constitute an additional benefit to the group
19   sending out the materials that would need to be considered in the
20   cost benefit analysis?
21   **A.**  It could.  In fact, I've published other research on the
22   benefit of multi-touch points in political communication being
23   valuable to political actors.
24   **Q.**  Okay.
25       So having reviewed Dr. Green's analysis of the effects or what

1  he claims to be the effects of the anti-duplication provision, did

2  that analysis comply with the scientific standards in your field?

3  **A.**  It did not.

4  **Q.**  And exactly how did it depart from those standards?

5  **A.**  The analysis relies upon his intuition and speculation about

6  the incentives of groups and the ways in which the law would

7  effect operating practices.

8  **Q.**  Rather than --

9  **A.**  Rather than relying upon detailed evidence, empirical analysis

10  or any sort of study to reach a conclusion.

11  **Q.**  Thank you.

12     Let's talk a little bit more about the -- about the mechanics

13  of dealing with this anti-duplication provision.  To your

14  understanding how often does Georgia update the data on which

15  voters have sought a -- or have applied for an absentee ballot?

16  **A.**  My understanding is that when absentee ballot applications are

17  live, when they're in the period where people would be submitting

18  them, they're updated daily.

19  **Q.**  Okay.  And do you recall Dr. Green testifying that comparing

20  two datasets is a simple procedure?

21  **A.**  I do.

22  **Q.**  And do you agree with that?

23  **A.**  I do agree with that, yes.

24  **Q.**  And did you form an opinion on the difficulty of matching

25  names to avoid violating the anti-duplication provision?

**A.**   I did.

**Q.**   What is that opinion?

**A.**   I do not think it would be difficult.

**Q.**   And how did you form that opinion?

**A.**   Both from my prior work merging files, it's a -- it's a sort of day-to-day job of a social scientist, and also by reviewing an article by Professors Ansolabehere and Hirsch.  And they perform an analysis attempting to merge voter files from the State of Texas, and they had the advantage of also knowing the truth, they have a social security number to do the merge.

     And what they show is using things like name, date of birth, address, that they're able to obtain matches that they say are functionally equivalent to matching on social security numbers.

**Q.**   Okay.  And, of course, you -- did you hear Mr. Waters' testimony earlier today?

**A.**   I did.

**Q.**   And does that have any -- in your view, does that have any additional impact on your assessment of the difficulty of complying with the anti-duplication provision?

**A.**   Based on the testimony it -- it appears it would be relatively easy to identify individuals who have submitted applications and then remove those mailers from an outgoing mailing.

**Q.**   And to your knowledge, does the absentee ballot data include a voter number?

**A.**   It does.

**Q.**  And if the plaintiff groups have that information, what impact would that have on the ease or difficulty with which they could avoid sending applications -- sending duplicate applications?

**A.**  It renders the merge trivial, you just merge on the number.

**Q.**  And does the data in the voter file also include the name of the voters?

**A.**  It does.

**Q.**  And in your opinion, if the plaintiff group doesn't have the correct voter ID number, how difficult would it be to find a voter on its mailing list that has already requested a ballot?

**A.**  It would be easy.

**Q.**  Okay.  And how would they do it?

**A.**  You would set up a simple algorithm, matching algorithm where you would seek either an exact or a fuzzy match based on name, date of birth, address.  And just to be clear what I mean by "fuzzy match," I mean a procedure that enables us to deal with any sorts of small errors or deviations.

      And so, for example, if a voter has the last name Núñez, we might be concerned that they record their name with an "N" in a particular -- in one file or in one dataset that we're working with, and it's recorded as an E-N-Y-A (phonetic) in another file. If you do an exact match, then you wouldn't be able to find that person.  But fuzzy matching, which is a standard technique available across a number of statistical programs, would enable an individual or a group to identify that person based on similarity

 1  of the Nunez and Nunez with an N.

 2  **Q.**  And, by the way, is the voter file that we're talking about,

 3  is it difficult to read on a computer?

 4  **A.**  It is not, no.

 5  **Q.**  What kinds of programs could read it?

 6  **A.**  The voter file we're talking about is the absentee information

 7  from the State of Georgia?

 8  **Q.**  Right.

 9  **A.**  So that is distributed as a comma separated file.  And every

10  commercial and non-commercial statistical program I'm aware of can

11  read in that data.

12  **Q.**  And can it be read by very common computer programs?

13  **A.**  It can, yes.

14  **Q.**  Like, for example?

15  **A.**  Microsoft Excel would be -- comma separated files are often

16  opened in Microsoft Excel, OpenOffice as well, Google Sheets.  I

17  work in the R statistical programming language, which is a

18  freely-available software.

19  **Q.**  And would it be possible simply to import those data into a

20  common program like Excel or Google Sheets?

21  **A.**  Yeah.  You would simply open it.  In the -- in the program

22  there's an option to open and you can just declare what the suffix

23  is that's a comma separated file.

24  **Q.**  Now, based on your experience, would a check for matches using

25  a fuzzy matching algorithm be difficult in the setting that we're

1   talking about here?

2   **A.**   It would not, no.

3   **Q.**   In your opinion, would it require any additional training for

4   the plaintiff groups to create such an algorithm?

5   **A.**   Just the training that might be associated with using a new

6   package for a statistical programming language.

7   **Q.**   Or would it be necessary in your opinion to retain a

8   programmer to create a separate program to compare the datasets?

9   **A.**   You would want -- one would write code in order to do this.

10  And I obviously can't speak to the expertise in the particular

11  groups, but it would -- it's a pretty standard operation.

12  **Q.**   Can a program like Excel accommodate something like fuzzy

13  matching?

14  **A.**   There's an add-on in Excel to do fuzzy matching, yes.

15  **Q.**   So they could just get the add-on and use it with their Excel

16  software if they wanted, is that correct?

17  **A.**   Yes.

18  **Q.**   Let's move on then to our last topic, which is the pre-filling

19  prohibition.

20      Do you recall Dr. Green admitting that he based his opinion on

21  a single study by Hans Hassell?

22  **A.**   I recall that, yes.

23  **Q.**   And did you review that study in preparing your response to

24  Dr. Green?

25  **A.**   I did.

1  **Q.**  Do you remember Dr. Green conceding that the Hassell study's

2  conclusions lacked statistical significance?

3  **A.**  I recall that, yes.

4  **Q.**  In your opinion, does the Hassell study support a claim that

5  pre-filled applications actually increase absentee voting?

6  **A.**  It does not support that claim.

7  **Q.**  And why is that?

8  **A.**  So if we were to examine the results from the Hassell study or

9  take Professor Hassell's word for it, we would make a comparison

10  between the rate at which individuals voted absentee in the

11  pre-filled condition and the rate at which individuals voted

12  absentee in what he calls the generic condition, or where the

13  ballot's not pre-filled.  And if we made a difference between

14  those two treatment arms, we would find a difference of

15  0.52 percent.

16  **Q.**  Let me stop you.  What do you mean by "treatment arm"?

17  **A.**  Sorry about that.

18      By "treatment arm," I mean these experimental conditions.  One

19  treatment arm would be the pre-filled ballot condition.  Another

20  treatment arm would be the generic condition.

21      So if we make that comparison, it's 0.52 percent -- percentage

22  points, excuse me, 0.52 percentage points.  And, of course, that's

23  a positive difference.  But one of the things that we want to do

24  when performing any sort of analysis is to take into account the

25  uncertainty about our estimates.  And so one approach to taking

1  into account that uncertainty is to conduct what's called a null

2  hypothesis test.

3     And so under the null hypothesis, that there's no difference

4  between these two conditions, we would fail to reject the null.

5  In other words, this sort of difference is not that surprising in

6  a world where these two conditions are the same, have the same

7  effect.

8  **Q.**  And is it fair to say in that circumstance, then, that the

9  slight difference could actually be generated simply by

10  randomness?

11  **A.**  That's exactly right.  When we assign individuals to these

12  experimental conditions, there's naturally going to be some

13  variability in who gets in one condition or the other.  And the

14  result of that could be that we end up with this sort of

15  difference.

16  **Q.**  Okay.  And did the Hassell study examine the entire universe

17  of voters that were potentially relevant to the study?

18  **A.**  It did not.  It was a study targeted at Republicans and

19  Independents who lean Republican.

20  **Q.**  Okay.  And is it fair to say that it relied upon a -- simply a

21  sample of the universe?

22  **A.**  Precisely, yes.  It relied upon a sample of individual voters.

23  **Q.**  Okay.  And they're -- is it fair to say, then, that the slight

24  difference could simply be the result of a sampling phenomenon?

25  **A.**  So the effects that I conducted in my study were -- I hope

1  this doesn't get too in the weeds -- it's called a sample average

2  treatment effect.  So I took the sample that's given and I wanted

3  to compare those two conditions.  There's a different condition or

4  phenomenon called a population average treatment effect that would

5  take into account the variability from the sampling, and I didn't

6  conduct that.  But if we conducted that sort of population

7  estimate, we would have more uncertainty about our estimate.

8  **Q.**  So do you agree with the authors of the Hassell study, that

9  their paper found no significant difference between the rate of

10  absentee voting among the pre-filled and the non-pre-filled

11  absentee ballot conditions?

12  **A.**  I agree with that, yes.

13  **Q.**  Okay.

14      Now, do you recall Dr. Green's calling what you've described

15  as null hypothesis testing as nihilistic and silly and mechanical?

16  **A.**  I recall that, yes.

17  **Q.**  And do you agree with that characterization of null hypothesis

18  testing?

19  **A.**  No, I do not.

20  **Q.**  Okay.  Is that approach consistent with the approach of other

21  scientists in your field?

22  **A.**  It is the predominant approach in the field.

23  **Q.**  You mean null hypothesis --

24  **A.**  I'm sorry, null hypothesis testing is the primary approach to

25  inference in the field, particularly experiments.

1  **Q.**  And if someone came along at a professional conference or

2  submitted an article to a journal saying we should just get rid of

3  null hypothesis testing, how would that suggestion be treated?

4  **A.**  Yeah, that's an interesting -- like there's philosophical

5  debates whether we should get rid of null hypothesis testing, but

6  often they end up with a system that is exceedingly similar to

7  null hypothesis testing.

8  **Q.**  But is it fair to say that in your field of study, your

9  scientific field, null hypothesis testing is the norm?

10  **A.**  It's, in fact, the norm.  And indeed some of the criticisms

11  that Dr. Green brought up actually suggest solutions that are

12  essentially mathematically equivalent to null hypothesis testing.

13      So one of the papers that Dr. Green brought up, I'm going

14  to -- I'm going to mispronounce the name, I think Fisk (sic) 1959.

15  And in that study he said, look, this is someone who is critical

16  of null hypothesis testing.  And what that author suggests is

17  instead using something called a confidence interval.

18      Just to explain what a confidence interval is, suppose we ran

19  a study repeatedly and we wanted to find the narrowest interval so

20  that 95 percent of the time this interval covered the truth, the

21  true estimate.  In that case, that 95 percent confidence interval,

22  we would -- that's the uncertainty this author wants.  The area

23  outside of that 95 percent confidence interval constitutes the

24  region of point estimates we would reject under null hypothesis

25  testing.

1     So effectively the solution that Dr. Green suggested in that

2  literature is what's called a dual or the mathematical equivalent

3  of the null hypothesis test.

4  **Q.**  Okay.

5     Now, has Dr. Green himself conducted studies that relied upon

6  null hypothesis testing?

7  **A.**  He has.

8  **Q.**  And how many times has --

9  **A.**  So I just did a review of the ten most recent papers, and

10  every single paper conducts a null hypothesis test.

11  **Q.**  And does Dr. Green himself rely upon null hypothesis testing

12  in reaching conclusions in those studies?

13  **A.**  He does, yes.

14  **Q.**  And do you recall Dr. Green's discussion of the Mann Mayhew

15  study?

16  **A.**  I recall that, yes.

17  **Q.**  And did Dr. Green have anything to say about the strengths

18  of -- strength of that study relative to null hypothesis testing?

19  **A.**  It's my recollection that he described that effect as

20  significant in his expert report.

21  **Q.**  Okay.  Now, you were an associate editor of Political Analysis

22  I think you said, right?

23  **A.**  That's right.

24  **Q.**  And if somebody submitted a study that failed to reject the

25  null hypothesis that made an argument like Dr. Green made here

1  about betting, how would that kind of an argument be received at a

2  publication like the one you were an associate editor of?

3  **A.**  Yeah.  It's a real interesting issue in the field at the

4  moment because one of the big things we're concerned about is

5  called researcher degrees of freedom.

6  **Q.**  Researcher --

7  **A.**  Degrees of freedoms.  And so the idea is that oftentimes

8  researchers, particularly in my position, were under pressure to

9  publish.  You invest money in doing a study and you end up with

10  null results, those are harder to publish.  So then researchers

11  will find creative ways to shift the standards of evidence so that

12  lower standards of evidence can be used to identify effects that

13  could be interesting -- interested for publication.

14      And so Dr. Green's betting analysis effectively lowers the

15  standard of evidence for publication.  And, in fact, this sort of

16  beige analysis you can show in a very large dataset is exactly

17  equivalent to moods of inference I was engaging with.  And as a

18  result of that, if this sort of argument came across my desk, as

19  an associate editor you were faced with two decisions on an

20  initial reception of an article:  You could desk reject, which

21  means don't send it out for peer review because it's exceedingly

22  unlikely to meet the rigorous standards for publication --

23          (Interruption by the court reporter)

24          THE WITNESS:  Unlikely to reach the rigorous standards

25  for publication after peer review.

1  BY MR. SCHAERR:

2  **Q.**  Y'all who come from the coast just talk too fast.

3  **A.**  Yeah.  I'm from Indiana, I think it's -- yeah, it's just

4  inherited.

5     Exceedingly unlikely to reach the rigorous standards for

6  publication after peer review; or you could send it out for peer

7  review.  And I assure you that if I saw this sort of betting

8  analysis, it would be desk rejected.

9  **Q.**  It would --

10 **A.**  Sorry.  It would not even be sent out for peer review, it

11 would not reach that sort of level of rigor.

12 **Q.**  And are you familiar with the term "false discovery"?

13 **A.**  I am familiar with that term.

14 **Q.**  And how does that concept apply if at all to Dr. Green's

15 analysis?

16 **A.**  One of the big things, again, that we're worried about

17 condition to researchers degrees of freedom is that we can run a

18 study, we can come up with some difference between our conditions,

19 and we could assert that that difference is real, it's a

20 difference that we expect to see in the world, but, in fact, it's

21 not real at all.  So in that case, that would be a false

22 discovery.

23    And one of the reasons to use standard procedure that limits

24 researcher degrees of freedom and to use something like null

25 hypothesis testing is to guard against false discovery.  Indeed,

1  the 5 percent threshold and 1 percent threshold, both of which are

2  commonly used, build in explicitly the rate at which we're willing

3  to make false discoveries.

4  **Q.**  Okay.  And can you give an example of a false discovery issue

5  in another context?

6  **A.**  Sure.  Just imagine we were, you know, trying to cure

7  headaches or something like that and we had a sugar pill, we could

8  imagine assigning some people the sugar pill as a placebo, other

9  people nothing.  We could find a positive effect of the sugar

10  pill, but if we then lowered the standard of evidence, we would

11  make a false discovery in that case.

12  **Q.**  Okay.  And do you think the associations that Dr. Green

13  purports to have found between the three provisions at issue in

14  this case and voting behaviors represent false discoveries?

15  **A.**  In so much as he has point estimates to provide, yes, but

16  oftentimes in order to make a false discovery, you have to provide

17  a point estimate.

18  **Q.**  Okay.

19      Now, you may recall that Dr. Green makes another assertion

20  about pre-filled applications, that is that they are more

21  convenient.  Do you recall that?

22  **A.**  I recall that, yes.

23  **Q.**  And to your knowledge, did he provide any data to support that

24  assertion?

25  **A.**  No.

1  **Q.** Based on your own experience with voting and election

2  administration, is there any reason to doubt that pre-filled

3  applications are more convenient?

4  **A.** Yes. And I believe we've heard testimony from another -- a

5  number of individuals that describe errors in a pre-filled ballot

6  application. In that case, it would be quite inconvenient for a

7  potential voter because they would have to either correct the

8  error or go out and find a different absentee ballot application.

9  **Q.** And based on the testimony that you've heard here in this

10  trial -- in this hearing, could that be inconvenient for anybody

11  else?

12  **A.** It sounds like it could be inconvenient for election

13  administrators as well, yes.

14  **Q.** Now, your report suggests at paragraph 36 that without

15  systematic evidence you cannot evaluate Dr. Green's claims about

16  the convenience of pre-filled applications. Do you recall that

17  from your report?

18  **A.** I recall that.

