UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VOTEAMERICA, et al., | |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, et al., | CIVIL ACTION NO. 1:21-CV-01390-JPB |
| Defendants, | |
| and | |
| REPUBLICAN NATIONAL COMMITTEE, et al., | |
| Intervenor Defendants. | |

## <u>ORDER</u>

Before the Court is VoteAmerica, Voter Participation Center ("VPC") and

Center for Voter Information's ("CVI") (collectively "Plaintiffs") Motion for

Preliminary Injunction ("Motion").  ECF No. 103.  After due consideration of the

briefs, accompanying evidence and oral argument, the Court finds as follows:

## I.   <u>BACKGROUND</u>

### A.   Procedural History

Plaintiffs challenge certain provisions of Georgia Senate Bill 202 ("SB 202") on First Amendment grounds.  SB 202 governs election-related processes and was signed into law by Governor Brian Kemp on March 25, 2021.

On April 7, 2021, Plaintiffs filed suit against Brad Raffensperger, in his official capacity as the Georgia Secretary of State; Rebecca Sullivan, in her official capacity as the Vice Chair of the State Election Board; and David Worley, Matthew Mashburn and Anh Le, in their official capacities as members of the State Election Board (collectively "State Defendants").[1]  The Court permitted the Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee and Georgia Republican Party, Inc. (collectively "Intervenor Defendants") to intervene in this action.

Both State Defendants and Intervenor Defendants moved to dismiss Plaintiffs' Complaint, but the Court denied the motions on December 9, 2021. Discovery opened thereafter and is ongoing.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), State Election Board members Edward Lindsay (who succeeded Rebecca Sullivan), Sara Ghazal (who succeeded David Worley) and Janice Johnston (who succeeded Anh Le) were automatically substituted as Defendants in this action upon their appointments to the State Election Board.

On April 26, 2022, Plaintiffs filed the instant Motion, asking the Court to enjoin the following three provisions of SB 202:  (1) the Prefilling Provision, (2) the Anti-Duplication Provision and (3) the Disclaimer Provision (collectively the "Ballot Application Provisions").  The challenged provisions pertain to the distribution of absentee ballot application forms by third parties.

Briefing on the Motion closed on June 6, 2022, and the parties presented oral argument and evidence on June 9 and 10, 2022.

### B.    The Parties

VoteAmerica is a nonpartisan, nonprofit organization whose mission is to "engage eligible voters throughout the country in the electoral process, with an emphasis on voting absentee."  ECF No. 103 at 7; *see also* McCarthy Decl. ¶ 2, ECF No. 103-4.  VoteAmerica provides online resources for voting, including an absentee ballot application tool.  The tool allows voters to submit their personal information online and receive a prefilled absentee ballot application form that they can complete and send to their local election office.  McCarthy Decl. ¶ 7, ECF No. 103-4.

VPC and CVI are also nonpartisan, nonprofit organizations.  Lopach Decl. ¶¶ 2-3, ECF No. 103-3.  Their mission is to "encourage the political participation of historically underrepresented groups" by providing members of those groups

with voter resources, including vote-by-mail information.  ECF No. 103 at 8;

Lopach Decl. ¶¶ 2-7, ECF No. 103-3.  Their core message is that "absentee voting

is reliable and trustworthy," ECF No. 103 at 13; *see also* McCarthy Decl. ¶¶ 2-5,

ECF No. 103-4; Lopach Decl. ¶¶ 7-10, ECF No. 103-3, and that "all eligible voters

should participate in the political process," ECF No. 103 at 18.  VPC and CVI

further their mission in part by sending absentee ballot application forms to

prospective voters.  ECF No. 103 at 18.

Prior to the enactment of SB 202, Plaintiffs could send prospective voters an

unlimited number of absentee voter application forms.  VPC and CVI prefilled the

absentee ballot applications with prospective voters' personal identification

information, such as name and address, before sending the applications to the

voters.  Tr. 43:21-44:3, June 9, 2022, ECF No. 129 (hereinafter "Tr. Day 1").  VPC

and CVI obtained this information from the state's voter registration records.  *Id.*

The package mailed to prospective voters included cover information that urged

the recipients to vote absentee.  ECF No. 103 at 19.  For example, cover letters

exclaimed that the recipients' votes matter and that voting by mail "is EASY."  *Id.*

VPC and CVI contend that, based on their experience and research, voters

are more likely to return the ballot application form when it is prefilled with their

personal information, and the applications are less likely to be rejected by election officials for scrivener errors, illegible handwriting, etc.  Tr. 65:8-66:1, Day 1.

### C.      The Ballot Application Provisions[2]

The Ballot Application Provisions changed Georgia law regarding the distribution of absentee ballot application forms by third parties.

### 1.    The Prefilling Provision

The Prefilling Provision provides that "[n]o person or entity . . . shall send any elector an absentee ballot application that is prefilled with the elector's required information."  O.C.G.A. § 21-2-381(a)(1)(C)(ii).  Failure to comply with this provision could result in misdemeanor or felony charges.  *See id.* §§ 21-2-598, 21-2-562(a).

VPC and CVI seek an injunction against the enforcement of the Prefilling Provision because they argue that it "restricts the content of [their] communications; interferes with their models for voter engagement, assistance, and association; and curtails the most effective means of conveying their speech."  ECF

---

[2] VoteAmerica's claims regarding the Prefilling and Anti-Duplication Provisions appear to be moot for the purposes of this Motion.  VoteAmerica initially believed that its operations would be impacted by the Prefilling and Anti-Duplication Provisions, but State Defendants confirmed during the preliminary injunction hearing that those provisions do not apply to VoteAmerica's absentee ballot application tool.  Tr. 38:25-39:15, June 10, 2022, ECF No. 130 (hereinafter "Tr. Day 2").

No. 103 at 14.  They explain that prospective voters are more likely to return ballot application forms that are prefilled, and those application forms are less likely to be rejected by election officials.  Therefore, the prohibition on sending prefilled forms diminishes the effectiveness of their work.[3]

## 2.    The Anti-Duplication Provision

The Anti-Duplication Provision states that "[a]ll persons or entities . . . that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff."  O.C.G.A. § 21-2-381(a)(3)(A).  According to VPC and CVI, this provision requires them to compare their mail distribution lists with the most recent information available from the Secretary of State's office and cull from their mailing lists the names of electors who have already requested, been issued or voted an absentee ballot.

---

[3] Plaintiffs' expert, Dr. Donald P. Green, testified that "the net effect of [the Prefilling Provision] is that groups such as the Plaintiffs must waste money sending *more* unfilled forms in an attempt to generate the same number of vote-by-mail requests."  ECF No. 103-5 at 9.  During the preliminary injunction hearing, State Defendants moved to exclude Dr. Green's opinions on the ground that they do not satisfy the Federal Rule of Evidence 702 standard for expert testimony.  Tr. 205:7-12, Day 1; *see also* Tr. 215:21-216:7, Day 2.  State Defendants' oral motion reiterated arguments that they mentioned in their brief.  Because the arguments regarding the validity of Dr. Green's opinions have not been adequately developed for the Court, the Court defers ruling on State Defendants' motion to exclude.  The Court considers Dr. Green's opinions only for the purposes of this Motion.

McCarthy Decl. ¶¶ 25-30, ECF No. 103-4; Lopach Decl. ¶¶ 51-60, ECF No. 103-3.

