# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

VOTEAMERICA, *et al.*,

        *Plaintiffs*,

        v.

BRAD RAFFENSPERGER, in his
official capacity as the Secretary of
State for the State of Georgia, *et al.*,

        *Defendants*,

REPUBLICAN NATIONAL
COMMITTEE, *et al.*,

        *Intervenor-Defendants.*

Civil Action No.:
1:21-CV-1390-JPB

## STATE DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................. 3

   A.   Factual background .................................................................. 3

   B.   Procedural background............................................................ 8

LEGAL STANDARDS ........................................................................ 9

ARGUMENT ...................................................................................... 9

   I.   The Pre-Filling Prohibition and the Anti-Duplication Provision Survive Any Level of Scrutiny. ............................................... 10

      A.   The Pre-Filling Prohibition and Anti-Duplication Provision do not restrict Plaintiffs' core political speech or their expressive conduct, and they are thus subject to, and survive, rational-basis review. ................................................ 10

      B.   The Pre-Filling Prohibition and the Anti-Duplication Provision Would Also Survive *Anderson-Burdick* scrutiny......... 16

   II.   The Disclaimer Provision Does Not Unconstitutionally Burden or Compel Plaintiffs' Speech. ............................................... 19

      A.   The Disclaimer Provision Survives *Anderson-Burdick* scrutiny.......................................................................... 20

      B.   The Disclaimer Provision Survives Exacting Scrutiny. ............. 23

   III.   The Challenged Provisions do not Implicate Plaintiffs' Freedom of Association. ....................................................... 25

   IV.   The Challenged Provisions are not Overbroad................................. 27

   V.   The Challenged Provisions are not Vague......................................... 32

CONCLUSION.................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*Am. Party of Tex. v. White,*
    415 U.S. 767 (1974) ....................................................................... 19

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021) .................................................................. 24

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ....................................................................... 17

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ......................................................................... 9

*Ave. CLO Fund, Ltd. v. Bank of Am., N.A.,*
    723 F.3d 1287 (11th Cir. 2013) ...................................................... 9

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ....................................................................... 26

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021) .................................................................. 19

*Broadrick, v. Oklahoma,*
    413 U.S. 601 (1973) ....................................................................... 28

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ....................................................................... 17

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ....................................................................... 24

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984) ....................................................................... 10

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ....................................................................... 17

*Daubert v. Merrill Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ....................................................................... 21

*Democracy N.C. v. N.C. State Bd. of Elections,*
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ....................................... 12

*Feldman v. Arizona Secretary of State's Office,*
    843 F.3d 366 (9th Cir. 2016) ....................................................... 12

ii

*Hershey v. City of Clearwater*,
 834 F.2d 937 (11th Cir. 1987) .......................................................... 28, 33, 34

*Johnson v. Robison*,
 415 U.S. 361 (1974) ................................................................................. 15

*Johnson v. United States*,
 576 U.S. 591 (2015) ................................................................................. 32

*Lubin v. Panish*,
 415 U.S. 709 (1974) ................................................................................. 24

*Mazo v. New Jersey Sec'y of State*,
 No. 21-2630, 2022 WL 17172673 (3d Cir. Nov. 23, 2022) ..................... 15, 17

*McCutcheon v. FEC*,
 572 U.S. 185 (2014) ................................................................................. 25

*Members of City Council of L.A. v. Taxpayers for Vincent*,
 466 U.S. 789 (1984) ....................................................................... 28, 29, 30

*Meyer v. Grant*,
 486 U.S. 414 (1988) ................................................................................. 14

*MidAmerica C2L Inc. v. Siemens Energy Inc.*,
 25 F.4th 1312 (11th Cir. 2022) .................................................................. 9

*New Ga. Project v. Raffensperger*,
 484 F. Supp. 3d 1265 (N.D. Ga. 2020) ....................................................... 11

*New Ga. Project v. Raffensperger*,
 976 F.3d 1278 (11th Cir. 2020) ................................................................. 19

*New York v. Ferber*,
 458 U.S. 747 (1982) ................................................................................. 28

*Richardson v. Tex. Sec'y of State*,
 978 F.3d 220 (5th Cir. 2020) .............................................................. 17, 19

*Roberts v. U.S. Jaycees*,
 468 U.S. 609 (1984) ................................................................................. 25

*Rumsfeld v. FAIR*,
 547 U.S. 47 (2006) ................................................................................... 11

*Texas v. Johnson*,
 491 U.S. 397 (1989) ........................................................................... 11, 12

*United Sav. Ass'n. of Tex. v. Timbers of Inwood Forest Assocs.*,
  484 U.S. 365 (1988) ......................................................................... 33

*Virginia v. Hicks*,
  539 U.S. 113 (2003) .................................................................... 28, 30

*Voting for Am., Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ...................................................... 12, 14

*Williams v. Pryor*,
  240 F.3d 944 (11th Cir. 2001) .......................................................... 16

**Statutes**

O.C.G.A. § 21-2-381 ..................................................... 5, 7, 8, 30, 34

# INTRODUCTION

Recent elections in Georgia have revealed that third-party organizations like Plaintiffs sent absentee-ballot applications that caused confusion and concern among Georgia voters.  For instance, Plaintiffs sent applications that were pre-filled with incorrect information about voters.  And Plaintiffs sent multiple applications to the same voters.  This caused many recipients of Plaintiffs' mailings to contact the State with concerns about election integrity and the potential for voter fraud.  This also required State officials to divert their finite resources away from other election-related responsibilities.

In response, the Georgia General Assembly included three modest regulations governing these activities (the "Challenged Provisions") as part of a larger election law—SB 202. First, complaints and confusion about the receipt of applications with incorrect pre-filled information led to SB 202's prohibition on pre-filled applications ("Pre-Filling Prohibition"). Second, complaints and confusion about multiple absentee-ballot applications led to SB 202's prohibition on sending applications to voters who already applied for such a ballot ("Anti-Duplication Provision"). Third, complaints and confusion about whether unsolicited *applications* were actually State-issued *ballots* led to SB 202's disclaimer requirement—i.e., a statement that the applications are not ballots and are not sent by the State ("Disclaimer Provision").

