# EXHIBIT D

```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                           ATLANTA DIVISION

 3


 4    VOTEAMERICA; VOTER PARTICIPATION
      CENTER; and CENTER FOR VOTER
 5    INFORMATION
                Plaintiffs,
 6
      V.                                Case No. 1:21-CV-01390-JPB
 7
      BRAD RAFFENSPERGER, in his         Judge J.P. Boulee
 8    Official capacity as Secretary
      Of State of the State of Georgia;
 9    SARA GHAZAL, JANICE JOHNSTON,
      EDWARD LINDSEY, and MATTHEW MASHBURN,
10    In their official capacities as members
      Of the STATE ELECTION BOARD,
11
                Defendants,
12
      And
13
      REPUBLICAN NATIONAL COMMITTEE;
14    NATIONAL REPUBLICAN SENATORIAL
      COMMITTEE; NATIONAL REPUBLICAN
15    CONGRESSIONAL COMMITTEE; and
      GEORGIA REPUBLICAN PARTY, INC.,
16              Intervenor-Defendants.
                                          /
17

18              DEPOSITION OF THE SECRETARY OF STATE

19          Charles Ryan Germany, Designated Representative

20              DATE:  Tuesday, September 13, 2022

21              TIME:  9:30 a.m. - 4:24 p.m.

22              LOCATION:  1600 Parkwood Circle, Suite

23                         200, Atlanta, Georgia

24              REPORTED BY:  Tamika Burnette, RPR, CSR

25              No. 2870
```

1  inspectors as well?
2     A.  It's 25 investigators --
3     Q.  Okay.
4     A.   -- then inspectors would be in addition to
5  that.
6     Q.  Okay.  And there are how many inspectors?
7     A.  I want to say, kind of, between 12 and 15.
8     Q.  Can you describe a little bit how the working
9  relationship works between the Elections Division and
10 yourself in the Investigations Division?
11    A.  Can you clarify?  The Elections Division,
12 myself, Investigations Division?
13    Q.  Yes.  So I'm trying to understand how do those
14 pieces, yourself as general counsel, the Elections
15 Division, and the Investigations Division work together
16 when it comes to investigations.
17    A.  Yes.  So my role is I kind of provide legal
18 support to all the divisions.  So I'm really there to
19 support them.  You know, I'm not overseeing either of
20 those divisions, but my job is to support both of them.
21 I would say that most of the complaints that we get
22 regarding elections will come in by e-mail.  And I think
23 both our people in the Elections Division, I think it's
24 Michelle, has kind of the access to that.  And some
25 complaints are going to be more of like, hey, I'm having

```
 1    like it's not a signature match verification of identify
 2    like it was pre-SB 202, but voters still have to sign
 3    the form and that -- and you know, the counties, they
 4    are the registrars; they're making these determinations.
 5    And I think that's, generally, how they're going about
 6    it.
 7         Q.   That makes sense to me.  So to summarize,
 8    signature matching is no longer the primary
 9    identification system for absentee ballot application.
10    However, if a signature is suspicious in some way, just
11    as if any part of the application is suspicious, the
12    election officials can further investigate; is that
13    fair?
14         A.   Right.  Yes, do a little due diligence.  I
15    think that's -- you know, I would only say -- the only
16    thing I would say is instead of identification, I'll say
17    verification.  Right?  I'll say signature is not the
18    primary kind of verification of a voter's identity.
19         Q.   Okay.  And then you mentioned the eligibility
20    for the rollover list.  Is there a means by which
21    election officials verify eligibility for the rollover
22    list beyond the checking if they were eligible?
23         A.   The only one would be really elderly.  If you
24    put you're elderly but -- and they know your birthday --
25    but you're not, and then it would not allow that.  But
```

1   --
2           Q.   Okay.
3           A.   -- if you're, like, disabled, that's going to
4   be essentially a -- they're going to take the voter's
5   word for it, and then same with overseas.  Now,
6   overseas, you do have to kind of check a box as to which
7   one you apply, which one -- if you're overseas military,
8   military state assigned, overseas temporary, overseas
9   permanent -- you have to check a box.  And so I can see
10  a situation where, hey, you say you're this, but it
11  doesn't really make sense, and so they might reach out
12  to the voter.  But other than elderly, it's going to be
13  pretty much the voter's -- take the voter's word for it.
14          Q.   Okay.  Great.
15          A.   And the form the voter is filling out is pretty
16  clear on it.  One, it's pretty clear that you have to be
17  truthful on this form.
18          Q.   Of course.
19          A.   And so I think that works.
20          Q.   Yes.  And so I think we've talked through the
21  various ways in which election officials make sure that
22  the absentee ballot application matches the voter
23  registration data and reflects an actual voter in
24  Georgia.
25               Can you talk through how the system is set

