# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| VOTEAMERICA, *et al.*, | |
| *Plaintiffs,* | |
| v. | Civil Action No.: 1:21-CV-1390-JPB |
| BRAD RAFFENSPERGER, in his official capacity as the Secretary of State for the State of Georgia, *et al.*, | |
| *Defendants,* | |
| REPUBLICAN NATIONAL COMMITTEE, *et al.*, | |
| *Intervenor-Defendants.* | |

# BRIEF IN SUPPORT OF STATE DEFENDANTS'
# MOTION TO EXCLUDE CERTAIN OPINIONS
# OF PLAINTIFFS' EXPERT DONALD P. GREEN, PHD

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... ii

INTRODUCTION ............................................................................ 1

BACKGROUND: Dr. Green's Challenged Opinions ......................... 3

    A.    Disclaimer Provision............................................................ 4

    B.    Prefilling Prohibition .......................................................... 5

    C.    Anti-Duplication Provision ................................................. 5

ARGUMENT ................................................................................... 6

    I.    Dr. Green's Qualifications Do Not Make His Opinions
        Admissible. ........................................................................ 9

    II.   Dr. Green's Opinions Are Not Based on a Recognized Scientific
        Methodology, Are Unreliable, and Are Unhelpful to the Trier
        of Fact. ............................................................................. 11

        A.    Disclaimer Provision................................................... 12

        B.    Prefilling Prohibition ................................................. 18

        C.    Anti-Duplication Provision......................................... 22

CONCLUSION................................................................................ 24

CERTIFICATE OF COMPLIANCE.................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Burdick v. Takushi*, 504 U.S. 428 (1992) ........................................................... 6

*Cartwright v. Home Depot U.S.A., Inc.,*
  936 F. Supp. 900 (M.D. Fla. 1996) ................................................................ 16

*Chapman v. Procter & Gamble Distrib., LLC*,
  766 F.3d 1296 (11th Cir. 2014) ..................................................................... 13

*City of Tuscaloosa v. Harcros Chems., Inc.,*
  158 F.3d 548 (11th Cir. 1998) ......................................................................... 7

*Clark v. Takata Corp.,* 192 F.3d 750 (7th Cir. 1999) ....................................... 10

*Cooper v. Marten Transp., Ltd.,*
  No. 1:10-cv-03044-JOF, 2012 WL 12835704 (N.D. Ga. June 4, 2012),
  *aff'd in part on relevant grounds, rev'd in part on other grounds,*
  539 F. App'x 963 (11th Cir. 2013) ................................................................ 11

*Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022) ............................... 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ......... 1, 16

*Diamond Resorts U.S. Collection Dev., LLC v. Newton Grp.*
  *Transfers, LLC*, No. 9:18-cv-80311-REINHART, 2022 WL 1642865
  (S.D. Fla. Mar. 31, 2022) ...................................................................... 15, 17

*Frye v. Daimler Trucks N. Am., LLC*, No. 1:18-cv-04827-JPB,
  2021 WL 4241658 (N.D. Ga. Mar. 3, 2021) ................................. 8, 11, 16, 17

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ............................................... 11

*Joiner v. General Elec. Co.*, 78 F.3d 524 (11th Cir. 1996), *rev'd,*
  522 U.S. 136 (1997) ...................................................................................... 16

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................................... 8

*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253 (11th Cir. 2002) ........... 8

*McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004) ...................................... 10

*MidAmerica C2L Inc. v. Siemens Energy, Inc.*,
   25 F.4th 1312 (11th Cir. 2022) ................................................. 11, 23

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) ........................*passim*

*United States v. Perry*, 14 F.4th 1253 (11th Cir. 2021) ............................ 12, 17

**Statutes**

O.C.G.A. § 21-2-381(a)(1)(C)(ii) ............................................................... 1

O.C.G.A. § 21-2-381(a)(3)(A) ................................................................... 2

**Rule**

Federal Rule of Evidence 702 ................................................................. 1, 7

**Other Authorities**

Fed. R. Evid. 702 advisory committee's note to 2000 amends. ...................... 23

Donald P. Green & Alan S. Gerber, *Get Out the Vote: How to Increase
   Voter Turnout* (Brookings Inst. Press, 4th ed. 2019) ..................................... 9

Hans J.G. Hassell, *Teaching voters new tricks: The effect of
   partisan absentee vote-by-mail get-out-the-vote efforts*,
   4 Rsch. & Pol. 1 (2017) .................................................................. 19, 20, 22

