# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| VOTER PARTICIPATION CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, *et al.*, <br><br> Defendants, <br><br> and <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> Intervenor-Defendants. | Case No. 1:21-cv-01390-JPB <br> Judge J.P. Boulee |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 1

LEGAL STANDARD ....................................................................................... 4

ARGUMENT .................................................................................................... 5

I. Plaintiffs' Distribution Of Absentee Ballot Applications Is Protected
Speech, Expressive Conduct, And Associational Activity ............................ 5

A. The Disclaimer Provision Compels Plaintiffs' Speech ............................ 6

B. Distributing Personalized Applications Is The Dissemination Of
Information Protected By The First Amendment ..................................... 7

C. Plaintiffs' Distribution Of Communications Containing Absentee
Ballot Applications Is Protected Expressive Conduct .............................. 9

D. Distributing Absentee Ballot Applications Is Characteristically
Intertwined With Conveying Plaintiffs' Message ................................... 13

E. Distributing Personalized Absentee Ballot Applications Is Protected
Associational Activity .............................................................................. 17

II. The Ballot Applications Restrictions Seriously Infringe Plaintiffs' First
Amendment Rights And Are Subject To Strict Scrutiny ............................... 19

A. The Disclaimer Provision Is Subject To Strict Scrutiny .......................... 20

B. Strict Scrutiny Is Required Because The Ballot Application
Restrictions Limit Core Political Speech ................................................. 22

C. Strict Scrutiny Is Required Because The Ballot Application
Restrictions Are Content- And Viewpoint-Based .................................... 26

D. The Restrictions Abridge Plaintiffs' Associational Activity ................... 28

E. The *Anderson-Burdick* Framework Is Improper Here But Nonetheless
Requires Heightened Scrutiny .................................................................. 29

III. The Ballot Application Restrictions Fail First Amendment Scrutiny ......... 31

A. Defendants Do Not Demonstrate Any Compelling State Interest ........ 32

B.  The Restrictions Are Not Narrowly Tailored ............................................ 36

IV. The Ballot Application Restrictions Are Unconstitutionally
Overbroad ........................................................................................... 41

CONCLUSION ........................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Association of People with Disabilities v. Herrera,*
   690 F. Supp. 2d 1183 (D.N.M. 2010) ....................................................... 13

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ......................................... 19, 26, 29, 30, 32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)....................................................... 4

*Arizona Alliance for Retired Americans v. Clean Elections USA,*
   No. 22-cv-01823, 2022 WL 15678694 (D. Ariz. Oct. 28, 2022)............................. 11

*Baptiste v. Kennealy*, 490 F. Supp. 3d 353 (D. Mass. 2020)......................................... 21

*Barker v. Hazeltine*, 3 F. Supp. 2d 1088 (D.S.D. 1998).................................................... 6

*Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.,*
   482 U.S. 569 (1987) ........................................................................................ 41

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983)....................................... 7, 33

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ................................................. 17, 28

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) .................................................................. 41

*Brown v. Hartlage*, 456 U.S. 45 (1982) ............................................................................. 5

*Buckley v. American Constitutional Law Foundation, Inc.,*
   525 U.S. 182 (1999) ......................................................... 5, 23, 26, 30, 34, 35

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................................................. 19, 26, 29, 30, 32

*California Democratic Party v. Jones*, 530 U.S. 567 (2000).......................................... 16

*Centro Tepeyac v. Montgomery County,* 722 F.3d 184 (4th Cir. 2013) ........................ 20

*Citizens for Legislative Choice v. Miller*, 144 F.3d 916 (6th Cir. 1998) ....................... 30

*Citizens for Police Accountability Political Committee v. Browning,*
   572 F.3d 1213 (11th Cir. 2009)............................................................................. 32

*Citizens United v. FEC*, 558 U.S. 310 (2010) ................................................................. 21

*Clark v. Community for Creative Non–Violence,* 468 U.S. 288 (1984)....................... 9, 11

*Coley-Pearson v. Martin*, No. 5:20-cv-151, 2021 WL 4782272
   (S.D. Ga. Oct. 13, 2021) ............................................................................ 13, 23

*Consolidated Edison Co. of New York v. Public Service Commission of New York*, 447 U.S. 530 (1980) ...................................................................... 7, 33

*Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015) ................................. 11

*Dallas v. Stanglin*, 490 U.S. 19 (1989) ........................................................ 18

*Democracy North Carolina v. North Carolina State Board of Elections*, 476 F. Supp. 3d 158 (M.D.N.C. 2020) ........................................................ 13

*Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312 (11th Cir. 2019) ................................................................ 29, 32

*Doe v. Marshall*, 367 F. Supp. 3d 1310 (M.D. Ala. 2019) .............................. 6

*Edmondson v. Velvet Lifestyles, LLC*, 43 F. 4th 1153 (11th Cir. 2022) ................... 4, 16

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................... 28

*Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989) ................................................................................ 33

*Fort Lauderdale Food Not Bombs v. Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018) ................................................................... 9

*Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999) ............................................... 6

*Harriet Tubman Freedom Fighters Corporation v. Lee*, 576 F. Supp. 3d 994 (N.D. Fla. 2021) ......................................... 4, 22, 30

*Healy v. James*, 408 U.S. 169 (1972) ..................................................... 19, 28

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) ................................................. 5, 10, 12, 20

*In re Georgia Senate Bill 202*, No. 1:21-CV-01229-JPB, 2022 WL 3573076 (N.D. Ga. Aug. 18, 2022) ................................ 9, 27, 29

*J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778 (11th Cir. 2020) ..................... 4, 16

*Kusper v. Pontikes*, 414 U.S. 51, 58-59 (1973) ............................................... 29

*League of Women Voters of Florida, Inc. v. Detzner*, 314 F. Supp. 3d 1205 (N.D. Fla. 2018) ....................................................... 32

*League of Women Voters of Tennessee v. Hargett*, 400 F. Supp. 3d 706 (M.D. Tenn. 2019) ............................... 14, 17, 22, 28, 30

*League of Women Voters of Florida v. Cobb*,
447 F. Supp. 2d 1314 (S.D. Fla. 2006) ...................................................... 13

*Martin v. City of Struthers, Ohio*, 319 U.S. 141 (1943) .................................. 34

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
138 S. Ct. 1719 (2018) .......................................................................... 11

*Mazo v. New Jersey Secretary of State*, No. 21-2630,
2022 WL 17172673 (3d Cir. Nov. 23, 2022) ............................................ 26

*McClendon v. Long*, 22 F.4th 1330 (11th Cir. 2022) ......................... 20, 21, 22

*McCullen v. Coakley*, 573 U.S. 464 (2014) .................................................. 40

*McIntyre v. Ohio Election Commission*, 514 U.S. 334 (1995) ........... 6, 11, 25, 26, 27, 29

*Meyer v. Grant*, 486 U.S. 414 (1988) ...................... 5, 7, 14, 17, 19, 22, 23, 24, 31, 37, 41

*NAACP v. Button*, 371 U.S. 415 (1963) ............................................ 18, 28, 29

*National Institute of Family Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018) ................................................................... 5, 6, 20, 21

*NetChoice, LLC v. Attorney General, Florida*,
34 F.4th 1196 (11th Cir. 2022) ...................................................... 7, 10, 11, 12

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) ............... 27, 31, 40

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .................................... 26, 28, 31

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988) ....................................................... 14, 33, 35, 38, 39

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006) ................................................................................. 6, 12

*Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) ............ 5, 13, 14

*SD Voice v. Noem*, 432 F. Supp. 3d 991 (D.S.D. 2020) ................................ 27

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) .......................................... 7

*Spence v. Washington*, 418 U.S. 405 (1974) ....................................... 9, 11, 16

*Texas v. Johnson*, 491 U.S. 397 (1989) ....................................................... 10

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ...................... 6

*Troster v. Pennsylvania State Department of Corrections*,
   65 F.3d 1086 (3d Cir. 1995) ..................................................................... 11

*Turner Broadcasting System, Inc. v. Federal Communications Commission*,
   512 U.S. 622 (1994) ......................................................................... 20, 32

*U.S. West v. FCC*, 182 F.3d 1224 (10th Cir. 1999) ......................................... 8

*VoteAmerica v. Schwab*, 576 F. Supp. 3d 862
   (D. Kan. 2021) .................................................... 13, 14, 17, 24, 26, 28, 30

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ................................... 13

*Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002) ........................................... 36

*Wollschlaeger v. Governor, Florida*, 848 F.3d 1293 (11th Cir. 2017) ............................. 14

*Wood v. Meadows*, 117 F.3d 770 (4th Cir. 1997) ............................................ 30

