# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| VOTER PARTICIPATION CENTER; and CENTER FOR VOTER INFORMATION, | |
| Plaintiffs, | Case No. 1:21-cv-01390-JPB |
| v. | Judge J.P. Boulee |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia; SARA GHAZAL, JANICE JOHNSTON, EDWARD LINDSEY, and MATTHEW MASHBURN, in their official capacities as members of the STATE ELECTION BOARD, Defendants, | |
| and | |
| REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; and GEORGIA REPUBLICAN PARTY, INC., | |
| Intervenor-Defendants. | |

# PLAINTIFFS' RESPONSE TO
# STATE DEFENDANTS' STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1(B)(1), Plaintiffs submit the following response to Defendants' Statement of Material Facts:

## I.      Absentee Voting in Georgia

1.      Georgia maintains an absentee-ballot application on its website, which is accessible by any voter. *See* Ga. Sec'y of State, *Online Voter Registration, Absentee Ballot Request*.[1]

**Plaintiffs' Response to Fact No. 1:** Disputed in part. Plaintiffs do not dispute that Georgia currently maintains an absentee ballot application on its website. But it is disputed that the application is "accessible by any voter." *Id.* Under SB 202, a voter must print, sign, and mail the absentee ballot application. O.G.C.A. § 21-2-381(C). Not all voters have ready access to the internet. *See* Ex. 9, June 9, 2022 Prelim. Inj. Hrg. ("6/9/22 PI Tr.") 37:16-20; Ex. 2, Dep. of Blake Evans ("Evans Tr.") 55:15-56:12. And even if a voter has access to the website, not every voter has access to a printer to print the application. *See* 6/9/22 PI Tr. 37:16-20; Evans Tr. 55:15-56:16. Finally, the absentee ballot application is not available year-round, *see*, *e.g.*, Ex. 18,

---

[1] https://securemyabsenteeballot.sos.ga.gov/s/.

1

Government Communications and Voter Email Alerts, GA-VA00050768 at GA-VA00050769, and the website is not always functional, Ex. 18, CDR00112588; it has crashed during the absentee voting period, preventing voters from accessing the absentee ballot application on Defendants' website. *See, e.g.,* Joe Ripley, *Georgia voters finding dead links when trying to request absentee ballots*, 11ALIVE (Mar. 16, 2022), https://www.11alive.com/article/news/local/georgia-absentee-ballot-applications-website-problems/85-d714dfd9-21b3-4fce-a2e0-dd2cb9c0c639.

2.      Georgia also maintains "A Guide for Registered Voters" on its website, which includes a section titled: "An Overview of Georgia's Absentee Voting Process." *See* Elections Div., Ga. Sec'y of State, *A Guide for Registered Voters* (Mar. 30, 2022).[2]

**Plaintiffs' Response to Fact No. 2:** Disputed in part. Plaintiffs do not dispute that "A Guide for Registered Voters" dated March 30, 2022 exists on the website of the Georgia Secretary of State, and the Guide includes the subtitle: "An Overview of Georgia's Absentee Voting Process." To the extent Defendants assert that the Secretary of State's office "maintains" this guide in any way other than posting it

---

[2] https://sos.ga.gov/sites/default/files/forms/Absentee_Voting_In_Georgia_Rev_3-30-22.pdf.

on the website, that is unsupported by the cited source.

3.      This Guide informs voters how to apply for an absentee ballot, how to complete it, and how to submit it. *See id.*

**Plaintiffs' Response to Fact No. 3:** Disputed. The Guide does not provide instructions to voters about how to submit an absentee ballot; instead, the Guide refers voters to "Follow the instructions that your county elections official provides with your ballot." Elections Div., Ga. Sec'y of State, *A Guide for Registered Voters*, 4 (Mar. 30, 2022). Furthermore, instructions in this Guide are unclear and vague. The Guide instructs voters that in addition to absentee voting by mail, "Voting any time prior to Election Day, even when done in person, is considered absentee voting. You will complete an absentee ballot application in person at the early-voting location immediately prior to casting your vote." *Id.* at 5. But the Guide does not instruct voters on any differences or similarities between applications for absentee mail ballots versus absentee in-person ballots, submitting the appropriate absentee application depending on whether a voter intends to vote in-person or by mail, or what a voter can and should do if they have submitted an application to vote by absentee mail ballot but later decide to vote an absentee in-person ballot. *See id.*

4.      Since 2005, Georgia has had no excuse absentee voting, allowing any

qualified voter to apply for an absentee ballot. Germany Depo. 179:8–9.

**Plaintiffs' Response to Fact No. 4:** Disputed in part. Plaintiffs do not dispute to the extent that Georgia law provides that every eligible voter is entitled to vote absentee by mail without providing a reason for doing so. *See* Ga. Code Ann. § 21-2-380. Plaintiffs also do not dispute that Georgia passed legislation enacting no-excuse absentee voting in 2005. *See* 2005 Georgia Laws Act 53 (H.B. 244). To the extent that this assertion implies that every eligible voter has been able to vote absentee in practice, or that every eligible voter has been able to apply for an absentee ballot, that is unsupported by the cited source.

5.     The Election Division of Georgia's Secretary of State's Office also provides voters with a phone number and an e-mail address for use with questions about absentee-ballot applications. *See* https://sos.ga.gov/how-to- guide/how-guide-voting.

**Plaintiffs' Response to Fact No. 5:** Disputed in part. Plaintiffs do not dispute that the Election Division of Georgia's Secretary of State's Office "provides voters with a phone number and an e-mail address." To the extent that Defendants assert that the phone number and e-mail address is provided "for use with questions about absentee-ballot applications," that is unsupported by the cited source.

6.     When an individual submits an absentee-ballot application and that application is processed, the individual's information is updated on the State's absentee voter file to reflect that he or she has requested a ballot. Germany Depo. 47:3–8; Day 2 Tr. 73:3–22.

**Plaintiffs' Response to Fact No. 6:** Disputed. When an individual submits an absentee ballot application, the application is not always processed contemporaneously. *See* Evans Tr. 129:2-25, 131:1-9; Ex. 10, June 10, 2022 Prelim. Inj. Hrg. ("6/10/22 PI Tr.") 123:19-124:1. Counties' processes for receiving and recording applications vary, and the individual's information is not always automatically entered into the state's electronic database, ElectioNet. Evans Tr. 45:10-46:10. The State's absentee voter file updates daily and only reflects applications that have been recorded on ElectioNet. *Id.* 45:10-46:10, 47:6-21. The Secretary's office and county election offices often receive voter complaints stating that they have filled out an absentee ballot application but their information is not updated on the website and they have not received their absentee ballot. *See, e.g.,* Ex. 18, GA-VA00000628; GA-VA00048462.

7.     During an election cycle, that file is updated daily and is publicly available. 6/10/22 PI Tr. 73:3–22.

**Plaintiffs' Response to Fact No. 7:** Disputed in part. Plaintiffs do not dispute that the State's absentee voter file updates daily and only reflects applications that have been recorded on ElectioNet. Evans Tr. 45:10-46:10, 47:6-21. But Georgia elections offices often receive complaints from voters stating that they have filled out an absentee ballot application but their information is not updated on the website. *See, e.g.,* GA-VA00000628; GA-VA00048462. This also occurs during the election cycle. *Id.* Counties routinely fail to process applications contemporaneously such that the voter file is not always updated with the most recently completed absentee ballot applications.  Evans Tr. 45:10-46:10; 129:2-25, 131:1-9; 6/10/2022 PI Tr. 123:19-124:1.

## II.     Absentee-Ballot Applications Sent by Third-Party Organizations

8.     For several election cycles, third-party organizations like Plaintiffs Voter Participation Center ("VPC") and the Center for Voter Information ("CVI") sent absentee-ballot applications to voters in many states, including Georgia. Lopach Depo. 42:8–11, 62:4–12.

**Plaintiffs' Response to Fact No. 8:** Disputed in part. The cited source does not support Defendants' characterization that various third-party organizations have sent absentee ballot applications to voters in many states over several election cycles. The cited testimony specifically concerns a test run of absentee ballot

application mailers that Plaintiffs ran in several states, including Georgia, in May and June 2020, Ex. 4, Dep. of Thomas Lopach ("Lopach Tr.") 42:8-11, and mailers Plaintiffs sent in several states between 2021-22. *See id.* at 62:4-12.

9.     In each such mailing, CVI and VPC send an absentee-ballot application and a cover letter that explains why they believe absentee voting is important and encouraging the recipient to complete and return the application. Lopach Tr. 63:2–7, 64:13–65:4.

**Plaintiffs' Response to Fact No. 9:** Disputed in part. Plaintiffs do not dispute that CVI and VPC send absentee ballot application mailers that consist of applications, cover letters, and postage-paid return envelopes addressed to the voter's respective election office and which, in its entirety, encourages the recipient to participate in the upcoming election and to apply for any absentee ballot. Lopach Tr. 63:2-7, 64:13 – 65:4; Ex. 15, Decl. Of Thomas Lopach at 35-45 [ECF 103-3]; 6/9/22 PI Tr. 40:5-43:2. To the extent Defendants assert that Plaintiffs' cover letters alone explain the importance of voting and encourage the recipient to apply for an absentee ballot application, it is unsupported by the cited source and is disputed. *Cf.* 6/9/22 PI Tr. 40:5-43:2.

10.    Plaintiffs' cover letters also include instructions for how to complete

and return the application. *See* Ex. B.

