# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| VOTEAMERICA, *et al.*,<br><br>    *Plaintiffs*,<br><br>     v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of State for the State of Georgia, *et al.*,<br><br>    *Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>    *Intervenor-Defendants.* | Civil Action No.: 1:21-CV-1390-JPB |

## STATE DEFENDANTS' RESPONSE TO
## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1(B)(3), State Defendants respond to the Plaintiffs' additional material facts:

1. All registered Georgia voters are eligible to vote absentee by mail. O.C.G.A. § 21-2-380.

**Response:** Undisputed, subject to the voter satisfying all other applicable requirements for requesting and voting an absentee ballot.

2. To vote absentee by mail in Georgia, a voter needs to submit a request for an absentee mail ballot to their election office. O.C.G.A. § 21-2-381(a)(i)(A).

**Response:** Undisputed.

3. A voter can apply using the Secretary's online portal, O.C.G.A. § 212-381(a)(1)(C)(ii), or by submitting an application form, a copy of which is available on the Secretary's website. *Id.* Ga. Comp. R. & Regs. 183-1-14-.12; Ex. 12, 2021 Georgia Absentee Ballot Application.

**Response:** Undisputed.

4. Despite their eligibility, some Georgia voters with disabilities may be unable to exercise their right to vote by absentee mail ballot if they cannot receive necessary assistance with obtaining, filling out, and submitting their absentee ballot application. *See* Laura Nwogu, *Barriers to the ballot: Georgia voters with disabilities working to improve access to the polls*, SAVANNAH MORNING NEWS (Nov. 1, 2022), https://www.savannahnow.com/story/news/politics/elections/2022/11/01/ga-voters-disabilities-fight-against-obstacles-voting-election-2022/10499428002/.

**Response:** This paragraph contains Plaintiffs' characterization of the cited news report, not a statement of fact, to which no response is required.

5. Additionally, many Georgia voters do not have reliable internet and cannot access the form online. *See, e.g.*, Ledyard King and Mike Stucka, *'Digital divide': In Georgia, many still lack broadband access*, THE AUGUSTA CHRONICLE (July 7, 2021),

https://www.augustachronicle.com/story/news/2021/07/07/gdabroadband-local-ga-naug/47205331/. Approximately 265,822 Georgia residents do not have a computer at home. U.S. Census Bureau, 2021 American Community Survey (5-Year Estimates).

**Response:** This paragraph contains Plaintiffs' characterization of the cited news report, not a statement of fact, to which no response is required.

6. Even Georgians who do have reliable internet access may not have access to a printer. *See* Ex. 10, June 10, 2022 Prelim. Inj. Hrg. ("6/10/22 PI Tr.") 37:16-20; Ex. 2, Dep. Of Blake Evans ("Evans Tr.") 55:15-56:16.

**Response:** Disputed, but immaterial. The cited testimony from Day 2 of the preliminary-injunction hearing does not support the claim for which it is cited, and the cited testimony from the Evans Deposition addresses only what would happen to a hypothetical voter who lacks a printer.

7. Even for voters with access to the internet and a printer, the online absentee ballot application portal provided by the Georgia Secretary of State is not available for every election, *see* Ex. 18, Government Communications and Voter Email Alerts, CDR00112588, and has crashed during the absentee voting period. *See, e.g.,* Joe Ripley, *Georgia voters finding dead links when trying to request absentee ballots*, 11ALIVE (Mar. 16, 2022), https://www.11alive.com/article/news/local/georgia-absentee-ballot-applicationswebsite-problems/85-d714dfd9-21b3-4fce-a2e0-dd2cb9c0c639.

**Response:** Undisputed that the absentee-ballot application portal has not always been available for every election in the past. Otherwise, this paragraph contains Plaintiffs' characterization of the cited news report, not a statement of fact, to which no response is required.

8.     Additionally, the State does not always update its website with the most current version of the absentee ballot application. *See, e.g.,* Ex. 18, GAVA00050768. As a result, voters may inadvertently submit absentee ballot application forms which are no longer valid, creating confusion for the voter and county election officials and resulting in rejections of applications from otherwise eligible voters. *E.g.,* Ex. 18, GA_VA00038511.

**Response:** Disputed. The cited portion of the record does not support the allegation that the website does not always have the most current version of the absentee-ballot application. Nor does the cited portion of the record support the claim that the State's website would lead voters to inadvertently submit prior absentee-ballot applications, as it is referring to an application found on a third-party website. *See* Pls.' Ex. 18, GA_VA00038512.

9.     Because of some voters' lack of access and other voters' general confusion with the absentee voting process, many Georgia voters rely on third party application distribution to register to vote and submit an absentee ballot application. Evans Tr. 56:13-57:10; *see also* Ex. 9, June 9, 2022 Prelim. Inj. Hrg. ("6/9/22 PI Tr.") 36:16-20.

**Response:** Disputed. Nothing in the cited portion of the record supports Plaintiffs' claim about lack of access and general confusion, nor does it support their characterization that Georgia voters "rely on third party application distribution."

10. The absentee ballot application has numerous fields and spans two pages. *See* Ex. 12, 2021 Georgia Absentee Ballot Application.

**Response:** Undisputed

11. As a result, voters often forget to fill in parts of the application when they submit it. Evans Tr. 220:16-221:4; Ex. 18, GA-VA00038834, GA_VA00024557. County election officials have complained to the state that voters will submit applications that leave the election date blank, for example. *Id.* at GAVA00038834. This can result in applications being rejected. Evans Tr. 219:4-222:6; Ex. 18, GA_VA00024557, GA-VA00051968.

**Response:** Undisputed that there have been reports of missing information in absentee ballot applications, which can be rejected. The remainder of this paragraph contains Plaintiffs' characterization of the record, not statements of fact, to which no response is required.

12. Kevin Rayburn, Deputy Elections Director for the Georgia Secretary of State, requested that Plaintiffs prefill their application forms with the election date in 2020. Ex. 15, Decl. of Thomas Lopach and Attached Exhibits at 52.

**Response:** Undisputed.

13. In at least one instance, Cherokee County requested permission from the state to fill out the missing information of the voter, because there were so many instances of

voters submitting incomplete absentee ballot applications. Ex. 18, GAVA00038834. Under the advice of Defendants, they rejected applications which contained incomplete information, because they did not have the authority to fill the application with the election date and county. *Id.* at GA_VA00024557, GAVA00051968.

**Response:** Disputed in part, but immaterial. The cited source, GAVA00038834, addresses pre-filling "an election date or the county" and thus does not support the claim that Cherokee County requested permission to fill in information "of the voter." Another cited source, GA_VA00024557, involved rejecting any requests for absentee-ballots that were submitted on the pre-SB 202 form and does not say anything about the authority of counties to fill in empty information. The final cited source, GAVA00051968, refutes Plaintiffs' claim that applications were "rejected" at the "advice of Defendants." *See* GAVA00051968 ("Just for the record, I don't think your statement that, 'in the past, your office has advised that applications should be rejected if there are any defects' is accurate.").

