UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VOTEAMERICA, et al.,

      Plaintiffs,

   v.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of State
of the State of Georgia, et al.,

      Defendants.

CIVIL ACTION NO.
1:21-CV-01390-JPB

## ORDER

This matter is before the Court on State Defendants'[1] Motion for Summary

Judgment [Doc. 149].  This Court finds as follows:

## BACKGROUND

This case concerns two provisions of Georgia Senate Bill 202 ("SB 202"),[2]

both of which relate to absentee ballot applications.[3]  The first provision at issue,

---

[1] State Defendants are Brad Raffensperger, in his official capacity as Secretary of State of the State of Georgia, and individual members of the State Election Board, in their official capacities.

[2] SB 202 governs election-related processes and was signed into law by Governor Brian Kemp on March 25, 2021.

[3] To vote absentee in Georgia, a prospective voter must first fill out an absentee ballot application.

the Prefilling Provision, provides that "[n]o person or entity . . . shall send any elector an absentee ballot application that is prefilled with the elector's required information."  O.C.G.A. § 21-2-381(a)(1)(C)(ii).  The Anti-Duplication Provision, which is the second provision at issue, states that "[a]ll persons or entities . . . that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff."  Id. § 21-2-381(a)(3)(A).  The Prefilling Provision and the Anti-Duplication Provision are together the "Ballot Application Provisions."[4]

On April 7, 2021, Plaintiffs[5] filed this action against State Defendants, challenging the constitutionality of the Ballot Application Provisions.  [Doc. 1]. Specifically, Plaintiffs asserted that the Ballot Application Provisions violate their rights to free speech and freedom of association under the First Amendment of the United States Constitution.  Id. at 42–49.  They also asserted that the Ballot

---

[4] A third provision, the Disclaimer Provision, was previously at issue in this case.  On June 9, 2023, the parties notified the Court that any claims relating to that provision are moot.  [Doc. 176].

[5] Plaintiffs are Voter Participation Center and Center for Voter Information. VoteAmerica was originally a named plaintiff but was dismissed by stipulation of the parties on September 26, 2022.  [Doc. 142].

Application Provisions are unconstitutionally overbroad and impermissibly vague. Id. at 52–58.

On May 17, 2021, and June 21, 2021, State Defendants and Intervenor Defendants,[6] respectively, moved to dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief.  [Doc. 40]; [Doc. 53].  The Court denied the motions on December 9, 2021.  [Doc. 57].  Thereafter, on April 26, 2022, Plaintiffs moved for a preliminary injunction, asking the Court to enjoin the enforcement of the Ballot Application Provisions.  [Doc. 103].  After holding a hearing and fully considering the parties' evidence and arguments, the Court denied the motion on June 30, 2022.  [Doc. 131].[7]

On December 13, 2022, State Defendants moved for summary judgment as to all counts of the Complaint.  [Doc. 149].  The parties have since stipulated that any claims relating to the Disclaimer Provision are now moot, see supra note 4, and Plaintiffs have clarified that they are no longer pursuing their vagueness claim. Plaintiffs have also abandoned their argument that the Anti-Duplication Provision

---

[6] Intervenor Defendants are the Republican National Committee, the National Republican Senatorial Committee, the National Republican Congressional Committee and the Georgia Republican Party, Inc.

[7] The Court cites to the docket for ease of reference, but the order denying the motion for preliminary injunction is also available at VoteAmerica v. Raffensperger, 609 F. Supp. 3d 1341 (N.D. Ga. 2022).

is overbroad.  Thus, the only claims before the Court concern whether the Ballot

Application Provisions violate Plaintiffs' rights to free speech and freedom of

association and whether the Prefilling Provision is unconstitutionally overbroad.

## FACTS

The Court derives the facts of this case from State Defendants' Statement of

Material Facts [Doc. 149-2], Plaintiffs' Response to State Defendants' Statement

of Material Facts [Doc. 159-31], Plaintiffs' Statement of Additional Material Facts

[Doc. 159-32] and State Defendants' Response to Plaintiffs' Statement of

Additional Material Facts [Doc. 171-1].  The Court also conducted its own review

of the record.

In accordance with the Local Rules, this Court will not consider unsupported

facts.  The Court will, however, use its discretion to consider all facts that the

Court deems material after reviewing the record.  For the purpose of adjudicating

the instant motion, the facts of this case are as follows, divided into these sections:

(A) Absentee Voting in Georgia; (B) Plaintiffs' Activities; (C) Voter Complaints

Regarding Plaintiffs' Activities; (D) Additional Challenges Arising from Plaintiffs'

Activities; and (E) Ballot Application Provisions.

**A.    Absentee Voting in Georgia**

All registered Georgia voters are permitted to vote absentee by mail.  [Doc. 171-1, p. 1].  To do so, a voter must first apply for an absentee ballot.  Id. at 2. Voters may apply for a ballot through the Secretary of State's online portal or by submitting an application, a copy of which is available on the Secretary of State's website.  Id.  Notably, because the application requires a wet signature, voters must obtain a physical copy of the application to sign and submit, whether as a hard copy or a scanned copy.  Id. at 6–7.

**B.    Plaintiffs' Activities**

Plaintiffs are nonpartisan, nonprofit organizations with the mission to encourage the political participation of historically underrepresented groups, such as young people, people of color and unmarried women.  Id. at 8.  Plaintiffs' stated purpose is to engage in political speech and expressive conduct to disseminate their views that all eligible voters should participate in the political process, that voting should be easy and accessible and that absentee voting is safe, beneficial and secure.  Id. at 9–10.

