# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| VOTER PARTICIPATION CENTER and CENTER FOR VOTER INFORMATION, | |
| Plaintiffs, | Case No. 1:21-cv-01390-JPB |
| v. | Judge J.P. Boulee |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia; SARA GHAZAL, JANICE JOHNSTON, EDWARD LINDSEY, and MATTHEW MASHBURN, in their official capacities as members of the STATE ELECTION BOARD, Defendants, | |
| and | |
| REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; and GEORGIA REPUBLICAN PARTY, INC., | |
| Intervenor Defendants. | |

## PLAINTIFFS' PRETRIAL BRIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 2

LEGAL ARGUMENT ........................................................................................ 7

I.  Plaintiffs' Absentee Ballot Application Mailers Are Speech .................... 7

II.  Sending Personalized Mail Ballot Applications is Expressive Conduct .. 11

    a.  Plaintiffs Send Personalized Applications to Communicate that the Recipient Should Vote by Mail ........................................................... 12

    b.  Recipients of Plaintiffs' Personalized Applications Understand the Message ............................................................................................... 13

        i.  Plaintiffs' Mailers Are Intertwined with and Reinforced By Accompanying Speech .................................................................. 14

        ii.  Plaintiffs' Communications Are Open to Everyone ................. 16

        iii.  The Use of Mail is Associated with the Exercise of First Amendment Rights .......................................................................... 18

        iv.  Voting Is an Issue of Public Debate .......................................... 20

        v.  Speech Through Mail Has a Long History ................................ 21

III.  Other Record Evidence Demonstrates That Plaintiffs' Mailers Are Expressive Conduct ................................................................................ 23

CONCLUSION ................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Blount v. Rizzi*, 400 U.S. 410 (1971) ....................................................................21

*Burns v. Town of Palm Beach*, 999 F.3d 1317
(11th Cir. 2021)....................................................................8, 11, 13, 17, 18, 23

*Castaneda by Castaneda v. Pickard*, 781 F.2d 456 (5th Cir. 1986)......................23

*Consolidated Edison Co. of New York v. Pub. Serv. Comm'n of New York*,
447 U.S. 530 (1980)..............................................................................16, 18, 19

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235
(11th Cir. 2018) ("*FNB*")............................... 8, 11, 13, 14, 15, 17, 18, 20, 21, 23

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).....24

*Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) ........................11

*Lamont v. Postmaster General of U. S.*, 381 U.S. 301 (1965) ...............................19

*League of Women Voters of Florida v. Cobb*, 447 F. Supp. 2d 1314
(S.D. Fla. 2006)............................................................................................11, 22

*League of Women Voters v. Hargett*,
400 F. Supp. 3d 706 (M.D. Tenn. 2019) ................................................7, 10, 12

*Martin v. City of Struthers, Ohio*, 319 U.S. 141 (1943) .........................................18

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) ................................8

*Meyer v. Grant*, 486 U.S. 414 (1988) .....................................................................8

*NetChoice, LLC v. Attorney General, Florida*, 34 F.4th 1196 (11th Cir. 2022).......7

*Priorities USA v. Nessel*, 462 F. Supp. 3d 792 (E.D. Mich. 2020) ........................11

*Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006).........................22

*Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781
(1988)............................................................................................................10

*Rowan v. U.S. Post Office Department,* 397 U.S. 728 (1970)................................18

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
   547 U.S. 47 (2006)................................................................14

*Spence v. State of Washington*, 418 U.S. 405 (1974) ............................................12

*Texas v. Johnson*, 491 U.S. 397 (1989) ....................................................11

*Village of Schaumburg v. Citizens for a Better Environment*,
   444 U.S. 620 (1980)..............................................................10

*VoteAmerica v. Raffensperger*, No. 1:21-CV-01390-JPB, 2023 WL 6296928
   (N.D. Ga. Sept. 27, 2023) .......................................................20

*VoteAmerica v. Schwab*, 576 F. Supp. 3d 862 (D. Kan. 2021) ...........................11

*VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230
   (D. Kan. 2023) ("*Schwab*").................................7, 10, 11, 12, 13, 24

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013)......................12, 22

**Statutes**

O.C.G.A. § 21-2-599..............................................................................6

O.C.G.A. § 21-2-381(a)(1)(C)(ii) ..........................................................5

O.C.G.A. § 21-2-381(a)(3)(A)...............................................................6

O.C.G.A. § 21-2-381(a)(3)(B) ...............................................................6

O.C.G.A. § 21-2-598..............................................................................6

O.C.G.A. § 21-2-603..............................................................................6

**Other Authorities**

George Washington, Third Annual Address to Congress, October 25, 1971.
   *Available at* University of California, American Presidency Project,
   https://www.presidency.ucsb.edu/node/204464 ...........................................19, 22

George Washington, Fourth Annual Address to Congress, November 6, 1972.
   *Available at* University of California, American Presidency Project,

https://www.presidency.ucsb.edu/node/205453 .................................................19

## INTRODUCTION

Plaintiffs are actively engaged in the ongoing national political debate about absentee voting and seek to spread their own message that absentee voting is important, effective, and secure. They engage in this debate by sending personalized absentee ballot applications, with a cover letter and return envelope, to convey the effectiveness and security of absentee voting in Georgia and to encourage eligible Georgians to participate in the electoral process by voting absentee. SB 202 restricts Plaintiffs' core political speech by prohibiting the personalization of the absentee ballot applications Plaintiffs send, and by chilling Plaintiffs' ability to share their mailers with Georgia voters.

