UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VOTEAMERICA, et al.,

       Plaintiffs,

   v.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of State
of the State of Georgia, et al.,

       Defendants.

CIVIL ACTION NO.
1:21-CV-01390-JPB

## **ORDER**

This matter is before the Court following a bench trial on Plaintiffs'[1] claim

that two provisions of Georgia Senate Bill 202 ("S.B. 202")[2] violate their rights to

free speech protected by the First Amendment.  This Court finds as follows:

---

[1] Plaintiffs are the Voter Participation Center and the Center for Voter Information.
Through a stipulation, the parties dismissed a third plaintiff, VoteAmerica, on September
26, 2022.  [Doc. 142].

[2] S.B. 202 governs election-related processes in Georgia.

## PROCEDURAL HISTORY

On April 7, 2021, Plaintiffs filed this action against Defendants[3] challenging three provisions of S.B. 202. [Doc. 1]. All three provisions relate to absentee-ballot applications.[4] The two provisions discussed below, which the Court collectively refers to as the Ballot Application Provisions, are the only provisions currently at issue.[5]

- **O.C.G.A. § 21-2-381(a)(1)(C)(ii) (the "Prefilling Provision")**

  The Prefilling Provision provides that "[n]o person or entity . . . shall send any elector an absentee ballot application that is prefilled with the elector's required information."

- **O.C.G.A. § 21-2-381(a)(3)(A) (the "Anti-Duplication Provision")**

  The Anti-Duplication Provision states that "[a]ll persons or entities . . . that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff."

---

[3] Defendants are Brad Raffensperger, in his official capacity as Secretary of State of the State of Georgia, and the individual members of the State Election Board, in their official capacities.

[4] To vote absentee in Georgia, a voter must first submit an absentee-ballot application.

[5] Plaintiffs originally challenged the Disclaimer Provision as well. On June 9, 2023, the parties notified the Court that those claims were moot. [Doc. 176].

In essence, the Prefilling Provision prohibits sending absentee-ballot applications that are prefilled with the elector's required information, and the Anti-Duplication Provision proscribes sending an absentee-ballot application to any voter who has already requested an absentee ballot.

In their Complaint, Plaintiffs asserted five causes of action.  In Counts 1 and 2, Plaintiffs claimed that the Ballot Application Provisions and the Disclaimer Provision violated their rights to free speech and freedom of association guaranteed under the First Amendment.  [Doc. 1, pp. 42–49].  In Count 3, Plaintiffs asserted that the Disclaimer Provision violated their First Amendment rights due to compelled speech.  Id. at 50–52.  In the final two counts, Counts 4 and 5, Plaintiffs alleged that the Ballot Application Provisions and the Disclaimer Provision were unconstitutionally overbroad and impermissibly vague.  Id. at 52–58.  To redress these alleged violations, Plaintiffs requested:  (1) a declaration that the challenged provisions violate the United States Constitution; and (2) a permanent injunction prohibiting Defendants from enforcing the challenged provisions.  Id. at 58.

On May 17, 2021, and June 21, 2021, Defendants and Intervenor Defendants[6] moved to dismiss Plaintiffs' Complaint. [Doc. 40]; [Doc. 53]. The Court denied the motions on December 9, 2021. [Doc. 57]. Thereafter, on April 26, 2022, Plaintiffs requested a preliminary injunction. [Doc. 103]. After holding a hearing and fully considering the parties' evidence and arguments, the Court denied preliminary relief on June 30, 2022. [Doc. 131].

On December 13, 2022, Defendants moved for summary judgment. [Doc. 149]. Before an order was issued, Plaintiffs informed the Court that they were no longer pursuing their vagueness claim. Plaintiffs also abandoned their argument that the Anti-Duplication Provision was overbroad. Thus, the only claims remaining before the Court at the summary judgment stage were Plaintiffs' free speech and freedom of association claim and the overbreadth claim regarding the Prefilling Provision.

On September 27, 2023, the Court granted in part and denied in part the motion for summary judgment. [Doc. 179]. Specifically, the Court granted summary judgment as to all the claims except Plaintiffs' free speech claim. Id. On

---

[6] Intervenor Defendants are the Republican National Committee, the National Republican Senatorial Committee, the National Republican Congressional Committee and the Georgia Republican Party, Inc.

April 9, 2024, the case proceeded to a bench trial on the sole remaining issue of whether the Ballot Application Provisions violate Plaintiffs' rights to free speech. The Court now sets forth its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT[7]

After consideration of the evidence and witnesses presented at trial, the Court finds the following facts.

## A.    Absentee Voting in Georgia

All registered voters who maintain the qualifications to vote in Georgia are eligible to vote absentee by mail.  [Doc. 185-4, p. 3].  While no excuse is required to vote absentee, a voter must first submit an application for an absentee ballot to his county election office.  [Doc. 185-4, p. 3]; [Doc. 237, p. 30].  This can be done in several ways.  For instance, a voter can go to his county election office and complete and submit the application form.  [Doc. 239, p. 106].  A voter may also print the application form directly from the Secretary of State's website, sign it and submit it to his county election office.  Id.  Particularly relevant here, a voter is also

---

[7] After trial, the parties submitted proposed findings of fact and conclusions of law. [Doc. 243]; [Doc. 244].  The parties also submitted objections and responses.  [Doc. 246]; [Doc. 247]; [Doc. 248].  The Court has adopted and rejected portions of those submissions as set forth herein.

permitted to submit an application form to his county election office that he received from a third party in the mail.  Id.

## B.    Plaintiffs' Activities and the 2020 Election in Georgia

Plaintiffs are nonprofit organizations that seek to increase the engagement of underrepresented communities in voter registration and voter turnout.  [Doc. 238, p. 53].  Although Plaintiffs serve different groups of people, the organizations work together and run very similar programs.  Id. at 54.  One such program is a direct-mail program that encourages voters to use the absentee voting process.

In 2020, as part of their direct-mail programs, Plaintiffs sent voters in Georgia mailers that included the following components:  (1) an outer envelope with the voter's name and address; (2) a cover letter explaining the absentee-voting process; (3) an absentee-ballot application prefilled with a voter's name and address; and (4) a preaddressed postage-paid return envelope to the voter's county election office.  Id. at 91; [Plaintiffs' Exhibits 26, 27].  Plaintiffs always sent the mailers with all four parts and never sent absentee-ballot applications without the cover letters.  [Doc. 234, p. 111].  The parts of the mailers are discussed in more detail below.

The outer envelope was addressed to a specific individual rather than a current resident.  [Doc. 238, pp. 91–92].  Printed on the outer envelope was the

following language: "Vote at home ballot request form. Do not discard." Id.
According to Plaintiffs, they included this language so that voters would know that
there is a difference between an actual ballot and a ballot request form. Id. at 92.

Each mailer contained a cover letter. While not every cover letter was the
same, each cover letter generally explained the prefilled application and the return
envelope and encouraged the recipient to vote by mail. Id. at 93. The cover letters
mentioned that Plaintiffs included an absentee-ballot application to make
requesting an absentee ballot easy. Id. at 94. The cover letters, which explicitly
stated that Plaintiffs were nongovernmental entities, also included a disclaimer
which stated that "if you've already submitted a request for a ballot by mail . . . ,
there is no need to submit another request." [Plaintiffs' Exhibit 26].