19  **Q.** Why is that?

20  **A.** Again, just sort of a basic standard in the way we do science

21  is that we make a claim, that claim is supported by evidence that

22  other researchers can evaluate. And without that sort of

23  evidence, I don't know what to make of the claim.

24  **Q.** Do you recall Dr. Green asserting in his report that the

25  pre-filling prohibition will require the plaintiffs here to send

1  more unfilled forms in an attempt to generate the same number of

2  vote-by-mail requests?

3  **A.**   I recall that assertion, yes.

4  **Q.**   And using the data provided by Dr. Green, is it scientifically

5  possible or defensible to reach that conclusion?

6  **A.**   It is not.

7  **Q.**   Why is that?

8  **A.**   I didn't see any data to reach that conclusion, no study was

9  conducted.

10 **Q.**   Okay.  So, in summary, having reviewed Dr. Green's analysis of

11 the likely effects of the pre-filling provision, did that analysis

12 comply with the scientific standards in your field?

13 **A.**   It did not.

14 **Q.**   In brief, how did it depart from those standards?

15 **A.**   Again, it sort of shifted the standards of evidence in a way

16 to allow for lower -- lower standards of evidence that are more

17 prone to false discovery and then made assertions without basic

18 data analysis.

19 **Q.**   Okay.  Now, let me ask you a question about your own analysis.

20 Do you hold the opinions that you've expressed here today and in

21 your report to a reasonable degree of scientific certainty?

22 **A.**   Yes.

23 **Q.**   And do you recall Dr. Green's being asked that question?

24 **A.**   I do not.  I'm sorry if I missed it, but I do not recall that

25 question.

1  **Q.**  I missed it, too.  Thank you.

2          MR. SCHAERR:  Pass the witness, your Honor.

3                      CROSS-EXAMINATION

4  BY MR. DIAZ:

5  **Q.**  Good afternoon, Dr. Grimmer.

6  **A.**  Good afternoon.

7  **Q.**  My name is Jonathan Diaz.  I'm counsel for the plaintiffs in

8  this case.  Thank you for your patience in this hearing.

9  **A.**  No problem.

10  **Q.**  I am also a fast-talker.

11  **A.**  Okay.  We'll endeavor to keep each other slow.

12  **Q.**  For our court reporter, we're going to try to slow each other

13  down.

14      So, Dr. Grimmer, when you were discussing your qualifications

15  with Mr. Schaerr, you discussed your expertise in statistical

16  analysis, machine learning, mathematics.  Is it fair to say that

17  you consider yourself a primarily quantitative scholar?

18  **A.**  I am primarily a quantitative scholar.  I will just add one

19  provision there.  It really depends on how you classify my text

20  as data work.  So I've published extensively on using large

21  collections of texts and that invariably leads me into the

22  qualitative area because previous qualitative scholars have been

23  the primary users of text data.  So I in some ways sit right at

24  this intersection.

25  **Q.**  Okay.  Great.

1    And so you testified that quantitative and qualitative

2 analyses can serve different goals in social science, is that

3 right?

**A.**   Different research questions can serve different goals, yes.

**Q.**   A particular study?

**A.**   A particular study can serve different goals, yes.

**Q.**   Can you briefly explain what the difference between the goals

8 of a quantitative analysis and a qualitative analysis might be?

**A.**   I'm a little uncertain there because I think you can use a

10 qualitative study to do many of the things a quantitative study

11 can do.  So, for example, there's a procedure called process

12 tracing that's used to make assessments of causal effects; in

13 particular, when we're interested in mechanisms of causal effects.

14 And by "mechanisms" I mean how a causal effect came to be.  And we

15 can use quantitative studies to come up with quite detailed

16 summaries of what was previously considered qualitative

17 information; indeed, my entire new book on Text As Data does

18 exactly that.

**Q.**   And you discussed with Mr. Schaerr quite a bit the idea of

20 null hypothesis testing?

**A.**   I did.

**Q.**   And statistical significance, is that right?

**A.**   That's right.

**Q.**   And am I correct that the standard for statistical

25 significance with a P value of .05 is equivalent to 95 percent

1  certainty, is that right?

2  **A.**   I just want to know a little bit more about what you mean

3  there because the P value of .05 is actually regulating this false

4  discovery rate.  And so it's equivalent to a confidence interval

5  of 95 percent.  So the areas in the failed to reject region,

6  that's 95 percent confidence interval.

7  **Q.**   For a quantitative analysis to be statistically significant

8  based on the standards that you applied, would it have to be

9  95 percent accurate or more, is that how that works?

10 **A.**   That's not how it works.  Accuracy is a completely different

11 idea.

12 **Q.**   Would you have to be 95 percent certain that the result is

13 returning a true value?

14 **A.**   That is not what a null hypothesis test does.

15 **Q.**   I'll come back to that.

16    Substantively I think you said that your work focuses on

17 American politics generally, political communication and

18 representational style?

19 **A.**   That is the title of my dissertation -- the beginning of the

20 title of my dissertation.  Actually, my first book as well.

21 **Q.**   Does your scholarship focus on public opinion research?

22 **A.**   I have published on public opinion research, yes.

23 **Q.**   What about voter persuasion?

24 **A.**   I have studied on -- let me be clear there.  So I've done a

25 number of studies within the contexts of Congressional elections,

1    so that would be voter persuasion in the sense how can members of

2    Congress cause or not cause individuals to want to vote for them.

3    **Q.**   How about absentee voting specifically?

4    **A.**   I have not published on absentee voting.

5    **Q.**   Have you ever conducted a study involving absentee voting or

6    absentee ballot applications?

7    **A.**   I have not, no.

8    **Q.**   I want to direct your attention to Plaintiff's Exhibit 37,

9    which is what the white binder I --

10   **A.**   This one right here?

11   **Q.**   The one that says "I" on it.   There might be a Volume II.

12   **A.**   Okay.   And you said 37?

13   **Q.**   37.

14   **A.**   Yep.   I have it open to -- it's Exhibit 3, just make sure I

15   have the right one.

16   **Q.**   Yeah.   If you could just page over to page three using the

17   pagination on the top of the page.

18   **A.**   Yep, I see that.

19   **Q.**   Is this the report that you prepared in this case?

20   **A.**   It certainly looks like it, yes.

21   **Q.**   On page three, using the top numbers, in the paragraph marked

22   two you list the materials that you reviewed in preparing this

23   report, is that right?

24   **A.**   That's correct, yep.

25   **Q.**   Were there any other materials that you reviewed besides the

1    ones listed here?

2    **A.**   Yeah, I think there are citations in my report that aren't

3    listed here.

4    **Q.**   Did you review the text of Senate Bill 202?

5    **A.**   I have not.

6    **Q.**   Have you ever read the text of Senate Bill 202?

7    **A.**   I have not read the text of Senate Bill 202.

8    **Q.**   So you didn't conduct an independent analysis of the language

9    of the disclaimer requirement?

10   **A.**   I did not conduct an independent analysis of the language of

11   the disclaimer requirement, no.  It's a no.

12   **Q.**   Can you turn to tab 26 of that same binder.

13   **A.**   Tab 26.  Okay.  Yep, I'm here.

14   **Q.**   Great.

15       Do you recognize this document?

16   **A.**   It looks like the expert report of Professor Green.

17   **Q.**   Can you turn to page six of that document.  And you've

18   reviewed this report before?

19   **A.**   Yes.

20   **Q.**   Can you take a look at -- under sub-header number two.

21   **A.**   Uh-huh (affirmative).

22   **Q.**   The paragraph about halfway down the page that begins, "Any

23   application for an absentee ballot."

24   **A.**   Yep, I see it.

25   **Q.**   Do you understand that paragraph to be the disclaimer language

1  required by Senate Bill 202?

2  **A.**   It looks like from this citation, yes.

3  **Q.**   Okay.  You don't quote that language anywhere in your report,

4  do you?

5  **A.**   I do not, no.

6  **Q.**   You don't discuss the specific language used in the

7  disclaimer?

8  **A.**   I do not.

9  **Q.**   Okay.  So in your report you don't take a position on the

10  possible impact of the disclaimer language on a given voter?

11  **A.**   My report's focused on the lack of evidence in Dr. Green's --

12  **Q.**   Okay.

13  **A.**   Yep.

14  **Q.**   So that's a no, you don't express an opinion one way or the

15  other.

16  **A.**   No, I don't express an opinion one way or the other.  I -- go

17  ahead.

18  **Q.**   So in your report you don't assess whether the language

19  required by the disclaimer is accurate?

20  **A.**   I do not make an assessment of the accuracy, no.

21  **Q.**   You don't assess whether the language required by the

22  disclaimer could be misleading or confusing to a voter one way or

23  the other?

24  **A.**   No, I don't have the kind of evidence I would want to have to

25  make that conclusion, no.

**Q.** And so you testified that some of your research and some of your recent publication has to do with analysis of large text sets, is that right?

**A.** Yes.

**Q.** Can you describe that research a little bit.

**A.** Absolutely.  So if it's okay, I'll just go back to what the dissertation was about.

So I analyzed large collections of press releases from US Senators to get a sense of what they said to their constituents and how that varied across various sorts of strategic political positions those senators were in.

**Q.** And in that research, did you look into the impact of that language on voters?

**A.** Absolutely.  So in subsequent research that we published in the APSR, we have a paper called How Words -- I'm going to screw up the title.  There's a paper published in the APSR that reaches what I think is a really non-intuitive and surprising conclusion that when legislators are claiming credit for money, they get more credit for the number of things they claim credit for, rather than the amount that they -- the amount that they announce.

We subsequently did an array of studies, I don't know the number, between 10 to 20 different batteries of experiments and published that in a book called The Impression of Influence.

**Q.** And one of the things that you considered in that study was the specific language used by the legislators, is that right?

 1  **A.**   We looked at the language, yes.

 2  **Q.**   Okay.  Can you turn to tab 2 in that binder.

 3  **A.**   Uh-huh (affirmative).

 4  **Q.**   Do you recognize that document?

 5  **A.**   This looks like the application for an absentee ballot from

 6  the State of Georgia.

 7  **Q.**   Okay.  And so at the top do you see where it says "Application

 8  For Georgia Official Absentee Ballot"?

 9  **A.**   Yes.

10  **Q.**   And do you see an image in the top left corner from there?

11  **A.**   Are you referring to the stamp from the Secretary of State?

12  **Q.**   Yes.  So you preempted my next question, what is that image,

13  so we'll skip that.

14      And what's the language right next to that stamp?

15  **A.**   Just to be clear -- I'm going to say Brad Raffensperger's

16  Secretary of State?

17  **Q.**   That's right.

18  **A.**   Okay.

19  **Q.**   Is it your understanding that this document is published by

20  the Georgia Secretary of State's Office for use by third parties?

21  **A.**   No, because of the disclaimer at the bottom.  Oh, sorry.  I'm

22  sorry, I thought you were asking something else.

23  **Q.**   I'll repeat.

24  **A.**   Can you repeat it, yeah.

25  **Q.**   Is it your understanding that this is -- this document is

 1  published by the Secretary of State's Office for use by third

 2  parties?

 3  **A.**   I just want to be clear that I know that there's like a lot of

 4  dispute about what the verb "published" means.

 5  **Q.**   Designed.

 6  **A.**   Yeah.   That is my understanding, yeah.

 7  **Q.**   Okay.   And going now to the bottom of the page.

 8  **A.**   Uh-huh (affirmative).

 9  **Q.**   Do you recognize the language in the box at the bottom of the

10  page?

11  **A.**   I do, yeah.

12  **Q.**   And is that the same language required by the text of SB 202?

13  **A.**   I assume -- I'm making the quick assessment here.   I assume it

14  is.   If there's some deviation, I would need an extra minute to

15  find it.

16  **Q.**   Have you seen this form before?

17  **A.**   I have.

18  **Q.**   Just making sure.

19  **A.**   Yeah.

20  **Q.**   And so in that box at the bottom it says this is not an

21  official government form, is that right?

22  **A.**   It says "this is not an official government publication."

23  **Q.**   Thank you.

24        If a registered voter filled that form out and submitted it to

25  their local election official, do you have any reason to believe

1   it wouldn't be accepted?

2   **A.**   If it's accurately filled out, I presume it would be.

3   **Q.**   On pages 16 and 17 of your report, which is back to tab 37.

4   **A.**   Thank you.   One more second, please.

5   **Q.**   No worries.

6   **A.**   Should I use the number at the top or the bottom?

7   **Q.**   I think it's the bottom this time, sorry.

8   **A.**   I'm there for the numbering at the bottom.

9   **Q.**   So starting on page 17, the sentence -- or 16, rather, sorry,

10  the sentence that begins "given this confusion."

11  **A.**   Uh-huh (affirmative).

12  **Q.**   Can you just read that sentence for me.

13  **A.**   Yep.   Given this confusion receiving an official-looking

14  absentee ballot application in the mail could plausibly cause

15  voters to believe that they must fill out the application in order

16  to participate in the election, even if they would prefer to not

17  vote by mail.

18  **Q.**   Okay.   What's the basis for that assertion?

19  **A.**   So I meant to convey this with the "plausibly," so it's

20  speculation.

21  **Q.**   Do you cite any studies or research to support that assertion?

22  **A.**   I do not.

23  **Q.**   Have you conducted a study to support that assertion?

24  **A.**   I have not.

25  **Q.**   So it's based on your experience as a scholar?

1   **A.**   It's -- no, it's not -- it's speculation.  Hypothesis I would
2   say.
3   **Q.**   Okay.  Does the language in the disclaimer provision say
4   specifically that filling out the application is not required?
5   **A.**   I don't have that.  Can you remind me, it's 2 again?
6   **Q.**   It is tab 2.
7   **A.**   I just don't have it memorized.
8   **Q.**   No worries.
9   **A.**   I don't see anything that says it's not required.
10  **Q.**   All right.  I apologize for making you flip back and forth.
11  **A.**   It's okay.
12  **Q.**   We're going to go back to tab 37.
13  **A.**   Yep.  Okay.
14       I'm ready.
15  **Q.**   Okay.  On page 13 of your report, in the paragraph numbered
16  23 --
17  **A.**   Uh-huh (affirmative).
18  **Q.**   -- you write:  The law does not require organizations to
19  create disclaimers that so prominently stand out from the rest of
20  the application.  Do you remember writing that?
21  **A.**   I do.
22  **Q.**   Okay.  And is that a reference to the form used in the
23  interviews in the study Dr. Green discusses?
24  **A.**   It is a reference to that.
25  **Q.**   Okay.  Can I direct you now to Exhibit 3 -- or, sorry, tab

1  number 3 in the binder.

2  **A.**   This is the West Georgia Administrative Code.

3  **Q.**   Yes, it is.  And can you turn to the second page of that.

4  **A.**   I'm there.

5  **Q.**   Okay.  Do you see where it says the disclaimer required in

6  Section A of this rule shall be of sufficient font size to be

7  clearly readable by the recipient of the communication?

8  **A.**   I do see that.

9  **Q.**   Is it your recollection that the disclaimer on the form used

10  in Dr. Green's interviews was of sufficient font size to be read

11  by a recipient?

12  **A.**   I believe it used at least a 12 point font, yeah.  I -- yeah.

13  I'll work off my --

14  **Q.**   I'm trying to save you from --

15  **A.**   I've got you.  Yep.  I don't want to give an inaccurate

16  answer.

17  **Q.**   So in the second binder on tab 65 is that document, if you

18  want to take a look.

19  **A.**   I'm going to do this at the risk of it falling over.  Yep.

20  Although, just for the record, this is cut off.

21  **Q.**   Oh, that must be a printing error.  I apologize.

22  **A.**   Yep.  So this is not the material that was used in the

23  experiment.

24  **Q.**   Okay.  Then we'll skip these, that's fine.

25      Is it -- never mind, I'll move on.  We'll save us some time.

1      So back to your report in tab 37.

2   **A.**   Yep.

3   **Q.**   We're going to go to page nine.

4   **A.**   Can you just say the page number again, I'm sorry.

5   **Q.**   Page nine.

6   **A.**   Thank you.  Yep, I'm there.

7   **Q.**   So here you discuss the participants in the interviews that

8   Dr. Green --

9   **A.**   Yep.

10  **Q.**   -- considered, is that right?

11  **A.**   Yes, that's right.

12  **Q.**   And you say that:  When measuring public opinion, the goal is

13  to use a smaller group of people, a sample, to learn about a

14  larger group of people of populations, is that right?

15  **A.**   That is what I wrote, yes.

16  **Q.**   What do you mean by "measuring public opinion" there?

17  **A.**   It's an interesting question.  I take the issue here to be if

18  the disclaimer causes individuals to vote absentee -- vote by

19  absentee or turn out to vote on average less than they would

20  otherwise in the absence of the disclaimer.  And because that's

21  the question I had when writing this report presumed that that's

22  what Green's study was targeting.