Failure to comply with the Anti-Duplication Provision may result in fines of up to

$100 "per duplicate absentee ballot application," O.C.G.A. § 21-2-381(a)(3)(B),

and criminal penalties, including confinement of up to twelve months, *see id.* §§

21-2-598, 21-2-603, 21-2-599.  However, the statute provides a safe harbor for any

entity that "relied upon information made available by the Secretary of State within

five business days prior to the date" the applications were mailed.  *Id.* § 21-2-

381(a)(3)(A).

VPC and CVI challenge the Anti-Duplication Provision because they

contend that it is "logistically impossible" to remove duplicates from the voter roll

and print and mail applications within the five-day safe harbor.  ECF No. 103 at

11; *see also* Lopach Decl. ¶¶ 33, 56, ECF No. 103-3.  They explain that during the

2020 election cycle, they mailed more than eleven million absentee ballot

applications in up to five waves, Tr. 38:4-10, Day 1, and preparation for each bulk

mailing typically required several weeks of lead time, Lopach Decl. ¶¶ 33, 56, ECF

No. 103-3.

VPC and CVI insist that it is equally untenable to cull duplicates after the

packages are printed because that task would entail manually searching up to two

million mailers stored on pallets to identify and remove packages addressed to

7

voters who have already requested, been issued or voted an absentee ballot.  Tr. 61:10-62:9, Day 1.  They underscore that this task is even more daunting because the mailers are arranged by zip code and postal carrier route, rather than in alphabetical order.[4]  *Id.* at 61:24-62:2.

Additionally, VPC and CVI assert that removing mailers from a completed print run will likely result in increased mailing rates because the rates are tiered according to the size of the batch, and certain bulk discounts may no longer apply. *Id.* at 62:10-14.

Given these logistical difficulties, VPC and CVI intend to send only one wave of mailers this election cycle as close as possible to August 22, 2022, which is the first day that voters may request a ballot application form.  *Id.* at 63:2-10. They argue that, even though voter communications are "less effective earlier in an election season" and sending "multiple waves increase[s] the effectiveness of their communications," ECF No. 103 at 12; *see also* Lopach Decl. ¶¶ 34, 54, ECF No. 103-3, this course of action is necessary to avoid sending duplicate forms in violation of the Anti-Duplication Provision and incurring the concomitant fines, Tr. 63:15-64:2, Day 1.

---

[4] State Defendants, however, presented evidence that some of these difficulties could potentially be avoided by using a different vendor.  *See, e.g.*, Tr. 138:5-12, Day 2.

In sum, VPC and CVI conclude that the Anti-Duplication Provision will "force [them] to drastically alter their civic engagement communications in Georgia in 2022."[5]  ECF No. 103 at 11.

### 3.    The Disclaimer Provision

The Disclaimer Provision mandates that "[a]ny application for an absentee ballot sent to any elector . . . shall utilize the form of the application made available by the Secretary of State and shall clearly and prominently disclose on the face of the form" the following language (the "Disclaimer"):

> This is NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot.  It is being distributed by [insert name and address of person, organization, or other entity distributing such document or material].

O.C.G.A. § 21-2-381(a)(1)(C)(ii).  Failure to include this Disclaimer may result in criminal penalties.  *Id.* §§ 21-2-598, 21-2-603, 21-2-599.

Plaintiffs challenge the Disclaimer Provision on two grounds.  First, they contend that the first statement of the Disclaimer ("[t]his is NOT an official government publication") is factually inaccurate because the ballot application form onto which Plaintiffs must affix the Disclaimer is indeed the official ballot

---

[5] Dr. Green opined that the Anti-Duplication Provision will "severely attenuate or altogether eliminate" Plaintiffs' absentee ballot application communications.  ECF No. 103-5 at 11.

application form promulgated by the Georgia Secretary of State.  In Plaintiffs' view, the form **is** an "official government publication," *see* Tr. 66:14-67:9, Day 1, and stating to the contrary is "wrong, false, misleading and a lie," *id.* at 143:18.[6]

Second, Plaintiffs assert that the third statement of the Disclaimer ("this is NOT a ballot") is confusing, and the Disclaimer's overall successive use of the capitalized word "NOT" portrays Plaintiffs as an "untrusted source." *Id.* at 66:17. Plaintiffs reason that the language will discourage recipients from using the application forms, *id.* at 145:1-21, or from voting at all, *id.* at 66:14-67:9. Plaintiffs therefore conclude that the Disclaimer Provision renders their efforts less effective and detracts from their mission.[7] *See id.* at 66:14-67:9.

---

[6] Contrary to Plaintiffs themselves, their expert testified that the portion of the Disclaimer stating that the application form is not an "official government publication" is "[t]rue." Tr. 215:23-216:51, Day 1. Dr. Green explained that the form Plaintiffs mail to prospective voters is "identical" to the official publication but that it is not the actual publication. *Id.* at 216:1.

[7] Dr. Green opined that the Disclaimer would "likely . . . create confusion among voters" and make prospective voters "reluctant to fill out an otherwise innocuous form." ECF No. 103-5 at 6, 7. He based his opinion in part on a qualitative semi-structured interview of five potential voters in Georgia and on his "decades" of experience "studying public opinion[,] . . . conducting randomized trials and reading about randomized trials involving things like voter turnout and absentee voting or registration." Tr. 228:10-16, Day 1. While Dr. Green concedes that the type of qualitative study he employed to analyze the Disclaimer Provision cannot establish what proportion of absentee ballot applications would not be returned as a result of the Disclaimer, he emphasized that the study "clearly indicates" that the Disclaimer "can cause hesitancy to complete an otherwise acceptable form." ECF No. 103-5 at 8.

During oral argument, Plaintiffs clarified that at this stage of the litigation, they wish to focus on the first and third statements in the Disclaimer: "[t]his is NOT an official government publication" and "this is NOT a ballot." *Id.* at 219:1-221:8, Day 2. They maintain that the Court may enjoin the enforcement of these statements, leaving the remainder of the Disclaimer intact.

### D. State Defendants' Justifications for the Challenged Provisions

State Defendants argue that the Ballot Application Provisions are justified because they were enacted in response to the numerous complaints State Defendants received from the public regarding absentee ballot applications sent by third-party organizations. *See* ECF No. 113 at 8. Some complaints concerned (i) applications prefilled with incorrect voter information; (ii) receipt of duplicate application forms; (iii) confusion over whether the applications were ballots or whether recipients of multiple applications could cast more than one vote; (iv) the identity of the sender of the application forms; and (v) whether recipients were required to return the forms. *Id.* at 8-10. State and county election officials spent a significant amount of time fielding calls from the public regarding these concerns. Tr. 43:20-44:1, Day 2.

Apart from the specific complaints, some recipients completed and returned the ballot application forms even though they did not intend to vote absentee. ECF

No. 113 at 9.  This caused election officials to divert finite resources to process redundant applications or to cancel them on election day when voters who had inadvertently submitted an absentee ballot application form arrived to vote in person.  *Id.*

State Defendants assert that the Ballot Application Provisions were enacted to address these issues:  the Prefilling Provision was designed to address the issue of incorrectly prefilled applications; the Anti-Duplication Provision was designed to minimize voter confusion and the administrative disruption caused by duplicate absentee ballot application forms sent by third parties; and the Disclaimer Provision was designed to address overall voter confusion and the resulting burdens on election officials.  *Id.* at 10-11.