At each turn, however, the General Assembly ensured that organizations like Plaintiffs may still communicate their messages about absentee voting to Georgia voters. Indeed, SB 202 regulates no other mailings Plaintiffs wish to send to voters encouraging them to vote by absentee ballot. SB 202 thus struck a careful balance between prohibiting conduct that caused significant concern and confusion among voters and allowing Plaintiffs to still communicate their messages to Georgia voters. Indeed, the Court agreed with that fundamental conclusion when it denied Plaintiffs' motion for a preliminary injunction.

Since then, discovery has confirmed that the Challenged Provisions cause Plaintiffs little to no harm. In contrast, the record developed through discovery confirms that the harms to the State and Georgia voters by the actions of Plaintiffs and other groups were significant.

For these reasons, summary judgment should be entered in favor of the State on each of Plaintiffs' claims. For instance, the Pre-Filling Prohibition and the Anti-Duplication Provision do not restrict Plaintiffs' speech and are thus subject only to rational-basis review, which each provision easily satisfies. But even under *Anderson-Burdick* review, these provisions survive because they are reasonable restrictions that impose only minimal burdens on Plaintiffs' activities and are justified by the State's legitimate interests.

The same is true for the Disclaimer Provision, which, although it affects

Plaintiffs' speech, is also subject only to *Anderson-Burdick* review. Here again, Plaintiffs have shown no harm caused by a disclaimer on their application mailings, but the State has shown how this provision is tied to its significant interest in minimizing voter confusion and ensuring efficient elections.

Plaintiffs' freedom-of-association challenges to these provisions are equally doomed by the simple fact that, as this Court already concluded (Order at 27 [Doc. 131]), Plaintiffs typically send their application materials to strangers, and each provision serves compelling State interests.

Finally, Plaintiffs' overbreadth and vagueness challenges fail because Plaintiffs rely exclusively on far-fetched hypotheticals to support their claims. But the record developed through discovery confirms that each of the Challenged Provisions is clear, and Plaintiffs developed no evidence showing otherwise.  Accordingly, summary judgment should be entered for the State.

## BACKGROUND

### A.    Factual background

*Plaintiffs' absentee-ballot application mailings.*   For several election cycles, Plaintiffs Voter Participation Center ("VPC") and the Center for Voter Information ("CVI")[1] sent absentee-ballot applications to voters in many

---

[1] Plaintiff VoteAmerica dismissed its claims.  [Doc. 142].

states, including Georgia.  Depo. of T. Lopach 42:8–11, 62:4–12 (Ex. A).  In each

such mailing, Plaintiffs included a cover letter explaining why they believe that

absentee voting is important and encouraging the recipient to complete and

return the application.  *Id.* 63:2–7, 64:13–65:4.  Plaintiffs' cover letter also

included instructions for how to complete and return the application.  Ex. B.

In more recent election cycles, Plaintiffs began pre-filling those

applications with what they believed was the voter's personal information.

Lopach Depo. 112:8–13.  But, as Plaintiffs acknowledge, that information was

often incorrect.  *Id.* 127:20–128:2, 129:14–19.  And, as Plaintiffs also

acknowledge, they routinely sent *multiple* absentee-ballot applications to the

same voters.  *Id.* 109:20–110:15, 111:9–12.  Those recipients often contacted

Plaintiffs to complain about the mailings and to request removal from future

mailing lists. PI Hr'g Tr. 84:13–24 ("Day 1 Tr.") (Ex. C); Lopach Depo. 102:19–

103:12, 153:15–154:5.

*SB 202 responds to voter concerns.*  At the same time, Georgia voters

complained to the State about the absentee-ballot applications they were

receiving from third-party organizations like Plaintiffs.  Decl. of R. Germany

¶¶ 13, 23, 41, 49–50 [Doc. 113-2]; Depo. of R. Germany 181:7–12 (Ex. D); Depo.

of M. Mashburn 90:11–23, 91:2–13 (Ex. E).  In particular, voters complained

about: (1)  receiving  applications  that  were  pre-filled  with  incorrect

information; (2) receiving duplicate applications; and (3) receiving applications that were not sent by the State.  SB 202 addresses each of these complaints.

*Pre-Filling Prohibition.*   As noted, before SB 202, organizations like Plaintiffs increased their use of pre-filled absentee-ballot applications. Germany Decl. ¶¶ 20–21; Mashburn Depo. 88:16–89:15; PI Hr'g Tr. 18:13–20, 19:4–13, 19:25–20:5 ("Day 2 Tr.") (Ex. F); Lopach Depo. 34:1–10, 153:7–9.  And that pre-filled information was often incorrect.   For instance, many voters complained that the pre-filled applications listed individuals who no longer (or never) lived at the address.  Ex. G.  Other voters complained to the State that the applications were pre-filled with incorrect information.  *Id.*  These errors caused many Georgia voters to contact the Secretary of State's office with questions and concerns about potential fraud.  Germany Decl. ¶ 22; Day 2 Tr. 22:4–14; Mashburn Depo. 84:3–4; Ex. G.

Responding to these concerns, SB 202 prohibits sending absentee-ballot applications that are "prefilled with the elector's required information." O.C.G.A. § 21-2-381(a)(1)(C)(ii).  But this provision still allows organizations like Plaintiffs to send absentee-ballot applications.  They simply may not pre-fill the applications.

*Anti-Duplication Provision.* Georgia voters also complained about receiving multiple absentee-ballot applications from organizations like

Plaintiffs.  Germany Decl. ¶ 39; Day 2 Tr. 19:25–20:5, 22:4–14; Ex. H.  Voters were worried that these applications presented an open invitation for voter fraud—a concern exacerbated by voters believing that the *applications* themselves were actually *ballots*. Germany Decl. ¶ 42; Day 2 Tr. 20:3–5.

Moreover, voters who received multiple applications often returned multiple applications. Germany Depo. 51:2–18.  And, in some instances, they did so even though they did not intend to vote by absentee ballot.  Germany Decl. ¶ 43; Day 2 Tr. 28:12–16, 42:16–22; Germany Depo. 199:13–25. This required election officials to divert their finite resources to processing many unnecessary absentee-ballot applications.  Day 2 Tr. 28:16–21.  Then, on Election Day, officials were required to process many absentee-ballot cancellations when voters who had submitted absentee-ballot applications arrived to vote in person, leading to longer lines. Day 2 Tr. 29:25–30:4; Germany Depo. 199:13–200:7. For the 2020 general election, for instance, there were 40,694 absentee-ballot applications cancelled by voters when they arrived to vote in person, compared with only 5,472 such cancelled applications during the 2018 general election, and 3,170 cancelled applications during the 2016 general election. Germany Decl. ¶ 31.