Transcript of Charles Ryan Germany, Designated Representative
September 13, 2022
47

```
 1    up to avoid the issuance of duplicate -- duplicate
 2    ballots, if duplicate applications are received?
 3         A.   Sure.  So, you know, it's all tied to the
 4    voter's voter registration record.  So if you get a
 5    duplicate application and the voter is already listed
 6    as, kind of, being set up to receive an absentee ballot,
 7    then you would see that, you know, when you go to
 8    process that duplicate.  And so you wouldn't send them
 9    another ballot.  The voter is already flagged to receive
10    a ballot.  And so if you -- if they get another
11    application, they're not going to get another ballot for
12    the most part, but it would -- it would be processed as
13    a duplicate.
14              I mean, the risk would come if there's
15    someone with, like, a very similar name or, you know, we
16    have some counties that do a better job keeping up with
17    their duplicate voter registration records than others.
18    So if there's, you know, potentially a duplicate
19    registration, that could cause an issue.  But generally,
20    as long as it's going to be matched with the actual
21    voter that the previous application was matched to, then
22    the system is not going to send another absentee ballot
23    to that voter.
24         Q.   And that --
25         A.   I shouldn't say it like that.  The system is
```

1  ballot applications are received?
2       A.   There's a field -- so if they receive a
3  duplicate and they go in and they see, okay, you've
4  already received an -- we've already processed an
5  application, they're going to kind of mark this one,
6  this new one, as a duplicate.
7       Q.   Okay.
8       A.   The system will just kind of file it away, but
9  won't do away with it.
10      Q.   And now there will be records of duplicate
11 applications in the system?
12      A.   Yes.
13      Q.   Okay.
14      A.   But, then, it won't be the duplicate
15 application itself, it will be kind of what -- kind of
16 you'll enter information from the duplicate application.
17      Q.   There will be a record that there was one?
18      A.   Correct.  And then they'll -- they should keep
19 the actual applications themselves.  I mean, that's a --
20 sort of a -- more of a paper file system that the
21 counties utilize.
22      Q.   Okay.  One thing that I noticed in the
23 documents that I was hoping you could talk me through is
24 the -- what, I think, is, maybe, some back end reporting
25 and analysis about potential duplicates that your office

1   Q.  Okay.  And for tools and applications that meet
2   the rule, this regulation says that the pre-filling
3   prohibit would not apply to these kinds of tools and
4   applications, correct?
5   A.  Yes.  I think it's saying that that practice
6   would not fall under that prohibition.
7   Q.  Exactly.  And also, tools or applications that
8   fall under this rule do not have to include the
9   disclaimer that is discussed in SB 202, correct?
10  A.  Correct.
11  Q.  And tools or applications that fall under this
12  rule do not have to check the list of current absentee
13  voters to de-duplicate their communications, correct?
14  A.  Correct.  I mean, because I think the, you
15  know, web tool, if you're just kind of saying, hey, you
16  can go fill this out here, I think this regulation is
17  saying that's -- that's not viewed as, you know,
18  basically, you kind of sending that voter an
19  application; it's more kind of making them -- making
20  them -- making the voter aware of kind of the fact that
21  an application exists and you can go here and fill it
22  out.  I think the real distinction was, like, this is
23  the web-based tool where the voter goes and puts in
24  their own information.  It really seems kind of a
25  voter-initiated process.  Even if they're nudged by,

1  your office did in response to SB 202 is draft a new
2  absentee ballot application form; is that correct?
3       A.   Correct.
4       Q.   Okay.  And as I understand it, there are a
5  number of things you needed to change about the absentee
6  ballot application form in response to SB 202, correct?
7       A.   Correct.
8       Q.   You needed to add space for the identification,
9  for example; is that correct?
10      A.   Right.
11      Q.   Okay.  And one of the things you had to do
12 was -- well, actually scratch that.  One thing you
13 ultimately did do is create an application form that
14 third parties could use that had all the required
15 disclaimer language?
16      A.   Yes.
17      Q.   Okay.  And can you talk me through kind of the
18 timeline and who was involved in the drafting process
19 with the new absentee ballot application?
20      A.   Yes.  So drafting the new application was, I
21 think, one of the first things we really started to do
22 even before we did any regulations.  I think we wanted
23 to have the absentee ballot application drafted.  Sarah
24 Beck was our election attorney at the time, and I think
25 she sort of, you know, spearheaded the project.  Again,

1      A.   And for our purpose, I mean, I know, like, the
2   main thing is the -- so that is a matter from the
3   processing of the application.
4      Q.   Right.
5      A.   I get how it could be difficult for a
6   third-party group, and they have to kind of consult with
7   their lawyers on it.
8      Q.   Sticking with this kind of distinction between
9   mail, e-mail, in person, I'd like to move to the
10  pre-filling prohibition.  It clearly applies to mailing
11  absentee ballot applications prefilled.
12          Is it your understanding that the
13  pre-filling prohibition would also apply to your e-mail?
14     A.   Yes.
15     Q.   Okay.  It's kind of hard to imagine this, but
16  let's imagine a world where I was holding a conference,
17  so I knew who all the attendees were, and so I kind of
18  prefilled absentee ballot applications for all the
19  individuals because I have them, you know, at
20  registration and I was going to give them out
21  personally.  Would that also be prohibited?
22     A.   I think so.
23     Q.   Okay.
24     A.   Yes.
25     Q.   And moving on to the mailing restriction.