Christopher Mann & Genevieve Mayhew, *Voter Mobilization Meets
   eGovernment: Turnout and Voting by Mail From Online or Paper
   Ballot Request*, 14 J. Pol. Mktg. 352 (2015) .......................................... 18

## INTRODUCTION

Plaintiffs' Expert, Donald P. Green, PhD intends to offer certain expert opinions during trial as described in the Expert Report of Donald P. Green ("Rep.") [Doc. 103-5], the Amended Expert Rebuttal Report of Donald P. Green ("Am. Rebuttal Rep.") [Depo. Ex. 4] [Exhibit A hereto], and the testimony of Donald P. Green taken during the first day of the hearing on Plaintiffs' Motion for Preliminary Injunction (June 9, 2022) ("TR") [Doc. 129] and his October 4, 2022 deposition ("Depo.") [Exhibit B hereto].  Those opinions concern the specific effects of three provisions of Georgia SB 202 related to third-party organizations sending unsolicited absentee-ballot applications to prospective voters.  Those causal opinions, however, are not based on any reliable scientific methodology and fail to satisfy the "helpfulness" standard required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

Specifically, Dr. Green opines on three SB 202 provisions: (1) O.C.G.A. § 21-2-381(a)(1)(C)(ii) ("Disclaimer Provision"), which requires anyone sending an absentee-ballot application directly to an elector to include a simple disclaimer that the application is "NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot"; (2) O.C.G.A. § 21-2-381(a)(1)(C)(ii) ("Prefilling Prohibition"), which prohibits

third-party organizations from sending absentee-ballot applications that were "prefilled with the elector's required information"; and (3) O.C.G.A. § 21-2-381(a)(3)(A) ("Anti-Duplication Provision"), which imposes fines on "persons or entities" that mail absentee-ballot applications to voters who have "already requested, received, or voted an absentee ballot in the primary, election, or runoff" while providing a five-day safe harbor provision.

Based on his reading of the statute, Dr. Green offers three opinions on the effects of these provisions that the State Defendants seek to exclude:  First, he opines that the Disclaimer Provision would likely "stir up confusion" with the absentee-ballot application going "in the trash."  TR 225:21–226:1 [Doc 129].  Second, he opines that, because of the Prefilling Prohibition, groups such as Plaintiffs would have to waste money sending more unfilled absentee-ballot applications to voters to generate the same level of vote by mail participation. Finally, he opines that, because of the Anti-Duplication Provision, groups such as Plaintiffs may decline to send any unsolicited absentee-ballot applications for fear of incurring potential penalties.

In forming these opinions, Dr. Green admits he conducted no scientific study.  Instead, he relies on anecdotal "evidence" from a grand total of five interviews of individuals at Atlanta public transit locations who were paid $20 to answer leading questions related to the disclaimer language.  Dr. Green

relies on "convenience" and his inappropriate extrapolation of a partisan study in Minnesota to form his opinions regarding the Prefilling Prohibition. Finally, Dr. Green offers no study, data, or scientific analysis at all for his opinions regarding the Anti-Duplication Provision. These three opinions are simply *ipse dixit* and should be excluded as unreliable and unhelpful to the trier of fact.

### BACKGROUND: Dr. Green's Challenged Opinions

Dr. Green first opined that groups such as Plaintiffs send out mailers with absentee-ballot applications to voters to increase voter turnout. Rep. at 3. This is because, according to Dr. Green, when a voter receives an unsolicited absentee-ballot application in the mail, it decreases the voter's "transaction costs" to voting, thus making it more likely that the voter would complete the application and vote by mail. *Id.* Based on this "transaction cost" principle, Dr. Green suggests that the Disclaimer Provision, Prefilling Prohibition, and Anti-Duplication Provision raise "transaction costs" on voters or increase campaign costs to Plaintiffs, making such mail campaigns less effective. As shown below, his opinions are not supported by any scientifically valid methodologies but rather are solely based on his intuition, instinct, assumptions, or theories on how these provisions *might* impact voters and groups such as Plaintiffs.

3

### A.    Disclaimer Provision

As to the Disclaimer Provision, Dr. Green expresses the following opinions that the State Defendants seek to exclude:

- "These provisions, in my professional opinion, are likely to create confusion among voters who receive applications from an individual or group seeking to assist them in voting by mail. ... Given their [the average voter] limited familiarity with these specific provisions [absentee-ballot application provisions of SB202] and apprehensiveness about filling out official forms in general, the wording of the disclaimer is likely to make them reluctant to fill out an otherwise innocuous form." Rep. at 6–7.