*Worley v. Florida Secretary of State*, 717 F.3d 1238 (11th Cir. 2013) ............................. 32

*Zeller v. The Florida Bar*, 909 F. Supp. 1518 (N.D. Fla. 1995) ...................................... 37

**Statutes, Rules, and Constitutional Provisions**

K.R.S. 25-1122(k) ............................................................................. 20

O.C.G.A. § 21-2-381(a)(1)(C)(ii) ......................................................... 2, 20

O.C.G.A. § 21-2-381(a)(3)(A) ................................................................. 2

O.C.G.A. § 21-2-381(a)(3)(B) ................................................................. 3

O.C.G.A. § 21-2-598 ....................................................................... 3, 20

O.C.G.A. § 21-2-599 ....................................................................... 3, 20

O.C.G.A. § 21-2-603 ....................................................................... 3, 20

**Other Authorities**

Amy J. Sepinwall, *Free Speech and Off-Label Rights*, 54 Ga. L. Rev. 463
   (2020) ................................................................................... 41

Daniel Rauch, *Customized Speech and the First Amendment*, 35 Harv. J.L.
   & Tech. 405 (2022) ..................................................................... 15

Oral Argument Transcript, *Meyer v. Grant*, Case No. 87-920 (U.S. Apr. 25, 1988), perma.cc/T6VL-AATM ........................................................................ 17

**INTRODUCTION**

Material fact disputes concerning the character of Plaintiffs' speech, the nature and magnitude of the challenged restrictions' abridgment of their rights, and the strength and tailoring of the State's asserted interests preclude summary judgment. These factual disputes bar summary judgment even if this Court applies the standards Defendants (wrongly) propose. While Plaintiffs marshal considerable evidence supporting their claims, Defendants offer paltry and inadmissible support for their purported interests. At trial, Plaintiffs will establish that their activity is protected speech and that the challenged restrictions fail First Amendment scrutiny. Plaintiffs are entitled to the opportunity to make that factual showing and this Court should deny Defendant's summary judgment motion.

**BACKGROUND**

Plaintiffs Voter Participation Center and Center for Voter Information distribute personalized absentee ballot application communications to inform and encourage voters to trust absentee voting, and then assist them to easily participate in the political process. Plaintiffs' advocacy works, having convinced over 663,500 Georgians to apply to vote absentee using a VPC/CVI mailer during the 2020 election cycle. Ex. 15, Lopach PI Decl. ¶ 23; *Id*. at 35-39, 40-45. Plaintiffs' mailers convey their message and persuade selected recipients to vote absentee. Ex. 15 at 3-4, 6, 9, 14, 23, 33 ¶¶ 7-10, 12, 17, 24, 34, 54, 71; Ex. 13, Diaz Decl. Ex. B at 38.

Despite the successes of these efforts, in 2021 Georgia passed Senate Bill 202, including three challenged provisions (the "Ballot Application Restrictions" or "Restrictions") that abridge Plaintiffs' First Amendment rights by limiting their distribution of absentee ballot applications. *First*, the Prefilling Prohibition bars Plaintiffs from distributing communications with applications that are "prefilled with the elector's required information." O.C.G.A. § 21-2-381(a)(1)(C)(ii). Through data vendors, Plaintiffs periodically draw voter registration information from the State's databases and then use that information to personalize the applications they send to their selected recipients. Ex. 15 at 8, 26-27 ¶¶ 22, 61; Dep. of Thomas Lopach ("Lopach Tr.") 113:9-13. Plaintiffs take on the extra expense to personalize because doing so makes their advocacy more persuasive and reduces transaction costs. Ex. 24, Expert Report of Donald Green at 8; Ex. 26, Am. Expert Rebuttal Report of Donald Green at 8-14. SB 202 categorically prohibits this practice.

*Second*, the Mailing List Restriction requires that anyone distributing applications can do so "only to individuals who have not already requested, received, or voted an absentee ballot in the" election. O.C.G.A. § 21-2-381(a)(3)(A). It provides that a group must "compare its mail distribution list with" an undefined list of "most recent information available about which electors" are restricted to then "remove the names of such electors." *Id.* Although it specifies that entities can rely on information that is five business days old, *id.*, it fails to

account for the fact that nothing in Georgia law requires the State to maintain that list (much less guarantee its accuracy), there are imperfections in any such lists, and the size of mailer programs like Plaintiffs' simply cannot make midstream, five-day adjustments. 6/9/22 PI Tr. 61:10-63:14; Ex. 15 at 12, 22-26 ¶¶ 33, 53-59. Failure to strictly comply, however, can result in $100 fines per violation and potential criminal penalties, including a misdemeanor with a sentence of up to twelve months confinement. O.C.G.A. §§ 21-2-381(a)(3)(B), 21-2-598, 21-2-603, 21-2-599. This forces Plaintiffs to minimize their communications, including sending only one mailer in 2022. Lopach Tr. 133:19-134:4; Ex. 24 at 9-11; Ex. 26 at 14-16.

*Third*, the Disclaimer Provision broadly requires that "[a]ny application … sent to any voter by any person or entity" must affix a confusing disclaimer:

> This is NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot. It is being distributed by [insert name and address of person, organization, or other entity distributing such document or material].

O.C.G.A. § 21-2-381(a)(1)(C)(ii). The Disclaimer is required for *any* distribution of applications—by mail or otherwise. *Id.* It contradictorily must be stamped on a State-mandated application that is titled "Application for Georgia Official Absentee Ballot." Ex. 12. And it primes voters to question whether the third-party communication is legitimate by juxtaposing the disclaimer next to a voter fraud warning. *Id.* Overall, it compels Plaintiffs to convey a State-mandated message that

3

they oppose, in part because it misleadingly suggests that Plaintiffs' applications are unofficial or illegitimate. Ex. 15 at 30-32 ¶¶ 67-69; Ex. 24 at 6-8; Ex. 26 at 3-8.

## LEGAL STANDARD

Summary judgment should be denied if there are any genuine disputes of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The movant has the burden of proof, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. If the movant "fails to show that the facts ... are not in dispute, then summary judgment should be denied—even if the non-moving party has introduced no evidence whatsoever." *Edmondson v. Velvet Lifestyles, LLC*, 43 F. 4th 1153, 1160 (11th Cir. 2022) (quotations omitted). And "even in the absence of a genuine issue as to a material fact, the need for a more detailed factual basis ... to decide a complicated legal issue may warrant denial of" summary judgment. *Harriet Tubman Freedom Fighters Corp. v. Lee*, 576 F. Supp. 3d 994, 1001 (N.D. Fla. 2021) (quotations and alterations omitted).[1]

## ARGUMENT

### I.    Plaintiffs' Distribution Of Absentee Ballot Applications Is Protected Speech, Expressive Conduct, And Associational Activity.

Plaintiffs' communications advocating for absentee voting are protected speech, conduct, and associational activity. Speech concerning the electoral

---

[1] The Court's legal and factual rulings at the preliminary injunction stage are not binding here. *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 794 (11th Cir. 2020).

process receives utmost constitutional protection. *Brown v. Hartlage*, 456 U.S. 45, 52-53 (1982). Because the First Amendment was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes," *Meyer v. Grant*, 486 U.S. 414, 421 (1988), courts must "be vigilant … to guard against undue hindrances to political conversations and the exchange of ideas," *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 191-92 (1999). Accordingly, protected political speech is broadly defined, such as "the expression of a desire for political change," "communication of information," and "dissemination and propagation of views and ideas" about the electoral process. *Meyer*, 486 U.S. at 421-22 & n.5 (citing *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)).

The First Amendment protects Plaintiffs' personalized application mailers under several conceptualizations of the doctrine. And because "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995), material fact disputes on the nature of Plaintiffs' speech preclude summary judgment.

### A.    The Disclaimer Provision Compels Plaintiffs' Speech.

As this Court held, the Disclaimer Provision implicates First Amendment rights because it compels Plaintiffs' speech. ECF 131 at 33, 36. "Compelled statements of fact … are subject to First Amendment scrutiny." *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006). This is so even if the disclaimer is compelled on a State-

generated form, *see Doe v. Marshall*, 367 F. Supp. 3d 1310, 1324-26 (M.D. Ala. 2019), and regardless of whether it is accurate. *See McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 355 (1995); *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018).

Indeed, Defendants' admission that the Disclaimer affects speech proves too much. *See* Br. in Supp. of Defs.' Mot. for Summ. J. ("Br."), ECF 149-1 at 2-3. If the Disclaimer compels Plaintiffs' speech on the applications, it follows that the applications themselves are, much like initiative petitions, communicative despite their electoral function.[2] As such, SB 202's other provisions likewise affect speech.