**Plaintiffs' Response to Fact No. 10:** Undisputed. Plaintiffs do not dispute that their cover letters include instructions for completing the return application. *See, e.g.,* Ex. 15 at 35-45; Ex. 16. By way of further response, Plaintiffs note that in 2020, Plaintiffs also printed step-by-step instructions on the back of the personalized applications and pre-addressed return envelopes. *Id*.

11.    CVI and VPC have never sent absentee-ballot applications without a cover letter. Lopach Tr. 62:4–63:7.

**Plaintiffs' Response to Fact No. 11:** Undisputed. Plaintiffs have testified that all parts of its mailer, including the cover letter, application, and return envelope, are a "package" that "works together to engage voters." 6/9/22 PI Tr. 43:16-18. Plaintiffs view this package "as speech in of itself" which conveys Plaintiffs' mission "to increase participation in democracy." *Id.* at 42:15-24.

12.    Sending absentee-ballot applications without a cover letter would be cheaper. Lopach Tr. 70:4–11.

**Plaintiffs' Response to Fact No. 12:** Disputed. Plaintiffs do not dispute that Mr. Lopach testified that the cost of mailing absentee ballot applications without a cover letter would "likely be somewhat less" given the money spent designing the cover

8

letters. Lopach Tr. 70:4-11. Immediately prior to that statement, however, Mr. Lopach explained that because of "the volume at which VPC and CVI mail Vote By Mail messages" while forgoing a cover letter might save money "at a limited amount," it might also "create a need for increased customer service," which would itself bring additional expense. *Id.* at 69:16 – 70:3. This is in keeping with Mr. Lopach's consistent testimony that the pieces "work together as one message" as a "package." 6/9/22 PI Tr. 43:16-18, 47:8-12.

13.    Plaintiffs' cover letters have always included the name of the organization sending the package, including contact information. Lopach Tr. 70:20–71:4.

**Plaintiffs' Response to Fact No. 13:** Undisputed.

14.    That contact information includes both a phone number, an email address, and a URL directing recipients to the website of the group that sent the package. Lopach Tr. 71:10–11, 72:2–3, 73:3–5.

**Plaintiffs' Response to Fact No. 14:** Undisputed.

15.    VPC sends its mailings to the "New American Majority"—its name for young voters, voters of color, and unmarried women. Lopach Tr. 11:15–19.

**Plaintiffs' Response to Fact No. 15:** Disputed in part. Plaintiffs do not dispute that

VPC endeavors to "register and turn out" voters of the "New American Majority," which constitutes "people of color, young people, and unmarried women," whom "[d]ata demonstrates . . . register to vote and turn out to vote at rates much lower than their actual numbers in society and much lower than the general population." Lopach Tr. 11:15-12:1. To the extent Defendants assert that every VPC mailing is sent to a member of one of these three groups, that is unsupported by the cited source.

16.    CVI focuses on engaging voters who "would like to see people of color, young people, and unmarried women turning out in elections … at rates equal to the general population." Lopach Tr. 12:12–16.

**Plaintiffs' Response to Fact No. 16:** Disputed in part. Plaintiff CVI focuses on "voters who share the values of wanting to see the New American Majority register and turn out in the full strength." *See* Lopach Tr. 12:9-11; https://www.centerforvoterinformation.org/about-us/. This includes the goal of seeing the New American Majority turn out at least equal to the general population, but also to "provide resources and tools to help voting-eligible citizens register and vote in upcoming elections." *See* https://www.centerforvoterinformation.org/about-us/. To the extent that Defendants' assertion includes the goal of providing resources

to voters to enable voter participation, undisputed.

17.     CVI and VPC track responses to their mailings with nearly daily updates. Lopach Tr. 164:11–21.

**Plaintiffs' Response to Fact No. 17:** Disputed in part. Plaintiffs do not dispute that Mr. Lopach testified that Plaintiffs' "response tracking database is updated multiple times a week, if not daily, so that number is adjusted whenever we get updated scans from the postal service." Lopach Tr. 164:11-21. Immediately prior to that statement, Mr. Lopach testified that he had not yet tracked the response rate to the mailing sent in Georgia for the 2022 cycle as he had been "looking largely at the national response rate" while also focusing on the other requirements of his job. *See id.* at 163:12-164:10. To the extent that Defendants assert that VPC and CVI somehow "track" the responses to their mailings on a near daily basis in any way other than the tracking information received from postal scans, it is unsupported by the cited source and is disputed.

18.     In more recent election cycles, CVI and VPC began pre-filling those applications with what they believed was the voter's personal information. Lopach Tr. 112:8–13.

**Plaintiffs' Response to Fact No. 18:** Disputed. When asked whether either Plaintiff organization always sent prefilled absentee ballot application mailers or began at a later year, Mr. Lopach replied, "I believe that in 2006, VPC or CVI, or their predecessor organizations, sent prefilled Vote by Mail applications." Lopach Tr. 112:8-13. Mr. Lopach does not say whether this was when either organization first sent prefilled applications. Rather, he explains that he is aware that more than 16 years prior, roughly three years after Plaintiffs' predecessor organization was founded, prefilled absentee ballot application mailers were being sent. To the extent Defendants assert this is a "recent" or new development in VPC's or CVI's practices, it is unsupported by the cited source.

Further, Plaintiffs prefill their absentee ballot applications using an individual state's voter file, which is provided by the state. Ex. 15 at 26 ¶ 61; 6/9/22 PI Tr. 44:19-22. To the extent that Plaintiffs "believe" that the information is the voter's personal information, it is because the voter provided that information to the state, and Plaintiffs obtain that information from the state's publicly available registered voter lists via their data vendors. 6/9/22 PI Tr. 44:19-22; Lopach Tr. 120:21-122:3.

19.     That information was often incorrect. Lopach Tr. 127:20–128:2, 129:14–19.

**Plaintiffs' Response to Fact No. 19:** Disputed. Plaintiffs do not dispute that Mr. Lopach testified "I believe – I directly heard from two individuals" that "they had a suffix or middle initial that was not theirs" on their application." Lopach Tr. 127:2-8. In 2020, after learning that one wave of absentee ballot application mailings included a small percentage of voters where Plaintiffs' data vendor had appended additional commercial data to the voter name information prefilled on that voter's absentee ballot application, Plaintiffs "demanded" that the data vendor "provide pure data from the voter file" and ceased prefilling for two waves of mailings until the data vendor's process complied with Plaintiffs' demand. *Id.* at 131:14-21, 131:9-17. To the extent that Defendants assert that this resulted in prefilled voter information that was "often" incorrect, that is unsupported by the cited source and disputed.

Further, errors exist in the state's voter file. *See* 6/10/22 PI Tr. 65:4-7; Ex. 18, GA-VA00052395. Plaintiffs source the information prefilled into their absentee ballot applications from the state's voter file. Ex. 15 at 27 ¶ 62; 6/9/22 PI Tr. 44:19-22. To the extent Defendants assert that "information is often incorrect" it is reflective of any errors in the state's file. *See* 6/9/22 PI Tr. 49:2-5.

20.     CVI and VPC use voter information obtained from third-party data vendors. Lopach Depo. 90:18–91:16; 126:15–127:12.

**Plaintiffs' Response to Fact No. 20:** Disputed. Plaintiffs use third party vendors to obtain state voter file data. Lopach Tr. 90:18-91; *see also* 132:1-9. Plaintiffs' vendors obtain the voter file from the state, and then the vendors provide that data to Plaintiffs. *See*, *e.g.*, Lopach Tr. 126:4-12.

21.    In a given election cycle, CVI and VPC will obtain voter data from its vendors "at least once, possibly twice." Lopach Depo. 133:4–8.

**Plaintiffs' Response to Fact No. 21:** Disputed in part. Plaintiffs do not dispute that Mr. Lopach testified that "[f]or the 2021 and 2022 election cycle, there were elections in New Jersey and Virginia in 2021, in which we would have received voter file data from either TargetSmart or Catalist, at least once, possibly twice." Lopach Tr. 133:4-8. To the extent that Defendants assert that Plaintiffs obtain voter data from their vendors no more than twice an election cycle, it is unsupported by the cited source.

Further, starting in late 2020, Plaintiffs began using both Catalist and TargetSmart to obtain voter data. Lopach Tr. 122:7-8; 140:21-22. Both data vendors obtain state voter lists from states throughout the country multiple times a year, on a rolling basis, and Plaintiffs will use whichever voter data vendor has the most

recent list for a particular state when running a mailer program in that state. Ex. 15 at 10 ¶ 27; Lopach Tr. 123:16-124:13.

22.     These vendors have provided CVI and VPC with incorrect voter information, which resulted in CVI and VPC not pre-filling applications for multiple mailings. Lopach Depo. 127:20–128:17.

**Plaintiffs' Response to Fact No. 22:** Disputed. Plaintiffs do not dispute that Waves C and D of its 2020 general election absentee ballot application mailings were not prefilled as they worked with their data vendor to ensure that the prefilled information was a "pure reflection" of states' voter file data. Lopach Tr. at 127:20-128:21, 131:5-17. To the extent that Defendants assert that Plaintiffs' data vendor provided incorrect information regarding any Georgia voters or that all the information provided to Plaintiffs was incorrect, that is unsupported by the cited testimony and is disputed.

In general, Plaintiffs' vendors only modify the voter file to the extent necessary to "narrow the data by [Plaintiffs'] stated populations, review the data against the National Change of Address database, [and] to review the data against a number of databases of deceased individuals," among other quality control measures. *Id.* 135:16-136:12. It is important to Plaintiffs to maintain accurate

information in order to ensure that their "message to voters to be clear and understood without question." *Id.* 134:20. Plaintiffs have demanded that vendors only send Plaintiffs the voter file without modifications except to narrow the information as explained above. *See, e.g., id.* 142:13-143:7.