14.    In another instance, Bartow County requested guidance about whether to reject applications where the voter did not fill in the election date. *Id.* at GAVA00038671. As the county election official noted, "I used to get around this by prefilling it on my application, but I can't do that anymore," because of SB 202. *Id.*

**Response:** Undisputed.

15.    Under SB 202, voters applying for an absentee ballot using the application form are now required to provide a wet signature even if they otherwise fill out their

application online, so at some point the voter must have a physical document to sign and submit, whether in hard or scanned copy. *See* O.G.C.A. § 212-381(C)(i); Evans Tr. 54:18-55:14.

**Response:** Undisputed.

16. The state's voter file and absentee voter file, which provide the data used by both Georgia officials and third-party civic organizations to pre-populate application forms, Lopach Tr. 90:18-91; 6/10/22 PI Tr. 63:14-19, also contains errors and duplicate entries. 6/10/22 PI Tr. 65:4-7; Evans Tr. 77:9-14; Ex. 18 at GAVA00052395.

**Response:** Undisputed.

17. When an individual submits an absentee ballot application, the application is not always processed contemporaneously. *See* Evans Tr. 129:2-25, 131:1-9; 6/10/22 PI Tr. 123:19-124:1. As a result, voters have expressed confusion when they have submitted an application but that submission is not reflected on the State's online ballot tracking system. *See*, *e.g.*, Ex. 18, GA-VA00000628, GA-VA00048462.

**Response**: Undisputed that absentee-ballot applications are "not always processed contemporaneously." Undisputed that some voters have contacted election officials when the submission of their absentee ballot application is not reflected on the online ballot tracking system. Plaintiffs' characterization of those communications as "confusion" is not a statement of fact supported by the cited record. To the extent that Plaintiffs suggests that the State Defendants are involved with the processing of absentee-ballot applications, there is nothing in the cited sources to support that suggestion.

18.     When  absentee ballot applications are not processed contemporaneously, the absentee voter file will not reflect a full account of the voters who have already submitted an absentee ballot. *See* Evans Tr. 129:2-25, 131:1-9; 6/10/22 PI Tr. 123:19-124:1.

**Response**:  Disputed in part. It is undisputed that the absentee voter file will not reflect that a voter has applied for an absentee ballot if the application has not been processed. To the extent that Plaintiffs suggests that the State Defendants are involved with the processing of absentee-ballot applications, there is nothing in the cited sources to support that suggestion.

19.     Plaintiffs Voter Participation Center ("VPC") and Center for Voter Information ("CVI") are sister 501(c)(3) and 501(c)(4) organizations, respectively. Ex. 15 at 2-3 ¶¶ 2-7.

**Response:** Undisputed.

20.     VPC and CVI are nonpartisan, nonprofit organizations with a mission to encourage the political participation of historically underrepresented groups, such as young people, people of color, and unmarried women, by providing them with voter registration, early voting, vote by mail, and get-out-the-vote resources and information. Ex. 15 at 2-3 ¶¶ 2-7; Lopach Tr. 28:4-10.

**Response:** Undisputed.

21.     Plaintiffs further their mission by educating, assisting, and convincing historically disenfranchised communities to vote absentee by utilizing their resources. Ex.

15 at 3-4 ¶¶ 7-10; Lopach Tr. 28:4-10. They attempt to reduce transaction costs for voters to help assist voters to participate in the electoral process, in particular by mail voting. Ex. 24, Mar. 21, 2022 Expert Report of Dr. Donald Green, at 3-8; Ex. 26, June 16, 2022, Amended Expert Rebuttal Report of Dr. Donald Green, at 8-14; 6/10/22 PI Tr. 206:5-212:3, 238:10-12; Ex. 27, Dep. of Dr. Donald Green ("Green Tr.") 78:19-82:4.

**Response**: Undisputed.

22. VPC and CVI have designed and implemented direct mail programs to share their pro-voting and pro-absentee mail voting message and resources with eligible, registered voters nationwide, including Georgia. Ex. 15 at 4 ¶ 12.

**Response:** Undisputed.

23. The core message of Plaintiffs' absentee voting mailer is that it is reliable, easy, beneficial, and trustworthy. Ex. 15 at 3-4 ¶¶ 7-10. In the ongoing debate about absentee voting, VPC and CVI believe that they can use their effective absentee ballot application communications to persuade Georgians to further engage in the democratic process and trust absentee voting to do so. Ex. 15 at 3-4, 6, 28 ¶¶ 7-10, 17, 63.

**Response:** Undisputed that Plaintiffs express their views about absentee voting in the cover letter they send to potential voters. The absentee-ballot application itself (Pls.' Ex. 15 at 36–40) does not include any such message.

24. Plaintiffs exist for the purpose of engaging in political speech and expressive conduct to disseminate their core viewpoint that all eligible voters should participate in the

political process, that voting should be easy and accessible, and that absentee voting is safe, beneficial, and secure. Ex. 15 at 3-4, 6, 28, 31 ¶¶ 7-10, 17, 63, 68.

**Response**: Undisputed.

25. Plaintiffs communicate their pro-absentee voting message by mailing communications conveying personalized absentee ballot applications to eligible, registered voters. 6/9/22 PI Tr. 42:14-43:2.

**Response**: Undisputed that Plaintiffs express their views about absentee voting in the cover letter they send to potential voters. The absentee-ballot application itself (Pls.' Ex. 15 at 36–40) does not include any such message.

26. Plaintiffs' objective is to encourage these specific recipients to submit an absentee ballot application and vote absentee. Ex. 15 at 5, 6, 8, 26-28 ¶¶ 15, 17, 22, 60-63; *see*, *e.g.*, Ex. 15 at 36-39, 40-45.

**Response**: Undisputed that Plaintiffs express their views about absentee voting in the cover letter they send to potential voters. The absentee-ballot application itself (Pls.' Ex. 15 at 36–40) does not include any such message.

27. Plaintiff VPC sends its mailers to registered people of color, unmarried women, and young people. Lopach Tr. 86:11-17.

**Response:** Undisputed.

28. Plaintiff CVI sends its mailers to individuals who are modeled to share the organization's values of wanting to see people of color, unmarried women, and young

people participate in elections at proportionate rates as the general population. Lopach Tr. 86:18-87:1.

**Response:** Undisputed.

29.     The purpose of Plaintiffs' mailers is to convince its specific, carefully selected voters that engaging in the electoral process through absentee voting is trustworthy and easy. Ex. 15 at 3-4, 6, 9 ¶¶ 7-10, 12, 17, 24.