Plaintiffs have designed and implemented direct mail programs to further their mission and communicate their views that engaging in the electoral process through absentee voting is trustworthy and easy.  Id. at 9; [Doc. 171-1, p. 24].  The

5

mailer, which is sent to members of the groups identified above, consists of (1) an absentee ballot application prefilled with the voter's personal information, (2) a cover letter that includes instructions for completing the application and explains why Plaintiffs believe that absentee voting is important and (3) a postage-paid return envelope addressed to the voter's county election office.  [Doc. 159-31, pp. 8–9]; [Doc. 171-1, p. 11].  According to Plaintiffs, all parts of its mailer, including the cover letter, the prefilled application and the return envelope, form "an intertwined package that, as a whole, is necessary to convey Plaintiffs' message." [Doc. 171-1, p. 24]; see also [Doc. 159-31, p. 9].  Plaintiffs have never sent absentee ballot applications without a cover letter.  [Doc. 159-31, p. 9].

Plaintiffs associate with other organizations to further their mission.  For example, Plaintiffs have worked with the Georgia NAACP to send absentee ballot applications to Georgia voters.  Id. at 20.  Plaintiffs have also worked with national and state-based organizations to communicate with voters through door-knocking, text messages and phone calls.  Id. at 19.

As stated above, Plaintiffs send absentee ballot applications that are prefilled with voters' personal information.[8]  Id. at 15.  Based on Plaintiffs' experience and

---

[8] This personal information is drawn from the voter registration records generated by the State of Georgia.  [Doc. 171-1, p. 15].  The state's absentee voter file is populated by

research, voters are more likely to submit an application to vote absentee when the application is prefilled with their personal information.  Id. at 26.  Plaintiffs assert that sending personalized, prefilled applications is a form of outreach to build greater association with a specific group of voters.  Id. at 14.

Plaintiffs send mailers in multiple waves because they believe that it is the most effective way of conveying their message and engaging voters.  Id. at 18. Each wave of communications takes Plaintiffs six weeks to finish and at least twenty days from print order to mailing.  Id. at 30.  This process entails retrieving the data from the state; filtering the data to Plaintiffs' target audience and removing voters based on deceased status, change of address and the absentee voter file; and beginning the printing orders.  Id.

Although Plaintiffs send multiple waves of mailers, Plaintiffs assert that they do not intend to send mailers to individuals who have already requested an absentee ballot application.  Id. at 15-16.  Thus, Plaintiffs rely on various mechanisms to prevent duplicative mailers.  For instance, Plaintiffs use a barcode on the applications that they send to track whether voters have already submitted

---

information entered into the state's voter database and is updated roughly every twenty-four hours with new information.  Id. at 29.  Because counties have varied practices for inputting absentee ballot application information, the state's absentee voter file may not always include an accurate account of every voter who has submitted an absentee application on a given date.  Id.

an absentee ballot application.  Id. at 16.  Plaintiffs also make periodic requests for updated voter records from Georgia state election officials before initiating a mailer program.  Id.

Leading up to the 2020 election, Plaintiffs sent more than 9.6 million communications to registered Georgia voters in multiple waves.  Id. at 18. Ultimately, 575,000 Georgia voters used Plaintiffs' materials to submit absentee ballot applications during the November 2020 general election and 88,500 Georgia voters used the materials in the January 2021 runoff election.  Id. at 19.

## C.   Voter Complaints Regarding Plaintiffs' Activities

It is undisputed that some voters complained about Plaintiffs' activities. Specifically, some recipients of Plaintiffs' mailings contacted Plaintiffs to complain about receiving the materials and to request removal from future mailing lists.[9]  [Doc. 159-31, p. 19].  Similarly, voters also contacted the Georgia Secretary

---

[9] Recipients who no longer wish to receive communications from Plaintiffs on electoral engagement issues may opt out of future mailings online, by phone or by email.  [Doc. 159-31, p. 18]; [Doc. 171-1, pp. 16–17].  To ensure that voters who have opted out of these mailings do not receive them, Plaintiffs review later mailings against removal lists at least twice.  [Doc. 159-31, p. 19].

of State's Office[10] with complaints and questions about absentee ballot

applications received from third-party organizations, such as Plaintiffs.[11]  Id. at 20.

The record reveals two broad categories of complaints received from voters, which

the Court discusses below:  (1) receiving multiple absentee ballot applications and

(2) receiving incorrectly prefilled absentee ballot applications.[12]

---

[10] Voters may submit complaints and concerns to the Secretary of State's Office via phone, email or online forms.  [Doc. 159-31, p. 21].  Complaints may also be lodged with the State Election Board or with county election offices.  Id.

[11] Plaintiffs consistently objected to these voter complaints as inadmissible hearsay because, according to Plaintiffs, State Defendants rely on the voter complaints "to prove the truth of the matter asserted by the voters' out-of-court statements."  [Doc. 159-31, p. 22].  "The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'"  Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  However, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'"  Id. at 1323.  As a threshold matter, many of the voter complaints serve as evidence of State Defendants' rationale in passing the Ballot Application Provisions rather than as evidence of the truth contained in the asserted statements.  As such, the complaints are not hearsay at all.  But to the extent that they are, this Court considers them on summary judgment because the voter complaints can be "reduced to admissible form" at trial by calling the complainant as a witness.  Id.; see also, e.g., Fair Fight Action, Inc. v. Raffensperger, No. 1:18-CV-5391, 2021 WL 9553856, at *9 (N.D. Ga. Mar. 31, 2021) (reaching this same conclusion on the issue of hearsay and voter complaints when deciding a motion for summary judgment), op. clarified, 2021 WL 9553849 (N.D. Ga. Nov. 15, 2021).

[12] State Defendants provided many examples of voter complaints about these issues.  The Court's discussion cites just a few illustrative examples.