The core political speech of Plaintiffs' mailers is inseparable from and inextricably intertwined with the enclosed personalized applications that communicate their message. At trial, Plaintiffs will show that every component of their mailers—from the cover letter to the personalized application and the return envelope—works together to communicate their message about the importance, reliability, and ease of absentee voting. Thus, Plaintiffs' mailers are no different than any other constitutionally-protected literature discussing matters of public concern.

Even if the Court determines that the inclusion of personalized applications is purely conduct, that conduct is expressive. Plaintiffs will show that the inclusion of each component evinces the expressive nature of their absentee ballot application

assistance. Plaintiffs use the United States Postal Service to send personalized applications in an expression of the importance and accessibility of voting by mail— a reasonable observer could only view this activity as Plaintiffs' expression of a message to the selected recipient. Such expressive conduct warrants the highest constitutional protections. And because Defendants fail to demonstrate that SB 202 is narrowly tailored,[1] its challenged provisions must be struck down. This Court should enter final judgment in Plaintiffs' favor.

## FACTUAL BACKGROUND

Plaintiffs Voter Participation Center ("VPC") and Center for Voter Information ("CVI") are, respectively, sister 501(c)(3) and 501(c)(4) nonprofit, nonpartisan organizations whose goals are to encourage the political participation of historically underrepresented groups—including young people, people of color, and unmarried women—by providing them with resources and information about voter registration, early voting, vote-by-mail, and in-person voting. June 9, 2022 Preliminary Injunction Hearing ("Day 1 Tr."), 33:21-34:7 (Lopach). Plaintiffs attempt to reduce informational barriers for voters to participate in the electoral process because they believe that doing so effectively persuades historically

---

[1] Because this Court only tasked the Parties with briefing the legal arguments regarding core political speech and expressive conduct, Plaintiffs incorporate by reference their arguments in their Response in Opposition to Defendants' Motion for Summary Judgment with respect to government interests. ECF No. 159 at 36-41.

disenfranchised communities to vote. *Id.* 36:7-25 (Lopach).

Plaintiffs exist solely to engage in political speech and expressive conduct meant to disseminate their viewpoint that all eligible voters should be able and encouraged to participate in the political process, and that voting should be easy and accessible. *Id.* 35:15-36:6 (Lopach). They communicate this in part by mailing personalized absentee ballot applications to registered voters nationwide, including Georgia. *Id.* 36:7-25, 37:15-21 (Lopach). Plaintiffs track whether recipients use Plaintiffs' application and return envelope to request an absentee ballot. *Id.* 38:11-39:21 (Lopach). The core message of these mailers is that voting absentee is reliable, easy, beneficial, and trustworthy and that the recipient should vote, and vote absentee using the provided materials. *Id.* 37:1-12 (Lopach); Pls. Ex. 26, 27.[2] In the ongoing national debate, Plaintiffs take a firm stance in favor of absentee voting and believe that mailing personalized absentee applications informs and persuades Georgians to engage in the democratic process through this method. *Id.* 37:1-12 (Lopach); Pls. Ex. 26, 27.

Plaintiffs' activities are supported by a long history of individuals and entities using mailers to express political messages regarding issues of public concern and debate. Political campaigns, advocacy groups, and nonprofit organizations

---

[2] Plaintiffs' exhibits refer to Plaintiffs' proposed trial exhibits attached to the pretrial order at ECF No. 186 at 43-63.

promoting the voting process—including Plaintiffs and Intervenor-Defendants—often include voter registration and absentee ballot applications with their mailers to reiterate their pro-mail voting message and encourage voters to act on it. Deposition of Brandon Waters ("Waters Tr."), ECF No. 161 at 17:10-18:7, 34:22-35:21; Pls. Ex. 44, 45, 52, 75. Plaintiffs will show their internal research demonstrates the effectiveness of mailers in communicating their pro-voting message and persuading voters to act on that message. When they "can provide information and tools for voters who have questions in the mailer, [they] can help them answer their own questions" about the absentee voting process. Day 1 Tr. 43:6-10 (Lopach); Pls. Ex. 36. Plaintiffs have spent years testing the persuasive efficacy of their ballot application mailers and have been able to demonstrate increased turnout in states where they send personalized absentee ballot applications. *See* Pls. Ex. 36 at 2-4.

Plaintiffs' expert witness, Dr. Donald Green will testify that copious academic research in political science confirms that "recruitment to vote by mail using a traditional paper ballot application significantly increase[s] the number of successful applications over" time. Pls. Ex. 28, Expert Report of Donald P. Green. Dr. Green's analysis has shown that the most effective forms of direct mail are mailers that convey "special forms of messaging," including messages "that exert social pressure, express gratitude for past participation, offer financial inducements, or provide official reassurances about the ballot secrecy." Deposition of Donald P.