The third part of the mailers were absentee-ballot applications prefilled with
some of the voters' personal information[8] and the date of the specific election. To
complete the application, voters were still required to input their date of birth and
signature. Id. Plaintiffs assert that prefilling the application made it easier for the
recipient to engage with the document. [Doc. 238, p. 98].

---

[8] The personal information included a voter's first name, last name and middle initial as
well as a voter's street address, city, zip code and county. [Doc. 238, p. 97].

Lastly, each mailer included a postage-paid return envelope preaddressed from the voter to the voter's county election office.  Id. at 99.  Plaintiffs included this envelope to make applying to vote absentee as easy as possible.  Id.

According to Plaintiffs, all parts of the mailers worked together to convey the following types of messages:  "we believe your voice is important in our elections"; "we want you to participate"; and "here are the tools you need to participate if you choose to vote by mail."  Id. at 69.  By sending the mailers, Plaintiffs contend that they were telling recipients that "we want you to vote."  Id. at 68.

For the 2020 election cycle,[9] which occurred during the Covid-19 pandemic, Plaintiffs sent approximately 9.6 million mailers to Georgia voters.  Id. at 70.  This was a substantial increase from the 950,000 sent for the 2018 election.  Id.  During the November 2020 general election, roughly 550,000 Georgia voters submitted absentee-ballot applications that Plaintiffs had mailed them.  Id.  For the January 2021 runoff election, 88,500 voters tendered absentee-ballot applications that they received from Plaintiffs.  Id. at 70–71.  Overall, Plaintiffs reported an 11.7% response rate to their mailers in 2020.  Id. at 79.

---

[9] The election cycle includes the primary, general and runoff elections.

Plaintiffs were not the only entities sending voters absentee-ballot applications in 2020. In fact, because of the Covid-19 pandemic and the corresponding increase of individuals wanting to vote by mail, the Secretary of State also sent out applications. [Doc. 239, pp. 126–27]. The Secretary of State thought that sending the absentee-ballot applications would help streamline the data entry process for county election officials because the Secretary of State's absentee-ballot applications had a barcode that the counties could scan which would directly input the voter's information. Id. at 127.

It is undisputed that voters lodged complaints about the prefilled absentee-ballot applications and duplicate applications. At trial, Defendants presented numerous examples of these complaints. Because many of the complaints are similar in nature, however, the Court does not address every complaint in the discussion that follows.

The prefilled absentee-ballot applications sparked confusion and concern about voter fraud, especially when the prefilled information was incorrect. By way of example, in 2018, a voter in DeKalb County complained as follows:

> Today I received mail at my home address from the Center for Voter Information addressed to Jeremy Stephen Smith. I have lived in this house for 13 years and can verify that this person has never lived at this address. I wanted to call it to your attention as possible voter fraud.

9

[Doc. 236, pp. 20–21].

Also in 2018, a voter from Fulton County lodged the following concern with the Secretary of State's Office:  "I received a prefilled . . . application for [an] absentee ballot . . . with my first and last name but a different middle name.  The name on the ballot is Michelle Zenovia Smith.  My name is Michelle Denise Smith.  I suspect this to be fraudulent voter registration."  Id. at 22.

In 2020, a Bibb County voter complained about receiving an unsolicited application.  That voter stated:

> I received an unsolicited application for an official absentee ballot from the Center for Voter Information with my name and address already completed, incorrect middle initial.  I did not request this, and I'm extremely displeased to receive this.  What if the form was sent to [an] incorrect address and someone tried to fill it out?  This should not be allowed and causes me great concern that possible voter fraud may result from these unsolicited mailings.

Id. at 23–24.

In another complaint, a Cobb County voter simply stated:  "My wife and I continually receive prefilled absentee ballot applications that we did not request.  Most of these multiple mailings are from the Center for Voter Information."  Id. at 25.  Notably, the voter explained that "[w]e have also been receiving the same type of unsolicited applications for a former resident at this address, Debbie Lee, who hasn't lived at this address for over 15 years or so."  Id.

As another example, a voter stated in an e-mailed complaint:

> Fourth piece of mail request for ballot runoff in Georgia sent to the same person who has never lived here.  Both the envelope and return envelope [have] her address as our address, but the request sheet has a different preprinted address.  This is rampant fraud.  The sending address is from the Voter Participation Center.

Id. at 32.

Voters complained or were confused about duplicate applications as well. For instance, voters wondered why they were receiving so many applications. [Doc. 239, p. 59].  Other voters thought they were receiving actual ballots—not applications.  Id. at 60.  Moreover, some voters who had already applied to vote absentee questioned whether there was a problem with their application since they received another application in the mail.  Id. at 59–60.  A group of voters even thought that receiving multiple applications indicated voter fraud because those voters assumed that they could send all the applications in, get multiple absentee ballots and vote each of those ballots.  Id. at 60.  Lastly, some voters simply complained about the number of absentee-ballot applications that they received. Id. at 76.

Voters were not the only individuals who expressed misgivings about the duplicate applications.  In fact, county officials complained too.  One county official contacted the Secretary of State's Office to express concern about the

number of ballots that would have to be canceled on election day as a result of groups like Plaintiffs sending out absentee-ballot applications.  Id. at 81.  Absentee ballots must be canceled if a voter has received an absentee ballot and presents to vote in person.  Id.  To cancel an absentee ballot, the poll worker must call the election office and confirm that the absentee ballot has not been returned.  Id. at 82.  If the absentee ballot has not been returned, the election office cancels the absentee ballot just in case that absentee ballot is returned later.  Id.  While this process is not overly complicated, it takes time, leading to longer lines and a "less smooth" voter experience.  Id.

## C.    The Ballot Application Provisions

Brian Kemp, the Georgia governor, signed S.B. 202 into law on March 25, 2021.  The bill contains the two provisions at issue in this case:  the Prefilling Provision and the Anti-Duplication Provision.  As stated previously, the Prefilling Provision provides that "[n]o person or entity . . . shall send any elector an absentee ballot application that is prefilled with the elector's required information." O.C.G.A. § 21-2-381(a)(1)(C)(ii).  Required information includes the elector's name, date of birth, address as registered, address where the elector wishes the ballot to be mailed and the elector's driver's license or identification card number.

Id. § 21-2-381(a)(1)(C)(i).  Failure to comply with the Prefilling Provision can result in either felony or misdemeanor charges.  Id. § 21-2-598.

The Anti-Duplication Provision states that "[a]ll persons or entities . . . that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff."  Id. § 21-2-381(a)(3)(A).  Simply put, the Anti-Duplication Provision prohibits a party from sending an absentee-ballot application to an individual who has already requested or voted an absentee ballot.  The Anti-Duplication Provision includes a safe harbor that states, "[a] person or entity shall not be liable for any violation of this subparagraph if such person or entity relied upon information made available by the Secretary of State within five business days prior to the date such applications are mailed."  Id.  Violations of the Anti-Duplication Provision are punishable by fines levied by the State Election Board (the "SEB").  Specifically, the SEB may impose a $100 fine per violation.  Id. § 21-2-381(a)(3)(B).