23      Instead what looks like Green's study is targeting is a much

24  different question, which is:  How did this particular group of

25  people in this particular setting using these particular materials

1  with questions asked in these specific ways react to the

2  disclaimer which provides, at best, some loose information about

3  this original question.

4  **Q.**  So is it your understanding that Dr. Green was not trying to

5  assess the -- what proportion of mailings with the disclaimer

6  would result in a negative reaction?

7  **A.**  That is -- it would be -- this would be a very poor tool to do

8  that.

9  **Q.**  Okay.  Can we flip back to tab 26.

10 **A.**  I'm there.

11 **Q.**  On page eight, the last sentence of the first complete

12 paragraph.

13 **A.**  Uh-huh (affirmative).

14 **Q.**  Can you read that sentence.

15 **A.**  Yes.

16 **Q.**  Slowly for our court reporter.

17 **A.**  Qualitative study of this kind cannot tell us what proportion

18 of mailings would end up in the trash on account of the

19 disclaimer, but it clearly indicates that disclaimer can cause

20 hesitancy to complete an otherwise acceptable form.

21 **Q.**  So based on your rereading of this sentence, was Dr. Green

22 trying to determine how many people would be dissuaded by the

23 disclaimer?

24 **A.**  He was not.

25 **Q.**  Did Dr. Green's study show that the disclaimer in your opinion

1  was capable of generating a negative response?

2  **A.**   It showed -- again, just to reiterate, when an individual's

3  attention was directed to the disclaimer in the presence of an

4  interview in this particular setting, then, yes, he was able to

5  elicit and -- excuse me, with the disclaimer represented on the

6  form in this particular way, then, yes, it is possible the

7  disclaimer could in this one instance generate a negative

8  reaction.

9  **Q.**   Okay.   I want to move on to discuss the pre-filling

10  provision.

11  **A.**   Can I put the binder down?

12  **Q.**   Yes.   I shouldn't have said that.

13  **A.**   It's okay.

14  **Q.**   I'm sorry.

15  **A.**   No problem.

16  **Q.**   So we're going to stick with your report for a little while.

17  Just tab 37.

18  **A.**   37.   I'm there.   Go ahead.

19  **Q.**   On page 18, in the paragraph numbered 32.

20  **A.**   Yep.

21  **Q.**   You say that:   One of the problems with the Hassell study that

22  Dr. Green discussed is that it is difficult to extrapolate to

23  Georgia.   Is that right?

24  **A.**   That's correct.

25  **Q.**   And the reason for that is that the Hassell study targeted

1  only Republicans and Republican-leaning Independents.  Is that

2  correct?

3  **A.**  That's correct.

4  **Q.**  Or a reason for that?

5  **A.**  Yep.  Yep.

6  **Q.**  But you testified earlier that a study -- an experiment could

7  be conducted in another state, not Georgia, that looked at

8  pre-filled application, a blank application and no application?

9  **A.**  It could, yes.

10  **Q.**  Do you know if -- sorry, let me backtrack.  That kind of

11  experiment could not be conducted in Georgia is your

12  understanding, is that right?

13  **A.**  Obviously you would have to ask some attorney or someone who

14  could speak to the legality of it, but my understanding, under the

15  current provisions, is that that experiment could not be conducted

16  in Georgia.

17  **Q.**  Are you aware if the laws of other states would prohibit such

18  an experiment?

19  **A.**  I'm not aware if laws of other states would prohibit it or

20  not, we would have to check.

21  **Q.**  So you don't know for certain that the experiment you

22  described could be conducted in another state?

23  **A.**  There's another way to run the experiment without running

24  afoul of any laws.  It's not as ideal of an experiment, but it's

25  what's called a survey experiment.  So the idea would be we

```
 1  commission a survey.  We could show individuals in the survey one
 2  absentee ballot application with the disclaimer, another without
 3  that, and then assess their reaction using a series of survey
 4  responses.
 5      That doesn't run the risk of running afoul of any laws, and it
 6  would provide some information about the effect of the disclaimer.
 7  However, it wouldn't be as, I would say, valid as the field
 8  experiment because that would be reliant upon behavioral data.
 9  And there's other experiments that could be run.
10  Q.  And do you know if the laws of other states prohibit the
11  modification of absentee ballot application forms?
12  A.  I do not know.
13  Q.  Okay.
14      You say in paragraph 32 on page 18 of your report that:
15  Democratic individuals may be more willing to fill out an absentee
16  ballot application even if it is not pre-filled?
17  A.  Exactly.
18  Q.  And that is one of the reasons why in your view the Hassell
19  study cannot be extrapolated to Georgia?
20  A.  That's correct.
21  Q.  Do you cite any evidence in your report to show a heterogenous
22  treatment effect on pre-filling ballots between Republicans and
23  Democrats?
24  A.  I do not.
25  Q.  No?  All right.
```

1      Even if the experiment population in the Hassell study doesn't

2  translate one for one to Georgia because it only focused on

3  Republicans and Republican-leaning Independents, could those

4  results extrapolate to the population of Georgians that shared

5  those characteristics?

6  **A.**   One of the ways one would do this sort of extrapolation is by

7  first doing what's called a heterogeneous treatment effect

8  analysis.  And then based on those strata, we would reweight those

9  strata to apply it to Georgia.

10     A key assumption we would make is that we would have the

11  relevant co-variants, the relevant features of those individuals

12  that would enable us to ensure that there's nothing out, nothing

13  missing between the population in Minnesota and Georgia.

14     Once you do that, then you can do the reweighting under that

15  assumption.  It could be done.  It would require some assumptions

16  and it would require some analysis.

17  **Q.**   Okay.  Are you aware of any studies looking at heterogenous

18  treatment effects between the populations of Georgia and any other

19  state when it comes to pre-filled ballot applications?

20  **A.**   I am not aware.

21  **Q.**   Or pre-filled forms generally?

22  **A.**   I'm not aware.

23  **Q.**   Okay.  And so you don't cite to any such studies in your

24  report?

25  **A.**   No.

**Q.**   On page 19 of your report at the top you discuss the data in
the Hassell study, you said that the data implies a modest
increase of 0.52 percentage points between a pre-filled absentee
ballot application and unfilled application, is that right?

**A.**   That is what I have there, yes.

**Q.**   And I understand that you testified that you don't think that
the results of this study are statistically significant?

**A.**   That is what I testified to, yes.

**Q.**   Setting the question of statistical significance aside for the
moment, are you -- do you agree that an election can sometimes be
decided by a margin of less than .52 percentage points?

**A.**   It is logically possible for an election to be decided by less
than .52 percentage points, yes.

**Q.**   So an increase of .52 percentage points in voter turnout, for
example, could be significant to the results of an election in the
layman's sense if not statistically significant in this study?

**A.**   This -- this sort of analysis would imply that literally any
difference you uncover in any experiment would be of significance
because elections could, of course, logically be decided by one
vote.  This is an approach that's been wholly rejected by people
who do experiments in this area because it leads exactly to a
rejection of statistical inference which is just a basic
scientific procedure.

**Q.**   And when you're analyzing the statistical significance of a
study such as the one in the Hassell report, how would you put --

```
 1  what's the best way to phrase this?  How would you describe the

 2  degree of certainty that you would need to have -- let me rephrase

 3  that.

 4      If you determine that a study is statistically significant,

 5  what is your degree of certainty that the results of the study are

 6  true and correct?

 7  A.  A test of statistical significance does not relate to a degree

 8  of certainty, those are not things that are held together in

 9  statistics.

10  Q.  Okay.  On page 20 of your report in paragraph 35, in that last

11  sentence that -- or second-to-last sentence that begins with

12  further, you say:  Increasing the number of absentee ballot

13  applications could actually be harmful to election administration

14  if it leads to increased numbers of people canceling absentee

15  ballots at the polls if they decide they would rather vote in

16  person.  Do you recall that?

17  A.  That's correct.

18  Q.  Do you cite to any evidence in your report that increasing the

19  number of absentee ballot applications leads to increased numbers

20  of people canceling their applications?

21  A.  I do not.

22  Q.  And the next sentence you say:  This would greatly increase

23  the amount of work required by county election officials and

24  potentially increase the risk of error.  Is that right?

25  A.  That's the next sentence.
```

1  **Q.**  Okay.  And you don't cite to any evidence that an increased

2  number of applications would result in -- would certainly result

3  in those outcomes?

4  **A.**  I do not cite any evidence.

5  **Q.**  So what are the bases for the assertions you make in this

6  paragraph?

7  **A.**  So I've spent a lot of time in conversation with election

8  officials.  So I'm an informal advisor to a group that's called

9  The Election Officials Legal Defense Network.  And subsequently

10  I've spent a lot of time talking with election officials as part

11  of my work debunking voter fraud claims.  And from those

12  conversations that's how I reach this conclusion.

13  **Q.**  So the conclusions you reach in this paragraph of your report

14  are based on your past experience?

15  **A.**  They're based on my conversations with election officials.

16  **Q.**  But not on a study you conducted of election officials?

17  **A.**  Yeah, I'm not making an assertion about a treatment effect on

18  a population.

19  **Q.**  So, no, it's -- this assertion is not based on a field

20  experiment?

21  **A.**  This assertion is not based on a field experiment.

22  **Q.**  Or a randomized study?

23  **A.**  It is not based on a randomized study.

24  **Q.**  In paragraph 36 you make the claim in the sentence beginning

25  "for example" -- oh, there's more than one of those.

1  **A.**   You mean the first instance or the second?

2  **Q.**   The second.

3  **A.**   Got it.  I've got a tick in my writing, I'm sorry.

4  **Q.**   That is okay.  If there is a mistake on the pre-filled

5  application, it may be cumbersome for the voter to correct.  I'm

6  sorry, I lost my place.

7      So in this paragraph generally you discuss mistakes on

8  pre-filled applications that might be cumbersome for voters to

9  correct or for election officials to process, is that right?

10 **A.**   That is the subject of this paragraph, right.

11 **Q.**   Okay.  Do you cite to any evidence that a pre-filled

12 application is more likely to have an error in it than a

13 handwritten application?

14 **A.**   That's not my assertion.

15 **Q.**   Okay.  So that's not your testimony?

16 **A.**   I'm not making an assertion in either direction.  I'm saying

17 conditional on receiving a pre-filled application that has an

18 error, it would be cumbersome to correct.

19 **Q.**   Okay.  And just to be clear, I know you -- we went through

20 your CV and your educational history at the beginning with

21 Mr. Schaerr.  You've never been an election official, is that

22 right?

23 **A.**   That's correct.

24 **Q.**   And you've never processed an absentee ballot application?

25 **A.**   Never processed an absentee ballot application.

1   **Q.**   Neither have I.

2        So I want to move onto the mailing list restriction, or the

3   anti-duplication restriction is what the state refers to it as.

4   **A.**   Uh-huh (affirmative).

5   **Q.**   So in your report and in your earlier testimony you referred

6   to your experience matching lists of data?

7   **A.**   Yep.

8   **Q.**   In your report you talk about Python programming language and

9   using SQL databases.  I think you also mentioned R, the

10  programming language.  These are methods you utilize commonly in

11  your work?

12  **A.**   They're programming languages.

13  **Q.**   Yeah.

14  **A.**   Yeah.

15  **Q.**   And do you have specialized training or education on how to

16  manipulate and work with large datasets?

17  **A.**   Yes.

18  **Q.**   Have you taken courses on those subjects?

19  **A.**   I have not taken a course on the subject of how to work with a

20  large dataset.

21  **Q.**   In your coursework and your study of quantitative research

22  methods, do those topics come up?

23  **A.**   It does come up in the course of my research, yes.

24  **Q.**   And you've mentioned a few programming languages?

25  **A.**   Yes.

1  **Q.**  Did you take courses to learn how to use those programming

2  languages?

3  **A.**  In graduate school we were trained on how to use R, but not

4  Excel or -- and I'm self-taught in Python.

5  **Q.**  You're self-taught in Python, but that required training of

6  some kind, is that right?

7  **A.**  Yes.

8  **Q.**  And I think you testified earlier that some of this data

9  matching can be done in Microsoft Excel, is that right?

10 **A.**  That's right.

11 **Q.**  And requires an add-on?

12 **A.**  That's correct.

13 **Q.**  Would you need to write code to run that kind of program?

14 **A.**  I don't believe so.

15 **Q.**  Okay.  Would you have to -- if you were using, say, the

16 Microsoft Excel plug-in that you described to match two large

17 datasets, would you have to make choices about how strict of a

18 match to require?

19 **A.**  You would have to make choices, yes.

20 **Q.**  And if you made the parameters for a match too strict, for

21 example, you might miss some true positive matches?

22 **A.**  In an instance where you can do exact matching there's no

23 risk, there's no parameter to set, that's straightforward.  In

24 the sort of tail remainder, where you have to rely upon fuzzy

25 matching, that does require there to be a cutoff.

1    From the Ansolabehere and Hirsch paper, what they show in the

2 big State of Texas is that using a relatively small combination of

3 information from voters, you get unique combinations which implies

4 that you can do a lot of this exact matching.  In fact, the

5 entirety of the Ansolabehere and Hirsch paper, which asserts that

6 it's functionally equivalent to matching on social security

7 numbers, does not involve fuzzy matching at all.  So this would be

8 a -- this is sort of a prophylactic procedure on top of the exact

9 match.

10 **Q.**  Okay.  But even if you were using a program like the one in

11 the study you described, is that totally error proof?

12 **A.**  I don't know of any procedure that would be totally error

13 proof.  One could come up with a lot of ways to make errors.

14 **Q.**  Even with a sophisticated algorithm matching two large

15 datasets such as the voter file and the list of voters who have

16 already voted absentee, you might end up with a false positive?

17 **A.**  It's feasible that one could make a mistake, yes.

18 **Q.**  And, you know, if a matching -- if a matching program had an

19 error rate of, say, .001 percent, that's one out of every

20 thousand, is that right?

21 **A.**  No, that's not.

22 **Q.**  No?

23 **A.**  It is not because you said 0.001 percent, which would add two

24 more zeros, which would mean it would be 1 out of every 100,000 I

25 think, if I'm just doing the math here quickly.

1  **Q.**  Math is not my strong suit.  It's yours.

2     So let's say one out of every thousand.

3  **A.**  The one out of every thousand is much higher than the rate in

4  the Ansolabehere and Hirsch paper, but, okay, I'll stipulate to

5  that.

6  **Q.**  I think I'll move on from that, then.

7        MR. DIAZ:  I don't think I have any further questions

8  for Dr. Grimmer.

9                    REDIRECT EXAMINATION

10  BY MR. SCHAERR:

11  **Q.**  Dr. Grimmer, we're almost done.

12  **A.**  Okay.

13  **Q.**  Have you attempted to make any claims about causality on your

14  own in this proceeding?

15  **A.**  I don't believe so, no.

16  **Q.**  So in your opinion, does it have any relevance that you didn't

17  try to do any experiments yourself in connection with your work in

18  this case?

19  **A.**  I don't think so, but -- yeah.

20  **Q.**  Okay.  But is it your understanding that Dr. Green did attempt

21  to offer opinions about causality with respect to the three

22  provisions of SB 202 that are at issue here?

23  **A.**  Yes, that's my understanding.

24  **Q.**  Okay.  And it's your opinion that he made those claims based

25  on intuition and other things, but not on data, is that fair?

**A.**  That's my understanding, yes.

**Q.**  Okay.  And what is your ultimate opinion about opinions that are offered on matters of causality without data and accepted statistical analysis?

**A.**  They're just not particularly useful for even beginning a scientific discussion about assessing those claims.

**Q.**  Okay.

Do you recall that Mr. Diaz asked you a couple of questions about Exhibit 2, which is the application for a Georgia absentee ballot?

**A.**  I recall, yeah.  Yes.

**Q.**  And do you recall that he focused in particular on the first part of the disclaimer that's at the bottom of the page there?

**A.**  Can you just remind me what tab.

**Q.**  Yeah.  Well, it's the language that says that "this is not an official government publication."

**A.**  Yes, I recall.

**Q.**  Okay.  Now, do you recall Dr. Green's testifying that that particular statement was true?

**A.**  I recall that, yes.

**Q.**  And is it fair to say that his statement rests upon an interpretation of the word "publication" or "publish"?

**A.**  I assume that's how one would reach that conclusion.

**Q.**  Yeah.  Now, in your opinion is -- you know, is Dr. Green's understanding of that word "publish" unreasonable?

1  **A.**   It's not unreasonable.

2  **Q.**   Okay.  All right.  Let's turn back to your report, which is

3  Exhibit 29.

4  **A.**   Is that in the black binder?

5  **Q.**   I think it's in the white binder.