With respect to the first statement of the Disclaimer ("[t]his is NOT an official government publication"), State Defendants maintain that they intended to communicate to application recipients that they are not required to complete and return the forms they receive.  Tr. 42:7-43:7, Day 2.  State Defendants assert that the third statement of the Disclaimer ("this is NOT a ballot") aimed to address the common misimpression that the form is a ballot.  *See id.* at 44:5-45:1.

## II.   <u>DISCUSSION</u>

### A.   Preliminary Injunction Standard

A plaintiff seeking preliminary injunctive relief must show the following:

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Sofarelli v. Pinellas Cnty.*, 931 F.2d 718, 723-24 (11th Cir. 1991) (quoting *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983)).  "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).  Granting a preliminary injunction is thus the exception rather than the rule.  *See id.*

### 1.   Likelihood of Success on the Merits

A plaintiff seeking preliminary injunctive relief must show a substantial likelihood that he will ultimately prevail on the merits of his claim.  *Sofarelli*, 931 F.2d at 723.  This factor is generally considered the most important of the four factors, *see Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986), and

failure to satisfy this burden—as with any of the other prerequisites—is fatal to the claim, *see Siegel*, 234 F.3d at 1176.

Because Plaintiffs contend that the Ballot Application Provisions infringe on their freedom of speech and expression, the Court begins its analysis of this prong with a general overview of the available First Amendment protections.

The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances."[8]  U.S. Const. amend. I.  As reflected in the text of the amendment, the First Amendment guarantees not only freedom of speech, *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988), but also "the right of citizens to associate . . . for the advancement of common political goals and ideas," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997).

First Amendment protection of speech "includes both the right to speak freely and the right to refrain from speaking at all."  *McClendon v. Long*, 22 F.4th 1330, 1336 (11th Cir. 2022) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).  Protection of associational rights turns on "collective effort" with others

---

[8] The First Amendment was made applicable to the states through the Fourteenth Amendment.  *See Meyer v. Grant*, 486 U.S. 414, 420 (1988).

"in pursuit of a wide variety of . . . ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

Importantly, First Amendment protections exist against the reality that "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons*, 520 U.S. at 358. When election regulations are in tension with constitutional rights, the United States Supreme Court requires lower courts to balance the character and magnitude of the asserted injury against the state's justifications for imposing the election rule. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). This approach is commonly referred to as the "*Anderson-Burdick*" framework, named after *Anderson* and *Burdick v. Takushi*, 504 U.S. 428 (1992), where the Supreme Court reiterated and refined the standard it first enunciated in *Anderson*.

The *Anderson-Burdick* framework is, however, inapplicable where the election statute directly regulates core political speech and does not merely "control the mechanics of the electoral process." *McIntyre v. Ohio Elections*

*Comm'n*, 514 U.S. 334, 345 (1995).  If the regulation at issue directly controls speech, courts must employ whatever level of scrutiny corresponds to the category of speech.  *See id.* at 345-46.

In accordance with the foregoing principles, the decision process this Court must use to evaluate Plaintiffs' claims requires the Court to consider (i) what category of speech is at issue here;[9] (ii) what protections are available for the category of speech and what level of scrutiny or analytical framework applies; (iii) whether the Ballot Application Provisions implicate that category of speech; (iv) whether the *Anderson-Burdick* framework or some other level of scrutiny is appropriate; and (v) whether the provisions ultimately pass muster under the applicable framework or level of scrutiny.  Therefore, the Court finds it helpful to structure its analysis around these questions.

### a.     What Category of Speech Is at Issue; What Protections Are Available; and Whether the Ballot Application Provisions Implicate That Category of Speech

The First Amendment protects several categories of speech and expression, and the Supreme Court's decisions in this area have created a "rough hierarchy" of available protections.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992).  "Core

---

[9] The Court's reference to "speech" generally refers to First Amendment speech and association rights.

political speech occupies the highest, most protected position" in the hierarchy, while obscenity and fighting words receive the least protection. *See id.* Other categories of speech rank somewhere between these poles. *See id.*

The Court's analysis will address only the following categories of speech, which are relevant to the arguments raised in this case: core political speech, expressive conduct, associational rights and compelled speech.

### i.    Core Political Speech

The Supreme Court has found that "interactive communication concerning political change . . . is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422 (1988). In *Meyer*, the Supreme Court was asked to decide whether the circulation of a petition constituted core political speech and therefore was afforded the highest level of protection under the First Amendment. *Id.* at 416. The Court reasoned that circulating a petition necessarily "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.* at 421. This, "in almost every case[, would] involve an explanation of the nature of the proposal and why its advocates support it." *Id.* As such, a restriction limiting who could circulate petitions would impede political expression and limit the quantum of speech available on the topic of the petition. *Id.* at 422-23. The Supreme Court therefore determined that the statute restricted

17

core political speech and "trenche[d] upon an area in which the importance of First Amendment protections is 'at its zenith.'"  *Id.* at 425.  The Court emphasized that the state's burden to justify the law in that circumstance was "well-nigh insurmountable."  *Id.*

In short, the Supreme Court's First Amendment jurisprudence defines core political speech as the discussion of public issues and the exchange of ideas for bringing about political and social change and reserves the highest level of protection for such speech.  *See McIntyre*, 514 U.S. at 346.  Thus, a law that burdens core political speech is subject to strict scrutiny and will be upheld "only if it is narrowly tailored to serve an overriding state interest."  *Id.* at 347.

Here, Plaintiffs argue that their application distribution program constitutes core political speech because the application forms are "characteristically intertwined" with the pro-absentee voting message in the accompanying cover information.  ECF No. 103 at 18 (quoting *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)).  Plaintiffs conclude that the Ballot Application Provisions directly regulate their core political speech by restricting to whom and the manner in which they can distribute ballot application packages.

State Defendants counter that Plaintiffs' advocacy occurs only through the cover information included with the ballot application forms, not through the ballot

applications themselves.  ECF No. 113 at 13.  State Defendants contend that the Ballot Application Provisions do not regulate Plaintiffs' cover information and concern only whether the forms can be prefilled with voters' personal information, how the voter roll may be used to identify potential recipients and what information must be included in the required Disclaimer affixed to the form.  *See id.* at 14-15.

Plaintiffs' argument that their application distribution program constitutes core political speech does not square with the line of cases that the Supreme Court has ruled implicates political speech.  For example, both *Meyer* and *Buckley v. American Law Constitution Foundation, Inc.*, 525 U.S. 182 (1999), which Plaintiffs cite, involved circulating petitions expressing a desire for political change.  The Supreme Court concluded that the circumstances in *Meyer* involved core political speech because the act of circulating a petition necessarily requires a discussion of the nature of the proposal, the merits of the proposed change and why advocates support it.  *See* 486 U.S. at 421; *see also Buckley*, 525 U.S. at 199 (noting the substantial nature of communications between petition circulators and their targets).

In contrast, distributing forms prefilled with a prospective voter's own personal information and the ability to send an essentially unlimited number of

forms to a prospective voter do not require the type of interactive debate and advocacy that the Supreme Court found constituted core political speech in *Meyer*.

Moreover, Plaintiffs are not prohibited from engaging in any of the persuasive speech regarding absentee voting that is reflected in their cover communication.  To the contrary, they can engage in those communications as often as—and in whatever form—that they desire.