Responding to these concerns, SB 202 prohibits distributing duplicate applications once a voter has requested an absentee ballot. O.C.G.A. § 21-2-

381 (a)(3)(A). But this provision does *not* prohibit organizations like Plaintiffs from sending multiple applications *before* a voter requests a ballot. *Id*. And it contains a safe harbor allowing Plaintiffs to avoid liability for sending duplicate applications if they relied upon information made available by the State within five business days before their mailing. *Id*.

*Disclaimer Provision*.  Finally, Georgia voters expressed confusion about who was sending the various absentee-ballot applications. Day 2 Tr. 13:12–15; Mashburn Depo. 90:10–23.  In many instances, voters thought they came from the State, and thus they contacted election officials with questions.  Mashburn Depo 90:11–23.  And, as noted above, these questions included concerns about whether the *applications* were actually *ballots*.  *Id*. 84:4–6, 90:10–23, 91:2–13. As one county election supervisor explained, the misimpression that each such application was sent by the State would lead "people [to] feel the need to complete and sign [the] form without really paying attention to what it is for." Germany Decl. ¶ 49.

To address this problem, SB 202 requires that, when Plaintiffs and similar organizations send absentee-ballot applications, they include a short disclaimer stating that the application is "NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot."  O.C.G.A. § 21-2-381(a)(1)(C)(ii).  Through this short

7

disclaimer, SB 202 addressed the various concerns expressed by voters about prior practices.  The disclaimer explains that the application is not a ballot, and it informs a voter that the application was not sent by the State.  As Plaintiffs' own expert confirmed, this disclaimer is "true."  Day 1 Tr. 215:23–216:16.

## B.   Procedural background

Plaintiffs filed their complaint on April 7, 2021. [Doc. 1].  On December 9, 2021, this Court denied Defendants' motion to dismiss.  [Doc. 57].  On June 30, 2021, this Court also denied Plaintiffs' motion for a preliminary injunction. [Doc. 131].  In so doing, this Court held that neither the Pre-Filling Prohibition nor the Anti-Duplication Provision implicated the First Amendment and were thus subject only to *Anderson-Burdick* scrutiny, a test they likely passed. *Id.* at 36–40. Likewise, the Court held that, while the Disclaimer Provision compelled speech, the compulsion was minor, and that the Disclaimer Provision was also subject to and likely passed *Anderson-Burdick* scrutiny. *Id.* at 40–43. In the alternative, the Court applied First Amendment scrutiny and found that both the Anti-Duplication Provision and the Pre-Filling Prohibition survived rational-basis review and that the Disclaimer Provision was subject to and likely survived the exacting scrutiny standard that applied to disclaimers in the election context. *Id.* at 44–47.

## LEGAL STANDARDS

Summary judgment is appropriate where the record shows that there is no genuine dispute about any material fact and the moving party has shown that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Id.* at 248. And a dispute is only "genuine" if supported by more than a mere "scintilla of evidence." *Id.* at 252. Although the Court views the record in the light most favorable to the non-moving party, *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1325 (11th Cir. 2022), the non-moving party cannot rely on speculation or conjecture to meet its burden of production, *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013).

## ARGUMENT

Plaintiffs' First Amendment claims fail because the record shows that each of the Challenged Provisions furthers compelling interests and Plaintiffs have failed to identify evidence showing that their speech or freedom of association is harmed.  Additionally, Plaintiffs' vagueness and overbreadth claims fail because Plaintiffs rely exclusively on unsupported hypothetical concerns, not upon any genuine vagueness or overbreadth.

I.      **The Pre-Filling Prohibition and the Anti-Duplication Provision Survive Any Level of Scrutiny.**

As this Court has already held, neither the Pre-Filling Prohibition nor the Anti-Duplication Provision "implicate[s] Plaintiffs' First Amendment rights." [Doc. 131 at 38, 44–45]. Both are therefore subject to rational-basis review. But even under *Anderson-Burdick*, these provisions pass constitutional muster and summary judgment should be entered for the State.

A.      **The Pre-Filling Prohibition and Anti-Duplication Provision do not restrict Plaintiffs' core political speech or their expressive conduct, and they are thus subject to, and survive, rational-basis review.**

As noted, Plaintiffs have failed to meet their "obligation," as the Supreme Court requires, to "demonstrate that the First Amendment even applies" to their pre-filled absentee-ballot applications or their duplicate mailings. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Rather, as this Court correctly recognized, "the Prefilling and Anti-Duplication Provisions do not implicate Plaintiffs' First Amendment rights." [Doc. 131 at 38]. And the record developed through discovery confirms that conclusion.

1.      As this Court held (*id.* at 17–28), Plaintiffs' claims that these provisions violate the First Amendment are foreclosed by Supreme Court precedent. Indeed, while the First Amendment protects certain speech and expressive conduct, the Supreme Court has repeatedly explained that the Free

Speech Clause protects only "inherently expressive" conduct. *E.g., Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006). And such a showing requires more than merely "combining speech and conduct." *Id.* Otherwise, "a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* But that is what Plaintiffs try to do here, asking the Court to import the expressive conduct from their cover letters—which SB 202 does not affect—into the activity that SB 202 does affect—namely, their absentee-ballot applications.

To avoid such gaming of the system, the Supreme Court developed a two-part test to determine whether conduct is inherently expressive. First, courts ask whether the plaintiff intended to "convey a particularized message." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Second, courts ask whether that message would likely be "understood by those who viewed it." *Id.* Plaintiffs cannot satisfy this test.

In fact, courts across the country have applied the two-part *Johnson* test and rejected claims that sending or collecting forms is protected expressive conduct. *See New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1300 (N.D. Ga. 2020) (collecting cases). In *Feldman v. Arizona Secretary of State's Office*, for instance, the Ninth Circuit explained that a similar activity— collecting ballots—is not expressive conduct, despite the "ballot collectors' inten[t] to communicate that voting is important." 843 F.3d 366, 392 (9th Cir.