1   out, you know, prefilled applications to every voter,
2   every active voter.  And, you know, and we did that, of
3   course, because like I said, we -- some counties were
4   going to do it and we wanted everyone to be treated
5   equally.  And then I think with COVID a lot of groups
6   focused on absentee that may be normally that wouldn't
7   be their -- their focus.  It does seem like this year it
8   is going back to a more -- I mean, Georgia has had no
9   excused absentee voting since 2005, but, you know,
10  predominantly, people have preferred to vote in person
11  whether on election day or early.  And then in 2020 it
12  went up tremendously, absentee did.  But I think -- but
13  -- and the thinking has been that it would go down to
14  closer to where it's historically been in Georgia than
15  2020.
16       Q.  Prior to SB 202, did the SOS or county
17  officials track inaccuracies on applications that were
18  the result of pre-filling by third-parties?
19           MR. FIELD:  I'll just note that he's not
20  here or able to testify on what counties did
21  necessarily.
22           MS. LANG:  To your knowledge?
23           MR. FIELD:  With that caveat.
24           THE WITNESS:  No.  I'm not really aware
25  of -- there was prefilled voter registration forms and

1    MR. KAUFMAN: Ask your question again.
2    MR. FIELD: Can you ask your question
3  again, 2020, because I think he was talking about 2020?
4    THE WITNESS: My answer was I meant, like,
5  prior to the 2020 election cycle. Sorry.
6  BY MS. LANG:
7    Q. Okay. Prior to SB 202, did the Secretary of
8  State, including the 2020 election cycle, did the
9  Secretary of State or county officials, to your
10 knowledge, track inaccuracies and applications that were
11 due to prefilled absentee ballot applications?
12   A. We received complaints about that. We didn't
13 track the specific sort of complaints, inaccuracy
14 complaint of -- some of them might have been -- like,
15 some of them are due to the fact that there's a lag in
16 removing the voter rolls, like, kind of federally
17 required flag if someone is moved. So if you get an
18 application mailed to your address, but it's addressed
19 to someone who used to live there, I think it's filled
20 inaccurately to the person who receives it, but it's not
21 necessarily an inaccuracy, you know, on the rolls.
22   Q. Right. I understand that. My question was a
23 little bit different, which is, was there any tracking
24 of inaccuracies on an absentee ballot applications that
25 were received by officials that could be attributed to

1　people vote or 5 million people vote, you're going to
2　have people who have an issue when they show up.  You
3　know, of course, we want that to be as few people as
4　possible, but the 2020 or 2018 -- we didn't see any
5　issues that went to the overall confidence on the
6　accuracy of the results of the election.
7　　　　Q.  And do you believe the -- that SB 202 that you
8　helped draft, in part addressed some of those concerns
9　or those issues that you described in 2018 and 2020?
10　　　　A.  Yes.
11　　　　Q.  All right.  And what kind of issues do you
12　believe it addressed just in general terms?
13　　　　A.  Well, it addressed -- you know, we did receive
14　a lot of complaints about kind of absentee ballots-type
15　issues because there was a big increase of absentee
16　ballots in 2020.  So we talk about some of the
17　complaints here, but then some of the things that it led
18　to were voters who didn't show up to vote being told
19　they've requested an absentee ballot, and then those
20　voters would say that must mean someone had voted for
21　me, and that's fraud.  Whereas in reality what we saw a
22　lot was they filled out an absentee application, maybe
23　they kind of forgot about it, maybe they were on the
24　rollover list and didn't understand what that -- what
25　that meant.  And so when they had to clear that issue

```
 1   up, you know, it led to sort of -- and again, Stacey
 2   Abrams, like, that's what happened when they went to
 3   vote in 2018 too.  So we want to avoid that happening,
 4   you know, for anybody, basically.  So I think it helps
 5   with that.  There's a lot of things that speak to that
 6   that we didn't talk about today, like, kind of some of
 7   the line tracking things, you know, of the -- other
 8   aspects of it as well, but I can't really recall off the
 9   top of my head.
10        Q.  Sure.  Obviously, you've had a long day.  Is
11   there anything else that you think you need to clarify
12   or that could have left anyone with the wrong
13   understanding of what you meant?
14        A.  I hope not.  I don't think so.
15        Q.  Well, I assume we all have an opportunity to
16   read and sign; so I don't have any other questions for
17   you.  Thank you.
18              MS. LANG:  No further questions
19   (Whereupon, proceedings were concluded at 4:24 p.m.)
20
21
22
23
24
25
```