- "The wording of the required disclaimer is likely to generate suspicion and reluctance to complete the application."  Am. Rebuttal Rep. at 2.

- "My expert opinion, based on more than three decades of research on public opinion and voting behavior, *focused primarily on a direct reading of the disclaimer and how I expect voters to respond to it*.  My opinion is that the language of the disclaimer will cause voters to become suspicious of the mailer and reluctant to complete it." Am. Rebuttal Rep. at 4 (emphasis added).

- After reviewing the actual form to be used by nongovernmental organizations that includes the required disclaimer, Dr. Green stated: "In my opinion, this juxtaposition [putting the disclaimer at the bottom of the form rather than at the top as in his interviews] makes the disclaimer more conspicuous and will cause greater suspicion among recipients.  In effect, voters are 'primed' to think about fraud immediately before encountering the disclaimer warning them about unofficial forms from nongovernmental entities.  Furthermore, they are urged to be on the lookout for 'multiple or duplicate copies in the mail,' which is not itself prohibited under Georgia law but might lead many voters to wonder if they have been the victims of fraud.  The two boxes taken together have the potential to create an even more ominous

4

impression in voters' minds than the disclaimer presented on its own." Am. Rebuttal Rep. at 7.

### B. Prefilling Prohibition

As to the Prefilling Prohibition, Dr. Green expressed the following opinions about its effects:

- "The prohibition against prefilled forms reduces the efficiency with which mailings generate requests to vote by mail. Voters are more likely to sign and send in request forms that are pre-filled, due to their convenience." Rep. at 8.

- "The net effect of this prohibition is that groups such as the Plaintiffs must waste money sending *more* unfilled forms in an attempt to generate the same number of vote-by-mail requests." Rep. at 9, (emphasis in original).

- "The prohibition in my opinion lacks a legitimate justification or purpose, as the information that nongovernmental organizations such as Plaintiffs use to populate the forms comes from the public voter file itself and has already been vetted by election officials." Am. Rebuttal Rep. at 2.

### C. Anti-Duplication Provision

Dr. Green expresses the following opinions on the effects of the Anti-Duplication Provision:

- "The risk of a punishment this large [$100 per duplicate absentee-ballot application] is sufficient to deter groups, such as the Plaintiffs in this lawsuit, from engaging in these mail campaigns." Rep. at 10.

- "The law's draconian penalties seem to be designed to deter individuals and groups from sending any such mailings. These chilling effects are likely to be especially severe for small organizations, such as church groups, that lack the staffing or technical capacity to regularly download and inspect the official

5

database to ensure that those who 'already requested, received, or voted an absentee ballot' do not inadvertently receive an outgoing mailing." Rep. at 10–11.

- "A final serious encumbrance on nongovernmental organizations stems from the fact that SB202 imposes penalties for each individual application sent to those who have already "requested, received, or voted an absentee ballot," permitting only a five-day grace period. The severity of the potential penalties and the difficulty of expunging all inadvertent mail from a logistically complex mass mailing makes such campaigns perilous for nongovernmental organizations such as Plaintiffs. In my expert opinion, the risk of fines and jail time for inadvertent mailings is sufficient to deter groups from engaging in this form of communication." Am. Rebuttal Rep. at 2.

## ARGUMENT

As the Supreme Court has said, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992). And, as the Eleventh Circuit has held, "the Constitution charges States, not federal courts, with designing election rules." *Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022). Yet Plaintiffs intend to rely on various opinions by Dr. Green to argue that the Disclaimer Provision, Prefilling Prohibition, and Anti-Duplication Provision are "unnecessary" and *could* cause some voters to decline to participate in the mail-in voting process. But those opinions are simply his personal musings, unmoored from any scientific methodology and should be excluded.