### B.   Distributing Personalized Applications Is The Dissemination Of Information Protected By The First Amendment.

Conveying information and personalizing applications is protected speech. When speakers "'disclose,' 'publish,' or 'disseminate' information, they engage in 'speech.'" *NetChoice v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011)). The First Amendment protects Plaintiffs' "communication of information" and "dissemination and propagation of views and ideas" encouraging absentee voting. *Meyer*, 486 U.S. at 421-22 & n.5.

---

[2] This point also refutes Defendants' analogy to *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), arguing that absentee *applications* are never expressive because they claim that *ballots* are not. ECF 113 at 13. They also misread *Timmons* on its own terms. Later decisions have ruled that ballots themselves can have speech elements and are subject to *Meyer-Buckley* scrutiny. *Gralike v. Cook*, 191 F.3d 911, 917 (8th Cir. 1999); *Barker v. Hazeltine*, 3 F. Supp. 2d 1088, 1095 (D.S.D. 1998).

The application that Plaintiffs distribute includes detailed instructions on how to apply to vote absentee (e.g., what information is required) in the most accessible format—the actual application. Ex. 15 at 6 ¶ 17; *Id.* at 35-39, 40-45. Personalizing the applications through prefilling is also itself speech. Plaintiffs obtain voter information, employ it to personalize their applications, and then distribute them to a selected set of specific voters. These personalized applications include words chosen by Plaintiffs—specific names from the voter rolls and the associated addresses—written on a page. Ex. 15 at 5, 6, 8 ¶¶ 15, 18, 22; *Id.* at 35-39, 40-45. Overall, the personalized mailers represent "the creation and dissemination of information" for voters to use to vote absentee. *Sorrell*, 564 U.S. at 570.

The Restrictions implicate Plaintiffs' "right to speak" in this manner because the "information [Plaintiffs] possess[] is subjected to restraints on the way in which the information might be used." *Id.* at 568 (quotations omitted). The Tenth Circuit in *U.S. West v. FCC* applied a similar rule to analogous facts. 182 F.3d 1224, 1228-30 (10th Cir. 1999). Like here, the challenged law limited a speaker's ability to use specific recipient information to distribute targeted direct mailers. *Id.*[3] The court rejected as "fundamentally flawed" an analogous argument to Defendants' claim that restricting the ability to "target" the speaker's message did "not prevent [the

---

[3] The First Amendment broadly protects mailers. *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60 (1983); *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530 532 (1980).

speaker] from communicating with its customers or limit anything that it might say to them." *Id.* at 1232. Instead, the Tenth Circuit held that the "existence of alternative channels of communication ... does not eliminate the fact that the [challenged laws] restrict speech." *Id.* The same is true for Plaintiffs' creation and dissemination of personalized applications with specific voter information to target their pro-absentee voting message here. Plaintiffs' speech warrants *even greater* protection than the commercial speech in *U.S. West v. FCC* because their communications take a stance in the contested debate at the core of our electoral process: in what manner voters can and should cast a ballot.

**C.     Plaintiffs' Distribution Of Communications Containing Absentee Ballot Applications Is Protected Expressive Conduct.**

Plaintiffs' distribution of personalized absentee applications is inherently expressive conduct. Conduct is expressive when (1) the actor "aimed to convey a message," and (2) "a reasonable person would view such conduct as conveying 'some sort of message.'" *In re Georgia Senate Bill 202*, No. 1:21-CV-01229-JPB, 2022 WL 3573076, at *10 (N.D. Ga. Aug. 18, 2022) (quoting *FLFNB v. Fort Lauderdale*, 901 F.3d 1235, 1242 (11th Cir. 2018)). The analysis is "focused on the context," *id.*, examining the "nature of [the] activity, combined with the factual context and environment," to determine whether the conduct is "sufficiently imbued with elements of communication." *Spence v. Washington*, 418 U.S. 405, 409-10 (1974).

Plaintiffs' distribution of personalized applications is "intended to be communicative," especially viewed "in context." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 294 (1984). Defendants do not dispute that Plaintiffs distribute personalized applications with the goal to persuade and assist voters to vote absentee. Plaintiffs' conduct is intended to express to carefully selected voters that participation in democracy is good, voting absentee is convenient and beneficial, and the identified voter should use the enclosed and already personalized form to easily start the process. Ex. 15 at 3-4, 6, 28 ¶¶ 7-10, 17, 63.

Thus, the only remaining question is whether a reasonable person would view Plaintiffs' conduct as conveying "*some* sort of message." *NetChoice*, 34 F.4th at 1212 (citation omitted). The record shows not only that a reasonable person would infer *a message*, but many voters did understand Plaintiffs' specific message. Over 663,500 Georgians were spurred to action to submit a VPC/CVI distributed application in 2020. Ex. 15 at 9 ¶ 25. And many of Defendants' purported voter complaints show that the recipients understood Plaintiffs' message but responded by voicing their political opposition to absentee voting. Defs. Exs. H at 17, M; Ex. 23 at 71. Even SB 202's sponsor noted the expressive elements of distributing applications. Ex. 23 at 87, 101. Defendants do not contradict this evidence or otherwise show that a reasonable person would not infer *some* message from this conduct. At the least, there is a material fact dispute barring summary judgment.

Defendants' contrary legal arguments misapprehend the expressive conduct test in three ways. *First*, Defendants rely on *Texas v. Johnson*, 491 U.S. 397 (1989), to argue that conduct is expressive only if the observers subjectively understand the actor's "particularized" message. Br. at 11-12. But six years after *Johnson*, the Supreme Court clarified in *Hurley* that "a narrow, succinctly articulable message is not a condition of constitutional protection" and protected conduct is not "confined to expressions conveying a 'particularized message.'" 515 U.S. at 569 (quoting *Spence*, 418 U.S. at 411). Thus, the question is "not whether an observer would necessarily infer a *specific* message;" it is an objective analysis of whether a reasonable person would perceive "*some* sort of message." *NetChoice*, 34 F.4th at 1212 (collecting cases).[4] Defendants' speculation that Plaintiffs' conduct might be interpreted to "mean a number of things" is beside the point. Br. at 13.

*Second,* Defendants ignore the Supreme Court's repeated instructions to consider context in assessing whether conduct is expressive. *See Spence*, 418 U.S. at 410; *Clark,* 468 U.S. at 294. The context here reinforces that Plaintiffs' conduct conveys their message encouraging voters to trust absentee voting and then easily

---

[4] There is broad consensus on this point. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rts. Comm'n*, 138 S. Ct. 1719, 1741 (2018) (Thomas, J., concurring); *id.* at 1748 n.1 (Ginsburg, J., dissenting); *Cressman v. Thompson*, 798 F.3d 938, 955 (10th Cir. 2015); *Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1090 n.1 (3d Cir. 1995); *AARA v. Clean Elections USA*, No. 22-cv-01823, 2022 WL 15678694, at *4 (D. Ariz. Oct. 28, 2022).

participate in the electoral process using that method. VPC/CVI distribute their applications at key moments during the election season—when debates over the merits of absentee voting are most salient. Lopach Tr. 146:2-11. Such activity represents "advocacy of a politically controversial viewpoint" that is "the essence of First Amendment expression." *McIntyre*, 514 U.S. at 347.

On this point, Defendants also stretch *Rumsfeld* beyond its scope. Br. at 11-12. The holding in *Rumsfeld* is that the First Amendment does not protect conduct if it is "expressive *only because* the [actors] accompanied their conduct with speech explaining it." 547 U.S. at 66 (emphasis added). *Rumsfeld* hinged on the fact that the school's conduct toward military recruiting—absent explicit explanation— would not be interpreted as expressive. But the mere presence of accompanying speech does not make conduct non-expressive; instead, *Rumsfeld* reaffirmed the *Hurley* decision, in which the Court determined that a parade was expressive conduct in part because the context also included speech from participants "carrying placards," "singing," and "carrying ... banners." 515 U.S. at 568-69.[5]

---

[5] The facts here align more with *Hurley* than *Rumsfeld* because Plaintiffs' distributed communications are not "expressive *only because*" of their cover letter. *Cf. Rumsfeld*, 547 U.S. at 66 (emphasis added). The key fact in *Rumsfeld* was that an observer of where military recruiting occurred could infer *no message at all* on behalf of the law school; they were more likely to assume that "interview rooms are full, or the military recruiters decided for reasons of their own [to] interview someplace else." *Id.* But here, a voter receiving only a personalized absentee

*Third*, Defendants resort to cases about restrictions on third-party *collection and delivery* of completed voting materials, without explaining why this is "similar activity" to the *persuasion and distribution* conduct here. Br. at 11-12. None of their citations support that distributing applications is unprotected conduct; rather, several directly distinguish distribution activity from collection activity, finding the former protected but the latter not. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 224 (M.D.N.C. 2020); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389-90 (5th Cir. 2013) ("accept[ing]" that "some voter registration activities involve speech—'urging' citizens to register; 'distributing' voter registration forms; [and] 'helping' voters to fill out their forms"). This is because "[s]oliciting, urging and persuading the citizen to vote [is] the canvasser's speech[.]" *Steen*, 732 F.3d at 390.