23.    Additionally, CVI and VPC routinely sent multiple absentee-ballot applications to the same voters in Georgia. Lopach Depo. 109:20–110:15, 111:6–12.

**Plaintiffs' Response to Fact No. 23:** Disputed in part. Plaintiffs admit that in 2018 and 2020, Plaintiffs sent multiple waves of mailers to Georgia voters. 6/9/22 PI Tr. 68:2-3; Lopach Tr. 145:18-146:1, 146:12-16. However, the cited sources do not support Defendants' characterization that CVI and VPC routinely sent duplicative absentee ballot application mailers to Georgia voters. The cited testimony concerns Plaintiffs ability to identify addresses where multiple applications were sent, but Mr. Lopach explicitly declined to speculate regarding the percentage of recipients who were sent multiple applications. *Id.* Plaintiffs send multiple waves of absentee ballot application mailers to voters in Georgia who have not yet submitted an absentee ballot application. Ex. 15 at 13 ¶ 34. Plaintiffs do not intentionally mail duplicative absentee ballot applications to voters who have already submitted an

application. *See* 6/9/22 PI Tr. 41:24-42:11, 71:19-25, 90:15-19; Ex. 15 at 10 ¶ 27, 11 ¶ 31. Thus, Plaintiffs use their ballot tracking data to avoid duplicative application mailers. 6/9/22 PI Tr. 70:17-25.

24.    Although Plaintiff sent multiple waves of absentee-ballot applications, the largest number of voters respond to the first wave. Lopach Depo. 147:12–19.

**Plaintiffs' Response to Fact No. 24:** Disputed. This assertion is unsupported by the cited source. Nowhere in the cited testimony does Mr. Lopach indicate that the largest number of recipients respond to the first mailer they receive. *Id.* Indeed, Mr. Lopach has testified about the importance of sending multiple waves of mailers, because "[n]ot everybody responds to the first wave of mail," 6/9/22 PI Tr. 70:20-25, and "voters oftentimes need additional encouragement and resources before they submit an absentee ballot application." Ex. 15 at 13 ¶ 34.

25.    Recipients of a mailing from either Plaintiff group can opt out of future mailings online, by phone, and possibly by email. Lopach Depo. 101:22–102:5.

**Plaintiffs' Response to Fact No. 25:** Disputed in part. Voters can opt-out of mailers online, by phone, and by email. Lopach Tr. 101:20-102:5. To the extent that Defendants do not dispute that voters can opt-out by email, undisputed.

26.  Opting out of communications from one Plaintiff group (CVI or VPC)

17

also opts a person out of the other group's communications. Lopach Depo. 103:14–21.

**Plaintiffs' Response to Fact No. 26:** Undisputed.

27.     To ensure that voters who have opted out do not receive subsequent mailings, the two Plaintiff groups review later mailings against the various removal lists. Lopach Depo. 106:3–10.

**Plaintiffs' Response to Fact No. 27:** Undisputed.

28.     The comparison is made both by contractors and by internal data staff and happens at least twice: "one at the beginning of compiling a list and two, at the end of compiling a list prior to a list being sent to the printer." Lopach Depo. 106:11-107:3.

**Plaintiffs' Response to Fact No. 28:** Undisputed.

**III.   Voters Complain About Third-Party Absentee-Ballot Applications**

29.     Some recipients contact CVI and/or VPC to complain about the mailings and to request removal from future mailing lists. Day 1 Tr. 84:13– 24; Lopach Depo. 102:19–103:12, 153:15–154:5.

**Plaintiffs' Response to Fact No. 29:** Undisputed. Plaintiffs do not dispute that they receive communications from recipients of their absentee ballot application mailers, a few of which are complaints and unsubscribe requests. 6/9/22 PI Tr. 84:13– 24;

Lopach Tr. 153:15 – 154:8; Ex. 17, 2018-2020 GA VBM Unsubscribe Request.

30.    Recipients also contacted the Georgia Secretary of State's Office with complaints and questions about absentee-ballot applications received from third-party organizations. *See* Exs. G, H, M (examples of complaints); Germany Depo. 17:21–22.

**Plaintiffs' Response to Fact No. 30:** Disputed in part. Plaintiffs do not dispute that the Secretary of State's office received communications from various individuals nor that Mr. Germany testified "I would say that most of the complaints that we get regarding elections will come in by e-mail." To the extent that Defendants assert that these individuals communicated "complaints and questions about absentee-ballot applications received from third-party organizations," it is inadmissible hearsay and is disputed.

31.    Indeed, CVI and VPC acknowledge that their mailings can "create more work for local election officials." Day 1 Tr. 119:23–25.

**Plaintiffs' Response to Fact No. 31:** Disputed in part. Plaintiffs do not dispute that Mr. Lopach testified that "[b]y sending out voter registration forms and vote-by-mail forms that have to be processed, indeed that would result in processing for election officials." *See* 6/9/22 PI Tr. 120:1-5. But Plaintiffs made that statement in

acknowledgement that their work increases the number of voters who submit an absentee ballot application, the processing of which necessarily increases the work of election officials. *See id.* at 120:1-5. Indeed, Plaintiffs helped more than 660,000 voters to submit their absentee ballot applications in Georgia in 2020 and 2021 runoff election. Ex. 15 at 9 ¶ 25.

32.   Complaints are sent to the Secretary of State's office in various ways, including by phone, by web forms, and by email sent to voterfraudalerts@sos.ga.gov. Day 2 Tr. 8:11–25.

**Plaintiffs' Response to Fact No. 32:** Undisputed. To the extent that Defendants' assertion suggests that complaints sent to the Secretary of State's office are limited to complaints about Plaintiffs, that is unsupported by the cited source and is disputed.

33.   Complaints can also be sent to the State Election Board ("SEB") in a number of ways, including by phone or email. Mashburn Depo. 85:6–18.

**Plaintiffs' Response to Fact No. 33:** Undisputed. To the extent that Defendants' assertion suggests that complaints sent to the State Election Board are limited to complaints about Plaintiffs, that is unsupported by the cited source and is disputed.

34.   Complaints are also submitted to county election offices. Day 2 Tr.

9:14–16.

**Plaintiffs' Response to Fact No. 34:** Undisputed. To the extent that Defendants' assertion suggests that complaints sent to county election offices are limited to complaints about Plaintiffs, that is unsupported by the cited source and is disputed.

### A.  Voters express concern about the source of the absentee- ballot applications.

35.  One category of complaints the State received from voters was "a lot of confusion" about whether the applications sent by third-party groups came from the State. Mashburn Depo. 90:10–25; Ex. M.

**Plaintiffs' Response to Fact No. 35:** Disputed. This statement is based on inadmissible hearsay testimony. Mr. Mashburn's testimony that there was "a lot of confusion" is based on unspecified out-of-court statements of voters. Defendants seek to introduce this testimony to prove the truth of the matter asserted by the voters' out-of-court statements: that there was confusion about whether applications sent by third parties came from the State. Plaintiffs dispute this inadmissible hearsay inference.

Further, Plaintiffs do not dispute that the Secretary's fraud alert tip line received the three emails purportedly from Georgia voters that are contained in Exhibit M, each of which specifically identifies a third-party sender of an absentee

ballot application other than the State. To the extent that Defendants assert that these voters experienced "confusion" about the identity of the sender, it is unsupported by the cited source.

36.    This occurred even when a return address of a third-party group was included, as voters were confused about why the Secretary of State was sending them an absentee-ballot application. Mashburn Depo. 90:10–23.

**Plaintiffs' Response to Fact No. 36:** Disputed. This statement is based on inadmissible hearsay testimony. Mr. Mashburn testimony that voters were confused is based on out-of-court statements of voters. Defendants seek to introduce this testimony to prove the truth of the matter asserted by the voters' out-of-court statements: that voters were confused about who sent them an absentee ballot application even when a return address of a third-party organization was included. Plaintiffs dispute this forbidden hearsay inference.

Further, voters acknowledged and understood that they received absentee ballot applications from third party organizations as opposed to from the Secretary's office. *See* Ex. M; Germany Tr. 30-32, 34.

37.    Those complaints included questions about who sent the absentee-ballot applications and whether they were forms that needed to be filled out to vote.

Day 2 Tr. 13:12–15.

**Plaintiffs' Response to Fact No. 37:** Disputed. The cited source does not support Defendants' characterization of voters' questions regarding absentee ballot applications received from third parties. The cited testimony makes no mention of mailers like the ones sent by Plaintiffs that were directed to and personalized for certain individuals and that utilized the State's official absentee ballot application form.

Further, while the statement is cited as support for Defendants' motion for summary judgment, it does not reach a material question in the case. Plaintiffs have never objected to identifying themselves when distributing absentee ballot applications. *See, e.g.,* Ex. 15 at 35-45; Ex. 16; 6/10/22 PI Tr. 105:18-23, 126:20-21. It is undisputed that Plaintiffs have always provided their name and contact information on every absentee ballot application mailer that it has ever sent. Lopach Tr. 70:20-71:4. And, voters do not generally express confusion about where the third-party absentee ballot application originates. Ex. M; Ex. 23, Decl. of Ryan Germany, at 30-32, 34 [ECF 113-2]. This is specifically true regarding comments from voters about Plaintiffs. *See id.* Indeed, immediately following the cited testimony, Mr. Germany explained that in 2018 some third parties had distributed

23

"really, really pared-down application forms" which generated voter questions, and that since then the State began to require that third-party applications be "substantially similar" to the state's application. 6/9/22 PI Tr. 13:20-14:12. In fact, SB 202 now requires that third parties use the State's official application form. Ga. Code Ann. § 21-2-381(a)(C)(ii). Plaintiffs are not challenging this requirement and this fact is therefore immaterial.