**Response:** Undisputed that Plaintiffs express their views about absentee voting in the cover letter they send to potential voters. The absentee-ballot application itself (Pls.' Ex. 15 at 36–40) does not include any such message.

30.     Plaintiffs' absentee ballot application mailers include a cover letter, a personalized application, and postage-paid return envelope addressed to the recipient's county election office. Ex. 15 at 36-39, 40-45; Ex. 16.

**Response:** Undisputed.

31.     Plaintiffs' cover letter identifies the organization as the sender and provides instructions for unsubscribing should the recipient so choose, references the enclosed, personalized application, and contains instructions for submitting the absentee ballot application. Ex. 15 at 6 ¶ 17; *Id*. at 36-39, 40-45; Ex. 16.

**Response:** Undisputed.

32.     Plaintiffs also personalize their applications with prefilled voter information from the State's voter file to indicate the specific recipient should complete the application and make it easier for elections workers to process. 6/9/22 PI Tr. 44:12-45:1. *See also* Ex.

15 at 36-39, 40-45; Ex. 16. In 2020, Plaintiffs also printed step-by-step instructions on the back of the personalized applications. *See also* Ex. 15 at 36-39, 40-45.

**Response:** Undisputed that, before SB 202, Plaintiffs personalized their applications with voter information, including incorrect information, and that Plaintiffs included "step-by-step instructions."

33.     Plaintiffs include the postage paid envelope so that the recipient does not need to pay to apply for an absentee ballot and so their application is sent to their correct elections office. 6/9/22 PI Tr. 45:24-46:7. *See also* Ex. 15 at 36-39, 40-45.

**Response:** Undisputed.

34.     Plaintiffs believe that absentee voting by mail "is one of the best ways to ensure a robust democracy." Ex. 15 at 3 ¶ 8; *see also* Lopach Tr. 28:4-10.

**Response:** Undisputed.

35.     In the ongoing debate about absentee voting, Plaintiffs' mailer communications take a strong stance in favor of absentee voting by including personalized applications and expressing, for example, that "Your vote matters," "Voting by mail is EASY," it "keeps you healthy and safe," and ensures that "[y]our privacy is protected. Ex. 15 at 36-39, 40-45.

**Response**: Undisputed that Plaintiffs express their views about absentee voting in the cover letter they send to potential voters. The absentee-ballot application itself (Pls.' Ex. 15 at 36–40) does not include any such message.

36.     Plaintiffs distribute their personalized applications at the height of election season, when debates over the safety and reliability of absentee voting are most salient. Lopach Tr. 146:2-11.

**Response**: Undisputed that Plaintiffs distributed absentee-ballot applications during the election season.  The remainder of this paragraph includes Plaintiffs' characterization, to which no response is required.

37.     Plaintiffs' communications list their organization's name and contact information in several locations and include a prominent and specific disclaimer that they are "not affiliated with state or local election officials." Ex. 15 at 36-39, 40-45.

**Response:** Undisputed.

38.     Plaintiffs personalize their absentee ballot applications with the voters' information to build relationships with voters and advocate for increased absentee voting in Georgia among segments of the population who are underrepresented in the political process. Ex. 15 at 3-4, 26-27 ¶¶ 7-10, 61.

**Response**: Undisputed that, before SB 202, Plaintiffs included pre-filled and often incorrect information on applications.  The remainder of this paragraph contains characterization of the record, rather than statements of fact, to which no response is required.  State Defendants further respond that Plaintiffs sent their mailings to strangers who have not expressly requested receiving any mail from Plaintiffs.  Moreover, recipients routinely ask Plaintiffs to stop sending such mailings.  Pls.' Ex. 17 at 20–21, 26 ("Stop sending these bloody letters"; "Stop this immediately"; "NEVER MAIL ME AGAIN OR

ELSE!"; "JUST STOP!!"; "ENOUGH ALREADY!!").

39.     Specifically, Plaintiffs use their effective personalized absentee application communications as outreach to build greater association with a specific group of voters and then further engage them in the political process with future mailers. Ex. 15 at 9, 10, 13 ¶¶ 24, 26, 34.

**Response**: Undisputed that this is how Plaintiffs characterize their actions, but the record reflects that Plaintiffs sent their mailings to strangers who have not expressly requested receiving any mail from Plaintiffs. Moreover, recipients routinely ask Plaintiffs to stop sending such mailings. Pls.' Ex. 17 at 20–21, 26 ("Stop sending these bloody letters"; "Stop this immediately"; "NEVER MAIL ME AGAIN OR ELSE!"; "JUST STOP!!"; "ENOUGH ALREADY!!").

40.     Plaintiffs' mailers alleviate the confusion caused by Georgia's complicated application process because the personalized application helps to ensure that the voter does not submit an incomplete or inaccurate application. Ex. 15 at 8 ¶ 22; *see also* 6/9/22 PI Tr. 55:14-22, 65:11-15; *compare* Ex. 18, GA-VA00052394 (voter did not input his full registered name including suffix when he applied via the Secretary's online portal and was sent an absentee ballot bearing his deceased grandfather's name and suffix).

**Response**: Plaintiffs' characterization of the application process as "complicated" is not a statement of fact and thus no response is required. And Plaintiffs' characterization of how a "personalized applications helps" a voter is not a statement of fact and thus no response is required.

41.     Some voters are opposed to absentee voting and therefore do not want to receive a communication promoting voting by mail and containing an application for an absentee ballot. *See e.g.*, Ex. 18, GA-VA00061955, GA-VA00061911.

**Response**:  The cited portions of the record do not support Plaintiffs' statement that referenced voters are "opposed to absentee voting."  But undisputed that many voters request Plaintiffs to stop sending absentee-ballot application mailings.  See Pls.' Ex. 17.

42.     The personalized applications include words chosen by VPC/CVI— specific names from the voter rolls and the associated addresses—written on a page. Ex. 15 at 36-39, 40-45.

**Response**: Disputed.  The information required for an absentee-ballot application is not chosen by VPC/CVI, but rather required by law.  O.C.G.A. § 21-2-381(a)(1)(C)(i).

43.     The information prefilled in Plaintiffs' absentee ballot application mailers is drawn from the voter registration records generated by the State. Ex. 15 at 5, 26-28 ¶¶ 15, 60-62.

**Response**: Disputed but immaterial, as Plaintiffs obtain information from third-party vendors, rather than directly from the State.  Lopach Depo. 90:14-91:16 [Doc. 162].

44.     Plaintiffs only ever intend to send absentee ballot application mailers to voters who have not yet submitted an absentee ballot application. 6/9/22 41:2442:11, 71:19-25, 90:15-19; Ex. 15 at 10, 11 ¶ 27, 31.  Sending an absentee ballot application to a voter who has already submitted an application creates unnecessary costs for Plaintiffs, and

does not achieve their mission of encouraging voter participation among underrepresented populations. Ex. 15 at 10, 11 ¶ 26, 27, 29.