### 1.    Receiving Multiple Absentee Ballot Applications

Some voters complained to the Secretary of State's office that they received multiple absentee ballot application forms.  Id. at 26.  For instance, one voter informed the Secretary of State's office that he received five applications for the 2021 Senate runoff election.  Id. at 29; see also [Doc. 113-2, p. 57].  When another voter received three absentee ballot applications that she did not request, she contacted the Secretary of State by email to convey her concern that the duplicate mailings could be considered fraudulent.  Id. at 30; see also [Doc. 113-2, p. 72].  During legislative hearings on SB 202, Representative Rick Williams stated that he personally received approximately six absentee ballot applications.  [Doc. 159-31, p. 34].

### 2.    Receiving Incorrectly Prefilled Absentee Ballot Applications

Voters also expressed concern about receiving incorrectly prefilled absentee ballot applications.[13]  By way of example, one voter submitted a complaint after receiving a prefilled absentee ballot application that contained the wrong middle name.  Id. at 44; see also [Doc. 113-2, p. 48].  Another individual contacted the

---

[13] Plaintiffs do not dispute that voters received prefilled applications with errors or inaccuracies.  Plaintiffs, however, argue that any errors resulted from mistakes in the state's own voter file.  Whether the state's voter file data contained inaccuracies is immaterial because the record nonetheless shows that voters complained about receiving prefilled applications with errors.

Secretary of State to communicate her concerns about voter fraud when she received a prefilled absentee ballot application for someone who did not reside at her address.  [Doc. 159-31, p. 45]; see also [Doc. 113-2, p. 46].  Yet another voter reported that she received a partially prefilled absentee ballot application for her husband, who had passed away seven years earlier.  [Doc. 159-31, p. 47]; see also [Doc. 113-2, p. 29].

**D.    Additional Challenges Arising from Plaintiffs' Activities**

In addition to shouldering the burden of addressing and responding to voter complaints pertaining to Plaintiffs' activities, the record shows that duplicate applications placed an additional burden on election officials.  Indeed, if a voter submits multiple applications for an absentee ballot, the Secretary of State must process each application, even if they are duplicative.  See [Doc. 113-2, p. 17]; [Doc. 164, pp. 50–51].  Moreover, election officials must process ballot cancellations on Election Day when voters who had submitted an absentee ballot application show up to vote in person.[14]  [Doc. 159-31, p. 39].  For the 2020 general election, voters cancelled 40,694 absentee ballot applications, compared to 5,472 cancelled applications during the 2018 general election and 3,170 during the

---

[14] The parties dispute how many ballot cancellations election officials must process, but it is undisputed that on Election Day, election officials are responsible for this task.

2016 general election.  Id. at 40–41.  To cancel an absentee ballot request, an elections official at the polling location must call the county election headquarters to confirm that the absentee ballot has not been voted.  [Doc. 113-2, p. 11].  In the event the ballot has not been voted, the elections official at the polling location must then have the representative from the county election headquarters cancel the ballot that was requested.  Id.  This can be a time-consuming process.  Id.

**E.     Ballot Application Provisions**

State Defendants assert that the Ballot Application Provisions address the concerns raised by the voter complaints discussed above as well as the additional burden the applications place on election officials.  Plaintiffs, on the other hand, contend that these provisions substantially complicate their voter engagement efforts.  The Court discusses the provisions and these related issues below.

**1.     The Prefilling Provision**

The Prefilling Provision prevents anyone other than "a relative authorized to request an absentee ballot for such elector or a person signing as assisting an illiterate or physically disabled elector" from "send[ing] any elector an absentee ballot application that is prefilled with the elector's required information." O.C.G.A. § 21-2-381(a)(1)(C)(ii); [Doc. 159-31, p. 53].  The Prefilling Provision does not apply to web-based tools and applications that allow voters themselves to

input their own personalized information into an absentee ballot application.  [Doc. 159-31, p. 53].

As previously noted, Plaintiffs assert that prefilling absentee ballot applications is a "key component" of their work.  [Doc. 171-1, p. 25].  Plaintiffs believe that personalizing absentee ballot applications is the most effective means of conveying their message that voting absentee is easy to complete, beneficial and accessible.  Id. at 26.  According to Plaintiffs, sending prospective voters a prefilled absentee ballot reduces the transaction costs of voting, and the Prefilling Provision—by prohibiting this practice—undermines the effectiveness of Plaintiffs' message.  Id. at 9, 24.

## 2.    The Anti-Duplication Provision

The Anti-Duplication Provision prohibits anyone other than the "Secretary of State, election superintendents, boards of registrars, and absentee ballot clerks" from sending absentee ballot applications "to individuals who have … already requested, received, or voted an absentee ballot in the primary, election, or runoff." O.C.G.A. § 21-2-381(a)(3)(A); [Doc. 159-31, p. 55].  Any entity (other than the exempted groups identified in the statute) seeking to send absentee ballot applications must "compare its mail distribution list with the most recent information available about which electors have requested, been issued, or voted

an absentee ballot in the primary, election, or runoff and shall remove the names of such electors from its mail distribution list." O.C.G.A. § 21-2-381(a)(3)(A); [Doc. 159-31, p. 56]. If an entity complies with this component of the Anti-Duplication Provision, that entity is not liable for violating the Anti-Duplication Provision if they "relied upon information made available by the Secretary of State within five business days prior to the date such applications are mailed." O.C.G.A. § 21-2-381(a)(3)(A); [Doc. 159-31, p. 57].