Green, PhD, ECF No. 187-4, 95:5-13. Plaintiffs will attest that this is reinforced by their own data, which demonstrates that their mailers resulted in more than 600,000 Georgia voters completing their absentee ballot applications during the 2020 election cycle. Day 1 Tr. 38:17-24 (Lopach).

Despite Plaintiffs' success in assisting Georgians to vote via absentee mail ballot in record numbers during the 2020 election, Georgia passed Senate Bill 202, including the two challenged provisions (together, the "Ballot Application Restrictions"), which abridge Plaintiffs' First Amendment rights by sharply limiting the content and distribution of Plaintiffs' absentee ballot application mailers.

*First,* the Prefilling Prohibition bars Plaintiffs from distributing communications with applications that are "prefilled with the elector's required information." O.C.G.A. § 21-2-381(a)(1)(C)(ii). Through data vendors, Plaintiffs regularly obtain voter registration information directly from the State and then use that information to personalize the applications they send to their selected recipients. Deposition of Thomas Lopach ("Lopach Tr."), ECF No. 162 at 113:9-13. Plaintiffs will show they take on the extra expense to send personalized applications because doing so is key to their chosen messaging; it provides an exclusive voter experience and conveys their message that the specific recipient whose name is pre-filled should apply for an absentee mail ballot. Pls. Ex. 36. Doing so also reduces barriers and potential stumbling blocks for voters who may not be able to apply online, access a

printer, or remember whether they are registered under their given name or nickname. Pls. Ex. 28, Expert Report of Donald P. Green at 8; Pls. Ex. 30, Am. Expert Rebuttal Report of Donald P. Green at 8-14. SB 202 categorically prohibits this practice, and as a result, Plaintiffs can no longer send personalized absentee ballot application mailers in Georgia. *See* Pls. Ex. 316-321. Plaintiffs were also forced to change the content of their cover letter to account for the lack of personalization. *Compare* Pls. Ex. 316 (VPC 2022 mailer) *with* Pls. Ex. 26 (CVI/VPC 2020 mailer).[3]

*Second,* the Mailing List Restriction requires that anyone distributing applications do so "only to individuals who have not already requested, received, or voted an absentee ballot in the" election. O.C.G.A. § 21-2-381(a)(3)(A). It requires senders to "compare [their] mail distribution list with" the "most recent information available about which electors" have already requested an absentee ballot and then "remove the names of such electors." *Id*. Although it specifies that entities can rely on information that is five business days old, *id*., it fails to account for the fact that there are imperfections in such lists and, as Plaintiffs will show, a large-scale mailer program makes midstream, five-day adjustments functionally impossible. Day 1 Tr. 61:10-63:14 (Lopach). Further, failure to strictly comply can result in a $100 fine

---

[3] As Plaintiffs' have testified, Plaintiffs CVI and VPC's 2020 mailers were exclusively sent by CVI, and VPC reimbursed CVI for the cost of the mailer. *See* Day 1 Tr. 35:5-12 (Lopach).

per violation and potential criminal penalties, including a misdemeanor with a sentence of up to twelve months of confinement. O.C.G.A. §§ 21-2-381(a)(3)(B), 21-2-598, 21-2-603, 21-2-599. The attendant liability for even inadvertent mistakes in a program of the Plaintiffs' size could be quite significant and has a serious chilling effect on Plaintiffs' speech, resulting in Plaintiffs sending half as many absentee ballot application mailers to voters in Georgia as in any other state where Plaintiffs run their absentee voting program. Lopach Tr. 133:19-134:4. Plaintiffs will show that in 2022 they sent only one mailer, at the very beginning of the application period, followed by a letter without any accompanying absentee ballot application or return envelope. *See* Pls. Ex. 318. Overall, the amount, timing, and efficacy of Plaintiffs' speech has been substantially reduced.

## LEGAL ARGUMENT

### I.     Plaintiffs' Absentee Ballot Application Mailers Are Speech.

Because Plaintiffs "disclose, publish, or disseminate information, they engage in speech within the meaning of the First Amendment." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022) (internal quotation marks omitted); *VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230, 1244 (D. Kan. 2023) ("*Schwab*"). And as this Court noted, "[e]ncouraging others to vote or engage in the political process is the essence of First Amendment expression." Order on Summary Judgment, ECF No. 179 at 24. *See also League of Women Voters v. Hargett*, 400 F.

Supp. 3d 706, 720 (M.D. Tenn. 2019) ("Encouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity") (internal quotation omitted). It follows, then, that conveying information about absentee voting and disseminating personalized absentee ballot applications implicates core political speech, as that information pertains to the voting process. First Amendment protection for this activity is therefore "at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (finding core political speech, "the category of speech [which] occupies the core of the protection afforded by the First Amendment").