Defendants presented evidence that the legislature drafted the Ballot Application Provisions to address the previously discussed complaints and concerns stemming from the 2018 and 2020 elections.  [Doc. 239, pp. 85–87].  As an initial matter, both provisions were enacted to address voter confusion.

Reducing confusion is important because "confusion about the system . . . especially when it's a close election . . . can lead to a lack of confidence in the overall system." Id. at 96.  Similarly, reducing concerns over voter fraud is important to increase "confidence in the election results." Id. at 98.

As to the Prefilling Provision specifically, Defendants contend that it drastically reduced the number of canceled ballots.  Id. at 88.  Ryan Germany[10] testified that the Prefilling Provision was the best way to ensure that accurate information was placed on the absentee-ballot application.  Id. at 89.  As to the Anti-Duplication Provision, Defendants asserted that it decreased a county's burden of processing duplicate ballots and reduced complaints and the resulting confusion from voters receiving multiple applications.  Id. at 92.  Ultimately, Defendants set forth the following state interests in defense of the Ballot Application Provisions:  reducing voter confusion, enhancing voter confidence and increasing electoral efficiency.

## D.    Plaintiffs' Activities After March 2021

For the 2022 elections, which occurred after the passage of S.B. 202, Plaintiffs sent approximately one million mailers to Georgia voters.  [Doc. 234, p.

---

[10] Ryan Germany worked as general counsel of the Secretary of State's Office from 2014 until January 2023.  [Doc. 239, p. 36].  In that position, he took a lead role in drafting the Ballot Application Provisions.  Id. at 143–44.

33].  The response rate to these mailers was 3.12%.  Id.  In 2022, Plaintiffs changed their vote-by-mail programming in two ways.  First, to comply with the Prefilling Provision, Plaintiffs no longer prefilled absentee-ballot applications with the intended recipient's name and address.  Id. at 5.  Second, to comply with the Anti-Duplication Provision, Plaintiffs mailed only one wave of packages and sent those packages early in the election cycle so that they arrived on or as close as possible to the opening day of absentee voting in Georgia.[11]  Id. at 5–6.

<strong>CONCLUSIONS OF LAW</strong>

The Court now sets forth its conclusions of law.  The Court will first address the threshold issue of standing before proceeding to the merits.

**A.    Standing**

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  To satisfy this case-and-controversy requirement, litigants must have standing.  Lujan v. Defs. of

---

[11] The Court notes that the Anti-Duplication Provision does not limit the number of applications an entity can send so long as the voter has not already requested a ballot. Nevertheless, Plaintiffs chose to send only one wave of applications because they use a union printer with a slower printing process for the mailings.  Because of this slower printing process, Plaintiffs contend that they were unable to complete any additional mailings within the safe-harbor provision.  This evidence was not terribly persuasive in light of Defendants' witness who testified that such mailings could be completed within a shorter time period by a non-union printer.

Wildlife, 504 U.S. 555, 560 (1992).  The standing doctrine requires a plaintiff to show that it:  (1) suffered an injury-in-fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable judicial decision.  Id. at 560–61.  "These three elements 'are not mere pleading requirements but rather an indispensable part of the plaintiff's case.'"  Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections, 36 F.4th 1100, 1113 (11th Cir. 2022) (quoting Lujan, 504 U.S. at 561).

The Court recognizes that neither party addressed standing at the bench trial.[12]  However, "[f]ederal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute." Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1245 (11th Cir. 2020). Importantly, because the elements of standing are not mere pleading requirements, each standing element must be supported "with the manner and degree of evidence required at the successive stages of the litigation."  Lujan, 506 U.S. at 561.  "If an action proceeds to trial, the facts necessary to establish standing 'must be supported adequately by the evidence adduced at trial.'"  Jacobson, 974 F.3d at

---

[12] Because standing is a necessary threshold determination that must be made in every case, the Court directed the parties to file supplemental briefs regarding standing.

1245 (quoting Lujan, 506 U.S. at 561).  The Court will begin by discussing the injury-in-fact requirement before turning to traceability and redressability.

### 1. Injury-In-Fact

To establish an injury-in-fact, a plaintiff must show that it "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016).  "A 'concrete' injury is one that actually exists—it is 'real,' as opposed to 'abstract.'"  Ga. Ass'n of Latino Elected Offs., 36 F.4th at 1114. Where, as here, a plaintiff asserts that its First Amendment rights have been violated, the "fundamental question" is whether the law "objectively chills" protected expression.  Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1120 (11th Cir. 2022).  In cases like this, "a pre-enforcement First Amendment injury is typically realized by evidence of self-censorship."  Pernell v. Fla. Bd. of Governors, 641 F. Supp. 3d 1218, 1250 (N.D. Fla. 2022).  Stated differently, objective chill occurs where "operation or enforcement of the government policy would cause a reasonable would-be speaker to 'self-censor.'"  Speech First, 32 F.4th at 1120 (internal citation omitted).

Given the potential penalties that Plaintiffs face for violations of the Ballot Application Provisions, Plaintiffs have self-censored their activities.  For instance,

fearing that they will be punished, Plaintiffs send less mail to Georgia voters.  In the past, Plaintiffs sent voters multiple mailers and now, because of the Anti-Duplication Provision, they only send one.  Moreover, Plaintiffs no longer prefill any of the applications.  Because Plaintiffs have self-censored their activities as a result of the Ballot Application Provisions, the Court finds that Plaintiffs have demonstrated the objective chill necessary to establish that they have suffered an injury-in-fact.  See Moms for Liberty v. Brevard Pub. Schs., 118 F.4th 1324, 1331 (11th Cir. 2024) (holding that the injury requirement was satisfied where the plaintiffs self-censored their comments or avoided speaking at all).

### 2.  Traceability and Redressability

"When traceability and redressability are at stake, the key questions are who caused the injury and how it can be remedied." City of South Miami v. Governor, 65 F.4th 631, 640 (11th Cir. 2023).  For traceability, the Eleventh Circuit Court of Appeals has held that "[t]he injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" Ga. Ass'n of Latino Elected Offs., 36 F.4th at 1115–16 (quoting Lujan, 504 U.S. at 560–61).  Stated another way, traceability requires that the injury must have been caused by the defendant's actions.  Finn v. Cobb Cnty. Bd. of Elections & Registration, 682 F. Supp. 3d 1331, 1339 (N.D. Ga.

2023).  Redressability is a closely related concept, and traceability and redressability often "travel together."  <u>Support Working Animals, Inc. v. Governor of Fla.</u>, 8 F.4th 1198, 1201 (11th Cir. 2021).  To show redressability, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'" of the court.  <u>Lujan</u>, 504 U.S. at 561 (quoting <u>Simon v. E. Ky. Welfare Rts. Org.</u>, 426 U.S. 26, 38 (1976)).  Particularly relevant here, "[t]o establish traceability and redressability in a lawsuit seeking to enjoin a government official from enforcing the law, a plaintiff must show 'that the official has the authority to enforce the particular provision [being] challenged, such that [the] injunction prohibiting enforcement would be effectual.'"  <u>Dream Defs. v. Governor of the State of Fla.</u>, 57 F.4th 879, 888–89 (11th Cir. 2023) (quoting <u>Support Working Animals</u>, 8 F.4th at 1201).