6  **A.**   I thought it was 37 in the white, if I'm remembering

7  correctly.

8  **Q.**   You are right, it's 37 in the white.  Thank you for correcting

9  me.

10     Let's look for a moment at paragraph 29, which is on pages 16

11  and 17, numbered at the bottom.

12  **A.**   That's where I am.

13  **Q.**   Okay.  And do you recall Mr. Diaz was asking you a couple of

14  questions about that paragraph?

15  **A.**   I recall, yes.

16  **Q.**   Okay.  Let's look at the second sentence of that paragraph.

17  And you say there in your report:  Given this confusion, receiving

18  an official-looking absentee ballot in the mail could plausibly

19  cause voters to believe that they must fill out the application in

20  order to participate in the election even if they would prefer not

21  to vote by mail.  Is that what it says?

22  **A.**   That's what it says.

23  **Q.**   And do you still believe that sentence to be true?

24  **A.**   Yeah.  The key assertion there is it's about plausibility.

25  Could it be?  It's not assessing the causal effect of the --

1  **Q.**  And is that opinion an opinion about causality?

2  **A.**  It's not about the treatment effect.

3  **Q.**  Right.  But is that opinion based on your experience and your

4  study of voting-related matters and elections?

5  **A.**  Based on that and my experience working -- delivering sort of

6  treatment messages to voters and seeing how they respond.

7  **Q.**  Right.

8  **A.**  Yeah.

9  **Q.**  And I think you testified earlier that you -- you've also had

10  a number of conversations with election officials in various

11  capacities, is that true?

12  **A.**  That's true.

13  **Q.**  And is that statement based in part on those conversations?

14  **A.**  In part, yes.

15  **Q.**  And then the final sentence is:  Given this possibility, the

16  disclaimer serves a reasonable purpose signaling to voters that

17  this is not a form that they are required to complete in order to

18  maintain their eligibility.  Did I read that correctly?

19  **A.**  Looks like it.

20  **Q.**  Okay.  And does that statement remain true in your view?

21  **A.**  Yes.

22  **Q.**  Okay.  And are all the other opinions expressed in your report

23  still true in your opinion?

24  **A.**  In my opinion, yes.

25         MR. SCHAERR:  Thank you.  I have no other questions.

1  Any recross?

2         MR. DIAZ:  I have just one question, your Honor.

3         THE COURT:  Go ahead.

4                          RECROSS-EXAMINATION

5  BY MR. DIAZ:

6  **Q.**  Dr. Grimmer, there's no more binder flipping, I promise.

7  **A.**  Yeah.  I'm sorry.

8  **Q.**  On that same paragraph that you were just discussing with

9  Mr. Schaerr, that last sentence, the disclaimer serves a

10  reasonable purpose signaling to voters that this is not a form

11  they are required to complete in order to maintain their

12  eligibility.

13  **A.**  Uh-huh (affirmative).

14  **Q.**  You don't cite to any evidence in support of that assertion in

15  this report?

16  **A.**  I do not.

17  **Q.**  Okay.  That's based on your past experience?

18  **A.**  Conversations with election officials and prior work, yes.

19  **Q.**  Okay.

20         MR. DIAZ:  That's all.  Thank you, your Honor.

21         MR. SCHAERR:  Your Honor, if I could -- I have no more

22  questions, but at this time we mentioned earlier that we would be

23  moving to exclude Dr. Green's specific opinions about the impact

24  of these three provisions on voter behavior, and so we now would

25  like to make the motion.

1            And we do move to exclude those three opinions as

2    being -- as violating Section 702 of the Federal Rules of Evidence

3    and because they are not offered with the requisite scientific

4    support and are, therefore, not admissible.

5            Now, I don't intend to argue that motion at length,

6    we're happy to brief it if you would like, but we do want to have

7    that motion on the record.

8            THE COURT:  All right.  Thank you.

9            Professor, you can step down.  Thank you.

10           (Witness excused)

11           THE COURT:  Does that conclude the presentation of

12   evidence on the motion?

13           MR. SCHAERR:  Yes, your Honor.  From the defendants'

14   standpoint anyway.

15           THE COURT:  Any rebuttal?

16           MS. LANG:  No, your Honor.

17           THE COURT:  Very well.

18           We've been going a good while, so I think it's a good

19   time for a break.  Would you like a little bit longer break than

20   usual to gather your notes before you sum things up for me?

21           MR. SCHAERR:  Yes, your Honor.

22           THE COURT:  Okay.  How long would you y'all like?

23           MS. LANG:  Your Honor, I would ask that we not take too

24   long.  I do have a flight I'm still hoping to make this evening,

25   for a number of us.

 1          MR. SCHAERR:  We'll defer to whatever they would like.

 2          MS. LANG:  Maybe ten minutes.

 3          THE COURT:  Okay.  Ten minutes, then.

 4          (After a recess, proceedings were continued as follows:)

 5          THE COURT:  All right.  You have the floor.

 6          MS. LANG:  Thank you, your Honor.

 7          I thought I would start by providing you some of the

 8   case law that I promised you with respect to the potential for a

 9   more narrow injunction on the disclaimer.  And luckily we were

10   able to find quite a bit of case law that's directly on point.

11          THE COURT:  All right.

12          MS. LANG:  So one case, for example, is called *Centro*

13   *Tepeyac v. Montgomery County*.  The cite for that is 722 F.3d 184.

14   And that's a Fourth Circuit en banc case.  And that was a

15   compelled speech case about compelled speech for I believe a

16   crisis pregnancy center in the abortion context.  And there there

17   were two required disclaimers.  One was to inform women that there

18   were no medical licensed physicians in the office.  And the second

19   was we encourage pregnant women to seek the counsel of medical --

20   of a physician.  And the second portion was the only portion that

21   the Court held was unconstitutional, at least at the preliminary

22   injunction stage, and only enjoined that provision.

23          And there are a couple more examples along the same

24   lines.  A Case called *Baptiste v. Kennealy*, 490 F.Supp 3d 353,

25   District of Massachusetts.  That's another compelled speech case

where they enjoined just one paragraph of a number of required

disclaimers.

        *Novardis Consumer Health* is 290 F.3d 578, Third Circuit,

2002.  That's a commercial speech case.  And there the Court was

looking at commercial speech and injunction to cover only the

speech that was most likely to deceive.

        In the overbreadth context the Supreme Court has said

that if a statute is overbroad, the Court must ask whether it can

sever the problematic provision.  And that's in *Ferber*, which is

458 US at 769.

        THE COURT:  What was that case name again?

        MS. LANG:  *Ferber*, F-E-R-B-E-R.  I don't have the full

case name in front of me, I apologize.  And that's at Footnote 24

on page 769.

        And so all of this case law I think is in line with what

I had, you know, explained earlier, your Honor, which is it's my

understanding that a court should enjoin only the portions of a

law that the -- the enforcement, enjoin enforcement only of the

portions of the law that it finds unconstitutional.

        But I would note that if this Court found that a

narrower injunction was not appropriate, the result would not be

to not issue an injunction, but it would be our position that it

would be to enjoin the entire provision because where there is

compelled speech, there is irreparable harm.  And all of that

speech must be justified and narrowly tailored to a --

```
1            THE COURT:  Let me interrupt.  What part of the

2   disclaimer are you seeking an injunction of because I guess I'm

3   not clear on that?  Your briefs, I think, at one point say our

4   clients are fine with this and this.  So I'm not clear if you want

5   an injunction of the entire disclaimer provision or of just the

6   first sentence of the disclaimer provision.

7            MS. LANG:  Thank you, your Honor.

8            I think that our clients have requested a full

9   injunction of the entire disclaimer requirement.  The part that is

10  most pertinent to the state's interests is identifying the source.

11  And our clients already do that.  And you heard evidence today

12  that basically all the third parties do that.

13           That being said, I think it's always the case that the

14  Court has the option to grant some but not all of the relief that

15  we seek, so it's not over -- our request is not overbroad, it's

16  just that we note that there are parts that are more egregious

17  than others.  So the first sentence is the most egregious.

18           But, for example, I think it would be appropriate to

19  enjoin that this is not a ballot language as well because the case

20  law that we cite says where the government can speak rather than

21  compelling the speech of a third party, they should do so.  And

22  so they could just put "this is not a ballot" on their form

23  themselves rather than requiring it as a disclaimer.

24               And all of this negative language --

25               THE COURT:  Do I recall your brief correctly where you
```

1 | said I think one or both of your clients are fine with the

2 | language this isn't from the -- this isn't sent to you from the

3 | government, this is sent to you from us?  Am I misremembering

4 | that?

5 |         MS. LANG:  You're not.  Your Honor, while our clients

6 | think that it would be entirely appropriate for you to enjoin the

7 | entire provision as compelled speech and our clients already tell

8 | their recipients that, they would be perfectly fine with a more

9 | tailored injunction that kept in place the requirement that they

10 | write this is not from a government entity, it is from VPC, CVI,

11 | or whatnot.

12 |         THE COURT:  I guess -- I don't want to get us too far

13 | down this rabbit hole because I think we need to in your closing

14 | arguments have discussions about *Purcell* and some other things

15 | that are very important, and I may not even get to this question.

16 |         MS. LANG:  Sure.

17 |         THE COURT:  But I guess I'm just trying to think of --

18 | if I'm looking at any harm to your clients, if you're telling me

19 | in the brief they're fine saying this, it's okay to say this, they

20 | don't have a problem with saying this, but it sounds like you

21 | still -- they still want me to enjoin it, but they're saying they

22 | don't have a problem with it.  So I'm having trouble computing --

23 |         MS. LANG:  Fair enough.  The claim overall is for a full

24 | injunction.  At the preliminary injunction stage our clients are

25 | more than happy to focus the relief that they seek on the first

1  sentence.

2          THE COURT:  So are you withdrawing, then, your request

3  for an injunction as to the entirety of the disclaimer provision?

4          MS. LANG:  Yes, your Honor.

5          THE COURT:  Okay.  And you're seeking to enjoin just the

6  first sentence or just the first sentence in the last part about

7  the ballot?

8          MS. LANG:  The latter, your Honor.

9          THE COURT:  Okay.  Thank you.

10         MS. LANG:  So I do want to start with *Purcell* because I

11 imagine that that's weighing on the Court.  And I agree with the

12 question you asked right at the outset yesterday morning, which is

13 that you, of course, have to take into account even non-binding

14 precedent from the Eleventh Circuit, like the *League of Women*

15 *Voters* case.  So I think it's important for us to start with those

16 cases and the arguments made about *Purcell*.

17         But as this Court has already held last year in

18 *Coalition for Good Governance*, *Purcell* is not a bright-line rule.

19 And the *League of Women Voters* case that defendants rely upon and

20 intervenors rely upon also says that *Purcell* is not a bright-line

21 rule as does *Merrill v. Milligan*.  Of course, when I talk about

22 *Merrill*, I'll be talking about Justice Kavanaugh's concurrence in

23 *Merrill* that was only joined by Justice Kavanaugh, no one else,

24 but it is some language that at least expresses the views of

25 Justice Kavanaugh on the *Purcell* principle.

1         So if it's not a bright-line rule, then how do we apply

2    it?  Rather than mechanically applying a rule against injunctions

3    in an election year, for example, this Court has to think about

4    the reasoning behind *Purcell*, largely the logistical challenges

5    for election officials, and in the case of redistricting

6    candidates and the confusion that may arise from last-minute

7    changes affecting the administration of elections.

8         And so in Justice Kavanaugh's concurrence, he agrees

9    with this approach.  And he says in Footnote 1 that:  How close to

10   an election is too close may depend in part on the nature of the

11   election law at issue and how easily the state could make the

12   change without undue collateral effects, changes that require

13   complex or disruptive implementation must be ordered earlier than

14   changes that are easy to implement.

15        Well, you heard from Mr. Germany directly that with

16   respect to the disclaimer provision, he could do that easily.

17   Logistically and practically it would be no problem for him.  So

18   the question is with respect to the mailing list and pre-filling

19   prohibition.  You also heard from Mr. Germany that they have not

20   trained election officials on these provisions at all.  And he

21   explained why, which is that it doesn't require election officials

22   to do their job differently in any way and that the prohibitions

23   in the absentee ballot applications apply to third parties and not

24   to election officials and it wouldn't change any of the training

25   that they have done for election officials.

 1          And so unlike most election law cases that seek to force
 2 election officials to do something differently, you know, apply a
 3 voter ID law or not apply a voter ID law, allow drop boxes or not
 4 allow drop boxes, this is a much more traditional injunction,
 5 asking only that government officials refrain from the enforcement
 6 of an unconstitutional provision.
 7          Nothing about this case would require election officials
 8 to process absentee ballot applications differently or change the
 9 means by which election officials receive absentee ballot
10 applications, which will always be from the voters themselves.
11          And so looking at *League of Women Voters*, I think we can
12 glean -- *League of Women Voters* doesn't provide a lot of analysis
13 about the bounds of *Purcell*, it says so explicitly.  It says we're
14 not going to kind of opine on the bounds of *Purcell*.  But looking
15 at what was at issue in *League of Women Voters*, we can learn a
16 great deal about what League of Women Voters says.
17          So here I want to specifically clarify something that
18 Mr. Norris said in opening, which is that he said there was a
19 First Amendment claim against a disclaimer at issue in the *League*
20 *of Women Voters* case.  That is not true.  There is a specific
21 footnote, I don't have the number of the footnote written down,
22 that says:  We decline to weigh in on the merits of the
23 registration disclaimer provision, that provision has been
24 repealed by a newly-enacted statute, which Florida's governor has
25 already signed.  That law will go into effect thereby mooting any

1 challenge as soon as the district court-ordered preclearance

2 regime ceases to operate and that regime will cease to operate

3 upon the issuance of this opinion.  So there was no disclaimer

4 issue there.

5          And then Mr. Norris said that these cases are similar

6 because there were voter registration restrictions in that case

7 that involved First Amendment challenges.  But there, once again,

8 the similarities are surface level because the restrictions in

9 *League of Women Voters* on registration concerned the delivery of

10 completed voter registration forms to election officials and

11 whether or not third parties had to deliver completed absentee

12 ballot application -- or voter registration applications within a

13 certain time period.  So that much more directly effects election

14 officials in their planning, it directly effects how election

15 officials are going to be receiving voter registration

16 restrictions.

17          And that is -- and similarly, there was a solicitation

18 at the polling places claim.  Again, election officials have to be

19 trained on how to enforce solicitation rules at the polls.  But,

20 again, that was a case where even there the Eleventh Circuit said

21 it was a much closer call.

22          And the regulation of drop boxes is another issue

23 that -- another provision that was at issue in the *League of*

24 *Women Voters* and much more the kind of classic election law

25 administration type of claim.

1           In *Merrill v. Milligan*, the other case that defendants

2    and intervenors rely upon, it's hard to find an election law case

3    less like this one, a redistricting case, changing the maps,

4    nothing could be more disruptive to an election.  You know, the

5    quote from *Merrill* says:  The state says those individuals and

6    entities now do not know who will be running against whom in the

7    primaries, filing deadlines need to be met, et cetera, et cetera.

8    And says:  The district court's order would require heroic efforts

9    by those state and local authorities in the next few weeks and

10   even heroic efforts likely would not be enough to avoid chaos and

11   confusion.  I think you heard from Mr. Germany that no heroic

12   efforts would be required to avoid chaos and confusion.

13           And while there is no date certain for *Purcell*

14   applications, if you were to look for one, the closest I've ever

15   seen the Supreme Court to announcing a date certain for election

16   cases outside of redirecting is a case called *Veasey v. Abbott*.

17           Now, this is not binding, just the way that Justice

18   Kavanaugh's opinion in *Merrill* is not binding.  But in *Veasey v.*

19   *Abbott*, a case I was personally involved in, there was a stay

20   of -- there was a stay in place of Texas's -- of the holding that

21   Texas's voter ID law violated Section 2 of the Voting Rights Act.

22   So the Voting Rights -- so what had happened, the procedure

23   history, was the law was held to violate the Voting Rights Act.