As State Defendants point out, the Prefilling and Anti-Duplication Provisions simply prohibit Plaintiffs from inserting personal identification information on applications and from sending applications to prospective voters who have already requested or received one.  These actions relate to the administrative mechanisms through which eligible voters request and receive an absentee ballot.  The actions do not embody core political speech.

Plaintiffs' reliance on *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), is similarly misplaced.  The ordinance in that case prohibited charitable organizations from soliciting donations if they did not use at least seventy-five percent of the donations "'directly for the charitable purpose of the organization.'"  *Id.* at 622 (citation omitted).  The Supreme Court's finding that the ordinance restricted core political speech was based in part on the "reality" that on-the-street or door-to-door solicitations are "characteristically

intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views."  *Id.* at 632.

*Schaumburg* is different from the circumstances here because the cover information and application forms that Plaintiffs send are not inextricably linked or "characteristically intertwined."  Each can exist and be sent without the other. Since the Ballot Application Provisions do not restrict Plaintiffs from sending their cover information, they are not restricted from sharing their pro-absentee voting message.

For these reasons, the Court finds that Plaintiffs have not shown that the Ballot Application Provisions restrict core political speech.

### ii.      **Expressive Conduct**

Although the First Amendment, on its face, forbids only the abridgment of "speech," the Supreme Court has recognized that "conduct may be 'sufficiently imbued with elements of communication to fall within the scope'" of First Amendment protection.  *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)).  To make this determination, the Supreme Court looks at whether the plaintiff intended "'to convey a particularized message'" ***and*** whether it is likely that "'the message would be understood by those who viewed it.'"  *Id.* (quoting *Spence*, 418 U.S. at 410-11).

21

The Supreme Court has classified a range of activities as expressive conduct. *See, e.g.*, *Spence*, 418 U.S. at 409 (superimposing a peace sign on a flag to convey the message that America stood for peace); *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966) (engaging in a sit-in demonstration to protest segregation); *Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (contributing funds to a political campaign). While "[i]t is possible to find some kernel of expression in almost every activity a person undertakes," *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989), Supreme Court precedent is clear that First Amendment protection extends only to conduct that is "***inherently*** expressive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) (emphasis added).

Indeed, the Supreme Court has rejected the view that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). The Court explained in *Rumsfeld* that "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Rumsfeld*, 547 U.S. at 66.

*Rumsfeld* involved a challenge to a statute that penalized schools for refusing to allow United States military recruiters to interview on their campuses due to the

military's policy on homosexuals serving in the military.  *Id.* at 51.  The Supreme

Court found that the schools' prohibition of military recruiters was not inherently

expressive because an observer would not know whether the recruiters were

interviewing off campus due to personal preference, lack of space or some other

innocuous reason.  *Id.* at 66.  The Court pointed out that the necessity of

"explanatory speech" to elucidate why military recruiters were absent from campus

was "strong evidence" that the speech was not "so inherently expressive" as to

qualify for First Amendment protection.  *Id.*  In other words, the "expressive

component of [the] . . . school's actions [was] not created by the conduct itself but

by the speech that accompanie[d] it."  *Id.*

The *Rumsfeld* opinion relied in significant part on the analysis in *O'Brien*,

where the Supreme Court recognized that some forms of symbolic speech warrant

First Amendment protection.  *See* 391 U.S. at 376.  In *O'Brien*, the plaintiff burned

his Selective Service registration certificate on the steps of a courthouse to

communicate his antiwar beliefs.  *See id.* at 369.  Although the Supreme Court did

not decide whether the plaintiff's conduct constituted expressive conduct protected

by the First Amendment, it dismissed the argument that conduct is necessarily

protected if the actor intends to express an idea.  *See id.* at 376.

In short, conduct that lacks inherent expression is not transformed into protected First Amendment speech merely because it is combined with another activity that does involve protected speech.  When conduct is deemed sufficiently expressive and thereby deserving of First Amendment protection, the state's asserted interest in regulating the conduct is subject to "the most exacting scrutiny."  *Johnson*, 491 U.S. at 412 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)).

Here, Plaintiffs maintain that mailing absentee voter application packages is inherently expressive conduct protected by the First Amendment.  ECF No. 103 at 19.  They argue that this conduct personifies political advocacy of a controversial viewpoint that "absentee voting is safe, accessible, and beneficial."  *See id.* at 19.

While State Defendants concede that Plaintiffs' cover information may fairly be described as political advocacy, they disagree that the distribution of ballot application forms is expressive conduct.  *See* ECF No. 113 at 15.

Intervenor Defendants additionally contend that the conduct of sending an application form is not expressive because it is not likely that the recipient will understand Plaintiffs' message.  ECF No. 114 at 12.  Intervenor Defendants insist that most recipients will view the application package as any other mass mailing that arrives in their mailboxes or possibly perceive other messages, including a

conclusion that they are being targeted because they may be more likely to vote for a given candidate.  *See id.*

As an initial matter, the Court finds that Plaintiffs' conduct in distributing applications is clearly distinguishable from conduct such as burning a flag and participating in a demonstration sit-in, which the Supreme Court has explicitly found to embody expressive conduct.

Further, this Court finds that combining speech (in the cover information) with the conduct of sending an application form, as Plaintiffs do here, is not sufficient to transform the act of sending the application forms into protected speech.  Plaintiffs' pro-absentee voting message is not necessarily intrinsic to the act of sending prospective voters an application form.  As Intervenor Defendants suggest, without the accompanying cover information, the provision of an application form could mean a number of things to a recipient.  For example, some voters likely perceived the state's decision to send absentee ballot applications to all eligible voters during the 2020 primary elections, Tr. 63:14-16, Day 2, as merely a convenience offered to citizens in light of the pandemic.  This Court cannot say that the state's conduct in sending those forms would necessarily have been understood as communicating a pro-absentee voting message.

As in *Rumsfeld*, the expressive component of sending application packages in this case is not created by the conduct itself but by the included cover information encouraging the recipient to vote. The necessity of the cover message is "strong evidence" that the conduct of sending an application form is not so inherently expressive as to qualify for First Amendment protection.

Based on the foregoing analysis, the Court finds that Plaintiffs have not shown that the act of sending ballot application packages is expressive conduct subject to First Amendment protections.[10]

### iii.   Associational Rights

The First Amendment protects the "right to associate with others" for a variety of purposes. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Such protection exists because the "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958); *see also NAACP v. Button*, 371 U.S. 415, 430 (1963) (recognizing "the kind of cooperative,

---

[10] Implicit in this Court's finding that the Prefilling and Anti-Duplication Provisions do not restrict speech or protected conduct is the conclusion that they are likewise not content-based restrictions of speech. The Court therefore does not address Plaintiffs' argument in this regard.

organizational activity" that arises from an association formed "'for the advancement of beliefs and ideas'" (quoting *Patterson*, 357 U.S. at 460)).

Opinions in cases like *Roberts*, *Patterson* and *Button* demonstrate that the cornerstone of associational rights is cooperative advocacy. The Supreme Court has therefore refused to recognize associational rights where the parties were strangers to one another and were not members of a particular organization. *See, e.g.*, *City of Dallas v. Stanglin*, 490 U.S. 19, 24-25 (1989) (finding that the hundreds of teenagers who patronized a dance hall on a certain night did not have expressive associational rights because they were not members of an organization; they did not engage in the type of collective effort that typically supports associational rights; and most were just strangers who were willing to pay a fee for admission).