2016).  Similarly, the Fifth Circuit applied *Johnson* and rejected a challenge to a law that limited who could work with voter-registration forms, holding that "non-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389, 392 (5th Cir. 2013).

Applying this same standard, this Court previously held (Doc. 131 at 25–26) that the inclusion of a cover letter with an absentee-ballot application does not convert the application *itself* into speech, but that providing the application is instead simply a way to facilitate the machinery of voting—that is, it is conduct.  *See Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 225 (M.D.N.C. 2020) ("Delivering absentee ballot requests is not expressive conduct.").  For that reason, the application itself—the only part of Plaintiffs' mailing that SB 202 regulates—could not be "understood by those who viewed it" to "convey a particularized message."  *Johnson*, 491 U.S. at 404.

2. Nothing in the record developed since the Court issued its preliminary-injunction Order changes that conclusion.  Rather, it remains true that Plaintiffs' sending pre-filled applications is not "expressive conduct subject to First Amendment protections." [Doc. 131 at 26]. Indeed, as this Court explained, "Plaintiffs' pro-absentee voting message is not necessarily intrinsic to the act of sending prospective voters an application form" because recipients

could understand the receipt of the application, without more, to "mean a number of things" beyond Plaintiffs' intended message. *Id.* Rather, it is the *cover letter* that expresses Plaintiffs' views, which is no doubt why Plaintiffs have never sent absentee-ballot applications without a cover letter. Lopach Depo. 62:4–63:7, 70:4–11.[2]

Thus, Plaintiffs' sending absentee-ballot applications—prefilled or not—is entirely separate from their absentee-voting message, which is typically included in their cover letters. While Plaintiffs may wish to "encourage all Georgians … to participate in elections through absentee voting," Decl. of T. Lopach ¶ 12 [Doc. 103-3], that message is delivered through the cover letter Plaintiffs send with the ballot application, not by the application itself, *id.* ¶ 17. And that cover letter is unaffected by SB 202.

In fact, as this Court recognized, Plaintiffs may say whatever they wish to Georgia voters "as often as—and in whatever form—that they desire." [Doc. 131 at 20]. And both the cover letter and the absentee-ballot applications

---

[2] If the application itself expressed a message, there would certainly be instances of Plaintiffs' sending applications alone, considering that doing so would be much less expensive. Lopach Depo. 62:4–63:7, 70:4–11.

at issue here "can exist and be sent without the other." *Id.* at 21.[3]  Thus, as this Court correctly held, the sending of multiple or pre-filled applications is not "characteristically intertwined" with otherwise protected speech. *Id.*

Accordingly, the record confirms that SB 202 does not restrict Plaintiffs' ability to "explain … how to request and cast an absentee ballot" or to send "messaging that express[es] VPC/CVI's advocacy for absentee voting and encourages voters to apply to vote absentee." *Id.*  Sending the application is conduct, not speech.[4]

3. Because these provisions do not implicate speech, they are subject only to rational-basis review.  *Steen*, 732 F.3d at 392; *Johnson v. Robison*, 415 U.S.

---

[3] Before SB 202, for example, "VPC/CVI sent follow up mail to Georgia voters reminding them to submit mail ballots if they had requested one and had not yet submitted it." Pls.' Resps. to RFAs, No. 3 (Ex. I). They may still do so.

[4] Because the applications are conduct, and not speech, Plaintiffs' claim (Doc. 103 at 13–15) that the applications are *core political* speech likewise fails.  As this Court already recognized, these provisions of SB 202 do not implicate the "type of interactive debate and advocacy that the Supreme Court found constituted core political speech in *Meyer* [*v. Grant*, 486 U.S. 414 (1988)]." [Doc. 131 at 20]. Rather, *Meyer* involved the "circulation of a petition" that included "'both the expression of a desire for political change and a discussion of the merits of the proposed change,'" including "'an explanation of the nature of the proposal and why its advocates support it.'" *Id.* at 17 (quoting *Meyer*, 486 U.S. at 421). Those features are absent from Plaintiffs' absentee-ballot applications.

14

361, 375 n.14 (1974).[5]  Under that standard, each provision easily survives scrutiny because they are rationally related to the compelling ends of "avoiding voter confusion and reducing the administrative burden on election officials." [Doc. 131 at 45].

As the General Assembly confirmed when passing SB 202, these provisions addressed "some outside groups" sending "multiple absentee ballot applications," often "with incorrectly filled-in voter information," leading to "significant confusion by electors."  SB 202 § 2(8).  Many voters contacted the State to express confusion about why they were receiving incorrect or duplicate applications and to express concern that such applications invited fraud.  Day 2 Tr. 19:4–13, 19:25–20:5; Germany Decl. ¶¶ 23, 41; Germany Depo. 181:7–17. State Election Board ("SEB") Member Matthew Mashburn gave further examples of such confusion, explaining that voters who received multiple applications sometimes considered them to be multiple ballots, or were not sure if they needed to fill out multiple copies of the form.  Mashburn Depo. 83:22–84:14; *accord* Depo. of M. Kidd 183:7–184:13 (Ex. J).  And, as Mr.

---

[5] In fact, the Third Circuit recently recognized as much, holding that, even if a law regulates the mechanics of the electoral process, the *Anderson-Burdick* framework does not apply unless the law "burden[s] a relevant constitutional right." *Mazo v. New Jersey Sec'y of State*, No. 21-2630, 2022 WL 17172673, at *6 (3d Cir. Nov. 23, 2022).

Mashburn further explained, there was a "giant wave of complaints" from voters who received applications "for people that used to live" at their homes but no longer do, applications that had women's "maiden name[s]," or applications "for [a] dead relative[.]" Mashburn Depo. 88:16–89:15.

The Pre-Filling Prohibition and the Anti-Duplication Provision thus respond directly to these concerns. For instance, voters who already requested an absentee ballot will no longer receive an application from third-party groups that confuses those voters. Nor will voters face the confusion from receiving an official-looking form pre-filled with incorrect personal information.    By addressing such concerns, these provisions of SB 202 easily survive rational-basis review.    As the Eleventh Circuit explains: "Only in an *exceptional circumstance* will a statute not be rationally related to a legitimate government interest and be found unconstitutional under rational basis scrutiny." *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001) (emphasis added).  This is not such an "exceptional" case, and summary judgment should thus be entered for the State on Plaintiffs' claim alleging free-speech violations.