Under Federal Rule of Evidence 702,[1] courts apply "a rigorous three-part inquiry" to ensure the "foundations" of the testimony "meet[s] the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). This inquiry requires the court to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). While these criteria may overlap, "they remain distinct concepts and the courts must take care not to conflate them." *Id.*

The purpose of this analysis is for the court to exercise its "gatekeeper" function over evidence admitted at trial. The Eleventh Circuit has it made clear that "[t]he importance of *Daubert*'s gatekeeping requirement cannot be

---

[1] Fed. R. Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

overstated." *Id.* As this Court has recognized, "the trial court must 'conduct an exacting analysis of the proffered expert's methodology.'" *Frye v. Daimler Trucks N. Am., LLC*, No. 1:18-cv-04827-JPB, 2021 WL 4241658, at *3 (N.D. Ga. Mar. 3, 2021) (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)). "The objective is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). It is always the burden of the party offering the expert to establish the expert's qualifications, "the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony assists the trier of fact." *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257) (cleaned up).

While Dr. Green is an expert in voter behavior and the use of random trial studies in evaluating get-out-the-vote (GOTV) efforts, he did not use any scientific methodology to come to the opinions challenged here. Indeed, he testified that he simply *feels* that the "negative effects" of the Disclaimer Provision, Prefiling Prohibition, and Anti-Duplication Provision are so obvious that no study was necessary. Depo. 156:16–157:5 [Exhibit B]. Because his

opinions are not based on sound scientific methodology and will not assist the trier of fact, Dr. Green's expert opinions should be excluded.

## I.   Dr. Green's Qualifications Do Not Make His Opinions Admissible.

Obviously, Dr. Green's qualifications cannot, by themselves, make Dr. Green's opinions admissible.  To be sure, his "expertise lies in the area of voting behavior, public opinion, elections, research design, and statistical analysis." Rep. at 1.  He teaches classes on these topics and has published articles on the topics of "voting and elections" in various journals.  *Id.*  He has also co-written a book, *Get Out the Vote: How to Increase Voter Turnout* (with Alan S. Gerber, Brookings Inst. Press, 4th ed. 2019) that relies on hundreds of randomized trial studies to evaluate various forms of GOTV efforts to determine the most cost-effective means for partisan and nonpartisan groups to get more voters to the polls.  *Id.*; Depo. 29:4–8; TR 203:9–16, 280:10–14.  Yet, Dr. Green chose to forgo such research methodologies and rely on his own impressions from reading the statute.  Am. Rebuttal Rep. at 4.

Dr. Green did ask a third-party company to conduct "semi-structured" interviews to verify that others perceived the disclaimer language the same as he did.  TR 219:18–20, 220:18–22; Depo. 150:6–13; 162:1–7.  This, even though

Dr. Green acknowledges that he is not an expert in "qualitative" studies.  Depo. 20:12–16, 21:2–7.

Of course, the fact that Dr. Green may be qualified as an expert in various GOTV efforts is irrelevant here, since even "a 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method.'" *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (quoting *Clark v. Takata Corp.,* 192 F.3d 750, 759 n.5 (7th Cir. 1999)); *see also, Frazier,* 387 F.3d at 1261 ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong").  Yet, that is precisely what Dr. Green does.[2]

---

[2] Of course, Dr. Green is free to testify, as he has already, that the Disclaimer language is accurate, TR 215:23–216:5, that *in general* mail get-out-the-vote (GOTV) efforts have little if any effect on voter turnout, Depo. 105:19–106:3, 114:22–115:21, and how randomized trials are the most reliable means of evaluating the effects of GOTV efforts, Depo. 27:16–17, 30:5–8, 33:9–36:7, 66:10–11, 151:1–3, although all such testimony only further shows why he has no admissible opinion testimony regarding specific effects of the provisions of SB202 at issue in this case.

## II.   Dr. Green's Opinions Are Not Based on a Recognized Scientific Methodology, Are Unreliable, and Are Unhelpful to the Trier of Fact.

As this Court has held, "it remains a basic foundation for admissibility that [p]roposed [expert] testimony must be supported by appropriate validation—*i.e.,* good grounds, based on what is known." *Frye*, 2021 WL 4241658, at *6 (quoting *Frazier*, 387 F.3d at 1261). "In all events, the expert must have factual and analytical support for his opinions." *Id.* Moreover, as the Eleventh Circuit has held, "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert,' and the 'court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *MidAmerica C2L Inc. v. Siemens Energy, Inc.*, 25 F.4th 1312, 1327 (11th Cir. 2022) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997)). Similarly, "[a]n expert's unexplained assurance that he or she has relied on accepted principles fails as well." *Cooper v. Marten Transp., Ltd.*, No. 1:10-cv-03044-JOF, 2012 WL 12835704, at *2 (N.D. Ga. June 4, 2012), *aff'd in part on relevant grounds, rev'd in part on other grounds,* 539 F. App'x 963 (11th Cir. 2013) (per curiam). Expert opinions that do not satisfy these conditions— as is true of Dr. Green's opinions on the effects of the three SB202 provisions

11

at issue here—are not helpful to the finder of fact and should therefore be excluded.