Meanwhile, courts have repeatedly held that distribution of voter materials and other forms of voter education and assistance is expressive conduct.[6]

---

application from a civic organization during the election season would at least infer "*some* sort of message" concerning engagement in the electoral process, *NetChoice*, 34 F.4th at 1212, even if it is only that the mailed application is meant to be "a convenience" for voting "in light of the pandemic." ECF 131 at 25. Plaintiffs need not alter their activity and send only an application in order to show that the conduct is objectively expressive. *Cf.* Br. at 13. Like the context in *Hurley*, Plaintiffs' cover letter and other materials only reinforce the expressive nature of distributing applications. *See* Ex. 15 at 6, ¶ 17, 36-45; Ex. 16; Ex. 3 at 44:11-18, 45:4-11.

[6] The cases involve a range of voting advocacy. *LWV of Tenn. v. Hargett*, 400 F. Supp. 3d 706 (M.D. Tenn. 2019); *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862 (D. Kan. 2021); *Dem. N.C.*, 476 F. Supp. 3d at 224; *LWV of Fla. v. Cobb*, 447 F. Supp. 2d

Defendants make no attempt to distinguish this precedent or explain why *all* these courts are wrong. In sum, Plaintiffs' distribution of personalized absentee applications is inherently expressive conduct.

### D.    Distributing Absentee Ballot Applications Is Characteristically Intertwined With Conveying Plaintiffs' Message.

Distributing personalized absentee applications is "characteristically intertwined" with expressing Plaintiffs' message. *Schaumburg*, 444 U.S. at 632. Defendants' attempt to disaggregate Plaintiffs' mailer into its component parts fails on the law and the facts. Legally, Defendants' "efforts to characteriz[e]" Plaintiffs' protected "speech as [unprotected] conduct is a dubious constitutional enterprise." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1309 (11th Cir. 2017) (en banc). It also improperly engages in the "slicing and dicing" of speech that numerous other courts have rejected. *LWV of Tenn.*, 400 F. Supp. 3d at 720; *accord VoteAmerica*, 576 F. Supp. 3d at 874-75. Precedent instead instructs courts to "refuse[] to separate the component parts of" speech "from the fully protected whole." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988). Courts "cannot parcel out the speech, applying one test to one phrase and another test to another" because "[s]uch an endeavor [is] both artificial and impractical." *Id.*

---

1314 (S.D. Fla. 2006); *AAPD v. Herrera*, 690 F. Supp. 2d 1183 (D.N.M. 2010); *LWV of Mo. v. Missouri*, 20AC-CC04333, at 22-30 (Cole Cty. Cir. Ct. Oct. 24, 2022) (Ex. 29); *Coley v. Martin*, No. 5:20-cv-151, 2021 WL 4782272, at *3 (S.D. Ga. Oct. 13, 2021).

Under the facts here, the First Amendment instead requires "due regard for the reality that" Plaintiffs' personalized application "is characteristically intertwined with informative and ... persuasive speech" in their mailer packages, and that without the ability to distribute the personalized application, "the flow of such information and advocacy would likely cease." *Id.* (applying, e.g., *Schaumburg*, 444 U.S., at 632; *Meyer*, 486 U.S. at 422 n.5). The entire point of Plaintiffs' mailer is to convince a selected voter that engaging in the electoral process through absentee voting is trustworthy and easy, using a calculated message and personalized resources to assist and persuade them. Ex. 15 at 3-4, 6, 9, 28 ¶¶ 7-10, 12, 17, 24, 63; *Id.* at 35-39, 40-45; Ex. A; Ex. 13 at 38. In 2020, for example, Plaintiffs tested messaging about the personalization of mailers to "call attention to the fact that the voter was explicitly chosen to receive the application." Ex. 13 at 7. They personalized the applications to "provide[] an exclusive voter experience" and express that the *particular voter* receiving the mailer should vote absentee. Ex. 13 at 7; Ex. 15 at 5, 8, 26-30 ¶ 15, 22, 60-66; 6/9/2022 PI Tr. 46:8-20.[7]

Plaintiffs cannot convey their message through their cover letters alone that say, for example, "I have sent you the enclosed absentee ballot application to make requesting a ballot easy," without also including an application. Ex. 15 at 37; *see*

---

[7] This targeted personalization further reinforces the expressive nature. Daniel Rauch, *Customized Speech and the First Amendment*, 35 Harv. J.L. & Tech. 405 (2022).

*also id.* at 38, 42. Intervenors' mailers similarly intertwined their communications with the enclosed application. Ex. 13 at 14-65 (mailers stating, e.g., "President Trump wants you to return this form!"). And as Defendants' own witness stated, the parts of a mailer are integrated as a single unit that together convey "the intent of the message the [sender] is trying to deliver." Waters Tr. 34:15-35:9; 44:7-45:11.

Thus, the mailer package expresses Plaintiffs' desired message that the voter should easily vote absentee by submitting the attached personalized application; that cannot be expressed without the application. The testimony from both Plaintiffs *and* Defendants' witness Brandon Waters (whose business also distributes applications) that the mailers as a package constitute their speech at least raises a material fact dispute of whether the communications are intertwined. Defendants' contrary argument offers sparse consultation of the record, elides the law on integrated communications, and relies on their own unsupported conclusions about the nature of Plaintiffs' speech. Br. at 10-14. This is insufficient for summary judgment. *J-B Weld*, 978 F.3d at 794; *Edmondson*, 43 F.4th at 1160.

At bottom, Defendants' argument is that the State can dictate Plaintiffs' speech here, insisting that civic organizations should speak about absentee voting through a communication that lacks the relevant materials. Br. at 13. While this Court preliminarily found it relevant that Plaintiffs could still send pro-absentee voting cover letters, the Supreme Court has "consistently refused to overlook an

15

unconstitutional restriction upon some First Amendment activity simply because it leaves other ... activity unimpaired." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581 (2000); *accord Spence*, 418 U.S. at 411 n.4. If Defendants' view of the law were reality, then *Meyer* would have come out differently: the inability to pay petition circulators would pose no constitutional problem because speakers could simply promote the petition without circulating it. *Cf.* 486 U.S. at 419.[8] The *Meyer* Court instead concluded that a speaker's ability "to employ other means to disseminate their ideas" does not take their speech "outside the bounds of First Amendment protection." *Id.* at 424. Thus, the fact that Plaintiffs could speak in a *different* way that the State prefers cannot negate the constitutional protections of Plaintiffs' integrated communications distributing personalized applications.

### E.   Distributing Personalized Absentee Ballot Applications Is Protected Associational Activity.

Finally, the Restrictions implicate Plaintiffs' associational activity. Courts "give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000). Restrictions on distributing absentee or registration applications "bear[] directly on the expressive and associational aspects" at the core of get-out-the-vote work. *LWV of Tenn.*, 400 F. Supp. 3d at 720.

---

[8] Colorado pursued precisely this argument. *See* Oral Argument Transcript at 19-21, *Meyer v. Grant*, Case No. 87-920 (U.S. Apr. 25, 1988), perma.cc/T6VL-AATM.

This is because "[a]n organization's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association." *VoteAmerica*, 576 F. Supp. 3d at 875.

As the record shows, VPC/CVI use their effective personalized absentee application communications to build greater association with partner organizations and a specific group of voters with whom Plaintiffs further engage in the political process via future mailers. Ex. 15 at 13-14 ¶¶ 35-39; Lopach. Tr. 147:20-148:20. Among the reasons Plaintiffs personalize their applications, track responses to their mailers, and provide robust unsubscribe opportunities is to ensure that their follow-up get-out-the-vote messages target supportive associates. Ex. 15 at 13-14 ¶¶ 35-39. These circumstances are far from *Dallas v. Stanglin*, where the plaintiffs were merely "patrons of the same business establishment" that admitted anyone "willing to pay the admission fee," who expressed no shared views, and who had no articulated associational outreach. 490 U.S. 19, 24-25 (1989).

First Amendment protection of associational interests is not predicated on whether there is a "preexisting relationship," as Defendants insist.[9] Br. at 26. In

---

[9] Regardless, Plaintiffs also use their distribution activity to associate with other civic organizations who share their goals of expanding the electorate by, for example, assisting them with encouraging and assisting prospective voters and sharing data about Plaintiffs' successful voter engagement programs. Ex. 15 at 14 ¶ 37-39; Lopach. Tr. 147:20-148:20, 147:20-148:20; 6/9/22 PI Tr. 47:15-23; P-0114.