38.     This led to "a lot of calls to counties and to the state." Day 2 Tr. 13:15.

**Plaintiffs' Response to Fact No. 38:** Disputed. The cited source does not support Defendants' characterization of third-party applications generally leading to "a lot of calls to counties and to the state." The cited testimony does not refer to mailers like the ones sent by Plaintiffs that were directed to and personalized for certain individuals and that utilized the State's official absentee ballot application form. 6/10/22 Tr. 13:15. Further, while the statement is cited as support for Defendants' motion for summary judgment, it does not reach a material question in the case. *See supra,* ¶ 37. This fact is therefore immaterial and irrelevant for the Court's consideration.

**B.    Voters express concern about receiving duplicate absentee-ballot applications.**

39.     A second category of complaints the State received from voters related

to voters having received multiple absentee-ballot applications complained that they were receiving multiple ballots. Mashburn Depo. 84:4–6, 91:2–13; Kidd Depo. 183:7–184:13; Ex. H.

**Plaintiffs' Response to Fact No. 39:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received the emails purportedly from Georgia voters that make up Exhibit H, all but two of which properly identified the received documents as applications, not ballots. To the extent Defendants use these emails to infer that these voters did in fact receive multiple applications, and that some of these voters did in fact think they had received multiple ballots as opposed to applications, it is unsupported by the cited source and is inadmissible hearsay.

Further, the testimony of Mr. Mashburn and Mr. Kidd is based on out-of-court statements of voters. Defendants seek to introduce this testimony to prove the truth of the matter asserted by the voters' out-of-court statements: that voters confused their receipt of absentee ballot applications with ballots. Plaintiffs dispute this forbidden hearsay inference.

Moreover, Defendants' reliance on occasional references to absentee ballot applications as "ballots" as evidence of widespread confusion is unsupported. The record shows that even experts occasionally misspeak and refer to ballot

applications as ballots. 6/10/22 PI Tr. 32:19-33:5. Further, the cited source does not connect any alleged confusion between applications and ballots to third-party distribution in particular, and a voter might be confused, for example, because they filled out an absentee ballot application for multiple elections during a single election cycle. *E.g.,* Ex. 18, GA_VA00067386, GA-VA00062464, GA-VA00038815.

40.   The SEB received "so many calls" from voters concerned with fraud after receiving what they believed to be multiple ballots. Mashburn Depo. 83:20–84:4.

**Plaintiffs' Response to Fact No. 40:** Disputed in part. Plaintiffs do not dispute that Mr. Mashburn testified that the SEB had "had so many calls" about the distribution of absentee ballot applications generally. Ex. 7, Dep. of T. Matthew Mashburn ("Mashburn Tr.") 83:16-22. To the extent Defendants use this source to assert that there were "so many calls" about voters who believed mistook applications for ballots and were concerned about fraud, that is unsupported by the cited source. The remainder of Mr. Mashburn's cited testimony is based on Mr. Mashburn's generalized and unspecific accounts of out-of-court statements of voters. Mashburn Tr. 83:22-84:19. Defendants seek to introduce this testimony to prove the truth of

26

the matter asserted by the voters' out-of-court statements: that many voters mistook applications for ballots and were concerned about fraud. Plaintiffs dispute this forbidden hearsay inference.

Further, while the statement is cited as support for Defendants' motion for summary judgment, it does not reach an ultimate question in the case. The mere fact that SEB receives calls from voters about their belief that they received multiple ballots does not mean that SEB receives calls from voters regarding Plaintiffs, nor other third-party absentee ballot application distributors. Finally, Defendants have cited no admissible support for this statement. Therefore, this fact is immaterial and irrelevant for the Court's consideration.

41.    Some voters who received third-party absentee-ballot applications after they had already requested a ballot were concerned that there was a problem with their initial request. Day 2 Tr. 33:9–17; Mashburn Depo. 91:10– 12.

**Plaintiffs' Response to Fact No. 41:** Disputed. The statement is based on inadmissible hearsay testimony. Mr. Germany's testimony is speculative, reflecting vague concerns about the potential "effect on the voter" in receiving an absentee ballot application, *see* 6/9/22 PI Tr. 33:9-11. It is not evidence of voters' concern. Further, Plaintiffs do not attempt to send absentee ballot applications to voters who

have already submitted an absentee ballot application. 6/9/22 PI Tr. 41:24-42:11,

71:19-25, 90:15-19; Ex. 15 at 10 ¶ 27, 11 ¶ 31. Mr. Mashburn's testimony is based

on out-of-court statements of voters. Defendants seek to introduce this testimony to

prove the truth of the matter asserted by the voters' out-of-court statements: that

voters who received third-party absentee ballot applications after already requesting

a ballot were concerned that there was a problem with their initial request. Plaintiffs

dispute this forbidden hearsay inference. Defendants have cited no admissible

support for this statement.

42.   One voter, Brian Pollard, expressed concern about fraud after he

received 5 absentee-ballot applications from multiple third-party groups for the

2021 Senate runoff. Germany Decl. ¶ 41(a).

**Plaintiffs' Response to Fact No. 42:** Disputed in part. Plaintiffs do not dispute that

the Secretary's fraud alert tip line received an email from an individual purportedly

named Brian Pollard who wrote that he had received five absentee ballot

applications from various senders for the 2021 Senate runoff. *Id.* To the extent that

Defendants use this source to infer that this voter in fact received five absentee ballot

applications from third-party groups for the 2021 Senate runoff, it is inadmissible

hearsay. Further, while the statement is cited as support for Defendants' motion for

summary judgment, it does not reach an ultimate question in the case. The communication states that Brian Pollard "did not request any absentee ballot." In such cases, where a voter has not already submitted an absentee ballot application and/or where a voter intends to vote in person, the challenged restrictions would not prevent a voter from receiving multiple applications in the mail. *See* Ga. Code Ann. § 21-2-381(a)(3)(A); Evans Tr. 109:7-111:5. As such, this statement is immaterial and irrelevant for the Court's consideration.

43.     Another voter, Sheree Muniz, expressed concerns about fraud after she received three absentee-ballot applications from a group called America Votes. Germany Decl. ¶ 41(b).

**Plaintiffs' Response to Fact No. 43:** Disputed in part. Plaintiff does not dispute that the Secretary's fraud alert tip line received an email from an individual purportedly named Sheree Muniz who wrote that she "received 3 unrequested absentee ballot applications from America Votes" and that if "this company mailed anything during the Presidential election, this could be considered fraud." Ex. 23 at 72. To the extent that Defendants use this source to infer that this voter in fact received three absentee ballot applications or that the voter is concerned about fraud, it is inadmissible hearsay.

29

Further, while the statement is cited as support for Defendants' motion for summary judgment, it does not reach an ultimate question in the case. In the communication, Sheree Muniz states "I personally drop off my absentee ballot application at my local office." *Id.* The communication does not indicate whether Sheree Muniz had already requested an absentee ballot application at the time she received the applications; indeed, as written, the communication seems to imply a future intention to apply. *Id.* In such cases, where a voter has not already submitted an absentee ballot application and/or where a voter intends to vote in person, the challenged restrictions would not prevent a voter from receiving multiple applications in the mail. *See* Ga. Code Ann. § 21-2-381(a)(3)(A); Evans Tr. 109:7-111:5. As such, this statement is immaterial and irrelevant for the Court's consideration.

44.     A third voter, Matthew Kirby, expressed concern about fraud after he received multiple absentee-ballot applications during the 2021 Senate runoff. Germany Decl. ¶ 41(c).

**Plaintiffs' Response to Fact No. 44:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received an email from an individual purportedly named Matthew Kirby who wrote that he had "received 3 absentee ballot

applications for the US Senate runoff in the mail," as well as a text message providing him "with a link to request a mail ballot," and stated that this "could easily allow fraudulent activity." Ex. 23 at 71. To the extent Defendants use this source to infer that this voter did in fact receive multiple absentee ballot applications or that the voter was concerned about fraud, it is inadmissible hearsay.

Further, while the statement is cited as support for Defendants' motion for summary judgment, it does not reach an ultimate question in the case. The communication states Mr. Kirby "never requested an absentee ballot" and "plan[ned] to vote in person." *Id.* In such cases, where a voter has not already submitted an absentee ballot application and/or where a voter intends to vote in person, the challenged restrictions would not prevent a voter from receiving multiple applications in the mail. *See* Ga. Code Ann. § 21-2-381(a)(3)(A); Evans Tr. 109:7-111:5. Further, nothing in the restrictions prohibits third parties from texting voters with the link to apply for an absentee ballot. *See generally* Ga. Code Ann. § 21-2-381(a). As such, this statement is immaterial and irrelevant for the Court's consideration.

45.     Another voter, Peggy Johnson, expressed concerns about fraud *and* harassment after receiving multiple unsolicited absentee-ballot applications.

Germany Decl. ¶ 41(d).

**Plaintiffs' Response to Fact No. 45:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received an email from an individual purportedly named Peggy Johnson who wrote that she was "receiving 3 unsolicited Absentee Ballot Applications from America Votes," and stated "[t]his is harrassment *[sic]."* Ex. 23 at 70. To the extent Defendants use this source to infer that this voter did in fact receive multiple absentee ballot applications or that the voter was concerned about fraud or harassment, it is inadmissible hearsay.