**Response**: Disputed, but immaterial, as Plaintiffs' *intention* does not change the fact that Plaintiffs have repeatedly sent duplicate applications. *See* Pls.' Ex. 17 at 23–25 (reporting that dozens of voters opted out of Plaintiffs' mailers because they were "Already registered"); Lopach Depo. 155:21–156:3 ("Q: … [H]as VPC or CVI received any feedback from state election officials about duplicate applications being sent to voters in their state? A: Yes.") [Doc. 162].

45.     Plaintiffs use a unique scannable barcode on the return envelope for absentee ballot applications included in their mailers to track effective engagement with potential voters and deepen their association with them through further targeted communications. Ex. 15 at 7 ¶ 20; Lopach Tr. 67:1-6.

**Response**: Undisputed that Plaintiffs include a barcode on the applications they send to strangers.

46.     This barcode also tracks which voters have already submitted an absentee ballot application to an elections office. Lopach Tr. 67:1-6.

**Response:** Undisputed that Plaintiffs are able to track when a voter has returned an application Plaintiffs sent.

47.     Plaintiffs also provide robust unsubscribe opportunities for recipients who no longer wish to receive communications from VPC and CVI which help to ensure that VPC and CVI's communications are going to the correct recipients and to voters who are

interested in having further connection and communication with VPC and CVI on electoral engagement issues. Lopach Tr. 101:22, 102:1-12.

**Response:** Undisputed.

48.     To further prevent duplicative mailers, Plaintiffs hire third party vendors to retrieve the list of registered voters from the States, including Georgia. 6/9/22 PI Tr. 44:19-22; Lopach Tr. 120:21-122:3. The third-party vendor then undergoes a process of narrowing the list of voters by checking the list against the National Change of Address database and against a list of deceased individuals in the state. Lopach Tr. 135:16-136:3.

**Response**: Undisputed.

49.     Plaintiffs also make periodic requests for updated voter records from Georgia state election officials before initiating a mailer program. Ex. 15 at 10 ¶ 27; Ex. 15 at 46-74.

**Response**: Undisputed.

50.     Preparing bulk mailings takes several weeks in total and at least 20 days from when VPC and CVI provide their recipient list to the printing vendor until the message is mailed. Ex. 15 at 12, 24 ¶¶ 32, 56.

**Response:** Undisputed that Plaintiffs work with printers who state that this timeframe is required, but the record reflects that other printers can do the same project in fewer days. Day 2 Tr. 138:5–12 (Waters).

51.     Plaintiffs' absentee voting mailer communications—including the cover letter, pre-stamped and pre-addressed envelope, instruction sheet, and the personalized absentee ballot application—cost about 39 cents per mailer to produce. Ex. 15 at 11 ¶ 29.

**Response:** Undisputed.

52.     In 2018 and 2020, Plaintiffs sent multiple waves of absentee ballot application mailers to Georgia voters. Lopach Tr. 41:5-42:11.

**Response:** Undisputed that Plaintiffs sent multiple duplicate applications to Georgia voters in 2018 and 2020.

53.     In the 2020 election alone, Plaintiffs sent more than 9.6 million communications to registered Georgia voters. Ex. 15 at 9 ¶ 23. These messages urged registered Georgia voters to participate, described the absentee voting process as easy and secure, and guided voters through that process by including absentee ballot applications. *Id.*; *id.* at 36-39, 40-45.

**Response:** Undisputed that Plaintiffs sent multiple duplicate applications to Georgia voters in 2020.

54.     Plaintiffs sent these communications in several waves, finding that doing so was the most effective way to convey their message and to persuade and engage voters. *Id.* at 13, 23, 33 ¶¶ 34, 54, 71.

**Response:** Undisputed that Plaintiffs sent multiple duplicate applications to Georgia voters and that Plaintiffs believe this was an effective way to convey their message.

55.     Plaintiffs also tested messaging to voters that relied on including a personalized application to "call attention to the fact that the voter was explicitly chosen to receive the application by mail." Ex. 13, Ex. B to Diaz Decl., Sept. 14, 2020 VPC/CVI Memo, at 38. Plaintiffs provided the personalized application to "provide[] an exclusive voter experience" and express their belief that the particular voter to whom VPC/CVI sent its mailer should participate in the democratic process through absentee voting. *Id.*

**Response**: Undisputed that Plaintiffs communicate their message through a cover letter which references an accompanying application.

56.     More than 663,500 Georgians submitted the application distributed by Plaintiffs during the 2020 election cycle. Lopach Decl. ¶ 23. This includes 575,000 Georgia voters who submitted applications in the November 2020 general election, and 88,500 voters who submitted applications in the January 2021 runoff election. Ex. 15, 9 ¶ 25.

**Response**: Undisputed.

57.     Plaintiffs likewise associate with other organizations to assist them with also mailing their absentee ballot applications to voters. Lopach. Tr. 147:20-148:20.

**Response**: Undisputed.

58.     Specifically, Plaintiffs work with national and state-based organizations to follow up with the voters to whom Plaintiffs have sent an absentee ballot application mailer. Lopach. Tr. 147:20-148:20; 6/9/22 PI Tr. 47:15-23. Plaintiffs work with organizations to follow up with voters via door-knocking, text message, and phone calls. Lopach. Tr. 147:20-148:20.

**Response**: Undisputed.

59.     Plaintiffs have worked with organizations including the Georgia NAACP to send its absentee ballot application mailers to Georgia voters. *E.g.,* Ex. 25.

**Response**: Undisputed

60.     Before mailing their communications in 2020, Plaintiffs also corresponded with Georgia election officials to coordinate, provide notice, and solicit feedback for Plaintiffs to implement. Ex. 15, 15-21 ¶¶ 40-50; *id.*, 52-74.

**Response:** Undisputed.

61.     In 2018, Plaintiffs sent their absentee ballot application mailers to Chris Harvey, Deputy Elections Director for the Secretary of State, to receive feedback regarding their prefilled absentee ballot application mailer. *Id.*, 46-48. Mr. Harvey did not see any issues with the mailer. *Id.*

**Response**: Undisputed

62.     In 2020, Plaintiffs again sent their absentee ballot application mailer to the Secretary of State's Office. *Id.*, 52-62. Kevin Rayburn, Deputy Elections Director for the Secretary of State, noted that Plaintiffs' applications "look[] accurate when compared to [Georgia's] state request form." *Id.*, 53. Mr. Rayburn also requested that Plaintiffs additionally prefill the election date on the form. *Id*.