Plaintiffs hired a consultant to examine their ability to comply with the Anti-Duplication Provision. [Doc. 171-1, p. 30]. That consultant advised that it would be logistically impossible for Plaintiffs to complete the data collection, printing and mailing process within the provision's five-day allowance. Id. According to Plaintiffs, manually checking millions of mailers against the state's absentee voter file would be cost prohibitive. Id. at 31. In an effort to comply with the Anti-Duplication Provision, Plaintiffs have substantially reduced their communications with Georgia voters. Id. Indeed, Plaintiffs ultimately decided to send only one wave of communications due to the risk of criminal and civil penalties for potential violations of the Anti-Duplication Provision. Id. at 32.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Allen, 121 F.3d at 646 (quoting Anderson, 477 U.S. at 251).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party."  Id.  After the movant satisfies this initial burden, the burden shifts to the nonmovant who must then present evidence indicating that summary judgment is

improper.  Id.  However, "[a] mere 'scintilla' of evidence supporting the opposing

party's position will not suffice; there must be enough of a showing that the jury

could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th

Cir. 1990) (quoting Anderson, 477 U.S. at 251).  If the record taken as a whole

cannot lead "a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391

U.S. 253, 288 (1968)).

## ANALYSIS

In this case, the Court must decide whether the Ballot Application

Provisions violate the rights to free speech and freedom of association.  The Court

must also decide whether the Prefilling Provision is unconstitutionally overbroad.

**A.     Rights to Free Speech and Freedom of Association**

Plaintiffs argue that the Ballot Application Provisions infringe their rights of

speech and association under the First Amendment.  State Defendants, however,

contest whether Plaintiffs' conduct implicates the First Amendment at all.  In the

analysis that follows, the Court first analyzes whether Plaintiffs' conduct (i.e.,

prefilling applications or sending multiple absentee ballot applications) is protected

by the First Amendment.  The Court then applies the appropriate level of scrutiny to assess the constitutionality of the Ballot Application Provisions.

When analyzing whether the First Amendment is implicated, the Court focuses on the precise conduct at issue instead of Plaintiffs' activities as a whole. See Voting for Am., Inc. v. Steen, 732 F.3d 382, 388–89 (5th Cir. 2013) (analyzing challenged provisions of a Texas voting law "separately because . . . discrete steps of the voter registration drive are in fact separable and are governed by different legal standards"); Voting for Am., Inc. v. Andrade, 488 F. App'x 890, 898–99 (5th Cir. 2012) (explaining that "[b]ecause different legal principles apply to . . . discrete actions, it is important to assess regulations on each separately" and to conduct a "discerning regulation-by-regulation analysis").  Here, the conduct at issue is prefilling an absentee ballot application with a voter's personal information (such as a voter's name, date of birth and address) and sending an absentee ballot application to a voter who has already requested, been issued or voted an absentee ballot.

What is not at issue is the host of other activities in which Plaintiffs may freely engage that are designed to encourage voters to vote.  For instance, Plaintiffs may assist voters in applying for an absentee ballot.  Plaintiffs may also have as many conversations or send as many letters as they wish to voters regarding the

importance of voting and the process of voting absentee.  Plaintiffs may even send

numerous blank absentee voting applications to voters so long as the voter has not

requested, been issued or voted an absentee ballot.  To conclude, the Ballot

Application Provisions restrict a narrow subset of activities—prefilling an absentee

ballot application and sending duplicate applications—while leaving untouched a

broad assortment of means by which to engage with voters.  See Lichtenstein v.

Hargett, 489 F. Supp. 3d 742, 765 (M.D. Tenn. 2020) ("[H]owever one slices it,

the Law . . . leaves open a very wide swath of conduct, prohibiting just one very

discrete kind of act.").[15]

## 1.     Right to Free Speech

The Court will first evaluate whether Plaintiffs' conduct implicates the First

Amendment's protections for freedom of speech before applying the appropriate

level of scrutiny.

### a.     Whether Plaintiffs' Conduct Constitutes Protected Expressive Activity

Plaintiffs contend that their activities—specifically, prefilling absentee ballot

applications and sending multiple applications to potential voters—constitute

---

[15] The Tennessee statute at issue in Lichtenstein went further than S.B. 202 and prohibited any person who is not an employee of an election commission from giving an application for an absentee ballot to any person.

expressive conduct that is protected by the First Amendment.  "As the party

invoking the First Amendment's protection," Plaintiffs have the burden to prove

that the First Amendment applies.  Steen, 732 F.3d at 388; see also Clark v. Cmty.

for Creative Non-Violence, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of

the person desiring to engage in assertedly expressive conduct to demonstrate that

the First Amendment even applies.")

In addition to spoken and written speech, the First Amendment protects

expressive conduct.  Texas v. Johnson, 491 U.S. 397, 404 (1989).  The test of

whether conduct is expressive has evolved over time.  Holloman ex rel. Holloman

v. Harland, 370 F.3d 1252, 1270 (11th Cir. 2004).  The original test asked courts to

analyze whether "[a]n intent to convey a particularized message was present" and

whether "in the surrounding circumstances the likelihood was great that the

message would be understood by those who viewed it."  Spence v. Washington,

418 U.S. 405, 410–11 (1974).  The Supreme Court, however, "later liberalized this

test" by "emphasizing that 'a narrow, succinctly articulable message is not a

condition of constitutional protection.'"  Holloman, 370 F.3d at 1270 (quoting

Hurley v. Irish-Am., Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 569

(1995)).  "Thus, in determining whether conduct is expressive," courts must now

ask "whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message."[16] Id.

The Eleventh Circuit has held that in expressive conduct cases where a court must analyze whether there is some sort of message, "context matters." See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.3d 1235, 1237 (11th Cir. 2018). Context separates "the physical activity of walking from the expressive conduct associated with a picket line or a parade"; the act of sitting down to read at a library from sit-ins protesting segregation; and nude dancing from private dressing. Id. at 41. Indeed, the "circumstances surrounding an event" help a reasonable observer discern the dividing line between expressive conduct and everyday conduct. Id.