Plaintiffs' mailers are pure speech because the communications in question are written words. *Cf. Burns v. Town of Palm Beach*, 999 F.3d 1317, 1342-43 (11th Cir. 2021) (regulating expressive conduct and describing forms of pure speech to include the printed word); *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1242 (11th Cir. 2018) ("*FNB*"). The entirety of Plaintiffs' mailers use written words—including the prefilled voter information on the enclosed application—to convey that voting is easy and that the recipient should engage in the voting process. Unlike *Burns* and *FNB*, Plaintiffs will show that the affected speech here relies on the distribution of printed words expressing a message to encourage voters to vote by mail and inform them how to do so. *See* Pls. Ex. 26-

27, 316-317, 319-321. The Ballot Application Restrictions limit to whom, when, and how Plaintiffs may communicate their written message by restricting the number of absentee ballot applications they may send to individuals; to whom and when they can send their pro-mail voting communications; and how they may communicate those spoken words by proscribing an entire component of their speech.

Plaintiffs will show that the entire package of Plaintiffs' mailers constitutes their speech. Day 1 Tr. 37:1-12 (Lopach); Pls. Ex. 26, 27. Their cover letters include different formulations of Plaintiffs' pro-mail voting message that are targeted toward the specific recipient, Pls. Ex. 36, but they all reference the "enclosed, personalized application," which itself indicates that the specific recipient should complete the form and request an absentee mail ballot. *E.g.*, Pls. Ex. 26, 27, 69. Plaintiffs will also show that the application's inclusion ensures that, no matter whether the recipient has internet access and a driver's license or access to a printer and transportation to their election office, they are able to act on Plaintiffs' encouragement to vote by mail. Pls. Ex. 52, 89, 90; Deposition of Blake Evans ("Evans Tr."), ECF No. 160 at 55:15-57:07; Day 1 Tr. at 36:12-25, 64:09-22 (Lopach); Declaration of Tom Lopach, ECF No. 103-3 at ¶ 10. Finally, the enclosed pre-addressed, postage-paid return envelope further conveys that the recipient should submit the enclosed absentee application to their election office, even if paying for postage might otherwise be difficult for the recipient. Pls. Ex. 26, 27; Day 1 Tr. 41:15-45:1 (Lopach); Day 1 Tr.

9

43:15-44:2 (Lopach). As Plaintiffs have explained, "All of that works together as our speech saying to a target, hey, we think your participation in our democracy is important, let us help you participate." *Id.* 37:10-12 (Lopach). Defendants' witness Brandon Waters similarly agreed that the entire contents of a campaign's mailer— including the cover, the application, and the return envelope—comprise the sender's speech. Waters Tr. 33:24-35:3 ("Q: Is it safe to say that the entire contents of a mailer express that message to encourage a voter to vote for a particular candidate or issue? A: Generally speaking, yes.").

The Parties agree that parts of Plaintiffs' mailers are undeniably speech, *see* Defs. Mot. for Summ. J., ECF No. 149-1 at 9, 16 (acknowledging the cover letter is speech), and any inquiry into the expressiveness of the entire mailers should end there. To the extent Defendants might contend that Plaintiffs' speech is confined to their cover letter, the Supreme Court has instructed courts to "refuse[] to separate the component parts of" speech "from the fully protected whole." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988). Courts are not to "parcel out the speech, applying one test to one phrase and another test to another" because "[s]uch an endeavor [is] both artificial and impractical." *Id.* Thus, to separate out Plaintiffs' cover letters from the entirety of their absentee ballot application mailers would be to engage in the improper "slicing and dicing" of speech that numerous other courts have rejected. *See League of Women Voters of Tennessee*, 400 F. Supp.

3d at 720 (internal quotation marks omitted); *Schwab*, 671 F. Supp. 3d at 1244.

Further, Plaintiffs' distribution of personalized absentee applications is "characteristically intertwined" with the expression of their message. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980). And "[w]hen the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1278 (11th Cir. 2024). Fundamentally, "because their application packets include speech that communicates a pro-mail voting message," the entirety of Plaintiffs' mailers are speech. *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875 (D. Kan. 2021); *see also Schwab*, 671 F. Supp. 3d at 1243; *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 814 (E.D. Mich. 2020); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1340 (S.D. Fla. 2006).

## II.     Sending Personalized Mail Ballot Applications is Expressive Conduct.

To the extent that this Court determines that Plaintiffs' inclusion of a personalized absentee ballot application is conduct, that conduct is expressive. "Constitutional protection for freedom of speech does not end at the spoken or written word. The First Amendment guarantees all people the right to engage not only in pure speech, but expressive conduct as well." *FNB*, 901 F.3d at 1240 (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)) (internal quotation marks omitted). Conduct

is sufficiently expressive if (1) there was an intent to convey a particularized message, and (2) "the surrounding circumstances would lead the reasonable observer to view the conduct as conveying some sort of message." *FNB*, 901 F.3d at 1242; *Burns*, 999 F.3d at 1336; *Texas v. Johnson*, 491 U.S. 397, 404 (1989). As discussed below, Plaintiffs' absentee ballot application mailers are expressive conduct which can only be understood to convey a message about absentee voting.

### a. Plaintiffs Send Personalized Applications to Communicate that the Recipient Should Vote by Mail.

The record demonstrates that Plaintiffs intend to communicate a pro-voting message through the entirety of their absentee ballot application mailers. Indeed, "only an organization which intends to convey such a message would expend its resources to personalize and distribute advance mail ballot applications." *Schwab*, 671 F. Supp. 3d at 1243. And as other courts have held, the distribution and personalization of applications, on its face, conveys a message about the importance of voting. *Schwab*, 671 F. Supp. 3d at 1249; *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 398 (5th Cir. 2013) (noting that "facilitate[ing] voter registration . . . encompasses activities that involve expression"); *League of Women Voters*, 400 F. Supp. 3d at 720 (recognizing that voter registration activities are expressive).