### i.    The Prefilling Provision

The Court will first address traceability and redressability with respect to the Prefilling Provision.  Although not raised at trial, Defendants contend in their post-trial briefing that Plaintiffs cannot meet their burden to show traceability or redressability because Plaintiffs have not sued any prosecutorial officials.  As stated previously, failure to comply with the Prefilling Provision could result in misdemeanor or felony charges.  [Doc. 243, pp. 6–7].  Defendants argue that

"[b]ecause Plaintiffs opted not to name any [prosecutors] as defendants, Eleventh Circuit precedent confirms that Plaintiffs would still face [a] significant threat of injury even if the Court were to enjoin the [SEB] and the Secretary of State from enforcing the Prefilling [Provision]."  [Doc. 254, p. 5].  Defendants assert that "nothing in the trial record suggests that enjoining [them] would do anything to prevent a district attorney or solicitor general from investigating and prosecuting Plaintiffs for misdemeanor violations of the Prefilling [Provision]."  Id. at 14. Plaintiffs, on the other hand, argue that they have established traceability and redressability because Defendants have primary responsibility for initiating investigations, pursuing enforcement actions and referring violations of election law to either the Attorney General or the appropriate district attorney who is responsible for further investigation and prosecution.  In short, while Plaintiffs recognize that the Attorney General and district attorneys may have independent authority to bring criminal charges for alleged violations of the Prefilling Provision, Plaintiffs contend that "in practice, criminal prosecutions of violations of Georgia election law often originate with a referral from the [SEB]."[13]  [Doc.

---

[13] The Eleventh Circuit noted that a similar standing argument had "glimmers of potential."  Polelle v. Fla. Sec'y of State, 131 F.4th 1201, 1229 (11th Cir. 2025).  The court did not consider the argument, however, because it was raised for the first time on appeal.

253, p. 9].  Essentially, this Court must decide whether Plaintiffs have standing to sue Defendants, who are not the ultimate enforcers of the law, but who nonetheless play a part in the causal chain that leads from violation to most prosecutions.

The Court will begin by addressing the traceability requirement.  As stated previously, "standing requires that the plaintiff's injuries be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"  Walters v. Fast AC, LLC, 60 F.4th 642, 650 (11th Cir. 2023).  While traceability "is not an exacting standard," the "requirement is not toothless."  Id.  At the very least, a plaintiff must demonstrate "factual causation between his injuries and the defendant's misconduct," and traceability is lacking "if the plaintiff 'would have been injured in precisely the same way' without the defendant's alleged misconduct."  Id. (emphasis omitted).

It is undisputed that Defendants cannot bring a misdemeanor or felony charge for violations of the Prefiling Provision.  Importantly, however, a plaintiff need not show that "the defendant's actions are the very last step in the chain of causation."  Wilding v. DNC Servs. Corp., 941 F.3d 1116, 1126 (11th Cir. 2019). Here, Plaintiffs argue that they have shown traceability because prosecutions "often originate" from Defendants referring cases to prosecutors.  [Doc. 253, p. 9]. In the Court's view, this is sufficient to show traceability.  Plaintiffs' harm in this

case comes not from a prosecution itself, "but from the threat of [prosecution] and their adaptation of their activities to avoid [prosecution]." Fla. State Conf. of Branches & Youth Units of NAACP v. Byrd, No. 23cv215, 2024 WL 2668694, at *3 (N.D. Fla. Jan. 12, 2024). Because Defendants play a role (namely, investigating and referring cases for prosecution) in the process that could result in prosecution, the Court finds that Defendants are part of the reason that Plaintiffs have altered their behavior. Id. "The mere availability of other potential causal chains does not" alter this conclusion. Id. at *5. The traceability requirement is thus satisfied.

As to redressability, a plaintiff must demonstrate that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Support Working Animals, 8 F.4th at 1205. In deciding whether the redressability requirement is satisfied, a court must first analyze "whether a decision in a plaintiff's favor would 'significant[ly] increase . . . the likelihood' that [it] 'would obtain relief that directly redresses the injury' that [it] claims to have suffered." Lewis v. Governor of Ala., 944 F.3d 1287, 1301 (11th Cir. 2019). "Second, 'it must be the effect of the court's judgment on the defendant'—not an absent third party—'that redresses the plaintiff's injury, whether directly or indirectly.'" Id. (emphasis omitted). Importantly, "a plaintiff's injury isn't

redressable by prospective relief where other state actors, who aren't parties to the litigation, would remain free and clear of any judgment and thus free to engage in the conduct that the plaintiffs say injures them." Support Working Animals, 8 F.4th at 1205.

Plaintiffs contend that they have presented sufficient evidence to show "a substantial likelihood of redressability." [Doc. 255, p. 15]. In other words, Plaintiffs assert that an injunction against Defendants would substantially increase the likelihood that enforcement of the Prefilling Provision would be curtailed. The Court agrees. In this case, Plaintiffs presented evidence that the majority of prosecutions of election law begin with investigations and referrals from Defendants. Defendants, on the other hand, presented only one example of a prosecution that originated separate and apart from an investigation or referral from Defendants.[14] Therefore, enjoining Defendants from investigating or referring violations to prosecutors "would increase the likelihood that Plaintiffs obtain relief." Byrd, 2024 WL 2668694, at *5. In the Court's view, without Defendants investigating prefiled applications or referring those cases for prosecution, Plaintiffs "would face a reduced threat" of prosecution. Id. Because

---

[14] In that case, the Fulton County District Attorney, Fani Willis, indicted President Donald J. Trump and eighteen co-defendants. [Doc. 254, p. 14].

this reduction in threat "affords at least partial relief," the Court finds that Plaintiffs have established redressability.[15]  Id.

### ii.    The Anti-Duplication Provision

As to the Anti-Duplication Provision, the traceability and redressability analysis is not as complicated because potential criminal penalties are not involved.[16]  Instead of criminal penalties, violations of the Anti-Duplication Provision are punishable by a $100 fine levied by the SEB.

Plaintiffs assert that they have met their burden to show traceability because Defendants have enforcement authority. In this case, the evidence showed that the SEB has the authority to levy a $100 fine for violations of the Anti-Duplication Provision.  The evidence further demonstrated that the Secretary of State plays an active role in investigating violations of election law and refers those violations to

---

[15] Other cases support this conclusion.  See Brooklyn Branch of the NAACP v. Kosinski, 735 F. Supp. 3d 421, 441 n.5 (S.D.N.Y. 2024) ("That the State Board lacks the ultimate authority to prosecute is beside the point where it has statutory authority to investigate and refer violations for prosecutions."); see also N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections, No. 20CV876, 2020 WL 6488704, at *6 (M.D.N.C. Nov. 4, 2020) ("[E]njoining [the defendants] from enforcement of the challenged statute would necessarily prohibit them from investigating or referring for prosecutions any violation of the statute;" and therefore "[t]here can be no question that enjoining [the defendants] would be a tangible benefit to [the plaintiffs].").