24   The Court -- the Fifth Circuit had enjoined that ruling in 2014 as

25   too close to the election under *Purcell*.  But then that stay of

 1   the holding had kind of remained in place for years while the case
 2   was churning in the Fifth Circuit.  So the plaintiffs applied to
 3   the Supreme Court to say, please lift this *Purcell*-based stay
 4   because *Purcell* no longer applies.  That was years ago.  And that
 5   was in early 2016.
 6         And Justice Thomas wrote and said:  We're denying your
 7   application because we should give the Fifth Circuit an
 8   opportunity to resolve this case.  But if the Fifth Circuit does
 9   not resolve this case by July 20th, 2016, you can come back and
10   ask for relief then.  And as a result, the Fifth Circuit issued
11   their opinion on July 20th and relief was entered thereafter.  So
12   the closest I've ever seen the Supreme Court or any member of the
13   Supreme Court providing us a date was July 20th.
14         And applying *Purcell* here would be a substantial
15   expansion of *Purcell* that would stretch the bounds of reason and
16   fly in the face of the rationales of *Purcell* for all the reasons
17   we just discussed.  And the Court should decline the defendant
18   intervenors' request that you ignore all of the reasons behind
19   *Purcell* and the evidence that's been presented here and instead
20   impose a bright-line rule on election law cases in election years.
21         And I'll add here whatever heightened burden we might
22   face under *Purcell* we meet.  The factors that were outlined by
23   Justice Kavanaugh that, again, are not -- are the view of Justice
24   Kavanaugh only, first say that the merits must be clear-cut.  And
25   I'm happy to discuss the merits in a moment.

1          And then there's the question of irreparable harm.

2    Well, you heard directly yesterday from VPC and CVI and

3    VoteAmerica, from Tom Lopach and Daniel McCarthy that SB 202 will

4    dramatically reduce the quantum and nature of their speech to

5    Georgia voters.  This is not speculative as the defendants

6    suggested in their opening.  The decision has already been made

7    that absent an injunction in this case, VPC and CVI are cutting in

8    half their communications to Georgia voters in 2022 because they

9    have not managed to find a feasible solution that will not expose

10   them to dramatic civil and criminal penalties.

11          That decision has already been made.  Not only will they

12   cut those communications in half, but they will send them at a

13   time that they know will mean that voters will engage less with

14   their communications.  When you send an election mailer on

15   August 22nd instead of mid or late September, you necessarily are

16   catching voters at a time when they are not thinking about

17   elections in the same way as they are later in the election

18   season.

19          With respect to the disclaimer, you heard from Tom

20   Lopach and from Daniel McCarthy that this is speech that

21   they vehemently protest having to give, and that is -- and that

22   compelled speech is always considered irreparable harm if it is

23   not justified by a compelling state interest and narrowly

24   tailored.

25          And with respect to pre-filling, once again, the state

1   is dictating the contents of the communications of our clients.

2   In fact, if you look at one of the exhibits that we cited in our

3   reply brief, VPC and CVI actually go to great lengths to test the

4   different types of messaging that they can do.  And that messaging

5   says things like, we've already filled it out for you.  And they

6   tested messaging that was meant to make voters feel like they were

7   having an exclusive experience.  You know, communication has been

8   selected to be sent to you and we've, you know, pre-filled this

9   information for you.  This is plainly part of their communication

10  and their message, and *Myer v. Grant* and other similar cases

11  grant them the right to choose their most effective means of

12  communication.

13        And, third, there's the question of undue delay, which I

14  know defendants and intervenors raised in their opening.  But I

15  would raise a few points there:

16        One, Justice Kavanaugh said undue delay in bringing

17  their complaint to court.  And, of course, plaintiffs did not

18  delay in any sense in bringing their complaint to court.

19  Defendants have been on notice about these claims since last year.

20        And with respect to the timing of this motion,

21  plaintiffs reasonably waited for this Court's motion to dismiss

22  ruling before filing this motion to determine whether or not the

23  Court believed that they could move forward with their case at all

24  before they went through the exercise of a preliminary injunction

25  motion.  And they also reasonably sought to conduct some discovery

1   so that they could present more evidence to this Court.

2          Now, unfortunately the amount of discovery that was

3   received prior to the filing of this motion was limited, but that

4   is not due to the efforts of plaintiffs, and I will not drag you

5   into discovery disputes here, but plaintiffs have been waiting on

6   discovery, both document requests and deposition requests, for

7   several months and working diligently with defendants to try to

8   obtain that discovery.

9          But much of the discovery we were able to present here,

10  interrogatory responses, RFA responses, were important to our

11  presentation and understanding of the case.  The issuance of a

12  regulation -- of the regulation in December helped us narrow the

13  issues in the case and determine what was applicable to

14  VoteAmerica, although apparently not with as much clarity as we

15  thought.

16         And, finally, defendants and intervenors set plaintiffs

17  up for a Goldie Locks' problem.  And it's one that I've

18  encountered in other cases already.  Neither of our clients were

19  doing any work in Georgia in 2001 -- in 2021.  VPC and CVI only

20  recently decided on how they could proceed in 2022 and how they

21  planned to proceed under SB 202.  And, indeed, the state itself

22  did not even create the form that they've posted on their website

23  with the disclaimer until earlier this year.  And so the filing of

24  this motion was at a time when plaintiffs would actually be able

25  to show irreparable harm.  And I can guarantee that if we had

 1  filed this motion earlier, defendants and intervenors would have

 2  claimed that our motion was not yet ripe and that our claims of

 3  harm were speculative.  In fact, they are still arguing that

 4  today.

 5          And the final factor that Justice Kavanaugh has

 6  identified is implementation, but we've already talked about

 7  Mr. Germany's testimony which unequivocally stated that they have

 8  done no training on the absentee ballot applications, that the

 9  absentee ballot applications do not change anything about how

10  election officials will be instructed to handle absentee ballot

11  applications and absentee ballots.  And they could easily change

12  the disclaimer form.

13          With respect to the core merits here, the question is

14  whether or not this -- whether or not the distribution of absentee

15  ballot applications implicates speech.  It unquestionably does.

16  And we cited in our reply brief that the sponsor of SB 202 said it

17  multiple times, you know, that this is a First Amendment issue,

18  that we can't tell them not to do it altogether because that's a

19  First Amendment issue.  So if it's a First Amendment issue, then

20  strict scrutiny applies and the statute that they crafted cannot

21  possibly meet it.

22          In the reply brief we also attached exhibits from

23  campaigns saying, you know, Donald Trump wants you to return this

24  enclosed absentee ballot application.  Nothing could be more

25  clear-cut as political speech than how campaigns reach their

1   voters and try to engage them.

2           And in their opening, defendants contended that *Myer* was

3   obviously different, but they didn't explain why.  And that's far

4   from obvious.  In fact, there is no meaningful way to distinguish

5   *Myer* from this case.  *Myer* is a case, as you know I'm sure, about

6   petition circulation.  And defendants argue that somehow the

7   speech in *Myer* was more necessarily intertwined with the gathering

8   of signatures than plaintiffs' speeches with the distribution of

9   absentee ballot applications.  But if you just take a look at

10  plaintiffs' materials, you'll see those communications are

11  necessarily intertwined.

12          And just like here, in *Myer* the plaintiffs could have

13  paid individuals to urge voters to support the petition without

14  actually gathering the signatures.  Indeed that's what the

15  district court had held in *Myer*, saying that they were free to use

16  their money to employ other spokesmen who could advertise their

17  cause.  The Court did not find that sufficient.

18          And just like here, there was some nominal connection to

19  the administration of elections because when petition signatures

20  are gathered, they then have to be reviewed by election officials,

21  they have to be verified by election officials, and only through

22  that verification can a petition go on the ballot.  And, indeed,

23  many of the arguments that the state made is that they thought

24  that by restricting petition circulation, they could eliminate

25  fraud or that they could make sure that the petition signatures

 1   would be more verifiable in some way.  The Court did not find that

 2   in any way persuasive or a reason to apply lesser scrutiny.

 3           In fact, despite that nominal connection to

 4   administration of elections, the Court recognized that when a

 5   speaker is engaged in an interactive communication with potential

 6   voters on a matter of societal concern, First Amendment protection

 7   is at its zenith.

 8           And I'll quote Justice Thomas in his concurrence in

 9   *Buckley*, which was the follow-on case to *Myer*, that says:  When a

10   state's election law directly regulates core political speech, we

11   have always subjected the challenge restriction to strict scrutiny

12   and require that legislation be narrowly tailored to serve a

13   compelling government interest.  When core political speech is at

14   issue, we have ordinarily applied strict scrutiny without first

15   determining that the state's law severely burdens speech.

16           So Justice Thomas was reviewing the case law about

17   *Anderson-Burdick* and when it applies and specifically explaining

18   that when it has to do with direct regulation of core political

19   speech rather than regulating the mechanics of how an election

20   official runs their elections, that is subject to strict scrutiny.

21   And defendants have still not provided any reason that the Court

22   can distinguish *Myer* and *Buckley* and all of the cases that have

23   followed on from *Myer* and *Buckley* in the district courts.

24           I will not say too much more about the compelled speech

25   and disclaimer point because I think it's one that has -- that

1  we've already had a lot of discussion about.  But I did want to

2  note that defendants do concede the application at minimum of the

3  *Citizens United* test in both footnote one of their opposition and

4  on page 20 of their opposition.  Nowhere do they argue in their

5  briefing that anything less than *Citizens United* should apply to

6  the disclaimer provision.

7          And we've explained that *Citizens United* really isn't

8  the appropriate test because it's never been applied outside of

9  the campaign finance context and you're much better off looking to

10  *Myer.*  But even if *Citizens United* extended beyond campaign

11  finance, merely labeling something a disclosure doesn't avoid a

12  compelled speech analysis.  In *Citizens United* there was a

13  straightforward disclosure of who was speaking that was at issue.

14  Again, that's something not at issue today as we've clarified.

15  And the question instead here is whether or not defendants can put

16  speech other than disclosure of who they are in plaintiffs' mouths

17  and speech that is designed to dissuade and undercut their message

18  and is, quite frankly, likely to cause, not alleviate, confusion.

19  And under that circumstance you're much better off looking to

20  compelled speech analysis in the crisis pregnancy center cases

21  like *NIFLA*, rather than disclosure cases that are only about

22  disclosure of the source of the speaker.

23          The last thing I'll say on the disclaimer is I would

24  urge you to take a look at any number of dictionary definitions

25  of publication.  Perhaps you could stretch the bounds of your

1   imagination and come up with one definition of publication that is

2   about who is delivering this particular piece of paper I suppose.

3   But the ordinary meaning in some dictionary definitions I looked

4   up is, you know, the issuing of a communication -- a printed

5   matter for distribution, right?  Something that is produced or

6   released for distribution.  And so while our clients are the

7   distributors of that form, that form has undeniably been

8   published, published on the Secretary of State's Office website

9   for distribution.

10          On the mailing list restriction, you heard extensive

11   evidence, particularly from Tom Lopach, on the harms that VPC and

12   CVI are facing.  They've done their research.  They've talked to

13   their vendors.  They have every desire to send two waves of mail.

14   They are sending two waves of mail in other states where they're

15   permitted to do so.

16          So, against that you heard evidence from a vendor who

17   does -- has a different business model, works with different

18   clients, uses different printers and has no knowledge of VPC and

19   CVI's work or how they function and his speculation that they

20   could comply nonetheless.  That is not meaningful countervailing

21   evidence here.

22          And the lack of justification and tailoring is plain.

23   Almost all of the justification provided by defendants is about

24   duplication.  But the law doesn't actually prevent the sending of

25   duplicate applications at all.  And, in fact, that would be a much

 1  easier law to comply with.  It might -- it would still curtail

 2  speech and dramatically so, I think we'd still be here today, but

 3  it would be a different case because it would be easy to comply

 4  with.  You could send one mailer to everyone.  And VPC could at

 5  least send their mailing closer to the election.  But here they

 6  not only have to send one wave but they have to send it right at

 7  the beginning of the opening because they have no other way to

 8  comply with this complicated mailing list restriction.

 9          And against that, the record is remarkably thin.  As I

10  pointed out in my cross of Mr. Germany, the number of complaints

11  that are actually relevant in any way to this case among the, you

12  know, 30-odd complaints that were attached to Mr. Germany's

13  declaration are vanishingly small.

14          And most of the complaints about duplication were just

15  that, were complaints; I wish I weren't receiving so many of these

16  applications.  But the Supreme Court has repeatedly held that the

17  journey from the mailbox to the trash bin is not a long one and it

18  is one that is a burden we can put on individuals in order to

19  protect free speech.

20          And, finally, with respect to the pre-filling

21  prohibition, again, you heard about the harms from Mr. Lopach

22  here.  This is their model of speech.  It is part of their

23  communications.  They would have to change their cover letters in

24  order to comply with the SB 202.  And defendants agree that their

25  cover letters are speech.  It's all one package, it cannot be

1  disentangled.

2          And *Myer* specifically protects their right to speak in

3  the way that they see as most effective.  *Myer* was all about them

4  being able to collect signatures in the way that they found most

5  effective.  So the fact that you could speak in support of the

6  petition openly as much as you want was not enough to save the law

7  in *Myer*, and it's not enough to save the law here.

8          And the last thing I'll note on tailoring when it comes

9  to pre-filling is it is extremely bizarre for SB 202 to restrict

10  pre-filling when it comes to absentee ballot applications when you

11  can use the voter file for that information and not restrict

12  pre-filling for voter registration applications where you can

13  pre-fill that information based on commercial data that is far

14  less reliable than the state's own voter file.

15          With that, I don't have anything further prepared, your

16  Honor, but I'm happy to answer any questions.

17          THE COURT:  All right.  Thank you very much.

18          MS. LANG:  Thank you.

19          MR. NORRIS:  If it's okay with your Honor, I'll go next

20  and let the state have the last word for our side.

21          THE COURT:  Very well.

22          MR. NORRIS:  So my friends at the state will get into

23  the merits of this case.  I think some of those questions are

24  interesting, some are harder than others.  Whether Georgia's laws

25  regulate speech or whether they only regulate the conduct that

1 | these organizations are engaged in is important.

2 |         If it's speech, what is the legal standard?  I think

3 | we've spent the last two days talking about whether pre-filling

4 | and duplication and disclaimers make it more or less likely people

5 | will vote, which is not exactly directly connected to speech of

6 | the plaintiffs, it sounds more like an *Anderson-Burdick* problem,

7 | which is the position that we've taken as the applicable legal

8 | standard.

9 |         And then I think your Honor touched on the question of

10 | even if this is strict scrutiny, strict scrutiny is not fatal in

11 | fact is what the Supreme Court has said.  And so is this close

12 | enough on provisions like the disclaimer where it seems to be the

13 | debate has narrowed down to should they have said "printing"

14 | instead of "publication," or should they have capitalized the word

15 | "not" or left it lower case?  And I think in that range close is

16 | close enough here.

17 |         But my position today is that you don't need to decide

18 | any of those questions because under *Purcell* in a PI hearing the

19 | equities alone are a sufficient reason to deny the plaintiffs'

20 | motion.

21 |         And we know that because the *League of Women Voters* case

22 | didn't actually get into the merits of the First Amendment claims,

23 | all it said was that it thought we had presented arguments to make

24 | those close enough questions to justify denying -- or staying the

25 | permanent injunction in that case.

1          And in *Purcell* itself Justice Kennedy's opinion for the

2    Court says the Court expresses no opinion on the merits, and yet

3    it stayed the injunction that the Ninth Circuit had entered.  So

4    you don't have to address the merits to deny PI on the grounds of

5    *Purcell*.

6          And we think *Purcell* fairly easily applies here.  We

7    keep forgetting and talking about August 22nd, which is the day

8    that the plaintiffs plan to send out absentee mailers, which is

9    close enough under *Purcell* in our view, but we keep forgetting

10   that we're in the middle of a runoff now and the runoff election

11   occurs in 11 days, couldn't be closer to the election.

12         But if you are just going to look at the general, the

13   key deadline is August 22nd, that's the deadline that we're

14   talking about here because that's the one that's influenced by

15   their claims, and that's two months away.

16         Ms. Lang mentioned a case where Justice Thomas said that

17   maybe July was not too late for a November election, but you don't

18   have to look at that single justice opinion.  The *League of Women*

19   *Voters* case said around four months is too close; if you're about

20   four months from the start of the next key election deadline,

21   that's too close under *Purcell*.  And it cites the Supreme Court's

22   decision in *Milligan*, which is unreasoned but we know five

23   justices voted to grant a stay.  Justice Kavanaugh later went on

24   to explain it was too close to the election.  Justice Cagen went

25   on to dissent and say, hey, it's still four months away but that

1  was the losing position in *Milligan*.

2          As I mentioned in my opening, the *League of Women Voters*

3  case entered a stay in a case involving very similar laws.  There

4  was a disclaimer.  The Court didn't get into the merits of the

5  disclaimer, but it still entered a stay and did not differentiate

6  the disclaimer in its *Purcell* analysis.  And I won't get into the

7  weeds of that case, but that case was very weird.  We had to get a

8  stay in order to get a bill passed that would moot the disclaimer

9  provision because the district judge in that case put Florida

10  under preclearance which blocked a bill that Florida had passed to

11  try to fix the disclaimer provision.  But that's TMI for this

12  hearing.