The right to associate for expressive purposes is also not absolute. "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623; *see also Buckley*, 424 U.S. at 25 (stating that "significant interference" with associational rights may be constitutional "if the [s]tate demonstrates a sufficiently important interest and employs means closely drawn to

27

avoid unnecessary abridgment of associational freedoms" (quoting *Cousins v. Wigoda*, 419 U.S. 477, 488 (1975))).

The record here shows that Plaintiffs send application forms to strangers whose information they obtain from the state's voter roll.  While it is undisputed that Plaintiffs' overall program involves advocacy work, there is no evidence of the type of two-way engagement that characterizes cases like *Button*.

The circumstances here are more akin to those in *Stanglin*, where the Supreme Court declined to find associational rights for strangers who merely patronized a dance club and were not engaged in any type of joint advocacy.  490 U.S. at 24-25.

Accordingly, the Court finds that Plaintiffs have not shown that the Ballot Application Provisions restrict their associational rights.

### iv.   Compelled Speech[11]

First Amendment protection of speech encompasses "the decision of both what to say and what ***not*** to say."  *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988).  For example, in *McClendon v. Long*, a Georgia sheriff

---

[11] It is clear that the Prefilling and Anti-Duplication Provisions do not compel Plaintiffs to convey any message, and Plaintiffs do not argue that those provisions compel speech.  Therefore, the Court's compelled speech analysis applies only to the Disclaimer Provision.

placed signs in the front yards of registered sex offenders (without their consent and despite their objections) warning the public not to trick or treat at the home. 22 F.4th 1330, 1333-34 (11th Cir. 2022). Because the sheriff used private property to disseminate "his own ideological message," the Eleventh Circuit Court of Appeals found that the signs were a "classic example of compelled government speech" prohibited by the First Amendment. *Id.* at 1337.

Similarly, in *National Institute of Family and Life Advocates v. Becerra* (hereinafter "*NILFA*"), the Supreme Court found that the State of California improperly compelled a crisis pregnancy center to speak by requiring it to notify patients of alternate reproductive services such as abortion, even though such services were antithetical to its mission. 138 S. Ct. 2361, 2371 (2018).

In these cases, the courts focused in part on the fact that the compelled messages altered the content of the plaintiffs' speech and forced them to convey a message that they would not otherwise communicate. Therefore, the statutes were subject to heightened scrutiny. *See, e.g.*, *McClendon*, 22 F.4th at 1338 (concluding that the compelled signs at issue were subject to strict scrutiny review and would be constitutional only if they represented a "narrowly tailored means of serving a compelling state interest").

However, the state's burden of proof appears to be lower in cases involving compelled disclaimers.  In the campaign finance context, the Supreme Court has stated that disclaimer requirements are subject to only exacting scrutiny review. *See Citizens United v. FEC*, 558 U.S. 310, 366 (2010); *see also Riley*, 487 U.S. at 798 (finding that a state statute compelling disclosure of information was subject to "exacting First Amendment scrutiny").  Thus, a disclaimer "may burden the ability to speak" so long as it has a "substantial relation" to a "sufficiently important" government interest.  *Citizens United*, 558 U.S. at 366-67 (quoting *Buckley*, 424 U.S. at 64, 66)).  The level of scrutiny is lower because a "disclosure is a less restrictive alternative to more comprehensive regulations of speech."  *Id.* at 369.

In *Americans for Prosperity Foundation v. Bonta*, the Supreme Court recently confirmed that the exacting scrutiny standard is applicable in election-related cases outside the campaign finance disclosure context.  141 S. Ct. 2373, 2383 (2021).  The Court clarified that under this standard, a "substantial relation" between the statute and the government's interest "is necessary but not sufficient." *Id.* at 2384.  The challenged rule must also "be narrowly tailored to the interest it promotes, even if [the rule] is not the least restrictive means of achieving that end." *Id.*

30

Further, a perfect fit between the state's interest and the regulation is not required.  *Id.*  Rather, a court must look for reasonableness and scope "'in proportion'" to the interest served.  *Id.* (quoting *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014)).

In this case, Plaintiffs contend that the Disclaimer Provision violates their First Amendment rights by compelling them to convey a misleading message to prospective voters.  ECF No. 103 at 33.  They also assert that the Disclaimer is an improper content-based regulation of speech.  *Id.*  As such, they argue that the Disclaimer Provision should be subject to strict scrutiny.

State and Intervenor Defendants agree that the Disclaimer Provision impacts Plaintiffs' First Amendment speech rights in some way, but they dispute the significance of the impact.  State Defendants argue that the Disclaimer Provision does not require Plaintiffs to change their message or to convey the government's own message.  Therefore, State Defendants analogize the Disclaimer Provision to those found in campaign disclosure cases, wherein the Supreme Court has applied only exacting scrutiny review.

Intervenor Defendants, on the other hand, argue that the Disclaimer Provision only requires Plaintiffs to include specified language on the ballot application forms they distribute.  Intervenor Defendants therefore conclude that

the Disclaimer Provision is an election regulation, not a regulation of speech, and the *Anderson-Burdick* framework should apply.

The Court agrees that the manner of speech compelled in this case (factual information regarding the nature of the application form) is quite different from the manner of speech compelled in cases like *McClendon* (a sheriff's yard sign warning the public not to trick or treat at a registered sex offender's home) and *NILFA* (a statute requiring a crisis pregnancy center to disclose the availability of alternate reproductive care, including abortions). In *McClendon* and *NILFA*, the plaintiffs were required to convey the government's own message, which directly altered whatever message the plaintiffs communicated or would have refrained from communicating. It therefore makes sense that the Supreme Court employed a heightened level of scrutiny in those cases.

In this case, pretermitting Plaintiffs' contention that the first statement of the Disclaimer is factually incorrect, the Disclaimer says nothing (whether complementary or contradictory) regarding the pro-absentee voting message Plaintiffs wish to convey. It simply presents information designed to reduce voter confusion regarding absentee ballot applications provided by third parties and to relieve election officials of the administrative burdens resulting from such confusion.

For these reasons, the Court finds that the Disclaimer constitutes compelled speech but is more analogous to the disclaimers in *Citizens United* and *Americans for Prosperity*. Therefore, it would be subject to exacting scrutiny if that type of analysis were applicable here.

The Court will next address whether the *Anderson-Burdick* framework or the First Amendment levels of scrutiny apply here.

### b.   Whether the *Anderson-Burdick* Framework Is Appropriate Here

The Supreme Court has recognized that "'there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). But election schemes "inevitably affect[]" First Amendment rights. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). The Supreme Court therefore developed the *Anderson-Burdick* framework as a balancing test to manage these competing interests and rights. *See Burdick*, 504 U.S. at 433. It explained that subjecting every voting regulation to strict scrutiny "would tie the hands of [s]tates seeking to assure that elections are operated equitably and efficiently." *Id.*

The *Anderson-Burdick* framework requires courts to carefully weigh the relative interests of the state in imposing election-related regulations against the

33

alleged constitutional injury and the extent to which it is necessary to burden the plaintiff's rights. *See Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434. Courts routinely employ the *Anderson-Burdick* framework to decide First Amendment challenges to election laws. *See, e.g.*, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 213-15 (1986) (employing the *Anderson-Burdick* framework to decide a freedom of association challenge to an election law governing voter access to a primary election); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (relying on the *Anderson-Burdick* framework to decide a challenge to a rule governing nomination of candidates); *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014) (reiterating, in the context of a ballot access case, that First Amendment challenges to a state's election laws are governed by the *Anderson-Burdick* framework); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1289 (N.D. Ga. 2020) (stating, in reference to a ballot application notification statute, that courts apply the *Anderson-Burdick* framework "[w]hen considering the constitutionality of an election law").