### B.    The Pre-Filling Prohibition and the Anti-Duplication Provision Would Also Survive *Anderson-Burdick* scrutiny.

If the Court were to nonetheless conclude that the Pre-Filling Prohibition and the Anti-Duplication Provision regulate speech, the *Anderson-*

*Burdick* standard applies, and the provisions still survive. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Under that test, the Supreme Court explains, if a "burden is not severe and imposes only reasonable, nondiscriminatory restrictions" on rights, "'the State's important regulatory interests are generally sufficient to justify the restrictions.'" *Mazo v. New Jersey Sec'y of State*, No. 21-2630, 2022 WL 17172673, at *12 (quoting *Burdick*, 504 U.S. at 434).  As the Fifth Circuit explains, this test looks at the "reasonable[ness]" of the "voting restriction." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 241 (5th Cir. 2020).  And, as this Court explained, slight burdens can be "justified by relevant and legitimate state interests" that are "sufficiently weighty to justify the limitation." [Doc. 131 at 38] (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008)). And here, this Court concluded already, "the magnitude of the alleged injury is not severe." *Id.*

That conclusion was and remains correct. As the Third Circuit recently recognized when upholding an election law that regulated what a candidate could include next to her name on a ballot, there is no "litmus test for measuring the severity of a burden that a state [election] law imposes." *Mazo*, 2022 WL 17172673, at *12 (quoting *Crawford*, 553 U.S. at 191). Rather, the Third Circuit explained, the severity of the burden is determined by looking at

whether the election law applies "equally to all," whether it leaves "open ample and adequate alternatives for expression and association," and whether it imposes a "specific burden" on the plaintiffs or anyone else. *Id.*

As the record now confirms, each of those characteristics is possessed by the Anti-Duplication Provision and the Pre-Filling Prohibition. They apply equally to all third parties, and they allow many alternative forms of communication. For instance, Plaintiffs may send absentee-ballot applications to any voters who have not yet requested a ballot. Lopach Depo. 162:4–19 (explaining that under SB 202, Plaintiffs were able to send applications to voters in the 2022 midterm elections).[6] And, as noted earlier, Plaintiffs may send as many letters to Georgia voters as they wish.[7] Day 2 Tr. 45:19–46:8. Thus, nothing learned in discovery can overcome this Court's prior conclusion that the magnitude of the injury is not severe.

Additionally, unlike the minimal burden on Plaintiffs' speech, these provisions serve important and compelling State interests of decreasing voter

---

[6] And Plaintiffs already have a mechanism for removing voters from their mailing lists. Lopach Depo. 106:3–10, 166:19–167:9.

[7] Moreover, as this Court recognized, the General Assembly *could* have followed what "some states have done," and entirely "prohibit[ed] the distribution of application forms by third parties." [Doc. 131 at 38–39]. But the General Assembly did not do so, allowing Plaintiffs to express their views on absentee voting widely and repeatedly.

confusion, combatting complaints of fraud, and increasing election integrity. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021) (combatting fraud is a "strong and entirely legitimate" reason for enacting voting laws); *Am. Party of Tex. v. White*, 415 U.S. 767, 782 n.14 (1974) ("preservation of the integrity of the electoral process" is a "compelling" objective); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (legitimate state interest in "conducting an efficient election"). As noted earlier, the record shows that these provisions further each of these interests. Voters were previously confused by incorrectly pre-filled applications and duplicate applications, which caused voters to submit multiple applications and to complain about potential for fraud.  Germany Depo. 199:13–21.  This resulted in delay and confusion on Election Day.  Day 2 Tr. 29:25–30:4.

Thus, under *Anderson-Burdick*, these provisions impose "*reasonable voting restrictions*" that have only a slight impact on Plaintiffs and that further compelling State interests.  *Richardson*, 978 F.3d at 241.  Accordingly, both the Pre-Filling Prohibition and the Anti-Duplication Provision are permissible under the *Anderson-Burdick* framework.

## II.    The Disclaimer Provision Does Not Unconstitutionally Burden or Compel Plaintiffs' Speech.

As with their other challenges, Plaintiffs fail to show that the Disclaimer

19

Provision violates the First Amendment by unconstitutionally compelling their speech or burdening their Free Speech rights. As this Court already recognized, "the state's burden of proof" is "lower in cases involving compelled disclaimers," where a less rigorous, "exacting" scrutiny generally applies, [Doc. 131 at 30], and lower still in election cases where, if a regulation is "not a direct regulation of speech," "the *Anderson-Burdick* framework applies," *id.* at 36. Because the Disclaimer Provision does not burden Plaintiffs' speech and only requires an accurate disclaimer, this Court should, once more, apply the *Anderson-Burdick* framework, or, at the most, the exacting-scrutiny standard of *Citizens United*. Under either standard, the Disclaimer Provision is lawful.

### A. The Disclaimer Provision Survives *Anderson-Burdick* scrutiny.

The Court's initial conclusion that the *Anderson-Burdick* framework applies to the Disclaimer Provision was correct because the Disclaimer Provision "is not a direct regulation of speech." [Doc. 131 at 36]. In applying *Anderson-Burdick*, the Court should grant summary judgment to the State because Plaintiffs have not identified any evidence showing that the Disclaimer Provision causes them harm, but the State has identified significant evidence of the harms that the Provision addresses.

*First*, there is still no evidence that the Disclaimer Provision imposes any

real harm on Plaintiffs. Earlier, Plaintiffs claimed that the Disclaimer Provision "compels them to disseminate false or, at the very least, misleading information." *Id.* at 40. But that argument is longer available to Plaintiffs, as their expert, Dr. Donald Green, testified that, as to the required disclaimer, "the statement is true." *Id.* at 42 n.13; Day 1 Tr. 215:23–216:16.[8]

Further, the Disclaimer Provision is nondiscriminatory and leaves open ample other mechanisms for Plaintiffs to communicate their pro-absentee-voting message. As with the Anti-Duplication Provision and the Pre-Filling Prohibition, the Disclaimer Provision allows Plaintiffs to engage with voters however they wish as long as they do not send an application without identifying themselves. Day 2 Tr. 45:19–46:8. And it applies equally to all third-party groups sending unsolicited absentee-ballot applications.