## A.    Disclaimer Provision

Dr. Green made it clear that his opinion on the Disclaimer Provision was based on his experience and "focused primarily on a direct reading of the disclaimer and how I expect voters to respond to it."  Am. Rebuttal Rep. at 4; TR 243:24–244:19.  Dr. Green's interpretation of ordinary, non-technical language is not a proper subject for expert testimony.  *See United States v. Perry*, 14 F.4th 1253, 1264–65 (11th Cir. 2021).  Significantly, moreover, Dr. Green admits each provision of the Disclaimer Provision is true.  TR 215:23–216:5, 242:22–243:10.

1.    Dr. Green even testified that, although he believes randomized trial studies are the "gold standard," Depo. 66:10–11, he did not do that in this case because he believed doing so would be like "proving that water is wet." TR 265:1–7.  Of course, Dr. Green has written and maintains that "Experts may report speculations in the guise of findings, but without a rigorous research design those findings are suspect."  Depo. 42:8–10, 43:17–19.  Yet here, Dr. Green admits he did not engage in any scientific study, certainly nothing based on "a rigorous research design."  TR 243:17–245:14.

12

Dr. Green's lone "study" of the impact of the Disclaimer Provision was to engage a researcher named Alisa Hamilton to go to downtown Atlanta and interview non-professionals about how they perceived the disclaimer language. Depo. 18:8–19, 19:13–18, 148:12–16, 150:6–13; TR 246:6–9.   Ms. Hamilton conducted five interviews with three Black women and two Black men encountered at MARTA stations and for which each interviewee was paid $20 for their time.  TR 249:22, 250:22–24, 251:23–25; Depo. 146:15.

Of these, Dr. Green relies on the response of a single person who, in response to a leading question, stated that he would throw the application "in the trash" because of the disclaimer.  Rep. at 8; Am. Rebuttal Rep. at 5.  But this interviewee at first responded to questions about the same application by stating that he "pretty much would fill it out, put all my name and identification and stuff and sign it and basically just wait for my ballot to come back."  TR 261:21–262:3.  Because that was not the answer the interviewer wanted, the interviewee was directed "to take a look" at the disclaimer.  Only then did he pick up on the answer the interviewer was seeking and made the reference to "throwing [the application] in the trash."  TR 225:18–226:1 & Pls.' Ex. 66 (TR 228 (videos admitted into evidence)).  Those gaping holes in the data underlying Dr. Green's report make it unreliable.  *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305–06 (11th Cir. 2014).

13

Even Dr. Green admits that what he now claims to be a "small qualitative study" (Am. Rebuttal Rep. at 4)[3] is a methodology only used to gather background information and "pretest" actual study questions.  Depo. 22:1–23:2, 23:13–17, 148:12–16; TR 224:13–24.  Dr. Green further admits that he did not conduct a randomized study, or any other study for that matter, even though he acknowledged that it would have been better to do a randomized trial rather than just a handful of "qualitative" interviews.  Depo. 151:1–3.  Indeed, Dr. Green himself recognized that a randomized study would have used around 25,000 participants for each "treatment" in the study—a control group who did not receive any absentee-ballot application in the mail, a group that received the application with the disclaimer, and another that received the application without the disclaimer—a total of around 75,000 people, Depo. 154:17–19, not five people in MARTA stations.  *Diamond Resorts U.S. Collection Dev., LLC v. Newton Grp. Transfers, LLC*, No. 9:18-cv-80311-

---

[3] Dr. Green admits, however, "I did not represent this study as an attempt to quantify the causal effect of the disclaimer on the rate at which the disclaimer would be noticed by voters or on the rate at which absentee-ballot applications bearing the disclaimer would be completed; I simply offered it as one lens through which one can examine what non-experts make of the disclaimer when they read it."  Am. Rebuttal Rep. at 4; TR 219:18–20, 224:13–24.  Of course, none of his five interviewees noticed the disclaimer until it was pointed out to them by Ms. Hamilton with the suggestion that it was out of place.  TR 254:22–23; Depo. 126:11–16, 127:13–129:13.