*NAACP v. Button*, the plaintiff's efforts to solicit then-unassociated individuals to participate in litigation was protected as the means to *begin* an association. 371 U.S. 415, 429-23, 437 (1963). Similarly, in *Healy v. James*, the Court protected a student group's activity seeking the "use of campus bulletin boards and the school newspaper" to reach "new students" and create further associations to "remain a viable entity in a campus community." 408 U.S. 169, 181 (1972). Plaintiffs' activity reaching new associates here is no different and Defendants' cramped reading of associational rights goes against binding precedent. Regardless, their alternative view of the facts concerning Plaintiffs' associations presents a material dispute.

## II.   The Ballot Application Restrictions Seriously Infringe Plaintiffs' First Amendment Rights And Are Subject to Strict Scrutiny.

The record further supports that the Ballot Application Restrictions are subject to strict scrutiny, and material fact disputes bar summary judgment. As discussed above, the Restrictions directly regulate and impinge on speech, expressive conduct, and association, and therefore are subject to heightened scrutiny. The Disclaimer Provision is subject to strict scrutiny because it compels Plaintiffs to convey the government's message, not merely to disclose something about themselves. Likewise, the Prefiling Prohibition and Mailing List Restriction are subject to strict scrutiny because they abridge Plaintiffs' core political speech by reducing the overall quantum of speech and violating their "right not only to

advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 424. They are also content- and viewpoint-discrimination. And even if *Anderson-Burdick* applies, that inquiry is highly fact-intensive and there remain material fact disputes about the degree of the burden on Plaintiffs' rights as weighed against the purported state interests.

### A. The Disclaimer Provision Is Subject To Strict Scrutiny.

The Disclaimer unlawfully compels speech. The "fundamental rule of protection under the First Amendment" is "a speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 573. When the State "compel[s] speakers to utter or distribute speech bearing a particular message," as the Disclaimer does here, "such a policy imposes a content-based burden on speech and is subject to strict-scrutiny review." *McClendon v. Long*, 22 F.4th 1330, 1337 (11th Cir. 2022) (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994)); *accord NIFLA*, 138 S. Ct. at 2371, 2374-75 (applying similar rule).

The Disclaimer Provision requires Plaintiffs to "prominently" stamp a lengthy disclaimer, *see supra* Background, on any distributed application. O.C.G.A. § 21-2-381(a)(1)(C)(ii).[10] Failure to include this Disclaimer may result in criminal

---

[10] The Disclaimer is an extreme outlier. Only Kansas has an analogous law, but it is a more traditional disclosure requiring the sender's identity and a statement that "This is not a government mailing. It is from a private individual or organization." K.R.S. 25-1122(k). No other State compels speakers like the Disclaimer does here.

penalties. *Id.* §§ 21-2-598, 21-2-603, 21-2-599. Plaintiffs do not challenge the portion of the Disclaimer that requires Plaintiffs to disclose themselves (and not the government) as the sender. *See, e.g., Centro Tepeyac v. Montgomery County,* 722 F.3d 184 (4th Cir. 2013) (affirming injunction of part, but not all, of a disclosure requirement); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 406 (D. Mass. 2020) (similar). But the remainder of the Disclaimer—and in particular the assertion that "This is NOT an official governmental publication"—goes far beyond requiring *disclosure* of Plaintiffs' information.[11] Like in *McClendon* and *NIFLA*, the Disclaimer "alter[s] the content of the plaintiffs' speech and force[s] them to convey a message that they would not otherwise communicate." ECF 131 at 29. It amounts to a government script that compels Plaintiffs to convey a misleading message that is "antithetical to its mission," *id.*, of persuading voters that their personalized application communications are legitimate, trustworthy, and can be easily used to apply to vote absentee. Ex. 15 at 3-4, 6, 9 ¶¶ 7-10, 12, 17, 24.

The First Amendment prohibits such compelled speech. It does not matter whether the language of the disclaimer is technically accurate. *See NIFLA*, 138 S.

---

[11] Therefore, the standard applied in *Citizens United v. FEC* and other campaign finance disclosure cases does not apply. In *Citizens United*, the challenged provisions were solely aimed at ensuring speakers identified who was responsible for the disclaimer. 558 U.S. 310, 366 (2010). The Disclaimer here goes much further and is more akin to the compelled speech in cases like *NIFLA v. Becerra*.

Ct. at 2372. [12] It is also irrelevant that Plaintiffs can convey their own message

alongside the Disclaimer, *cf.* Br. at 20-21, because "the harm here is the forced

display of a government message … not the forced appearance of endorsement of

that message," *McClendon*, 22 F.4th at 1337 (quotations omitted).[13] And it does not

matter if the State designed the script with the benign goal of "reduc[ing] voter

confusion," ECF 131 at 32. If the government wishes to speak, it can do so itself,

but it cannot force Plaintiffs to convey its message. *See, e.g.*, *LWV of Tenn.*, 400 F.

Supp. 3d at 730 (applying *McIntyre*, 514 U.S. at 348; *Riley*, 487 U.S. at 800).

## B.   Strict Scrutiny Is Required Because The Ballot Application Restrictions Limit Core Political Speech.

The Restrictions are subject to strict scrutiny because they abridge Plaintiffs'

core political speech. As detailed *supra* Part I, Plaintiffs' communications

constitute speech that "involves both the expression of a desire for [an engaged

electorate] and a discussion of the merits of [absentee voting]." *Meyer*, 486 U.S. at

---

[12] Putting aside any creative argument about the definition of "publication," the compelled language undeniably contains the confusing and misleading message that a document that is created by the Secretary, bears the official seal, is titled "Application for Georgia Official Absentee Ballot," and that will be processed by election officials is somehow not a government publication. This Court has already recognized the likelihood of confusion here. ECF 131 at 42. And Mr. Germany stated that he supported deleting the misleading text. 6/10/2022 PI Tr. 95:1-20.

[13] Plaintiffs need not show evidence of "significant harm," *cf.* ECF 131 at 43, because the Disclaimer imposes a *per se* harm by requiring Plaintiffs to convey a message to which they strenuously object. *Harriet Tubman*, 576 F. Supp. 3d at 999.

421. The *Meyer-Buckley* framework, which is "not limited to the circulation of initiative petitions," applies. *LWV of Tenn.*, 400 F. Supp. 3d at 723-24. "If anything[,]" Plaintiffs' advocacy is even closer to the center of core political speech because "a person's decision to sign up to vote is more central to shared political life," *id.*, and it inherently "implicates political thought and expression," *Buckley*, 525 U.S. at 195; *Coley*, 2021 WL 4782272, at *3 (applying *Meyer* to voter assistance).

Defendants' attempts to distinguish *Meyer* overlook how the factual and legal circumstances apply here. The *Meyer* plaintiffs were proponents of an initiative on "whether the trucking industry should be deregulated" who wished to use paid petition circulators. 486 U.S. at 421. The Supreme Court held that the ban on paid circulators was unconstitutional because restricting *how* proponents chose to convey their message—using paid circulators to promote the petition and collect signatures—"reduc[ed] the total quantum of speech" and violated their "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.* at 423-24. The question before the *Meyer* Court was not whether paying circulators or collecting signatures was itself speech, but whether barring a speaker's most effective means of delivering their message violated the First Amendment. *Id.* The Court held that it did. *Id.*

The Restrictions here even more directly strain Plaintiffs' conveyance of their desired message than in *Meyer* because Plaintiffs cannot distribute their

personalized applications at all. A more apt comparison would be if the law in *Meyer* allowed initiative advocates to knock doors to promote their cause but barred them from circulating the actual petition. Such an analogous law would be unconstitutional, and here, Plaintiffs' advocacy concerning the fundamental right to vote warrants at least as much protection as speech about "whether the trucking industry should be deregulated." *Id.* at 421.

Like in *Meyer*, the Restrictions infringe Plaintiffs' core political speech in two ways. First, they "reduc[e] the total quantum of speech," *id.* at 423, by "drastically limit[ing] the number of voices advocating for the politically controversial topic of voting by mail, limit[ing] the audience which proponents can reach and mak[ing] it less likely that proponents will gather the necessary support," *VoteAmerica*, 576 F. Supp. 3d at 889. The Restrictions bar or encumber Plaintiffs' communications by limiting to whom Plaintiffs can speak, how often, in what manner, and only by also speaking the State's message. Ex. 9 at 63:2-6, 70:20-25; 209:20-214:22, 232:24-236:1, 271:17-24, 278:13-280:22; Ex. 15 at 13 ¶ 34; Ex. 26 at 14-16; Ex. 24 at 9-11; Ex. 27 90:13-91:1, 165:18-166:17. This "will have the inevitable effect of reducing the total quantum of speech on" absentee voting. *VoteAmerica*, 576 F. Supp. 3d at 889.