46.   Another member of the General Assembly, Representative Barry Fleming, heard from voters who thought that they had received multiple absentee ballots. Tr. of Hr'g on Ga. SB 202 before Special Comm. on Election Integrity at 16:5–13 (Feb. 22, 2021) (attached as Ex. F to Germany Decl. [ECF No. 113-2]).

**Plaintiffs' Response to Fact No. 46:** Disputed.   This statement is based on inadmissible hearsay testimony.   Representative Barry Fleming testified, "Yeah. One of the biggest contentions, I guess you would say, that I heard – several members have heard – is that many members of the public thought that they received seven, eight, nine absentee ballots. What we find out in most instances – overwhelmingly most instances – what they received is five, six, or seven absentee

ballot applications." Ex. 19, Tr. Of Hr'g on Ga. SB 202 before Special Comm. On Election Integrity at 16:5-13 (Feb. 22, 2021). Representative Fleming's testimony provides vague, generalized accounts of out-of-court statements of unidentified voters. Defendants seek to introduce this testimony to prove the truth of the matter asserted by the purported voters' out-of-court statements:  that the General Assembly "heard from voters who thought that they had received multiple absentee ballots." Plaintiffs dispute this forbidden hearsay inference. As Defendants have cited no admissible support for this statement it is irrelevant for the Court's consideration.

47.    Representative Rick Williams said during the legislative hearings on SB 202 that he received six absentee-ballot applications. Tr. of Hr'g on Ga. SB 202 before Special Comm. on Election Integrity at 52:12–19 (Feb. 4, 2021) (attached as Ex. F to Germany Decl. [ECF No. 113-2]).

**Plaintiffs' Response to Fact No. 47:** Disputed in part. Plaintiffs do not dispute that Representative Rick Williams testified "I know I got myself probably about six different pieces of mail encouraging me by the different political parties and third parties to apply for an absentee ballot," Ex. 23 at 84. To the extent Defendants assert that Representative Williams received exactly six applications, or that the

applications were received from the same sender, disputed.

48.    In many instances, voters were worried that these multiple applications presented an open invitation for voter fraud—a concern exacerbated by voters believing that the applications were ballots, each of which could be cast. Germany Decl. ¶ 42; Day 2 Tr. 20:3–5; Kidd Depo. 183:7– 184:13.

**Plaintiffs' Response to Fact No. 48:** Disputed in part. Plaintiffs do not dispute that Mr. Germany stated in his declaration "duplicate absentee-ballot applications raised serious confusion and concern about voter fraud," Ex. 23 at 16 ¶ 42, and that he read from an email received by the Secretary's fraud alert tip line that stated a purported voter's concern of fraud after receiving multiple applications during preliminary injunction hearing. *See* 6/10/22 PI Tr. 20:3–5. Plaintiffs dispute that the cited material supports the vague and subjective characterization that voters expressed concern of voter fraud stemming from multiple applications "[i]n many instances."

Similarly, Plaintiffs do not dispute that Douglas County Elections Director Milton Kidd testified to receiving complaints of "receipt of multiple absentee ballot applications," Ex. 8, Dep. of Milton Kidd ("Kidd Tr.") 183:7–184:13, but he states that his county received "20 to 30" such complaints, *id*. 183:17, in a county of

approximately 96,695 registered voters[3], and does not characterize this as "many instances." Further, while Mr. Kidd states that "there was confusion as to the fact that an absentee ballot application is not a ballot," he does not testify that this exacerbated concerns of voter fraud. *See* Defs.' MSJ Ex. J, [ECF 149-13]. Indeed, when directly asked whether "individuals express to you concern that there might be wrongful use of the ballots or voter fraud when making these complaints," Mr. Kidd declines to confirm any such concerns were expressed. Kidd Tr. 184:6-13.

49.     Moreover, voters who received multiple applications often returned multiple applications. Germany Depo. 51:2–22.

**Plaintiffs' Response to Fact No. 49:** Disputed. The cited source does not support Defendants' characterization that voters' receipt of multiple applications resulted in their returning multiple applications. The cited testimony concerns how elections offices and the state's electronic database process duplicative applications submitted by a single voter. Germany Tr. 51:2–22. It makes no mention of the reasons voters may submit duplicative applications, receipt of multiple applications or otherwise. Defendants cite no evidence connecting duplicate application

---

[3] Georgia Secretary of State, Election Results (2022).

submission to third party distribution of absentee ballot applications. Further, several voters who purportedly received multiple applications stated they did not in fact return multiple applications. *See* Ex. 23 at 31, 33, 71.

50.     In some instances, they did so even though they did not intend to vote by absentee ballot. Germany Decl. ¶ 43; Day 2 Tr. 28:12–16, 42:16–22; Germany Depo. 199:21–25.

**Plaintiffs' Response to Fact No. 50:** Disputed. The cited sources do not support Defendants' characterization of voters who received multiple applications submitting those applications despite not intending to vote by absentee ballot. Plaintiffs do not dispute that Mr. Germany's declaration relays the story a single voter who spoke to Chris Harvey and informed him that she had submitted multiple applications and that she did not presently intend to vote by absentee ballot. Ex. 23 ¶ 43. To the extent Defendants assert that the voter submitted multiple applications for an absentee ballot without intending to vote absentee, that is unsupported. *Id.* Further, Mr. Germany's declaration reports the out-of-court statements of a voter to a colleague.  Defendants seek to introduce this testimony to prove the truth of the matter asserted by the voter's out-of-court statements later relayed out-of-court to Mr. Germany. Plaintiffs dispute this forbidden hearsay within hearsay.

Mr. Germany's cited Preliminary Injunction Hearing testimony concerns the process by which a voter who has applied for and received an absentee ballot may cancel that ballot and instead vote in person. 6/10/22 PI Tr. 28:12–16. It makes no mention of whether such voters submitted their applications despite intending to vote in person or simply changed their mind about how they would like to vote. *Id.* Mr. Germany goes on to describe various scenarios that might result in someone who submitted an absentee ballot nevertheless voting in person, including their having lost the ballot or never having received the ballot. *See, id.*, at 28:22 – 29:5. Mr. Germany's other cited Preliminary Injunction Hearing makes no mention of individuals completing and submitting absentee ballot applications while intending to vote in person or not at all. *Id.* 42:16-22.

Mr. Germany's cited deposition testimony concerns voters who complete and submit an absentee ballot application and forget they have done so or who are on the state's rollover list and are then surprised when they receive an absentee ballot. Germany Tr. 199:21–25. It makes no mention of voters submitting absentee ballot applications despite not intending to vote by absentee ballot.

Finally, purported Georgia voters told the Secretary's fraud alert tip line that they disposed of the unwanted absentee ballot applications they received in the mail.

37

*See* Ex. 23 at 56-77.

51.    This required elections officials to divert their finite resources to processing many unnecessary absentee-ballot applications. Day 2 Tr. 28:16– 21.

**Plaintiffs' Response to Fact No. 51:** Disputed. The cited sources do not support Defendants' characterization of voters' submission of applications despite not intending to vote by absentee ballot as requiring the diversion of finite resources to processing unnecessary absentee-ballot applications. Mr. Germany's cited testimony concerns the process by which a voter who has applied for and received an absentee ballot may cancel that ballot and instead vote in person. 6/10/22 PI Tr. 28:16-21. It makes no mention of processing "unnecessary" absentee ballot applications, the resources required to cancel an issued absentee ballot and issue an in-person ballot, or the various reasons why a voter may have received an absentee ballot but ultimately decide to vote in person. *Cf. id*; *see also id.* 28:5-29:5.

52.    Then, on Election Day, officials were required to process many ballot cancellations when voters who had submitted absentee-ballot applications showed up to vote in person, leading to longer lines. Day 2 Tr. 28:12–29:7, 29:25–30:4.

**Plaintiffs' Response to Fact No. 52:** Disputed in part. Plaintiff does not dispute that election officials are required to process absentee ballot cancellations during in

person voting, nor that Mr. Germany testified it "*can* definitely lead to issues at the polls, lines at the poll, which we very much want to avoid because we want to have a smooth voting experience for everybody." 6/10/22 PI Tr. 29:25-30:4 (emphasis added). To the extent Defendants assert that officials had to process "many ballot cancellations" which led to long lines on Election Day 2020, it is unsupported by the cited sources. *Id.* at 28:12–29:7, 29:25–30:4. Additionally, there are various reasons why a voter may cancel her absentee ballot and vote in person, including postal delays, missed deadlines, or a voter simply changing her mind. *See* 6/10/22 PI Tr. 28:5-29:5. Defendants cite no evidence tying cancelled ballots to third-party ballot application distribution but instead rely on pure supposition. Indeed, election officials received voter complaints stating they applied for an absentee ballot but did not receive one or received one too late. *See*, *e.g.*, Ex. 18, GA-VA00000628, GA-VA00048462, GA-VA00001715, GA-VA00041528. To the extent that Defendants' assertion implies that third-party ballot application distribution is the sole, primary, or even significant source of cancelled ballots, disputed.

53.    For the 2020 general election, for instance, there were 40,694 absentee-ballot applications cancelled by voters, compared with only 5,472 such cancelled applications during the 2018 general election, and 3,170 cancelled applications

during the 2016 general election. Germany Decl. ¶ 31.