**Response**: Undisputed.

63.     In 2022, Plaintiffs again notified the Secretary of State of their intent to send absentee ballot application mailers ahead of the November 2022 elections. Ex. 16. Plaintiffs

made several inquiries to the Secretary of State's Office in their attempt to comply with SB 202. Ex. 22.

**Response**: Undisputed.

64. During the 2020 primaries, Defendant Raffensperger's office sent prefilled applications to every active registered voter in the state in response to the COVID-19 pandemic. 6/10/22 PI Tr. 63:14-21.

**Response**: Undisputed.

65. Defendants also issued guidance to county election officials regarding the issuance of unsolicited absentee ballot applications by the State during the 2020 primaries. Ex. 18, GA-VA00048570.

**Response**: Undisputed.

66. Defendants received criticism about sending unsolicited, prefilled ballot applications to every Georgia voter, including allegations about voter fraud. *E.g.,* Ex. 18, GA-VA00061955, GA-VA00061911.

**Response**: Undisputed.

67. In response to that criticism, Secretary of State Brad Raffensperger lauded his decision to "direct[] our office to send absentee ballot applications to all active voters," which he stated would "further protect voters and poll workers from the continuing threat from COVID-19, and take pressure off of early voting and polling locations." *Id*.

**Response**: Undisputed that Plaintiffs accurately quote the cited record.

68.     Secretary Raffensperger also noted that the absentee ballot applications would be "pre-populated with voter data but have a barcode for the counties to be able to quickly lookup and process them. *Id*.

**Response**: Undisputed that Plaintiffs accurately quote the cited record.

69.     As Ryan Germany testified, there were several benefits to prefilling the application before sending to Georgia voters, including the ease on election administrators "to read generally when something is typed." 6/10/22 PI Tr. 64:1-5.

**Response:** Undisputed.

70.     The Intervenor-Defendants also sent mailers with prefilled absentee ballot applications in 2020. Ex. 13, 14-25.

**Response:** Undisputed.

71.     The Intervenor-Defendants' mailers in 2020 conveyed a similar message to Plaintiffs. For example, one of Intervenor-Defendants' mailers contained the message "Absentee voting is a safe and secure way to guarantee your voice is heard." *Id.* at 19.

**Response:** Undisputed.

72.     Intervenors collectively sent more waves of mailers than Plaintiffs. Plaintiffs sent five waves of absentee ballot mailers in 2020. 6/9/22 Tr. 38:6-10. Intervenors sent seven absentee ballot application mailers in 2020. Ex. 13 at 11.

**Response:** Undisputed.

73.     Arena designed mailers on behalf of the Intervenor Georgia Republican Party in 2020. *See, e.g.,* Ex. 3, Dep. of Brandon Waters ("Waters Tr."), 39:16-19, Waters Dep. Ex. 1. Brandon Waters, CEO of Arena, noted that the mailers it designed on behalf of Intervenors "were all ordered to say not absentee vote in particular, the importance of voting, and if you can't vote at your poling location, to vote absentee." Waters Tr. 45:4-11. Mr. Waters confirmed that the entire mailer package—including the application, cover letter, and return envelope—was intended to convey the speech of the client for whom the mailer is sent. *Id.* 34:1535:9; 44:11-18.

**Response:** Undisputed that Mr. Waters said the quote attributed to him. Disputed that Mr. Waters "confirmed that the entire mailer package … was intended to convey the speech." Waters Depo. 35:5–9 [Doc. 161] ("The other components are the application and a return mechanism if there are multiple devices.  So those are documents I would not say are intended to influence someone's vote.  They're merely forms.").

74.     Mr. Waters also noted that including the absentee ballot application "makes [the mailer] more effective." *Id.* 45:17-22. Arena prefills its applications "to reduce the error rate and make it faster for people to fill out the application [and] by prefilling it, it only allows that individual to submit the application." *Id.* 46:12-17.

**Response:** Undisputed.

75.     Plaintiffs are able to persuade Georgia voters to act on their message because Plaintiffs' effective communications are successful at reducing transaction costs for voters

to participate in the electoral process. 6/9/22 PI Tr. 43:15-20; 44:1245:1, 45:24-46:7, 206:18-207:3, 208:14-209:7; 6/10/22 PI Tr. 64:1-6. The Restrictions undermine Plaintiffs' ability to convey their message by reducing Plaintiffs' ability to convince voters through reducing transaction costs. 6/9/22 PI Tr. 64:9-22.

**Response**: The first sentence of this statement contains Plaintiffs' characterization of its actions, not a statement of facts, to which no response is required. The final sentence consists of a legal conclusion, not a statement of fact, to which no response is required.

76.     On March 25, 2021, SB 202 was enacted. 2021 Georgia Laws Act 9 (S.B. 202). It became effective on July 1, 2021. *Id.*

**Response**: Undisputed.

77.     SB 202 includes a Prefilling Prohibition, O.C.G.A. § 21-2381(a)(1)(C)(ii), a Mailing List Restriction, O.C.G.A. § 21-2-381(a)(3)(A), and a Disclaimer Provision, O.C.G.A. § 21-2-381(a)(1)(C)(ii) (collectively the "Ballot Application Restrictions").

**Response**: Undisputed.

78.     Plaintiffs' entire communication is an intertwined package that, as a whole, is necessary to convey Plaintiffs' message. 6/9/22 PI Tr. 42:14-21; *see also* Green Tr. 78:19-82:4; Ex. 24 at 3-6.

**Response:** Undisputed that this is how Plaintiffs characterize their mailing, but Plaintiffs' message appears only in its cover letters. *See* Pls.' Ex. 15 at 36–40.

79.     Plaintiffs would not be able to convey the same message through their cover letters alone, which say for example, "I have sent you the enclosed absentee ballot application to make requesting a ballot easy." Ex. 15 at 37; *see also id.* at 38, 42; Waters Tr. 44:7-10.

**Response**: Undisputed that Plaintiffs may not be able to reference an enclosed absentee-ballot application, but Plaintiffs cite no evidence to show that they cannot "convey the same message" in support of absentee voting.

80.     SB 202's Prefilling Prohibition prohibits sending any absentee ballot applications that are "prefilled with the electors' required information." O.C.G.A. § 21-2-381(a)(1)(C)(ii).

**Response**: Undisputed.

81.     Failure to comply with the Prefilling Prohibition can result in criminal prosecution, including misdemeanor and felony charges. *See* O.C.G.A. §§ 21-2-598; 21-2-562(a).

**Response**: Undisputed.

82.     A personalized absentee ballot application prefilled with a specific voter's information drawn from the State voter file is a key component of Plaintiffs expressing their belief that the particular recipient should participate in the electoral process and request an absentee ballot. Ex. 15 at 5, 8, 26-30 ¶¶ 15, 22, 60-66.