State Defendants argue that Plaintiffs' conduct is not expressive because Plaintiffs send a cover letter with the absentee ballot applications. The Court recognizes the Supreme Court's holding that the necessity of "explanatory speech" to convey a particular message is "strong evidence" that the conduct at issue is not "so inherently expressive" that it warrants First Amendment protections. Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 66 (2006). The Eleventh

---

[16] Other circuits still apply the original test requiring a great likelihood that the specific message would be understood by those who viewed it. Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 n.6 (2d Cir. 2004); Steen, 732 F.3d at 388.

Circuit, however, has clarified that this language "does not mean that conduct loses its expressive nature just because it is also accompanied by other speech." <u>Food Not Bombs</u>, 901 F.3d at 1243-44. "The critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct." <u>Id.</u> at 1244.

This Court finds that a genuine issue of material fact exists as to whether a reasonable observer would perceive some sort of message from Plaintiffs' conduct. Certainly, without the cover letters, voters are less likely to perceive Plaintiffs' specific messages that absentee voting is reliable, easy, beneficial and trustworthy; that all eligible voters should participate in the political process; that voting should be easy and accessible; and that absentee voting is safe, beneficial and secure. The relevant inquiry, however, is whether a reasonable observer would perceive some sort of message. In making this determination, the Court must conduct a fact-specific inquiry concerning the surrounding circumstances of Plaintiffs' activities. Indeed, the Eleventh Circuit instructs that courts should consider the following factors: (1) whether the plaintiff intends to distribute literature or hang banners in connection with the expressive activity, (2) whether the activity will be open to all, (3) whether the activity takes place in a traditional public forum, (4) whether the activity addresses an issue of public concern and (5) whether the activity "has been

understood to convey a message over the millennia." <u>Burns v. Town of Palm Beach</u>, 999 F.3d 1317, 1344-45 (11th Cir. 2021).  These fact-specific factors were not addressed by either party.  Ultimately, because neither party argued these factors nor developed the underlying facts, this Court finds that a genuine issue of fact exists as to whether the absentee ballot applications convey some sort of message.  <u>See</u> <u>League of Women Voters of Fla., Inc. v. Lee</u>, 576 F. Supp. 3d 1004, 1014 (N.D. Fla. 2021) (denying summary judgment where the parties failed to address each factor and failed to point to facts in the record supporting the argument).  Thus, for the purposes of this motion, the Court assumes that Plaintiffs' conduct is protected by the First Amendment.[17]

---

[17] The Court acknowledges that it analyzed this issue and others differently when it denied Plaintiffs' request for preliminary injunctive relief on June 30, 2022.  [Doc. 131].  As the parties are aware, that decision was made on an "expedited timeframe."  <u>Eknes-Tucker v. Gov. of Ala.</u>, No. 22-11707, 2023 WL 5344981, at *20 n.1 (11th Cir. Aug. 21, 2023) (Brasher, J., concurring) (recognizing that motions requesting preliminary injunctive relief are decided on an expedited timeframe where there is less time and resources to assess a legal question).  Because the Court and the parties have now had more time and the record is more complete, some of the relevant analysis has changed.  <u>See</u> <u>FTC v. On Point Cap. Partners LLC</u>, 17 F.4th 1066, 1079 n.9 (11th Cir. 2021) ("As more evidence is introduced and arguments are held over the course of the litigation, the District Court may, of course, change its mind and come to a different conclusion than the one it reached at the preliminary injunction hearing.")

b.     **Level of Scrutiny**

Assuming that the Ballot Application Provisions infringe upon Plaintiffs'

First Amendment free speech rights, the Court must decide what level of scrutiny

applies.  In the context of election-related laws that burden constitutional rights,

courts often struggle to determine which level of scrutiny is appropriate.  League

of Women Voters v. Hargett, 400 F. Supp. 3d 706, 721-22 (M.D. Tenn. 2019)

(describing a "bewildering array of standards to choose from").  Even in this

particular case, the parties cannot agree on the applicable standard.  Plaintiffs

contend that strict scrutiny applies because the Ballot Application Provisions

restrict core political speech and regulate speech based on both content and

viewpoint.  State Defendants, on the other hand, argue that the Court should apply

either rational basis review or the framework set forth in Anderson v. Celebrezze,

460 U.S. 780, 789 (1983), and Burdick v. Takushi, 504 U.S. 428, 434 (1992).

The Supreme Court has held that election restrictions involving a limitation

on "core political speech" are subject to strict scrutiny.  Buckley v. Am. Const.

Law Found., Inc., 525 U.S. 182, 207 (1999).  The Court will thus first analyze

whether the Ballot Application Provisions restrict core political speech.  Core

political speech includes, but is not limited to, the discussion of public issues and

debate on the qualifications of candidates, political expression designed to assure

23

the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people" and the discussion of governmental affairs. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347 (1995). Importantly, "core political speech need not center on a candidate for office," id., and typically involves "interactive communication concerning political change." Buckley, 525 U.S. at 186.

Construing the facts most favorably to Plaintiffs, this Court finds that Plaintiffs share pro-voting messages by sending prefilled absentee ballot applications to potential voters and that the Ballot Application Provisions target the ability of Plaintiffs to convey those messages. Encouraging others to vote or engage in the political process is the essence of First Amendment expression. At a minimum, discussing the right to vote and urging participation in the political process is a matter of societal concern because voting brings about "political and social changes desired by the people." Meyer v. Grant, 486 U.S. 414, 421 (1988) ("The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.").[18] Based on

---

[18] The Court acknowledges that there is evidence in the record that recipients sometimes did not want to receive the absentee ballot applications. This, however, does not change

the present record and given the case's current procedural posture, the Court finds that the Ballot Application Provisions restrict core political speech.  <u>See</u> <u>VoteAmerica</u>, 2023 WL 3251009 at *13 (finding that sending personalized applications constitutes core political speech).