Crucially, Defendants do not dispute that Plaintiffs intend to communicate a message via their personalized absentee ballot application mailers. Nor could they, as the undisputed record shows Plaintiffs "wanted people to know" their message on

the importance of absentee voting and conveyed it via their mailers. *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974) (determining that defendant's concession that plaintiff "wanted people to know" his speech was "inevitable" in light of the record).

### b. Recipients of Plaintiffs' Personalized Applications Understand the Message.

On their face, "it is overwhelmingly apparent to someone who receives plaintiff[s'] application[s] that plaintiff[s are] expressing a pro-advance mail voting message," because Plaintiffs would only be sending their mailers for that express purpose. *See Schwab*, 671 F. Supp. 3d at 1243. However, even if the specific message were not clear to the recipient, the second factor asks merely "whether the reasonable person would interpret [the sending of a personalized absentee ballot application] as <u>some</u> sort of message, not whether an observer would necessarily infer a <u>specific</u> message." *Burns*, 999 F.3d at 1336-37 (emphasis in original) (citing *Holloman*, 370 F.3d at 1270); *FNB*, 901 F.3d at 1240 (same).

To determine whether a reasonable person would interpret some sort of message, the Court must consider the context in which the conduct is undertaken. *Burns*, 999 F.3d at 1343 (quoting *FNB*, 901 F.3d at 1237). The Eleventh Circuit has identified several factors to assess whether the "surrounding circumstances would lead the reasonable observer to view the conduct as conveying some sort of message." *FNB*, 901 F.3d at 1242. These factors include (1) whether the conduct accompanies speech; (2) whether the activity will be open to all; (3) whether the

activity takes place in a traditional public forum; (4) whether the activity addresses an issue of public concern; and (5) the history of a particular symbol or type of conduct. *Burns*, 999 F.3d at 1344-45; *FNB*, 901 F.3d at 1242-44. Consideration of these factors demonstrates that Plaintiffs' inclusion of personalized absentee ballot applications in their mailers constitutes expressive conduct conveying some message to its recipient.

### i. Plaintiffs' Mailers Are Intertwined with and Reinforced By Accompanying Speech.

It is well established that Plaintiffs send their personalized mail ballot applications with cover letters that are undeniably protected speech. The first factor in considering whether Plaintiffs' conduct is expressive is therefore met.

It is important to note that despite Defendants' assertions to the contrary, Defs. Mot. for Summ. J., ECF No. 149-1 at 15-16, Plaintiffs' "conduct [does not] lose[] its expressive nature just because it is also accompanied by other speech." *FNB*, 901 F.3d at 1243-44 (noting that to hold otherwise would render parade marchers' conduct non-expressive when it is accompanied by banners and signage). The *Food Not Bombs* plaintiffs' food-sharing events did not lose their expressive nature just because they also passed out literature during the events. 901 F.3d at 1242. Instead, the inclusion of tables with banners and the distribution of literature during their events added context indicating their expressive nature and "distinguishe[d] their sharing of food with the public from relatives or friends simply eating together in

14

the park." *FNB*, 901 F.3d at 1242.[4]

Plaintiffs will show that they package their personalized absentee ballot application mailer with cover letters that indicate which organization sent the mailer and include encouraging language about the importance of voting and the benefits of voting by mail. *E.g.*, Pls. Ex. 26, 27. These cover letters are tailored with different messaging depending on the recipient, and all indicate the specific recipient should complete the enclosed personalized application. *See, e.g.*, Pls. Ex. 26, 313, 320, 321; Trial Tr. Day 1 45:12-45:10 (Lopach). At most, these cover letters assist "onlookers to infer [Plaintiffs'] *specific* message" in sending personalized applications—just as was true of the logos and words contained on the banners in *Food Not Bombs*, 901 F.3d at 1242. But they "add[] nothing of legal significance to the First Amendment analysis" where the recipient of Plaintiffs' mail would necessarily "infer some sort of message" upon receiving a personalized and partially prefilled application in the mail, even without reading the cover letter. *Id*. at 1242. As such, the expressiveness of Plaintiffs' sending personalized applications in the mail is enhanced, not negated,

---

[4] By contrast, conduct is not expressive when its "expressive component" is "not created by the conduct itself but by the speech that accompanies it." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("FAIR") (finding the accompanying speech—a letter advocating against military recruitment—was required to give make conduct expressive because there was no reason to infer any message from off-campus military events absent the letter). Thus, "the critical question is whether the explanatory speech is necessary for the reasonable observer to perceive a message from the conduct." *FNB*, 901 F.3d at 1244. Here it is not.

by its accompanying cover letter.