[16] Defendants do not challenge Plaintiffs' standing to bring claims regarding the Anti-Duplication Provision.

the SEB for enforcement.  Given Defendants' roles in enforcing the Anti-Duplication Provision, the Court finds that Plaintiffs have established the traceability element.

As to redressability, the Court is persuaded that an order enjoining Defendants from using their investigative and enforcement powers on any individual who sends duplicate absentee-ballot applications will meaningfully address Plaintiffs' injury.  Indeed, enjoining Defendants would remove the threat of fines for those who send duplicate applications.  In sum, the Court finds that Plaintiffs have met their burden to show redressability with respect to the Anti-Duplication Provision.

**B.    Merits**

Having established that Plaintiffs have standing to bring this action, the Court now turns to the merits of Plaintiffs' claim.  Plaintiffs allege that the Ballot Application Provisions violate their rights to free speech.  In analyzing the claim, the Court must determine whether sending prefilled and duplicate absentee-ballot applications is protected speech and what level of scrutiny applies.  Once the Court

decides the appropriate level of scrutiny, the Court must then apply that scrutiny to the Ballot Application Provisions.

### 1.    Speech

Plaintiffs contend that prefilling and mailing absentee-ballot applications to voters is speech protected by the First Amendment.  "The First Amendment prohibits the political restriction of speech in simple but definite terms:  Congress shall make no law . . . abridging the freedom of speech." Otto v. City of Boca Raton, 981 F.3d 854, 860 (11th Cir. 2020) (citation modified).  As the party invoking the First Amendment's protection, Plaintiffs have the burden to prove that the First Amendment applies.  Voting for Am., Inc. v. Steen, 732 F.3d 382, 387–88 (5th Cir. 2013).  In this case, Plaintiffs argue that the absentee-ballot applications, which are prefilled and mailed to prospective voters, are pure speech protected by the First Amendment because they contain written words. Defendants, on the other hand, claim that only conduct is at issue because Plaintiffs mail the applications.  The critical issue that the Court must decide is whether mailing the applications is speech or conduct.

In deciding this issue, VoteAmerica v. Schwab, 121 F.4th 822 (10th Cir. 2022), is instructive.  In VoteAmerica, the plaintiffs lodged a First Amendment challenge to a Kansas law that prohibited private parties from partially prefilling

absentee-ballot applications before sending them to registered voters.  Id. at 826–

27.  Finding that mailing prefilled applications was, in and of itself, protected

speech, the court made several observations.  Id. at 836.  First, the court found it

significant that the prefilled applications included some words chosen by the

plaintiffs that were written on a page.  Id.  The court stated that "the very fact that

prefilling the application adds words written on a page by [the plaintiffs] creates a

strong presumption that [the plaintiffs] engaged in speech under the First

Amendment."  Id.  Second, the court pointed out that mailing the applications does

not "somehow transform" the plaintiffs' activity from "speech" into "conduct."  Id.

The court noted that "[w]hether government regulation applies to creating,

distributing, or consuming speech makes no difference to First Amendment

analysis."  Id.  Third, the court was not persuaded by the defendants'

characterization of the speech as mere information.  Id. at 837.  The court

explained that it was "not aware of any recognized exception to treating

information as speech."  Id.  Fourth, the court rejected the defendants' arguments

that the prefilled applications were not entitled to First Amendment protection

because the prefilled applications did not express a clear message.  Id. at 838.

Instead, the court determined that it did not need to decide whether a reasonable

observer would discern any sort of message because that test is only relevant when

analyzing whether conduct is expressive.  Id.  In sum, the court held that prefilling the applications was speech because "there is no denying that [the applications] communicate *information*," and the "communication of even simple information is entitled to First Amendment protection."[17]  Id.

The Court finds the reasoning of the Tenth Circuit Court of Appeals persuasive and therefore concludes that prefilling and mailing absentee-ballot applications is pure speech protected by the First Amendment.  By prefilling and distributing the absentee-ballot applications to potential voters, Plaintiffs are conveying information to voters.  The absentee-ballot applications, whether prefilled or not:  (1) explain that the failure to provide accurate information may delay the processing of the application; (2) inform the reader of the deadline in which the application must be received by the election office in order to vote absentee; and (3) warn the recipient that signing the oath on behalf of another is punishable by a fine or imprisonment.  The applications also contain information as to what types of identification are permissible to vote absentee and explain how and where to return the form.  Because the applications communicate written

---

[17] The Fifth Circuit Court of Appeals has recognized that "distributing voter registration forms" is "constitutionally protected speech."  Steen, 732 F.3d at 389 (citation modified).  In the Court's view, handing out a voter registration form is not meaningfully different from mailing an application to vote absentee.  Both forms convey information to voters.

information, the Court finds that they are speech within the meaning of the First Amendment.[18]  See Giebel v. Sylvester, 244 F.3d 1182, 1186–87 (9th Cir. 2001) (holding that "words communicating information are 'speech' within the meaning of the First Amendment").

As stated previously, Defendants assert that Plaintiffs are merely engaged in conduct when they prefill and mail the application forms.  The Eleventh Circuit has recognized that governments occasionally assert conduct-not-speech defenses because "if the [law] restrict[s] only non-expressive conduct, and not speech, then [it] would not implicate the First Amendment at all."  Otto, 981 F.3d at 861.  In other words, "the comparative freedom to regulate conduct sometimes tempts political bodies to try to recharacterize speech as conduct."  Honeyfund.com Inc. v. Governor, 94 F.4th 1272, 1278 (11th Cir. 2024).  Crucially, the Eleventh Circuit has warned that "the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation."  Otto, 981 F.3d at 861.  Indeed, characterizing speech as conduct is

---

[18] Plaintiffs in the instant case also argue that the entire mailer should be considered a unified package of speech.  In other words, Plaintiffs contend that the applications are "characteristically intertwined" with the cover letters, and because the cover letters are protected speech, the applications are also protected speech. [Doc. 243, p. 107, 111–12].  Given this Court's finding that the applications themselves are protected speech, the Court need not decide this issue.

a "dubious constitutional enterprise" and a "losing constitutional strategy."

Honeyfund.com, 94 F.4th at 1278.

In explaining why characterizing speech as conduct is a "dubious constitutional enterprise," the Eleventh Circuit referenced two cases from the United States Supreme Court:  Cohen v. California, 403 U.S. 15 (1971), and Bartnicki v. Vopper, 532 U.S. 514 (2001).  In Cohen, a defendant was convicted of violating a state law prohibiting offensive *conduct* after he wore a jacket that contained the words "F*CK the Draft."  403 U.S. at 16.  The Supreme Court overturned the conviction on First Amendment grounds because the "only 'conduct' which the State sought to punish [was] the fact of communication"—*i.e.*, the communication derived from the words on the shirt.  Id. at 18.  "Thus, we deal here with a conviction resting solely upon speech, not upon any separately identifiable conduct which allegedly was intended by [the defendant] to be perceived by others as expressive of particular views but which, on its face, does not necessarily convey any message."  Id.  As explained by the Eleventh Circuit, the conduct of "putting on the [jacket] was not the issue; it was the message

communicated by the [jacket]." Otto, 981 F.3d at 866. In short, because the jacket contained words, wearing the jacket was considered pure speech, not conduct.