13          The point is that the *Purcell* holding does cover the

14  disclaimer provision.  And more importantly, our friends in the

15  consolidated cases were -- their attorneys were in that case as

16  well, and they said, hey, *Purcell* doesn't apply here because we're

17  talking about the delivery of voter registration applications and

18  disclaimers of voter registration groups.  Voter registration

19  groups and what they do is not the machinery of the election.

20  You're not actually enjoining the state directly, therefore,

21  *Purcell* doesn't apply.  That argument fell on deaf ears at the

22  Eleventh Circuit.  And that's sort of the same argument that you

23  hear today in this case, but in this case we have absentee ballot

24  applications, which are actually legally operative and go into the

25  process of getting the ballots, it's actually closer to voting

1 | than voter registration.

2 |    So *Purcell* applies here.  And we don't think the

3 | plaintiffs can overcome it unless they satisfy all four of the

4 | criteria that Justice Kavanaugh outlined in the *Milligan* case.

5 | And I know Justice Kavanaugh was writing for himself, but I think

6 | his opinion is persuasive.  I think it actually nicely categorizes

7 | what the Supreme Court has actually done over the last several

8 | years in applying *Purcell*.

9 |    Also *League of Women Voters*', Judges Newsom, Brasher and

10 | Lagoa all said that Justice Kavanaugh's test -- they treat it as

11 | mandatory, that the four requirements all had to be met.  If even

12 | one isn't met, then the plaintiffs can't overcome the *Purcell*

13 | principle.

14 |    And I think my friends on the other side, Ms. Lang likes

15 | those opinions, she likes *League of Women Voters,* she likes

16 | *Milligan* because both opinions say that *Purcell* can be overcome.

17 | I've argued before that it's quite a bit stricter than that, and I

18 | think those two opinions say that that's not true, but there are

19 | still four key requirements that you have to overcome, and I'll

20 | just go through three of them.  I think they fail three of them,

21 | any one of which would be sufficient.

22 |    I think they fail the requirement that they had to act

23 | without undue delay.  Ms. Lang said that Justice Kavanaugh

24 | mentioned that you had to file the complaint quickly, that he

25 | didn't say anything about filing the PI motion quickly.  But if

1  you read the Supreme Court's majority opinion in the *Benisek* case,

2  that's a majority opinion of the Supreme Court where they faulted

3  plaintiffs for filing their preliminary injunction motion too

4  late.  And, of course, that would be the rule.  It's the point

5  where you try to coerce the state and change its election laws

6  that matters, not when you file the complaint.  As long as you sit

7  back and are willing to litigate a complaint at a normal pace,

8  that doesn't necessarily implicate *Purcell*.  It's when you try to

9  get affirmative relief.

10        And they waited 14 months after filing their complaint

11  to file their PI motion.  That's a really long time that I don't

12  think -- no significant portion of that has been accounted for.  I

13  think the only arguments you heard was that they were worried if

14  they moved faster, that they would face a ripeness argument, but I

15  think that would be a very bad ripeness argument.  They have

16  brought basically a facial challenge to a law which almost itself

17  eliminates a ripeness defense.  And they brought a facial

18  challenge to a law that directly regulates them.  I don't think

19  there is a ripeness argument they we could have made.

20        I know the state filed a motion to dismiss early on

21  challenging plaintiffs' standing, but your Honor rejected that

22  motion, that wasn't a valid defense either.  So I don't think that

23  that's an excuse for waiting until 11 days before the end of the

24  runoffs and merely two months before they want to send out the

25  mailers in question.

1          The next factor I think is not met is that the merits

2    here are not clear-cut in their favor.  And this is a pretty easy

3    one to apply.  There are really two cases that have ever

4    considered the exact questions in front of you.  I know that it's

5    the exact questions in front of you because one of the cases is

6    *VoteAmerica v. Schwab*, it's a case out of the District of Kansas

7    where the plaintiffs won.  They won most of the issues and

8    arguments that they're raising before you now.

9          But there's another case called the *Leichtenstein* case

10   out of the Middle District of Tennessee that was about absentee

11   ballot applications and raising these same First Amendment

12   arguments.  The district court went the other way and agreed with

13   our arguments and the state's arguments.  So you've got two courts

14   that have considered these issues, they're split 1/1.  I don't see

15   how the plaintiffs' position could then be entirely clear-cut.

16         And the plaintiffs minimize these cases, but the only

17   circuit court cases that exist on these issues are a Fifth Circuit

18   case and a Ninth Circuit case involving -- I think one involves

19   voter registration drives and the other involves basically

20   third-party ballot delivery, people who collect your ballots and

21   take them in and turn them in for you.  Those aren't exactly

22   absentee ballot mailers but they're pretty close.  And I think if

23   you look at the reasonings of those cases, they're really in

24   tension with the plaintiffs' position.

25         What those courts say is that you have to look at the

1   laws that are challenged, what they actually regulate.  And what

2   those laws regulate is really just the conduct aspect of what

3   these groups are doing, not their speech.  So you can have the

4   voter registration drive, you can tell people that voting is

5   important, that you should do it, you should do it quickly, here's

6   how to do it and give them all that information, but that law, for

7   example, just regulated the part where they took the ballot and

8   delivered it to the state.  And the Court said you have to really

9   hone in on what's being regulated.  And both of those courts take

10  those older cases from the Supreme Court, *Myer* and *Buckley*, that

11  the plaintiffs' cite and they say those are really limited to the

12  petition context and they can't be extended so easily.

13          So I think there's a 1/1 split among district courts and

14  then all the circuit authorities at least against them, if not --

15  I think firmly against them, but it's at least in tention with

16  their position, so the merits aren't entirely clear-cut.  That's

17  enough, that's two requirements to overcome *Purcell* that aren't

18  met.

19          There is a third requirement I think that they fail,

20  which is they would substantially confuse voters and burden

21  election administrators if you were to enter a preliminary

22  injunction at this late stage.  I'm not here saying this is the

23  easiest *Purcell* case in terms of disruption, it's not, but I do

24  think this factor clearly favors us instead of them for a few

25  reasons.

1            It's conceded that if you enter a preliminary injunction

2    there will be duplicate absentee ballot mailers sent out.  That's

3    what they want to do, that's what they told you they will do if

4    they're able to.  You've heard some testimony that voters get

5    confused when they receive those.  A voter who gets a duplicate

6    mailer might think, well, I responded to the first one, I guess it

7    didn't go through, they think they have to do it again.  That will

8    certainly lead to more applications being sent to the state, that

9    requires more time, more money, more staff to process the added

10   burden that is significant.

11           The pre-filling, you've heard that there are pre-filled

12   applications that get sent out with errors.  We're a little bit

13   more neutral on this question.  I'm very willing to say that the

14   state's database is probably not that accurate.  The state --

15   states have this problem across the country of keeping their

16   voting lists accurate and up to date.  The NVRA is the federal law

17   that does create some of these problems for states, and then some

18   of it's just -- it's difficult to keep these up to date.  There

19   will be mailers sent out with inaccurate information that will

20   confuse voters and lead to delays in processing and burdens on the

21   state.

22           Then lastly this disclaimer provision, I know we've

23   talked about maybe sort of a partial solution here where you

24   strike out certain parts, maybe you strike out both the parts that

25   say this isn't a ballot and the part that says it's not a

1    government publication, maybe just that last one.

2            But the problem, the *Purcell* problem for purposes of

3    this PI motion is that there will be mailers sent out both with

4    this Court's remedy and without, and that's because people are

5    designing and printing these mailers now.  They may not think it's

6    worth the cost to redo it just to get rid of this disclaimer.

7    Some groups won't know about this Court's order, some groups might

8    not think this Court's order is permanent given the likelihood of

9    further appeals.

10           There will be competing versions sent out, and so there

11   will be -- and especially if there are duplicates allowed -- even

12   if there are not, there are multiple groups, people are going to

13   get more than one potentially.  There will be some that say this

14   is not a ballot and there will be some that don't say this is not

15   a ballot, which is an interesting difference that really ought to

16   fuel voter confusion.  There will be ones that say this is from

17   the government, and there are ones that don't say that, I think

18   that's a problem.

19           And I'll close with just saying this:  I normally -- I

20   litigate a lot of *Purcell* stay preliminary injunction issues.  I

21   normally hear the argument that there's no evidence of confusion.

22   There's actually a significant amount of evidence here, you heard

23   testimony about the burdens on voters and election administrators.

24   Normally I'm doing these on appeal where there is no record.

25   There's quite a bit of evidence here.

1          But I do think most importantly *Purcell* is a legal

2    doctrine.  I don't think they have definitively ruled out voter

3    confusion or electoral burdens.  But even if they thought they

4    had, Justice Kavanaugh and the *League of Women Voters* opinion both

5    say that the burdens here are unpredictable and unforeseeable and

6    that the better course is to let the laws that are duly enacted by

7    the people's representatives stay in place while the plaintiffs

8    litigate.

9          Questions about the scope of the remedy, whether the

10   rights have been violated, those can all be answered at final

11   judgment.  You shouldn't disrupt an election now based on this

12   presentation.  Thank you.

13          THE COURT:  Thank you.

14          MR. SCHAERR:  Your Honor, thank you again for your

15   patience with all of us.

16          I agree with Mr. Norris' statement of the law,

17   especially with regard to *Purcell*.  But I think it's worth

18   emphasizing something about the *Purcell* doctrine and Justice

19   Kavanaugh's opinion in the *Merrill* case because it's clear that we

20   don't have the burden of establishing -- the state does not have

21   the burden of establishing that *Purcell* should not apply.

22   Certainly under Justice Kavanaugh's opinion as adopted in the

23   *League of Women Voters* case, it's clear that the plaintiffs have

24   the burden to establish at least those four things that Justice

25   Kavanaugh listed.

 1          Now we may have the burden on the -- well -- and they

 2    also have the burden obviously on the question of the balancing

 3    of -- of the equitable balancing factor, which Justice Kavanaugh

 4    doesn't really discuss but also still applies, and I'll discuss

 5    that a little bit later.  So they have the burden on five issues.

 6    And if they fail to meet that burden on any of those five issues,

 7    then it would be legally erroneous to issue a preliminary

 8    injunction.  So that's true of the correctness of plaintiffs'

 9    position on the merits, which Justice Kavanaugh said has to be

10    entirely clear-cut, and they have the burden of establishing that.

11    And I'll talk about that probably last.

12          They have to show that they would suffer irreparable

13    harm absent the injunction.  They have to show that they have not

14    unduly delayed bringing their complaint to court.  And, obviously,

15    Mr. Norris is correct, that when Justice Kavanaugh says bringing

16    their complaint to court, he's obviously talking about their

17    request for relief, which, of course, here is a preliminary

18    injunction.  And I'll get into the evidence on that point.

19          And then they have the burden of establishing that the

20    changes in question, the changes they're asking for in their PI

21    motion are at least feasible before the election without

22    significant costs, confusion or hardship.  So they have the burden

23    on all of that.  So I think I will start and just pick up where

24    Mr. Norris left off.

25          And with respect to the delay point, that is have

1  plaintiffs proven that they did not unreasonably delay?  Let me

2  just emphasize some of the evidence on that point.  First of all,

3  the evidence is clear that they could easily have filed a

4  preliminary injunction motion along with or soon after they filed

5  their complaints way back in April of 2021, but they waited

6  17 months to do that.

7         Now, Mr. Lopach admitted on cross that his organizations

8  had been aware of all three of the challenged provisions here

9  since at least April of 2021.  In fact, he further admitted that

10  he and, therefore, his companies had a memo from this Mission

11  Control organization laying out what that organization viewed as

12  the problems in complying with SB 202, they had that memo in April

13  of 2021.  And that was the principle evidence on which they relied

14  here for their claim that these provisions are a burden on their

15  ability to communicate with voters.

16         If they had that information in April of 2021, why

17  didn't they seek a preliminary injunction right then?  It's not

18  unusual for people to seek a preliminary injunction at about the

19  time that they file their complaint, they could have done that.

20         Similarly, Mr. McCarthy admitted that VoteAmerica had

21  its spiffy new tool ready to go in November of 2021.  But they,

22  too, waited at least six more months before they sought a

23  preliminary injunction.

24         And so it seems to me watching the evidence come in that

25  the plaintiffs were not just not diligent, they were actually

 1   lying in wait.  They wanted to wait until the election was just

 2   over the horizon.  In fact, it seems like they were sandbagging

 3   the state, albeit, as we'll explore later, they were sandbagging

 4   with empty bags.

 5        And in this circuit under decisions like *Wreal v. Amazon*

 6   from 2016, in this circuit a delay of, quote:  Even only a few

 7   months militates against a finding of irreparable harm.  And under

 8   the *Purcell* standard that kind of a delay affirmatively precludes

 9   relief because it makes it impossible for the plaintiffs to prove,

10   for them to carry their burden of establishing that they did not

11   unreasonably delay.

12        And here, of course, the first absentee ballots will

13   actually be cast in the general election a little over 100 days

14   from now, on September 20th.  And, of course, the applications for

15   absentee ballots will begin to be processed on August 22nd, which

16   is just a very few weeks from now.  So under the case law this

17   delay, which is well documented in the evidence, in fact, I think

18   it's irrefutable, is a sufficient reason to deny the requested

19   preliminary injunction, and it requires denial of the preliminary

20   injunction.

21        So let's move onto the second -- another thing on --

22   another proposition on which the plaintiffs bear the burden which

23   is to establish, quote:  That the changes they're seeking are at

24   least feasible before the election without significant cost,

25   confusion or hardship.

1          Now, Ms. Lang claimed that Mr. Germany said in his

2   testimony that he could make the change easily.  Well, that in

3   all -- with all respect, that simply misstates the evidence.  What

4   he said was that the state could easily change the language in the

5   disclaimer on their website.  And it's true, that would be a

6   trivial task, to change the language on the website.  But what

7   Ms. Lang ignores is all the other evidence that Mr. Germany

8   presented about the other burdens that the state would face if it

9   had to make a change to this system this close to an election.

10          Number one, he testified that the state would have to

11   redo its training materials for county election workers, including

12   how to respond to questions about applications.

13          Second, they would have to actually train these

14   officials in the new rules.

15          Third, they would have to try to find -- and this may

16   have been in his declaration, but he testified that they would

17   have to try to find every instance where they previously gave

18   guidance on these provisions and then change that guidance to

19   avoid confusion.

20          And even so, if they were to change the disclaimer or

21   any other language, there's no question that that would result in

22   an increase in absentee ballot applications, and he testified to

23   this, which in turn would lead to more ballots that then have to

24   be canceled on Election Day, and that in turn would lead to lines

25   at polling places on Election Day.  And so -- you know, that I

1   think is a significant reason for this Court not to issue a

2   preliminary injunction here because the end result of that may

3   well be lines on Election Day, which in turn will further cause

4   concerns about the credibility of the whole election system.

5          So for all those reasons -- and, again, this is an issue

6   on which the plaintiffs have the affirmative burden, and they've

7   not even attempted to meet that burden.  And merely citing that

8   one little snippet from Mr. Germany's testimony doesn't do it when

9   they ignore all the rest.  So they have not and cannot establish

10  that the PI they're asking for could, in fact, be implemented with

11  minimal cost and delay.

12         Let me turn now briefly to the balance of the equities

13  before I discuss the merits.  As I mentioned yesterday under

14  Eleventh Circuit precedent like *Hand v. Scott*, it's clear that the

15  state would suffer irreparable injury if the Court enjoins the

16  state, quote:  From effectuating a statute that's enacted by

17  representatives of the people.  And no matter how narrow or broad

18  the Court's injunction was, it would obviously prevent the state

19  from fully effectuating a statute that was enacted by the Georgia

20  Legislature.

21         But as Mr. Germany testified, the harm extends well

22  beyond the state.  And that is that -- because the absentee ballot

23  application system used by organizations like plaintiffs before

24  SB 202 significantly harmed the voting public then; it caused

25  confusion, it left room for voter fraud, it caused elections to

1   run less efficiently.

2         And SB 202, as Mr. Germany testified, was designed by

3   the legislature to try to find a way to allow the plaintiffs --

4   plaintiff groups to still send out absentee voting applications

5   to still accomplish their core objectives as -- you know, as

6   pro-democracy, pro-voting groups without the harm that had been

7   seen in prior elections.  It was a balance between those two

8   competing objectives.  And the legislature came down on the side

9   of allowing these -- of allowing these groups to speak but in a

10  way that hopefully is going to reduce some of the problems that

11  have occurred in the past, including long lines at polling places.

12        So if those provisions were enjoined, as I said before,

13  it is very likely that both the state and its citizens would

14  suffer significant harm.  And, again, the plaintiffs have the

15  burden of establishing that the balance of the equities is in

16  their favor rather than in the state's favor.  They haven't even

17  attempted to establish that.  And by contrast, the plaintiffs'

18  harms, if any, pale in comparison to those that an injunction

19  would inflict on the state and Georgia voters.