The Supreme Court has, however, declined to apply the *Anderson-Burdick* framework in cases that concern "pure speech" as opposed to the "mechanics of the electoral process." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). In *McIntyre*, the Supreme Court concluded that the exacting scrutiny level

of review applied to the plaintiff's challenge of a statute that prohibited the anonymous distribution of documents designed to influence voters in an election. *Id.* at 347. The Court reasoned that the *Anderson-Burdick* framework did not apply because the ordinance did not merely impact speech incident to the ordinance's regulation of election procedure. *Id.* at 345-46. It directly regulated "the essence of First Amendment expression." *Id.* at 347. Therefore, the ordinance fell outside the scope of the *Anderson-Burdick* framework.

It is important to note that no bright line separates an election regulation that incidentally burdens speech and one that directly regulates speech. Courts must conduct a case-specific inquiry to determine whether the facts support an *Anderson-Burdick* analysis or are more appropriate for a traditional First Amendment scrutiny test.

Given the Court's conclusion above that Plaintiffs have not shown that the Prefilling and Anti-Duplication Provisions restrict speech, the Court finds that those provisions are more appropriately categorized as rules governing the "mechanics of the electoral process." *McIntyre*, 514 U.S. at 345. As such, the Court will employ the *Anderson-Burdick* framework to determine Plaintiffs' challenge to the Prefilling and Anti-Duplication Provisions.

The Court likewise finds that the *Anderson-Burdick* framework applies to Plaintiffs' challenge to the Disclaimer Provision.  Although, as the Court found above, the Disclaimer Provision burdens Plaintiffs' First Amendment rights, the Disclaimer Provision is not a direct regulation of speech similar to the ordinance in *McIntyre*.  It does not prohibit Plaintiffs from conveying their message and merely establishes what information Plaintiffs must affix to application forms they send to third parties.  Accordingly, the Disclaimer Provision can more appropriately be described as a regulation that governs the mechanics of an election process.

The Court now considers whether the Ballot Application Provisions are constitutional under the *Anderson-Burdick* analysis.

### c.     Evaluation of the Ballot Application Provisions Under the *Anderson-Burdick* Framework

The *Anderson-Burdick* framework requires courts to:  (i) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (ii) "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; (iii) "determine the legitimacy and strength of each of those interests"; and (iv) "consider the extent to which those interests make it necessary to burden the plaintiff's rights."  *Anderson*, 460 U.S. at 789.  The analysis is not a "litmus-paper test" and instead requires a "'flexible'" approach.

*Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (quoting *Anderson*, 460 U.S. at 789). Any "[d]ecision . . . is very much a matter of degree, very much a matter of considering the facts and circumstances behind the law, the interests which the [s]tate claims to be protecting, and the interests of those who are disadvantaged by the classification." *Storer*, 415 U.S. at 730 (internal citations and punctuation omitted). Ultimately, "there is 'no substitute for the hard judgments that must be made.'" *Anderson*, 460 U.S. at 789-90 (quoting *Storer*, 415 U.S. at 730).

If a court finds that a plaintiff's rights "are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when [the law] imposes only reasonable, nondiscriminatory restrictions . . . , the [s]tate's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (internal citations and punctuation omitted); *see also Common Cause*, 554 F.3d at 1354-55 (stating that where the burden is slight, "the state interest need not be 'compelling . . . to tip the constitutional scales in its direction'" (alteration in original) (quoting *Burdick*, 504 U.S. at 439)). Thus, the balancing test ranges from strict scrutiny to rational basis analysis, depending on the circumstances of the case. *See Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir. 1992).

In any event, even a slight burden "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).  Lastly, "a [s]tate may not choose means that unnecessarily restrict constitutionally protected liberty." *Anderson*, 460 U.S. at 806 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973)).

### i.    The Prefilling and Anti-Duplication Provisions

Since the Court has already found that the Prefilling and Anti-Duplication Provisions do not implicate Plaintiffs' First Amendment rights, it follows that the magnitude of the alleged injury is not severe.  As a result, State Defendants have to show only that the provisions are reasonable and supported by important regulatory interests.

The record shows that the government designed the Prefilling Provision to address the concerns and confusion that arise when voters receive prefilled applications with incorrect identification information.

The Anti-Duplication Provision was designed to address the confusion and administrative burden that occurs when voters receive multiple ballot applications. Rather than altogether prohibit the distribution of application forms by third parties, as some states have done, the Georgia legislature struck a balance.  It

required third parties to consult the state voter roll and refrain from sending duplicate applications to voters who have already requested, received or voted an absentee ballot.  The legislature also provided a safe harbor for entities who relied on information made available by the Secretary of State within five business days prior to the date the applications were mailed.

To be sure, avoiding voter confusion and administering effective elections are important regulatory interests.  *See Storer*, 415 U.S. at 730 (recognizing the importance of fair, honest and orderly elections).  Thus, State Defendants have demonstrated sufficient reasons for enacting the Prefilling and Anti-Duplication Provisions.

Moreover, the Prefilling and Anti-Duplication Provisions appear to be reasonable and nondiscriminatory methods of achieving the state's goals.  This is especially true where State Defendants elected not to impose an outright ban on third-parties' distribution of absentee ballot applications and instead chose to regulate only the specific parts of the process that are problematic.

In all, it is not the role of the courts to dictate election policy to legislatures. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).  Elected officials should be permitted leeway to address potential deficiencies in the electoral process, so long as the response is reasonable and does not impose a

severe burden on constitutionally protected rights.  *See id.*

Based on the foregoing analysis under the *Anderson-Burdick* framework, the Court finds that Plaintiffs have not shown a substantial likelihood of success on the merits of their claim as to the Prefiling and Anti-Duplication Provisions.

### ii.    The Disclaimer Provision

As stated above, the parties agree that the Disclaimer Provision impacts First Amendment speech rights in some way.  Thus, this Court must balance the magnitude of the injury against the strength of the government's interests as well as consider the extent to which the Disclaimer is necessary.

Plaintiffs contend that the Disclaimer Provision compels them to disseminate false or, at the very least, misleading information, which portrays them as an untrusted source and is contrary to the pro-absentee voting message that they wish to convey.  Plaintiffs argue that this type of forced communication strikes at the heart of First Amendment freedoms and warrants the highest level of scrutiny.

On the other hand, State Defendants argue that Plaintiffs have not demonstrated the alleged harm of the Disclaimer.  State Defendants also point to the voter confusion and burden on election officials that result from third-party ballot application programs, including questions regarding the source of the forms and the misperception that the application form is itself a ballot or that recipients

must return it.  State Defendants assert that the Disclaimer Provision addresses

these issues by affirmatively stating that (i) the application form is not published

by the government, (ii) it is not provided by the government and (iii) it is not a

ballot.

It is undisputed that the last two statements of the Disclaimer are true:  a

third party is responsible for sending the application form to the prospective voter,

and the application form is the mechanism for requesting a ballot, not a ballot

itself.[12]  The main dispute relates to whether the first statement is true, false or

otherwise confusing.