Moreover, despite months of discovery, Plaintiffs have identified no additional evidence of any harm from including an accurate disclaimer in their mailings. Rather, as this Court recognized, the only evidence—beyond Dr.

---

[8] The State is separately filing a motion to exclude certain conclusions Dr. Green made with respect to the Challenged Provisions. As the State explains more thoroughly in that motion, Dr. Green's adverse opinions regarding the Challenged Provisions are not based on any reliable scientific methodology, are themselves unreliable, and would not assist the trier of fact in evaluating the issues in this case as required by Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharms., Inc.,* 509 U.S. 579 (1993).

Green's *ipse dixit*—is a "cursory survey of only five potential Georgia voters" offered by Dr. Green in his report that Dr. Green himself "conceded … cannot establish what proportion of absentee ballot applications would not be returned as a result of the Disclaimer." [Doc. 131 at 42]. The Court correctly found that evidence "regarding the Disclaimer's impact" to be "unpersuasive." *Id.* at 47.

In fact, discovery has only underscored the shortcomings of this evidence, showing that mailings such as Plaintiffs' already have minimal impact on the recipient.  For instance, Dr. Green testified that: "[C]ertain get-out-the-vote efforts, including direct mail efforts," have little to no effect. Depo. of D. Green 46:6–47:5 (Ex. K). The most common result with direct mail—even without the disclaimer—is that "recipients will glance at the piece only momentarily on route to the trashcan." *Id.* 97:15–98:8. Unsurprisingly, then, Dr. Green's "cursory survey" showed that a voter would likely do just that with Plaintiffs' mailing—throw it in the trash.  Depo. of A. Hamilton 60:17–19 (Ex. L). Yet Plaintiffs have not developed any other evidence that the Disclaimer Provision harms them.

*Second*, and by contrast, the record is replete with examples of the harms that the Disclaimer Provision is designed to remedy. In the 2020 election, voters regularly complained about receiving multiple ballot applications from third parties. Day 2 Tr. 32:19–33:5; Mashburn Depo. 84:4–6, 91:2–13; Kidd

Depo. 182:10–184:13. Some of those voters, in turn, believed that their initial ballot requests were insufficient after receiving subsequent applications that they incorrectly concluded came from the Secretary of State. Mashburn Depo. 90:10–23. And these voters frequently contacted the State with questions about these mailings that came from third parties. *See* Exs. G, H, M.

The Disclaimer Provision directly responds to those concerns by ensuring that voters know the mailing is not a ballot. Day 2 Tr. 44:2–45:1. Also, the Disclaimer ensures that the recipient knows who sent the application, and where to direct any questions. *Id.* 43:12–19. And, because a third-party absentee-ballot application says it is not being sent by a government entity, voters are no longer left wondering if they must complete it to vote. *Id.*

Thus, the evidence produced to date shows that the benefits of the Disclaimer Provision to the State's compelling interests far outweigh any possible harms to Plaintiffs. Accordingly, this Court should find that the Disclaimer Provision survives *Anderson-Burdick* scrutiny.

**B.  The Disclaimer Provision Survives Exacting Scrutiny.**

Although this Court was correct at the preliminary-injunction stage to apply *Anderson-Burdick* scrutiny to the Disclaimer Provision, the Provision would survive even exacting scrutiny. As this Court recognized, [Doc. 131 at 46], a disclaimer subject to "exacting scrutiny" survives if there is: (1) a

"substantial relation" between the disclaimer and a "sufficiently important government interest," *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010); and (2) narrow tailoring, "even if [the rule] is not the least restrictive means," *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021).

As discussed above, and as this Court has already concluded, the Disclaimer Provision is substantially related to the State's interests in "reducing voter confusion and ensuring the effective and efficient administration of its elections." [Doc. 131 at 46]. And that is an interest of the "highest order." *Lubin v. Panish*, 415 U.S. 709, 715 (1974). The Disclaimer Provision responds directly to voter confusion about receiving unsolicited applications that appear to be official forms bearing on their right to vote, and it does so by ensuring the voters will not mistake the application for a ballot. This, in turn, leads to less administrative burdens as fewer complaints and concerns are raised with state election officials. Day 2 Tr. 13:12–15 (describing burdens); Mashburn Depo. 134:5–135:7 (explaining drop in complaints following SB 202).

The Disclaimer Provision is also narrowly tailored to that interest. Again, the State could have prohibited third parties from sending applications altogether but opted instead to require a disclaimer on the application to address voter confusion. Since the Court's preliminary-injunction Order,

Plaintiffs have not developed any evidence showing otherwise. Rather, it remains true that the disclaimer is unlikely to cause voter confusion. [Doc. 131 at 46–47]. And, in any event, the fit need only be reasonable. *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014). Each statement in the disclaimer meets that standard, and the Court should enter summary judgment in the State's favor on Plaintiffs' claims challenging the Disclaimer Provision.

## III.  The Challenged Provisions do not Implicate Plaintiffs' Freedom of Association.

In addition to claiming that the Challenged Provisions burden their speech, Plaintiffs claim that the provisions burden their freedom of association. Those claims fail any level of scrutiny for substantially the same reasons as Plaintiffs' speech claims fail.

The Supreme Court has often explained that the First Amendment protects "join[ing] in a common endeavor" or engaging in "collective effort on behalf of shared goals." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984). This Court was thus correct when it concluded that "the cornerstone of associational rights is cooperative advocacy." [Doc. 131 at 27]. Because of its emphasis on "common" or "cooperative" work, the right to associate cannot be invoked to link people who are legally "strangers" to them because they are "not members of [that] particular organization." *Id.*

Discovery has confirmed the accuracy of the Court's prior conclusion that: "Plaintiffs send application forms to strangers whose information they obtain from the state's voter roll." [Doc. 131 at 28]. Indeed, that was confirmed repeatedly during discovery, when Plaintiffs' representative testified that Plaintiffs receive contact information from data vendors, not from voters. Lopach Depo. 90:18–20.[9] Moreover, Plaintiffs do not select their recipients based on any preexisting relationship but based instead on demographics. *Id.* 11:15–19, 12:12–16.