REINHART, 2022 WL 1642865, at *20 (S.D. Fla. Mar. 31, 2022) (excluding defendant's expert who relied on "qualitative research methods" consisting simply of reviewing three of six depositions taken of plaintiff's owners because the opinions were not based on "a reliable methodology").

As Dr. Green recognized, moreover, "a weak design can be used to prove things that are patently false," Depo. 61:16–17, and "observational designs can produce misleading conclusions." Depo. 63:9–10. So, while Dr. Green acknowledges that research design is key, Depo. 62:11–13, 64:14–16, he failed to design any kind of actual scientific study of the effects of the Disclaimer Provision. Rather, Dr. Green's approach is, essentially: "trust me, I'm an expert." TR 244:20–22; *see also,* Depo. 45:2–22 (noting that relying on experts who crank out studies "whose outcomes they find congenial to the services that they are selling" are really doing nothing but "shooting from the hip"). Such *ipse dixit* testimony must be excluded.

Dr. Green also opined that the absentee-ballot application with disclaimer published by the State, which is different from the form he used in his "study" because it places the disclaimer language at the bottom of the form rather than the top, "will cause greater suspicion among recipients" because of its placement after a fraud warning. Am. Rebuttal Rep. at 7; TR 254:1–6. But Dr. Green offers no scientific analysis of the disclaimer, let alone the

positioning of the disclaimer on the form or any other language on the form itself. There is no scientific methodology to support his conclusions. Dr. Green is simply "shooting from the hip" and such opinions are likewise inadmissible under Federal Rule of Evidence 702.

2.     For similar reasons, Dr. Green's opinions on the effects of the Declaimer Provision would not be helpful to the finder of fact. To help the trier of fact, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63 (citations omitted); *see also, Frye*, 2021 WL 4241658, at *8. "*Daubert* establishes a two-pronged test which requires a district court, before it may admit scientific testimony, to determine 'whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.'" *Cartwright v. Home Depot U.S.A., Inc.,* 936 F. Supp. 900, 901–02 (M.D. Fla. 1996) (quoting *Joiner v. General Elec. Co.*, 78 F.3d 524, 529–30 (11th Cir. 1996), *rev'd,* 522 U.S. 136 (1997) (quoting *Daubert,* 509 U.S. at 592)).

For example, Dr. Green offers no scientific insight into the allegedly "confusing" language of the Disclaimer Provision. He admits he offers no

quantification of how many voters would be inclined to simply discard the absentee-ballot application due to the required disclaimer.  Rep. at 8; Am. Rebuttal Rep. at 4; TR 253:16, 263:3–6, 266:7–13.  Instead, all he has to offer is an argument to the effect of "I read it and found it confusing and suggestive that the form was not valid, so you should too."  Depo. 127:13–129:13, 150:6–13, 161:15–19; TR 228:10–16, 244:3–22.  Such testimony provides no scientific insight and no expert testimony is needed for the trier of fact to read and evaluate the disclaimer.  *Diamond Resorts,* 2022 WL 1642865, at *21; *Perry,* 14 F.4th at 1264–65.  Accordingly, Dr. Green's opinion about the overall effects of the Disclaimer Provision should be excluded.  *Frye*, 2021 WL 4241658, at *9.

Similarly, Dr. Green's suggestion that the placement of the disclaimer at the bottom of the form is even more likely to result in confusion has no scientific foundation at all.  He conducted no study to form that opinion, not even asking a single other person what they thought, and he cites no studies on the subject.  TR 227:21–228:5, 264:21–265:1.  His personal supposition is simply not helpful to assist the trier of fact in understanding that or other issues in this case and should be excluded.  *Id.*

17

## B.    Prefilling Prohibition

Dr. Green similarly opines that the Prefilling Prohibition is unjustified and will harm Plaintiffs.  He bases his opinion on his view of transaction costs[4] and his suggestion that the "betting odds" are that prefilled forms are more effective than blank forms.  Am. Rebuttal Rep. at 11; TR 229:15–17, 232:9–11, 234:2–3.  He bases this conclusion on the fact that credit card companies send out prefilled applications all the time and they must know what they are doing.  Am. Rebuttal Rep. at 8–9.  Dr. Green therefore concludes "voters are more likely to sign and send in request forms that are prefilled, due to their convenience."  Rep. at 8.  From this, Dr. Green extrapolates that it would cost Plaintiffs more money because they would need to mail out more unfilled ballot applications to have the same number of voters complete and return the form.  Rep. at 9.  Here again, this opinion is not based on any scientific methodology and would not be helpful to the trier of fact.