Second, the Restrictions limit Plaintiffs' protected right to "advocate their cause" through "what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 424. Based on their experience designing and operating voter

mobilization programs nationwide, Plaintiffs have determined that sending multiple waves of personalized absentee ballot applications is the most efficient method of reaching and persuading their target audience, Lopach Tr. 113:7-13; 146:22-147:7, and that a mailer package comprised of a cover letter, prefilled application, and postage-paid return envelope together is the most effective way to express their message, *id*. 60:8-17; 79:22-80:6; 6/9/2022 PI Tr. 42:14-43:2.[14]

Finally, protections for core political are not conditioned on whether Plaintiffs' speech is interactive or if someone speaks back. Such an incorrect "face-to-face interaction" rule would be directly contrary to *McIntyre*, in which the Supreme Court applied core political speech protections to anonymous leafletting. *See* 514 U.S. at 337-39, 344-48; *see also supra* n.3 (listing cases applying broad speech protections to direct mailers). Regardless, Plaintiffs' activity is analogous to both *Meyer* and *McIntyre*. Like in *Meyer*, Plaintiffs directly contact voters to solicit and encourage their participation in the political process, and like in *McIntyre*,

---

[14] While the *Meyer* "most effective means" analysis is subjective, Plaintiffs' belief is objectively justified. It is supported in randomized control tests that examine response rates among targeted populations. *Id*. at 66:14-67:6; 67:12-14. Dr. Green explained that voters are more likely to use prefilled forms and they are "also more convenient for election officials … than forms completed by hand." Ex. 24 at 8-9. Defendants admit that a study Dr. Green cites shows data that "prefilled … application[s] resulted in 25% more requests for absentee ballots than the blank forms[.]"ECF 150-1 at 19 n.5. And the State itself attests to the benefits of prefilling because they distributed such applications during the 2020 election. 6/10/22 PI Tr. 63:14-21; Ex. 18 at GA-VA00061955, GA-VA00061911, GA-VA00048570.

Plaintiffs' mailers reach voters apart from face-to-face interaction. Wherever it falls

between *Meyer* and *McIntyre*, Plaintiffs' activity is core political speech.[15]

### C.    Strict Scrutiny Is Required Because The Ballot Application Restrictions Are Content- And Viewpoint-Based.

The Ballot Application Restrictions are content- and viewpoint-based limits

on speech and subject to strict scrutiny. A law is "content based if [it] applies to

particular speech because of the topic discussed," *Reed v. Town of Gilbert*, 576 U.S.

155, 163 (2015), or when it defines the "category of covered documents … by their

content," *McIntyre*, 514 U.S. at 345; *see also Buckley*, 525 U.S. at 209 (Thomas, J.,

concurring). The Restrictions are content-based for both reasons.

First, they dictate the content that Plaintiffs are both required to and

prohibited from including in their messages. This "inhibits communication with

voters about proposed political change and eliminates voting advocacy by

plaintiffs … based on the content of their message." *VoteAmerica*, 576 F. Supp. 3d

at 888. Like SB 202's linewarming ban, the Restrictions are "premised on the

---

[15] Along similar lines, *Mazo v. New Jersey Secretary of State* also does not support Defendants. The *Mazo* Court held that regulation of candidates' slogans on a ballot burdened speech before reaching the non-novel conclusion that a state regulating what is printed on its ballots—exchanged only between the State and the voter— relates to the mechanics of the electoral process and thus subject to *Anderson-Burdick* review. No. 21-2630, 2022 WL 17172673, at *11 (3d Cir. Nov. 23, 2022). The Restrictions here, however, are "aim[ed] at regulating political speech" among private parties and are subject to "traditional First Amendment analysis." *Id*. at *8.

message a speaker conveys[;]" they hinge explicitly on the *content* of their communications. *In re SB 202*, 2022 WL 3573076, at *13-14. The State's asserted justification for these provisions—avoiding voter confusion allegedly caused by Plaintiffs' communications—is "based on the potential direct and emotive impact" of those communications, indicating that they are content-based. *Id*.

Second, the scope of the Restrictions' regulation is defined by the category of covered documents, applying only to mailers that include applications and only those that are prefilled. In this manner, the Restrictions are content based similar to the speech limitations at issue in *McIntyre*. *See* 514 U.S. at 345.

The Restrictions are also viewpoint-based, which is "an egregious form of content discrimination." *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (quotations omitted). The Restrictions apply solely to views *advocating* absentee voting because only those communications would include an application and one that is personalized; they impose no limits on mailers *against* absentee voting because that contrary message would not include any prefilled application. Such a law that "specifically applies a burden to the speech of those who 'solicit' others to" vote absentee, "but not those who solicit them not to do so" is unconstitutional viewpoint discrimination. *SD Voice v. Noem*, 432 F. Supp. 3d 991, 996 (D.S.D. 2020).

These content- and viewpoint-based restrictions are subject to strict scrutiny and presumptively unconstitutional. *Reed*, 576 U.S. at 163-64.

**D.     The Restrictions Abridge Plaintiffs' Associational Activity.**

The Restrictions are subject to strict scrutiny because they abridge Plaintiffs' associational rights. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976). This "freedom of association encompasses not only the right to associate with others but also the right to choose how one associates with others." *VoteAmerica*, 576 F. Supp. 3d at 875 (citing *Dale*, 530 U.S. at 653). And Plaintiffs' associational rights are "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference" on their "means of communicating" to further their associations. *Healy*, 408 U.S. at 181-83.

The Restrictions limit Plaintiffs' associational rights because they "involve[] the direct regulation of communication and political association, among private parties, advocat[ing] for a particular change." *LWV of Tenn.*, 400 F. Supp. 3d at 725 (quotation omitted). The abridgment of Plaintiffs' associational activities is analogous to the solicitation ban ruled unconstitutional in *NAACP v. Button*, which criminalized the solicitation of plaintiffs in segregation litigation. 371 U.S. at 421, 434. The ban violated First Amendment rights because it prevented the NAACP from associating to persuade others to action, which burdened their efforts to bring litigation as their chosen means for affecting change. *See id.* at 429–31, 437.

Similarly here, Plaintiffs' activities are their chosen means for associating with voters and organizations to prompt action for a common goal: greater trust in and use of absentee voting. *Supra* Section I.E. But, as in *Button*, the Restrictions abridge Plaintiffs' ability "to engage in association for the advancement of beliefs and ideas" by restricting Plaintiffs' communications, which are used to "persuade [their audience] to action" to vote absentee. 371 U.S. at 430, 437. Strict scrutiny applies to such abridgment. *Id*. at 438; *Kusper v. Pontikes*, 414 U.S. 51, 58-59 (1973).

### E.     The *Anderson-Burdick* Framework Is Improper Here But Nonetheless Requires Heightened Scrutiny.

The *Anderson-Burdick* test applies to constitutional challenges "on the basis that the scheme violates the prohibition against undue *burdens on the right to vote*." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) (emphasis added). The test does not apply to all election cases. *Id.* at 1318-19 & n.9. Here, it is "inapplicable [because] the election statute directly regulates core political speech and does not merely 'control the mechanics of the electoral process.'" *In re SB 202*, 2022 WL 3573076, at *9 (quoting *McIntyre*, 514 U.S. at 345). In such cases, courts "employ whatever level of scrutiny corresponds to the category of speech." *Id.*

But even if *Anderson-Burdick* were the appropriate analytical lens, heightened scrutiny still applies because the Restrictions severely burden Plaintiffs' speech. Burdens on core political speech are *per se* severe. *Buckley*, 525

U.S. at 207 (Thomas, J., concurring); *see also LWV of Tenn.*, 400 F. Supp. 3d at 725 n.9 (observing in similar circumstances that *Anderson-Burdick* "is just another road to strict scrutiny"); *VoteAmerica*, 576 F. Supp. 3d at 887-88 (similar). And "a law severely burdens" rights under *Anderson-Burdick* "if it discriminates based on content instead of neutral factors." *Harriet Tubman*, 576 F. Supp. 3d at 1003 (quoting *Citizens for Legis. Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998)).