**Plaintiffs' Response to Fact No. 53:** Undisputed. Plaintiffs do not dispute that Mr. Germany stated in his declaration that "there were 40,694 absentee-ballot applications cancelled by voters" and "5,472 absentee ballots cancelled by voters during the 2018 General Election, and 3,170 absentee ballots cancelled in the 2016 general election." Ex. 23 at 12 ¶ 31. However, those increases are largely explained by the multi-fold increase in absentee ballot usage in 2020 overall. Absentee ballot usage increased from about 220,000 voters in 2018 to over 1.3 million voters in 2020.[4] As Mr. Germany has testified, Georgia "saw a big increase in all kind of absentee ballot applications in 2020," in large part because of the pandemic. Germany Tr. 50:23-24; *see also* Germany Tr. 53:21-22; 54:3-4; 6/10/22 PI Tr. 30:17-21. Thus, the increase in cancelled absentee ballot applications in 2020 is largely attributeable to the increase in absentee voting overall. 6/10/22 PI Tr. 30:17-21. Defendants provide no evidence linking the increase in cancelled absentee

---

[4] *Compare* Georgia Sec'y of State, November 6, 2018 Governor Election Results, https://results.enr.clarityelections.com/GA/91639/Web02-state.221451/#/cid/20000,  *with* Georgia Sec'y of State, November 3, 2020 Presidential Election Results by Vote Type, https://results.enr.clarityelections.com/GA/105369/web.264614/#/detail/5000.

ballots to third party distribution of applications.

**C.    Voters express concern about receiving incorrectly pre- filled absentee-ballot applications.**

54.    A third category of complaints the State received related to inaccuracies in pre-filled applications since before 2020. Germany Depo. 181:7–12; Ex. G.

**Plaintiffs' Response to Fact No. 54:** Disputed in part. While Mr. Germany testified "We received complaints about that" when asked whether the Secretary of State tracked inaccuracies in applications that were due to prefilled absentee ballot applications, he went on to discuss inaccuracies caused by lags in removing voters from the state's voter roll, stating "if you get an application mailed to your address, but it's addressed to someone who used to live there, I think it's filled inaccurately to the person who receives it, but it's not necessarily an inaccuracy, you know, on the rolls." Germany Tr. 181:7-21.  Plaintiffs do not dispute that the Secretary's fraud alert tip line received the emails purportedly from Georgia voters that make up Exhibit G, some of which reported receipt of applications personalized for deceased or relocated individuals. To the extent these voters still appear on the Georgia voter rolls, Plaintiffs dispute the cited sources support Defendants characterization of "inaccuracies in pre-filled applications."   To the extent Defendants use these emails

to infer that these voters did in fact receive inaccurately pre-filled applications, it is inadmissible hearsay.

55.    The Secretary of State's Office has "receive[d] … complaints from voters complaining that these applications left the door open to fraud and suggesting they may or may not continue participating in the electoral process." Day 2 Tr. 22:4–14.

**Plaintiffs' Response to Fact No. 55:** Disputed. This statement is based on inadmissible hearsay testimony.  Mr. Germany testified, "Yes, we got complaint that said, look, this is – we got complaints that basically said this looks like rampant fraud to me, I don't see any reason to participate in the process if this is what the process is." 6/10/22 PI Tr. 22:4–14. Mr. Germany's testimony reports his vague account of the out-of-court statements of unspecified voters.  Defendants seek to introduce this testimony to prove the truth of the matter asserted by the purported voters' out-of-court statements: that some voters complained that they might not continue to participate in elections due to what they assessed to be a process vulnerable to fraud. Plaintiff disputes this inadmissible hearsay inference. As Defendants have cited no admissible support for this statement, it is irrelevant for the Court's consideration.

42

56.    The SEB also received a "giant wave of complaints" from voters who received applications "for people that used to live" at their home but no longer do, applications that had women's "maiden name[s]," applications "for [a] dead relative," and even an application for "some cat." Mashburn Depo. 88:16–89:15.

**Plaintiffs' Response to Fact No. 56:** Disputed. This statement is based on inadmissible hearsay testimony.  Mr. Mashburn testified that the Board received various complaints about mailings and applications. Mashburn Tr. 88:11-25. Mr. Mashburn's generalized testimony reporting the out-of-court statements of unspecified voters is not reliable evidence.  Defendants seek to introduce this testimony to prove the truth of the matter asserted by the purported voters' out-of-court statements: that some voters complained about mailings they received. Plaintiff disputes this forbidden hearsay inference. Further, the cited source itself acknowledges that some of these complaints were concerning voter registration applications, *id.* 88:24-25 ("There was some cat that was getting an application to register."), and therefore are immaterial.

57.    A complaint was submitted in Georgia after a voter received a prefilled application with the wrong middle name. Day 2 Tr. 18:19–20; Germany Decl. ¶ 23(a).

**Plaintiffs' Response to Fact No. 57:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received an email from an individual who wrote that she received "a pre-filled application for absentee ballot" where "the name on the ballot" included her correct first and last name, but an incorrect middle name. Ex. 23 at 48. To the extent Defendants use this source to infer that this voter did in fact receive an inaccurately filled absentee ballot application, it is inadmissible hearsay.

58.    Another complaint was submitted after a voter received a pre-filled application from someone who did not live at her address, causing her to worry about "rampant fraud." Germany Decl. ¶ 23(b).

**Plaintiffs' Response to Fact No. 58:** Disputed in part. Plaintiffs do not dispute that the Secretary Raffensperger received an email from an individual who wrote that she received "4th piece of election mail request for ballot for runoff in GA, sent to same person who has NEVER lived here . . . .  This is rampant fraud." Ex. 23 at 46. To the extent Defendants use this source to infer that this voter did in fact receive an inaccurately filled absentee ballot application, it is inadmissible hearsay.

59.    One voter expressed concerns that someone was voting for him in Georgia after he received absentee-ballot applications from the Democratic Party of

Georgia even though he had been a Florida resident for years. Germany Decl. ¶ 23(c).

**Plaintiffs' Response to Fact No. 59:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received an email from an individual who wrote that he had "been getting absentee ballot applications from the Democratic Party of Georgia." Ex. 23 at 25. The individual additionally wrote, "your website shows that [I'm] an active registered voter in Georgia." *Id.* To the extent Defendants use this source to infer that this voter did in fact receive an absentee ballot applications despite residing in Florida, it is inadmissible hearsay. Moreover, even accepting the individual's hearsay as true, it suggests that he was still an active Georgia voter on the State's voter rolls despite his relocation and the mailing helped alert him to this fact.

60.    Another voter reported that she received multiple absentee-ballot applications from, among others, VPC that included "false voter information." Germany Decl. ¶ 23(d).

**Plaintiffs' Response to Fact No. 60:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received an email from an individual who wrote that she had "been receiving absentee ballots or applications from third party

organizations like VPC and NAACP with false voter information*.*" Ex. 23 at 28. The email does not explain what about the information was allegedly "false." To the extent Defendants use this source to infer that this voter did in fact receive an inaccurately filled absentee ballot application from Plaintiff VPC, it is unsupported by the cited sources and inadmissible hearsay.

61.     Another voter received a partially pre-filled absentee-ballot application for her husband who had been dead for seven years. Germany Decl. ¶ 23(e).

**Plaintiffs' Response to Fact No. 61:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received an email from an individual who wrote that she received "a partial pre-filled Absentee Ballot application for my husband on 12/3/2020." Ex. 23 at 29. To the extent Defendants use this source to infer that this voter did in fact receive an inaccurately filled absentee ballot application for her late husband, it is inadmissible hearsay.

62.     A complaint was submitted after "at least three pre-filled applications for absentee ballots from the Center for Voter Information" were sent to a voter who, because of those applications, was concerned about fraud. Day 2 Tr. 19:4–13.

**Plaintiffs' Response to Fact No. 62:** Disputed. This statement is based on inadmissible hearsay testimony.  Firstly, the cited source consists of Mr. Germany's

recitation of a demonstrative exhibit created by Defense counsel containing out-of-court statements of a purported voter. 6/10/22 PI Tr. 19:2-13.  Defendants seek to introduce this testimony to prove the truth of the matter asserted by the voter's out-of-court statements: that this voter received pre-filled mailings and was concerned about fraud.  Plaintiffs dispute this forbidden hearsay inference.

Secondly, Defendants' demonstrative cites to a document attached to Mr. Germany's declaration. *See* Ex. 23 at 47. Plaintiffs do not dispute that the underlying document is a fraud alert tip line email received by the Secretary from an individual who wrote "in reference to numerous political mailings . . . received at GSP Post 23-Brunswick" at least three of which were "pre-filled applications for absentee ballots with postage paid envelopes." *Id.* The email further notes that "[m]ost of the mailings have come from The Center for Voter Information in Atlanta." *Id.* Defendants' assertion that this complaint concerns three or more pre-filled applications sent by Center for Voter Information is unsupported by the document underlying Defendants' cited source.

63.    That complaint came from a Georgia State Patrol officer who was worried about fraud after Georgia State Patrol itself received absentee-ballot applications from CVI that included information for someone with no affiliation

with the patrol. Germany Decl. ¶ 23(f).

**Plaintiffs' Response to Fact No. 63:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received an email from an individual who wrote that "GSP Post 23-Brunswick" had received "numerous political mailings" including "[t]o date, there have been at least three pre-filled applications for absentee ballots with postage paid return envelopes." Ex. 23 at 47. Plaintiffs also do not dispute that the email states "[m]ost of the mailings come from The Center for Voter Information." *Id.* To the extent Defendants use this source to infer that prefilled applications were in fact received at Georgia State Patrol Post 23-Brunswick, it is unsupported by the cited source and is inadmissible hearsay.