**Response**: Undisputed that Plaintiffs have previously included a personalized application in their mailings. Plaintiffs' statement that including that application is a "key component" of their message is a characterization to which no response is required.

83. Plaintiffs believe that personalizing their absentee applications is the most effective means of conveying their message that voting absentee is easily completed, beneficial, and accessible. *Id.* at 28 ¶¶ 63-64.

**Response**: Undisputed that this is Plaintiffs' belief.

84. Based on Plaintiffs' experience and research, voters are more likely to submit an application per Plaintiffs' messaging when it is personalized with their prefilled information. *Id.* at 8, 26-27 ¶¶ 22, 61; Lopach Tr. 113:9-13.

**Response**: Undisputed.

85. As Plaintiffs' expert Dr. Donald Green further observed based on his review of quantitative studies and extensive experience in the field, Plaintiffs belief in the benefits of personalizing applications is also empirically justified in the public literature. Green Tr. 90:4-91:1, 164:16-166:17; 6/10/22 PI Tr. 209:20-214:22, 232:24-236:1, 271:17-24; Ex. 24 at 4-6, 8-9; Ex. 26 at 8-13.

**Response**: Undisputed that Dr. Green so testified.

86. Studies on the positive effects of reducing transaction costs for voters are widely accepted in academic scholarship. Ex. 24 at 3-8; Ex. 26 at 8-13; 6/10/22 PI Tr. 206:5-212:3, 238:10-12; Green Tr. 78:19-82:4; *see also* Ex. 28, Dep. of Dr. Justin Grimmer

("Grimmer Tr.") 64:9-66:3 (summarizing decreasing transaction costs result from recent study in Colorado). And a specific study on the practice of distributing personalized absentee voting applications—the Hans Hassell study— shows that there was a 25% increase in effectiveness compared to distributing a generic or blank absentee application. 6/10/22 PI Tr. 212:11-214:22, 233:11-236:1; Ex. 26 at 9.

**Response**: Undisputed that there have been studies that address decreasing transaction costs. Disputed that the Hans Hassell study "shows that there was a 25% increase in effectiveness" as the cited materials do not support that claim. As Dr. Grimmer noted in his report, the difference was not statistically significant at standard levels. *See* Grimmer Rep. ¶ 34 [Doc. 113-4]. This dispute, however, is immaterial.

87.     Plaintiffs also know that neatly typing the voters' information from the voter file leads to fewer erroneous rejections when election officials receive the application. Ex. 15 at 8, 26-27 ¶¶ 22, 61; Evans Tr. 158:9-22 (noting that applications with typed voter information, like Plaintiffs' personalized applications, are "generally easier" for election officials who no longer need to "interpret or read handwriting"); 6/10/22 PI Tr. 64:1-5 (Mr. Germany noting the same).

**Response:** Disputed.  The quoted portion of the record refers to typed information generally, rather than "typ[ed] … information from the voter file."

88.     Plaintiffs' belief in the benefits of prefilling is also justified by complaints from county election officials, who constantly receive absentee ballot applications with

missing information. Ex. 18, GA-VA00038834. This can result in applications being rejected. *Id.*, GA_VA00024557, GA-VA00051968. *See*, *also*, Ex. 15 at 52-54.

**Response**: Disputed but immaterial. The claim that county election officials "constantly" complained is unsupported by Plaintiffs' citation to a single page in the record. Undisputed that applications with missing information can be rejected.

89.     SB 202's Mailing List Restriction restricts to whom Plaintiffs can mail their communications by prohibiting Plaintiffs from distributing applications to individuals who appear on the State's absentee voting file as having "already requested, received, or voted an absentee ballot." O.C.G.A. § 21-2-381(a)(3)(A); Evans Tr. 243:4-14.

**Response**: This paragraph contains a legal conclusion, not statements of fact, to which no response is required.

90.     The Mailing List Restriction provides a limited exemption from liability for third party distributions that rely on data provided by the State within five business days of the application being mailed. O.C.G.A. § 21-2-381(a)(3)(A).

**Response**: This paragraph contains a legal conclusion, not statements of fact, to which no response is required.

91.     Failure to strictly comply with the Mailing List Restriction can result in fines of up to $100 "per duplicate application" sent and potential criminal penalties, including a misdemeanor with a sentence of confinement of up to 12 months. O.C.G.A. §§ 21-2-381(a)(3)(B), 21-2-598, 21-2-603, 21-2-599.

**Response**: This paragraph contains a legal conclusion, not statements of fact, to which no response is required.

92.     The State's absentee voter file is populated by information entered into the State's voter database and is updated roughly every 24 hours with information newly input to the database. Evans Tr. 45:10-46:10, 47:6-21.

**Response**: Undisputed.

93.     Counties have varied practices for inputting absentee ballot application information into the voter database and are able to backdate information entered after the fact. *Id.* 73:4-14.

**Response:** Undisputed.

94.     Thus, the State's absentee voter file may not always include an accurate account of every voter who has submitted an absentee ballot application at a given date. *Id.* 129:2-25, 131:1-9; 6/10/22 PI Tr. 123:19-124-1.

**Response**: Undisputed.

95.     To comply with the Mailing List Restriction, Plaintiffs must continuously compare their distribution lists with Georgia's constantly changing absentee voter list and remove any electors from their distribution lists who appear to have already requested a ballot.  O.C.G.A. § 21-2-381(a)(3)(A); Ex. 15 at 21-26 ¶¶ 51-60.

**Response**: Undisputed that Plaintiffs must compare their mailing list with the absentee voter list.

96.    For each specific wave of communications, Plaintiffs require at least six weeks to finish, and at least 20 days from print order to mailing. Ex. 15 at 10 ¶ 32. Specifically, Plaintiffs must retrieve the data from the State; filter the data to their target audiences and remove voters based on deceased status, change of address, and the absentee voter file; and begin the printing orders that in 2020 resulted in a total of over 83 million absentee ballot application mailers being sent nationwide. *Id.* at 9-10 ¶¶ 23, 32.

**Response**: Undisputed that Plaintiffs have opted to use printers that state such time is required, but the record reflects that other printers can do the same project in fewer dates. Day 2 Tr. 138:5–12 (Waters).

97.    To comply with SB 202, anyone who applied for an absentee ballot application between the three to four intervening weeks between data retrieval and any printing would need to be identified and their mailer manually pulled from the printing order. 6/9/22 PI Tr. 59:2-4, 61:2-15; Ex. 20, Apr. 6, 2021 Mission Control Memo, at 2.

**Response**: Undisputed that this would be required if Plaintiffs continue to use the printers they have selected, but the record reflects that other printers can do the same project in fewer dates.  Day 2 Tr. 138:5–12 (Waters).