When a law burdens core political speech, strict scrutiny is the appropriate standard of review.[19]  <u>Weaver v. Bonner</u>, 309 F.3d 1312, 1319 (11th Cir. 2002). Under strict scrutiny, the government bears the burden to show that the restriction is "(1) narrowly tailored, to serve (2) a compelling state interest."  <u>Id.</u>  The Court will first address whether State Defendants have shown a compelling state interest before turning to whether the Ballot Application Provisions are narrowly tailored.

State Defendants have identified decreasing voter confusion, combatting complaints of fraud and increasing election integrity as the compelling state

---

the Court's opinion that a message about voting, even if rejected or ignored, is "valuable to the democratic process."  <u>Buckley</u>, 525 U.S. at 211 n.3 (Thomas, J., concurring) (explaining that core political speech existed even if petition circulators did not meaningfully discuss the merits of the proposed change and simply asked voters to "sign this" petition).

[19] The Court declines State Defendants' invitation to apply the <u>Anderson</u>-<u>Burdick</u> framework because applying <u>Anderson</u>-<u>Burdick</u> to a statute regulating core political speech would be "unlike any law that [the Eleventh Circuit] or the Supreme Court has ever evaluated" using the framework.  <u>Jacobson v. Fla. Sec'y of State</u>, 974 F.3d 1236, 1262 (11th Cir. 2020) (explaining that <u>Anderson</u>-<u>Burdick</u> is typically used only to evaluate laws that burden voting or associational rights).

interests justifying the Ballot Application Provisions.  It is well-settled that these are compelling state interests.  See Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2340 (2021) ("One strong and entirely legitimate state interest is the prevention of fraud.");  Green Party of Ga. v. Kemp, 171 F. Supp. 3d 1340, 1365 (N.D. Ga. 2016) ("The Supreme Court and the Eleventh Circuit have consistently recognized that limiting voter confusion is an important state interest.").

Plaintiffs do not dispute that these are compelling state interests.  Instead, Plaintiffs contend that State Defendants failed to present sufficient evidence to support their interests.  The Court disagrees.  In this case, State Defendants tendered multiple affidavits demonstrating that voters complained about receiving duplicative absentee ballot applications.  State Defendants also provided evidence that in 2020, voters cancelled 40,694 absentee ballot applications that had been submitted.[20]  Additionally, State Defendants presented numerous affidavits that voters were concerned about errors in prefilled applications.  For instance, one

---

[20] Absentee ballot applications are cancelled when a voter decides to vote in person.  The need to cancel over 40,000 applications strongly suggests that voters were confused when they submitted the absentee ballot application requesting to vote via an absentee ballot. The Court thus disagrees with Plaintiffs that State Defendants' evidence is limited solely to voters who were annoyed because they received multiple absentee ballot applications.

voter complained when her middle name was incorrectly prefilled, and another voter complained when she received a prefilled application for her husband who had been deceased for seven years.  Here, State Defendants have done more than show a theoretical interest in avoiding voter confusion.  Accordingly, the Court finds that State Defendants have sufficiently shown compelling state interests in this case.

The Court must next consider whether the Ballot Application Provisions are narrowly tailored to the compelling state interests.  Narrow tailoring requires the government to employ the least restrictive alternative to further its interests. United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 813 (2000).  The Supreme Court has held that a law fails to survive the narrow tailoring analysis if the law is "seriously underinclusive" or "seriously overinclusive."  Brown v. Ent. Merch. Ass'n, 564 U.S. 786, 805 (2011).  "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes."  Id. at 802. Overinclusiveness, on the other hand, raises questions about whether the statute "encompasses more protected conduct than necessary to achieve [the government's] goal."  Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 578 (1993).

Plaintiffs assert that State Defendants failed to meet their burden to show an absence of a genuine issue of material fact regarding the narrow tailoring requirement. As to the Anti-Duplication Provision, Plaintiffs assert that State Defendants failed to meet their burden because the statute leaves the duplicate mailings issue largely unaddressed. Specifically, Plaintiffs explain that the Anti-Duplication Provision does not reduce complaints from those voters who received multiple applications and who had no intention of voting absentee. As to the Prefilling Provision, Plaintiffs contend that State Defendants have not met their burden because the prefilling errors can be attributed to groups relying on data from the State's own voter list.

State Defendants assert that they have met their burden to show that the Ballot Application Provisions are narrowly tailored. As to the Prefilling Provision specifically, State Defendants contend that the law is narrowly tailored because it prohibits the actions most closely related to the complaints received. In regard to the Anti-Duplication Provision, State Defendants argue that it is narrowly tailored because the State targeted a narrow set of conduct instead of all the conduct as evidenced by the fact that Plaintiffs can still send duplicate mailings to voters that have not already applied.

In light of Plaintiffs' suggestion that the Ballot Application Provisions are underinclusive and overinclusive, the Court finds that State Defendants' competing arguments are insufficient to show that they are entitled to judgment as a matter of law. As such, to the extent that State Defendants seek summary judgment as to the free speech claim, the motion is **DENIED**.

### 2.  Right to Freedom of Association

The Court will next consider whether Plaintiffs' activities merit the First Amendment's protections for freedom of association before applying the appropriate level of scrutiny.