### ii. Plaintiffs' Communications Are Open to Everyone.

Sending personalized absentee ballot applications to encourage voting and voting by mail is a form of communication open to everyone, as "all persons are free to send correspondence to private homes through the mails," *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980), and voters' information for prefilling applications is available to the public for purchase from the Secretary. Day 1 Tr. at 19:18-21 (Lopach); June 10, 2022 Preliminary Injunction Hearing ("Day 2 Tr."), 23:07-08 (Germany).

Indeed, as described *supra*, Plaintiffs will show that many organizations involved in encouraging civic participation, including Plaintiffs and Intervenor-Defendants, regularly engage in this form of communication. *See* Pls. Ex. 34, 35. Intervenor-Defendants Republican National Committee and Georgia Republican Party sent approximately 660,000 and 1 million such mailers in 2020 alone in Georgia, respectively. *See* Deposition of Josh Findlay at 23:16-24:2. Likewise, Plaintiffs send millions of mailers to Georgia voters every election cycle. *See* Day 1 Tr. 39:17-18 (Lopach); *see also* Pls. Ex. 26, 27, 316-321. And, as State-Defendants acknowledge, political campaigns regularly employ this method of communication. *See* "Evans Tr." at 56:17-57:13; *see also* Pls. Ex. 52 (showing a municipal candidate asking Defendants whether they can send mailers with absentee ballot applications);

Pls. Ex. 75 (showing local candidate sending out an absentee ballot application mailer post-SB 202). In this way, Plaintiffs' mailers are much like the food-sharing events at issue in *FNB*, where a diverse range of interests converged to hear a common message; here, the fact that groups comprising a diverse range of viewpoints engage in this form of communication via the mail "in and of itself, has social implications." *FNB*, 901 F.3d 1235, 1242 (11th Cir. 2018). This contrasts sharply with the conduct in *Burns*, where the plaintiff had "carefully shielded [the house supposedly conveying his message] from public view with a limestone wall, louvered gate, heavy landscaping, and substantial vegetation." 999 F.3d 1317, 1344.

Moreover, Plaintiffs' message is that absentee voting in Georgia is open to every eligible voter, and that Plaintiffs' target populations should take advantage of no-excuse absentee voting in order to safely and effectively cast their ballots. *See, e.g.,* Pls. Ex. 26, 27, 97. Indeed, the entire goal of their mailers is "to reduce barriers to entry [and] to increase participation in our democracy." Day 1 Tr. 44:15-20 (Lopach). The fact that Plaintiffs' target their message to voters who traditionally have faced greater barriers to voting and send their pro-mail voting message through the mail itself only underscores that Plaintiffs' activities are "open to all": Plaintiffs seek to expand the reach of vote by mail so that every voter can participate. The use of absentee ballot application mailers is open to everyone, and this factor reinforces the expressive nature of Plaintiffs' mailers.

### iii. The Use of Mail is Associated with the Exercise of First Amendment Rights.

That Plaintiffs choose to express their pro-vote-by-mail message *by using the mail* only underscores that their mailers are expressive in nature. "Although the choice of location alone is not dispositive, it is nevertheless an important factor in the 'factual context and environment' that we must consider." *FNB*, 901 F.3d at 1242 (citing *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974)). This includes whether the location is a traditional public forum or "historically associated with the exercise of First Amendment rights." *Id.*; *see also Burns*, 999 F.3d at 1344. The United States Postal Service is a vehicle for communication that is usable by any member of the public. *See Consol. Edison Co. of New York,* 447 U.S. at 543. And postal mail is certainly a location associated with the exercise of First Amendment rights. *See Rowan v. U.S. Post Off. Dep't,* 397 U.S. 728, 737 (1970) (recognizing the "mailer's right to communicate"); *Martin v. City of Struthers, Ohio,* 319 U.S. 141, 146 (1943) (recognizing the First Amendment right to "distribute information to every citizen wherever he desires").

Plaintiffs' message is indisputably communicated via postal mail, demonstrating its reliability and explaining the safety of voting by mail. Postal mail has long been recognized as "an indispensable adjunct of every civilized society and . . . imperative to a healthy social order," and is widely understood to be a method of communicating political literature. *Rowan v. U.S. Post Off. Dep't,* 397 U.S. 728,

736 (1970); *see also Lamont v. Postmaster Gen. of U. S.*, 381 U.S. 301, 305 (1965) (regarding the use of mail to distribute "communist political propaganda"); *Consol. Edison Co. of New York*, 447 U.S. at 541 (regarding the distribution of political mail by a utility company). Indeed, the importance of postal mail as a means of communication dates back to the Founding: in a 1791 address to Congress, President George Washington declared the "importance of the post office and post roads" with respect to "the expedition, safety and facility of communication" and "their instrumentality in diffusing a knowledge of the laws and proceedings of the Government, which, while it contributes to the security of the people, serves also to guard them against the effects of misrepresentation and misconception."[5] The following year, President Washington again emphasized "the importance of facilitating the circulation of political intelligence and information" via the mail.[6] By using postal mail, Plaintiffs express an unsubtle message about its importance in voting. Indeed, Plaintiffs' use of the mail strongly suggests the expressive nature of mailing personalized absentee ballot applications to their selected recipients.

### iv. Voting Is an Issue of Public Debate.

---

[5] George Washington, Third Annual Address to Congress, October 25, 1791. *Available at* University of California, American Presidency Project, https://www.presidency.ucsb.edu/node/204464.