Bartnicki involved a civil action whereby members of the media were sued for intentionally disclosing an intercepted phone conversation in violation of a statute that made it illegal to "intentionally disclose[ ] . . . to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(c). The media defendants argued that they could not be liable because the disclosure of the intercepted phone conversation was protected speech. The Supreme Court agreed and held that "the naked prohibition against *disclosures* is fairly characterized as a regulation of pure speech." Bartnicki, 532 U.S. at 526 (emphasis added). The Court explained that "it is true that the delivery of a tape recording might be regarded as conduct, but given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects." Id. at 527 (citation modified). Notably, the Supreme Court held that "if the acts of disclosing and

publishing information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."  Id.

The Eleventh Circuit has set forth the following guidance to determine whether a regulation restricts speech or conduct:

> When the conduct-not-speech defense is raised, courts need tools to distinguish between the two.  One "reliable way" to sort them out is to "ask whether enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated."  In other words, we ask whether the message matters, or just the action.  When the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech.  And that means we treat it just like any other content-based speech restriction under the First Amendment.

Honeyfund.com, 94 F.4th at 1278 (internal citations omitted).

The tool identified above is helpful in resolving whether the Ballot Application Provisions regulate speech or conduct.  Here, any enforcer of the Ballot Application Provisions must examine the content of what is being mailed to know whether a violation of the law has occurred.  In other words, the enforcer must analyze whether Plaintiffs have mailed an application form (instead of another document) and whether it has been prefilled.  In this way, the message itself matters—not just the conduct.  If only the conduct mattered, the mailing of

any information would be prohibited. Instead, it is only the mailing of certain documents that is restricted.

Ultimately, because the Ballot Application Provisions target the content of what is being mailed, Defendants' conduct-not-speech defense fails. As such, this Court finds that Plaintiffs are engaged in pure speech when they mail or otherwise distribute the absentee-ballot applications to prospective voters. To be sure, if the act of mailing written information does not constitute speech, "it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."[19] Bartnicki, 532 U.S. at 527.

## 2.    Level of Scrutiny

The Court must now determine what level of scrutiny applies. In the context of election-related laws that burden constitutional rights, courts often struggle to determine which level of scrutiny is appropriate. Indeed, one court described the struggle as a "bewildering array of standards to choose from." League of Women

---

[19] Because the Court finds that mailing absentee-ballot applications is speech, the Court need not address whether it is also protected expressive conduct.

Voters v. Hargett, 400 F. Supp. 3d 706, 721–22 (M.D. Tenn. 2019).  It is thus no surprise that the parties in this case cannot agree on the applicable standard.

Plaintiffs contend that strict scrutiny applies because the Ballot Application Provisions regulate speech based on content.  A law is content based if it, among other things, "applies to particular speech because of the topic discussed or the idea or message expressed."  Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015).  "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  Id.  The Eleventh Circuit has held that "one reliable way to tell if a law restricting speech is content-based is to ask whether enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated."  Otto, 981 F.3d at 862 (citation modified).

As previously stated when analyzing Defendants' conduct-not-speech defense, an enforcer of the Ballot Application Provisions would only know that a violation occurred if he looked to the content of the mailers.  Under these circumstances, "[t]he answer to the content-based-or-not question turns out to be" relatively straightforward because a violation of the ordinance depends on what is mailed.  Id. at 861; see also VoteAmerica, 121 F.4th at 850 (stating that the

restriction against prefilling "prohibits certain content on its face" because it "applies only to speech with a certain communicative content"). Because an enforcer of the Ballot Application Provisions would have to analyze the content of the message to determine if a violation occurred, this Court finds that the Ballot Application Provisions regulate speech based on content.[20]

Defendants contend that even if the law is content based, intermediate scrutiny should apply because the Ballot Application Provisions are "among the narrow group of content-based but viewpoint-neutral regulations subject only to intermediate scrutiny."[21]  [Doc. 261, p. 2].  To support their argument, Defendants cite to Wacko's Too, Inc. v. City of Jacksonville, 134 F.4th 1178, 1186–88 (11th

---

[20] Plaintiffs also argue that strict scrutiny applies because the Ballot Application Provisions restrict core political speech.  Strict scrutiny applies regardless of whether the law burdens core political speech or speech based on content.  Because the Court is satisfied that the Ballot Application Provisions are content-based regulations, the Court need not address the core political speech issue.

[21] In VoteAmerica, the Tenth Circuit recognized that the Supreme Court has never applied something less than strict scrutiny to a situation like this one.  121 F.4th at 848.  Nevertheless, the court determined that "adequate protection is provided by intermediate scrutiny" because "the threat to free speech posed by the [prohibition] is sufficiently small."  Id. at 850.  This Court is unaware of any similar precedent in the Eleventh Circuit; thus, it declines to follow suit.

Cir. 2025), and <u>McDonough v. Garcia</u>, 116 F.4th 1319, 1329 (11th Cir. 2024).  The
Court discusses <u>Wacko's</u> first.

In <u>Wacko's</u>, the court analyzed a statute that prohibited erotic dancers under
the age of twenty-one from performing in adult-entertainment establishments.  134
F.4th at 1181.  The establishment owners argued that the statute should be subject
to strict scrutiny because the statute was content based.  <u>Id.</u> at 1187.  While the
Eleventh Circuit agreed that the statute was content based, it nevertheless applied
intermediate scrutiny because the regulation targeted the "undesirable secondary
effects of protected expression."  <u>Id.</u>  Importantly, the Eleventh Circuit limited its
holding to "cases specifically involving adult-entertainment establishments."  <u>Id.</u>
Given that limitation, this Court finds that <u>Wacko's</u> does not change the outcome
here or reduce the scrutiny required in this case.

Defendants also cite to <u>McDonough</u> to support their assertion that
intermediate scrutiny applies to some content-based but viewpoint-neutral
regulations.  In <u>McDonough</u>, the court analyzed what level of scrutiny should
apply to a person banned from city hall.  116 F.4th at 1319.  Ultimately, the court
found that in a limited public forum, intermediate scrutiny applies where
regulations are reasonable and viewpoint neutral.  <u>Id.</u> at 1321.  Because the instant
case does not involve a limited public forum, this Court finds <u>McDonough</u>

inapposite and not persuasive to show that the Court should apply intermediate scrutiny.

### 3.    Application of Strict Scrutiny

When a law is content based, as is the case here, strict scrutiny is the appropriate standard of review.[22]  Weaver v. Bonner, 309 F.3d 1312, 1319 (11th Cir. 2002).  As a general rule, strict scrutiny is a demanding standard and requires the restriction to be "narrowly tailored to serve compelling state interests."  Town of Gilbert, 576 U.S. at 163.  To overcome strict scrutiny, the challenged regulation must be the "least restrictive means" of accomplishing the government's compelling interest, meaning that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."  United States v. Playboy Ent. Grp., 529 U.S. 803, 813 (2000).  Defendants bear the burden of proof

---

[22] The Court declines Defendants' invitation to apply the Anderson-Burdick framework because applying it to a statute regulating speech would be "unlike any law that [the Eleventh Circuit] or the Supreme Court has ever evaluated" using the framework. Jacobson, 974 F.3d at 1262 (explaining that the framework is typically used only to evaluate laws that burden voting or associational rights).  The Third, Sixth and Tenth Circuits have already rejected the argument that Anderson-Burdick applies in a situation like this.  Mazo v. New Jersey Sec'y of State, 54 F.4th 124, 136–43 (3d Cir. 2022); Lichtenstein v. Hargett, 83 F.4th 575, 589–94 (6th Cir. 2023); VoteAmerica, 121 F.4th at 839–43.

to show that the Ballot Application Provisions are narrowly tailored to serve a compelling governmental interest.  Town of Gilbert, 576 U.S. at 171.