20        Under SB 202 the plaintiffs, as the evidence has shown,

21  they can continue communicating their message to voters without

22  interruption.  They can even continue to engage in the conduct of

23  sending absentee ballot applications, albeit with some modest

24  restrictions to protect the state and its voters.  And they may

25  also help anyone who has already requested an absentee ballot from

1  the state to fill it out.

2          And as to the public interest, the kind of injunction

3  sought by the plaintiffs here, as we've discussed earlier, would

4  be in sharp tension with our federalist system, including the

5  constitutional distinction between the role of state legislatures

6  and federal judges.  And we talked earlier today about cases like

7  *New Georgia Project* and *Curry v. Baker* that admonish Federal

8  Courts to avoid getting into the details of state election systems

9  no matter what kinds of good ideas might come out of a proceeding

10  like this.  That's an issue for the Georgia Legislature.

11          And if the plaintiffs want to make their policy

12  arguments to the legislature, they're more than welcome to do

13  that.  They had an opportunity to do that during the last

14  legislative session.  But that's where those kinds of policy

15  arguments, that are really the heart of their case here, ought to

16  be lodged.

17          Now, I'll pause there in case the Court has any

18  questions about -- aside from questions about the merits.

19          THE COURT:  Go ahead.

20          MR. SCHAERR:  Okay.

21          So, again, as Justice Kavanaugh's opinion explains, the

22  plaintiffs here bear the burden of establishing that the

23  correctness of their position on the merits is, quote:  Entirely

24  clear-cut.  Now, there's no way that anybody could listen to the

25  trial that we've -- or the hearing that we've had for the last two

```
 1  days and conclude that their position on the merits as a legal
 2  matter is entirely clear-cut.  No matter who you think has the
 3  better of the argument, it's clearly not entirely clear-cut in
 4  their favor.  So that, too, is an independent reason that requires
 5  denying their request for a preliminary injunction.
 6           So let's begin -- and, obviously, regardless of the
 7  legal standard -- actually, why don't I start with the applicable
 8  legal standard.
 9           As we've said before, everybody agrees that the -- I'm
10  sorry.  Well, everybody agrees that the one provision that they've
11  challenged implicates their free speech rights, right?  Everybody
12  agrees on that.  But they've said that we have acknowledged that
13  the Supreme Court's decision in Citizens United provides the
14  applicable standard for that claim.  And we do not believe that
15  that's true.  We believe that Citizens United provides kind of an
16  upper bound on the legal standard.  But we believe, as Mr. Norris
17  explained, that, in fact, it's the Anderson-Burdick standard that
18  applies there to the claims that go beyond mere conduct.  And some
19  of their claims are simply challenges to regulations of conduct.
20           Now, Ms. Lang invoked the Myer case.  But unlike this
21  case, Myer involved not just a restriction on the conduct of
22  circulating petitions, but also on the speech that accompanies and
23  necessarily accompanied that circulation.  And it was that aspect
24  of the situation there that led the Court, the Supreme Court to
25  include that strict scrutiny applies.  And I think it's worth
```

1  reading the relevant portion of Justice Stephens' opinion in *Myer*.

2  He says -- and this was his description and his analysis of the

3  facts there.  He said:  Although a petition circulator may not

4  have to persuade potential signatories that a particular proposal

5  should prevail to capture their signatures, he or she -- and this

6  is at page 1892 of the opinion -- I'm sorry, 421 of the US

7  Reporter, I think.  Although a petition circulator may not have to

8  persuade potential signatories that a particular proposal should

9  prevail to capture their signatures, he or she will at least have

10  to persuade them that the matter is one deserving of public

11  scrutiny and debate that would attend its consideration by the

12  whole electorate.  This will in almost every case involve an

13  explanation of the nature of the proposal and why its advocates

14  support it.

15          So he's describing the old petition circulation process

16  that you may remember, your Honor, I certainly remember it,

17  where -- you know, it was before the Internet, and if you wanted

18  to circulate a petition, you've got to print it out and you've got

19  to go to shopping centers or you've got to go door to door and you

20  got to talk to people in person and you've got to personally

21  persuade them that this is an issue of sufficient importance, that

22  they need to pay attention to it.  Okay.  So that was the factual

23  setting back then when *Myer* came out.

24          So in that factual setting the Court concluded, quote:

25  The circulation of a petition involves the type of interactive

1 communication concerning political change that is appropriately

2 described as core political speech.  And, therefore, to tell a

3 political organization that they could not employee paid

4 circulators was truly making it impossible at some level for them

5 to actually communicate personally and one on one with voters, to

6 actually provide a substantive political message to potential

7 voters.

8          That's not what we have here.  With the growth of the

9 Internet and all of that and e-mail, we don't have the same kind

10 of political advocacy that was involved in the *Myer* case.  And so

11 for that and the other reasons that we've explained, we don't

12 think *Myer* requires strict scrutiny here.  But let's go to the

13 evidence.

14          Well, one important piece of evidence is the testimony

15 that Ms. Lang alluded to that her clients want to send two waves

16 of mail with respect to the upcoming general election.  Well,

17 under SB 202 there's no question that they can send the first wave

18 exactly as they wish, at least with respect to being able to

19 include an absentee ballot application, okay.  They can clearly

20 send the first wave pretty much as they want to do it.  Yeah,

21 there's the dispute about pre-filling and that kind of stuff, but

22 they can clearly send the first wave with a ballot application

23 with it.

24          The only question is if they want to send a second wave,

25 are they going to be willing to go to the trouble, which the

 1  evidence I think establishes is not that great, but are they going

 2  to be willing to go to the trouble of pulling out from their

 3  second mailing ballot applications being sent to people who have

 4  already submitted an application?  And so they can clearly -- at a

 5  minimum they can do a second wave that has their cover letter and

 6  says, you know, we sent you a ballot application earlier and we

 7  encourage you to fill it out.  So there's nothing to prevent them

 8  from sending that second wave of messages to voters.  The only

 9  question is can they send another potentially duplicative ballot

10  application with that second wave?  And we just don't think that's

11  a very significant burden on anybody's First Amendment rights.

12          Now, I think it's also relevant that Dr. Green in his

13  testimony with respect to the disclosure provision, and I know

14  there's been quite a bit of discussion of that earlier, as I said

15  we acknowledge that that provision is subject to *Anderson-Burdick*

16  balancing, at least under current Supreme Court doctrine.  I know

17  there's a movement afoot to perhaps change the *Anderson-Burdick*

18  doctrine, but under current Supreme Court doctrine that's the

19  standard that applies.  And, of course, that doctrine requires

20  that you look at the burden on speech or association and balance

21  that against the state's interest, which we've talked about quite

22  extensively during the trial.

23          So in terms of the burdens on speech or association,

24  it's highly relevant that Dr. Green twice acknowledged that the

25  one statement they really contest in the disclaimer, that is that

1  this is not an official government publication, is, in fact, true.

2  Now, obviously that depends on how you interpret the word

3  "publication," but, you know, the fact that Dr. Green immediately

4  saw that that was a true statement suggests that many other people

5  would view that as a true statement as well.

6       The fact that the government hasn't printed the form,

7  it's not coming from the government is, you know -- under a

8  reasonable interpretation of the word "publication," that

9  statement is absolutely true.  And that's obviously the sense in

10  which the legislature intended it.  And the fact that you could

11  say the legislature was lying under some different interpretation

12  of the word "publication" doesn't mean that their warning and

13  their disclaimer is a violation of the First Amendment.  In fact,

14  Dr. Green, well...

15       Now, it's true that Dr. Green and other witnesses

16  complained a lot that the wording, including the capitalization of

17  "not" would be confusing and in their view thus discourage people

18  from using the form.  You know, I question whether that would

19  really make much difference to anybody, but the only evidence for

20  such confusion or concern by actual voters was the interviews with

21  the five paid responders.

22       Really only one of them after prompting seemed to think

23  that there was something particularly troubling about that

24  language.  And, again, it was only after prompting, after it was

25  pointed out to that person.  And, you know, what -- to me the

1  overall message of that analysis that Dr. Green did is that it's

2  really unlikely that anybody's even going to notice this

3  disclaimer provision unless somebody points it out to them, or

4  unless the person is really, you know -- is really concerned about

5  whether this came from the government or not.

6         So that certainly can't provide the plaintiffs with the

7  evidence necessary to establish that their position on the merits,

8  with respect to that provision at least, is entirely clear-cut, as

9  Justice Kavanaugh said.

10        And, again, any burden on First Amendment rights, if

11  there really is any, or on speech and association rights, is not

12  sufficient to outweigh the state's substantial interest in that

13  disclosure.  And, again, Mr. Germany repeatedly testified about

14  the many burdens on the system that had resulted from prior

15  situations where that application had been sent without that

16  disclaimer, including a lot of phone calls asking is this an

17  official government form.

18        So, obviously, the -- if you have a disclaimer there, if

19  somebody's concerned about whether it's an official government

20  form, they're probably going to see the disclaimer and know not to

21  make the phone call to the elections offices and, therefore, not

22  to sort of throw sand in the whole system, not that that's -- not

23  that it's deliberate on anybody's part, but that's the effect of

24  it.  When you have lots of people calling into elections offices

25  to ask questions like that, it just makes it difficult for them to

 1   do their jobs.

 2          As to the anti-duplication provision -- I'm sorry, does

 3   your Honor have any questions for me about the disclosure?

 4          THE COURT:  Y'all should know by now I am going to

 5   interrupt you when I have questions.  So, go ahead.

 6          MR. SCHAERR:  I apologize.

 7          So as to the anti-duplication provision, the plaintiffs

 8   have never claimed that they have a First Amendment right or even

 9   a free speech interest in sending applications to people who have

10   already requested them.  And based on that alone, that failure

11   alone, the anti-duplication provision is clearly just a regulation

12   of conduct; that is, sending the application to somebody who has

13   already requested one and it's not a regulation of speech.

14          And so for that reason, under Supreme Court decisions

15   like *City of Cleburne* and a host of others, that provision, the

16   anti-duplication provision is subject only to rational-basis

17   review.  And under that lenient standard the facts clearly

18   demonstrate that the challenged provisions are a rational means of

19   serving the legitimate ends of reducing voter confusion, voter

20   fraud and burdens on the state election system.

21          And, in fact, Mr. Lopach conceded, both here in court

22   and in his comments in the ProPublica article that we discussed

23   with him, that the reason his organizations -- I'm sorry, that the

24   reason his organizations include a notice to people not to submit

25   duplicate applications is that they recognize that it makes

 1  administrators lives easier.  And that just -- that just proves

 2  the rationality of that provision.

 3         But, again, even if you thought that provision also

 4  implicated the plaintiffs' speech rights, it easily passes muster

 5  under *Anderson-Burdick*.  The plaintiffs have not clearly shown

 6  that this provision imposes any significant burden on their

 7  speech.  And, indeed, as Mr. Germany noted, the relevant state

 8  election board's rule permits systems like Voting America's (sic)

 9  print-and-mail tool, which relies directly on information from the

10  voter himself.

11         And, moreover, Mr. Lopach admitted that his groups

12  are currently planning to send 1.1 Million applications around

13  August 26th, which is the beginning of the absentee ballot

14  application period.  And nobody thinks that the anti-duplication

15  provision will create any risk of liability for those groups doing

16  that.  As I mentioned, the only real concern is over the second

17  round of applications, which he said is just going to be sent to a

18  subset of people.

19         And Mr. Lopach, who admitted that he's not an expert in

20  printing, relied only on a single hearsay memo that didn't even

21  identify the one printer that the author checked with and

22  expressed concern that his organizations wouldn't have time within

23  the statute's five-day window to screen out recipients who have

24  already received an application.

25         But as we heard from Mr. Waters, that kind of screening

 1  is indeed feasible within the five-day statutory window and it's

 2  five business days, so a total of seven days in all, which means

 3  that these groups can easily send out applications any time they

 4  want during the election cycle.  And there may be some modest cost

 5  to pulling out mailers that have already been sent to people who

 6  have already submitted an application, but there certainly has not

 7  been a clear showing that that would impose any kind of a

 8  significant burden on the plaintiffs.  And, in any event, they

 9  haven't even attempted to show that any burden that they face is

10  sufficiently great to overcome the state's interest that we've

11  already discussed.

12         So, finally, the pre-filling provision, which, of

13  course --

14         THE COURT:  Let me stop you for one second while I just

15  review something you just said.  Bear with me, please.

16         (Pause in proceedings)

17         THE COURT:  Well, as far as the duplication issue, when

18  you're arguing *Anderson-Burdick* there, that's just your backup if

19  somehow I considered that speech?

20         MR. SCHAERR:  That's correct.

21         THE COURT:  All right.

22         And I don't know that I would possibly get there, but if

23  I did, I mean, I think that this is one part of the plaintiffs'

24  case that I was on -- if I were even asking that question, which I

25  don't know that I would be, it does seem that certainly there's

```
 1  some -- I'm not sure it was clearly defined for me what the cost
 2  would be, but certainly you can see that there's some cost to the
 3  plaintiffs here if they have to go in and pull out, you know,
 4  500,000 out of a million letters on day three of five, right?  I
 5  mean, I don't know that I've seen a scientific study that says
 6  that clearly, but that's -- at some point I can use my common
 7  sense, right?
 8            MR. SCHAERR:  Sure.  But they have the burden to
 9  establish what the cost is, right, because you can't -- again, if
10  you get to the point of applying Anderson-Burdick --
11            THE COURT:  I understand as far as degree of the burden,
12  I don't think I've heard it exactly definitively, but my only
13  point is just the way you say it there, you're not contesting that
14  there's no cost to the plaintiffs?
15            MR. SCHAERR:  No, we're not contending there's no cost
16  at all to complying with that provision, we're just saying it's
17  minimal by comparison to the burdens on the state and to the
18  damage to the state's interest.
19            THE COURT:  All right.  Thank you.
20            MR. SCHAERR:  Which is the balancing.
21            So with respect to the pre-filling provision, it's true
22  that the plaintiffs, other than VoteAmerica, claim to have a free
23  speech interest in sending forms that are pre-filled rather than
24  blank.  It's also hard to see that as a serious speech interest.
25  After all, the people they're speaking to presumably know their
```

1 | own names and addresses.  So it's hard to see how that particular

2 | speech is entitled to protection.

3 |        And, indeed, to the extent that they want to -- that

4 | they want to use a pre-filled ballot to establish a connection

5 | with people by letting them know that they know their names,

6 | they're able to put their names and addresses on the envelope, so

7 | they can accomplish that objective just by putting the names and

8 | addresses on the envelope.  So it's hard to see how pre-filling a

9 | ballot is really speech in any meaningful sense given that they're

10 | already putting the same information on the envelope.

11 |        And so let's look at the evidence that was presented on

12 | the question of whether that -- you know, of whether the

13 | pre-filling provision actually burdens the plaintiffs in any

14 | meaningful way.

15 |        Yes, Dr. Green claimed that there was some burden from

16 | that provision, but he relied upon the Hassle study in attempting

17 | to argue that pre-filled applications have a slightly greater

18 | likelihood of leading to voting.  But as Dr. Grimmer testified,

19 | the Hassell paper itself concluded that the difference was not

20 | statistically significant.  And so, you know, Dr. Green 's

21 | opinion, as Dr. Grimmer testified, isn't based on an accepted

22 | scientific methodology, and so it can't be relied upon by the

23 | plaintiffs to meet their burden on that point.

24 |        And similarly, Mr. Lopach offered the opinion that,

25 | quote:  Based on 20 years of experience, pre-filled ballots have a

1 higher response rate than non-pre-filled ballots.  But he later

2 admitted he's only been at his companies for a little over a year,

3 not the 20 years that he suggested.  You know, before that he was

4 working on Capitol Hill, which, you know, is not really the kind

5 of job where you deal with elections very much; you deal with the

6 consequences of elections but not the actual mechanics of

7 elections.

8           And, again, Dr. Grimmer endorsed Hassell's conclusion

9 that there is, in fact, no statistical difference between a

10 pre-filled ballot and a blank ballot in terms of voter behavior.

11          Again, the plaintiffs have not attempted to show that

12 the burden on them, if any, is substantial in relation to the

13 state's interest in avoiding errors in absentee ballot

14 applications and the consequent need to cancel those ballots on

15 Election Day and the consequent risk of long lines at polling

16 stations as a result.

17          So we think for all those reasons the plaintiffs have

18 not carried and cannot possibly carry their burden of establishing

19 any of the five propositions that they have to establish in order

20 to be able to get a preliminary injunction this close to the

21 general election.

22          We, therefore, think it would be legal error for any of

23 the number of reasons to grant a preliminary injunction, and so we

24 urge the Court to deny their motion.