The Court understands Plaintiffs' argument that the Disclaimer is internally

inconsistent.  Specifically, Plaintiffs point out that the application form made

available on the Secretary of State's website bears the Secretary of State's seal and

includes a header that states it is an "Application for Official Absentee Ballot" at

the same time that the first statement of the Disclaimer declares that the form is

"NOT an official government publication."  If a recipient understands "government

publication" to refer to the source of the form, *see Official Publication*, Black's

Law Dictionary (11th ed. 2019) ("book, pamphlet, or similar written statement

---

[12] Plaintiffs contend that the Secretary of State could easily include the third
statement of the Disclaimer on the required application form if it desired to do so.

issued by a government authority"), then the first statement of the Disclaimer will be confusing.[13]

Although the Court finds that a recipient could reasonably be confused by the Disclaimer, the record currently does not establish what harm may result from this potential confusion. Dr. Green's cursory survey of only five potential Georgia voters found one person who was reluctant to use the form based on the Disclaimer. Tr. 225:18-226:5, Day 1. That person initially stated that he would complete the form, and only after the researcher prodded him with a question regarding the specifics of the Disclaimer did he say that he would throw the form in the "trash." *Id.* at 226:1. In any event, Dr. Green conceded that this type of qualitative study cannot establish what proportion of absentee ballot applications would not be returned as a result of the Disclaimer. *See* ECF No. 103-5 at 8.

---

[13] The Secretary of State's General Counsel had some concern regarding the clarity of this statement in the Disclaimer. Tr. 93:21-95:20, Day 2. He provided language for a bill that would have amended the Disclaimer to delete the statement, but the legislature did not pass the bill. *Id.* Also, Plaintiffs' own expert conceded that the statement is true, apparently based on the interpretation that the specific application provided by third parties is "identical" to but is not the actual government publication. Tr. 215:23-216:16, Day 1. The Court agrees that this is one plausible interpretation of the statement. *See Publication*, Merriam-webster.com, https://www.merriam-webster.com/dictionary/publication (last visited June 27, 2022) ("the act or process of publishing"). The differing views underscore the potential for confusion here.

Balancing this lack of evidence of significant harm against the state's compelling interests in avoiding voter confusion and ensuring the smooth administration of its elections, the Court finds that the Disclaimer Provision is justified.  Although the Court's conclusion could change after a trial on the merits where the burden will be different and the evidence will be more developed, the Court cannot at this time (and on this record) find that Plaintiffs have shown a substantial likelihood of success on the merits of their claim with respect to the first statement of the Disclaimer.[14]

### d. Whether and How the First Amendment Scrutiny Levels Apply

As the Court's analysis herein indicates, the *Anderson-Burdick* framework applies to each of the Ballot Application Provisions.  However, Plaintiffs argue that the *Anderson-Burdick* framework is inapplicable here, and they urge the Court to employ the strict scrutiny test across the board.  *See* ECF No. 103 at 32-33.

Intervenor Defendants advocate for rational basis review with respect to the Prefiling and Anti-Duplication Provisions but contend that the *Anderson-Burdick*

---

[14] For the same reasons, the Court finds that Plaintiffs have not shown a substantial likelihood of success on the merits of their claim with respect to the third statement of the Disclaimer.

framework is appropriate with respect to the Disclaimer Provision.  *See* ECF No. 114 at 11, 16.

State Defendants agree with Intervenor Defendants that rational basis review should apply to the Prefilling and Anti-Duplication Provisions but argue in their brief that exacting scrutiny is the correct standard to apply to the Disclaimer Provision.  *See* ECF No. 113 at 26.

To account for these disagreements, the Court will also consider the constitutionality of the Ballot Application Provisions under the scrutiny levels applicable to First Amendment cases.

### i.     The Prefilling and Anti-Duplication Provisions

Because the Court found that the Prefilling and Anti-Duplication Provisions do not regulate speech, those provisions are subject only to rational basis review. *See Romer v. Evans*, 517 U.S. 620, 631 (1996) (stating that if a law does not burden a fundamental right, it will survive scrutiny as long as "it bears a rational relation to some legitimate end").

"A statute is constitutional under rational basis scrutiny so long as 'there is *any reasonably conceivable state of facts* that could provide a rational basis for the' statute."  *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993)).  Such "leniency . . . provides

the political branches the flexibility to address problems incrementally and to engage in the delicate line-drawing process of legislation without undue interference from the judicial branch." *Haves v. City of Miami*, 52 F.3d 918, 923-24 (11th Cir. 1995). Courts must accept the "legislature's generalizations" regarding the impetus for a statute "even when there is an imperfect fit between means and ends" or when the statute causes "'some inequality.'" *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).

The Court's *Anderson-Burdick* framework analysis herein demonstrates that the Prefilling and Anti-Duplication Provisions are rational and reasonable in light of the state's goals of avoiding voter confusion and reducing the administrative burden on election officials. The Prefilling and Anti-Duplication Provisions thus survive rational basis scrutiny.

Accordingly, even assuming that the First Amendment scrutiny levels are relevant here, Plaintiffs have not shown a substantial likelihood of success on the merits of their claim as to the Prefilling and Anti-Duplication Provisions.

### ii.      The Disclaimer Provision

Given the Supreme Court's guidance in *Americans for Prosperity* that "compelled disclosure requirements are reviewed under exacting scrutiny" and that

such analysis is applicable in other election-related settings, the Court will employ exacting scrutiny review here.  141 S. Ct. 2373, 2383 (2021).

"[E]xacting scrutiny requires that there be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest' and that the disclosure requirement be narrowly tailored to the interest it promotes."  *Id.* at 2385 (citation omitted) (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).  Narrow tailoring in this context means that the government must endeavor to balance the restriction against the interests it seeks to advance, even if the solution it selects is not the least restrictive means of achieving the end.  *See id.* at 2384.  Thus, "'fit matters.'"  *Id.* (quoting *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014)).  The fit need not be "'perfect'" or represent "'the single best disposition,'" but it must be "'reasonable,'" and its scope must be "'in proportion to the interest served.'"  *Id.* (quoting *McCutcheon*, 572 U.S. at 218).

Based on the Court's above *Anderson-Burdick* analysis of the Disclaimer Provision, the Court concludes that there is a "substantial relation" between the language of the Disclaimer and the state's interests in reducing voter confusion and ensuring the effective and efficient administration of its elections.  The fit is certainly not perfect, as evidenced by the potentially confusing information

conveyed by the first statement of the Disclaimer.  Also, the Disclaimer is likely

not the narrowest possible solution to the problems the state identified.

Nevertheless, whatever infirmities may exist in the government's choice of

words, Plaintiffs have not sufficiently demonstrated that the alleged harm of the

Disclaimer is so severe as to outweigh the compelling interests at stake.  Indeed, as

the Court highlighted above, Plaintiffs' evidence regarding the Disclaimer's impact

is unpersuasive.  Consequently, the Court finds that the Disclaimer reasonably fits

and is in proportion to the interests its serves.  The Disclaimer Provision therefore

survives exacting scrutiny review.

In sum, whether the Court employs the *Anderson-Burdick* framework or the

First Amendment exacting scrutiny test, it remains that Plaintiffs have not

demonstrated a substantial likelihood of success on the merits of their Disclaimer

Provision claim.

### 2.    Irreparable Harm

"A showing of irreparable injury is 'the sine qua non of injunctive relief.'"

*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Ne. Fla. Chapter*

*of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th

Cir. 1990)).  Even if a plaintiff can show a substantial likelihood of success on the

merits, "the absence of a substantial likelihood of irreparable injury would,

standing alone, make preliminary injunctive relief improper." *Id.*; *see also City of Jacksonville*, 896 F.2d at 1285 (declining to address all elements of the preliminary injunction test because "no showing of irreparable injury was made").