This Court was thus correct to conclude that Plaintiffs' programming lacks any "two-way engagement" between Plaintiffs and the voters they target. [Doc. 131 at 28]. Now, as before, "Plaintiffs have not shown that the [Challenged Provisions] restrict their associational rights." *Id.*

Moreover, even if the Challenged Provisions somehow affected Plaintiffs' associational rights, "regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms," are constitutional. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 640–41 (2000). Here again, the Challenged

---

[9] In fact, the only evidence of voters interacting with Plaintiffs after receiving their absentee-ballot mailings is when voters contact Plaintiffs to request removal from future mailings. *See* Lopach Depo. 101:20–102:12.

Provisions readily meet that test for the reasons described above. Starting with the narrow tailoring requirement, the Challenged Provisions do not affect Plaintiffs' ability to send communications to Georgia voters. Now, as before, they remain free to "use their communications to build their political community." [Doc. 103 at 18]. Plaintiffs may also continue communicating with voters through other mailings. They may even send non-duplicative and non-prefilled ballot applications—as long as they include the disclaimer.

There is simply no evidence that Plaintiffs' ability to associate with voters turns on pre-filling an absentee-ballot application or on sending duplicate applications after a voter has already requested a ballot. That is because, as the Court already concluded, the Challenged Provisions do not "restrict [Plaintiffs'] associational rights." [Doc. 131 at 28].

Accordingly, under any standard of scrutiny, the Court should enter summary judgment for the State on Plaintiffs' freedom-of-association claims.

## IV.   The Challenged Provisions are not Overbroad.

The Court should also enter summary judgment for the State on Plaintiffs' claim that the Challenged Provisions are unconstitutionally overbroad. As this Court has already recognized, "the bar for ultimate success is high" in overbreadth claims. [Doc. 57 at 16]. Indeed, the Supreme Court has stated that the overbreadth doctrine should be applied "only as a last resort."

*New York v. Ferber*, 458 U.S. 747, 769 (1982) (quotation omitted). Here, Supreme Court doctrine requires Plaintiffs to show that the Challenged Provisions "punish[] a 'substantial' amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quotation omitted). And, even then, the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

1. At the outset, the Court has already correctly concluded that the Pre-Filling Prohibition and Anti-Duplication Provision restrict conduct, not speech. [Doc. 131 at 25–26, 38]. As the Supreme Court has explained, that makes the overbreadth scrutiny even "less rigid." *Broadrick, v. Oklahoma*, 413 U.S. 601, 614 (1973). In fact, the Eleventh Circuit has explained that the "concept of overbreadth will usually *only apply* when a case involves constitutionally protected conduct." *Hershey v. City of Clearwater*, 834 F.2d 937, 940 n.5 (11th Cir. 1987) (emphasis added). That is likely why this Court, at the motion-to-dismiss stage, stated that the question whether to dismiss Plaintiffs' overbreadth claim was "a close question" *even assuming* that the provisions "impinge on constitutional rights." [Doc. 57 at 15].

2. The evidence confirms that neither the Pre-filling Prohibition nor the

Anti-Duplication Provision are unconstitutionally overbroad. Looking first at the Pre-Filling Prohibition, it has a plainly legitimate sweep because it serves the State's compelling interest in preventing voter confusion and the perception of fraud, and it is narrowly tailored to apply only to unsolicited absentee-ballot applications sent by third parties. Day 2 Tr. 18:5–24.

Plaintiffs have not developed any evidence to the contrary. Rather, in their Complaint, Plaintiffs identified only one possible example of overbreadth where a voter provides Plaintiffs with the information to pre-fill the application. [Doc. 1 ¶ 149]. But the State already showed that the Pre-Filling Prohibition does not apply "where the absentee-ballot application is solicited by the voter[s] and the voter[s] themselves provide[] Plaintiffs with the required prefilled information." [Doc. 1 ¶ 149]; Day 2 Tr. 38:16–39:8. As the Pre-Filling Prohibition does not even reach the one example of overbreadth Plaintiffs identified, this challenge to the Pre-Filling Prohibition fails.[10]

For similar reasons, the Anti-Duplication Provision is not substantially overbroad. As the State already demonstrated, the Anti-Duplication Provision has a clearly legitimate sweep because it responds directly to concerns about

---

[10] Further, even if that one situation did raise constitutional questions, it does not rise to the level of overbreadth required to invalidate a duly enacted statute. *See Members of City Council*, 466 U.S. at 800.

voter confusion and burdens on election administration.  And Plaintiffs have not identified the "substantial amount of protected free speech" that this provision allegedly limits.  *Hicks*, 539 U.S. at 118–19.  Rather, once again, Plaintiffs point to just one hypothetical, where an individual has already requested an absentee ballot and the Anti-Duplication Provision prevents Plaintiffs from sending another application where the individual "made an error on their prior request, had their prior request rejected, or need[ed] a new application for any other reason." [Doc. 1 ¶ 150].  But that is precisely what the Supreme Court had in mind when it held that the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."  *Members of City Council*, 466 U.S. at 800.  Accordingly, this hypothetical falls far short of showing that the Anti-Duplication Provision limits a "substantial amount of protected free speech."[11]  *Hicks*, 539 U.S. at 118–19.

3.  Finally, as with the other Challenged Provisions, Plaintiffs' challenge to the Disclaimer Provision [Doc. 1 ¶ 147] fails for several reasons.

*First*, like the other provisions, the Disclaimer Provision has a legitimate

---

[11] Of course, such a voter could still obtain an application from the Secretary of State or county election officials, O.C.G.A. § 21-2-381(a)(3)(A), or through VoteAmerica's online absentee-ballot application tool, [Doc. 1 ¶ 19].

sweep, merely requiring private entities sending applications to voters to note that they, not the government, are the senders, that the document is not a ballot, and that it is not an official government publication. Even Plaintiffs' expert recognized that latter point to be true: although the "application provided by third parties is 'identical' to" the application, it is "not the actual government publication." [Doc. 131 at 42 n.13].