---

[4] Dr. Green's citation for his transaction costs analysis comes from a study that found more people completed a printed blank absentee-ballot application form provided to them in the mail than who went to a state election website to complete the application in response to a postcard reminder for them to do so. TR 210:10–211:3; Christopher Mann & Genevieve Mayhew, *Voter Mobilization Meets eGovernment: Turnout and Voting by Mail From Online or Paper Ballot Request*, 14 J. Pol. Mktg. 352 (2015) [Exhibit C hereto].  This study did not evaluate prefilled forms, disclaimer language, or any relevant provision of SB202 at issue here.

1.    On this point, Dr. Green relies on a single study from Minnesota to support his claim, but that study does not bolster his conclusions.  *See* Hans J.G. Hassell, *Teaching voters new tricks: The effect of partisan absentee vote-by-mail get-out-the-vote efforts*, 4 Rsch. & Pol. 1 (2017) [Exhibit D hereto].  The study reviewed the overall voter participation of groups provided a partisan mailer that contained either a prefilled absentee-ballot application, a blank application, or a group that received no mailer at all.  The mailing contained messages encouraging voters to vote in the upcoming election, so it was not simply the absentee-ballot application, as Dr. Green assumes in his analysis.  Indeed, Dr. Green notes that the messaging of mailers is critical to them being effective.  Depo. 95:5–8, 105:19–106:3, 106:7–17.

The results of the Hassell study showed an *insignificant* increase in absentee-ballot participation by those with the prefilled application (2.57%) versus those with the blank application (2.05%).  Hassell, *supra*, at 3 tbl.1 & 5 n.10.[5]  Of course, the group that received the unfilled ballot applications were

---

[5] From these numbers, the prefilled absentee-ballot application resulted in 25% more requests for absentee ballots than the blank forms or ten people out of 1900 (49 versus 39).  Am. Rebuttal Rep. at 9; Hassell, *supra*, at 3 tbl.1 [Exhibit D hereto].  That means to reach the equivalent "outcome," it would take approximately 2381 unfilled ballot applications to equal the results from the 1906 prefilled ballot applications.

also less likely to vote at all than even the group that received no mailer, thus raising the question of whether the difference was due to the prefilled versus blank application or the overall propensity of the particular voters in the blank group to vote in general.  Hassell, *supra*, at 3 tbl.1.

Not only does the Hassell study not suggest that prefilled absentee-ballot applications automatically result in more individuals voting by mail, but there is nothing to suggest a cost comparison between successful prefilled absentee-ballot applications versus blank absentee-ballot applications assuming effective messaging with the application.   Dr. Green notes that prefilled absentee-ballot applications are "much more expensive" than a blank application.  TR 229:20–24; Depo. 88:14–19, 89:8–10.  But he provides no data on the difference in cost to even allow a comparison,[6] meaning again, the trier of fact must take his word for it that the Prefilled Prohibition creates some greater cost burden to Plaintiffs.

Dr. Green also suggests that prefilled applications are beneficial because they contain "vetted" information from the voter file and thus fewer errors.  Rep. at 9; TR 231:22–232:1.  But here again, he provides no support for his

---

[6] If that cost is 25% greater per form (perhaps as little as .25 per application at $1 per blank application) then prefilling applications is *less cost-effective* and undermines Dr. Green's efficiency argument regarding the Prefilling Prohibition.  *See, e.g.*, TR 280:10–14.

assertion.  TR 277:2–3.  Nor does he provide an answer for what the State is supposed to do if, even assuming the information was initially vetted, it eventually becomes stale because of death, moving, a name change, or any other of life's potential circumstances especially when the federal National Voter Registration Act places limits on the State's ability to perform voter list maintenance.  Because the mail-in ballot may be sent to another address where the voter will be at the time of the election, that and other portions will have to be blank or contain potentially inaccurate information.  Again, for his opinion to be accepted, the trier of fact would have to trust Dr. Green's assumptions simply because "he's an expert"—which is insufficient under *Daubert* and Federal Rule of Evidence 702.  *Frazier,* 387 F.3d at 1261.  Dr. Green's opinions about the effects of the Prefilled Prohibition are unreliable and should be excluded.