The record shows remaining material disputes of facts concerning the cumulative burden of the Restrictions on Plaintiffs' rights. *See Clingman v. Beaver*, 544 U.S. 581, 607 (2005) (O'Connor, J., concurring) (emphasizing "the combined effect" of "a panoply of regulations" under *Anderson-Burdick*). The severe burdens on Plaintiffs compared to the sparse record supporting the State's interests makes summary judgment particularly improper here. *See, e.g., Wood v. Meadows*, 117 F.3d 770, 776 (4th Cir. 1997) (reversing summary judgment to allow further record development for the "fact-specific [*Anderson-Burdick*] inquiry [to] be undertaken").

Plaintiffs significantly reduced their communications in Georgia in 2022 — sending only one wave of mailers to a much smaller number of voters — as a direct result of the adverse effects of the Restrictions on their programs. *Compare* Ex. 21 at P-0360, P-0363, *with* Ex. 11 at 4. Even though Defendants disagree, the Prefilling Prohibition eliminates Plaintiffs' most effective method of furthering their speech and association. The Disclaimer Provision forces Plaintiffs to recite a government

script they object to because it makes their communications appear illegitimate and less trustworthy. Ex. 13 at 59-61. This undermines the persuasiveness of their message and ability to effectively convey it, despite Defendants' contrary view. Ex. 15 at 30-32. And the Mailing List Restriction limits the amount of communication Plaintiffs can have with Georgia voters and risks crippling penalties. 6/9/22 PI Tr. 63:2-6; Ex. 15 at 22-25. Defendants' disagreement on these points only further shows fact disputes that make summary judgment improper.

### III.   The Ballot Application Restrictions Fail First Amendment Scrutiny.

The Restrictions fail First Amendment scrutiny. Speech restrictions face a "demanding standard," requiring clear evidence rather than "ambiguous proof" that the restrictions are narrowly tailored to serve a compelling state interest. *Otto*, 981 F.3d at 868. Here, restrictions on core political speech receive *Meyer-Buckley* scrutiny that "is well-nigh insurmountable," *Meyer*, 486 U.S. at 425; content-based laws "are presumptively unconstitutional," *Reed*, 576 U.S. at 163; and compelled speech must serve a "compelling necessity … only by means precisely tailored," *Riley*, 487 U.S. at 800. Even under *Anderson-Burdick*, "[a] law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest" and less severe burdens must still be "justified by legitimate state interests of sufficient weight." *Lee*, 915 F.3d at 1318 (finding burden outweighed the asserted interests); *LWV of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) (similar).

Under any applicable standard, Defendants bear the burden of demonstrating that the Restrictions are sufficiently tailored to further legitimate state interests that outweigh the burdens on Plaintiffs' constitutional rights.[16] Defendants fail to meet this burden, and in attempting to do so, only deepen the existence of material disputes of fact that preclude summary judgment.

### A. Defendants Do Not Demonstrate Any Compelling State Interest.

To be compelling, the State's interest must have both "legitimacy" in the abstract and "presence" in the specific case. *Citizens for Police Accountability Pol. Comm. V. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009). The State must "do more than simply posit the existence of" an interest. *Turner,* 512 U.S. at 664. Through evidence, Defendants must prove the absence of fact disputes showing "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* They fail to do so here.

Defendants argue the Restrictions reduce voter confusion. Br. at 15. But a State's claim that it is "enhancing the ability of its citizenry to make wise decisions by restricting the flow of information … must be viewed with some skepticism." *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 228 (1989). Courts

---

[16] Even if the Disclaimer is scrutinized under the test for campaign finance disclosures, there must still be a "substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1242-43 (11th Cir. 2013).

should instead "assume that the people are smart enough to get the information they need than to assume that the government is wise or impartial enough to make the judgment for them." *Riley*, 487 U.S. at 804 (Scalia, J., concurring).

Whether the Restrictions address purported confusion is a disputed fact that must be resolved at trial. Defendants offer scant evidence of actual confusion, relying exclusively on a collection of 54 "tips" to the State's fraud tip line and generic, secondhand testimony. Br. 15-16, 18-19, 22-23.[17] But there is almost no connection to actual issues from the distribution of personalized applications. Most of these "tips" are little more than a voter alerting the State that they received applications, only some of which are personalized. Defs. Ex. H at 17, 19. At least thirty-three of the tips clearly identify the third-party or county office that sent the application. Defs. Exs. G at 2-6, 8, 17-22, 25-33; H at 4, 16, 20, 22-30; M at 2-4. Only about twenty tips reference purportedly incorrect voter information or addresses. Defs. Exs. G at 2-8, 11, 15, 17, 19, 21, 22, 26, 29, 30, 32; H at 13, 16, 25, 28. Seven tips are from former Georgia voters who report receiving applications despite having moved out of state. Defs. Exs. G at 18, 20, 23; H at 7, 25, 29, 30. One tip concerns receipt of applications from a county election office, not a third party, and at least two do not concern absentee applications at all. Defs Exs. G at 9-11, 18; M at 2.

---

[17] As further explained in Plaintiffs' responses to Defendants' Statement of Facts, the asserted voter complaints are hearsay and cannot support summary judgment.

In total, almost all of the tips demonstrate annoyance or dislike of the communications rather than confusion. Defs. Ex. G at 3, 15, 17, 18, 20-28; H at 11-14, 16-24, 27-29. But the First Amendment does not permit the State to enact speech restrictions because of annoyance. *See Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943). If Plaintiffs' mailer recipients find the content "objectionable," they may "escape exposure … simply by transferring the [mailer] from envelope to wastebasket." *Consol. Edison*, 447 U.S. at 542; *accord Bolger*, 463 U.S. at 72.

With regard to fraud concerns, Defendants do not argue that Plaintiffs' activity endangered election integrity or that the Restrictions prevent fraud. And despite their conclusory arguments, "it does not follow like the night the day" that the Restrictions do anything about voters' concerns about fraud. *Buckley*, 525 U.S. at 204 n.23. Rather, to justify the Restrictions based on fraud, the State must "satisfy its burden of demonstrating that fraud is real, rather than a conjectural, problem." *Id.* at 210 (Thomas, J., concurring). The record indicates that Georgia elections are not afflicted by fraud at all, much less related to civic organizations' absentee application mailers. *See, e.g.*, Ex. 5, Dep. of Frances Watson ("Watson Tr.") 189:23-190:4, 191:3-13; Ex. 2, Dep. of Blake Evans ("Evans Tr.") 142:3-9; 145:17-19.

Defendants also assert that the Prefiling Prohibition and the Mailing List Restriction serves efficient election administration. Br. at 15, 18-19. But Defendants fail to show how that interest is actually implicated. While efficient election

administration is compelling in the abstract, "the First Amendment does not permit the State to sacrifice speech for efficiency." *Riley*, 487 U.S. at 795; *accord Buckley*, 525 U.S. at 192 (rejecting administrative convenience rationale). Here, Defendants provide little evidence that election administration was hindered by third parties' distribution of absentee applications. Defendants claim the record shows that receipt of successive personalized applications "caused voters to submit multiple applications," but Mr. Germany's cited testimony makes no mention of voters submitting duplicative applications. *Cf.* Br. at 19.

While Defendants previously put forward some basic evidence of increased duplicates in 2020, *see* Germany Decl. ¶ 31, they have provided no evidence linking those duplicates to third-party distribution. Moreover, the duplicate increase is largely symmetrical to the overall increase in absentee voting in 2020, *see* 6/10/22 PI Tr. 30:17-21, 50:23-24, 53:21-22, 54:3-4, and could just as easily be explained by unique aspects of the 2020 election, such as first-time absentee voters' lack of knowledge, issues related to the COVID-19 pandemic, and delays in delivering and processing applications, *see id*. Even if some record evidence did show this, however, Defendants witness Mr. Evans testified that duplicate applications are "not too terribly uncommon" and the process for dealing with them is "not that long." Evans Tr. 71:18-72:2, 85:18-86:5. And other evidence demonstrates that far from impeding election administration, Plaintiffs' personalization of applications

can actually ease their processing. *See id.* 158:9-22 (noting that applications with typed voter information, like Plaintiffs' personalized applications, are "generally easier" for election officials who no longer need to "interpret or read handwriting"); Lopach Decl., Ex. E; Ex. 18 at GA-VA00024557, GA-VA00051968, GA-VA00038670; Ex. 1-4 (noting benefits of typefaced applications for processing).

**B.     The Ballot Application Restrictions Are Not Narrowly Tailored.**

Defendants also fail to establish narrowly tailoring. Overall, the State must "afford the requisite breathing space to protected speech." *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002) (quotations omitted). Courts "cannot cavalierly accept without proof that the means being used achieve the legitimate ends being sought;" the State must "establish a nexus." *Zeller v. Fla. Bar*, 909 F. Supp. 1518, 1526 (N.D. Fla. 1995) (citing *Meyer*, 486 U.S. at 426-27). The State does not meet its burden to show the absence of material fact disputes on these tailoring issues here.