64. The applications received by the Georgia State Patrol included different variations of the same name. Germany Decl. ¶ 23(f).

**Plaintiffs' Response to Fact No. 64:** Disputed in part. Plaintiffs do not dispute that the Secretary's fraud alert tip line received an email from an individual who wrote that "GSP Post 23-Brunswick" had received mail addressed to Brandon Jacques De Llen Moses and Brandon J. Moses. Ex. 23 at 47. To the extent Defendants use this source to infer that applications prefilled with different variations of the same voter name were in fact received at Georgia State Patrol Post 23-Brunswick, it is

inadmissible hearsay.

65.    A complaint was submitted after a voter, concerned about potential
fraud, "received mail to my address with someone else's name … from the Voter
Participation Center." That voter received "six applications in the mail for absentee
ballots that [she] did not request." Day 2 Tr. 19:25–20:5.

**Plaintiffs' Response to Fact No. 65:** Disputed. This statement is based on
inadmissible hearsay testimony.   The cited source consists of Mr. Germany's
recitation of a demonstrative exhibit created by Defense counsel. 6/10/22 PI Tr.
19:23-20:5. Mr. Germany's testimony reports the out-of-court statements of a
purported voter.  Defendants seek to introduce this testimony to prove the truth of
the matter asserted by the voter's out-of-court statements: that this voter received
multiple pre-filled mailings with someone else's name.   Plaintiffs dispute this
forbidden hearsay inference.

66.    Representative Barry Fleming explained during the legislative
hearings on SB 202 that "a lot of those [pre-filled absentee-ballot applications] were
prefilled out incorrectly, and it caused a lot of problems came into the boards of
elections." Tr. of Hr'g on Ga. SB 202 before Special Comm. on Election Integrity
at 17:3-8 (Feb. 22, 2021) (attached as Exhibit H to Germany Decl. [ECF No. 113-

2]).

**Plaintiffs' Response to Fact No. 66:** Disputed in part. Plaintiffs do not dispute that Representative Barry Fleming testified that "another problem that we found is that a lot of those forms were prefilled out incorrectly, and it caused a lot of problems when it came into the boards of elections." Ex. 19, 17:3-8. However, Representative Fleming testified in the context of absentee ballot applications generally, including those applications sent by county and state election officials. *See id.*, 16:14-22. To the extent that Defendants' assertion implies that the pre-filled applications were unsolicited, or sent by Plaintiffs or any other nongovernmental entity, it is unsupported by the cited source and disputed.

67.    One witness, Caroline Garcia, agreed with Representative Fleming at the legislative hearings that pre-filled absentee-ballot applications quite often included the wrong information. Tr. of Hr'g on Ga. SB 202 before Special Comm. on Election Integrity at 23:3-9 (Mar. 18, 2021) (attached as Exhibit H to Germany Decl. [ECF No. 113-2]).

**Plaintiffs' Response to Fact No. 67:** Disputed. Plaintiffs do not dispute that Representative Fleming described a scenario of a voter sending in an inaccurately prefilled application, and Ms. Garcia testified "Yes. We saw something like that."

Ex. 23 at 108, 23:3-9. To the extent Defendants assert that prefilled absentee ballot applications "quite often [included] the wrong information," it is unsupported by the cited sources. *Id.*

68.     The State received many other similar complaints. *See* Ex. G.

**Plaintiffs' Response to Fact No. 68:** Disputed. The cited sources do not support Defendants' characterization of the State's having received "many" other similar complaints. Plaintiffs do not dispute that Exhibit G compiles 26 emails received by the Secretary's fraud alert tip line. *See* Ex. G. Of these 26 emails, all 26 are previously included in Defendants' above-enumerated paragraphs, and are not "other similar complaints." To the extent Defendants assert that any of these constitute "many" additional complaints, that is unsupported. *Id.* Additionally, many of these 26 emails reported receipt of applications personalized for deceased or relocated individuals. To the extent these voters still appear on the Georgia voter rolls, Plaintiffs dispute the cited sources support Defendants characterization of complaints about pre-filled applications including "wrong information."

Further, the email communications compiled in Exhibit G all constitute unverified, out-of-court statements made by purported voters. Defendants seek to introduce these documents to prove the truth of the matter asserted by the voters'

out-of-court statements. Plaintiff disputes this forbidden hearsay inference.

**IV.   The   Challenged   Provisions   of   SB   202   Respond   to These Concerns.**

69.    The Pre-Filling Prohibition prohibits all but "a relative authorized to request an absentee ballot for such elector or a person signing as assisting an illiterate or physically disabled elector" from "send[ing] any elector an absentee ballot application that is prefilled with the elector's required information." O.C.G.A. § 21-2-381 (a)(1)(C)(ii).

**Plaintiffs' Response to Fact No. 69:** Undisputed.

70.    The Pre-Filling Prohibition does not apply to web-based tools and applications that allow voters themselves to input their own personalized information into an absentee-ballot application. Ga. Comp. R. & Regs. 183-1- 14- .12(2); Germany Depo. 100:1–5.

**Plaintiffs' Response to Fact No. 70:** Undisputed.

71.    The Pre-Filling Prohibition does not prevent anyone from pre-filling the election date on absentee-ballot applications. Day 2 Tr. 17:15–23.

**Plaintiffs' Response to Fact No. 71:** Disputed. Plaintiffs do not dispute that when asked whether SB 202 "would prevent plaintiffs from continuing to include the date on applications in the future" Mr. Germany testified "No." 6/10/22 PI Tr. 17:15-23.

However, when county election officials specifically requested to do so, the Secretary's office told them they could not, citing SB 202. Evans Tr. 220:16-221:15; Ex. 18, GA-VA00038833, GA-VA00051968.

72.    "[E]ncouraging people to fill out forms by themselves" results in "vanishingly low" "error rates." Day 1 Tr. 209:25–210:3.

**Plaintiffs' Response to Fact No. 72:** Disputed. The cited source does not support Defendants' characterization of "encouraging people to fill out forms by themselves" as leading to "vanishingly low" "error rates." When asked what effects "reducing transaction costs have on" applications' rejection rates, Dr. Green testified that "perhaps encouraging people to fill out forms by themselves elevates the number of errors they will make, but the kinds of error rates are vanishingly low," and continued "we're really talking about a relatively trivial kind of nuisance in terms of inflicting extra time commitments on election officials." 6/9/22 PI Tr. 209:20 – 210:3. The cited testimony referred to the delta in error rates when individuals are encouraged to complete applications versus voters completing forms on their own accord. It did not opine about the rates of error generally when people fill out forms by themselves.

Further, the Secretary of State's Office has never identified whether there are

more errors between voter-filled applications and prefilled applications. 6/10/22 PI Tr. 123:6-9. Indeed, county officials have reported that voters will not fill out certain information on the application form, including the election date or county, when submitting an application without prefilled information. *See* Evans Tr. 219:19-220:5; Ex. 18, GA-VA00038833. Voters also put in information that doesn't exactly match the voter file, or will write illegibly, all of which can lead to error in processing the application. 6/10/22 PI Tr. 122:12-123:5; Evans Tr. 158:9-22.

73.    The Anti-Duplication Provision prohibits anyone other than the "Secretary of State, election superintendents, boards of registrars, and absentee ballot clerks" from sending absentee-ballot applications "to individuals who have … already requested, received, or voted an absentee ballot in the primary, election, or runoff." O.C.G.A. § 21-2-381(a)(3)(A).

**Plaintiffs' Response to Fact No. 73:** Disputed in part. Plaintiffs do not dispute that the Mailing List Restriction states that "[a]ll persons or entities, other than the Secretary of State, election superintendents, boards of registrars, and absentee ballot clerks, that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such applications only to individuals who have not already requested, received, or voted an absentee ballot." O.C.G.A. § 21-2-381(a)(3)(A). To

the extent that Defendants assert that any persons or entities not specifically exempted are prohibited from sending absentee ballot applications to anyone who has requested or voted an absentee ballot but is not listed on the state's absentee voter file, that is unsupported. SB 202 additionally provides that any person who relies on the Secretary of State's absentee voter file within five-business days of sending the application will be shielded from liability. *Id.* In practice, this means that the only means of complying with this provision is to check the Secretary of State's absentee voter file, Evans Tr. 243:4-14, which may not accurately reflect whether a voter has already submitted an application. *See id.* 129:2-25, 131:1-9; 6/10/22 PI Tr. 123:19-124:1.

74.     The Anti-Duplication Provision requires anyone but the exempted groups listed above seeking to send an absentee-ballot application to "compare its mail distribution list with the most recent information available about which electors have requested, been issued, or voted an absentee ballot in the primary, election, or runoff and shall remove the names of such electors from its mail distribution list." O.C.G.A. § 21-2-381(a)(3)(A).

**Plaintiffs' Response to Fact No. 74:** Disputed in part. Plaintiffs do not dispute that the Mailing List Restriction states that any person or entity not specifically

exempted "shall compare its mail distribution list with the most recent information available about which electors have requested, been issued, or voted an absentee ballot in their primary, election, or runoff and shall remove the names of such electors form its mail distribution list. O.C.G.A. § 21-2-381(a)(3)(A). To the extent that Defendants assert that any persons or entities not specifically exempted are required to compare their mail distribution list to any "recent information" other than the state's absentee voter file available on the Secretary's website, it is unsupported. Indeed, there is no way of knowing whether the absentee voter file contains "recent information," because election officials only record when the ballot has been processed, not when it has been received. *See* Evans Tr. 129:2-25, 131:1-9; 6/10/22 PI Tr. 123:19-124:1.