98.    Plaintiffs hired a consultant to examine their ability to comply with the Mailing List Restriction and were told it would be logistically impossible for Plaintiffs to complete the data collection, printing, and mailing process within SB 202's five-day allowance. 6/9/22 PI Tr. 57:23-58:2, 60:1-62:17; Ex. 20 at 2; Ex. 15 at 12, 24 ¶¶ 33, 56.

**Response**: Undisputed.

99.     Manually checking millions of already-printed and paid-for mailers against the State's constantly-changing list would be cost-prohibitive. Ex. 15 at 2526 ¶¶ 58-59; 6/9/22 PI Tr. 61:10-63:14.

**Response:** Undisputed that Plaintiffs claim that checking mailers manually would be cost prohibitive. To the extent that Plaintiffs are suggesting that they must manually check "already-printed and paid-for mailers," that is unsupported by the cited materials and, in any event, the record reflects that other printers can automate the process of list scrubbing. Day 2 Tr. 137:14–138:12 (Waters).

100.    Plaintiffs have concluded that the only means by which they can continue their absentee voting operations in Georgia under the Mailing List Restriction is to send a single wave of communications to voters during the first five days of Georgia's absentee voting window. Ex. 15 at 22-25 ¶¶ 53-57.

**Response**: Undisputed that this is Plaintiffs' conclusion, but Plaintiffs have not identified evidence that this is "the only means."

101.    Plaintiffs have substantially reduced their communications with Georgia voters to comply with the Mailing List Restriction as a result. As of October 14, 2022, Plaintiffs sent a total of 1,205,162 absentee ballot application mailers to Georgia voters; 1,006,798 sent by VPC and 198,364 sent by CVI. Ex. 21, VPC and CVI 2022 Absentee Ballot Application Mailer Data, P-0360, P-0363. In 2020, VPC sent 8,565,683 absentee

ballot application mailers to Georgia voters, and CVI sent 897,628. Ex. 11, Pls' Amended Responses and Objections at 4. As of October 14, 2022, only 40,992 voters were assisted by the Plaintiffs in the November 2022 elections, compared to 575,000 voters in November 2020. Ex. 21, P-0360, P-0363.

**Response**: Undisputed.

102. Plaintiffs decided to send only one wave of communications because the risk of criminal and civil penalties for each individual instance of even an inadvertent violation of the Mailing List Restriction threatens to wipe out their organizations. 6/9/22 PI Tr. 63:2-6, 209:20-214:22, 232:24-236:1, 271:17-24, 278:13- 21, 280:10-22; Ex. 26 at 14-16; Ex. 24 at 9-11; Green Tr. 90:13-91:1, 165:18-166:17.

**Response**: Undisputed.

103. Plaintiffs' ability to convey their message is also much less effective when they can only send one mailer communication and only at the very beginning of the election cycle. 6/9/22 PI Tr. 70:20-25; Ex. 15 at 13 ¶ 34.

**Response**: Disputed but immaterial. *See* Lopach Depo. 147:12–19 (testifying that "earlier waves were more efficient" because "[m]any people will respond to the first wave they receive") [Doc. 162].

104. Plaintiffs know that sending follow-up communications to voters who have not already engaged with Plaintiffs' prior mailer and may have misplaced or disregarded the initial mailing, as well as sending communications closer to the actual election when

voters are more inclined to be thinking about voting, is more effective at persuading voters to participate through absentee voting. 6/9/22 PI Tr. 69:20-70:10.

**Response**: Undisputed that this is Plaintiffs' opinion about their mailings. But Plaintiffs have not provided evidence to substantiate their opinion.

105.  SB 202's Disclaimer Provision requires third parties that disseminate absentee ballot applications, like Plaintiffs, to use the official government form that includes the Secretary of State seal and is titled "Application for Georgia *Official* Absentee Ballot." O.C.G.A. § 21-2-381(a)(1)(C)(ii) (emphasis added); Ex. 13 at 59-61.

**Response**: This paragraph contains a legal conclusion, not statements of fact, to which no response is required.

106.  SB 202's Disclaimer Provision requires Plaintiffs to stamp a "prominent" disclaimer on the official absentee ballot application form, designed and published by the Secretary of State, which must state:

> This is NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot. It is being distributed by [insert name and address of person, organization, or other entity distributing such document or material.   O.C.G.A.  §  21-2-381(a)(1)(C)(ii); Ex. 13 at 59-61.

**Response:** Undisputed.

107.  Failure to include this language can result in criminal penalties. O.C.G.A. §§ 21-2-598, 21-2-603, 21-2-599.

**Response:** Undisputed.

108. The disclaimer required by SB 202 makes Georgia an outlier among the States. Only Kansas requires a disclaimer on the applications distributed by third parties at all similar to Georgia, though its disclaimer is closer to a traditional disclosure requirement and does not mandate misleading information. K.R.S. 251122(k).

**Response:** To the extent this paragraph contains legal conclusions, not statements of fact, no response is required. Moreover, Plaintiffs cite no evidence to substantiate their claim that Georgia is "an outlier among the states."

109. Plaintiffs reasonably believe that the required disclaimer will confuse voters and make them reluctant to use the forms that Plaintiffs provide, which defeats the purpose of their communications. Ex. 15 at 30-32 ¶¶ 67-69; *see* Ex. 26. at 2-8; 6/10/22 PI Tr. 217:14-220:22, 228:12-16, 244:13-19, 254:1-6; Green Tr. 123:15-22, 160:2-162:7, 165:8-17; Ex. 24 at 6-8.

**Response:** Undisputed that this is Plaintiffs' opinion, but the cited portions of the record do not show anything other than a single voter who expressed confusion after being presented with leading questions.

110. The qualitative study conducted by Plaintiffs' expert, Dr. Green, demonstrated that, upon reading the form with the required disclaimer included, there are real-life instances of Georgia voters who are dissuaded from using the form and "would just throw it in the trash . . . [b]ecause it is not an official government publication." Ex. 24, at 8; Green Tr. 123:13-126:9, 150:3-151:15. This is even more true given the Disclaimer

is juxtaposed next to a warning about voter fraud, which will multiple the adverse effects on both Plaintiffs and voters. *See* 6/10/22 PI Tr. 218:23-220:22, 254:1-6; Green Tr. 157:6-162:7; Ex. 26 at 6-7.

**Response**: Undisputed that a single potential voter made the cited statement after being presented with leading questions. Accordingly, disputed that this would apply to "Georgia Voters."

111. Even Defendants have expressed confusion about whether the Disclaimer Provision applies to conduct beyond mailings and suggested that it in fact does. Ex. 18 at GA_VA00055527.

**Response:** Disputed but immaterial given Plaintiffs' decision to abandon their vagueness claim. Nothing in the cited source supports Plaintiffs characterization that Defendants "have expressed confusion." Instead, Defendants merely discussed whether the Disclaimer Provision applied to particular conduct.