### a.  Whether Plaintiffs' Conduct Constitutes Protected Associational Activity

Plaintiffs contend that sending prefilled absentee ballot applications to voters constitutes protected associational activity. Specifically, Plaintiffs claim that their personalized absentee ballot applications build greater association with Plaintiffs' partner organizations and with a specific group of voters with whom Plaintiffs engage in the political process. Plaintiffs argue that the Ballot Application Provisions curb their ability to send prefilled absentee ballot applications to Georgia voters and, consequently, infringe upon their First Amendment right to freedom of association.

"Freedom of association is a fundamental right that encompasses two forms, namely 'intimate association' and 'expressive association.'"  Gary v. City of Warner Robins, 311 F.3d 1334, 1338 (11th Cir. 2002).  At issue in this case is expressive association, which is defined as "the 'right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'"  Id. (quoting Roberts v. United States Jaycees, 468 U.S. 609, 617–18 (1984)).  In other words, the First Amendment "[a]ccord[s] protection to collective effort on behalf of shared goals" and recognizes a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  Roberts, 468 U.S. at 622; see also Williams v. Rhodes, 393 U.S. 23, 38 (1968) ("The right of association is one form of 'orderly group activity' protected by the First Amendment." (citation omitted) (quoting NAACP v. Button, 371 U.S. 415, 430 (1963))).

Efforts that "expend resources 'to broaden the electorate to include allegedly under-served communities[]' qualify as expressive conduct which implicates the First Amendment freedom of association."  VoteAmerica v. Schwab, 576 F. Supp. 3d 862, 975 (D. Kan. 2021) (quoting Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158, 223 (M.D.N.C. 2020)).  "An organization's

attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'"  Id. (quoting Am. Ass'n of People with Disabilities v. Herrera, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010)).

This Court finds that Plaintiffs engage in associational activity by sending absentee ballot applications together with a cover letter to voters.  The Court is less convinced, however, that the discrete act of sending a prefilled absentee ballot application without a cover letter implicates Plaintiffs' right to freedom of association.  Nevertheless, for purposes of this motion, the Court will assume that it does because courts must "give deference to an association's assertions regarding the nature of its expression" as well as to "an association's view of what would impair its expression."  Boy Scouts of Am. v. Dale, 530 U.S. 640, 653 (2000).  Accordingly, the Court concludes that Plaintiffs' activities receive the First Amendment's protections for freedom of association.

### b.    Level of Scrutiny

Courts apply the Anderson-Burdick framework to assess challenges to election regulations that infringe on the right to associate.  See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997); Tashjian v. Republican Party of Conn., 479 U.S. 208, 213–15 (1986); Jacobson v. Fla. Sec'y of State, 974 F.3d

1236, 1262 (11th Cir. 2020); Stein v. Ala. Sec'y of State, 774 F.3d 689, 694 (11th

Cir. 2014).  The Anderson-Burdick framework requires the Court to "weigh the

'character and magnitude'" of the burden imposed by a law on the plaintiff's First

Amendment rights against the state's interests, or justifications for the law, and to

"consider the extent to which the [s]tate's concerns make the burden necessary."

Timmons, 520 U.S. at 358 (quoting Burdick, 504 U.S. at 434).  While laws that

impose severe burdens must be narrowly tailored to serve a compelling state

interest, "[l]esser burdens . . . trigger less exacting review, and a [s]tate's

'important regulatory interests' will usually be enough to justify 'reasonable,

nondiscriminatory restrictions.'"  Id. (quoting Burdick, 504 U.S. at 434); see also

Common Cause/Ga. v. Billups, 554 F.3d 1340, 1354–55 (11th Cir. 2009) (stating

that where the burden is slight, "the state interest need not be 'compelling . . . to tip

the constitutional scales in its direction'" (alteration in original) (quoting Burdick,

504 U.S. at 439)).  This analysis is not a "litmus-paper test" and instead requires a

"'flexible'" approach.  Common Cause/Ga., 554 F.3d at 1352 (quoting Anderson,

460 U.S. at 789).

### i.      Burdens Imposed on Plaintiffs

Plaintiffs assert that the Ballot Application Provisions impose substantial

burdens on their freedom of association.  Specifically, Plaintiffs claim that the

provisions eliminate their most effective methods of disseminating their views and reduce the number of communications that Plaintiffs can have with Georgia voters, with the effect of "undermin[ing] the persuasiveness of their message and ability to convey it." [Doc. 159, p. 38]. The Court does not deny that the Ballot Application Provisions might interfere to some extent with how Plaintiffs prefer to encourage absentee voting. But, as explained above, the Ballot Application Provisions only restrict the discrete acts of sending a prefilled application or sending multiple applications. Plaintiffs are in no way restricted from exercising other core political speech or numerous other forms of associational conduct—for instance, speaking with voters about absentee voting or guiding them through the process of completing an application. Indeed, Plaintiffs can send limitless letters to voters that explain the importance of voting and the benefits of voting absentee.

Moreover, the Court cannot ignore that the Ballot Application Provisions do not prevent Plaintiffs from working with other organizations to send a wide array of communications encouraging voters to vote absentee, explaining the process of absentee voting or conveying the message that absentee voting is safe, easy and reliable. Plaintiffs may even associate with those organizations to send blank absentee ballot applications to voters. These same efforts permit Plaintiffs to

engage with the recipients of their mailers.  At most, the fully developed record only shows a minimal infringement on Plaintiffs' right to freedom of association.

In sum, the record in this case shows that the Ballot Application Provisions impose narrowly defined restrictions while leaving Plaintiffs free to pursue their associational goals through a wide array of activities.  Consequently, the Court finds that the Ballot Application Provisions do not impose severe restrictions on Plaintiffs' First Amendment right to freedom of association.  See Priorities USA v. Nessel, 628 F. Supp. 3d 716, 736–37 (E.D. Va. 2022); see also Democracy N.C., 476 F. Supp. 3d at 224 (finding that the plaintiffs "experience almost no burdening or restriction of their political speech" in a case where a voting regulation prohibited the plaintiffs from filling out someone else's voting request form).