[6] George Washington, Fourth Annual Address to Congress, November 6, 1792. *Available at* University of California, American Presidency Project, https://www.presidency.ucsb.edu/node/205453.

The Parties agree that absentee mail voting is a hotly debated topic in current political discourse, and this Court has expressed the same. *See VoteAmerica v. Raffensperger,* No. 1:21-CV-01390-JPB, 2023 WL 6296928, at *9 (N.D. Ga. Sept. 27, 2023); *e.g.*, Day 1 Tr. 16:20-17:10. That Plaintiffs' message pertains to a matter of public debate "adds to the likelihood that the reasonable observer would understand" that Plaintiffs intend to convey a message. *FNB*, 901 F.3d at 1243.

The record reflects that during the 2020 elections, State-Defendants publicly promoted the importance of absentee voting. *See* Pls. Ex. 89. Likewise, Intervenor-Defendants' 2020 absentee ballot application mailers state that "Republicans are counting on you to vote," Pls. Ex. 34, and that "every vote matters," Pls. Ex. 35, and they engaged in door-knocking in Georgia to express the importance of voting absentee. *See* Pls. Ex. 79 at 12:16-13:07, 121:08-122:05; Pls. Ex. 83.

Additionally, as State-Defendants have noted, the "political temperature" around SB 202 has fueled public awareness of and opinions about absentee voting in Georgia. Day 1 Tr. 16:20-17:10. Intervenor-Defendants' talking points regarding SB 202—which emphasize the "narrative" surrounding absentee voting in Georgia—further demonstrate that absentee voting is a matter of public concern in the state. Pls. Ex. 262 at RNC_GA_0000830; *see also* Pls. Ex 265 (discussing pending SB 202 lawsuits concerning absentee voting); Pls. Ex. 267 (describing the "top myths" about absentee voting after the passage of SB 202). Plaintiffs,

meanwhile, believe that absentee voting can further their missions by helping to bridge the participation gap between voters of color, young people, and unmarried women and other voting groups, and send tens of millions of absentee ballot application mailers to these communities and the people who support them. *E.g.*, Pls. Ex. 36. The scale of Plaintiffs' absentee ballot application program itself demonstrates that Plaintiffs view voting by mail to be a matter of public concern.

Finally, Plaintiffs will show that the public understands absentee voting to be a matter of public concern. For example, individuals who unsubscribe from Plaintiffs' mailers state views about absentee voting, including concerns about the reliability of postal mail. Pls. Ex. 328 at lines 864, 899. Georgia voters have also publicly expressed their views about the importance of absentee voting. *E.g.*, Pls. Ex. 91. In sum, the record and the case law universally conclude that absentee mail voting is a matter of intense public debate in Georgia.

### v. Speech Through Mail Has a Long History.

"[T]he history of a particular symbol or type of conduct is instructive in determining whether the reasonable observer may infer some message when viewing it." *FNB*, 901 F.3d at 1243. As the Supreme Court recognized in 1971, "the use of the mails is almost as much a part of free speech as the right to use our tongues." *Blount v. Rizzi*, 400 U.S. 410, 416 (1971). And Plaintiffs will demonstrate that there is a long practice of using mail to convey core political speech. *See*, *e.g.*, Green Tr.

77:2-78:3 (describing a nonpartisan get-out-the vote mailing campaign in the 1980s). In fact, as noted above, President Washington spoke of the use of the postal mail to "diffus[e] a knowledge of the laws and proceedings of the Government, which, . . . serves [] to guard them against the effects of misrepresentation and misconception."[7] Indeed, as long as postal mail has existed, communicators have employed it to send messages, including political ones.

As discussed above, political campaigns, political parties, and advocacy groups regularly include absentee ballot application forms within their mailers to communicate their message that the recipient should apply for an absentee ballot. And organizations have long engaged in the conduct of distributing voter registration applications to convey a pro-voting message. *See, e.g.*, *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 396 (5th Cir. 2013); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700-06 (N.D. Ohio 2006); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1333 (S.D. Fla. 2006). But the practice of including prefilled application forms is not unique to political mail. Day 1 Tr. at 230:16-24 (Green). For example, in the commercial context companies frequently send mailers containing credit card or insurance applications, sometimes prefilled, *see id.,* and applications are also included in professional recruitment communications. *See Castaneda by Castaneda*

---

[7] George Washington, Third Annual Address to Congress, October 25, 1971. *Available at* University of California, American Presidency Project, https://www.presidency.ucsb.edu/node/204464.

*v. Pickard*, 781 F.2d 456, 469 (5th Cir. 1986).

*　　*　　*

Under these circumstances, the use of mail to distribute personalized applications accompanied by cover letters demonstrates the expressive nature of the conduct and would induce a "reasonable person [to] interpret . . . some sort of message," especially in light of postal mail's historical association with First Amendment rights. *FNB*, 901 F.3d at 1242 (internal citations and quotations omitted); *Burns*, 999 F.3d at 1344. Plaintiffs, especially by using postal mail to encourage voters to similarly do so to vote, could only be reasonably understood to convey a message about the importance of voting by mail.