While the Court recognizes the demanding nature of the strict scrutiny standard, the Court notes that the standard is not impossible to satisfy.  See Williams-Yulee v. Fla. Bar, 575 U.S. 433, 444 (2015) (collecting cases where statutes survive strict scrutiny).  Critically, the Supreme Court has explicitly dispelled the notion that strict scrutiny is "strict in theory, but fatal in fact." Adarand Constructors, Inc v. Pena, 515 U.S. 200, 237 (1995).  In this Court's view, if strict scrutiny means "'incapable of being overcome' upon any balancing process, then, of course, the test merely announces an inevitable result, and the test is no test at all."  Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 188 (1979) (Blackmun, J., concurring).  In the analysis that follows, this Court will first address whether Defendants have shown a compelling governmental interest before turning to whether the Ballot Application Provisions are narrowly tailored.

### i.    Compelling Governmental Interest

In this case, Defendants assert that the following interests justify the Ballot Application Provisions:  (1) reducing voter confusion; (2) enhancing voter confidence; and (3) increasing electoral efficiency.  The interests set forth by

Defendants are all interrelated, meaning that if voters are less confused, then elections will be more efficient. Moreover, voters will also have more confidence in elections if they are less confused.

Defendants contend that the Anti-Duplication Provision furthers the State's interests because duplicate applications cause tremendous voter confusion and increase burdens on election workers, especially on election day. Indeed, Defendants explain that the "problem" with duplicate applications is not so much duplicative mailing to voters in general, "but rather duplicate mailings to those voters who have already requested and received an absentee ballot." [Doc. 238, p. 44]. It is these voters, according to Defendants, who "create the additional burden on election officials of having to process multiple applications from the same person." Id. These voters also suffer from confusion because they believe that there may be a problem with their initial application. Ultimately, Defendants assert that these voters—not every voter who receives a duplicate application— create the greatest administrative burdens on the state and are the most likely to be confused or troubled by receiving an additional application.

Defendants contend that the Prefilling Provision primarily advances the State's interest in election integrity. Defendants presented evidence that voters raised concerns about fraud when they received prefilled applications. The

evidence showed that voters were alarmed when they received an application form that was prefilled with errors or when it contained someone else's information entirely. Notably, the trial evidence further demonstrated that voters voiced concerns even where the prefilled applications contained correct information. These voters were worried that others could simply use their application form to vote absentee since all the required information was already filled out. Some voters were also concerned that the application form contained information that they viewed as private.

As explained above, Defendants assert that the Ballot Application Provisions were designed to reduce voter confusion, enhance voter confidence and increase electoral efficiency. Based on the testimony presented at trial, the Court has little trouble finding that these are compelling governmental interests. See Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 197 (2008) ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process."); New Ga. Project v. Raffensperger, 976 F.3d 1278, 1282 (11th Cir. 2020) (suggesting that the state has a compelling interest in maintaining an efficient election process); Green Party of Ga. v. Kemp, 171 F. Supp. 3d 1340, 1365 (N.D. Ga. 2016) ("The Supreme Court and the Eleventh Circuit have consistently recognized that limiting voter confusion

is an important state interest.").  Accordingly, Defendants have met their burden as to the first prong of the strict scrutiny analysis.

    **ii.**    **Narrow Tailoring**

The second prong of the strict scrutiny test requires courts to determine whether the statute at issue is narrowly tailored to achieve the compelling interests that the government advances.  As stated previously, narrow tailoring means that the government must employ the least restrictive alternative to further its interests. Playboy Ent. Grp., 529 U.S. at 813.  Narrow tailoring, however, is not synonymous with "perfect" tailoring.  Williams-Yulee, 575 U.S. at 454.  Notably, "the impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity" of elections.  Id. (citation modified).

In considering whether a statute is narrowly tailored, courts often consider the following:  (1) whether the law is overinclusive; (2) whether the law is underinclusive; and (3) the availability of less restrictive alternatives.  See Brown v. Ent. Merch. Ass'n, 564 U.S. 786, 805 (2011) (explaining that a law is not narrowly tailored if the law is "seriously overinclusive" or "seriously underinclusive"); Reno v. ACLU, 521 U.S. 844, 874 (1997) (holding that a law cannot be narrowly tailored if "less restrictive alternatives would be at least as

effective in achieving the legitimate purpose that the statute was enacted to serve"). The Court first analyzes whether the Ballot Application Provisions are overinclusive.

### a. Overinclusiveness

A law is overinclusive when it regulates "too much conduct." Otto, 981 F.3d at 879 (Martin, J., dissenting). Stated differently, a law is overinclusive if the statute "encompasses more protected conduct than necessary to achieve [the government's] goal." Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 578 (1993) (Blackmun, J., concurring).

Plaintiffs contend that the Prefilling Provision is overinclusive.[23] According to Plaintiffs, the Prefilling Provision sweeps in "far more expressive conduct than is necessary to address any issues arising from errors or mistakes in pre-filled applications." [Doc. 243, p. 140]. Plaintiffs specifically state that the Provision is overinclusive because it "is a complete prohibition of prefilling any information on the application—including accurate information derived from the state's voter file." Id.

In claiming that the Prefilling Provision is overinclusive, Plaintiffs seem to argue that the Provision should not restrict prefilling an application with correct

---

[23] Plaintiffs do not argue that the Anti-Duplication Provision is overinclusive.

information.  By making this argument, however, Plaintiffs ignore part of the problem that Defendants were attempting to address with the Prefilling Provision—that is, confusion from voters as to why their personal information was publicly available or concern that other people could use the prefilled application to vote.  Because the Prefilling Provision addresses concerns regarding incorrectly prefilled applications *and* correctly prefilled applications—both of which caused confusion and led to worries about election integrity—this Court finds that the Prefilling Provision is not overinclusive.[24]

### b.  Underinclusiveness

In addition to overinclusiveness, courts also typically consider whether a statute is underinclusive.  A statute is underinclusive if similar conduct that also threatens the compelling interest is left unregulated.  Town of Gilbert, 576 U.S. at 172.  Crucially, a law is not underinclusive because it does not entirely solve a problem.  In fact, "a State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns."  Williams-Yulee, 575 U.S. at 449.

---

[24] It is also worth noting that a requirement that Plaintiffs only prefill correct information—though of noble intent—is likely a distinction without a difference.  Before S.B. 202, Plaintiffs endeavored to fill in correct information but were unable to do so with 100% accuracy due to errors in the voter registration file.