25          THE COURT:  Thank you.

1          Ms. Lang.

2          MS. LANG:  Can I respond?  Thank you.

3          THE COURT:  Yes, let me have you respond, and I have a

4    question for you.

5          MS. LANG:  Thank you, your Honor.  I'll try to make this

6    brief.  And I really do thank the Court's indulgence in hearing

7    out the case in full even though it took longer than we had hoped.

8          I'll start with the last thing that Mr. Schaerr said,

9    which is that it would be legal error, and I just want to remind

10   the Court that preliminary injunctions are typically within the

11   discretion of the district court.  I don't think there's been any

12   citation of precedent that would suggest that there isn't

13   discretion here.

14         And, similarly, when it comes to the legal standard, it

15   is not the law that plaintiffs have to show that their case is

16   entirely clear-cut.  So while we can look at the *League of Women*

17   *Voters* case and *Merrill* for what they're worth, the *League of*

18   *Women Voters* case did not establish any panel precedent on -- did

19   not even adopt Justice Kavanaugh's balancing test.  And even if it

20   had, it would have been in a non-precedential decision.  And

21   Justice Kavanaugh's suggestion that the merits have to be entirely

22   clear-cut, as signed by one justice, and it would be an upheaval

23   of the law, right?  There is a preliminary injunction standard and

24   it cannot be changed by Justice Kavanaugh signing, you know, an

25   opinion on the shadow docket.

1          But I will -- that's not to say that we don't believe

2    that the merits are entirely clear-cut, I think they are, but it

3    would be inappropriate at this stage for us to up-end what is

4    longstanding precedent on what the preliminary injunction standard

5    is.

6          I do want to address a few other things about *Purcell*

7    and the balance of equities.  Despite Mr. Norris' suggestion, the

8    *League of Women Voters* does not create a four-month rule, it

9    specifically says it's not creating a bright-line rule.  And, once

10   again, the Court could not have been ruling on the disclaimer

11   issue one way or another when it found that that issue was moot.

12         And with respect to the delivery component, we've

13   explained that courts have always -- the case law on this is very

14   clear at this point that the courts treat the delivery of absentee

15   ballot applications and delivery of voter registration

16   applications somewhat differently than they treat the

17   distribution.

18         And the Fifth Circuit case that Mr. Norris cited is

19   *Voting For America v. Steen*.  They specifically held that the

20   distribution of voter registration applications is the speech of

21   the individuals who are distributing it and drew that line between

22   the collection of completed forms and the distribution.  And that

23   makes -- I don't think that that kind of slicing and dicing of

24   First Amendment activity is appropriate, but you could see how the

25   Fifth Circuit could get there by saying when you're distributing a

1  form, you are encouraging someone to participate.  When they've

2  filled out that form, they've already, you know, been convinced to

3  participate in some way.  I think that avoids -- ignores some of

4  the associational claims.

5          But in any event, we know that there is no claim about

6  delivery of absentee ballot applications here.  In fact, there's

7  an SB 202 restriction on collection of absentee ballot

8  applications and the plaintiffs haven't challenged it.

9          One thing that Mr. Norris did say on the merits that

10  I'll reference is that registration cases are pretty close, voter

11  registration cases.  I couldn't agree more.  And by looking at the

12  voter registration cases, you'll see that the merits are entirely

13  clear-cut, that there is a slew of voter registration cases that

14  have held that distribution of voter registration forms is

15  expressive activity and associational activity.

16          There are a number of cases that have held that absentee

17  ballot application distribution and helping voters manage the

18  absentee ballot application process is expressive activity.  There

19  is one case, *Liechtenstein*, that goes in the other direction, just

20  one.  It's on appeal right now.  And I would encourage your Honor

21  to read it and consider whether or not it's persuasive.  I would

22  submit to you that it is not.

23          The defendants -- on the undue delay point I think I've

24  said most of what I want to say, but I do want to clarify, the

25  number of months that we've waited has now grown to 17.  We filed

1  this preliminary injunction motion in April, so that's just not

2  true.

3          And the suggestion that we are lying in wait and

4  sandbagging is entirely unfounded.  I don't know why plaintiffs

5  would delay in order to create additional legal trouble for

6  themselves, you know.  What possible benefit we would get out of

7  lying in wait and sandbagging at this stage is unclear to me, and

8  that kind of accusation is entirely unfounded.

9          When it comes to the ripeness concern, I can tell you

10  that that is an important consideration for the plaintiffs.  And

11  although Mr. Norris said that the ripeness argument would be a bad

12  one, he joined the motion to dismiss from the defendants that held

13  that -- that was arguing that plaintiffs didn't have standing.

14          And I had a case where Mr. Norris was representing the

15  same intervenors in Minnesota in which he argued that nine months

16  ahead of an election seeking relief in a facial challenge was not

17  ripe on a preliminary injunction, so I faced precisely this

18  argument.  And in that case Mr. Norris argued that it was both

19  not ripe, but also when we argued later it would be a *Purcell*

20  problem, and he said, yes, that would preclude relief at all times

21  and that was okay.  But that's not the type of Goldie Locks'

22  problem that the courts typically entertain.

23          Another really important distinction I want to make here

24  is about voter confusion.  *Purcell* is about problems that arise

25  because of the change being late-breaking.  Mr. Germany has made

1  it clear there's not going to be any voter confusion or harm

2  related to the change being late-breaking.  The voter confusion

3  that they're alleging will result from an injunction here is what

4  they allege will result regardless of when you issue an

5  injunction.  They're just saying that they believe that the

6  absentee ballot application restrictions prevent voter confusion

7  and that enjoining them will cause voter confusion, but that

8  collapses the merits in *Purcell* here in a way that's not proper.

9        And Mr. Schaerr said that there would have to be new

10 trainings and guidance on the new law, but I, quite frankly, find

11 that confusing because Mr. Germany was quite clear that the

12 election officials have not been trained on the law as it

13 currently stands with respect to these restrictions.

14       And on irreparable harm and the balance of equities, I

15 think Mr. Schaerr's presentation misunderstands First Amendment

16 law.  While there is case law that says that it is irreparable

17 harm to the state to enjoin a duly enacted law, there's case law

18 that also says that if that duly enacted law is unconstitutional,

19 then there's no harm to the state and there is a great deal of

20 harm to the public.

21       On the runoff, by the time that this Court enters any

22 ruling on this preliminary injunction, I would imagine that the

23 timeline for receiving absentee ballot applications will have run,

24 if it hasn't already.  But there's no objection from the

25 plaintiffs in ensuring that any injunction from this Court does

1    not affect the runoffs, although I cannot imagine a circumstance

2    in which it would.

3         One thing that Mr. Norris said that I completely agree

4    with is that -- you heard a lot of testimony today about -- and

5    yesterday about whether or not pre-filling or sending multiple

6    waves of mail increases voter participation.  And it's important

7    to put in context why that matters, because Mr. Norris said that

8    doesn't really sound like a free speech issue, it's more of an

9    *Anderson-Burdick* issue.  And in some sense he's right.

10        We don't bear any burden in showing that voters are more

11   or less likely to participate based on pre-filling or multiple

12   waves.  That evidence is meant to demonstrate to the Court why it

13   matters to the plaintiffs, that they reasonably believe that this

14   is a way that they can be effective in their communications.  But

15   the First Amendment law is adamantly clear that it's plaintiffs

16   who get to choose those methods, that they get to choose the

17   method that they believe is the most effective.  So that's why we

18   put on that evidence, that they believe it's most effective, it's

19   very important to them.  But whether or not there's some sort of

20   statistical significant study is really beside the point.

21        As we've talked about a couple of times, defendants and

22   intervenors concede that the disclaimer implicates speech, but I

23   think that that concession is actually really important and

24   actually demonstrates that all of it is speech because if the

25   disclaimer that the plaintiffs are putting on the absentee ballot

1 application is their speech, then their distribution of the

2 absentee ballot application is their speech.  Why would it be the

3 case that then putting a disclaimer on an application is their

4 speech, but then pre-filling the application is not their speech?

5       So their concession I think reaches far beyond the

6 disclaimer component.  Their concession is required based on case

7 law about disclaimers, but it demonstrates why the slicing and

8 dicing the defendants are trying to do doesn't work.

9       The final thing I'll say is with respect to Dr. Green's

10 testimony.  I don't read Dr. Green's testimony the same way the

11 defendants do but it doesn't really matter because Dr. Green

12 isn't -- I think ultimately it's for your Honor to decide whether

13 or not the disclaimer is truthful.  But it's also not the ultimate

14 question, it's whether or not it's misleading, whether or not it's

15 proper, and whether or not it's supported by a compelling

16 government interest.  Even if it was technically truthful, which I

17 think you have to do a lot of gymnastics to get there, defendants

18 haven't provided you one reason why they need to make that

19 disclosure, especially given the second sentence about this not

20 being from a governmental entity.

21       And Mr. Schaerr's argument about the prominence, I

22 think, proves too much.  You know, one of the primary arguments

23 that Dr. Grimmer makes in his report that defendants are making,

24 oh, the voters probably won't even notice it.  But then what

25 purpose does it possibly serve, except for to put language in the

1  mouths of our clients that they vehemently object to.

2          I know you have questions for me, or at least one.

3          THE COURT:  Thank you.

4          I know you're pointing me towards the *Myer* case, but for

5  a moment if I'm not -- if I don't end up there, and instead I end

6  up at *Anderson-Burdick* where Mr. Schaerr's pointing me, and I'm

7  speaking just as to the disclaimer piece here, if that's the test

8  I apply, do you think you can get an injunction here?

9          MS. LANG:  Yes, your Honor.

10         THE COURT:  Okay.  Tell me how.

11         MS. LANG:  Absolutely.

12         You heard testimony from three witnesses about the harm

13 that will come of this kind of disclaimer.  Mr. Lopach and

14 Mr. McCarthy are in the business of voter engagement.  They are in

15 the business of communicating with voters.  They know that every

16 word matters.  Even Dr. Grimmer understands that when he says

17 that he studies kind of like what exactly the word choice of

18 politicians is.  When you're at a behavioral threshold, as we

19 heard, you know, the fancy language of the experts say, these

20 small things matter a great deal.

21         And plaintiffs are working at a small margin, right?

22 You know, they have to send out an enormous amount of mail in

23 order to get the engagement rate that they're looking for.  And I

24 think it's undeniable using your common sense that this disclaimer

25 for anyone who reads it is going to be dissuading.  It's got

1  this -- there's research on using negative language and not, not,

2  not, this is not official, right next to a disclaimer that says

3  warn us about voter fraud if you get multiple -- duplicate

4  applications, even though that's not illegal.

5         So there's no doubt that there's a serious burden here.

6  And it's one that the defendants concede is a First Amendment

7  burden, so you have to weigh that pretty heavily.  A free speech

8  burden, a free speech denial or compelled speech under any test is

9  going to be a meaningful burden.  And against that you have

10  nothing.  The state has provided no justification for this portion

11  of the disclaimer whatsoever, and really has provided almost no

12  reason for the disclaimer at all because the only evidence that's

13  in the record is that everybody was already disclosing who they

14  were.

15         And, you know, the exhibit that Mr. Germany attached

16  that was supposed to go to this issue, actually all of the

17  complaints plainly identified who the applications were coming

18  from.  Mr. Kidd's testimony says everybody was disclosing who they

19  were.

20         So there's not only no justification for that first

21  sentence, but there's no jurisdiction for any of it.  Maybe the

22  only thing is this is not a ballot, although as you heard today in

23  my colloquy with Mr. Germany, people make that kind of language

24  mistake, it doesn't mean that they're actually confused about what

25  the form is.  But even if they were, that's something that the

 1  state can just put on the form, it doesn't need to come from the

 2  third party.

 3          So under any balancing test, under any scrutiny at all

 4  beyond a rational basis the disclaimer fails.

 5          THE COURT:  All right.  Thank you.

 6          MR. SCHAERR:  Can I respond briefly, your Honor?

 7          THE COURT:  Yes.  I will give Ms. Lang the last word you

 8  won't be surprised to hear, but go ahead.

 9          MR. SCHAERR:  That's fine.

10          With respect to the disclosure provision, I think its

11  useful to compare this case with the *NIFLA* case, which the

12  plaintiffs have cited and was obviously a very important First

13  Amendment decision about compelled speech.  As the Court will

14  recall, that case involved an attempt by the California

15  Legislature to force prolife pregnancy centers to display in their

16  facilities information about where the women who came to these

17  centers could go if they wanted to get a free abortion, okay?

18          Now, the Supreme Court held that what was obvious, which

19  is that that government-required message was fundamentally

20  contrary, idealogically and theologically, to everything that

21  those pro-life centers stood for.  So the ultimate ruling was, of

22  course, California cannot force a pro-life pregnancy center to

23  provide a pro-abortion message in their own facilities, you know,

24  absent compelling reason or something.

25          Well, contrast that with what we're talking about here.

 1  We're talking about a little disclaimer that is not at all, at
 2  least the plaintiffs haven't claimed, that it's in any way
 3  contrary to the political message that they want to convey to
 4  voters about the value of voting by mail and that sort of thing
 5  and about the importance of voting.  There's nothing there that's
 6  idealogically abhorrent to them, at least nothing that they've
 7  claimed.  Their fear is that just the negative wording of it will
 8  somehow deter people from sending it in.  It's just, you know, I
 9  mean, capitalizing the word "not" three times, and they're asking
10  the Court essentially to edit the capitalization in a
11  government-mandated disclosure.

12          And so they haven't established any real meaningful
13  interference with the messages that they're attempting to provide
14  to voters.  And, in fact, when you listen to the testimony, what
15  was pretty clear to me was that the real objection to that
16  disclaimer was that they kind of liked the idea that without the
17  disclaimer this form looks like an official government form,
18  right?  It looks like it came from the government.  And,
19  therefore, that fact gave the form added credibility to the people
20  who would see it, because it really does look like it came from
21  the government and that either the organization that sent it was a
22  government agency or, you know -- or the government agency was
23  sending them, you know, a government-provided form.

24          In any event, they felt like that form without the
25  disclaimer would have added credibility, more credibility than it

1   would have if it just looked like it was just the group sending it

2   out.

3         So I think one way to look at what the legislature did

4   is -- you know, is they were saying, we don't want people to be

5   misled into thinking that this form really came from us, and that

6   that disclaimer was designed to do that.

7         So the -- compared to cases like *NIFLA*, you know, the

8   burden on speech rights is really -- from that disclosure is

9   really minimal, if it exists at all.  And by contrast the state

10  interest is quite powerful.

11        Again, Mr. Germany testified that the reason for that --

12  the reason the legislature adopted that provision is because it

13  was a way of avoiding a lot of phone calls and a lot of inquiries

14  about whether this is an official government form, whether I have

15  to fill it out in order to be able to vote and that sort of thing.

16  And those kinds of questions just tended to bog down the whole

17  election machinery of the state.  And so that's why that provision

18  is there, we think it's -- we think it's supported by a compelling

19  governmental interest if we have to show that, which, of course,

20  we don't under *Anderson-Burdick*.

21        So, you know, even as to that provision, we don't think

22  there's a basis for a preliminary injunction.

23        THE COURT:  Thank you.

24        Ms. Lang, your motion, your last word.

25        MS. LANG:  Thank you.

1          I don't think that description of *NIFLA* is quite

2    accurate, but your Honor can read the case for yourself.  But I

3    will say there was specific testimony from Mr. McCarthy and

4    Mr. Lopach that this disclaimer is directly contrary to their

5    political message that they are trying to engage voters, to build

6    trust with voters, to ensure that voters understand and are not

7    confused by their publications, and that they have every reason to

8    believe that the disclaimer as written runs contrary to that

9    mission.

10         And I can tell you from many conversations with my

11   clients that they believe ideologically that this is an anti-voter

12   and fundamentally confusing disclaimer and that their goal is to

13   alleviate confusion and educate voters and it runs contrary to

14   their core political mission.

15         Thank you.

16         THE COURT:  Thank you, Ms. Lang.

17         All right, counsel, thank you very much for the

18   extensive briefing and the presentation of evidence and the

19   argument on this motion.

20         That concludes this proceeding.  Thank you.

21         (PROCEEDINGS REPORTED WERE CONCLUDED 5:50 P.M.)

22                    _____

23

24

25

1                      C E R T I F I C A T E

2

3  UNITED STATES DISTRICT COURT

4  NORTHERN DISTRICT OF GEORGIA

5

6      I do hereby certify that the foregoing pages are a true and

7  correct transcript of the proceedings taken down by me in the case

8  aforesaid.

9      This the 22nd day of June, 2022.

10

11

12

13

14      _____

15                  PENNY PRITTY COUDRIET, RMR, CRR
                    OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25