The irreparable injury sufficient to satisfy the burden "must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176 (quoting *City of Jacksonville*, 896 F.2d at 1285). In the context of constitutional claims, it is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also City of Jacksonville*, 896 F.2d at 1285-86 (noting that an ongoing violation of First Amendment rights constitutes irreparable injury).

In light of the Court's finding that Plaintiffs have not shown that they are substantially likely to succeed on the merits of their claims, the Court need not (and does not) address the irreparable injury prong of the preliminary injunction test. *See Siegel*, 234 F.3d at 1176 (stating that a preliminary injunction may not to be granted unless the movant clearly establishes "each of the four prerequisites").

### 3.    Balance of the Equities and the Public Interest

The Court is likewise not required to address the balance of the equities and the public interest prongs of the preliminary injunction test but provides the following analysis as additional support for its finding here.

The balance of the equities and the public interest factors are intertwined in the context of an election because "the real question posed . . . is how injunctive relief . . . would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018).  Courts therefore consider these two factors in "tandem."  *See*, *e.g.*, *id.* (merging the analysis of the third and fourth prongs of the preliminary injunction test); *see also Black Voters Matter Fund v. Raffensperger*, No. 1:20-CV-1489, 2020 WL 2079240, at *2 (N.D. Ga. Apr. 30, 2020) (same); *Martin v. Kemp*, No. 1:18-CV-4776, 2018 WL 10509489, at *3 (N.D. Ga. Nov. 2, 2018) (same).

The Court's analysis of the balance of the equities and public interest factors will focus on the considerations outlined in *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

The Supreme Court has recognized that while it would be "the unusual case" in which a court would not act to prevent a constitutional violation, "under certain circumstances, such as where an impending election is imminent and a [s]tate's

election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).  Although the election in *Reynolds* was not imminent, and that case does not necessarily have broad application to cases like the one at bar, *Reynolds* helped further the principle of exercising judicial restraint where an injunction could hamper the electoral process.

In subsequent opinions, the Supreme Court identified specific factors that could militate against granting election-related injunctive relief close to election day.  For example, in *Fishman v. Schaffer*, the Court focused on factors such as unnecessary delay in commencing a suit and relief that "would have a chaotic and disruptive effect upon the electoral process" as grounds for denying a motion for injunctive relief close to an election.  429 U.S. 1325, 1330 (1976) (Marshall, J., in chambers).

This principle of restraint has continued to develop over the years, and the Supreme Court's opinion in *Purcell* is now frequently cited for the proposition that a court should ordinarily decline to issue an injunction—especially one that changes existing election rules—when an election is imminent.  549 U.S. at 5-6. The *Purcell* court reasoned that such a change could be inappropriate because it

could result in "voter confusion and [the] consequent incentive to remain away

from the polls." *Id.* at 4-5.

The Supreme Court has reiterated this directive on many occasions. *See,

e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207

(2020) ("This Court has repeatedly emphasized that lower federal courts should

ordinarily not alter the election rules on the eve of an election."); *see also New Ga.

Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) (finding that an

injunction "at the last minute" would "violate *Purcell*'s well-known caution

against federal courts mandating new election rules").

Most recently, Justice Kavanaugh stated in a concurring opinion in *Merrill v.

Milligan* that *Purcell* concerns can be overcome by establishing that

> (i) the underlying merits are entirely clearcut in favor of the plaintiff;
> (ii) the plaintiff would suffer irreparable harm absent the injunction;
> (iii) the plaintiff has not unduly delayed bringing the complaint to
> court; and (iv) the changes in question are at least feasible before the
> election without significant cost, confusion, or hardship.

142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).  Considering the reasoning

in *Purcell* and Justice Kavanaugh's opinion in *Merrill*, the Eleventh Circuit

recently stayed an injunction in *League of Women Voters of Florida, Inc. v.

Florida Secretary of State*, 32 F.4th 1363, 1375 (11th Cir. 2022).  The court's

decision relied in part on the fact that voting in the next election was set to begin in

less than four months and that the injunction implicated aspects of the election

machinery that were already underway.  *Id.* at 1371.  The court also observed that

"[e]ven seemingly innocuous late-in-the-day judicial alterations to state election

laws can interfere with administration of an election and cause unanticipated

consequences."  *Id.* (alteration in original) (quoting *Democratic Nat'l Comm. v.

Wis. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring)).

Plaintiffs are, however, correct that *Purcell* does not function as a bright line

rule.  *Cf. Riley v. Kennedy*, 553 U.S. 406, 426 (2008) (noting that "practical

considerations ***sometimes*** require courts to allow elections to proceed despite

pending legal challenges" (emphasis added)); *People First of Ala. v. Sec'y of State

for Ala.*, 815 F. App'x 505, 514 (11th Cir. 2020) (Rosenbaum, R., and Pryor, J.,

concurring) ("*Purcell* is not a magic wand that defendants can wave to make any

unconstitutional election restriction disappear so long as an impending election

exists."); *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1141 (N.D. Fla. 2020)

(noting that *Purcell* did not "create a per se rule" prohibiting the issuance of an

injunction against voting laws on the eve of an election).  Rather, courts must

engage with the facts and specific circumstances of the case to reach a decision.

*See Purcell*, 549 U.S. at 4-5.

Here, State and Intervenor Defendants argue that the Court should withhold relief under *Purcell* because Plaintiffs unduly delayed in bringing the Motion.

Plaintiffs respond that they filed their Complaint close in time to the passage of SB 202, and the timing of their Motion makes sense within the procedural posture of this case—the Motion was filed after the Court's decision on State and Intervenor Defendants' motions to dismiss and after the parties had an opportunity to engage in some discovery.  The Court notes that cases discussing undue delay in connection with the *Purcell* doctrine usually refer to the timing of the complaint. *See, e.g.*, *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

In any event, the key issue here is whether an injunction at this stage of the current election cycle would cause further voter confusion.  SB 202 is already the law, and an injunction with respect to the Disclaimer Provision, for example, would not merely preserve the status quo.  It would change the law while the election machinery is already grinding.  Third parties who may not be aware of these proceedings are presumably already preparing to distribute ballot application forms bearing the current Disclaimer.  A ruling requiring a different disclaimer could cause two different application forms to be in circulation.  Prospective voters who receive both versions of the form could be confused by the conflicting

statements.  The Court is also mindful of unintended consequences of late-breaking changes to the law.  *See League of Women Voters*, 32 F.4th at 1371.

While the Court agrees that the *Purcell* consideration is arguably less significant in this case because the challenged provisions affect primarily back-of-the-house activity undertaken by third-party organizations, the Court finds that some risk does exist, and that risk indicates that the balance of the equities and the public interest weigh against entering a preliminary injunction in this case.

### III.   CONCLUSION

For all the reasons set forth in this opinion, Plaintiffs have not satisfied their burden on at least three of the four prongs of the preliminary injunction test (likelihood of success on the merits, balance of the equities and public interest). The Court did not reach the fourth prong (irreparable harm).  Accordingly, the Court finds that a preliminary injunction is not warranted here.  Plaintiffs' Motion (ECF No. 103) is **DENIED** in all respects.

**SO ORDERED** this 30th day of June, 2022.

J. P. BOULEE
United States District Judge