*Second*, Plaintiffs have not identified how the Disclaimer Provision impinges any protected speech or activities. In fact, Plaintiffs have not even relied on the hypothetical harms like they did for their overbreadth challenges to the other provisions. Here, Plaintiffs claim that the Disclaimer Provision somehow stops "individual Georgians [from] helping each other participate in the political process." [Doc. 1 ¶ 148]. But there is no reason that including an accurate disclaimer prevents Plaintiffs from helping "other[s] participate in the political process." *Id.* If anything, the disclaimer *increases* the ways that Plaintiffs can help voters. Voters will now know from the application that it was provided by Plaintiffs, and thus Plaintiffs can field questions from voters.

But even if Plaintiffs resist sending applications with the disclaimer, that would not stop them from communicating their messages about absentee voting. For instance, Plaintiffs could send a link to the absentee-ballot application on the Secretary of State's website, which would not require

Plaintiffs to include the disclaimer in their mailing.  Day 2 Tr. 45:24–46:2.
Thus, the Disclaimer Provision is not substantially overbroad because it does
not substantially burden conduct and has a plainly legitimate sweep.

## V.     The Challenged Provisions are not Vague.

Finally, the Court should reject Plaintiffs' claims that the Challenged
Provisions are unconstitutionally vague, as each provision provides sufficient
notice about what it requires.  As the Supreme Court has often explained, a
law is void for vagueness only if it "fails to give ordinary people fair notice of
the conduct it punishes" or is "so standardless that it invites arbitrary
enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). In making
that determination, moreover, courts applying the vagueness doctrine are "not
required to exhibit a naiveté from which ordinary citizens are free." *Dep't of
Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (cleaned up).

Under these standards, none of the Challenged Provisions is susceptible
to a challenge for vagueness.  In fact, these challenges fail for the same reasons
that Plaintiffs' overbreadth claims fail.  As the Eleventh Circuit has explained,
vagueness claims are governed by nearly the same basic standard as
overbreadth claims: "[w]hen an ordinance implicates no constitutionally
protected conduct, a challenge as to the vagueness of the enactment on its face
should succeed only if the enactment is impermissibly vague in *all* its

applications." *Hershey*, 834 F.2d at 940 n.5 (emphasis added).

1. Beginning with the Pre-Filling Prohibition, Plaintiffs focus first on the statute's use of the word "send" to suggest unconstitutional vagueness. [Doc. 1 ¶ 157]. But the meaning of the word "send" is clear, especially in context. *See United Sav. Ass'n. of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). The ordinary and natural meaning of "sent" (or "send") in this context is "to cause something to go from one place to another," Cambridge Dictionary (online ed.),[12] and "to convey or cause to be conveyed," Merriam-Webster Dictionary (online ed.).[13]  To quote Plaintiffs' own attorney, the Pre-Filling Prohibition "clearly applies to mailing absentee-ballot applications prefilled." Germany Depo. 171:10–11. And Ryan Germany also made clear that it applies to "e-mail" for similar reasons.  *Id.* 171:8–22.  The word "send" thus means in practice what it suggests in the statute—providing a voter with an unsolicited, pre-filled absentee-ballot application.

Nor are Plaintiffs correct that there is anything remotely vague about the prohibition on "prefill[ing]" an absentee-ballot application "with the elector's required information." [Doc. 1 ¶ 157]. Plaintiffs fail in their attempt

---

[12] https://dictionary.cambridge.org/us/dictionary/english/send.

[13] https://www.merriam-webster.com/dictionary/send.

to manufacture vagueness here by asking about the provision's application to pre-filling *all* of a voter's required information or just *some* of the voter's information.  *Id.*  As the General Assembly explained, this provision sought to address groups like Plaintiffs sending applications "with incorrectly filled-in voter information." SB 202 § 2(8). That issue clearly arises with *any* incorrectly pre-filled information.

Indeed, Plaintiffs clearly understand the reach of this provision, as shown by the fact that they complied with it in their 2022 mailings. Lopach Depo. 162:4–11.  Accordingly, this claim falls far short of satisfying Plaintiffs' obligation to show that the Pre-Filling Prohibition is "impermissibly vague in *all* its applications." *Hershey*, 834 F.2d at 940 n.5 (emphasis added).

2. The same is true of Plaintiffs' vagueness challenge to the Anti-Duplication Provision.  Here, Plaintiffs challenge the inclusion of the word "mail."  [Doc. 1 ¶ 158].  As already discussed, the Anti-Duplication Provision unambiguously allows only appropriate election officials to "mail [absentee-ballot] applications … to individuals who have … already requested, received, or voted an absentee ballot in the primary, election, or runoff"—and even then, only if the voters themselves request them. O.C.G.A. § 21-2-381(a)(3)(A).

Plaintiffs have again failed to develop any evidence of how anyone could be unclear about what it means to "mail" an application.  As Plaintiffs' conduct

shows, they correctly understood that it applies to their pre-SB 202 mailings. *Compare* Lopach Depo. 41:17–42:11, 44:5–7 (multiple waves in 2020), *with* Lopach Depo. 133:19–134:4, 150:11–14 (one wave in 2022). Accordingly, here again, Plaintiffs' claim fails based, in large part, on their own conduct.

3.   Finally, the Disclaimer Provision is not unconstitutionally vague. Here, Plaintiffs' challenge to this provision (like the others) alleges ambiguity in the word "sent."  But the Disclaimer Provision clearly applies to absentee-ballot applications that third parties cause—by mail, e-mail, or otherwise—to be conveyed to Georgia voters. Germany Depo. 100:7–10. Accordingly, like Plaintiffs' other vagueness challenges, the Court should enter summary judgment for the State on Plaintiffs' claim that the Disclaimer Provision is unconstitutionally vague.

## CONCLUSION

The record confirms that Plaintiffs cannot support their claims that any of the Challenged Provisions violates the First Amendment.  Indeed, they remain free to communicate their pro-absentee-voting message to Georgia voters.  In contrast, the record is replete with examples of the harms that Plaintiffs' previous mailings caused the State and Georgia voters.  Accordingly, under any standard of review, each of the Challenged Provisions survives and the Court should enter summary judgment in the State's favor.

Respectfully submitted this 13th day of December, 2022.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Edward H. Trent*
Joshua J. Prince*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272

36

bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

37

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(C).

*/s/Gene C. Schaerr*
Gene C. Schaerr