2.    Nor is Dr. Green's statement that he is "convinced" that prefilled absentee-ballot applications are more effective than blank applications helpful to the trier of fact in understanding a technical or scientific analysis of the Prefilling Prohibition.  Depo. 165:1–7.  Dr. Green's opinion is grounded in his understanding that other industry groups "seem dead set on sending prefilled forms whenever they can" so prefilling applications must be effective.  Depo. 90:4–12.  But he himself recognized that groups are often

wrong about what is effective.   Depo. 59:17–60:17.   Further, even if his intuition and betting strategy were correct, the real issue would be the impact on Plaintiffs and Dr. Green offers nothing to quantify any cost impact on Plaintiffs as discussed above.  A trier of fact does not benefit from Dr. Green "shooting from the hip."

Dr. Green also suggests the Plaintiffs and other organizations will obtain the information for prefilling from the voter file.  Yet he provides no evidence on where Plaintiffs get their mailing information.  The Hassell study relied on the partisan group's proprietary information.  Hassell, *supra*, at 2.  Whether that information will benefit, hinder, or have no effect on the processing of such prefilled applications is not the subject of any scientific analysis, but again a bald assumption by Dr. Green.  Dr. Green's opinions are simply argument that counsel can make during a closing argument, meaning it is not helpful expert testimony and should be excluded.  *Frazier*, 387 F.3d at 1262–63.

### C.    Anti-Duplication Provision

Dr. Green does not even pretend to rely on any scientific analysis for his opinions regarding the Anti-Duplication Provision.  TR 278:5–13.  Rather, he *assumes* that Plaintiffs and other entities are simply incapable of comparing their mailing list to the list provided by the State of who has requested, received or cast an absentee ballot during the five-day safe harbor period and

are thus rolling the dice on whether they will be subject to penalties for violating the Anti-Duplication Provision.  TR. 239:7–240:24; 280:25 ("I think . . .," "I don't know . . .," "I'm guessing . . .").  He suggests, again without reference to any study, survey, or data whatsoever, that some groups, including church groups will simply not participate in this form of get-out-the-vote activities.  Rep. at 10–11; Am. Rebuttal Rep. at 2, 15–16; TR 239:7–240:23, 241:24–25.

1.     The unreliability of such testimony is self-evident.  Dr. Green does not even provide anecdotal evidence of a single person or organization that limited or chose to not send out absentee-ballot applications because of the Anti-Duplication Provision or any provision of SB202 in Georgia or anywhere in the country.  TR 280:25.  To accept such testimony requires a huge leap of faith that would undermine Rule 702.  *MidAmerica C2L*, 25 F.4th at 1327.  Indeed, Dr. Green fails to explain how his experience led to the conclusion he reached in this regard, why his experience is sufficient standing alone to reach such a conclusion, or how any of his experience is even applicable to the Anti-Duplication Provision.  "Again, the court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  *Frazier*, 387 F.3d at 1265 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amends. (cleaned

23

up)).  Dr. Green's opinions on the Anti-Duplication Provision should be excluded.

2.    Dr. Green's opinions on the Anti-Duplication Provision are closer to ghost stories told around a campfire than a scientific or technical analysis of the impact of the Provision.  He suggests that individuals and organizations, particularly local churches, will stop sending out absentee-ballot applications for fear of violating the provision. Rep. at 10–11; Am. Rebuttal Rep. at 15–16; TR 239:7–240:23.  He suggests that complying with the five-day safe harbor provision is entirely too difficult while offering no study or any anecdotal evidence to support his claim.  Am. Rebuttal Rep. at 14–15; TR 240:14–24.

Dr. Green's dismissive approach to counter-arguments only highlights why his opinions provide no insight "beyond the understanding of the average lay person" related to the Anti-Duplication Provision and are more akin to closing arguments than expert analysis.  *Frazier*, 387 F.3d at 1262–63. Accordingly, Dr. Green's opinions regarding the effects of the Anti-Duplication Provision should be excluded.  *Id.*

## CONCLUSION

For all these reasons, Dr. Green's specific opinions on the effects of the three SB202 provisions discussed above are not based on a sound scientific methodology, are unreliable, and provide no assistance to the trier of fact in

24

understanding the issues in this case.   Accordingly, Plaintiffs should be precluded from offering any of these opinions.

Respectfully submitted this 13th day of December, 2022.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Edward H. Trent*
Joshua J. Prince*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Fax: (202) 776-0136
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

25

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief in Support of Defendants' Motion to Exclude Expert Opinions of Donald P. Green, PhD has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(C).

*/s/ Gene C. Schaerr*
Gene C. Schaerr

26