**Disclaimer Provision.** The Disclaimer's compelled speech is not narrowly tailored to serve a voter confusion interest, Br. at 23, because voters were already able to determine the sender of applications and Plaintiffs' mailers already explained that they were not sent by election officials. *Supra* Part III.A; *see also* Lopach Decl., Ex. A (identifying Plaintiff 11 times). If the Disclaimer simply required the sender's contact and a statement that the mailer did not come from the State, Plaintiffs would not have challenged it. *See* 6/10/2022 PI Tr. 220:23-221:9.

Defendants also contend that the required "This is NOT an official government publication" language means "voters are no longer left wondering if they must complete it to vote." Br. at 23. But they put forward no evidence to support that counterintuitive interpretation. To the contrary, Mr. Germany testified that he thought the language—which his office initially drafted *before* SB 202 was amended to require third parties to use the government's form—was confusing and has lobbied for its removal. 6/10/2022 PI Tr. 95:1-20. By compelling this language be placed on the official state-published form, Defendants created new cause for voter questions, while answering none. 6/9/2023 PI Tr. 215:10-219:20, 225:18-227:3. And if Georgia wants to reduce confusion between absentee applications and ballots, it is unclear why the State would require the Disclaimer only on forms distributed by third parties. Overall, the State "cannot impose a prophylactic rule requiring disclosure even where misleading statements are not made;" to be narrowly tailored, it instead "can assess liability for specific instances of deliberate deception." *Riley*, 487 U.S. at 803 (Scalia, J., concurring).

**Mailing List Restriction.** The paltry record of purported voter complaints about receiving successive absentee applications does not justify the strict Mailing List Restriction and its civil and criminal penalties. Many of Defendants' cited voter complaints state explicitly that the voter has not and does not plan to apply to vote absentee, meaning the Restriction is no bar to those voters receiving

36

subsequent mailers. *See, e.g.*, Defs. Ex. H at 4, 15, 21, 22, 27; *see also* 6/10/2023 PI Tr. 72:13-73:2; Evans Tr. 242:20-243:1. The Mailing List Restriction imposes severe risks on Plaintiffs while simultaneously leaving the duplicate mailings issue unaddressed: Plaintiffs can send unlimited applications to those who have not applied to vote absentee but risk severe penalties for any discrepancies between their mailing list and a constantly shifting absentee voter list that lacks accuracy.[18] At the least, fact disputes remain concerning whether the Mailing List Restriction is sufficiently tailored to serve the State's asserted abstract interests.

**Prefilling Prohibition.** Defendants similarly rely on fewer than two dozen "tips" about receipt of purportedly inaccurately personalized applications to justify the Prefilling Prohibition, many of which report receipt of an application personalized for an individual who no longer lives at the address. Defs. Exs. G at 4-6, 11, 17, 21, 29; H at 16, 23, 28. Mr. Germany explained that these are often caused by lags in removing voters from the State's voter rolls. Ex. 6, Dep. of Ryan Germany ("Germany Tr.") 181:7-21. Thus, imperfections from prefilling can be attributed to groups relying on data from the State's own voter list to convey their

---

[18] If SB 202 simply capped the number of "waves" Plaintiffs could send to potential Georgia voters, Plaintiffs would be free to schedule those "waves" to arrive at peak election cycles and avoid the risks imposed by SB 202's ever-shifting prohibited mailing list. But because of SB 202, Plaintiffs have been forced not only to send a single wave but also to send it at the very beginning of the election cycle, when voters are least engaged, to avoid penalties. Lopach Decl. ¶¶ 53-57.

message. *See, e.g.*, Defs. Ex. G at 7 (noting that voter's concern was from a typo creating "a duplicate entry for the same individual"). Defendants also do not show that it is the prefilling that triggered voters' concerns rather than other issues, such as addressing; errors in the voter file will lead to occasional incorrect addresses, just as the State's application distribution experienced in 2020. 6/10/22 PI Tr. 49:2-5, 65:4-7; GA-VA00052395. Fact disputes on these issues should be resolved at trial.

Moreover, restrictions on Plaintiffs' speech must also be the "least restrictive means of achieving a compelling state interest;" it cannot "be either underinclusive … or overinclusive." *Otto*, 981 F.3d at 879 (quotations omitted). To satisfy this requirement, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). Defendants fail to do so for each of the Ballot Application Restrictions.

The record demonstrates that there are numerous less-restrictive avenues for addressing alleged voter confusion, fraud concerns, and election administration. The Secretary's office conducts trainings that cover absentee voting, including things like processing duplicate applications. Evans Tr. 78:6-79:2; Ex. 18 at GA-VA00041544. Election officials also issue press releases and other statements to promote the integrity of the absentee voting process and explain the role that civic engagement groups play. Ex. 18 at GA-VA00052280, GA-

VA00052835; GA-VA00055527. If the State wants to address voter confusion or confidence, it should "communicate the desired information to the public" itself. *Riley*, 487 U.S. at 800. The record also shows that Georgia's preexisting processes sufficiently safeguard against absentee voting fraud. Evans Tr. 85:6-17, 109:15-24, 110:22-111:5 (confirming that the state's system can only issue a single ballot to a voter at a time). These preexisting safeguards in Georgia law and practice can promote confidence and reduce confusion without infringing free speech. At the least, there are material fact disputes about whether these less restrictive means are "adequate to the task" of addressing the state interests. *Meyer*, 486 U.S. at 427.

## IV.   The Ballot Application Restrictions Are Unconstitutionally Overbroad.

The Disclaimer and the Prefilling Prohibition are also unconstitutionally overbroad.[19] A law is overbroad if its ranging sweep invades areas of protected speech and association. *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Likewise, for compelled speech, a law is overbroad if it makes speakers avoid circumstances in which they would be compelled to speak. *See* Amy J. Sepinwall, *Free Speech and Off-Label Rights*, 54 Ga. L. Rev. 463, 518–19 (2020) (collecting cases).

---

[19] Given the regulation and Defendants' representations in this case, Plaintiffs no longer assert the Restrictions are vague. But they are unconstitutionally overbroad.

The Disclaimer broadly applies to "[a]ny application … sent to any voter by any person or entity." Ga. Comp. R. & Regs. 183-1-14-.12(3). As Defendants' own internal messages show, the confusing Disclaimer applies beyond mailings to other unquestionably protected conduct. Ex. 18 at GA-VA00055527. This includes applications "sent" between neighbors, from church groups to their parishioners, and within families. The command that Plaintiffs affix "This is NOT an official government publication" will also confuse and dissuade voters who receive a mailer from civic organizations that, like Plaintiffs, already identify themselves and must use the official application. Compelling this statement threatens to make Plaintiffs and other similar speakers forego constitutionally protected communications rather than be compelled to carry the State's misleading message.

The Prefilling Prohibition also reaches substantial protected activity, chills speech, and burdens innocent associations. It applies even when the personalized information is accurate and drawn from the State's own voter file. The Prohibition is overbroad especially in light of the fact that county elections officials themselves prefer prefilled applications because it reduces the number of incomplete or inaccurate applications they must process. *See* Evans Tr. 219:4-222:6; Ex. 18 at GA-VA00024557, GA-VA00038833, GA-VA00051968; 6/10/22 PI Tr. 122:4-11.

## <u>CONCLUSION</u>

For the above reasons, summary judgment should be denied.

Respectfully submitted this 31st day of January, 2023.

/s/ Danielle Lang
Danielle Lang*
Jonathan Diaz*
Alice Huling*
Hayden Johnson*
Valencia Richardson*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, D.C. 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org


*Admitted pro hac vice


Counsel for Plaintiffs

Robert B. Remar
(Ga. Bar No. 600575)
SMITH, GAMBRELL & RUSSELL, LLP
1105 W. Peachtree NE, Suite 1000
Atlanta, GA 30309
(404) 815-3500
rremar@sgrlaw.com

/s/ Katherine L. D'Ambrosio
Katherine L. D'Ambrosio
(Ga. Bar No. 780128)
COUNCILL, GUNNEMANN & CHALLY, LLC
One Atlantic Center
1201 W. Peachtree St, NW, Ste 2613
Atlanta, GA 30309
Tel: 404-407-5250
Facsimile: 404-600-1624
kdambrosio@cgc-law.com

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 5.1

I hereby certify that I have this date electronically filed the within and foregoing, which has been prepared using 13-point Book Antigua font, with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

Dated: January 31, 2023.

*/s/ Danielle Lang*
 Danielle Lang (admitted pro hac vice)

*Counsel for Plaintiffs*