75.    Anyone who follows the requirement of the preceding paragraph is not liable for violating the Anti-Duplication Provision if they "relied upon information made available by the Secretary of State within five business days prior to the date such applications are mailed." O.C.G.A. § 21-2-381(a)(3)(A).

**Plaintiffs' Response to Fact No. 75:** Undisputed.

76.    Some printers can update a data file and mail absentee-ballot applications within a five-business-day window. Day 2 Tr. 137:4–6.

**Plaintiffs' Response to Fact No. 76:** Disputed. The cited source does not support Defendants' characterization that "some printers" can update a data file and mail absentee ballot applications within a five-business day window. Plaintiffs do not dispute that Brandon Waters, CEO of a political consulting firm named Arena that does mail advertising, stated that Arena can update a data file and send an undefined number of absentee ballot applications within a five-business day window. 6/10/22 PI Tr. 137:4–6. But Mr. Waters has no knowledge about how Plaintiffs package their mailers, no knowledge about the method of printing that Plaintiffs employ, no knowledge about how Plaintiffs target their mailers, and no knowledge about the postage process that Plaintiffs use. *See* Waters Tr. 57:2-25. Arena's average absentee ballot application mailer order contains approximately 500,000 to 1 million mailers. 6/10/22 PI Tr. 142:2-5. In 2020, Plaintiffs sent more than 83 million absentee ballot application mailers nationwide, in addition to Plaintiffs' other pro-voting mail campaigns. Ex. 15 at 9 ¶ 23. Arena has not used a union printer since at least before the 2020 election, Waters Tr. 21:25-22:5; Plaintiffs almost exclusively hire union-only printers to comport with their values and business model. 6/9/22 PI Tr. 94:23-95:1; 101:5-10.

Further, Mr. Lopach's testimony, based on Plaintiffs' own experience,

directly disputes this assertion. *See id.* 60:7-61:19. Plaintiffs need approximately two weeks to retrieve and target the state's voter file across various states to prepare the 20 million mailer order. *Id.* 60:7-61:1. Plaintiffs' printers require three days minimum to print 2 million mailers. *Id.* 61:2-6. To comply with SB 202, anyone who applied for an absentee ballot application between the three to four intervening weeks between data retrieval any printing would need to be identified and their mailer manually pulled from the printing order, an "impossible" task to undertake within the five-day window. *Id.* 59:2-4, 61:2-15.

77.     That is particularly true if the printer is a "seamless entry firm" that both produces the mail, processes the paperwork, and enters it into the mail system without actually "bring[ing] it to the post office to get it checked in and technically mailed." Day 2 Tr. 135:18–136:6.

**Plaintiffs' Response to Fact No. 77:** Disputed. The cited source does not support Defendants' characterization that being a seamless entry firm "particularly" makes a firm or printer able to update a data file and mail absentee-ballot applications within a five-business day window. Plaintiffs do not dispute that Mr. Waters testified that "to streamline some processes with the post office, the US Postal Service instituted a seamless entry process which allows certain mail houses and

printers within the county to do what's called seamless entry, where they essentially function as a post office." *See* 6/10/22 PI Tr. 135:18–136:6.

78.    The Anti-Duplication Provision does not apply to web-based tools and applications that allow voters themselves to initiate the process leading to the receipt of an absentee-ballot application because the Secretary of State does not consider third parties responding to voter requests for an application online to be "sending [a] voter an application." Germany Depo. 100:11–22.

**Plaintiffs' Response to Fact No. 78:** Disputed in part. Plaintiffs do not dispute that the Mailing List Restriction does not apply to web-based tools or applications that allow voters to fill out an absentee ballot application online and then have a copy printed and/or mailed to them for signature and submission. Germany Tr. 100:11–22. To the extent Defendants assert that this is because the Secretary of State officially does not consider such activity to constitute "sending a voter an application," it is unsupported by the cited source.

79.    Finally, the Disclaimer Provision requires third parties seeking to send absentee-ballot applications to use the form made available by the Secretary of State and to "clearly and prominently disclose" the following disclaimer:

> This is NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot.

59

It is being distributed by [insert name and address of person, organization, or other entity distributing such document or material].

O.C.G.A. § 21-2-381(a)(1)(C)(ii).

**Plaintiffs' Response to Fact No. 79:** Disputed in part. Plaintiffs do not dispute that "the Disclaimer Provision requires third parties seeking to send absentee-ballot applications to use the form made available by the Secretary of State." O.C.G.A. § 21-2-381(a)(1)(C)(ii). However, the Disclaimer Provision does not apply to third party web-based tools or applications that send absentee ballot applications at a voter's behest. Germany Tr. 100:7-10.

Further, Plaintiffs do not dispute that the Disclaimer Provision requires that the third party "clearly and prominently disclose on the face of the form" the mandated language. O.C.G.A. § 21-2-381(a)(1)(C)(ii). To the extent that Defendants assert that the Disclaimer Provision permits the mandated language to be included anywhere other than the face of the form, it is unsupported by the cited source.

80.   The Secretary of State's office created "an application form that third parties could use that had all the required disclaimer language." Germany Depo. 133:11–16.

**Plaintiffs' Response to Fact No. 80:** Undisputed. Plaintiffs do not dispute that in

March 2022, more than one year after the passage of SB 202, the Secretary of State's office created an application form that included the language of the Disclaimer Provision.

81.    The Disclaimer Provision does not apply to web-based tools and applications that otherwise comply with the law. Germany Depo. 100:7–10.

**Plaintiffs' Response to Fact No. 81:** Undisputed.

82.    Since SB 202 went into effect, CVI and VPC sent absentee-ballot application mailers to Georgians in the most recent election cycle. Lopach Depo. 65:15–18.

**Plaintiffs' Response to Fact No. 82:** Disputed in part. Plaintiffs do not dispute that Plaintiffs sent a single wave of absentee ballot application mailers to Georgia voters in the 2022 election cycle. Lopach Tr. 65:15-18; 150:11-14. To the extent Defendants assert Plaintiffs sent multiple "mailers" containing absentee ballot applications to any particular Georgia voter during the 2022 election cycle, that is unsupported by the cited source and is disputed. Plaintiffs sent fewer mailers, did not include the information that Plaintiffs would have preferred, and sent them earlier than is most effective, all as a result of SB 202. Ex. 15 at 23 ¶ 54. *Compare* Ex. A-B to Lopach Decl. *with* 2022 VPC and CVI mailer. To the extent that

Plaintiffs sent any mailers to Georgia, therefore, the quantity and quality of those mailers were substantially reduced.

83.    Those mailers included the same "contents" as earlier mailers: "a carrier envelope, a cover letter, an application, albeit not prefilled, and a return envelope." Lopach Depo. 162:4–11.

**Plaintiffs' Response to Fact No. 83:** Disputed in part. Plaintiffs do not dispute that VPC's and CVI's single wave of 2022 absentee ballot application mailers included "a carrier envelope, a cover letter, an application, albeit not prefilled, and a return envelope." Lopach Tr. 162:4–11. To the extent Defendants assert that those contents are the "same" despite the applications lacking personalization and including a disclaimer to which they object and the cover letter not being able to reference a personalized application, it is unsupported by the cited source and disputed. Plaintiffs actually testified that voters did *not* receive the same cover letter in 2022. *Id*. 65:19-22. The cover letter contained different messages and graphics based on their evaluation of the most effective messages communicated to voters in prior elections. *Id*. 66:1-22.

84.    The mailing sent to Georgia this year was sent with enough time "to land in Georgia mailboxes on or as close as possible to the first day of Georgia's

Vote by Mail application period," "around August 26th of 2022." Lopach Depo. 162:14–19.

**Plaintiffs' Response to Fact No. 84:** Undisputed.

85.     Nothing in SB 202 prevents Plaintiffs from sending multiple letters to Georgia voters encouraging them to vote by absentee ballot. Day 2 Tr. 45:19–46:8.

**Plaintiffs' Response to Fact No. 85:** Undisputed but immaterial.

86.     Nothing in SB 202 prevents Plaintiffs from sending multiple blank absentee-ballot applications to Georgia voters who have not yet applied for a ballot. Day 2 Tr. 45:19–46:8.

**Plaintiffs' Response to Fact No. 86:** Undisputed but immaterial.


Respectfully submitted this 31st day of January, 2023.

/s/ Danielle Lang
Danielle Lang*
Jonathan Diaz*
Alice Huling*
Hayden Johnson*
Valencia Richardson*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, D.C. 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org

*Admitted pro hac vice

/s/ Katherine L. D'Ambrosio
Katherine L. D'Ambrosio
(Ga. Bar No. 780128)
COUNCILL, GUNNEMANN & CHALLY, LLC
1201 W. Peachtree St. NW, Suite 2613
Atlanta, GA 30309
(404) 407-5250
kdambrosio@cgc-law.com

Robert B. Remar
(Ga. Bar No. 600575)
SMITH, GAMBRELL & RUSSELL, LLP
1105 W. Peachtree NE, Suite 1000
Atlanta, GA 30309
(404) 815-3500
rremar@sgrlaw.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE
## <u>AND COMPLIANCE WITH LOCAL RULE 5.1</u>

I hereby certify that I have this date electronically filed the within and foregoing, which has been prepared using Times New Roman font, with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

Dated: January 31, 2023.

<u>*/s/ Danielle Lang*</u>
Danielle Lang

*Counsel for Plaintiffs*
*Admitted pro hac vice*

65