112. The Secretary of State's office attempted to "fix the disclaimer," GAVA00050750, because the current language is "not able to get across everything you want to perfectly." 6/10/22 PI Tr. 122:4-11.

**Response**: Undisputed

113. If the Disclaimer simply required the sender's contact and a statement that the mailer did not come from the State, Plaintiffs would not have challenged it. See 6/10/2022 PI Tr. 220:23-221:9.

**Response**: Disputed but immaterial. Plaintiffs asked for an injunction of the entire disclaimer and only asked for a "more tailored injunction" as a fallback. Day 2 Tr. 219:25–220:11.

114.    Plaintiffs seek to remove recipients from their mailing list that have already requested, received, or submitted an absentee ballot in a manner that is feasible with the timelines and logistics for their communication campaigns, the needs and restrictions of industry-leading vendors, the limits of the information available to VPC/CVI, and the timing demands of the election cycle. Ex. 15 at 10, 19, 24 ¶¶ 26-27, 47, 56; *see also* Ex. 24 at 11.

**Response:** Undisputed.

115.    Defendants' witness Mr. Evans testified that duplicate applications are "not too terribly uncommon" and the process for dealing with them is "not that long." *See* Evans Dep. 71:18-72:2, 85:18-86:5.

**Response:** Disputed in part. It is undisputed that duplicate applications are "not too terribly uncommon." The full quote from Mr. Evans provides: "I think for one single duplicate application, it's not -- you know, not that long." Evans Depo. 85:22–23 [Doc. 160]. To the extent that Plaintiffs are using that quote to imply that the process for dealing with the cumulative time of resolving all duplicate applications that are received by the state—rather than the time for dealing with "one single duplicate application"—is "not that long," it is unsupported by the cited source.

116. The Secretary's office runs and participates in trainings for their own and county election officials that cover mail voting, including things like processing duplicate applications. Evans Tr. 78:6-79:2; Ex. 18, GA-VA00041544.

**Response:** Undisputed.

117. Additionally, many of Defendants' cited complaints state explicitly that the voter has not and does not plan to apply to vote absentee, meaning the Mailing List Restriction does not prohibit those voters from receiving duplicate mailers. *See*, *e.g.*, Defs.' Ex. H at 4, 15, 21, 22, 27; *see also* 6/10/2023 PI Tr. 72:13-73:2; Evans Dep. 242:20-243:1.

**Response**: Plaintiffs' characterization of a voter's intention is not a statement of fact supported by the record, and thus no response is required. Undisputed that the Anti-Duplication Provision does not prohibit Plaintiffs from sending those voters duplicate mailers.

118. Plaintiffs identify themselves on mailers to Georgia voters. *E.g.,* Ex. 15 at 36-39, 40-45; Ex. 16 at P-0371, P-0380.

**Response:** Undisputed.

119. Plaintiffs' distribution of personalized absentee applications did not put an undue strain on election officials. Complaints regarding ballot applications are resolved relatively quickly within the Secretary of State's office, without the need to open an investigation. Ex. 5, Dep. of Frances Watson ("Watson Tr.") 66:1016. Indeed, the complaints regarding ballot applications received by the Secretary of State's Investigations

Division were not even considered a "set priority" for the Secretary of State's Office. Watson Tr. 76:10-19. County election officials *prefer* to prefill applications, because doing so reduces the number of applications that they have to process with missing information, which often requires following up with the individual voters to complete the application. Ex. 18, GA-VA00038833; *Id.* at GA_VA00024557, GA-VA00051968; 6/10/22 PI Tr. 122:4-11.

**Response:** Disputed that the cited portions of the record support Plaintiffs' statement. Even if any individual complaint is resolved quickly, the record shows that resolving *numerous* complaints is time consuming. Watson Depo. 90:3–19 [Doc. 163]. Indeed, nothing in the cited source, Watson Depo. 66:10–16, supports the claim that complaints are solved "relatively quickly" or that election officials do not start an "investigation." To the contrary, the cited source says that they do not generate a "case file." But subsequent lines make clear that election officials do "take[] up a lot of time" doing "threshold" "investigative work" related to those complaints. Watson Depo. 66:18–67:5.

120. The Ballot Application Restrictions increased confusion with respect to the disclaimer, *see* 6/9/22 PI Tr. 215:10-219:20, 225:18-227:3; 6/10/22 PI Tr. 95:120, which requires third parties to state "This is NOT a government form" on an official government form. Ex. 13 at 59-61.

**Response**: Disputed that the Disclaimer Provision requires third parties to state "This is NOT a government form," and the cited exhibit does not support that claim. Also, the cited portions of the record do not show anything other than a single voter who expressed confusion after being presented with leading questions.

121.    Reducing the ability of third-party civic organizations, such as Plaintiffs, to fill gaps left by election officials in informing and assisting voters on how to participate in the electoral process through absentee voting, *see, e.g.,* Evans Tr. 56:13-57:10, will increase the burdens on election officials. *See* Ex. 8, Dep. of Milton Kidd ("Kidd Tr.") 70:21-71:2.

**Response**: Disputed, as the first citation does not support the claim for which it is cited and says nothing to suggest that the State has "reduc[ed] the ability of third-party civic organizations … to fill gaps left by election officials." The second citation does not support the claim that the Challenged Provisions would "increase the burdens on election officials" as it merely reflects the thoughts of a single election official before SB 202 was enacted.

122.    Both state and county election officials issue press releases and other public statements to promote the integrity of the absentee voting process and explain the role civic engagement groups play in that process. Ex. 18, GA_VA00052835; GA_VA00055527.

**Response:** Undisputed.

123. Pre-SB 202, Plaintiffs were already criminally prohibited from inputting a "fraudulent entry" on any application. O.C.G.A. § 21-2-562.

**Response:** This paragraph contains a legal conclusion, not statements of fact, to which no response is required

124. Defendants' investigator with the Elections Division has never seen any evidence of voter fraud in connection with a ballot application distributed by a third party. Watson Tr. 189:23-190:4, 191:3-13.

**Response:** Disputed in part. To the extent that Plaintiffs are relying on the cited source to suggest that there has never been fraud in connection with a ballot application distributed by a third party, it is unsupported by the cited source.

125. Georgia's election systems were already designed to identify and discard duplicate applications submitted to election officials before SB 202. Evans Dep. 142:3-9; 145:17-18. *See* O.C.G.A. § 21-2-381 (2019) (describing the process for processing absentee ballot applications before SB 202 was enacted); *compare with id.* § 21-2-381 (2021) (retaining process for identifying absentee ballot applicants).

**Response:** Disputed, as none of the cited sources supports the claim for which they were cited, but immaterial.

Respectfully submitted this 28th day of February, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Edward H. Trent*
Joshua J. Prince*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Fax: (202) 776-0136
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272

bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*