### ii.     State's Interests

State Defendants assert that the Ballot Application Provisions serve important and compelling state interests, including "decreasing voter confusion, combatting complaints of fraud, and increasing election integrity."  [Doc. 149-1, pp. 23-24].  These interests are undoubtedly compelling as explained previously.  Moreover, these interests are aptly supported by the record.  State Defendants presented evidence of multiple voter complaints.  Among other issues, these voter complaints pertained to voters who received multiple applications and who were

confused as to why they had received so many when they were not requested.  The voter complaints also pertained to voters who were worried that duplicative applications signified fraud and voters who were alarmed by receiving prefilled applications with errors.  The Ballot Application Provisions respond to these concerns by limiting the number of duplicate applications sent to voters and preventing third parties from prefilling absentee ballot application forms.

### iii.      Weighing Plaintiffs' Burdens and State's Interests

As previously stated, the Anderson-Burdick framework requires the Court to weigh the character and magnitude of the burden on Plaintiffs against the state's interests.  After weighing the state's interests against the minimal burdens imposed on Plaintiffs, the Court concludes that insofar as they implicate Plaintiffs' associational rights, the Ballot Application Provisions survive the Anderson-Burdick standard of review.  See Burdick, 504 U.S. at 434 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.").  Because the Ballot Application Provisions impose "only reasonable, nondiscriminatory restrictions" upon Plaintiffs' right to freedom of association, State Defendants' compelling interests in decreasing voter confusion, combatting complaints of fraud and increasing election integrity are sufficient to justify the

provisions.  Id.; see also Roberts, 468 U.S. at 623 (explaining that infringements on the right to freedom of association "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms").  Thus, to the extent that State Defendants seek summary judgment on Plaintiffs' claim for freedom of association, the motion is **GRANTED**.

**B.**   **Substantial Overbreadth**

The final claim before the Court involves the overbreadth doctrine.  "The overbreadth doctrine prohibits the [g]overnment from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." Ashcroft v. Free Speech Coal., 535 U.S. 234, 255 (2002).  This doctrine

> seeks to strike a balance between competing social costs.  On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas.  On the other hand, invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects.  In order to maintain an appropriate balance, [the Supreme Court] vigorously enforce[s] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.

United States v. Williams, 553 U.S. 285, 292 (2008) (citation omitted).  Although the "concept of 'substantial overbreadth' is not readily reduced to an exact definition," the "mere fact that one can conceive of some impermissible

applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984). At bottom, a statute is not overbroad unless "a substantial number of instances" exist in which the statute "cannot be applied constitutionally." N.Y. State Club Ass'n, Inc. v. City of N.Y., 487 U.S. 1, 14 (1988).

Plaintiffs assert that the Prefilling Provision is unconstitutionally overbroad because it reaches substantial protected activity, chills speech and burdens innocent associations.[21] In their Complaint, Plaintiffs alleged that the Prefilling Provision is overbroad because it applies regardless of whether the absentee ballot application distributor is sending individualized applications in response to isolated requests from voters or mass applications on an unsolicited basis. [Doc. 1, p. 54]. At the summary judgment stage, however, Plaintiffs now contend that the Prefilling Prohibition is overbroad because it applies even when the personalized information is accurate and drawn from the State's own voter file or because some county election officials may prefer prefilled applications.[22] It is well-settled that "a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." Miccosukee Tribe

---

[21] Plaintiffs do not contend that the Anti-Duplication provision is overbroad.

[22] This is the entirety of Plaintiffs' argument on this point.

of Indians of Fla. v. United States, 716 F.3d 535, 559 (11th Cir. 2013).  Therefore, the Court does not address this new theory of overbreadth when deciding the instant motion.

In analyzing an overbreadth claim, it is necessary for the Court to analyze whether the statute penalizes a substantial amount of speech that is constitutionally protected.  This Court notes that Plaintiffs' only example of overbreadth pled in the Complaint related to sending a personalized ballot application at the specific request of a voter.  It is undisputed, however, that the Prefilling Provision does not apply in this scenario.  Indeed, the Prefilling Provision does not apply where the absentee ballot application is solicited by the voter and the voter provides Plaintiffs with the required information.  Ultimately, Plaintiffs have not shown that the Prefilling Prohibition penalizes a substantial amount of speech that is constitutionally protected.  Without this showing, Plaintiffs cannot prevail on an overbreadth challenge.  To the extent that State Defendants seek summary judgment on Plaintiffs' overbreadth claim, the motion is **GRANTED**.

## CONCLUSION

For the foregoing reasons, State Defendants' Motion for Summary Judgment [Doc. 149] is **GRANTED IN PART** and **DENIED IN PART**.[23]  The parties are **HEREBY ORDERED** to file the Consolidated Pretrial Order required by Local Rule 16.4 within thirty days of entry of this Order.  The parties are notified that a failure to comply with this Order may result in sanctions, including dismissal of the case or entry of default judgment.  In the event a Consolidated Pretrial Order is not filed, the Clerk is **DIRECTED** to submit the case at the expiration of the thirty-day period.

**SO ORDERED** this 27th day of September, 2023.

J. P. BOULEE
United States District Judge

---

[23] State Defendants moved to exclude certain opinions of Donald P. Green, PHD, who is Plaintiffs' expert.  Because his opinions were not relied upon in deciding the instant motion, State Defendants' Motion to Exclude [Doc. 150] is **DENIED** without prejudice to renew at trial.