## III.　Other Record Evidence Demonstrates That Plaintiffs' Mailers Are Expressive Conduct.

As noted in *Burns*, the factors elaborated by the Eleventh Circuit are not "exclusive," 999 F.3d at 1344-45, and "[t]here may be other factors that are relevant to whether [mailing a personalized absentee ballot application] is expressive conduct protected by the First Amendment." *Id.* at 1346.[8] In this case, additional factual evidence demonstrates that it is highly likely that a reasonable observer perceives some message from Plaintiffs' personalized absentee ballot applications.

---

[8] Similarly, the Eleventh Circuit has "never said that every contextual factor has to weigh in favor of the conduct being expressive." *Burns*, 999 F3d at 1346. Here, however, each of the identified factors do demonstrate the expressiveness of Plaintiffs mailing personalized mail ballot applications to Georgia voters.

First, Plaintiffs will demonstrate that hundreds of thousands of Georgians have used their applications to apply for an absentee ballot to vote absentee. *See* Pls. Ex. 20, 36, 41, 42, 65. In 2020 alone, more than 600,000 Georgians applied for an absentee ballot via an application sent by Plaintiffs. Day 1 Tr., 38:01-03, 38:14-15 (Lopach). That so many Georgians responded to Plaintiffs' message "strongly suggests that [Georgians] not only understood plaintiff's pro-advance mail voting message but also acted on its encouragement." *Schwab*, 671 F. Supp. 3d at 1242.

Additionally, Plaintiffs will show that they give voters the option to unsubscribe to their mailers. *See* Pls. Ex. 95. Countless cases have held, and the Eleventh Circuit has affirmed, disagreeable speech is still afforded constitutional protections. *See Holloman*, 370 F.3d at 1280 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 112 S. Ct. 2538, 120 L.Ed.2d 305 (1992)). Among the unsubscribe requests received by Plaintiffs, some express disagreement with Plaintiffs' message about absentee voting. *See e.g.*, Pls. Ex. 95. Defendants' witness Brandon Waters has similarly noted that voters have complained about the "content" of the political mailers he creates for clients. Waters Tr. at 19:23-20:4. In other words, readers understand Plaintiffs to be communicating a message, even if it is one with which some readers disagree.

Finally, during hearings on SB 202, legislators recognized that prohibiting sending unsolicited absentee ballots was a "freedom of speech issue." *See* Pls. Ex.

79 (Feb. 22, 2021) 16:21-22; *id*. 12:14-19 ("if a third-party group sends out . . . an absentee ballot application to an individual, that is a first amendment right. We believe they have the right to do that."). Defendants acknowledge that SB 202 "was designed by the legislature to try to find a way to allow the [] plaintiff groups to still send out absentee voting applications…to still accomplish their core objectives as [] pro-democracy, pro-voting groups without the harm that had been seen in prior elections." Day 2 Tr. 252:2-7. They thus concede the expressiveness of Plaintiffs' mailing personalized applications, instead focusing on why SB 202's limitations on Plaintiffs' communications are justified. But that is a question of narrow tailoring, not the First Amendment protections afforded Plaintiffs' mailers.[9]

## CONCLUSION

Plaintiffs respectfully request that this Court enter final judgement in favor of Plaintiffs.

Respectfully submitted this 3rd day of April, 2024.

---

[9] As Plaintiffs have previously briefed, Defendants' attempts are not narrowly tailored. *See* Pls. Opp to Defs. Mot. for Summ. J., ECF No. 159 at 36-41. Among other defects, SB 202's restrictions are both over and underinclusive in addressing the problems they purport to solve, and Defendants cannot show that Plaintiffs' activities endangered election integrity nor that the alleged complaints from voters indicate widespread confusion. But most importantly here, Defendants' averment with respect to Plaintiffs' "core objectives as [] pro-democracy, pro-voting groups" is an acknowledgment that Plaintiffs' speech is implicated by the restrictions, and that Plaintiffs seek to communicate a pro-absentee voting message with their mailers, irrespective of the insufficiency of Defendants' efforts.

*/s/Alice Huling*
Danielle Lang*
Jonathan Diaz*
Alice Huling*
Christopher Lapinig*
Valencia Richardson*
Rachel Appel*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, D.C. 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
clapinig@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
rappel@campaignlegalcenter.org

*Admitted pro hac vice*


*Counsel for Plaintiffs*

/s/*Robert B. Remar*
Robert B. Remar
(Ga. Bar No. 600575)
SMITH, GAMBRELL & RUSSELL, LLP
1105 W. Peachtree NE, Suite 1000
Atlanta, GA 30309
(404) 815-3500
rremar@sgrlaw.com

Katherine L. D'Ambrosio
(Ga. Bar No. 780128)
COUNCILL, GUNNEMANN & CHALLY LLC
75 14th Street, NE, Suite 2475
Atlanta, GA 30309
(404) 407-5250
kdambrosio@cgc-law.com

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 5.1

I hereby certify that I have this date electronically filed the within and foregoing, which has been prepared using 14-point Times New Roman font, with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

Dated: April 3, 2024.

*/s/Alice Huling*

*Counsel for Plaintiffs*