Plaintiffs assert that the Anti-Duplication Provision is underinclusive.[25] Plaintiffs contend that the Provision is underinclusive because it does "not prevent voters from receiving multiple absentee ballot applications in the mail—whether from the same organization or different ones—prior to applying for an absentee ballot." [Doc. 243, p. 140]. Essentially, Plaintiffs argue that a certain number of voters "may still receive a potentially unlimited number of absentee ballot applications." Id. Plaintiffs thus claim that the Anti-Duplication Provision does not reduce voter confusion if "all of these other people could still receive duplicate mailers." [Doc. 238, p. 33].

As an initial matter, this Court recognizes that the Anti-Duplication Provision places no limitations on the number of absentee-ballot applications an individual can receive prior to making a request for an absentee ballot. Plaintiffs' argument, however, ignores two important issues. First, Plaintiffs fail to recognize that narrow tailoring has never required the government to address all the problems in a single regulation. In other words, the Court does not believe that Defendants were required to ban every duplicate application in order to survive strict scrutiny. Indeed, if Defendants did ban every duplicate, it would be difficult—if not impossible—for the law to avoid becoming *overinclusive*. Importantly, the

---

[25] Plaintiffs do not suggest that the Prefilling Provision is underinclusive.

evidence presented at trial indicated that the most pressing problem with duplicate applications concerned the duplicate applications sent to voters who had already requested an absentee ballot. Defendants chose to address this issue. Second, Plaintiffs ignore the specific problem that Defendants were addressing with the Anti-Duplication Provision. At trial, Defendants made clear that the Anti-Duplication Provision was not aimed at eliminating the entirety of the confusion caused by duplicate applications. The Provision's goal was to reduce the confusion and increase the confidence of voters who had already requested an absentee-ballot—voters who might have otherwise been inclined to either submit duplicate applications or worry that their initial applications were not accepted. [Doc. 244, pp. 62–63]; see also [Doc. 238, p. 44] ("It's those voters who create the additional burden on election officials of having to process multiple applications from the same person and of having to cancel an absentee ballot on election day."). Because the Anti-Duplication Provision directly addresses the primary confusion created by duplicate applications, this Court finds that it is not underinclusive.

### c. Less Restrictive Alternatives

A statute will not survive strict scrutiny "if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." Reno, 521 U.S. at 874. Consequently, a government is

prohibited from advancing a compelling interest "by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Lynch v. Baxley, 744 F.2d 1452, 1458–59 (11th Cir. 1984) (citation modified). "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." Playboy Ent. Grp., 529 U.S. at 816.

Plaintiffs offer the following less restrictive alternatives to the Ballot Application Provisions:  (1) adding a disclaimer; (2) requiring those distributing voter forms to use the form designed and published by the Secretary of State; (3) requiring those that prefill applications to use the information from the voter registration file; and (4) adding a scienter requirement for violations of the Anti-Duplication Provision.  The Court addresses each below.

Plaintiffs suggest that the Disclaimer Provision found in S.B. 202 already addresses any potential voter confusion caused by prefilling applications and mailing duplicate applications.  The Disclaimer Provision requires entities that send absentee-ballot applications to include the following language on the application:

> This application is being distributed by [insert name and address of person, organization, or other entity distributing such document or material], not by any government agency or any state or local election office.  THIS IS NOT A BALLOT.

O.C.G.A. § 21-2-381.  At most, the Disclaimer Provision reduces confusion as to who is distributing the application and whether the application is actually a ballot. The Disclaimer Provision, however, does nothing to address the primary problems that the Ballot Application Provisions sought to address.  For instance, the Disclaimer Provision does not reduce any of the confusion stemming from duplicate ballots.  Even with the Disclaimer Provision, voters who receive duplicate applications would still be concerned that something was wrong with their initial application, potentially leading them to submit multiple applications. The Disclaimer Provision also does not reduce concerns caused by prefilling errors.  In short, the Court finds that the Disclaimer Provision is not an effective less restrictive alternative.

In the event that a third party wants to send a voter an absentee-ballot application, S.B. 202 requires them to use the form designed and published by the Secretary of State.  Plaintiffs assert that because this provision operates to reduce confusion, it is a viable less restrictive alternative.  The Court recognizes that this provision reduces voter confusion that could arise from voters who receive applications that are visually or informationally distinct from the official forms. The provision does nothing, however, to address the problems caused by duplicate

or prefilled ballots.  As such, this requirement is not effective as a less restrictive alternative.

Plaintiffs further contend that a less restrictive alternative to the Ballot Application Provisions would be to require organizations that prefill forms to only use information found in the voter registration file.  Although this sounds like a reasonable suggestion, the evidence presented at trial showed that this will not operate to reduce errors in the applications because it is undisputed that the voter file contains errors.  Indeed, Plaintiffs relied on the voter file to prefill the applications in both the 2020 and 2022 elections, and yet, errors occurred.  Thus, even if the law required exclusive use of the voter file, individuals would continue to receive prefilled forms containing errors.  Moreover, this suggested alternative would only mitigate half of the problem the Prefilling Provision was designed to address because it would not ease the concerns of those voters who lodged complaints about applications that were prefilled with correct information.  A requirement that still allows prefilling but fails to address the other issues pertaining to correctly prefilled applications does not effectively address the compelling governmental interest.

Finally, Plaintiffs propose that adding a scienter requirement to the Anti-Duplication Provision would be an effective less restrictive alternative.  The Court

disagrees because Plaintiffs presented evidence that they have always endeavored to avoid sending duplicate applications to individuals who have already requested a ballot. [Doc. 235, pp. 60–61]. In the Court's view, a scienter requirement would not change anything at all, much less accomplish the ends of the Anti-Duplication Provision in a less restrictive manner. Ultimately, none of these proposed less restrictive alternatives would effectively achieve the governmental interests set forth in this case.

After careful consideration of the evidence presented at trial, the Court finds that Defendants demonstrated that the Ballot Application Provisions directly advance the compelling interests in a way that is neither overinclusive nor underinclusive. Moreover, Defendants further established that alternative measures would not achieve the compelling interests with comparable efficiency. Accordingly, the Court finds that Defendants have met their burden to show that the Ballot Application Provisions are narrowly tailored.

## CONCLUSION

For the reasons explained above, the Court finds that the Ballot Application Provisions are content-based restrictions on speech subject to strict scrutiny. While this Court certainly acknowledges that strict scrutiny imposes the highest level of constitutional review, strict scrutiny does not operate to invalidate all

governmental actions.  Indeed, this is "one of the rare cases in which a speech restriction withstands strict scrutiny."  Williams-Yulee, 575 U.S. at 444.  Here, Defendants advanced interrelated compelling governmental interests for the Ballot Application Provisions—namely, reducing voter confusion, enhancing voter confidence and increasing electoral efficiency.  Defendants also demonstrated that the Ballot Application Provisions are narrowly tailored to further those compelling governmental interests.  Because Defendants established narrow tailoring with respect to a compelling governmental interest, this Court finds that the Ballot Application Provisions do not violate the First Amendment.  The Court thus finds in favor of Defendants.  The Clerk is **DIRECTED** to close this case.

SO ORDERED this 8th day of September, 2025.

J. P. BOULEE
United States District Judge